E-FILED
Friday, 12 February, 2016  04:06:01 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| BEVERLY THROGMORTON, et al., | ) | |
| | ) | Case No. 3:12-cv-3087 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Richard Mills |
| Lincoln Correctional Center Former Assistant | ) | |
| Warden REYNOLDS in his individual capacity, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

### PLAINTIFFS' RESPONSE TO DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

Plaintiffs, through their counsel, Loevy & Loevy, respond as follows to Defendants'

Motion for Summary Judgment (Dkt. No. 103):

### INTRODUCTION

In March 2011, Defendants[1] orchestrated the mass public strip search of approximately

200 women at Lincoln Correctional Center during a so-called "training exercise" for cadets. The

facts amassed by the Plaintiffs in discovery demonstrate numerous ways in which the cadet

training exercise transgressed all bounds of decency. Defendants performed strip searches of

female prisoners in large groups and in full view of men and other non-participants to the

searches. Despite the public setting, Defendants forced Plaintiffs to stand naked, shoulder-to-

shoulder with other prisoners, for prolonged periods of time and in positions in which they had to

---

[1] Plaintiffs are not pursuing their claims against Defendants M. Brooks, Last, Bender, Boch, Brown, Dilley, Hinton, Johner, Kenney, Killam, Mathias, Rickord, Van Middlesworth, Warden, and Eddie Jones, and proceed only against Defendants Hulett, Reynolds, Dawdy, Craig, Edmonson, Johnson, Leonetti, Pfeiffer, Slater, Krull, Dallas, Anderson, Crudup, Butler, and Spaniol.

expose their breasts and genitals. Defendants used threatening and sexually derogatory language to humiliate and intimidate the prisoners, while ridiculing their naked bodies and body odors. Defendants instructed the cadets to place tight handcuffs on the prisoners, and forced them to stand for hours under threats and intimidation, without water, access to the bathroom, or regard for age or disability status. And Defendants made no accommodation for the strip searches of menstruating prisoners, resulting in non-hygienic and degrading conditions for all prisoners.

Defendants seek summary judgment on Plaintiffs' Fourth Amendment claims on the sole basis that Plaintiffs lack a Fourth Amendment right to privacy. Strip searches by government actors are among the most demeaning, dehumanizing, humiliating, and degrading invasions of privacy that exist in our society. In recognition of this reality, both the Fourth and Eighth Amendments afford certain rights against unconstitutional strip searches to prisoners, and courts require that even authorized strip searches be performed in a reasonable and respectful manner. Defendants' conduct – subjecting the Plaintiffs to such a terrifying, humiliating, degrading experience for the sole purpose of training cadets – implicates the Fourth Amendment and subjects Defendants to liability, and the Seventh Circuit has made clear that the cases upon which Defendants' rely do not stand for a contrary proposition.

Defendants also cannot escape liability for their misconduct by claiming that liability attaches to only those who performed strip searches. An omission or a failure to intervene suffices to violate civil rights when, as here, Defendants either directly participated in the misconduct or failed to intervene despite having an opportunity to do so. The various Defendant supervisors are also liable based on their knowledge of the misconduct and facilitation or approval of it; their act of turning a blind eye toward the misconduct; and, their disregard of known or obvious risks of constitutional violations that flowed from their failure to supervise

2

their subordinates. In addition, Plaintiffs present ample evidence from which a jury could infer that Defendants participated in a conspiracy to deprive the plaintiffs of their constitutional rights, further establishing their liability.

Finally, Defendants argue, without citation to any legal authority, that Plaintiffs cannot show they are entitled to injunctive relief. To dispose of this argument, this Court need look no further than Plaintiffs' evidence that a similarly problematic cadet training exercise occurred at Logan Correctional Center in 2013. Taking the facts in the light most favorable to the Plaintiffs, IDOC has a significant ongoing constitutional problem each time IDOC cadets conduct mass strip searches for training purposes in a manner that degrades, humiliates, and sexually harasses female inmates without a valid penological purpose. IDOC's stated policy and the manner in which it conducted the searches in this case – without any resulting discipline and without any regard for the numerous grievances filed by inmates – demonstrates the serious risk of ongoing harm to Plaintiffs and those similarly situated. This Court should accordingly deny Defendants' motion for summary judgment in full.

**PLAINTIFFS' RESPONSE TO DEFENDANTS' FACTS**

I.   **Undisputed Material Facts**

9.   Admitted.

18.   Admitted.

23.   Admitted.

25.   Admitted.

32.   Admitted.

35.   Admitted.

36.   Admitted.

## II.    Disputed Material Facts

1.      Admitted in part. The cadet training exercise was not "facility-wide." *See* Exhibit 1, Reynolds Dep. at 36:18-22, 45:3-15. Pasley goes on to say two of five housing units searched. Appear to be using shakedown to mean living areas. Exhibit 2, 2013 Pasley Dep. at 7:1-10. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶2; *Id.,* Decl. of Beverly Throgmorton at ¶2; Exhibit 1, Reynolds Dep. at 70:15-21. Exhibit 2, 2013 Pasley Dep. at 57:22-58:3.

2.      Admitted in part. As set forth in response to Material Fact #1 above, the cadet training exercise was not "facility-wide" because only two of five housing units were searched. Exhibit 1, Reynolds Dep at 36:18-22, 45:3-15, 70:15-21; Exhibit 2, 2013 Pasley Dep. at 7:1-10, 57:22-58:3; Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶2; *Id.,* Decl. of Beverly Throgmorton at ¶2.

3.      Denied. Pasley testified that this was a training exercise, and that one reason for the cadets being involved was to provide them with experience, meaning one purpose was for training. Exhibit 2, 2013 Pasley Dep. at 7:1-10, 76:16-77:8. Pasley testified that the "overall goal" was to remove and stop contraband. Pasley further testified that people outside the training academy decided where the cadets go and what the cadets do, but the cadets and training staff arrive with the purpose of finding contraband, and "then under the direction of the facility staff that's where we go into." *Id.* at 75:9-20.) The purpose of having cadets conduct mass shakedowns is "training driven," and for no other reason. Exhibit 4, Yurkovich Dep. at 19:3-9 ("Q: Am I correct to say that the purpose of having the cadets conduct a mass shakedown was to train them? A: Yes. Q: Were there any other reasons that they conducted mass shakedowns during the training? A: No. It's training driven."); Exhibit 5, Zavala Dep. at 11:22-12:17 ("So it's

4

for training, correct? A: For training, absolutely. Q: Is it for anything else or primarily for training cadets? A: It's for training."). The March 31, 2011 cadet training exercise was not driven by concerns regarding Lincoln's institutional security or employee or inmate safety. Exhibit 6, Hulett Dep. at 76:11-15 ("Question:. . . . Can you think of any reason other than the training of cadets that you ordered a shakedown on March 31st, 2011, at the Lincoln facility? Answer: I cannot."); *see also id.* at 91:1-9 ("If it was something major that was going on . . . I would think that, you know, I would be able to recall that."); Exhibit 7, Hatfield Dep. at 51:19-23.

Defendant Reynolds has stated that he requested the cadet training exercise because of an increase in contraband and assaults by prisoners of other prisoners and staff. Exhibit 1, Reynolds Dep. at 12:7-14, 17:1-9. However, the monthly reports regarding inmate management data show low levels of contraband and assaults in January 2011, February 2011, and March 2011 as compared with previous months. *See* Exhibit 8, Inmate Management Data, Affidavit, and Inmate Management Reports.

5.      Denied in part. Pasley testified that having cadets conduct strip searches furthers two goals: stopping contraband from being introduced, and training. Exhibit 2, 2013 Pasley Dep. at 76:16-77:8. Numerous other IDOC employees testified that the sole purpose of the mass shakedowns was for training. Exhibit 4, Yurkovich Dep. at 19:3-9 ("Q: Am I correct to say that the purpose of having the cadets conduct a mass shakedown was to train them? A: Yes. Q: Were there any other reasons that they conducted mass shakedowns during the training? A: No. It's training driven."); Exhibit 5, Zavala Dep. at 11:22-12:17 ("So it's for training, correct? A: For training, absolutely. Q: Is it for anything else or primarily for training cadets? A: It's for training."). The March 31, 2011 cadet training exercise was not driven by concerns regarding Lincoln's institutional security or employee or inmate safety. Exhibit 6, Hulett Dep. at 76:11-15

("Question:. . . . Can you think of any reason other than the training of cadets that you ordered a shakedown on March 31st, 2011, at the Lincoln facility? Answer: I cannot."); *see also id*. at 91:1-9 ("If it was something major that was going on . . . I would think that, you know, I would be able to recall that."); Exhibit 7, Hatfield Dep. at 51:19-23.

6.      Denied in part. Pasley testified that cadet classes had four weeks of training in report writing, strip searches, communication skills, and then right before the actual shakedown had a short briefing on basic report writing skills, shakedown procedures, handcuffing procedures, and "verbal aspects of professionalism." Exhibit 2, 2013 Pasley Dep. at 9:16-10:16.

7.      Denied. Pasley testified that the training academy talked to the Chief of Operations about "where they would like us to go for these searches," not what facilities needed a shakedown. Exhibit 2, 2013 Pasley Dep. at 7:11-19.

8.      Denied. Pasley's deposition never provided a basis for his knowledge of what the Chief of Operations was thinking when they made decisions, so his opinion is inadmissible and lacking foundation. Moreover, Pasley testified that to determine where to send training cadets for searches the Chief of Operations considered (1) travel limitations based on location and weather; (2) current issues that gave certain facilities a specific need; (3) inmate intelligence; and (4) need, "such as the fact that maybe it hadn't been done for a specific amount of time." Exhibit 2, 2013 Pasley Dep. at 8:7-18.

10.     Admitted in part, denied in part. Deny that this was a facility-wide shakedown, since only some living units were searched. Exhibit 2, 2013 Pasley Dep. at 7:1-10.

11.     Denied. Routine shakedowns and tactical team shakedowns are not typically accompanied by strip searches. Exhibit 6, Hulett Dep. at 74:11-75:13; Exhibit 1, Reynolds Dep. at 27:10-19, 32:14-33:3.

13.     Admitted in part and denied in part. Pasley testified that cadets were told to look for expired medication and "general nuisance contraband such as, you know, too many sheets, too much commissary, things along that line." Exhibit 2, 2013 Pasley Dep. at 38:18-39:4.

16.     This statement of fact is so vague and poorly defined that it cannot be admitted or denied. Mr. Zavala testified that it was possible to search cellmates one at a time, but if there were time constraints, "time is not on your side." Mr. Zavala therefore testified that saving time might impact whether to search cellmates together or separately, but did not testify to "time constraints" impacting the method of searching beyond that situation. Exhibit 5, Zavala Dep. at 58:6-22.

17.     Denied. Pasley testified that the faster a strip search is conducted, "the less of a burden we create on the offenders, it lessens the burden on the staff who have to deal with the offender." Exhibit 2, 2013 Pasley Dep. at 93:3-23. Pasley was therefore testifying that the faster the shakedown, the more human because it lessened the burden on staff who have to deal with the inmates. *Id.*

19. This statement is vague and ambiguous and therefore impossible to admit or deny. It is unclear what is meant in this statement by "subject to discipline." Plaintiffs admit that IDOC policies prohibit making rude or derogatory comments to an inmate. However, in the search at issue in this case, correctional staff made numerous rude and derogatory comments to inmates. During the strip searches, correctional staff made demeaning references to gender and sexually derogatory insults, such as calling the plaintiffs "bitches" and "dirty bitches" and remarking: "No man wants to be with you because you smell like death." *See, e.g.*, Exhibit 9, 2013 Class Member Declarations at P98 (Decl. of Teresa Williams, ¶7), P34 (Decl. of Stacey Bennick, ¶7), P36 (Decl. of Iesha Brown, ¶7), P64 (Decl. of Jacqueline Hegwood, ¶7), P66 (Decl. of Delores

Henry, ¶7), P68 (Decl. of Amanda Hunt, ¶7). Correctional staff including Defendant Slater made derogatory comments and gestures about Plaintiffs' bodies and odors during the strip searches. *See, e.g.*, Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton at ¶22; Exhibit 9, 2013 Class Member Declarations at P44, Declaration of Michelle Clopton ("I remember the corrections officers making rude comments about some of the women's body odors, weight, and personal appearance"); P60, Declaration of Tina Grobe ("Your pussy stinks."); P88, Declaration of Shawna Turner ("These women are nasty and they smell."); P98, Declaration of Teresa Williams ("These bitches stink."); P46, Declaration of Amanda Conne ("You all are fucking disgusting."); P90, Declaration of Joanne Wade ("I can't believe women smell like this."). During the strip searches, Defendant Crudup put a cloth over her mouth and made comments like, "you bitches stink." Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶18, Decl. of Beverly Throgmorton at ¶22 ("One of the corrections officers put some sort of cloth over her nose and mouth and made insulting comments about the odor of women being strip searched."). Despite this, not a single cadet, corrections officer, training specialist, or administrator raised and reported concerns during the March 2011 cadet training exercise at Lincoln. Exhibit 1, Reynolds Dep. at 116:21-117:6; Exhibit 7, Hatfield Dep. at 61:23-63:1. No internal investigation was completed of the March 2011 cadet training exercise, and not a single employee received any discipline in connection with the cadet training exercise. Exhibit 1, Reynolds Dep. at 116:10-16; Exhibit 7, Hatfield Dep. at 44:22-24, 45:11-46:3, 62:19-23. Under Defendant Hulett's leadership of Lincoln, no correctional officers were ever disciplined for conduct during a shakedown. Exhibit 6, Hulett Dep. at 58:7-10. Thus, no correctional officer or training cadet involved in this search (or in any search under Defendant Hulett's leadership of Lincoln) was subject to discipline.

20.     Denied. Pasley testified that he learned about concerns about the way these searches were conducted based on the John Howard Association investigation. Exhibit 2, 2013 Pasley Dep. at 65:15-24. Plaintiff admits that Pasley testified he did not receive any formal complaints from inmates at Lincoln Correctional Center.

21.     Admitted in part and denied in part. Plaintiffs admit that during cadet training, cadets received four weeks of training covering report writing, strip searches, communication skills. Exhibit 2, 2013 Pasley Dep. at 9:16-10:16. Plaintiffs deny that cadets received training on professionalism at the cadet training exercise itself. Defendant Reynolds' briefing to the cadet class was about what cadets were looking for, and had no mention of professionalism. Exhibit 2, 2013 Pasley Dep. at 38:18-39:10 ("the specifics of [the briefing given by Defendant Reynolds] was basically thank you for coming and the fact that they were looking specifically for expired medication, medication that wasn't in its original container, and just general nuisance contraband such as, you know, too many sheets, too much commissary, things along that line"). Officer Slater also demonstrated for cadets how to apply handcuffs before the cadets practiced on the prisoners. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown ¶5. And regardless of whatever cadets were instructed about how to practice professionalism, during the shakedown numerous correctional officers modeled for cadets the making of rude and derogatory comments to inmates. During the strip searches, correctional staff made demeaning references to gender and sexually derogatory insults, such as calling the plaintiffs "bitches" and "dirty bitches" and remarking: "No man wants to be with you because you smell like death." *See, e.g.*, Exhibit 9, 2013 Class Member Declarations at P98 (Decl. of Teresa Williams, ¶7), P34 (Decl. of Stacey Bennick, ¶7), P36 (Decl. of Iesha Brown, ¶7), P64 (Decl. of Jacqueline Hegwood, ¶7), P66 (Decl. of Delores Henry, ¶7), P68 (Decl. of Amanda Hunt, ¶7). Correctional staff including

Defendant Slater made derogatory comments and gestures about Plaintiffs' bodies and odors during the strip searches. *See, e.g.*, Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton at ¶22; Exhibit 9, 2013 Class Member Declarations at P44, Declaration of Michelle Clopton ("I remember the corrections officers making rude comments about some of the women's body odors, weight, and personal appearance"); P60, Declaration of Tina Grobe ("Your pussy stinks."); P88, Declaration of Shawna Turner ("These women are nasty and they smell."); P98, Declaration of Teresa Williams ("These bitches stink."); P46, Declaration of Amanda Conne ("You all are fucking disgusting."); P90, Declaration of Joanne Wade ("I can't believe women smell like this."). During the strip searches, Defendant Crudup put a cloth over her mouth and made comments like, "you bitches stink." Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶18, Decl. of Beverly Throgmorton at ¶22 ("One of the corrections officers put some sort of cloth over her nose and mouth and made insulting comments about the odor of women being strip searched.").

22.     Denied. Pasley testified that the IDOC policy was to take the person to be searched to a private area. Pasley testified that he interpreted that statement to mean "to remove them to an area in which it's as private as possible." Exhibit 2, 2013 Pasley Dep. at 72:16-73:13.

24.     Denied. This statement of fact, as written, is vague and unclear as to whether Defendants are referring to IDOC policies or practices. Plaintiffs vehemently deny that male cadets do not participate in conducting strip searches of female inmates. Zavala testified that this did occur in emergency situations. Exhibit 5, Zavala Dep. at 29:24-30:2. Moreover, numerous witnesses testified in this case to observing or experiencing male cadets and male correctional officers being present for the strip searches of female inmates. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶14; Exhibit 3, 2015 Class Member Declarations, Decl. of

Beverly Throgmorton, at ¶16; Exhibit 9, 2013 Class Member Declarations at P33 (Decl. of

Stacey Bennick, ¶3 ("The strip search took place in full view of people who were not performing

the actual strip search, including male corrections officers, IDOC training academy cadets,

civilians, and other inmates . . . . I remember seeing male corrections officers in the gym looking

at me as I was being strip searched."); Exhibit 6, Hulett Dep. at 125:18-23. Exhibit 3, 2015 Class

Member Declarations, Decl. of Beverly Throgmorton, at ¶17.

26.     Denied. The statement of fact, as written, is vague and unclear as to what "search"

is being referred to ("Inmates who are menstruating would remove any sanitary devices during

the search.") Plaintiffs admit that during the search that was conducted in this case, women were

forced to remove tampons during the search. The cited reference does not support the statement

if this is intended to refer to what IDOC policy is in these situations – Mr. Pasley claimed in the

cited deposition pages that he had never conducted a search with a female inmate so it was "hard

to know" exactly how these searches were conducted, and he was unsure whether the inmate

would remove their own tampon or whether staff would do so (he placed a "guess" that women

would do it themselves). Exhibit 2, 2013 Pasley Dep. at 130:23-31:24.

27.     As with number 26 above, this statement of fact, as written, is vague and unclear

as to whether it refers to IDOC policy or to how the search in this case was conducted. Further,

the cited reference does not support the statement if this is intended to refer to IDOC policy on

strip searches. Alan Pasley testified in his deposition that the searching of women who were

menstruating was "not an area that [he] had to deal with a whole lot." Exhibit 2, 2013 Pasley

Dep. at 132:12-18. He further testified that after a strip search was finished, tampons or pads

"should be present in the area and if staff would observe the need they should be contacting

someone to get it," which implies the policy is for staff to determine whether there is a need for a

tampon or a pad. *Id.* at 132:19-33:9. Felipe Zavala also did not testify that menstruating inmates are allowed to replace a sanitary device after a strip search. He testified instead that tampons and feminine napkins were not available within cells and instead were in offices because there was "abuse" with some of those items, but that they were available "for when they do need them." Exhibit 5, Zavala Dep. at 32:5-13. All Mr. Zavala testified to was that these products were available after a search, but not that there was a policy that inmates be allowed to replace them. *Id*.

28.     Denied. The cited reference does not support the statement. Pasley testified on the cited page that there were ordinary correctional officers as well as tactical unit members who escorted the women as they were moving from the housing units to the gym. Exhibit 2, 2013 Pasley Dep. at 104:9-12. He did not testify that those correctional officers or tactical units were necessarily present in either the living areas or the gym.

29.     Denied. Defendant Pasley testified that he accompanied the cadets as they transported prisoners to the gym. Exhibit 23, 2015 Pasley Dep. at 7:6-13, 9:16-21.

30.     Denied. The cited reference does not support the statement. Pasley testified on the cited page that he "did not recall specifics as to who remained and who returned" but testified that "typically what occurs" would be that some cadets would conduct a strip search and other cadets would return to search the living areas." Exhibit 2, 2013 Pasley Dep. at 126:1-13. He repeated on this page several times that his theory was "strictly speculation" because he did not recall what happened that day and because he was not in the gymnasium. *Id*.

31.     Denied. The citation, apparently to the whole of Defendant Slater's and Defendant Edmonson's responses to Plaintiffs' First Set of Interrogatories, does not support the statement. Both Slater and Edmonson recalled specific people present escorting inmates, in the

housing units, and in the gymnasium, but both testified that they were "unable to remember every individual who was present for the searches." Dckt. 103-8, (Exhibit D Part 1 at 2; Dckt. 103-9, Exhibit D Part 2 at 2.)

33.     As with numbers 26 and 27 above, this statement is so vague that it can neither be admitted nor denied. It is not clear whether this statement refers to IDOC policies, IDOC practices, practices and/or policies at Lincoln Correctional Center, or some other circumstances. Mr. Pasley did testify in his deposition that after August or September of 2012, IDOC implemented a training academy policy to remove all opposing gender of cadets from an area when a search was being conducted. Mr. Pasley testified that this was not a change in training or policy, but "the procedure and the manner in which we do it and a lot of it . . . came about also from the enactment of Pria [*sic*]." Exhibit 2, 2013 Pasley Dep. at 145:4-46:4.

34.     Denied. The cited reference does not support the statement. Mr. Zavala testified in his deposition that "it was constantly preached" that searches should be of the same gender (a male strip searching a male or a female strip searching a female) and that the opposite gender would be there to assist in cases of emergency. Exhibit 5, Zavala Dep. at 29:4-30:16. Mr. Zavala did not explain when or where this was "preached."

## III.   Disputed Immaterial Facts

14.     This statement of fact is so vague and poorly defined that it cannot be admitted or denied. It is unclear whether this statement is meant to refer to whether it is IDOC's policy to allow inmates to be strip searched more than one at a time, which Plaintiff admits, or whether this at times occurred at IDOC, which Plaintiff also admits, or to some other situation. It is also immaterial whether IDOC at times, searches inmates in a strip search more than one at a time

because it has no relevance to what occurred during these searches or whether the searches that
occurred in this case violated the constitutional rights of the Plaintiffs and class members.

15.     Denied in part. Pasley testified that the construction of the facility would dictate
how IDOC handled searching multiple individuals at the same time. He testified that how many
people were searched together depended on the situation because it "can be a situation in which
it's a[s] [*sic*] a few as two individuals within a cell together all the way to situations in which we
end up in a gymnasium setting where it may be five to ten people together." Exhibit 2, 2013
Pasley Dep. at 61:8-16. Thus, it is not the construction of the facility that dictates the number of
people searched together, but the search situation. Regardless, this is immaterial. The
circumstances in which IDOC searched multiple people together has no relevance to what
occurred during these searches or whether the searches that occurred in this case violated the
constitutional rights of the Plaintiffs and class members.

## IV.    Undisputed Immaterial Facts

4.      Admitted, but immaterial. That the removal of certain types of contraband makes
an institution, to varying degrees, safer, does not establish that the searches that were conducted
here did not violate the constitutional rights of the Plaintiffs and class members.

12.     Admitted, but immaterial. Whether IDOC at times conducts unclothed searches in
conjunction with a search of a living area during a mass shakedown has no relevance to what
occurred during these searches or whether the searches that occurred in this case violated the
constitutional rights of the Plaintiffs and class members.

## PLAINTIFFS' ADDITIONAL MATERIAL FACTS

*Classes and Class Representatives*

1.      Plaintiff Class I consists of all women who were subjected to the March 31, 2011 public group strip search at Lincoln Correctional Center ("Lincoln"). Order of July 29, 2013, at 3, Dkt. No. 68 (certifying Class I). Class I challenges the constitutionality of the March 31, 2011 public group strip search and seeks damages. *Id.* The class representatives are Beverly Throgmorton, Delores Henry, Patricia Phillips, Jacqueline Hegwood, Sandra Brown, and Ieshia Brown. *Id.*

2.      Plaintiff Class I is divided into two subclasses. Order of July 29, 2013, at 3, Dkt. No. 68 (certifying Class I). Subclass A consists of all individuals who were subjected to the March 31, 2011 public group strip search at Lincoln, and who have remained in the custody of the Illinois Department of Corrections ("IDOC") since that time. *Id.* Subclass B consists of all individuals who were subjected to the March 31, 2011 public group strip search at Lincoln, and who were subsequently released from the custody of the Illinois Department of Corrections. *Id.*

3.      Plaintiff Class II consists of all women who are currently incarcerated at Logan Correctional Center ("Logan"), and all women who will be incarcerated at Logan in the future. Order of Oct. 21, 2014, at 12-13, Dkt. No. 87 (certifying Class II). Class II seeks injunctive relief. *Id.* Named plaintiffs Sandra Brown and Iesha Brown represent this class. *Id*

4.      Plaintiff Beverly Throgmorton was incarcerated at Lincoln on March 31, 2011, and was one of the women in Housing Unit 2B that was subjected to a group strip search. Exhibibt 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton at ¶1; Exhibit 9, 2013 Class Member Declarations at P83-86 (Decl. of Beverly Throgmorton at ¶¶ 1, 10).

5.       Plaintiff Ieshia Brown is a prisoner at Logan. On March 31, 2011, Ms. Brown was an inmate at Lincoln, and she was one of the women in Housing Unit 2B who was subjected to a group strip search. In 2013, Ms. Brown was transferred to Logan because Lincoln was converted to an all-male facility. On October 31, 2013, while incarcerated at Logan, Ms. Brown was strip searched during another "cadet training exercise." Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶¶ 1, 31-32.

6.       Plaintiff Delores Henry was incarcerated at Lincoln on March 31, 2011, and was one of the women in Housing Unit 2B that was subjected to a group strip search. Exhibit 9, 2013 Class Member Declarations at P65-66 (Decl. of Delores Henry at ¶¶1, 10).

7.       Plaintiff Patricia Phillips was incarcerated at Lincoln on March 31, 2011, and was one of the women in Housing Unit 2B that was subjected to a group strip search. Exhibit 9, 2013 Class Member Declarations at P79-80 (Decl. of Patricia Phillips at ¶¶1, 9).

8.       Plaintiff Jacqueline Hegwood was incarcerated at Lincoln on March 31, 2011, and was one of the women in Housing Unit 2B that was subjected to a group strip search. Exhibit 9, 2013 Class Member Declarations at P63-64 (Decl. of Jacqueline Hegwood at ¶¶ 1, 10).

9.       On or about March 31, 2011, Lincoln was a prison operated by the Illinois Department of Corrections ("IDOC") that housed female inmates. At all times relevant to this case, Lincoln was a medium security prison and housed approximately one thousand women. Exhibit 10, Monitoring Visit to Lincoln Correctional Center, John Howard Association of Illinois (P4-27) at P4; Exhibit 6, Hulett Dep. at 28:17-29:4.

10.       Logan is a multiple security level female facility of IDOC that houses approximately two thousand women. Exhibit 11, John Howard Association Special Prison Monitoring Report, Logan Correctional Center 2013-14 at P99-137.

*Defendants*

11.     At the time of the March 31, 2011 cadet training exercise, Defendants Melody

Hulett and Russell Reynolds were, respectively, the Warden and Assistant Warden of Operations

at Lincoln. Exhibit 6, Hulett Dep. at ¶6:1-9; Exhibit 1, Reynolds Dep. at 5:23-6:4.

12.     At the time of the March 31, 2011 cadet training exercise, Defendants Alan

Pasley and Renee Hatfield were training specialists from the Illinois Department of Corrections

training academy that accompanied the cadets during the exercise. Exhibit 2, 2013 Pasley Dep. at

18:12-21, 5:2-5; Exhibit 7, Hatfield Dep. at 10:16-20; Exhibit 12, IDOC Staff Assignment Sheet,

March 28-April 1, 2011 at Def 304.

13.     At the time of the March 31, 2011 cadet training exercise, Defendant Troy Dawdy

and Defendant Craig were, respectively, the commander and assistant commander of the tactical

team at Lincoln. Exhibit 1, Reynolds Dep. at 11:3-5, 85:19-86:3; Exhibit 13, Defendant

Johnson's Responses to Plaintiffs' First Set of Interrogatories at No. 7; Exhibit 14, March 29,

2011 Memo from Lt. Dawdy at Def. Bates 34. The tactical team at Lincoln was referred to as

"Orange Crush." Exhibit 2, 2013 Pasley Dep. at 105:12-14.

14.     At the time of the March 31, 2011 cadet training exercise, Defendant Correctional

Officers Carlita Edmonson, Kim Johnson, Peter Leonetti, Paul Pfeiffer, Monica Slater, and Krull

were members of the tactical team at Lincoln who participated in the March 31, 2011 cadet

training exercise (hereinafter, "Defendant Orange Crush Officers"). Exhibit 15, Institutional

Tactical Training Roster at Def. Bates 35-36; Exhibit 16, Lincoln Daily Roster at Def. Bates 37-

44; Exhibit 1, Reynolds Dep. at 35:14-21; Exhibit 2, 2013 Pasley Dep. at 105:12-14.

15.     At the time of the March 31, 2011 cadet training exercise, Defendant Correctional

Officers Benny Dallas, Abraham Anderson, Dominique Crudup, Butler, and Spaniol were

correctional officers at Lincoln who participated in the March 31, 2011 cadet training exercise

(hereinafter, "Defendant Correctional Officers"). Exhibit 1, Reynolds Dep. at 42:23-43:4, 61:9-

14 (Dallas); Exhibit 17, Grievances from strip search at Def. Bates 318 (Anderson); Exhibit 18,

Defendant Anderson's Responses to Plaintiffs' First Set of Interrogatories at No. 2 (Crudup);

Exhibit 19, Defendant Crudup's Responses to Plaintiffs' First Set of Interrogatories at No. 2

(Spaniol); Exhibit 20, Defendant Pfeiffer's Responses to Plaintiffs' First Set of Interrogatories at

No. 2 (Butler).

16.     The defendants to Plaintiffs' official capacity claims are Felipe Zavala, the current

IDOC Training Academy Manager of Staff Development and Training; Michael Atchison, the

current IDOC Deputy Chief of Operations; and Christine Brannon, the current warden of Logan.[2]

Exhibit 5, Zavala Dep. 6:18-22; Exhibit 21, IDOC website page on Michael Atchison, available

at: https://www.illinois.gov/idoc/aboutus/Pages/OperationsSecurityDirector.aspx; Exhibit 22,

IDOC website page on Logan Correctional Center, available at

https://www.illinois.gov/idoc/facilities/Pages/logancorrectionalcenter.aspx.

*Preparations for the March 2011 Cadet Training Exercise*

17.     On March 31, 2011, approximately 200 women were handcuffed and subjected to

group strip searches by cadets as part of a "cadet training exercise" for IDOC cadets at Lincoln.

Exhibit 6, Hulett Dep. at 70:21-24, 88:8-12; Exhibit 1, Reynolds Dep. at 12:2-6, 72: 3-7; Exhibit

7, Hatfield Dep. at 9:11-14; Exhibit 23, 2015 Pasley Dep. at 6:17-21, 11:4-17.

18.     Defendant Warden Hulett authorized the cadet training exercise. Exhibit 6, Hulett

Dep. at 75:14-6, 78:14-18, 100:14-20; Exhibit 1, Reynolds Dep. at 16:2-12.

---

[2] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Christine Brannon and Michael Atchison replace Angela Locke and Joseph Yurkovich, respectively, as defendants to Plaintiffs' official capacity claims.

19.     The March 2011 cadet training exercise was the first and only cadet training exercise to take place at Lincoln during Defendant Hulett's and Reynolds's employment there. Hulett Dep. 69:19-23, 70:13-24, 71:8-13, 74:5-75:13; Exhibit 1, Reynolds Dep. at 11:20-12:1, 19:24-20:9.

20.     Defendants Hulett and Reynolds did not create or review an operational plan for the cadet training exercise. Hulett Dep. at 129:14-130:4; Exhibit 1, Reynolds Dep. at 44:6-45:2.

21.     The lack of preparation of an operational plan prior to a mass strip search involving 200 prisoners is well understood by correctional officials to result in abuses. Exhibit 24, Expert Report of Wendy Still at 20.

22.     The cadets from the IDOC training academy arrived at Lincoln on the morning of the March 31, 2011 cadet training exercise. Exhibit 7, Hatfield Dep. at 13:10-17.

23.     Defendant Pasley was the cadets' primary supervisor during the cadet training exercise. Exhibit 6, Hulett Dep. at 79:20-80:12, 84:7-15, 94:10-95:3.

24.     Defendant Dawdy instructed the Orange Crush tactical team to report for duty on the morning of March 31, 2011, and to arrive in "[p]roper dress." Exhibit 14, March 29, 2011 Memo from Lt. Dawdy at Def. Bates 34. Pursuant to his instruction, Defendants Edmonson, Johnson, Leonetti, Pfeiffer, Craig, Slater, and Krull arrived in full riot gear, with helmets, vests, military boots, batons, pepper spray, and shields. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶¶2-3; *Id.*, Decl. of Beverly Throgmorton at ¶¶2-3; Exhibit 1, Reynolds Dep. at 67:2-3.

25.     Prior to the start of the cadet training exercise, Defendants Hulett, Reynolds, Dawdy, Pasley, the Defendant Orange Crush Members, and other correctional officers held a

19

briefing with the cadets in the dietary hall at which instructions were provided. Exhibit 1, Reynolds Dep. at 69:14-70:3; Exhibit 2, 2013 Pasley Dep. at 38:9-17, 58:23-59:11; Exhibit 6, Hulett Dep. at 85:9-13.

26.     Correctional facilities are extremely hierarchical, paramilitary organizations that function based on a tight command structure. Exhibit 24, Expert Report of Wendy Still at 21.

<em>The March 2011 Cadet Training Exercise Begins</em>

27.     Defendants Reynolds, Dawdy, the Defendant Orange Crush Members, and other correctional officers, along with the cadets, stormed the B wings of Housing Units 2 and 4 at Lincoln. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶2; *Id.,* Decl. of Beverly Throgmorton at ¶2; Exhibit 1, Reynolds Dep. at 70:15-21. Exhibit 2, 2013 Pasley Dep. at 57:22-58:3.

28.     Defendant Reynolds instructed the Lincoln staff, including Defendant Dawdy, during the cadet training exercise. Exhibit 6, Hulett Dep. at 85:6-14; Exhibit 1, Reynolds Dep. at 85:9-86:3.

29.     Defendants Dawdy and Craig gave orders to the tactical team members. Exhibit 1, Reynolds Dep. at 11:3-5, 85:19-86:3; Exhibit 13, Defendant Johnson's Responses to Plaintiffs' First Set of Interrogatoriesat No. 7; Exhibit 14, March 29, 2011 Memo from Lt. Dawdy at Def. Bates 34.

30.     As they entered the housing units, tactical team members including Defendants Dawdy and Johnson banged their batons on the walls, doors, and in their hands, in a threatening manner. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶4; Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶4.

31.     Corrections officers including Defendants Reynolds, Dawdy, and Johnson lined the women prisoners up in rows and forced them to stand facing the wall. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶5.

32.     Correctional officers including Defendants Reynolds, Johnson, Edmonson, and Slater called the women "bitches" and threatened to put them in segregation if they did not remain quiet. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶¶4, 8.

33.     Cadets performed a pat down search of all of the prisoners, making them take off their shoes and empty their pockets. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶6; Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶6; Exhibit 1, Reynolds Dep. at 71:9-13, 123:2-8.

34.     Cadets practiced the application of handcuffs tightly handcuffed each prisoner's hands behind her back. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶¶5, 9; Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶¶7-9; Exhibit 1, Reynolds Dep. at 70:22-71:17; Exhibit 2, 2013 Pasley Dep. at 101:17-102:14.

35.     In Plaintiff Ieshia Brown's room in Housing Unit 2B, Officer Slater first demonstrated for the cadets how to apply handcuffs, and then they practiced on the prisoners. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown ¶5.

36.     The handcuffs were brought in from outside Lincoln and were typically used for transporting prisoners on buses. Exhibit 2, 2013 Pasley Dep. at 98:16-99:2.

37.     The combination of being forced to stand for so long while being handcuffed reduced elderly prisoners to tears. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown ¶7.

38.     One prisoner informed corrections officers that she could not be handcuffed due to a shoulder disability, but a tactical officer placed her in handcuffs anyway, reducing her to tears. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶7.

39.     In addition to being painful, the handcuffs were humiliating, since prisoners are typically handcuffed at Lincoln only when they are being taken to the segregation unit for committing a serious violation of prison rules. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶7.

40.     Corrections officers and cadets marched the handcuffed prisoners to the gym. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶9; Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶9; Exhibit 1, Reynolds Dep. at 54:11-19, 70:22-71:17.

41.     Defendant Pasley went with the cadets to the housing units and accompanied them as they transported prisoners to the gym. Exhibit 23, 2015 Pasley Dep. at 7:6-13, 9:16-21.

42.     The women were not told why they had been placed in handcuffs, where they were going, or for what purpose. Exhibit 9, 2013 Class Member Declarations at P33 (Decl. of Stacey Bennick, ¶2), P35 (Decl. of Ieshia Brown, ¶2), P37 (Decl. of Krysta Burton, ¶2), P39 (Decl. of Brandy Camareno, ¶2), P41 (Decl. of Carrie Clanton, ¶2), P43 (Decl. of Michelle Clopton, ¶2).

43.     In the housing units and on the way to the gym, corrections officers screamed obscenities at the women, called them sexually derogatory names, threatened to put them in segregation if they did not cooperate, and made other threats. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶9; Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶8; Exhibit 9, 2013 Class Member Declarations at P33-34 (Decl. of

Stacey Bennick, ¶7), P37-38 (Decl. of Krysta Burton, ¶7), P39-40 (Decl. of Brandy Camareno, ¶7), P43-44 (Decl. of Michelle Clopton, ¶8).

44.     The prisoners were all compliant. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶10; Exhibit 9, 2013 Class Member Declarations at P33 (Decl. of Stacey Bennick, ¶2), P38 (Decl. of Krysta Burton, ¶2), P39 (Dec. of Brandy Camareno, ¶2; Exhibit 1, Reynolds Dep. at 63:8-65:2.

45.     Once in the gym, correctional officers including Defendant Johnson forced the women to stand facing the wall, shoulder to shoulder. Exhibit 1, Reynolds Dep. at 71:9-20, 75:6-13; Exhibit 3, 2015 Class Member Declaration, Decl. of Ieshia Brown at ¶13; Exhibit 9, 2013 Class Member Declarations at P43 (Decl. of Michelle Clopton, ¶4), P47 (Decl. of Mary Derixson, ¶4), P57 (Decl. of Anne Marie Getz, ¶4), P71 (Decl. of Millie Lee, ¶4), P77 (Decl. of Jennifer McWhorter, ¶4), P91 (Decl. of LaDonna Watson, ¶4), P93 (Decl. of Kimberly Welch, ¶93).

46.     Defendant Hulett went to the gym with the first group of prisoners and stayed until the strip searches began. When she left, she delegated her responsibility for overseeing the cadet training exercise to Defendants Reynolds, Pasley, and Dawdy. Exhibit 6, Hulett Dep. at 79:9-23; 94:10-95:3; Exhibit 25, Defendant Hulett's Responses to Plaintiffs' First Set of Interrogatories at No. 2.

*Public Group Strip Searches During the March 2011 Cadet Training Exercise*

47.     The Defendant Orange Crush members and other corrections officers ordered groups of women ranging in size from approximately four to ten to be strip searched together by the cadets. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶¶11; Exhibit 9, 2013 Class Member Declarations at P39 (Decl. of Brandy Camareno, ¶4), P43 (Decl.

of Michelle Clopton, ¶4), P49 (Decl. of Omayra Figueroa ¶4), P51 (Decl. of Zoraida Flores, ¶4), P55 (Decl. of Kathy Gaultney, ¶4), P71 (Decl. of Millie Lee, ¶4), P73 (Decl. of Bonnie McDonald, ¶4); Exhibit 1, Reynolds Dep. at 81:14-20; Exhibit 7, Hatfield Dep. at 17:5-19, 29:3-30:1.

48.     Defendant Hatfield was the sole female training instructor present in the gym during the cadet training exercise to supervise the cadets who conducted strip searches. Exhibit 2, 2013 Pasley Dep. at 18:12-21; Exhibit 7, Hatfield Dep. at 10:16-20, 21:12-23, 33:9-14. Defendant Hatfield spent most of her time during the cadet training exercise in the gym and in the bathroom abutting the gym. Exhibit 7, Hatfield Dep. at 18:22-19:12, 66:5-68:16.

49.     Defendant Benny Dallas also patrolled the gym during the cadet training exercise. Defendant Reynolds instructed Dallas that the strip searches should take place in the gym bathroom. Exhibit 1, Reynolds Dep. at 42:23-43:4, 61:9-14.

50.     The group strip searches were initially performed in a bathroom abutting the gym. After some time, corrections officers also took women for group strip searches in a beauty shop abutting the gym. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶14; Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶11; Exhibit 1, Reynolds Dep. at 55:24-56:21, 74:18-22.

51.     It would have been obvious to any person in the gym that group strip searches of prisoners were taking place in the bathroom and the beauty shop. Exhibit 1, Reynolds Dep. at 142:5-10.

52.     The bathroom was open to the gym, giving the many male correctional officers and cadets in the gym clear views of the women strip searched there. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶14; Exhibit 3, 2015 Class Member

24

Declarations, Decl. of Beverly Throgmorton, at ¶16; Exhibit 9, 2013 Class Member Declarations at P33 (Decl. of Stacey Bennick, ¶3.

53.     The beauty shop had mirrored walls and a door that remained open for the duration of the strip searches, subjecting the naked women to stares from male and female corrections officers and cadets who walked by. The beauty shop also had a window that faced the outdoors, permitting anyone outside to observe the women as they were being strip searched. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶17.

54.     In both settings, the strip searches were conducted in view of many people who were not performing the actual strip search. Exhibit 9, 2013 Class Member Declarations at P33 (Decl. of Stacey Bennick, ¶3), P35 (Decl. of Ieshia Brown, ¶3), P37 (Decl. of Krysta Burton, ¶3), P39 (Decl. of Brandy Camareno, ¶3), P41 (Decl. of Carrie Clanton, ¶3), P43 (Decl. of Michelle Clopton, ¶43), P45 (Decl. of Amanda Conne, ¶3), P47 (Decl. of Mary Derixson, ¶3), P49 (Decl. of Omayra Figueroa, ¶3), P51 (Decl. of Zoraida Flores, ¶3), P53 (Decl. of Kenlee Funk, ¶3), P55 (Decl. of Kathy Gaultney, ¶3), P57 (Decl. of Anne Marie Getz, ¶3), P59 (Decl. of Tina Grobe, ¶3), P61 (Decl. of Jennifer Hawkins, ¶3), P63 (Decl. of Jacqueline Hegwood, ¶3), P65 (Decl. of Delores Henry, ¶3), P67 (Decl of Amanda Hunt, ¶3), P69 (Decl. of Cheryl Anne Kalabsa, ¶3), P71 (Decl. of Millie Lee, ¶3), P73 (Decl. of Bonnie McDonald, ¶3), P75 (Decl. of Michelle McEntee, ¶3), P77 (Decl. of Jennifer McWhorter, ¶3), P79 (Decl. of Patricia Phillips, ¶3), P81 (Decl. of Marketta Sims, ¶3), P87 (Decl. of Shawna Turner, ¶3), P89 (Decl. of Joanne Wade, ¶3), P91 (Decl. of LaDonna Watson, ¶3), P93 (Decl. of Kimberly Welch, ¶3), P95 (Decl. of Michelle Wells, ¶3), P97 (Decl. of Teresa Williams, ¶3).

55.     The spectators to the strip searches included male corrections officers and cadets in the gym and walkway outside the beauty shop. *See, e.g.*, Exhibit 9, 2013 Class Member

Declarations at P33, Declaration of Stacey Bennick; Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶17.

56.     The spectators to the strip searches included other prisoners. Exhibit 9, 2013 Class Member Declarations at P71, Declaration of Millie Lee ("I went through the strip search with approximately 8-10 other women. We were ordered to strip naked as a group. We were forced to stand so close together that our naked bodies were nearly touching . . . . We had to go through the entire strip search procedure as a group"), P39, Declaration of Brandy Camareno ("I went through the strip search with approximately 7-8 other women.").

57.     The spectators to the strip searches included a civilian beauty shop employee. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶¶19-20.

58.     The spectators to the strip searches included female cadets and female correctional officers. Exhibit 7, Hatfield Dep. at 32:10-15; 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶20; Exhibit 7, Hatfield Dep. at 32:10-15, 68:17-20.

59.     The spectators to the strip searches included training specialist Renee Hatfield. Exhibit 7, Hatfield Dep. at 9:11-18, 18:22-19:12.

60.     Women strip searched in groups in the bathroom were forced to remove all of their clothing and stand in a line. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶13.

61.     Due to the number of prisoners, cadets, and correctional officers occupying the cramped bathroom, the naked women were forced to stand nearly shoulder to shoulder. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶13; *see also* Exhibit 9, 2013 Class Member Declarations at P38, Decl. of Krysta Burton, ¶4 ("We were forced to stand so close together that our naked bodies were touching; I could feel the body heat of the women who stood

next to me and we could barely move without bumping into each other."); P39, Decl. of Brandy Camareno, ¶4 ("We were forced to stand so close together that our naked bodies were nearly touching my elbow was touching the elbow of the woman next to me."); P41 Decl. of Carrie Clanton, ¶4 (We were forced to stand so close together that our naked bodies were nearly touching; I could feel the body heat of the women who stood next to me.").

62.     The women were forced to raise their breasts and lift their hair. They were then forced to turn around, bend over, spread open their buttocks and vaginas, and cough several times. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶16; Exhibit 26, Personal Search Curriculum (Def. Bates 238-249), at 244-248.

63.     As they did this, male members of the Orange Crush, correctional officers, and cadets could, and did, watch them from the gym. Exhibit 9, 2013 Class Member Declarations at P33-34, Declaration of Stacey Bennick ("The strip search took place in full view of people who were not performing the actual strip search, including male corrections officers, IDOC training academy cadets, civilians, and other inmates . . . . I remember seeing male corrections officers in the gym looking at me as I was being strip searched."); Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶¶13-15; Exhibit 9, 2013 Class Member Declarations at P36, Decl. of Iesha Brown (same); Exhibit 9, 2013 Class Member Declarations at P44, Declaration of Michelle Clopton at ¶8 ("I remember the corrections officers making rude comments about some of the women's . . . weight[] and personal appearance").

64.     Defendants Reynolds, Dawdy, Anderson, and Pfeiffer were among those males present in the gym during the time that strip searches were being performed in the bathroom with an open door. Exhibit 17, Grievances at Def. Bates 318.

65.     Named Plaintiff Throgmorton was among the women taken to the beauty shop for public group strip searches. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶18-20.

66.     The civilian beauty shop supervisor was never told to leave, and remained in the beauty shop for the duration of the strip searches, carrying on casual conversations with corrections officers and cadets during the group strip searches. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶¶19-20.

67.     In the beauty shop, IDOC cadets subjected women to the same strip search procedure, with breast raising, hair lifting, the squat and coughs, and bending over to expose private parts. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶19.

68.     The simultaneous strip search of many women at the same time prolonged the duration of time each woman was naked. The many prisoners who were strip searched simultaneously with other women were forced to stand naked in groups, shoulder-to-shoulder, for periods of as long as fifteen minutes during the group strip searches – far longer than a typical strip search. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶¶16-17; Exhibit 9, 2013 Class Member Declarations at P34 (Decl. of Stacey Bennick, ¶6).

69.     Defendants Johnson, Slater, Edmonson, Crudup, and Butler were among the correctional officers escorting prisoners to the gym and performing strip searches. Defendants Crudup, Slater, Edmonson and Johnson were ordered to perform the strip searches by Defendant Dawdy, and Defendant Craig gave further instructions to Defendant Johnson about performing the strip searches. Exhibit 18, Defendant Anderson's Responses to Plaintiffs' First Set of Interrogatories at No. 2; Exhibit 27, Defendant Edmonson's Responses to Plaintiffs' First Set of Interrogatories at Nos. 2, 7; Exhibit 25, Defendant Hulett's Responses to Plaintiffs' First Set of

Interrogatories at No. 2; Exhibit 20, Defendant Pfeiffer's Responses to Plaintiffs' First Set of Interrogatories at No. 2; Exhibit 28, Defendant Craig's Responses to Plaintiffs' First Set of Interrogatories at No. 2; Exhibit 19, Defendant Crudup's Responses to Plaintiffs' First Set of Interrogatories at Nos. 2, 7; Exhibit 29, Defendant Slater's Responses to Plaintiffs' First Set of Interrogatories at No. 7; Exhibit 13, Defendant Johnson's Responses to Plaintiffs' First Set of Interrogatories at No. 7.

*Verbal Abuse During the March 2011 Cadet Training Exercise*

70.    During the strip searches, correctional staff made demeaning references to gender and sexually derogatory insults, such as calling the plaintiffs "bitches" and "dirty bitches" and remarking: "No man wants to be with you because you smell like death." *See, e.g.*, Exhibit 9, 2013 Class Member Declarations at P98 (Decl. of Teresa Williams, ¶7), P34 (Decl. of Stacey Bennick, ¶7), P36 (Decl. of Iesha Brown, ¶7), P64 (Decl. of Jacqueline Hegwood, ¶7), P66 (Decl. of Delores Henry, ¶7), P68 (Decl. of Amanda Hunt, ¶7).

71.    Correctional staff including Defendant Slater made derogatory comments and gestures about Plaintiffs' bodies and odors during the strip searches. *See, e.g.*, Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton at ¶22; Exhibit 9, 2013 Class Member Declarations at P44, Declaration of Michelle Clopton ("I remember the corrections officers making rude comments about some of the women's body odors, weight, and personal appearance"); P60, Declaration of Tina Grobe ("Your pussy stinks."); P88, Declaration of Shawna Turner ("These women are nasty and they smell."); P98, Declaration of Teresa Williams ("These bitches stink."); P46, Declaration of Amanda Conne ("You all are fucking disgusting."); P90, Declaration of Joanne Wade ("I can't believe women smell like this.").

72.     During the strip searches, Defendant Crudup put a cloth over her mouth and made

comments like, "you bitches stink." Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia

Brown at ¶18, Decl. of Beverly Throgmorton at ¶22 ("One of the corrections officers put some

sort of cloth over her nose and mouth and made insulting comments about the odor of women

being strip searched.").

*Mistreatment of Menstruating Prisoners During the March 2011 Cadet Training Exercise*

73.     During the strip searches, menstruating prisoners were forced to remove tampons

and feminine sanitary napkins in front of persons in close proximity not conducting the searches,

and dispose of used tampons and sanitary napkins on the floor and in overflowing garbage cans,

in view of others. *See* Exhibit 9, 2013 Class Member Declarations at P34, Decl. of Stacey

Bennick, ¶5 ("At the time I was on my period and I was forced to remove my tampon in front of

everyone and throw it on the floor in full view of people who were not conducting the strip

search including male corrections officers, IDOC training academy cadets, civilians, and other

inmates."); P43-44, Declaration of Michelle Clopton, ¶4-5 ("I went through the strip search with

approximately 7-8 other women. We were ordered to strip naked as a group. We were forced to

stand so close together that our naked bodies were nearly touching . . . . One woman on her

period was forced to remove her sanitary napkin in front of everyone and throw it in a garbage

can in full view of people who were not performing the strip search . . . . The garbage can was

overflowing with sanitary napkins and tissue, which had begun piling up on the floor."); P46,

Declaration of Amanda Conne (Bates 46), ¶5.

74.     Menstruating women were not given replacement feminine products after the strip

searches. Many of these women got blood on their legs, feet, and clothes. They were then sent

back to the gym to wait until everyone had been strip searched, leading them to bleed through

their clothing while in the gym. *See* Exhibit 9, 2013 Class Member Declarations at P34, Decl. of Stacey Bennick ("After the strip search was over, I was not given a replacement tampon or sanitary napkin. It was approximately 2 hours before I was able to get another tampon. I bled through my clothing and felt uncomfortable."); Exhibit 9, 2013 Class Member Declarations at P46, Declaration of Amanda Conne ; Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶23 ("One woman strip searched in my group who was menstruating was ordered to discard her feminine sanitary product in a communal garbage can, in full view of all of us. After the strip search was over, I heard someone tell her that no sanitary products were available and that she should just pull her pants back up."); Exhibit 3, 2015 Class Member Declarations, Dec. of Ieshia Brown ¶21 ("In the gym, many women were bleeding through their clothes because they had not been given feminine products after being strip searched.").

75.     Defendant Reynolds was the person responsible for ensuring that reissue supplies of feminine sanitary products were available, but did not provide any. Exhibit 1, Reynolds Dep. at 100:6-11.

76.     Throughout the strip searches, the women were forced to stand barefoot on the bathroom floor, which was dirty with menstrual blood and other bodily fluids. *See* Exhibit 9, 2013 Class Member Declarations at P34, Declaration of Stacey Bennick, ¶5.

77.     No Defendant or IDOC employee cleaned the area where the women were standing. *See* Exhibit 9, 2013 Class Member Declarations at P34, Declaration of Stacey Bennick, ¶5; Exhibit 9, 2013 Class Member Declarations at P43-44, Declaration of Michelle Clopton, ¶5.

78.     The women were not allowed to wash their hands following the strip searches, even though they had used them to spread their butt cheeks during the strip search. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton, at ¶24.

*Forced Standing for Hours While Handcuffed*
*During the March 2011 Cadet Training Exercise*

79.     During the cadet training exercise, prisoners were forced to stand for long periods of time, first in the dayroom of their housing units, and then in the gym. *See* 12/14/15 Dec. of Beverly Throgmorton, ¶¶5-13; 12/23/15 Decl. of Ieshia Brown, ¶¶ 5-9, 19; Reynolds Dep. at 74:13-75:13; 136:9-137:17; 142:19-24.

80.     Prisoners were forced to stand in the gym, facing the wall, until they had been strip searched, even though strip searches for two hundred inmates would take a "significant amount of time" to complete – as many as five to seven hours. Reynolds Dep. at 75:3-13, 136:21-137:13. 12/14/15 Dec. of Beverly Throgmorton, ¶¶5, 11, 13; 12/23/15 Decl. of Ieshia Brown, ¶19 ("After the strip search, I was ordered to sit on the floor near the bleachers in the gym. This was the first opportunity I had to sit since the cadet training exercise had begun approximately four or five hours earlier").

81.     The pain of standing for such a lengthy duration was exacerbated by the tight handcuffs that the cadets had placed on the prisoners. 12/23/15 Decl. of Ieshia Brown at ¶¶5, 9; 12/14/15 Decl. of Beverly Throgmorton, at ¶¶7-9.

82.     No legitimate penological purpose justified forcing the prisoners to stand for so long while awaiting strip searches rather than permitting them to sit down. Reynolds Dep. at 136:21-137:13 (stating that "common practice" in corrections is to avoid unnecessarily forcing inmates to stand for many hours, and that "[i]f they are facing the wall sitting down [sic], they're accomplishing the same purpose as standing up."); Expert Report of Wendy Still, at 17.

83.     Defendants Dawdy and Leonetti were among those tactical team members yelling at the prisoners to face the wall throughout the morning, as they stood awaiting strip searches. 12/14/15 Decl. of Beverly Throgmorton ¶13.

84.     Defendant Spaniol monitored the handcuffed prisoners in the gym who were awaiting group strip searches. Crudup INT1 Resp. No. 2.

85.     Defendants Hulett and Reynolds visited the gym adjacent to which the strip searches were conducted near the end of the cadet training exercise. Exhibit 1, Reynolds Dep. at 79:3-11. During this visit, prisoners informed Defendant Reynolds that they had been standing for many hours without having been searched. Exhibit 1, Reynolds Dep. at 79:22-80:5.

*Additional Punitive Characteristics of the March 2011 Cadet Training Exercise*

86.     After each group of women had been strip searched, the women were forced to wait in the gym until all 200 women had been strip searched. Exhibit 1, Reynolds Dep. at 136:9-18; Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶19, Decl. of Beverly Throgmorton at ¶24.

87.     The entire incident lasted between five and seven hours. Exhibit 1, Reynolds Dep. 140:13-16; Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶20, Decl. of Beverly Throgmorton at ¶12.

88.     The women were not permitted to use the restroom or get a drink of water at any time during the entire cadet training exercise. *Id.*

89.     Defendant Reynolds, Defendant Hulett, and the Defendant Orange Crush Officers were among those telling the women they could not sit, get a drink of water, or use the restroom during the cadet training exercise. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶20.

90.     It was past lunch when the cadet training exercise ended. Prisoners were taken straight to the dining hall to eat, with no opportunity to wash their hands. Many did not feel like eating after undergoing the group strip searches. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton at ¶25, Decl. of Ieshia Brown at ¶22.

91.     When the prisoners finally arrived back in their rooms, the rooms were destroyed, with bedding, clothing, property, and food items strewn all over the room, without regard to whom they belonged to, generating conflict regarding ownership of certain property and missing items. Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton at ¶25, Decl. of Ieshia Brown at ¶22.

92.     Defendant Pasley testified that he did not know who supervised the cadets conducting strip searches and that he did not oversee the conduct of cadets in the gym. Exhibit 23, 2015 Pasley Dep. at 14:18-22; Exhibit 23, 2015 Pasley Dep. at 11:20-21, 12:2-8; 14:18-22.

*IDOC Policy and Practice*

93.     Section 501.220(b)(2) of Title 20 of the Illinois Administrative Code requires that strip searches of committed persons be "conducted by persons of the same sex as the committed person and in an area where the search cannot be observed by persons not conducting the search, except in cases of an emergency." Ill. Admin. Code tit. 20, § 501.220(b)(2).

94.     Just ten days prior to the cadet training exercise, Defendant Hulett had addressed a grievance regarding the strip search of five women in the same area in connection with a prison job by instructing: "Offenders are not to be strip searched as a collective group. Direction of proper strip searching will be addressed." Exhibit 17, Grievances from strip search at Def. Bates 314-18; Exhibit 2, 2013 Pasley Dep. at 135:21-136:3.

34

95.     IDOC practice is to allow prisoners to be strip searched in groups during cadet training exercises. Defendants admit that IDOC practice permits as many as twenty prisoners to be strip searched at the same time, in the same setting during cadet training exercises. Exhibit 2, 2013 Pasley Dep. at 138:1-6 ("The only time they should not be searched together would be if they were opposing gender."); Exhibit 23, 2015 Pasley Dep. at 20:8-17; Exhibit 1, Reynolds Dep. at 83:6-84:9.

96.     IDOC policy prohibits males and female non-participants from observing strip searches of women prisoners, absent emergency circumstances. Exhibit 1, Reynolds Dep. at 58:18-59:17; Exhibit 2, 2013 Pasley Dep. at 128:14-30:7.

97.     The Prison Rape Elimination Standards make clear that cross-gender observation of strip searches violates generally accepted correctional practices. Exhibit 24, Expert Report of Wendy Still at 10-11.

98.     IDOC policies and training prohibit the use of degrading and derogatory language during strip searches. *See, e.g.*, Exhibit 2, 2013 Pasley Dep. at 63:21-64:6; Exhibit 7, Hatfield Dep. at 41:1-14. IDOC's policy governing Standards of Conduct – Administrative Directive 03.02.108 – requires IDOC employees to "conduct themselves in a professional manner" and "not engage in conduct that is unbecoming of a State employee or which will reflect unfavorably on . . . the Department." *See* Exhibit 30, AD 03.02.108(I)(B) (Def. Bates 280); *see also* Exhibit 31, Professional Conduct Training Curriculum (Bates 250-303).

99.     When repeated, derogatory and demeaning verbal comments during strip searches rise to the level of "sexual harassment" pursuant to the Prison Rape Elimination Act Standards. Exhibit 24, Expert Report of Wendy Still at 13-14.

100.     IDOC policy requires implementation of a blood pathogen protocol when surfaces are contaminated with blood. Exhibit 1, Reynolds Dep at 108:2-24.

101.     Defendants Hulett, Reynolds, Pasley, and Hatfield were aware of the dignitary needs of menstruating prisoners, as well as the importance of maintaining hygienic conditions for all prisoners, and their responsibility as supervisors for ensuring that those needs were accommodated. Exhibit 1, Reynolds Dep. at 99:17-100:16; Exhibit 2, 2013 Pasley Dep. at 132:19-134:1; Exhibit 7, Hatfield Dep. at 36:14-38:10.

*Grievances and Discipline*

102.     Not a single cadet, corrections officer, training specialist, or administrator raised and reported concerns during the March 2011 cadet training exercise at Lincoln. Exhibit 1, Reynolds Dep. at 116:21-117:6; Exhibit 7, Hatfield Dep. at 61:23-63:1.

103.     No internal investigation was completed of the March 2011 cadet training exercise, and not a single employee received any discipline in connection with the cadet training exercise. Exhibit 1, Reynolds Dep. at 116:10-16; Exhibit 7, Hatfield Dep. at 44:22-24, 45:11-46:3, 62:19-23.

104.     Under Defendant Hulett's leadership of Lincoln, no correctional officers were ever disciplined for conduct during a shakedown. Exhibit 6, Hulett Dep. at 58:7-10.

105.     Dozens of prisoners submitted grievances following the March 31, 2011 cadet training exercise at Lincoln. Exhibit 9, 2013 Class Member Declarations, Decl. of Stacey Bennick (P34) (explaining: "Either that night, or the next day I wrote a grievance and put it in the drop box in my housing unit. The drop box in my housing unit quickly overflowed with grievances. Finally, I think after a week, the drop box was suddenly emptied. I never received a response to my grievance."); Exhibit 9, 2013 Class Member Declarations, Declarations of Iesha

36

Brown, Krysta Burton, and Brandy Camareno (P36-40) (same).

106.    The many prisoners who submitted grievances regarding the March 2011 cadet

training exercise never received any response. *See, e.g.*, Exhibit 9, 2013 Class Member

Declarations, Decl. of Stacey Bennick (P34) (explaining: "Either that night, or the next day I

wrote a grievance and put it in the drop box in my housing unit. The drop box in my housing unit

quickly overflowed with grievances. Finally, I think after a week, the drop box was suddenly

emptied. I never received a response to my grievance."); Exhibit 9, 2013 Class Member

Declarations, Declarations of Iesha Brown, Krysta Burton, and Brandy Camareno (P36-40)

(same).

107.    Defendant Reynolds was informed by prisoners that they planned to and had filed

grievances. *See, e.g.*, Exhibit 1, Reynolds Dep. at 90:1891:7 ("I remember talking to offenders

who said they filed grievances, yeah. . . . I mean, I heard them all. I heard them screaming, yeah,

I'm going to file a grievance."); *id.* at 91:10-18 (". . . I had inmates talk to me and say hey, we're

going to file a grievance, we didn't like the way it went down"); *id.* at 92:1-9 ("Most of them

were being shook down in the gym bathroom, something about bare feet.").

108.    During a February 2012 monitoring visit to Lincoln by the John Howard

Association, many prisoners independently voiced concerns about the March 2011 cadet training

exercise and the disappearance of their grievances. *See* Exhibit 10, Monitoring Visit to Lincoln

Correctional Center, John Howard Association of Illinois (P4-27), at P4 ("A troubling alleged

instance of grievances being lost was at Lincoln, where administrators informed JHA they had

been unable to locate a single grievance filed by any inmate regarding a cadet training and strip

search that multiple inmates protested to JHA and stated that they and others had filed numerous

grievances about. Administrators were adamant that had the matter been brought to their

attention by these inmates it would have been thoroughly investigated. They indicated that they were aware of one woman reportedly grieving the issue, but that the grievance was not located. While JHA cannot confirm or deny the validity of inmates' accounts, we did receive what we believe to be a significant number of consistent, unsolicited, and independent reports."); *id.* at 22 ("Inmates reported to JHA that they personally filed grievances about the incident, and they further believed that between 80 and 150 grievances were filed in total, as the grievance boxes on the housing units were "overflowing" after the incident. However, none of the inmates who reportedly filed grievances knew what happened to them since and they had received no response on the grievances. One inmate expressed frustration that she had been 'told three different stories' by her assigned correctional counsel about where the grievance forms had gone.").

109.    Warden Hulett participated in a debrief of the visit with John Howard Association staff and served as the warden of Lincoln at the time the John Howard Association's 2012 report on Lincoln came out. Exhibit 6, Hulett Dep. 6:3-6:9, 92:21-94:9.

110.    Defendants Hulett, Reynolds, Hatfield, and Pasley all testified that they had no knowledge of any complaints about the March 2011 cadet training exercise prior to Plaintiffs' lawsuit. Exhibit 1, Reynolds Dep. at 97:21-23 ("Q. And did you handle grievances about the cadet strip search? A. I don't remember having one grievance. . . ."); *id.* at 112:6 ("I didn't have complaints."); Exhibit 7, Hatfield Dep. at 45:5-46:3 ("Q. Before the lawsuit was filed no one mentioned to you at any time that many women prisoners had complaints about the way the March 31, 2011 cadet training exercise was carried out? A. No. I do not recall that."); Exhibit 2, 2013 Pasley Dep. at 64:20-24 ("Q. Did the training academy receive any complaints regarding the way in which the March 31st, 2011 strip searches were conducted at Lincoln Correctional Center? A. Not to my knowledge.").

38

111.    Plaintiff Beverly Throgmorton questioned Warden Reynolds about all of the grievances regarding the cadet training exercise, and he replied with words to the effect of that grievances were 'not his department.' Exhibit 3, 2015 Class Member Declarations, Decl. of Beverly Throgmorton at ¶33.

*The Purpose of IDOC Cadet Training Exercises*

112.    The purpose of having cadets conduct cadet training exercise including strip searches is to train them. Exhibit 4, Yurkovich Dep. at 19:3-9 ("Q: Am I correct to say that the purpose of having the cadets conduct a mass shakedown was to train them? A: Yes. Q: Were there any other reasons that they conducted mass shakedowns during the training? A: No. It's training driven."); Exhibit 5, Zavala Dep. at 11-12 ("So it's for training, correct? A: For training, absolutely. Q: Is it for anything else or primarily for training cadets? A: It's for training.").

113.    The March 31, 2011 cadet training exercise was not driven by concerns regarding Lincoln's institutional security or employee or inmate safety. Exhibit 6, Hulett Dep. at 76:11-15 ("Question:. . . . Can you think of any reason other than the training of cadets that you ordered a shakedown on March 31st, 2011, at the Lincoln facility? Answer: I cannot."); see also *id*. at 91:6-9 ("If it was something major that was going on . . . I would think that, you know, I would be able to recall that."); Exhibit 7, Hatfield Dep. at 51:19-23.

114.    No emergency or exigent circumstance existed on March 31, 2011 at Lincoln. *See* Exhibit 6, Hulett Dep. at 76:11-15 ("Question:. . . . Can you think of any reason other than the training of cadets that you ordered a shakedown on March 31st, 2011, at the Lincoln facility? Answer: I cannot."); *id.* at 91:6-9 ("If it was something major that was going on . . . I would think that, you know, I would be able to recall that.").

115.    Defendant Hulett did not select Units 2B and 4B for strip searches during the cadet training exercise because of any security concerns. Exhibit 6, Hulett Dep. 90:1-92:20, 100:14-20; Exhibit 1, Reynolds Dep. at 36:18-22.

116.    Prisons are selected for cadet training exercises based on the following considerations: selection of at least one maximum security facility for training on "maximum security elements"; distance from the training academy; the amount of overtime that would accrue; cost; and the need to rotate through different facilities. Exhibit 4, Yurkovich Dep. at 16:13-17:1, 19:22-20:9, 21:21-22:3.

117.    Defendant Reynolds testified that he requested the cadet training exercise because of an increase in contraband and assaults by prisoners of other prisoners and staff. Exhibit 1, Reynolds Dep. at 12:11-21. However, the monthly reports regarding inmate management data show low levels of contraband and assaults in January 2011, February 2011, and March 2011 as compared with previous months. *See* Exhibit 8, Inmate Management Data, Affidavit, and Inmate Management Reports.

118.    During Defendant Reynolds' briefing to the cadet class, he asked the cadets to search only for nuisance contraband and expired medication and did not mention an increase in prisoner assaults or major contraband. Exhibit 2, 2013 Pasley Dep. at 38:18-39:10 ("the specifics of [the briefing given by Defendant Reynolds] was basically thank you for coming and the fact that they were looking specifically for expired medication, medication that wasn't in its original container, and just general nuisance contraband such as, you know, too many sheets, too much commissary, things along that line"); *id.* at 74:6-13 ("The only specific contraband that I recall [Defendant Reynolds] mentioning like I said was nuisance contraband").

119.     Routine shakedowns and tactical team shakedowns are not typically accompanied by strip searches. Exhibit 6, Hulett Dep. at 74:11-75:13; Exhibit 1, Reynolds Dep. at 27:10-19, 32:14-33:3.

120.     Training cadets provides an inadequate justification for conducting a mass strip search of prisoners. Exhibit 24, Expert Report of Wendy Still at 8.

121.     Training cadets to conduct strip searches under humiliating and degrading conditions and in violation of policy runs *counter* to the training needs of an institution. Exhibit 24, Expert Report of Wendy Still at 8.

122.     Cadets may be properly trained through instruction and simulations of strip searches on clothed persons, followed by supervision as they conduct strip searches on an individual basis in a private and professional manner at the facilities to which they are assigned, which are the primary method that female cadets receive training on strip searches. Exhibit 5, Zavala Dep. at 15:5-16:20 ("Question: . . .[A]m I correct that most females who go through the training academy when they do their cadet exercises, they go to two male prisons and they don't get to do an actual strip search of a female prisoner? Answer: Correct. . . . . Question: Do you think that the women who go through the training academy and never get to perform a strip search of a female prisoner during the time of the training academy are properly prepared for their jobs that they're going to face at the prisons? Answer: Yes, because everybody is given language on what to expect on a strip search. So when they do go to their facilities, such as females going to Logan [Correctional Center], and an inmate is going to be strip searched, it's with another female, and so they are being mentored, so they do get the opportunity to learn, the practical. . . ."); Exhibit 7, Hatfield Dep. at 23:8-16, 24:23-25:5 (discussing different ways to

train employees in conducting strip searches and confirming that most female cadets complete the training academy without ever having completed a strip search of an inmate).

123.    The training academy sees no need to differentiate between cadets who strip search an inmate during the training academy, and those who do not, making no effort to inform a cadet's placement facility whether or not that cadet performed a strip search on a prisoner during the training academy. Exhibit 7, Hatfield Dep. at 24:17-25:5.

124.    To control contraband, Defendants Hulett and Reynolds could have restricted the cadets to pat down searches and shakedowns of living areas, or strip searches conducted in a private setting, such as on an individual basis or with the use of privacy screens. Exhibit 24, Expert Report of Wendy Still at 27.

125.    To afford some modicum of privacy, Defendants could have covered the windows of the beauty shop and the entrance of the gym bathroom. Exhibit 1, Reynolds Dep. at 56:22-57:3, 51:2-52:1; Exhibit 24, Expert Report of Wendy Still at 8.

126.    To afford dignity and hygienic conditions for menstruating prisoners, Defendants could have provide reissue supplies of sanitary supplies, allowed the prisoners to wash their hands after being strip searched, and conducted the strip searches of menstruating women in a private setting. Exhibit 24, Expert Report of Wendy Still at 8, 27.

127.    To reduce cross-gender observation of strip searches, Defendants could have prohibited opposite-sex cadets from being in the area where strip searches are happening during cadet training exercises, which has been IDOC policy since 2012. Exhibit 2, 2013 Pasley Dep. at 145:4-146:16.

128.    To reduce the degrading conditions of the group strip searches, Defendants could have ensured that no staff made derogatory comments during the strip searches. Exhibit 24, Expert Report of Wendy Still at 8.

129.    To reduce the trauma of the cadet training exercise, Defendants could have ensured that no staff made inappropriate threatening remarks during the cadet training exercise without justification. Exhibit 24, Expert Report of Wendy Still at 8.

*The Need for Injunctive Relief for Plaintiff Class II*

130.    Since the initial filing of Plaintiffs' lawsuit, and following the transfer of the female inmates from Lincoln to Logan, a "cadet training exercise" took place at Logan on October 31, 2013. Exhibit 3, 2015 Class Member Declarations, Decl. of Ieshia Brown at ¶¶ 1, 31-32.

131.    During the October 31, 2013 cadet training exercise at Logan, dozens of female inmates at Logan were subjected to public group strip searches in full view of male corrections officers, cadets, and other individuals not involved in the strip searches. Exhibit 32, Inmate Grievances from October 31, 2013 Logan Correctional Center cadet training exercise (Bates 1-185); Exhibit 33, Logan Class Member Declarations.

132.    The cadet training exercise at Logan on October 31, 2013 generated dozens of grievances alleging that the strip searches were conducted in a humiliating, unsanitary, and degrading manner, including within view of men. *See* Exhibit 32, Inmate Grievances from October 31, 2013 Logan Correctional Center cadet training exercise (Def. Bates 1-185); e.g., *id.* at 1 (stating for example: "I felt very violated, molested, and sexual exploited to all the male unknown [correctional officers] who were present"; *id.* at 14 (stating: "I felt violated, insecure and embarrassed to be stripped in front of those male officers and it was worse because we had

43

to cough and squat."); *id.* at 35 ("This search was shameful and embarrassing. Yes we are offenders but we have a right to dignity and integrity when it comes to our bodies.").

133.    As recently as September 2015, multiple defendants testified that in their view, IDOC policy permits as many as twenty prisoners to be strip searched at the same time in the same area. *See, e.g.*, Exhibit 23, 2015 Pasley Dep. at 20:8-14; Exhibit 1, Reynolds Dep. at 84:1-11.

134.    IDOC always conducts group strip searches during "cadet training exercises." Exhibit 1, Reynolds Dep. at 124:4-18; Exhibit 7, Hatfield Dep. at 28:20-29:2.

## LEGAL STANDARD

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). When ruling on summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Amer. Hoescht Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. The evidence and all inferences are viewed in the light most favorable to the nonmoving party. *Equip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981).

**ARGUMENT**

**I.     Plaintiffs Present Triable Causes of Action Pursuant to the Fourth and Eighth Amendments.**

"[A] strip search is an invasion of personal rights of the first magnitude." *Farmer v. Perrill*, 288 F.3d 1254, 1259 (7th Cir. 2002) (quoting *Chapman v. Nichols*, 989 F.2d 393, 395 (10th Cir. 1993)); *see also Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994). "Strip searches involving the visual inspection of the anal area are 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, [and] signify [ ] degradation and submission . . . .'" *Campbell v. Miller*, 499 F.3d 711, 718 (7th Cir. 2007) (quoting *Mary Beth G.,* 723 F.2d 1263, 1272 (7th Cir. 1983)). "Courts across the country are uniform in their condemnation of intrusive searches performed in public." *Campbell*, 499 F.3d at 719; *see also Iskander v. Village of Forest Park*, 690 F.2d 126, 129 (7th Cir. 1982) ("Defendant naturally does not maintain that routine strip searches may be conducted in a room open to the prying eyes of passing strangers consistent with the reasonableness requirement imposed on all searches under the Fourth Amendment, nor would such a contention be entertained."). "[W]hile all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." *Canedy*, 16 F.3d at 185 (citation omitted).

Where, as here, prison officials conducts the mass public strip search of 200 prisoners to train cadets, *see* PSOF 17, Plaintiffs are entitled to challenge the constitutionality of the search as an objective matter pursuant to the Fourth Amendment. Moreover, even if the Defendants were entitled to strip search the Plaintiff Class to train a class of cadets, the Fourth Amendment affords protection to prisoners from the humiliating, degrading, and public manner in which the strip search was conducted. *See* PSOF 27-92, 121-129. The Eighth Amendment further protects

prisoners from strip searches conducted in a punitive manner intended to humiliate them. *Id.* 112-119. Plaintiffs accordingly present triable Fourth and Eighth Amendment claims.

A.      The Fourth Amendment Protects Prisoners' Right to Bodily Privacy.

Defendants move for summary judgment on Plaintiffs' Fourth Amendment claims on the sole basis that prisoners have no Fourth Amendment right of privacy as a categorical matter (Def. Mtn. Summ. J. at 8). To the contrary, prisoners do retain a Fourth Amendment protection against unreasonable searches of their bodies, as distinguished from searches of their surroundings. *Forbes v. Trigg*, 976 F.2d 308, 312 (7th Cir. 1992) ("[P]rison inmates retain protected privacy rights in their bodies, although these rights do not extend to their surroundings"); *Peckham v. Wisconsin Dep't of Corrections*, 141 F.3d 694, 697 & n.2 (7th Cir. 1998) (answering "yes" to the question of whether prisoners enjoy protection under the Fourth Amendment against unreasonable searches and seizures); *Mary Beth G.*, 723 F.2d at 1272 (upholding the determination that mass strip searches in police lockups violated the Fourth Amendment and observing: "we can think of few exercises of authority by the state that intrude on the citizen's privacy and dignity as severely as the visual anal and genital searches practiced here"); *Bullock v. Dart*, 599 F. Supp. 2d 947, 963 (N.D. Ill. 2009) (class of prisoners challenging mass strip searches present triable Fourth Amendment claims).[3]

To be sure, the Seventh Circuit in *Peckham* indicated that the Eighth Amendment is the central focus of challenges to unconstitutional strip searches whose aim is punishment, and as set forth below, Plaintiffs assert a meritorious Eighth Amendment claim. *Id.* at 697. Where, as here, however, a prison conducts a mass public strip search to train cadets, Plaintiffs are entitled to

---

[3] Other circuits are in accord. *See, e.g.*, *Peckham*, 141 F.3d 694, 697 n.2; *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993); *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992); *Sepulveda v. Ramirez*, 967 F.2d 1413, 1415 (9th Cir. 1992) (recognizing that prison inmates retain the right to bodily privacy).

challenge the constitutionality of the search as an objective matter. Moreover, even if the Defendants were entitled to conduct strip searches of all prisoners in housing units 2B and 4B, the Fourth Amendment protects the right of prisoners to be free of a public group strip search conducted under humiliating, degrading, and painful conditions. *See* PSOF 27-92

In support of their argument, Defendants rely exclusively on two cases: *Hudson v. Palmer*, 468 U.S. 517 (1984), and *Johnson v. Phelan*, 69 F.3d 144, 146 (7th Cir. 1995). Defendants' analysis is incorrect, and was specifically rejected by the Seventh Circuit in *Peckham*. 141 F.3d at 696-97 (repudiating *Johnson* to the extent that it suggests that prisoners lack a Fourth Amendment right to bodily privacy). *Hudson*, as the Seventh Circuit explained in *Peckham,* merely abrogated Fourth Amendment protections against unreasonable searches of prisoners' cells. 141 F.3d at 696. Defendants' argument must therefore be rejected.

B.     Plaintiffs Present a Triable Fourth Amendment Claim.

Prisoners have a "well established right . . . not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest." *Farmer,* 288 F.3d at 121 (7th Cir. 2002). The constitutionality of prison strip searches turns on "a balancing of the rights of the inmates and the needs of the prison's administration." *Id.* at 121. Although courts "engage[] in a deferential review of the administrative decisions of prison authorities, the traditional deference does not mean that courts have abdicated their duty to protect those constitutional rights that a prisoner retains." *Fortner v. Thomas*, 983 F.2d 1024, 1029 (11th Cir. 1993). "[I]nfringments on prisoners' constitutional rights must not be 'arbitrary or irrational,' nor an 'exaggerated response' to security needs." *Farmer*, 288 F.3d at 1261 (quoting *Turner v. Safley*, 482 U.S. 78, 90 (1987)). Even when the use of a strip search is authorized to detect contraband, correctional officials must

be ensure that the searches are conducted in a reasonable and respectful manner. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Defendants have waived the right to argue these searches complied with the Fourth Amendment. *F.T.C. v. World Media Brokers*, 415 F.3d 758, 766 (7th Cir. 2005). Even if they had not, pursuant to these authorities, Plaintiffs present triable Fourth Amendment claims. Taking the facts in the light most favorable to Plaintiffs, Defendants conducted an unreasonable, disrespectful, and dehumanizing search of Plaintiffs without any penological purpose. PSOF 27-92, 112-129; Exhibit 24, Wendy Still Report at 23-27. As described in Plaintiffs' Statement of Additional Facts, Defendants acknowledged that hands-on training, as opposed to mere instruction, is not even a necessary component of training. PSOF 122. Moreover, training cadets to conduct strip searches under the humiliating and degrading conditions described above runs counter to the training needs of an institution. *See* Exhibit 24, Wendy Still Report at 8, 23-25. The mass strip searches at Lincoln Correctional Center served no legitimate penological interest in eliminating or deterring contraband, and were, as Defendants admit, solely implemented for training purposes. PSOF 112-129. Plaintiffs should therefore be permitted to present their Fourth Amendment claims to a jury.

C.      Plaintiffs Present a Triable Eighth Amendment Claim

For good reason, Defendants do not assert that Plaintiff has failed to show a genuine issue of material fact regarding whether the strip searches were carried out in violation of the Eighth Amendment. The Eighth Amendment prohibits the conduct of strip searches "in a harassing manner intended to humiliate and cause psychological pain.'" *May v. Trancoso*, 412 F. App'x 899, 902 (7th Cir. 2011) (citing *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009); *see also Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004); *Calhoun v. DeTella*, 319 F.3d 936, 939

(7th Cir. 2003). Facts that give rise to an inference of an intent to harass include: the demeaning of prisoners during the search, including through "sexual ridicule," *May*, 412 F. App'x at 903; *Mays*, 575 F.3d at 650; *Calhoun*, 319 F.3d at 940; the presence of opposite-sex or civilian spectators, *May*, 412 F. App'x at 903; *Calhoun*, 319 F.3d at 940; unhygienic or uncomfortable conditions, *Mays*, 575 F.3d at 650; and violation of prison regulations, *May*, 412 F. App'x at 903.

Plaintiffs present ample evidence of Defendants' intent to humiliate them and cause them pain during the March 2011 cadet training exercise, including demeaning and sexually derogative ridicule, opposite-sex spectators, civilian spectators, lack of hygiene, painful and uncomfortable conditions, violation of prison regulations, and threatening conduct. *See* PSOF 27-92. Based on this evidence, and because Defendants have waived any argument to the contrary, *see F.T.C.*, 415 F.3d at 766, Plaintiffs are entitled to present their Eighth Amendment claims to a jury.

## II.     Plaintiffs Present a Triable Claim as to All Defendants Based on their Personal Responsibility for Violating Plaintiffs' Civil Rights.

Defendants' contend that even if a jury believed the Plaintiffs' testimony, Defendants cannot be held liable because Plaintiffs have offered no evidence that any Defendant strip searched any of the Plaintiffs. Defendants' argument misunderstands the requirements for establishing personal liability under 28 U.S.C. §1983. "[W]hile it is true that a plaintiff must establish a defendant's personal responsibility for any claimed deprivation of a constitutional right, a defendant's direct participation in the deprivation is not required. *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (citing *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985)).

On the contrary, an omission or a failure to intervene may suffice to violate civil rights. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). "An official satisfies the personal

49

responsibility requirement of § 1983 if she acts or *fails to act* with a deliberate or reckless disregard of the plaintiff's constitutional rights." *Miller*, 220 F.3d at 495. (emphasis added) (citing *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)). Accordingly, correctional officers who "have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights" bear personal responsibility for the violation under section 1983 claims. *Id.* (citing *Yang*, 37 F.3d at 285).

In the same vein, supervisors are liable for a constitutional deprivation when they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). Of course, "if the conduct causing the constitutional deprivation occurs at [the defendant's] direction or with her knowledge and consent," the supervisor is liable for the deprivation. *Crowder*, 687 F.2d at 1005. Supervisory liability also arises "when the supervisor disregards known or obvious risks of constitutional violations that would flow from a lack of supervision." *Mayes v. City of Hammond*, 442 F. Supp. 2d 587, 635 (N.D. Ind. July 5, 2006) (internal quotation marks omitted). Finally, watching unconstitutional conduct, without intervening, is sufficient to subject supervisors to liability. *May*, 412 F. App'x at 903 (citing *George v. Smith*, 507 F.3d 605, 609-610 (7th Cir. 2007)).

Yet another basis upon which Defendants are liable is their part in a conspiracy to deprive the plaintiffs of their constitutional rights. To establish liability on that basis, Plaintiffs need only show that Defendants were "voluntary participant[s] in a common venture" and understood "the general objectives of the scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do [their] part to further them." *Jones*, 856 F.2d at 992; *see also, e.g.*, *McCann v. Mangialardi*, 337 F.3d 782, 789 (7th Cir. 2003); *Williams v. Brown*, 269 F.Supp.2d 987, 994-95

(N.D. Ill. July 1, 2003) reversed on other grounds by 2003 WL 22454083 (N.D. Ill Oct. 3, 2003).

Plaintiffs need not prove that Defendants "agreed on the details of the conspiratorial scheme or

even know who the other conspirators are." *Jones*, 856 F. 2d at 992.

Pursuant to these principles, Plaintiffs present a triable cause of action against Defendants

Hulett, Reynolds, Pasley, Hatfield, Dawdy, Craig, Edmonson, Johnson, Leonetti, Pfeiffer, Slater,

Krull, Dallas, Anderson, Crudup, Butler, and Spaniol and their citation to *Harper v. Padilla*, 400

F.3d 1052 (7th Cir. 2005) falls short.

A.    Defendants' Liability for Conspiracy

Plaintiffs put forward sufficient evidence from which a reasonable jury could infer that

the March 2011 cadet training exercise was conducted pursuant to Defendants' organized plan

and agreement to maliciously and sadistically inflict harm on Plaintiffs; to subject them to a

humiliating, degrading public strip search in violation of their constitutional rights; and to refrain

from intervening on their behalf.

Defendants began the cadet training exercise with a briefing in the dietary hall at which

they discussed and agreed upon how the exercise would unfold. PSOF 25. Following that

briefing, correctional staff of varying ranks and responsibilities engaged in widespread

misconduct, in obvious fashion, in multiple locations, and in the vicinity of numerous other staff

members. PSOF 27-92. The misconduct occurred in widespread, obvious fashion, and

Defendants made no attempt to conceal their actions. *Id.* The misconduct included subjection of

prisoners to group strip searches in full view of groups of men and women not conducting the

search, under humiliating, degrading, and unsanitary conditions; the direction of sexually

derogatory and humiliating insults at prisoners; the use of threatening behavior and language

without justification; the unnecessary and painful physical restraint of prisoners – in handcuffs –

51

without accommodation for elderly prisoners and those with disabilities; the deprivation of water and opportunities to use the bathroom throughout the duration of the cadet training exercise; and the forced standing of members of the Plaintiff class for hours while they awaited strip searches, for no penological purpose whatsoever. *Id.* Much of the misconduct was directly contradictory to IDOC policy, even though prisons are paramilitary organizations that operate on a strict chain of command. PSOF 26, 93-101. Despite the numerous problems that arose during the cadet training exercise, no staff member reported any rule violations; no internal investigation ensued; and no discipline was meted out in connection with the cadet training exercise. PSOF 102-111.

After the cadet training exercise, dozens of prisoners submitted grievances that mysteriously disappeared. PSOF 105-108. The John Howard Association and Class Representative Beverly Throgmorton brought the missing grievances to the attention of, respectively, Defendants Hulett and Reynolds. PSOF 108, 109, 111. No action was taken to investigate misconduct during the cadet training exercise as a result, however, and no employee received any form of discipline in connection with the event. PSOF 102-104, 110.

Taking all inferences in favor of the non-moving party, as this Court must, these facts suffice to create a genuine issue of material fact regarding whether Defendants agreed to deprive Plaintiffs of their constitutional rights and took steps in furtherance of that enterprise. A jury could easily infer from this highly coordinated and widespread misconduct – as well as the briefing that preceded it—that Defendants came to an agreement prior to the shakedowns to commit the misconduct and entered into a conspiracy. *See, e.g.*, *Williams v. Brown*, 269 F. Supp. 2d 987, 994–95 (N.D. Ill. 2003) (evidence suggesting that officers arrived *en masse* and subsequently acted in a "cooperative and organized manner" permitted inference that "some planning had taken place in advance" and precluded summary judgment against plaintiff on

conspiracy claim); *Petrovic v. City of Chicago*, No. 06 C 6111, 2008 WL 4286954, at \*8 (N.D. Ill. Sept. 16, 2008) ("A reasonable jury could conclude from the fact that these officers acted in concert while they used excessive force that there was an implied agreement to do so."). Plaintiffs accordingly present triable claims against Defendants Hulett, Reynolds, Pasley, Hatfield, Dawdy, Craig, Edmonson, Johnson, Leonetti, Pfeiffer, Slater, Krull, Dallas, Anderson, Crudup, Butler, and Spaniol.

     B.     <u>The Personal Involvement of Defendant Supervisors Warden Hulett and Assistant Warden of Operations Reynolds</u>

     Additional bases abound for proving at trial that Defendants Hulett and Reynolds were personally responsible for violating Plaintiffs' constitutional rights. Defendants Hulett and Reynolds were present during the strip searches and heavily involved in supervision of the cadet training exercise, also giving rise to personal responsibility for the constitutional deprivations. *See* PSOF 27-29, 31-34, 40, 44-45, 46-51, 64, 75, 79-82, 85-89.

     A jury could easily infer that Defendants Hulett and Reynolds had ample notice of the unconstitutional manner in which the cadet training exercise occurred, and failed to intervene on the Plaintiffs' behalf. *May*, 412 F. App'x at 903 (citing *George v. Smith*, 507 F.3d 605, 609-610 (7th Cir. 2007)). Warden Hulett authorized the cadet training exercise and Defendant Reynolds instructed staff members at a briefing. PSOF 18, 25. After the briefing, Defendants Hulett and Reynolds accompanied the cadets to the housing units to handcuff prisoners in Units 2B and 4B. PSOF 25. Defendant Reynolds was among those correctional officers calling the prisoners "bitches" and threatening to put them in segregation if they did not remain quiet during the cadet training exercise. PSOF 32. Defendant Reynolds was in charge of commanding Lincoln staff on the day of the cadet training exercise, and pursuant to authority delegated from Hulett, and he instructed his staff to conduct strip searches of prisoners in the bathroom abutting the gym. PSOF

28, 46, 49. Defendants Reynolds and Hulett visited the gym while group searches were taking place in the bathroom with an open door, and were among those staff members prohibiting prisoners from sitting, getting a drink of water, or use the restroom during the training exercise. PSOF 85, 89. Even after prisoners appealed to Defendants Hulett and Reynolds for help – informing them of complaints including that they had been standing in handcuffs for hours waiting for strip searches, and that the floor was contaminated with menstrual blood – Defendants Hulett and Reynolds failed to intervene on their behalf. PSOF 85. Defendant Reynolds did nothing to ensure that replacement feminine sanitary supplies were available during the mass strip search, even though he admits it was his responsibility to do so. PSOF 75.

Finally, even if a jury were to credit Defendants Hulett and Reynolds's testimony that they spent little time in the gym and did not see any misconduct therein – over which a genuine issue of material fact exists, a jury could reasonable conclude that Defendants Hulett and Reynolds disregarded known or obvious risks of constitutional violations that would flow from their lack of supervision over the cadet training exercise. *Mayes*, 442 F. Supp. 2d at 635. Defendants Hulett and Reynolds orchestrated the exercise without first preparing or reviewing an operational plan, even though the cadet training exercise was the first of its kind at Lincoln during their tenure and involved the mass strip search of 200 women, and even though the lack of such preparation is well understood by corrections officials as necessary to protect prisoners from abuse. PSOF 20-21. Plaintiff thus puts forward ample facts from which a jury could reasonably find Warden Melody Hulett and Assistant Warden of Operations Reynolds personally liable for the deprivation of Plaintiffs' constitutional rights.

C.      The Personal Involvement of Defendant Training Instructors Alan Pasley and
        Renee Hatfield

Training instructors Defendant Pasley and Renee Hatfield are liable not only as co-

conspirators, but also for their direct involvement in Plaintiffs' constitutional violations and their

failure to supervise their subordinates during the training exercise.

Defendant Pasley was, at the time of the March 31, 2011 cadet training exercise, the

training specialist primarily responsible for the conduct of the cadets during the training exercise

and was delegated additional responsibility for overseeing the cadet training exercise by

Defendant Hulett. PSOF 12. Defendant Pasley participated in the briefing, at which the

instructions for the cadet were given. PSOF 25. Pasley then went with the cadets and Defendant

Orange Crush Members to the housing units, accompanying the cadets as they transported

prisoners to the gym, inside which strip searches were taking place in a bathroom open to the

gym. PSOF 41, 51-52. In the housing units and on the way to the gym, multiple Defendants

engaged in misconduct including hurling sexually derogatory, humiliating, and degrading insults

at the prisoners; threatening the prisoners with their conduct and actions, without justification;

bringing members of the Plaintiff Class to tears through the use of tight handcuffs without

accommodation for elderly prisoners or those with disabilities, all without justification; and

forcing prisoners to stand for long periods of time, handcuffed, for no legitimate purpose. *See*

PSOF 27-46. A reasonable jury could easily infer from these facts that Pasley knew about the

misconduct at the cadet training exercise and either approved of it or turned a blind eye for fear

of what he would see. *Jones*, 856 F.2d at 992-93.

In addition, Defendant Pasley knew that the cadets he supervised were planning to

subject Lincoln prisoners to group strip searches, PSOF 17, 25, an invasion of privacy of the

"first magnitude." *Farmer*, 288 F.3d at 1259. Despite his supervisory responsibilities and the

important privacy interests at stake for the Plaintiff Class, Defendant Pasley testified that he did not bother to determine whether anyone was supervising cadets during the strip searches and did not oversee the cadets' conduct in the gym. PSOF 92. A jury could therefore infer that Pasley disregarded known or obvious risks of constitutional violations that would flow from his lack of supervision of cadets performing group strip searches of 200 prisoners, and find Pasley liable on that basis.

For her part, Defendant Hatfield also supervised the cadets as a training academy instructor. PSOF 48. In fact, Defendant Hatfield was the sole training instructor present in the gym throughout the cadet training exercise and had a central role in supervising the cadets conducting strip searches. PSOF 48. During the cadet exercise, Defendant Hatfield went into the gym bathroom to observe strip searches taking place there. PSOF 45, 48. Hatfield was also in close proximity to misconduct that took place in the gym, as prisoners were forced to stand facing the wall, unnecessarily and for many hours, while handcuffed, as they awaited group strip searches. PSOF 80. Although Hatfield now claims that she saw no misconduct, a jury could reasonably discredit this self-serving testimony and instead conclude that Hatfield had clear notice of the misconduct occurring around her, throughout the entire cadet training exercise and in obvious and unconcealed fashion, and that she failed to intervene on the Plaintiffs' behalf.

D. The Personal Involvement of Defendants Dawdy, Craig, Edmonson, Johnson, Leonetti, Pfeiffer, Slater, Krull, Dallas, Anderson, Crudup, Butler, and Spaniol

Finally, Plaintiffs present abundant evidence from which a jury could infer that Defendants Dawdy, Craig, Edmonson, Johnson, Leonetti, Pfeiffer, Slater, Krull, Dallas, Anderson, Crudup, Butler, and Spaniol directly participated in the constitutional deprivations or failed to intervene on Plaintiffs' behalf. *See* PSOF 27-32, 35, 45-46, 49, 64, 69, 71-72, 83-84.

Critically, Plaintiffs' evidence supports the inference that each of these defendants either conducted or directly observed the unconstitutional public strip searches. Defendants Johnson, Slater, Edmonson, Crudup, and Butler conducted the degrading strip searches, alongside cadets, and Defendants Slater and Crudup were among those making derogatory comments and gestures about Plaintiffs' naked bodies and odors. PSOF 47, 71. Defendants Dawdy, Leonetti, Johnson, Dallas, Spaniol, Anderson, and Pfeiffer monitored and yelled at the prisoners in the gym throughout the morning, as they stood for hours awaiting strip searches. PSOF 31, 49, 64, 83-84. Taking all inferences in Plaintiffs' favor, as this Court must, a jury could easily conclude that the Defendants either participated in strip searches or had notice of the unconstitutional conduct, and failed to intervene on the Plaintiffs' behalf.

Defendants' personal involvement does not stop there, however. Defendant Dawdy instructed the Orange Crush Officers to arrive for the cadet training exercise dressed in riot gear. Defendant Dawdy likewise permitted the members of the Orange Crush tactical team – Defendants Edmonson, Johnson, Leonetti, Pfeiffer, Slater, and Krull – to engage in threatening, punitive, and needlessly intimidating conduct as they stormed Plaintiffs' housing units and to refuse to make accommodations for elderly and disabled prisoners. PSOF 24, 27, 37-38. Defendants Johnson, Edmonson, and Slater called the prisoners "bitches" and threatened to put them in segregation if they did not remain quiet during the cadet training exercise. PSOF 32.

That a particular constitutional deprivation involved a large number of defendants does not insulate them from liability. "The number of officers present and able to intervene to save an innocent person from unconstitutional summary punishment . . . in no way correlates with any one officer's duty to intercede." *Yang*, 37 F.3d at 286. Instead, each state actor present "has an independent duty to act." *Id.* Moreover, a plaintiff's inability to identify which of the named

defendants violated his constitutional rights with a particular action does not preclude liability so long as the Plaintiff can show that each defendant either participated in the misconduct or "ignored a realistic opportunity to intervene." *Logan v. City of Chicago*, 891 F. Supp. 2d 897, 903 (N.D. Ill. 2012). Drawing all reasonable inferences in Plaintiffs' favor, there is sufficient evidence from which a reasonable jury could conclude that each of these defendants contributed personally to the deprivation of Plaintiffs' rights, further subjecting them to liability.

**III.    Plaintiffs Plead Personal Capacity Claims Against Defendant Hulett.**

Defendant Hulett seeks summary judgment for the claims against her on the basis that she has been sued only in her official capacity and is no longer the warden. Despite the inartful wording of Plaintiffs' complaint, Plaintiffs have provided clear notice that they have sued Defendant Hulett in her personal capacity for her involvement in the cadet training exercise. Accordingly, Defendant Hulett's argument should be rejected.

Rule 8 remains "a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (citation omitted); *see also Luckett v. Rent–A–Center, Inc.*, 53 F.3d 871, 873 (7th Cir. 1995) ("[T]he pleading stage is not the occasion for technicalities"); 2 James Wm. Moore, et al., Moore's Federal Practice § 8.04 (3d ed. 2006) ("The intent of the liberal notice pleading system is to ensure that claims are determined on their merits rather than through missteps in pleading."). The record supports that Hulett has received sufficient notice of the personal capacity claims directed at her, in compliance with Rule 8. First, Plaintiffs identify Defendant Hulett's personal involvement in the cadet training exercise in their complaint. *See, e.g.*, Sixth Amended Complaint, Dkt. No. 83, at ¶4 (noting that the cadet training exercise was "organized by Defendant[] Hulett" and other defendants); ¶19 (stating that Warden

Hulett and other defendants were "in charge of permitting the IDOC cadets to perform this

public group strip search at Lincoln").

     In addition, Plaintiffs made clear during Defendant Hulett's deposition that they sued her

in her personal capacity, focusing on her personal involvement with questions such as:

- "Q: Who was in charge of the mass shakedown? A: Outside of myself? Q: Well, that's what I was – you're the one in charge, correct? A: Yeah, I supervise, yes, the team." Exhibit 6, Hulett Dep. at 78:14-78:18.
- "Q: Well, you were in charge of the mass shakedown. Did you delegate some responsibilities? A: I did, uh-huh. Q: Who did you delegate responsibilities to?" *Id.* 79:9-79:12.
- "Q: . . . . Who made the decision as to which housing unit would be subject to a mass shakedown? A: That would have been a discussion between me and my assistant warden." *Id.* 90:1-90:5.
- "Q: . . . . Were you present in the gymnasium on March 31, 2011, when the strip searches were taking place? A: I was not. I was – I made the initial trip there with the first round of offenders that were taken over. I stayed and – until they start moving the women into the bathrooms. I left it in the hands of Assistant Warden Reynolds as well as Pasley and his staff." *Id.* 94:10-94:18.
- "Q: What direction, if any, did you give to the cadets and/or the regular correctional officers -- A: I didn't. Q: -- as to whether or not the women would be handcuffed when being taken from their cell to the gymnasium? A: I do not recall giving any." *Id.* 102:13-102: 19.
- "Q: Other than that, did you do anything else when the first group of women came in? . . . . . A: Huh-uh. Just did a walk-through and that's it, a walk-through and that's it." *Id.* 105:14-105:19.

     Plaintiffs also put Defendant Hulett on notice of the personal capacity claims against her

through written discovery, inquiring about her own role in the cadet training exercise and

whether she acted consistently with IDOC policy. *See* Exhibit 25, Defendant Hulett's Responses

to Plaintiffs' First Set of Interrogatories at Nos. 2, 4, 6. Defendant Hulett clearly understood that

she was being sued in her personal capacity, as she responded responding at deposition and in

interrogatories based on her personal involvement. *See id.*

     In sum, to hold that Defendant Hulett still does not have adequate notice of the

allegations against her would place form over substance. At this stage of the proceedings – after

extensive discovery about Defendant Hulett's personal involvement – seeking dismissal on a

technical pleading defect is simply gamesmanship. At a bare minimum, should this Court find

Plaintiffs' complaint insufficient, it should afford Plaintiffs an opportunity to amend their

complaint under the liberal allowance of Rule 15 to make it explicit that Defendant Hulett has

been sued in her personal capacity. *See* FED. R. CIV. P. 15; *Stanard v. Nygren*, 658 F.3d 792,

800-01 (7th Cir. 2011) (pleading rules favor decisions on the merits rather than technicalities,

and leave to amend pleadings should be freely given).

**VI.     Plaintiffs' Injunctive Claim Survives Summary Judgment.**

Defendants also argue that Plaintiffs' claim for injunctive relief fails as to Yurkovich,

Zavala, and Hatfield because there is no ongoing violation of Plaintiffs' constitutional rights. As

proof, Defendants contend that IDOC policy currently prohibits searching female inmates in

view of male officers, verbal abuse, and unhygienic conditions during a search. They contend

that the only IDOC policy that is at issue here is IDOC's policy of allowing the search of more

than one inmate at a time, and that group strip searches are only unconstitutional if conducted

without a valid reason and in a harassing manner intended to humiliate and cause psychological

harm. (Mot. Summary Judgment at 12-13) (citing *Mays v. Springborn*, 575 F.3d 643, 649-50 (7th

Cir. 2009)). Because, as they reason, IDOC's policies pass constitutional muster, there are no

ongoing violations that this Court need address through injunctive relief.

As set forth above, taking the undisputed facts in the light most favorable to Plaintiffs,

the searches that were conducted in this case were unconstitutional. But even setting that aside,

whether or not there are specific IDOC policies in place that prohibit aspects of the strip search

that Plaintiffs experienced in this case, there is evidence that these kinds of strips searches

continue unabated and that the lack of accountability and the lack of a meaningful grievance

process prove that IDOC has a problem with compliance even with its own stated policies and standards.

A.   Plaintiffs' Claim for Injunctive Relief Is Against Defendants Zavala, Brannon and Atchison to Prevent Ongoing Constitutional Violations.

Under the *Ex parte Young* doctrine, a plaintiff may file suit against state officials seeking prospective equitable relief to rectify ongoing violations of federal law. *Ex Parte Young*, 209 U.S. 123, 159-60 (108); *see also Sottoriva v. Claps*, No. 06-3118, 2008 WL 821870, at *11 (C.D. Ill. Mar. 26, 2008). The question is whether Plaintiffs have shown ongoing violations of federal law and seek prospective relief. *Verizon Maryland, Inc. v. Public Service Comm. Of Maryland*, 535 U.S. 635, 645 (2002). Here, both are true. Plaintiffs have shown, taking the facts in the light most favorable to them, that Defendants Zavala, Brannon and Atchison continue to violate Plaintiffs' constitutional rights by continuing to enforce a policy of allowing mass strip searches without appropriate constitutional safeguards, and by allowing unconstitutional strip searches without accountability for the IDOC employees who participate in them.

The operative version of Plaintiffs' Complaint, the Sixth Amended Complaint filed on March 31, 2014, does not raise an official capacity claim as to Defendant Hatfield. Plaintiffs do bring an official capacity claim against Defendants Zavala, Brannon and Atchison. Defendant Atchison is acting as the IDOC Deputy Chief of Operations at this time; Defendant Zavala is employed by IDOC as the IDOC Training Academy manager of Staff Development and training; and Defendant Brannon is the Warden at Logan Correctional Center. See Exhibit 21, IDOC page on Michael Atchison; Exhibit 5, Zavala Dep at 6:18-22; Exhibit 22, IDOC page on Christine Brannon.

These state actors, in their capacities as IDOC Chief of Operations, training manager, and Warden at Logan Correctional Center, where the female inmates formerly housed at Lincoln

Correctional Center now reside (PSOF 11), are responsible for the manner in which strip searches are conducted by IDOC cadets at institutions housing women. Each of these state actors continues to perpetuate unconstitutional policies and practices with respect to mass strip searches of female inmates, in that each of these state actors continues to perpetuate a policy of allowing mass strip searches of women a part of cadet training exercises where those mass strip searches are conducted in a humiliating fashion unrelated to any legitimate penological purpose.

B.     The Risk of Ongoing Harm is Already Manifested By Similar Unconstitutional Strip Searches in 2013 at Logan Correctional Center.

The Court need no better evidence that injunctive relief is necessary to prevent ongoing harm than evidence that on October 31, 2013, a similar cadet training exercise occurred at Logan Correctional Center, where female inmates of Lincoln Correctional Center were transferred subsequent to the mass strip search in this case. PSOF 130-132. The 2013 strip searches were also a cadet training exercise and had many of the same unconstitutional features as the searches at issue in this litigation did: (1) women were searched in large groups (2) in the presence of male correctional officers and (3) individuals who had no role in the search; (4) women were kept handcuffed for long periods of time in uncomfortable positions in the gym; (5) demeaning language was used by IDOC staff and cadets during the searches; (6) women were denied access to sanitary products, creating unsanitary and demeaning conditions; and (7) women were denied access to the bathroom. *Id.* The 2013 Logan strip searches alone demonstrate that injunctive relief is necessary to prevent ongoing and persistent violations of the rights of Plaintiffs and women who are similarly situated.

C.    IDOC's Codified Standards for Strip Searches Allow for Unconstitutional Searches.

Moreover, as Plaintiffs' expert Wendy Still concluded in her report in this case (Exhibit 24, Report of Wendy Sill), IDOC lacks accountability to ensure future compliance with generally accepted correctional standards regarding strip searches, even if some of those correctional standards are codified in IDOC's stated policies. As an initial matter, and as the Defendants acknowledge, IDOC's policies allow for the search of more than one inmate at a time, and the Defendants in this case testified that they interpreted that policy to allow as many as twenty correctional employees to be strip searched simultaneously, in the same location. PSOF 133. This ongoing policy fosters the conditions in which the constitutional violations in this case occurred, because the Defendants in this case believed the mass strip searches they were conducting were constitutional despite the clear constitutional problems with numerous aspects of the searches.

D.    The Way in Which The Strip Searches Were Conducted in This Case Demonstrates a Continuing Lack of Oversight and Discipline That Ensures Future Searches Will Also Be Unconstitutional

Even setting aside IDOC's written policies, however, the way in which the strip searches in this case were conducted demonstrates a continuing lack of oversight and discipline that creates a serious risk of ongoing harm in the form of future unconstitutional searches. This is true for two reasons. First, the grievance system at Lincoln Correctional Center failed after the March 2011 cadet training exercise. Numerous prisoners reported that they submitted grievances after the search, but never received any response. PSOF 108. During a February 2012 monitoring visit by the John Howard Association to Lincoln Correctional Center, a large number of inmates independently voiced concerns about the March 2011 cadet training exercise and the disappearance of their grievances. The John Howard Association report concluded that between

80 and 150 grievances about these searches were filed, but no one knew what happened to the grievances, and no one received a response to their grievances. *Id.* Despite this evidence that scores of inmates grieved the conditions of the mass strip search, the defendant administrators and training staff reported that they had no knowledge of those grievances. PSOF 110. The failure to permit inmates to report the sexual harassment during this cadet training exercise violates the standards of the Prison Rape Elimination Act. *See* 28 C.F.R. 115.51(a) (requiring that correctional agencies "provide multiple internal ways for inmates to privately report sexual abuse and sexual harassment, . . . and staff neglect or violation of responsibilities that may have contributed to such incidents"); *id*. 115.51(c) (requiring that "[s]taff shall accept reports made verbally, in writing, anonymously, and from third parties and shall promptly document any verbal reports"); *id*. 115.61(a) requiring that correctional agencies "require all staff to report immediately and according to agency policy any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency . . . and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation"); *id*. 115.61(e) ("The facility shall report all allegations of sexual abuse and sexual harassment, including third-party and anonymous reports, to the facility's designated investigators.").

In total, Ms. Still will testify that the scope of the failure to allow the women in this case to effectively grieve the strip search reflects a systematic problem and not an isolated incident. See Exhibit 24, Expert Report of Wendy Still at 30. This problem is related to the fact that despite all of the unconstitutional behavior that took place during this strip search, no staff reported any violations; no internal investigation was completed; and no discipline was handed out to any IDOC employees. PSOF 102-103. These widespread failures, too, reflect systematic

problems rather than isolated incidents and evidence a culture that emboldens, facilitates, and

encourages abuses of the kind that occurred during the March 2011 cadet training exercise.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion

for Summary Judgment in full.

RESPECTFULLY SUBMITTED,

/s/ Ruth Brown
Attorney for Plaintiffs

Arthur Loevy
Michael Kanovitz
Jon Loevy
Tara Thompson
Ruth Brown
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Ruth Brown, an attorney, certify that on February 2, 2016, I caused the foregoing
Plaintiffs' Response to Defendants' Motion for Summary Judgment to be served on all counsel
of record via CM/ECF electronic filing.

/s/ Ruth Brown

## <u>CERTIFICATION OF COMPLIANCE</u>

 I, Ruth Brown, an attorney and counsel for Plaintiffs in the present case, hereby certify that Section 2(c) of the foregoing Memorandum of Law complies with this Court's Local Rule 7.1(D)(5) and 7.1(B)(4) in that the word processing program I used to prepare the Memorandum, Microsoft Word, measures the Word Count of the Argument Section of this Brief at 6594 words, including headings, footnotes, and quotations.

         <u>  /s/ Ruth Brown</u>