1          IN THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
2                 SPRINGFIELD DIVISION

3

BEVERLY THROGMORTON, ET      )
4  AL.,                      )
                             )  12-CV-3087
5            PLAINTIFFS,     )
                             )  JURY TRIAL
6        VS.                 )
                             )  SPRINGFIELD, ILLINOIS
7  REYNOLDS, ET AL.,         )
                             )
8            DEFENDANTS.     )

9

           TRANSCRIPT OF PROCEEDINGS
10     BEFORE THE HONORABLE RICHARD MILLS
            UNITED STATES DISTRICT JUDGE
11
NOVEMBER 15, 2016
12
A P P E A R A N C E S:
13
  FOR THE PLAINTIFFS:   VINCENZO FIELD
14                       RUTH Z. BROWN
                         TARA ELIZABETH THOMPSON
15                       LOEVY & LOEVY
                         3RD FLOOR
16                       311 NORTH ABERDEEN STREET
                         CHICAGO, ILLINOIS
17

18
  FOR THE DEFENDANTS:   KAREN L. MCNAUGHT
19                       DEBORAH L. BARNES
                         LAURA K. BAUTISTA
20                       ILLINOIS ATTORNEY GENERAL
                         500 S. SECOND STREET
21                       SPRINGFIELD, ILLINOIS

22

23  COURT REPORTER:      KATHY J. SULLIVAN, CSR, RPR, CRR
                         OFFICIAL COURT REPORTER
24                       600 E. MONROE
                         SPRINGFIELD, ILLINOIS
25                       (217)492-4810

1                          I N D E X

2     WITNESS                                    PAGE

3        PATRICIA PHILLIPS
              Direct Examination            15-3
4             Cross Examination             15-9
              Redirect Examination          15-15
5
        RUSSELL REYNOLDS
6             Direct Examination            15-18
              Cross Examination             15-152
7             Redirect Examination          15-171
              Recross Examination           15-176
8
        ADRIAN MAYNOR
9             Direct Examination            15-179
              Cross Examination             15-197
10            Redirect Examination          15-199

11       TROY DAWDY
              Direct Examination            14-200
12

13
     PLAINTIFFS EXHIBIT
14   NUMBER                      IDENTIFIED   ADMITTED

15

16

17

18

19
     DEFENDANTS EXHIBIT
20   NUMBER                      IDENTIFIED   ADMITTED

21

22

23

24

25

P R O C E E D I N G S

\* \* \* \* \* \* \* \* \* \* \*

(The jury entered the courtroom.)

THE COURT:  Thank you, Madam Clerk.  Good morning, everyone.

Well, we're here again.  Everyone is in place.  Witness is on the stand.  And we will pick up from last evening.

Very well, counsel, you may proceed.

MR. FIELD:  Thank you, Your Honor.

PATRICIA PHILLIPS

recalled as a witness herein, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FIELD:  (CONT'D)

Q.  Good morning, Ms. Phillips.

A.  Good morning.

Q.  When we stopped yesterday, we were talking about your strip search on March 31st, 2011.  I just want to quickly run through a couple of things so we can get back up to speed.

Where you were strip-searched on March 31, 2011?

A.  In the beauty shop.

Q.  And how many women were searched with you?

1     A.  About eight.

2     Q.  Okay.  Does the beauty shop have a door to

3 the outside?

4     A.  Yes.

5     Q.  Okay.  And does that door have a window?

6     A.  Yes.

7     Q.  This is Exhibit 226 which we looked at

8 yesterday.  Is that the door in the beauty shop with

9 the window?

10     A.  Yes.

11     Q.  Okay.  You testified yesterday that you saw

12 Warden Hulett in the gym.  And that one of the

13 things that you overheard her say was "who

14 authorized this?"  Where were you when you overhead

15 Warden Hulett say that?

16     A.  I think I was -- I was sitting down I think.

17 It was after -- I can't -- I can't recall.

18     Q.  Okay.  Do you recall where Warden Hulett was

19 when she said that?

20     A.  Yeah.

21     Q.  Where was she?

22     A.  She was walking in the door towards Warden

23 Reynolds.

24     Q.  Walking in the door of the gym?

25     A.  Yeah, of the gym.

        Q.  Okay.  And you said she was walking towards
Warden Reynolds?

        A.  Yes.

        Q.  Okay.  Who was Warden Hulett talking to when
she said, "who authorized this?"

        A.  She just came in and said, "Who authorized
this?"  I don't know who she was talking to.

        Q.  Okay.  Was she -- was she with anybody --
was Warden Hulett with anybody when she said, "who
authorized this?"

        A.  I think Debbie Denning was right behind her.

        Q.  And you said she was walking towards
Assistant Warden Reynolds?

        A.  Yes.

        Q.  Okay.  After the strip search on March 31st,
2011, did you file a grievance?

        A.  Yes, I did.

        Q.  When did you file that grievance?

        A.  The same day.

        Q.  Okay.  And once you wrote your grievance,
what did you do with it?

        A.  I put it in the grievance box.

        Q.  Okay.  And did you ever get a response to
that grievance?

        A.  No, I didn't.

1      Q.  Okay.  Did you write any additional

2   grievances in relation to the March 31st, 2011,

3   strip search?

4      A.  No.

5      Q.  Okay.  Did you speak to Warden Hulett about

6   your grievance?

7      A.  Yes, I did.

8      Q.  What did you say to Warden Hulett?

9      A.  I just asked her where our grievances were.

10  Why they weren't answered.

11          MS. MCNAUGHT:  Objection, Your Honor.  I'd

12  like some foundation.

13          THE COURT:  I think you're correct, we

14  should have some foundation for that.  That is, give

15  us some of the background as to what we did with

16  these grievances and how she got there and how she

17  talked to her and so forth and so on.

18          MR. FIELD:  She testified, Your Honor, that

19  she wrote a grievance, put it in the grievance box,

20  and never got a response.

21          THE COURT:  Yes.  But then you said -- then

22  they talked.  Okay, let's get the setting for the

23  talking.  How did this happen, when and so forth.

24          MR. FIELD:  Sure.

25          THE COURT:  Okay.

1      Q.  (By Mr. Field)  where were you when you --

2  or when was it that you spoke to Warden Hulett about

3  your grievance?

4      A.  I was on the unit like a few days later.

5      Q.  Okay.  When you say on the unit, was that

6  Unit 2B?

7      A.  Yes.

8      Q.  Okay.  And what did you say to Warden Hulett

9  when you saw her in the unit that day?

10      A.  I asked her where our grievances -- why

11  haven't they been answered?  Where are they?  And

12  she said the counselor had them.

13      Q.  Okay.  Did you speak to anybody else about

14  the grievance?

15      A.  Yes, I did.

16      Q.  Who did you speak to?

17      A.  The counselor.

18      Q.  Where -- when did you speak to the counselor

19  about your grievance?

20      A.  A few days after I talked to Warden Hulett.

21      Q.  Okay.  And where were you when you spoke to

22  the counselor about your grievance?

23      A.  I went into the counselor's office on the

24  unit.

25      Q.  Okay.  What did you say to the counselor?

1    A.  I asked him where our grievances were.

2    Q.  What did the counselor say?

3    A.  He said he gave them to the committee.

4  Grievance Committee.

5    Q.  Did you speak to anybody else besides Warden

6  Hulett and the counselor about your grievance?

7    A.  No, I didn't.

8    Q.  Okay.  Did you have any additional

9  conversations with Warden Hulett about your

10  grievance?

11    A.  No.

12    Q.  What about the counselor; any additional

13  conversations about your grievance?

14    A.  Wait a minute.  I had a couple of

15  conversations with Warden Hulett.  And no to the

16  counselor.

17    Q.  Okay.  So you testified you had one

18  conversation with Warden --

19    A.  Yeah, I meant --

20    Q.  -- a couple of days after the search in the

21  unit.  When was the second conversation with Warden

22  Hulett?

23    A.  Probably about a month later or so.

24    Q.  Okay.  And where were you when you had

25  that --

1     A.  On the unit.

2     Q.  Okay.  And what did you say to Warden Hulett

3  on that occasion?

4     A.  I asked her where our grievances are.  Why

5  ain't they been answered.

6     Q.  And what did Warden Hulett say?

7     A.  They just gave me the runaround.

8        THE COURT:  Well --

9     A.  I mean --

10        MS. McNAUGHT:  Objection.

11        THE COURT:  I sustain the objection.  That

12  is no answer.  Back up, Mr. Field.

13     Q.  Do you recall what Warden Hulett said to you

14  when you asked her about your grievance?

15     A.  She -- I don't recall what she said.

16     Q.  Okay.  No further questions, Your Honor.

17        THE COURT:  Very well.  You may cross.

18        MS. McNAUGHT:  Thank you, Your Honor.

19              CROSS EXAMINATION

20  By MS. McNAUGHT:

21     Q.  The grievance issue was kind of important to

22  you, wasn't it?

23     A.  Yes.

24     Q.  So important to you that you don't remember

25  the specific day that you talked to Warden Hulett;

KATHY J. SULLIVAN, CSR, RPR, CRR
OFFICIAL COURT REPORTER

1 correct?

2     A. It was years ago. Five years ago, ma'am.

3     Q. And you don't remember specifically what you

4 said or what she said in response, is that --

5     A. I remember what I said, I don't remember

6 what --

7        MR. FIELD: Objection --

8        THE COURT: Wait a minute, wait a minute.

9 You can't talk over each other. One at a time.

10     Now, Mr. Field.

11        MR. FIELD: Objection. That

12 mischaracterizes her testimony.

13        THE COURT: Well, we'll work it out here.

14 We just started. Now, let's simmer down and get

15 back at it.

16     All right, Ms. McNaught, pose another question.

17     Q. You don't recall specifically what you said

18 to Ms. Hulett and you don't remember specifically

19 what Ms. Hulett responded to you; isn't that

20 correct?

21     A. No.

22     Q. Okay. What counselor did you talk to?

23     A. I can't remember her name.

24     Q. But a few minutes ago you said it was a him,

25 didn't you?

1          A.  I don't know, ma'am.

2          Q.  You weren't happy about being cuffed, were

3      you?

4          A.  No.

5          Q.  You had an out-of-perimeter job; is that

6      correct?

7          A.  Yes.

8          Q.  And you were doing gardening or maintenance

9      work or something like that?

10         A.  Yes.

11         Q.  Okay.  And that was for what, eight hours a

12     day?

13         A.  Yes.

14         Q.  And you were on your feet?

15         A.  Yes.

16         Q.  And then you had a dietary job too; is that

17     right?

18         A.  Yes.

19         Q.  And you were on your feet for that job about

20     eight hours a day?

21         A.  Not all the time.  We sit down a lot.

22         Q.  Oh, you sit down in the dietary?

23         A.  Yes.

24         Q.  You said that the shakedown on March

25     the 31st of 2011, started at about 7:00 in the

1     morning; is that correct?

2         A.  It was after count, ma'am.  After seven.

3         Q.  Okay.  So sometime between 7 and 7:30?

4         A.  Something like that, that I recall.

5         Q.  And you said that the tactical team came

6     into your unit; is that correct?

7         A.  Yes.

8         Q.  And cadets also came in?

9         A.  Yes.

10        Q.  What were you wearing that morning?

11        A.  I think my sweats and a t-shirt.

12        Q.  Okay.  So you had a t-shirt, sweat pants?

13        A.  What I can recall.

14        Q.  A bra?

15        A.  Yes.

16        Q.  Underwear?

17        A.  Yes.

18        Q.  Were you wearing anything else?

19        A.  Socks and shoes.

20        Q.  And when you were asked to get undressed,

21    how long did it take you to get undressed?  About

22    60 seconds, a minute?

23        A.  No.  About couple minutes.

24        Q.  Took two minutes to get undressed?

25        A.  Yes, about that time.

1        Q.  You'd never been handcuffed inside the

2  institution before March the 11th -- I'm sorry,

3  March 31st of 2011, had you?

4        A.  Not that I can recall.

5        Q.  The door to the -- the door between the

6  beauty shop and the gym has no window, does it?

7        A.  I don't remember that, ma'am.

8        Q.  And there was a big island of hairdryer

9  chairs in the middle of the beauty shop; isn't that

10  correct?

11        A.  I think so; yes.

12        Q.  And you previously testified that you were

13  strip-searched with eight other women; is that

14  correct?

15        A.  About that, ma'am.

16        Q.  You signed a declaration in this case under

17  penalty of perjury, didn't you?

18        A.  Yeah.

19        Q.  So you swore to tell the truth, didn't you?

20        A.  Yes.

21        Q.  And in that declaration, you said that you

22  were strip-searched -- I'm sorry, you were

23  strip-searched with approximately five to six other

24  women; isn't that correct?  Isn't that what you

25  said?

1      A.  I don't recall, ma'am.

2      Q.  Your Honor, may I approach?

3          THE COURT:  You may.

4      Q.  Defendant's Exhibit 33, Paragraph 4.  Don't

5  you say that you were searched with five or six

6  other women?

7      A.  Yes.

8      Q.  You didn't touch any other women that day,

9  did you?  When you were searched?

10     A.  We were close together; yes.  We --

11     Q.  Same paragraph.  You didn't say in number --

12  in Paragraph Number 4 that you touched anybody, did

13  you?

14     A.  I wrote that a long time ago, ma'am.  I

15  don't remember, but I remember --

16     Q.  Isn't that what you -- go ahead.

17     A.  I remember that we touched one time or two.

18     Q.  But in your statement that you filed under

19  penalty of perjury, you said, didn't you, that you

20  were not touching anybody?

21     A.  I must have.

22         MS. MCNAUGHT:  Your Honor, if I may have a

23  moment?

24         THE COURT:  You may.

25         MS. MCNAUGHT:  I have nothing further.

1          THE COURT:  Very well.  Redirect.

2                    REDIRECT EXAMINATION

3    BY MR. FIELD:

4        Q.  During either of the two conversations that

5    you testified that you had with Warden Hulett, did

6    she offer to investigate your grievance?

7        A.  No.

8        Q.  Did she ever follow-up with you about your

9    questions regarding your grievance?

10       A.  No.

11       Q.  Did you ever get any response whatsoever --

12           THE COURT:  Well now, Mr. Field, you know

13   this was not covered in cross-examination.  You're

14   going back to another issue that you didn't -- that

15   wasn't covered by cross.  So what's going on?

16           MR. FIELD:  She was asked about -- that she

17   didn't remember exactly when she spoke to Warden

18   Hulett, you know, and that it wasn't important

19   enough to her when she spoke to her.  So I was

20   trying to establish that there was no follow-up from

21   Warden Hulett.

22           THE COURT:  All right.  Since there's no

23   objection, I'll let you go ahead.

24           MS. MCNAUGHT:  Well, Your Honor, it is

25   outside the scope, so I will object.

1    THE COURT:  No, you can't do that.  I'm not

2  gonna spoon-feed anybody here.  But I'm just calling

3  attention to the fact that we've got to keep things

4  in order, folks.

5      Okay, you go ahead, Mr. Field.

6      Q.  (By Mr. Field)  In either of the two jobs

7  that you testified you had while in the prison, were

8  you forced to stand handcuffed for hours?

9      A.  No.

10     Q.  You were asked some questions about your

11 declaration, which is Defendant's Exhibit 33.  I'm

12 gonna put this -- can you see this?

13     MS. MCNAUGHT:  Oh, Your Honor, I object to

14 this.

15     THE COURT:  Wait a minute.

16     MS. MCNAUGHT:  It has not been entered into

17 evidence.

18     MR. FIELD:  My mistake, Your Honor.

19     THE COURT:  All right, very good.  That's a

20 valid objection.  Sustained.

21     MR. FIELD:  Do you object?

22     MS. MCNAUGHT:  Yes, I do object to it being

23 published to the jury if it's not admitted into

24 evidence.

25     THE COURT:  What is it?

1      Well, let me see it.

2           MR. FIELD:  Sure.  It's a copy of

3   Ms. Phillips' declaration.  The one she was just

4   asked about in cross.  So I would ask to enter it as

5   an exhibit, Your Honor.

6           MS. MCNAUGHT:  Your Honor, it can be used

7   for impeachment purposes by the defendant, but it

8   cannot be used to bolster credibility by the

9   plaintiff.

10          THE COURT:  I understand that completely.

11  No, can't do that.

12      Q.  (By Mr. Field)  You were asked some

13  questions about your declaration.  Did you say in

14  your declaration that you were nearly touching other

15  women?

16      A.  I don't recall.

17      Q.  Paragraph 4.

18      A.  Yes.

19      Q.  What time was count in the mornings?

20      A.  7:00 a.m.

21      Q.  Okay.  And did the strip search or the --

22  strike that.  Did the -- did Orange Crush come in

23  after count?

24      A.  From what I recall; yes.

25      Q.  Okay.  So they came in at some point after

1    count?

2        A.  Yes.

3            MR. FIELD:  Nothing further, Your Honor.

4            THE COURT:  Thank you.

5            MS. MCNAUGHT:  Nothing, Your Honor.

6            THE COURT:  Very well.  Then you may step

7    down, ma'am.  Thank you.

8        (The witness was excused.)

9            THE COURT:  And you may call your next

10   witness.

11           MS. THOMPSON:  We call Russell Reynolds,

12   Your Honor.

13           THE COURT:  Very good.

14       (The witness was sworn.)

15           THE COURT:  Right up here, please, sir.

16                    RUSSELL REYNOLDS

17   called as a witness herein, having been duly sworn,

18   was examined and testified as follows:

19                    DIRECT EXAMINATION

20   BY MS. THOMPSON:

21       Q.  Good morning, Assistant Warden Reynolds.

22       A.  Good morning.

23       Q.  Now, you are retired from the Illinois

24   Department of Corrections, is that --

25         (Court reporter requested clarification.)

1          Q.  I apologize.  Could you state your name for

2     the record, sir.

3          A.  Russell Reynolds.

4               THE COURT:  And spell it, please.

5          A.  Last name or first?

6               THE COURT:  Either one.  Or both.

7          A.  First name Russell, R-u-s-s-e-l-l.  Last

8     name, Reynolds, R-e-y-n-o-l-d-s.

9          Q.  As you said, you're retired from the

10    Illinois Department of Corrections; right?

11         A.  Yes.  I retired from Logan Correctional

12    Center May 1st of 2012.

13         Q.  And you retired as the Assistant Warden of

14    Programs there?

15         A.  Yes.  I was the Assistant Warden of Programs

16    at the Lincoln Correctional Center.

17         Q.  Before that you were Assistant Warden of

18    Operations at Lincoln Correctional Center; right?

19         A.  Officially was Acting Assistant Warden of

20    Operations at Lincoln Correctional Center.

21         Q.  For what years were you the Acting Assistant

22    Warden of Operations at Lincoln --

23         A.  I can't give you the exact date.  Somewhere

24    late in 2010 until December of 2011.

25         Q.  In December of 2011, you went over to Logan?

1      A.   Yes, I transferred across, yeah, across to

2  Logan.

3      Q.   Okay.  And so Acting Assistant Warden of

4  Operations was the title you had on March 31st of

5  2011?

6      A.   Yes, ma'am.

7      Q.   Okay.  Before 2010, what was your assignment

8  within IDOC?

9      A.   From the beginning or at 2010?

10     Q.   Well, where did you come to Lincoln from?

11     A.   I come to Lincoln from Illinois River

12 Correctional Center.

13     Q.   How long were you at Illinois River

14 Correctional Center?

15     A.   Illinois River Correctional Center was our

16 parent facility.  I was assigned in Hannah City Work

17 Camp.  They would have took over somewhere in early

18 2000.  And I was there until 2007.

19     Q.   Were you an assistant warden at Illinois

20 River?

21     A.   No.  I was a Correctional Captain until the

22 Governor eliminated that position and I was demoted

23 or sent back to Correctional Lieutenant.

24     Q.   So your work at Lincoln was the first time

25 you were an assistant warden?

1          A.  Yes, ma'am.

2          Q.  Okay.  And you started in the Illinois

3     Department of Corrections in 1984; is that right?

4          A.  I believe May 7th of 1984.

5          Q.  That's a good memory.  You have years of

6     experience in IDOC then; right?

7          A.  When I retired, I was a little short of

8     29 years; yes.

9          Q.  And you are familiar with the Illinois

10    Department of Corrections policies and procedures?

11         A.  Yes.  Somewhat.  I mean at least at my

12    facilities, yes.

13         Q.  Well, in 2011, you were familiar enough with

14    the Illinois Department of Corrections policies and

15    procedures that you could do your job; right?

16         A.  Yes, ma'am.

17         Q.  And in March of 2011, you were familiar with

18    the facility you worked at, Lincoln Correctional

19    Center?

20         A.  Yes.  I had been there since I think

21    December of 7 -- '07, as a major, until I was

22    promoted to Acting Assistant Warden.

23         Q.  So you knew the staff at Lincoln?

24         A.  Yes, ma'am.

25         Q.  You knew the facility?

1       A.  Yes, ma'am.

2       Q.  And in March of 2011, did you work well with

3  the people that you supervised?

4       A.  I believe so.

5       Q.  You trained some of your subordinates?

6       A.  I would say yeah.  As a Major, you know, you

7  guide Lieutenants and you always give directions to

8  subordinate staff.

9       Q.  And in March of 2011, did you have

10  confidence that if you gave the people you

11  supervised an order, they'd follow it?

12       A.  Yes, ma'am.

13       Q.  Just so the jury understands, would you

14  agree that the Illinois Department of Corrections

15  has -- and I don't mean this as a pejorative term,

16  but a paramilitary hierarchy?

17       A.  They have a chain of command; yes, ma'am.

18       Q.  There are ranks?

19       A.  Yes.

20       Q.  And you have a higher rank, people with a

21  lower rank needs to listen to what the higher

22  ranking people has to say?

23       A.  That's how it's designed; yes, ma'am.

24       Q.  I want to talk a little bit about your job

25  as the Acting Assistant Warden of Operations at

1    Lincoln.

2        One of the responsibilities that you had in

3    that capacity was for dietary in the prison?

4        A.  Yes, ma'am.

5        Q.  And that's food; right?

6        A.  Yep.

7        Q.  Okay.  You were also responsible for

8    maintenance?

9        A.  Yes, ma'am.

10       Q.  Does that mean keeping the facility up?

11       A.  That means safety, sanitation, cleanliness,

12   supervision of the maintenance, the facility

13   engineer, all maintenance staff all reported --

14   followed their chain of command up, but their chain

15   of command would report to me; yes, ma'am.

16       Q.  Okay.  And the other responsibility that you

17   had was for security of the institution?

18       A.  All security operations in the facility;

19   yes, ma'am.

20       Q.  Now, is it your testimony that as the Acting

21   Assistant Warden of Operations at Lincoln, that you

22   were not responsible for grievances?

23       A.  No, ma'am, that's not entirely correct.

24       Q.  So what responsibility did you have for

25   grievances as the Acting Assistant Warden of

Operations?

    A.  In -- grievances primarily were a
programs -- that came to the Assistant Warden of
Programs.  The counselors to the clinical services
supervisor to the AWP or the warden.  Now, both --
at that time, I believe both me and the AWP both had
signature authority for the warden for grievances.

    Q.  Can you explain to the jury what having
signature authority for the warden over grievances
means?

    A.  It's basically she has granted authority in
her absence or if she's gone from the facility that
we handle daily operations.  You could sign
grievances, you would sign rosters with her name.

    Q.  Does that mean reviewing grievances?

    A.  Yeah.  There would be times you would review
grievances; yes, ma'am.

    Q.  So what does it mean to have signatory
authority or signature authority over grievances?

    A.  The warden can grant signature authority to
certain delegated people in a facility and there's a
listing of what they're allowed to sign for her.

    Q.  So that means that in March of 2011, you had
authority to sign documents related to grievances on
Warden Hulett's behalf?

1      A.  Yes, I believe so.

2      Q.  Who was -- you mentioned the Assistant

3  Warden of Programs position.  Who was the Assistant

4  Warden of Programs at Lincoln Correctional Center on

5  March 31st of 2011?

6      A.  Like I said in my deposition, it changed a

7  lot, but I think on March 31st, 2011, it was

8  Mr. Brad Hillman.

9      Q.  Can you spell that name for the Court

10  report?

11      A.  Last name H-i-l-l-m-a-n.

12      Q.  One of your responsibilities as the

13  Assistant Warden of Operations was to be in charge

14  of the tactical team at Lincoln Correctional Center;

15  is that right?

16      A.  No.  My AD, the Tactical Unit Commander,

17  responds or is -- his chain of command is directly

18  to the warden.  Now, I might have dealt with the

19  tach commander when it come to training dates,

20  overtime, if we canceled a practice, that might come

21  through me.  But his actual chain of command is

22  through the Warden herself.

23      Q.  So as the Assistant Warden for Security,

24  it's your testimony that you are not responsible for

25  the tactical team --

1      A.  No, ma'am --

2      Q.  -- when they're in Lincoln Correctional

3  Center?

4      A.  No, ma'am.  That's not what I'm saying.  As

5  Assistant Warden of Operations, I'm responsible for

6  everything that happens inside my facility.  But if

7  he had -- like if a statewide callout, it would go

8  from Springfield to the Warden and directly to

9  Lieutenant Dawdy.  And if Lieutenant Dawdy had

10  reports that he had to have filed or had private

11  issues, his chain of command was directly to the

12  Warden, whether it be a him or a her.

13      Q.  But if there was something going on in the

14  facility in March of 2011, that -- that the tactical

15  team was going to be involved in, that would be

16  under your command?  Inside Lincoln Correctional

17  Center?

18      A.  I would have -- I would have knowledge of

19  it, yes.  But it would be the Warden's final

20  decision at any time a tac team is used inside the

21  facility.

22      Q.  Well, when you say that you would have

23  knowledge, what do you mean?

24      A.  Are we -- if we're talking about the day in

25  question --

1          Q.  And I'm not, I'm asking generally, sir.

2          A.  If -- in most of my situations in dealing

3     with wardens or assistant wardens, if a tac team was

4     coming in, there'd be a sit-down meeting and they'd

5     discuss, "Okay, this is what we're going to do, this

6     is what we're trying to accomplish, and this is

7     where we're going to go."  But the decision to bring

8     a tac team into the facility would come from the

9     Warden herself.

10         Q.  I'm asking a little different question, so

11    I'm sorry if I'm not being clear.

12         A.  Okay.

13         Q.  If there was -- in March of 2011, if the

14    Lincoln Correctional Center tactical team was going

15    to do something inside of Lincoln Correctional

16    Center, you would have authority over that; right?

17         A.  Yes, ma'am.

18         Q.  Okay.  Now, the tactical team, we've heard

19    some testimony about this, they were known as Orange

20    Crush?

21         A.  To the offender population that might have

22    been their title.  To me, it was the Tactical Unit.

23    The Elite Tactical Unit.

24         Q.  Did other IDOC employees call the tactical

25    team Orange Crush?

          A.  I can't say what other people called them.
To me, they were the Tactical Unit.

          Q.  But you knew that they were referred to by
others as Orange Crush?

          A.  As offenders, yeah; they always referred to
them as the Orange Crush.

          Q.  I'm showing you on the monitor, sir, what
was previously marked as Plaintiff's Exhibit 203.

          A.  Yes, ma'am.

          Q.  This is the uniform that the tactical team
wore at Lincoln Correctional Center; right?

          A.  That looks pretty much correct; yes, ma'am.

          Q.  Okay.  And so they're wearing orange
jumpsuits?

          A.  Yes, ma'am.

          Q.  And they've got black vests on?

          A.  Yes, ma'am.

          Q.  Okay.  And they've got gloves on?

          A.  Yeah.  Leather gloves.

          Q.  They have helmets?

          A.  Yes, ma'am.

          Q.  They have boots on?

          A.  Yes, ma'am.

          Q.  And they're carrying batons; right?

          A.  Yes.

1    Q.  How long --

2    A.  Tactical batons.

3    Q.  How long -- how long in terms of measurement

4  were the batons that the Orange Crush team at

5  Lincoln Correctional Center carried?

6    A.  I can't state for certain, but if I was to

7  give you an estimate, it would be 36 inches.

8    Q.  So three feet?

9    A.  Yeah.  Approximately.

10    Q.  And one of the responsibilities for the

11  tactical team in Lincoln Correctional Center was to

12  handle emergency situations; right?

13    A.  Yes, ma'am.

14    Q.  So if there was -- an inmate who needed to

15  be forcibly taken somewhere, that's something Orange

16  Crush would do?

17    A.  Yes.  All cell extractions were handled by

18  our tactical team.

19    Q.  Okay.  And riot situations, obviously?

20    A.  Yes, ma'am.

21    Q.  And other kinds of emergency situations?

22    A.  Yes, ma'am.

23    Q.  Did Orange Shake handle shakedowns?

24    A.  On occasions; yes, ma'am.

25    Q.  So were there shakedowns in Lincoln

1    Correctional Center when you were there that were

2    not done by the tactical teak?

3         A.   There's always shakedowns done in a facility

4    not usually by the tac team.

5         Q.   So shakedowns can also be done by just

6    regular COs?

7         A.   Yes, ma'am.

8         Q.   That's not something Orange Crush has to do?

9         A.   No, ma'am.

10        Q.   Officer -- and again, for all these

11   questions, I'm referring to the period of March

12   2011, so I hope you'll understand my questions that

13   way.

14        Officers volunteered to be on the tactical

15   team; right?

16        A.   Yes, ma'am.

17        Q.   There isn't any extra money that you get for

18   that?

19        A.   Just -- they have two -- usually, they have

20   two two-hour practices a month for training

21   purposes.  And if you come in -- they have practices

22   on different shifts so officers from all the shifts

23   can attend.  If you would come -- say you worked day

24   shift and you stayed over for a three to five

25   practice, you'd get two hours overtime.

1        Q.  So there's the ability to earn overtime on

2  the tactical team?

3        A.  A little bit; yes.

4        Q.  But in terms of your pay rate, if you're

5  doing a technical shift, you're not going to be

6  treated under some different pay structure than a

7  regular correctional officer?

8        A.  No, ma'am.  Correctional Officer,

9  Correctional Sergeant, or Correctional Lieutenant,

10 it doesn't change your pay.

11       Q.  Okay.  You don't get preferential scheduling

12 in terms of what shifts you work?

13       A.  No, ma'am, not at all.

14       Q.  You don't get extra vacation?

15       A.  No, ma'am, not at all.

16       Q.  But it is true that working on the tactical

17 team can be a step for promotion within the Illinois

18 Department of Corrections?

19       A.  I guess you could look at it that way,

20 because you're receiving more intensive and more

21 extensive training.

22       Q.  You're learning more about how different

23 aspects of corrections work --

24       A.  Yes, ma'am.

25       Q.  Operates?

1      A.  Yes, ma'am.

2      Q.  So that could benefit you in the future?

3      A.  Yes, ma'am, I would guess so.

4      Q.  Okay.  So we were talking about this a

5  minute ago, but sometimes, people who are tactical

6  officers will actually go to other IDOC

7  institutions; right?

8      A.  Yeah.  At the -- at the callout of the

9  statewide tac commander.

10     Q.  So if they need additional tactical officers

11 at some other institution, the statewide tactical

12 supervisor might ask officers from Lincoln

13 Correctional Center to go elsewhere?

14     A.  Well, he would contact the -- the facility

15 warden where he is requesting help from.  And that

16 warden or that facility's tach commanders.  And they

17 may take 20 guys, or whatever the number may be,

18 from 10 different facilities if they need them.

19     Q.  And that's because you might need officers

20 who have this specialized training at another

21 institution on a given day?

22     A.  Yes, ma'am.

23     Q.  Okay.  Now, on March 31st of 2011, did any

24 statewide tactical teams, meaning tactical officers

25 not from Lincoln Correctional Center, come to

Lincoln Correctional Center?

     A.  Not to be used in the shakedown.  I'm not

exactly sure if one of the statewide commanders made

an appearance or not.  They were doing a shakedown

simultaneously at Lincoln and Logan on the same day.

     Q.  Okay.  For the jury, Logan is essentially

across the road from --

     A.  Yes.  Lincoln is a male facility in Logan,

Illinois, and Logan Correctional Center is a male

facility in Lincoln, Illinois. (SIC)  they are

approximately 500 yards appoint, right across from

each other.

     Q.  Okay.  So there was -- there were statewide

tactical officers that were across the street on

March 31st; is that right?

     A.  I can't swear to that, but I -- I had heard

that there may have been.  I didn't see Commander

Polley, I didn't see Commander Brady.

     Q.  Okay.  And other than possibly a commander

being at Lincoln, other statewide tactical officers

did not come to Lincoln on March 31st?

     A.  No.  It was only our institutional tach

unit.

     Q.  Okay.  Now, on March 31st of 2011, Troy

Dawdy was the person at Lincoln Correctional Center

1  who was in charge of the tactical team; right?

2      A.  He was my tach unit commander; yes, ma'am.

3      Q.  Okay.  Did he have another rank beside

4  tactical unit commander?

5      A.  Inside the facility, I believe he was the

6  rank of Lieutenant.

7          THE COURT:  Say that again.  I didn't get

8  that.

9      A.  Inside the facility, sir, I think he was the

10 rank of a lieutenant.

11         THE COURT:  Thank you.

12     Q.  In March of 2011, did you know Lieutenant

13 Dowdy well?

14     A.  Yes, ma'am.

15     Q.  How long had you worked together for?

16     A.  I got to Lincoln in 2007, in December, as a

17 day shift Major, and he was there at that time.

18     Q.  So he's someone that you had worked with

19 frequently before March of 2000 -- March 31st of

20 2011?

21     A.  Yes, ma'am.

22     Q.  And you worked well with him?

23     A.  Yes, ma'am.

24     Q.  And on March 31st of 2011, did you believe

25 that if you asked Lieutenant Dowdy to do something,

1    that he would do it?

2         A.  Yes, ma'am.

3         Q.  Or that if you asked him not to do

4    something, that he would do it?

5         A.  Yes, ma'am.

6         Q.  Okay.  Was it your impression on March 31st

7    of 2011, that he was a good commander of the

8    tactical team?

9         A.  Absolutely, ma'am.

10        Q.  And did you believe that he had control over

11   his tactical team officers?

12        A.  Absolutely.

13        Q.  Did you believe that they would obey what

14   Lieutenant Dowdy asked them to do?

15        A.  Yes, ma'am.

16        Q.  And do you believe that they would not do

17   things that Lieutenant Dowdy told them not to do?

18        A.  Yes, ma'am.

19        Q.  Okay.  Now, you know, obviously, that we're

20   here to talk about events that occurred at shakedown

21   and strip searches on March 31st of 2011; right?

22        A.  Yes, ma'am.

23        Q.  Okay.  Were any members of the Illinois --

24   of the Lincoln Correctional Center -- Lincoln

25   Correctional Center Tactical Team ever disciplined

1    for anything that occurred on March 31st of 2011?

2        A.  No, ma'am; not to my knowledge.

3        Q.  No one was ever reprimanded?

4        A.  No, ma'am.

5        Q.  No one was ever talked to in a conversation

6    about things they might need to do differently in

7    the future?

8        A.  No, ma'am.  Not to my knowledge.

9        Q.  In your time as the Acting Assistant Warden

10   of Operations -- or excuse me, the Acting Assistant

11   Warden of Operations at Lincoln Correctional Center,

12   was this the only cadet training exercise that

13   occurred during your time in that position?

14       A.  Yeah, it was the only -- only strip search

15   or cadet exercise we had was -- that I know of in

16   2007 to when I left in '11, was the March 31st,

17   2011.

18       Q.  Okay.  And I think you mentioned this

19   before, but shakedowns were something that happened

20   I think you said all the time at Lincoln

21   Correctional Center?

22       A.  Strip searches, pat searches happen on a

23   daily basis.  Every day.

24       Q.  I'm sorry, I'm asking you specifically about

25   shakedowns.  Shakedowns happen all the time

1    during --

2        A.  Yeah.

3        Q.  -- this time period; right?

4        A.  Yes.

5        Q.  That was not unusual?

6        A.  No.  We assign five bed area shakedowns

7    every day at role call.

8        Q.  And that was -- it was Illinois Department

9    of Corrections policy that every bed had to be

10   looked at at least every 90 days; right?

11       A.  That is correct.  Every 90 days every

12   facility bed had to be shaken down.  The shift

13   commands had a chart in their office listing when

14   what bed was done, and every 90 days, they had to

15   complete that cycle and turn it in to me.

16       Q.  Okay.  So it was your understanding that in

17   the period around March 31st of 2011, Lincoln

18   Correctional Center was meeting that standard?

19       A.  Yes, ma'am.

20       Q.  They were looking at every bed every

21   90 days?

22       A.  Yes, ma'am.

23       Q.  Okay.  We talked earlier about the fact that

24   sometimes it's the tactical team that do shakedowns

25   and sometimes it's other correctional officers?

1    A. Yes, ma'am.

2    Q. In your experience as the Acting Assistant

3 Warden at Lincoln Correctional Center, how was it

4 decided whether particular shakedowns would be done

5 by COs, correctional officers, or by tactical team

6 members?

7    A. It's usually staffing concerns.  If I

8 wanted -- for example, if I wanted to shakedown

9 housing unit 5 and I had a problem in that area, and

10 I wanted to do it in this timeframe, if I had

11 excessive court reporter writs or -- where I

12 couldn't free up, you know, institutional daily line

13 staff, I might request to the warden to bring the

14 tac team in and do it through that procedure.

15    Q. So that's a manpower issue essentially?

16    A. A lot of it would be based on manpower and

17 age.  Financial situations.

18    Q. Okay.  Is there anything else it would be

19 based on besides manpower?

20    A. I mean if I wanted more, to cover a bigger

21 area using more staff, I could use both my line

22 staff and my tactical unit.  But it would be based

23 on what the needs of the facility were.

24    Q. Okay.  So is there -- are there any other

25 considerations you take into account about having

1    the tactical team do a shakedown as opposed to other

2    COs other than manpower; needing more people to do

3    it?

4         A.   No.   They can both accomplish the same

5    situation.

6         Q.   Okay.

7         A.   I'm saying they can handle the same task.

8         Q.   Now, we looked at -- we looked at

9    Plaintiff's Exhibit 203 a minute ago.  When you were

10   the Assistant Warden of Operations at Lincoln

11   Correctional Center and the tactical team did

12   shakedowns, did they do those shakedowns in their

13   regular tactical team outfits?  Like what's depicted

14   in Exhibit 203?

15        A.   If the tac team was used inside the

16   facility, that was their dress code.  That was their

17   uniform.

18        Q.   And is there a reason why they would need to

19   do shakedowns in these uniforms other than that

20   that's what they wear where they're in the facility?

21        A.   Regulations state, policy states that if a

22   tac team is used inside a facility, that is the tac

23   team's dress code.

24        I have never seen, in my 29 years of

25   experience, a tac team member come in as a member of

1    a tac team and not be in that dress code.  In any

2    facility I have ever been in.

3         Q.  Okay.  Let's talk a little bit specifically

4    about March 31st of 2011.  You are the person who

5    requested the shakedowns and the strip searches that

6    happened on that day; right?

7         A.  Yes, ma'am, I was.

8         Q.  Okay.  And there were really two reasons for

9    your requesting the strip search and the shakedown;

10   right?

11        A.  There was one reason on my need.

12        Q.  Okay.  What was the one reason on your need?

13        A.  My need was the safety and security of the

14   facility.  I mean we had an uptick in staff to

15   inmate violence, inmate to inmate violence,

16   unauthorized contraband, abuse of medications.  And

17   I couldn't seem to get, with normal staff

18   operations, get it back to the, you know, level that

19   I wanted it at.  That I thought was, you know,

20   appropriate.

21        So I did -- I did request -- well, I met with

22   Warden Hulett, we discussed it.  And I made a

23   request of Commander Polley through the training

24   academy that if he had extra cadets--because they do

25   a shakedown in every class that comes through the

academy--that if he had free time, I would gladly
accept some help.

Q.  Okay, let's talk about that.  You said for
you there was really one reason and that was safety
and security; is that right?

A.  My main reason always is safety and security
of everybody inside that facility.

Q.  Okay.  Well, you -- was there any other
reason for you besides safety and security?

A.  Just, you know, the normal -- at the time --
at the time this happened in the facility, 2B and 4B
were, not for a better word, my disruptive areas.
We -- we had a very limited, you know, disciplinary
housing seg unit at Lincoln.  And we had a program
called house arrest that we'd put ladies on house
arrest.  They would in seg status, but they didn't
go to segregation, they lived on the unit, they just
didn't have free movement.

And I wasn't -- we weren't controlling it.  I
mean seg was full, house arrest was full, and this
was a means to try to help control the situation.

Q.  Okay.  So there's a lot of things there and
we're gonna talk about them.  Let's talk about the
house arrest program first.

So there were some women in Units 2B and 4B, in

1    March of 2011, that were on this house arrest
2    program; right?
3        A.  I could not tell you for sure, but I would
4    assume that would be correct.
5        Q.  But not everybody?
6        A.  No, not everybody; no, ma'am.
7        Q.  So for instance, you've heard testimony from
8    the plaintiffs, from the class representatives in
9    this case, some of those people had these outside
10   the perimeter jobs; right?
11       A.  Yes, ma'am.
12       Q.  Those people are not on house arrest?
13       A.  Oh, no, ma'am.
14       Q.  You're not sending anybody outside the fence
15   that is a problem inmate; right?
16       A.  No, ma'am.
17       Q.  Okay.  And you're not sending anybody to
18   industry with scissors and sewing machines that is a
19   problem inmate?
20       A.  No, ma'am.
21       Q.  Okay.  So do you have any idea of what
22   percentage of women in Units 2B and 4B were in this
23   house arrest program?
24       A.  I could not tell you at this time.
25   Without --

1       Q.  Less than half?

2       A.  Oh, yes, ma'am, I would say less than a

3    half.

4       Q.  Less than a quarter?

5       A.  I couldn't tell you, ma'am.  I was --

6    there's a hundred offenders in that wing.  I would

7    estimate it was less than a quarter.

8       Q.  Okay.  There's a hundred on 4B and then a

9    hundred on 2B; right?

10      A.  Yes.

11      Q.  And are you saying it's less than a quarter

12   of both?

13      A.  Yes, it would be less than a quarter of the

14   population.

15      Q.  Was it less than 10 percent?

16      A.  I cannot tell you that, ma'am.

17      Q.  Okay.  But you know less than a quarter?

18      A.  I would -- I would venture to guess that

19   would be a safe estimate.

20      Q.  Okay.  Now, for Units 2B and Units 4B, like

21   everywhere else in the institution, you were looking

22   at the beds at least every 90 days?

23      A.  We were searching beds every 90 days; yes.

24   Bed areas.

25      Q.  Right.

1      A.  But understand that we search bed area 210,

2   and Room 2 bed 10 may change every two or three

3   weeks.  I mean you -- that inmate might not live in

4   that bed again.  She may live on House 4.  She may

5   have got transferred.

6      Q.  It was -- and we'll talk about this in a

7   minute, but it was -- you had concerns that looking

8   every 90 days wasn't enough; is that what you're

9   saying?

10      A.  At -- no -- at the time of that shakedown,

11   yes, I had concerns that we had contraband and

12   issues that we needed to correct.

13      Q.  Okay.  So let's go back to the safety and

14   security that you talked about a minute ago.  You

15   said that -- and I want to just list these reasons

16   and we'll talk about?

17      You said there was an uptick of violence at the

18   institution.  Is that right.

19      A.  Inmate to inmate, inmate to staff

20   aggression, you know.  Uptake in contraband.  And

21   increase in IDRs issued to the offenders.

22      Q.  Can you -- what is an IDR?

23      A.  It's an Inmate Disciplinary Report.  Inmates

24   will refer to it as a ticket.

25      Q.  Okay.  So an uptick in violence, concerns

1    about contraband, an increase in IDRs.  Was there

2    anything else that you were specifically concerned

3    about as to safety and security that caused you to

4    ask for the strip searches and the shakedowns?

5         A.  No, that's pretty much it.

6         Q.  Okay, those three things.

7         The contraband that you were concerned about

8    was what was called nuisance contraband; right?

9         A.  I wouldn't define it all as nuisance

10   contraband, ma'am.

11        Q.  Okay.  Well, the specific reason that you

12   ordered the -- or that you requested the shakedowns

13   and the strip searches on March 31st was to look for

14   nuisance contraband; right?

15        A.  Not just nuisance contraband, all contraband

16   nuisance.

17             THE COURT:  Let's have a definition.

18        Q.  Yeah, I would like to talk about that, so

19   let's address that next.

20        So contraband is an important issue in a

21   prison; right?

22        A.  Very important issue.

23        Q.  You can't have people having things they

24   shouldn't have in their living areas or on their

25   person; right?

1        A.  Yes, ma'am.

2        Q.  There are certain categories of contraband

3    that are serious contraband; right?

4        A.  There's major and minor contraband.

5        Q.  Okay.  And so for major contraband,

6    obviously, we're talking about weapons?

7        A.  Weapons; yes, ma'am.

8        Q.  We're talking about illegal drugs?

9        A.  Any kind of unauthorized drugs.

10       Q.  Cocaine?

11       A.  Yes, ma'am.

12       Q.  Heroin, those kinds of things?

13       A.  Yes, ma'am.  Yes, ma'am.

14       Q.  Prescription drugs that are not your

15   prescription?

16       A.  Yes.

17       Q.  Okay.  Phones?

18       A.  Yes, ma'am.

19       Q.  Like you United States currency, money?

20       A.  Yes, ma'am.

21       Q.  And then there is what you, I think, just

22   said is minor contraband?

23       A.  Minor contraband.

24       Q.  And is minor contraband also known as

25   nuisance contraband?

1          A.  I wouldn't classify it as nuisance

2    contraband.  It's contraband of a minor issue.

3          Q.  Okay.  So you didn't use the term nuisance

4    contraband to talk about minor contraband?

5          A.  I may have; yes, ma'am; I can't remember.

6    But I would prefer -- I mean I would much rather use

7    major and minor contraband.

8          Q.  Let's talking about it minor contraband.

9          A.  Okay.

10         Q.  Minor contraband is things like extra

11   blankets?

12         A.  Yes.  Yes, ma'am.

13         Q.  Extra clothing?

14         A.  Yes, ma'am.

15         Q.  Food from the kitchen that someone is not

16   supposed to have in their cell?

17         A.  Yeah.  Well, if it's -- excessive food that

18   belongs to them, that's one thing.  If it's stolen

19   from somewhere in the facility, it's another.

20         Q.  Okay.  So having onions in your housing unit

21   that are from the kitchen that you're -- that you

22   didn't buy from commissary?

23         A.  It would be minor contraband.  You would get

24   a minor IDR in most cases; yes.

25         Q.  Okay.  And then expired medication; right?

1        A.   Expired medication, as long as it's not

2   stockpiled--you know, nine months of expired

3   medication--would be one issue.  If the offender is

4   four days past the expiration date with two pills,

5   that would be a minor issue.

6        Q.   Okay.  And the main concern that you had

7   for -- and the reason that you asked for the strip

8   search and shakedowns on March 31st was because of

9   expired medication; right?

10        A.   Expired medication, inmates with the wrong

11   medication, inmates abusing prescribed medication,

12   inmates transferring or selling authorized

13   prescribed medications to other inmates, inmates

14   mixing medications together and snorting it.  We had

15   some issues going on.

16        Q.   Expired medication was a problem; right?

17        A.   Yes, ma'am.  It's always a problem.

18        Q.   Right.  It's something that inmates aren't

19   supposed to have?

20        A.   Yes, ma'am.

21        Q.   And you want to make sure women weren't

22   hoarding medication that wasn't theirs?

23        A.   Well, for their safety; yes.

24        Q.   Right.  And you wanted to make sure that

25   people didn't have other people's medication; right?

1    A.  That and medication that's outdated.

2  Sometimes, the longer the prescription goes, it

3  doesn't react like it's supposed to, or it

4  overreacts.  We don't want them taking something

5  that's not prescribed to them in the prescribed

6  timeframe by a doctor.

7    Q.  Part of the way that medication was

8  addressed at Lincoln Correctional Center in March of

9  2011 was through the Health Care Unit; right?

10    A.  Yes, ma'am.

11    Q.  I mean there were people who went to the

12  Health Care Unit to take their daily medication;

13  right?

14    A.  Yes.  Any what they called major or

15  dangerous medication, like, you know, painkiller or

16  something like that, that the offender would be on a

17  med unit call line.  She would go to the Health Care

18  Unit whatever time of day her call line was for.

19  She would take the medication in the presence of a

20  doctor or the nurse.  And she would be sent back to

21  her housing unit.

22    It was also issued out in -- minor medication

23  or non-controlled medication was issued out in

24  blister packs.

25    Q.  Right.  So if you're taking -- you know,

you're an older lady and you're taking water pills,
you get a blister pack to take to your cell to take
those yourself; right?

A.  It could be for any period of time, 7 days,
14, 21.  Usually no longer than a 30 day supply in a
blister pack.

Q.  Right.  And if you're taking lithium pills,
you're going to go to the Health Care Unit to take
that?

A.  Yes, ma'am.  You're going to go and take
them directly in front of a doctor or nurse.

Q.  Right.  And IDOC had procedures for the
doctor or nurse to check and make sure that the
person took the medication in front of them --

A.  Yes, ma'am.

Q.  -- so that's something -- the procedures
were designed so that somebody couldn't take that
back to the cell?

A.  If the procedure were followed, you know,
she would take the pill, swallow it, open her mouth
and it would be checked, and then she would be sent
back to the unit.

Q.  So in your concerns about minor contraband
or nuisance contraband on March 31st, one of the
specific concerns you had was that people had too

1   many blankets in their cells; right?

2        Or in their -- I shouldn't say cells.  They

3   weren't cells, they were dorms; right?

4        A.  Yeah.  It was dorms.

5        Q.  Okay.  And one of your specific concerns was

6   that people had too many blankets in their -- in

7   their housing areas; right?

8        A.  It wasn't a concern that they had too many

9   blankets.  The concern was new arrivals coming in

10  couldn't get a blanket because we were out.  We

11  would have 500 blankets over our inmate population

12  and they were all still out.

13       Q.  Right.  So you needed to make sure there was

14  enough for everybody; right?

15       A.  Yeah.  That was a minor part of the problem,

16  was getting some of the blankets back; yes.

17       Q.  Okay.  And one of the other reasons for

18  the -- for the strip search and the shakedowns on

19  March 31st was to train cadets from the Illinois

20  Department of Corrections Training Facility; right?

21       A.  Well, that was a benefit for the training

22  academy, that was not my purpose.  My purpose was to

23  ensure the safety and security of my facility.

24       Q.  So aside from the shakedowns, the other

25  component of what happened on March 31st was a mass

1    strip search of about 200 women; right?

2        A.  Yes.

3        Q.  And the reasons that you did the strip

4    search component of the events on March 31st were

5    the same reasons that you did the shakedown part of

6    the events of March 31; right?

7        A.  To ensure the safety of the -- safety and

8    security of the facility and to deter and detect

9    contraband.

10       Q.  Okay.  So you were also conducting strip

11   searches of the women because you were looking for

12   contraband?

13       A.  Yes, ma'am.

14       Q.  Okay.  Do you believe that it would have

15   been appropriate to do a mass strip search of female

16   inmates just to give cadets from the Illinois

17   Department of Corrections Training Center an

18   opportunity to learn how to do those strip searches?

19            MS. MCNAUGHT:  Objection.  I don't think

20   his opinion is relevant.

21            THE COURT:  Well, I'm going to allow it

22   though.  I think this comes within the broad context

23   of what -- and the jury and I are both interested in

24   knowing how this whole system works.  And I think

25   it's all part of the backdrop.  I'm going to allow

1    that.

2        A.  Can you repeat the question?

3        Q.  I can.  Thank you.

4        Is it your testimony that, given your knowledge

5    of Illinois Department of Corrections policies and

6    procedures, that it would have been appropriate to

7    do a strip search of 200 female inmates on

8    March 31st of 2011, just to provide a training

9    opportunity for cadets?

10       A.  As I stated before, my -- my reason for

11   using the training academy was not to train cadets,

12   it was used as a tool to help me, along with my

13   staff and my tactical unit, to ensure the safety and

14   security of my facility.

15       Q.  I understand that.  And I'm asking a

16   different question, sir.  Which is, given your

17   knowledge of Illinois Department of Corrections

18   policy and procedures, would it have been

19   appropriate to do a strip search of 200 female

20   inmates on March 31 of 2011 solely for the purpose

21   of giving cadets a training opportunity?

22       A.  I have no opinion on that.  I would -- I

23   wouldn't -- I don't know how to answer your question

24   because I don't control the training academy cadets.

25   I don't understand.

1        Q.  So you have no opinion on that?

2        A.  Well, I have -- I don't have an answer for

3   you.  I'm not trying to be elusive or evasive, but I

4   don't have an answer for you.

5        Q.  Well, my question is what is your opinion.

6   Do you have an opinion about that?

7        A.  If cadets are used and they go through our

8   training academy and they've already completed their

9   training in regards to restraints, strip searches,

10  to how that -- I would have no problem using cadets.

11  That's why I requested them.  I needed the

12  assistance for them --

13       Q.  Right.

14       A.  I mean I could cover more of an area and get

15  more accomplished by using the cadets, my tac team,

16  and my facility staff.

17       Q.  You would have no problem using cadets if

18  you had another reason for doing those kinds of

19  strip searches; right?

20       A.  I would have no problem using cadets from

21  the academy if I was still the warden in a facility

22  where I had a problem and I needed to control it for

23  the safety and security of my facility.  I would

24  have no problem using them.

25       Q.  But not only if the reason was to give them

1   a training opportunity?

2       A.  I don't understand your question.

3       Q.  I think we understand your answer.  I'll

4   move on.

5       A.  Okay.

6       Q.  So in talking back about minor contraband.

7   People -- depending on what the minor contraband is,

8   inmates can hide minor contraband in various places

9   in the prison; right?

10      A.  Yes, ma'am; just about anywhere.

11      Q.  Because there's some things, like you said

12  like blankets, that's a bigger item; right?

13      A.  Yes, ma'am.

14      Q.  So there's also smaller items that can be

15  nuisance contraband; correct?

16      A.  Yes, ma'am.

17      Q.  Okay.  So inmates that have property they're

18  not supposed to have, they could hide that in public

19  areas like dayrooms or somewhere on the grounds;

20  right?

21      A.  Yes, ma'am.

22      Q.  And they can also hide minor contraband on

23  their bodies?

24      A.  Yes, ma'am.

25      Q.  Okay.  You could hide it in your mouth?

1          A.  Yes, ma'am.

2          Q.  You could hide it in your hair if you had

3     longer hair; right?

4          A.  Sorry.  Yes, ma'am.

5          Q.  And I mean me, not referring to you.  That

6     was not -- that was not my comment.  But I think

7     there was testimony that some of the women in

8     Lincoln Correctional Center didn't have long hair;

9     right?

10         A.  There was all kinds of hairstyles; yes.

11         Q.  Right.  So if you had enough hair, you could

12    hide nuisance contraband in your hair; correct?

13         A.  Yes, ma'am.

14         Q.  Okay.  You could hide it behind your ears?

15         A.  Yes, ma'am.

16         Q.  You could hide it in your pockets if you had

17    pockets in your clothing; right?

18         A.  Yes, ma'am.

19         Q.  Or in the folds of your clothing, like

20    folding over a cuff of a shirt?

21         A.  Or sewn into a shirt; yes, ma'am.

22         Q.  Right.

23         A.  Found it about everywhere.

24         Q.  You could hide it in -- and I think there

25    was some testimony about this yesterday.  You could

hide this if you had, you know, folds, areas of your

body where you could fold your skin over; right?

     A.  Yes, ma'am.

     Q.  Okay.  And you could also hide it in body

cavities; is that right?

     A.  Yes, ma'am.

     Q.  Now, many of those places are places that

you could find contraband with just a pat-down

search; right?

     A.  Yes, ma'am.

     Q.  But obviously, if you've got contraband in

body cavities, in some areas of your body, or your

clothing, you're gonna have to do a strip search to

find it; right?

     A.  Yes, ma'am.

     Q.  Okay.  Now, if someone is hiding contraband

in their body cavities, they're going to great

lengths to hide that; right?

     A.  Yes, ma'am.

     Q.  It's difficult to do that?

     A.  Well, it's not difficult, but it surely

can't be comfortable or normal.

     Q.  Right.  And so if someone is in a strip

search in IDOC and they find contraband in a body

cavity, you're going to seg for that?

1          That person is gonna go to segregation?

2          A.  Yes, more than likely.

3          Q.  Okay.  So it's risky to do that?

4          A.  Yes, ma'am.

5          Q.  Okay.  So if you're gonna do a shakedown,

6     and inmates know the shakedown is gonna happen, they

7     might hide things on their bodies to keep contraband

8     from being found in the shakedown; right?

9          A.  Yes, ma'am.

10         Q.  That's one of the reasons why you try to

11    keep shakedowns a secret?

12         A.  Yes, ma'am.

13         Q.  Because it defeats the purpose of doing it

14    if people know it's happening?

15         A.  Yes, ma'am.  News travels around a

16    correctional facility faster than the internet.

17         Q.  Okay.  So by hiding that you're coming to do

18    a shakedown, you're going to decrease the chance

19    that there is going to be a need to do a strip

20    search associated with the shakedown; right?

21         A.  I would think it would definitely decrease

22    the chances of finding contraband; yes.

23         Q.  Okay.

24         A.  It could be moved to a -- inmates can only

25    be held accountable for what's on their person and

what's in their -- their specific bed area.  If it's
found in a common area, they can't be held
accountable for that.  Unless we do an investigation
and prove, you know, that it was their material.

     Q.  Okay.  So if your goal in doing a shakedown
was to find contraband, there would be no reason for
you to tell the inmates that you were gonna do the
shakedown; right?

     A.  No, ma'am.

     Q.  That would not make sense?

     A.  Yes, that --

     Q.  If your goal was to find contraband?

     A.  Yes, ma'am.

     Q.  Okay.  Now, you talked a minute ago about
the things for you that were the reasons you asked
for this operation.  And we talked about the
contraband piece of it just now; right?

     A.  Yes, ma'am.

     Q.  And you also said that there was an increase
in IDRs; right?

     A.  Yes, ma'am.

     Q.  That's Inmate Discipline Reports?

     A.  Yes, ma'am.

     Q.  And you also said that there was an uptick
in violence in the institution; right?

1    A.  Yeah, an uptick in the violence and an

2  uptick especially in the areas we shook down, 2B and

3  4B.

4    Q.  Okay.  And it's your testimony today that

5  the reason that you decided to do the strip search

6  was because of an uptick in violence?

7    A.  That, and abuse of prescribed medication,

8  the excessive contraband, and the issues I've

9  already mentioned.

10   Q.  But an uptick in violence was one of the

11 reasons is your testimony today?

12   A.  Yes.

13   Q.  Okay.  Did you give a deposition in this

14 case; sir?

15   A.  Yes, ma'am.

16   Q.  Okay.  And obviously, in that deposition,

17 you understood you were giving sworn testimony?

18   A.  To the best of my ability; yes, ma'am.  But

19 understand, I've been retired for four years and

20 didn't have notes or recollection or anything.

21   Q.  Well, you're testifying today without better

22 notes or recollection than you had in your

23 deposition in this case; right?

24   A.  Yes.

25   Q.  And your deposition in this case was given

1    on September 3rd of 2015; right?

2         A.  I believe that is correct; yes.

3         Q.  That's over a year ago?

4         A.  Yes.

5         Q.  So you had a better memory of these events

6    in March -- or excuse me, in September of 2015 than

7    you do today; right?

8         A.  No, I think I have a better recollection of

9    it now.  Given reading some of my Outlook messages

10   and some of the correspondence with Commander Polley

11   back and forth through the warden.

12        Q.  Right.  Because between your deposition and

13   today, you've done more reading; right?

14        A.  Well, I've done -- I've reviewed more of my

15   own documentation; yes.

16        Q.  Okay.  So you reviewed documents?

17        A.  Yes.

18        Q.  You prepared to come to testify today?

19        A.  Yes.

20        Q.  You talked with some of the people that are

21   your co-defendants today?

22        A.  I did witness prep with the defense

23   attorneys; yes.

24        Q.  Yeah.  And you've also had a chance to, you

25   know, catch up with people that are your

1    co-defendants that are here today; right?

2         (Court reporter requested clarification.)

3         A.  We don't discuss the case a lot.

4         Q.  Okay.  Well, in your deposition -- this is

5    Plaintiff's 47.  I'm looking at Page 125.  And for

6    the record, I'm looking at Page 125, Line 6 through

7    12.

8         In your deposition, sir, you were asked this

9    question and did you give this answer (as read:)

10   Why did you guys decide that the 200 women should be

11   strip-searched as part of the cadet training

12   exercise?  Was that for training for the cadets or

13   for some other purpose?  Answer --

14        MS. MCNAUGHT:  Your Honor, I object because

15   this is improper impeachment.

16        MS. THOMPSON:  I can show you the citation,

17   Your Honor.  It's directly relevant.

18        THE COURT:  Well, you have to show this to

19   him and he has to look at it.  And then you go

20   through the Q and A.  And Ms. McNaught?

21        MS. MCNAUGHT:  Your Honor, this is not

22   refreshing recollection.  She's not refreshing

23   recollection, she's trying to impeach.  And the

24   question that she asked and the response that she

25   got is not clearly different than what he has said

1    in court today.  Or what he testified to before.  So

2    it's improper impeachment.

3              THE COURT:  Well, I --

4              MS. THOMPSON:  It's a party admission as

5    well, Your Honor.

6              THE COURT:  Beg your pardon?

7              MS. THOMPSON:  It's a party admission.

8    It's a prior statement by a defendant.

9              THE COURT:  Well, we're going to allow it

10   to take place.  I'm going to overrule the objection

11   at this time.  And let us go ahead and see what the

12   testimony is both from there and the deposition.

13             MS. THOMPSON:  Would you Court like me to

14   show this document to the witness?

15             THE COURT:  Yes, I absolutely would like

16   you to.

17             MS. THOMPSON:  All right.  May I approach

18   the witness, Your Honor?

19             THE COURT:  You may.

20             MS. THOMPSON:  So I'm showing the witness

21   the deposition, Page 125, and I've referred his

22   attention to Line 6 through 13, Your Honor.

23             THE COURT:  Okay.

24             THE WITNESS:  Okay.

25             MS. THOMPSON:  May I now inquire, Your

1    Honor, of the document?

2           THE COURT:  Please.

3        Q.  (By Ms. Thompson)  All right.  So in your

4    deposition on September 20 -- on September 3rd of

5    2015, excuse me, were you asked this question and

6    did you give this answer?  (As read:)

7        Question:  Why did you guys decide that the 200

8    women should be strip-searched as part of the cadet

9    training exercise?  Was that for training for the

10   cadets or for some other purpose?

11       Answer:  Well, it served two purposes.  First,

12   it was controlling contraband.  And the second was

13   and the training exercise for the cadets.

14       Were you asked that question and did you give

15   that answer?

16       A.  Yes, ma'am.

17       Q.  Okay.  Now, I understand you're saying today

18   that for you, training was not the goal; right?

19       A.  When I was deposed, the attorney --

20       Q.  I'm asking you a different question --

21           THE COURT:  No, no, no.  Go ahead.

22       Q.  I appreciate that, Your Honor.

23           THE COURT:  Let's iron this out right now.

24   Don't wait.

25       Q.  All right.

A.  When I was deposed, your -- the plaintiff's
side attorney referred to it as a cadet training
exercise.  I just answered her question.  My main
purpose was to control the safety and security of my
facility, remove contraband.  The cadet training
part of it was just a by-product of the shakedown
itself.

Q.  I understand.  And when you were asked that
question and gave the answer that the purposes were
contraband and training -- the training exercise for
the cadets, I understand that your testimony is the
cadets was not -- the training was not a priority
for you.  And I don't know mean that pejoratively,
but the training was not a priority for you; right?

A.  No, the training --

Q.  The training --

A.  -- was not my main goal --

Q.  -- right main --

(Parties speaking simultaneously, court.
reporter requested clarification.)

THE COURT:  No, don't interrupt --

Q.  I apologize, Your Honor.

A.  My main goal was the safety and security of
the facility and controlling contraband.  And the --
and the inmate behavior issues we were having.

1    Q.  Right.  And when you gave your deposition in
2    2015, the question that you were posed there and the
3    answer you gave did not include an uptick in
4    violence as an explanation for why there was a strip
5    search; right?
6        In that -- as to that question and that answer,
7    sir?
8        A.  Not in that question.
9            MS. MCNAUGHT:  Your Honor, I object --
10           THE COURT:  And you have grounds to object.
11       Now, this is pretty well taken care of, I
12   think.  Haven't we got this --
13           MS. THOMPSON:  I think we have, Judge.  I
14   want to move on.  I appreciate what the Court is
15   directing.
16           THE COURT:  Let's move on.
17           MS. THOMPSON:  All right.
18       Q.  (By Ms. Thompson)  So your testimony today
19   is that this uptick in violence was part of the
20   issue for you; right?
21       A.  Correct.
22       Q.  Okay.  How does doing a mass strip search
23   reduce inmate violence?
24       A.  It ensures controllability and
25   accountability in a facility.  I mean the offender

1    population has to always understand that we're in

2    control of the facility.  I mean -- I don't know how

3    else to phrase it for you.

4         Q.  So there has to be accountability for inmate

5    behavior; right?

6         A.  Everybody's behavior in a facility is held

7    accountable.

8         Q.  For staff too?

9         A.  Yes, ma'am.

10        Q.  For inmates as well; right, sir?

11        A.  Yes, ma'am.

12        Q.  All right.  So one way that there's a

13   connection between doing a mass strip search and

14   reducing violence is that, obviously, if you find

15   items that relate to violent activity, you can

16   remove those items; right?

17        A.  Yeah, weapons --

18        Q.  Right --

19        A.  -- gang material.

20        Q.  And the other that you talked about there is

21   control -- controllability and accountability;

22   right?

23        A.  Yes, ma'am.

24        Q.  So if there were problems in Unit 2B and

25   Unit 4B -- well, let me ask you this question first.

1    So some of the women in Units 2B and 4B were these

2    women that were on house arrest; right?

3         A.  There could have been women on house arrest;

4    yes.

5         Q.  Okay.  But I think your testimony was, and

6    you'd agree that the majority of the women on both

7    those units were not on house arrest?

8         A.  Yes, that's correct, ma'am.

9         Q.  And I take it your testimony is not that

10   every single woman in 4B was contributing to an

11   uptick in inmate violence; right?

12        A.  Oh, yes, ma'am.

13        Q.  Some people were doing that --

14        A.  Yes.  It was a percentage of the population.

15   It was not whole offender population on 2B or 4B.

16        Q.  Okay.  So someone -- an inmate would be more

17   controllable if there was conduct that was a problem

18   for the institution and the inmate had an unpleasant

19   experience as a result; right?

20        A.  Can you repeat that question, please?

21        Q.  Sure.  If there is an inmate who does

22   something that creates a problem in the institution;

23   right?

24        A.  Mm-hmm.

25        Q.  And that person has an unpleasant experience

as a result of that behavior, that would promote

that inmate's controllability; right?

    A.  The intent is not unpleasurable, the intent

is to control.  I mean to have accountability for

their actions.  I mean we have a procedure designed;

an inmate makes a mistake or has an infraction, she

gets a ticket.  If it's a major infraction, she may

go to segregation.

    Q.  So can you explain to us how doing a mass

strip search contributes to accountability?

    A.  Well, I mean it's -- it's a tool we use to

eliminate contraband and try -- and in some way, try

to increase -- increase behavior.

    Q.  How does it increase behavior to do a mass

strip search, sir?

    A.  I -- I don't know how to describe it to you.

It's -- I don't -- I mean you're showing -- I don't

know, you don't want to say authority.  Maybe

authority or control of the facility.

    Q.  You're saying "If you act up, I'm going to

show you that we are in charge?"

    A.  It's not a show you thing, it's just

maintaining control and security of the facility.

It's not personal, it's business.  It's never

personal.

1    Q.  And setting aside the -- whether it's

2  personal or business or not, the purpose, you're

3  saying is if inmates are acting up and there is a

4  mass strip search, that makes the inmates more

5  controllable?

6    A.  It would ensure the safety of the -- safety

7  and security of the facility and improve control of

8  the inmate population.  Yes, I would believe so.

9    Q.  How does doing a mass strip search

10  contribute to the safety and security of the

11  institution other than finding contraband and

12  increasing controllability and accountability of

13  inmates?  Is there any other way it contributes to

14  safety and security other than those three things?

15    A.  No, ma'am.  I think that's about it.

16    Q.  Okay.  And so we talked about the finding

17  contraband.  That's obvious; right?

18    A.  Yes, ma'am.

19    Q.  Finding contraband is good?

20    A.  Yes, ma'am.

21    Q.  Aside from the contraband, it increases

22  controllability because if women have been acting up

23  and they have an unpleasant experience after acting

24  up, they're going to know that they need to do what

25  the institution wants them to do; right?

1          A.  Well, there's got to be repercussions for

2     your actions; yes.

3          Q.  Right.  So that's punishment; right?

4          A.  Not punishment.

5          Q.  Repercussions is not punishment?

6          A.  No.  I don't like -- I mean I wouldn't feel

7     a shakedown is punishment.

8          Q.  But it's repercussions?

9          A.  Yes, ma'am.

10         Q.  It's repercussions including for women who

11    weren't the source of the problem in Units 2B or 4B;

12    right?

13         A.  They were involved in the shakedown; yes.

14    If that --

15         Q.  Well, you said that -- your testimony today

16    is that one of the reasons for the strip search was

17    because there was an increase in violence that was

18    focused on Units 2B and 4B; right?

19         A.  Yes, ma'am.

20         Q.  But you agree that it's not that every woman

21    in Unit 2B and every woman in 4B was involved in

22    inmate violence?

23         A.  Yes, ma'am.

24         Q.  It's a small percentage of both of those

25    housing units; right?

1      A.  Yes, ma'am.

2      Q.  Okay.  And so my point is that if you're

3  doing a strip search to promote accountability and

4  controllability and to show that there's

5  repercussions, that involves repercussions for

6  people who were not the source of the problem;

7  right?

8      A.  It affected all 100 offenders on the inmate;

9  yes.  Or the housing unit; yes.

10      Q.  Yeah.  And you didn't -- and I want to

11  understand your testimony.  For you, you wouldn't

12  want to call that punishment; right?

13      A.  A shakedown or a strip search or -- you

14  know, that's not punishment.  That's part of normal

15  operations.

16      Q.  Because it wouldn't be appropriate to punish

17  inmates in that way; right?

18      A.  You don't use --

19      Q.  To do it for punishment?

20      A.  You don't use any operational procedure as

21  punishment.

22      Q.  Because you would agree that a repercussion

23  for an increase in inmate violence wouldn't be

24  appropriate if the repercussion was to call an

25  inmate the B-word; right?

1        A.  Ma'am, I would never tolerate any of my

2    staff calling an offender a bitch in my presence.  I

3    have never heard it, didn't hear it that day, nor

4    would I ever tolerate it.

5        Q.  And that's because that wouldn't be an

6    appropriate repercussion for inmate violence; right?

7        A.  Yes, ma'am.

8        Q.  Right.  And it wouldn't be an appropriate

9    repercussion for inmate violence to tell an inmate

10   that her body is disgusting; right?

11       A.  Ma'am, that's totally inappropriate.

12       Q.  Wouldn't be appropriate punishment; right?

13       A.  No.

14       Q.  All right.  Would it be an appropriate

15   repercussion for an uptick in inmate violence to

16   handcuff a woman in the affected housing units and

17   make that woman stand for several hours in handcuffs

18   without being able to sit down?

19       A.  They were not in restraints for that long.

20       Q.  You understand that's not my question

21   though; right?  I'm asking you a different question,

22   sir.

23       A.  Okay, repeat your question.

24       Q.  Okay.  Let me repeat my question.

25       Would it be an appropriate repercussion for

1    inmate violence to handcuff a woman and have her

2    stand in the gym for several hours without being

3    able to sit down?

4         A.  No.

5         Q.  Okay.  And to go back to my question about

6    calling inmates the B-word as a repercussion for

7    inmate violence, you would agree that that wouldn't

8    be appropriate because that would just be degrading;

9    right?

10        A.  Degrading.  It violets our procedure, our

11   professional standards.  It wouldn't -- you know, I

12   can't say it never happened, but it would not happen

13   in my presence, I can guarantee that.  Not without

14   reproductive -- I mean not without some further

15   corrective action coming.

16        Q.  And the same would be true for having --

17   forcing an inmate to be naked in the presence of

18   men?  That wouldn't be an appropriate repercussion

19   for inmate misconduct; right?

20        A.  No, ma'am.  Not under any circumstance.

21        Q.  Because that would be degrading?

22        A.  Yes, ma'am.  Not degrading, but it violates

23   our policy.

24        Q.  It wouldn't be degrading to have --

25        A.  It may be degrading for the offender too,

1    but it violates our policy.  No males in a female

2    strip search area.

3         Q.  I understand.

4         So let's go back to the uptick in inmate

5    violence that you just talked about.  So part of

6    what the Lincoln Correctional Center did in 2011 to

7    track inmate violence was to use what are called

8    Inmate Management Reports; right?

9         A.  You mean IDRs, Inmate Disciplinary Reports?

10   Yes.

11        Q.  All right.  And so -- well, I'm talking

12   about something else.  Inmate Management Reports.

13   Have you ever seen an Inmate Management Report?

14        A.  I don't remember the form.  You can refresh

15   my memory if you have one, please.

16        Q.  Sure.

17             JUROR:  Judge Mills, may I have a short

18   break, please?

19             THE COURT:  Beg your pardon?

20             JUROR:  May I have a short break, please?

21             THE COURT:  Yes, yes.  We will stand in

22   silence just for a moment while we have a short

23   break.  You may be seated.

24             THE WITNESS:  May I?

25             THE COURT:  You want to go too?  Sure, all

1    right.  Anybody else have to make a quick pit stop?

2    There we go.  Okay, let's do it.  Let's do it.

3    Everyone else will stay in their seats.

4         (A juror and the witness left the courtroom.)

5         THE COURT:  And when the juror gets back,

6    and the witnesses, we will start.  So the rest of

7    you are on your own.

8         (The juror and the witness returned.)

9         JUROR:  My apologies.

10        THE COURT:  That's quite all right.  During

11   the course of this trial, I may have to do the same

12   thing.

13        All right.  The juror and Warden Reynolds have

14   return.  Mr. Reynolds, you are still on the stand,

15   of course.

16        THE WITNESS:  Yes.

17        THE COURT:  Ms. Thompson, you may proceed.

18        MS. THOMPSON:  Thank you, Your Honor.

19        THE COURT:  Surely.

20        MR. THOMPSON:  So I was just going to

21   approach the witness with an exhibit, Your Honor?

22        THE COURT:  That's quite all right.

23        Q.  (By Ms. Thompson)  I've shown the witness

24   what's been marked as Plaintiff's Exhibit 216.  And

25   I think the question that was posed to you, sir, was

1  whether you'd ever seen something called an Inmate

2  Management Report?

3      A.  Yes, I have seen these before.  On a few

4  occasions.

5      Q.  Okay.  And Exhibit 216 that I just showed

6  you, that is an Inmate Management Report; right?

7      A.  Yes, I believe that to be correct.

8      Q.  Okay.  And one of the purposes of an Inmate

9  Management Report is to track things that occur

10 at -- with respect to inmates at an institution;

11 right?

12     A.  Yes, ma'am.

13     Q.  To report on sort of what's going on in the

14 prison?

15     A.  Yes, ma'am.

16     Q.  Okay.  And one of the things that Inmate

17 Management Reports track is inmate violence; right?

18     A.  I believe so.  I -- as the Assistant Warden,

19 I was not in that distribution list.

20     Q.  So you didn't -- these reports weren't

21 something that you regularly reviewed?

22     A.  No.  I -- those were compared -- or compiled

23 by our Internal Affairs officer or an Intel Officer,

24 and they were sent to the Warden's office.  Now, I'm

25 not saying I've never seen them because the Warden

1    would have shared them with me, I believe; yes.

2         Q.  Okay.  Well, you don't have any reason to

3    think that Inmate Management Reports are inaccurate

4    in the information they have in them; right?

5         A.  No knowledge, ma'am.

6         Q.  They're completed by Internal Affairs?

7         A.  Internal Affairs or our IA or Intel guy;

8    yes.

9         Q.  Okay.  And Internal Affairs and --

10        A.  Our Intel Unit.

11        Q.  I'm sorry, what was the last thing?

12        A.  Our Internal Affairs or our Intel Unit.

13        Q.  Okay.  And so Internal Affairs and Intel

14   Units have information about what's going on inside

15   the prison; right?

16        A.  Yes, ma'am.

17        Q.  Okay.  So they're not speaking from a

18   position of speculating when they create reports

19   about inmate violence; right?

20        A.  No, ma'am.

21        Q.  They know what's going on?

22        A.  Yes, ma'am.

23        Q.  Isn't it true that there was just one

24   assault in the entirety of Lincoln Correctional

25   Center in March of 2011?

1           MS. McNAUGHT:  Objection.

2           THE COURT:  Yes.

3           MS. McNAUGHT:  This witness is -- he said

4    that he was somewhat familiar with the report, he

5    doesn't -- he didn't compile it, he didn't see it,

6    it's not in his chain of command.

7           THE COURT:  Okay.

8           MS. McNAUGHT:  It's not a report that he

9    prepared.  The proper foundation hasn't been laid

10   for it so that this witness should be able to

11   testify to it.  So I object.  I don't believe that

12   it's -- that this witness is the appropriate person

13   to testify to it.

14          THE COURT:  I think that you have a valid

15   objection, but I'm going to let Ms. Thompson go

16   ahead with this.  And if the -- Warden Reynolds

17   doesn't have any knowledge about it or doesn't know

18   about it or hasn't seen it or hasn't had any action,

19   he can say so.  But it seems to me that we're -- we

20   can't just compartmentalize as we would in a trial

21   practice class in law school every one of these

22   things into categories.  This all bleeds into each

23   other.

24        And so I'm going to allow some leeway here.  Go

25   ahead, Ms. Thompson.

1    Q.  Thank you, Your Honor.

2    And let me say this, because I want to ask you

3    a fair question.  You're not -- Inmate Management

4    Reports, as you said, are not -- were not in your

5    chain of command; right?

6    A.  Yeah, not normal distribution.  I think they

7    go directly to the Warden.

8    Q.  But you agree they're likely accurate?

9    A.  Yes, ma'am.

10   Q.  Okay.  And setting aside the Inmate

11   Management Reports--I'm not even asking you about

12   that.  Isn't it true that there was just one assault

13   at Lincoln Correctional Center in all of March of

14   2011?

15   A.  I couldn't tell you that, ma'am.

16   Q.  Is it your belief that there were more?

17   A.  Are you defining assault or fights?

18   Q.  Assault.

19   A.  I could not tell you, ma'am.

20   Q.  Okay.  And isn't it true that the one

21   assault at Lincoln Correctional Center in March of

22   2011 was an assault that did not involve a weapon?

23        MS. MCNAUGHT:  Objection, Your Honor.

24        THE COURT:  I'm going to sustain that at

25   this time.  You've already exhausted his knowledge

1  of this.

2      Q.  Thank you, Your Honor.

3      Do you know how many assaults there were at

4  Lincoln Correctional Center in February of 2011?

5      A.  No, ma'am.

6      Q.  Do you know how many there were in January

7  of 2011?

8      A.  No, ma'am.

9      Q.  Warden Reynolds -- or I should say Assistant

10  Warden Reynolds --

11      A.  Thank you.

12      Q.  -- isn't it true that you received written

13  grievances about the events that occurred on

14  March 31st of 2011?

15      A.  I personally received written grievances?

16      Q.  That you saw them; that's right?

17      A.  No.  I never saw any inmate grievance.

18      Q.  Okay.  Let's talk a little bit about

19  grievances.

20      A.  Okay.

21      Q.  There are grievance boxes in the housing

22  units at Lincoln Correctional Center; right?

23      A.  Yes.  They're in the control officer's

24  section of the housing unit.

25      Q.  Okay.  And I should say, again, I'm talking

1    about March of 2011.  I realize you're not at the

2    institution today?

3         A.  Yes, ma'am.

4         Q.  But in March of 2011, there were these

5    grievance boxes; right?

6         A.  Yes, ma'am.  There was one in every housing

7    unit in the center control area --

8         Q.  And why were they in --

9         (Parties speaking simultaneously, court

10        reporter requested clarification.)

11        Q.  I apologize.  I'm going to do better, and I

12   apologize to the Court.

13             THE COURT:  Well, I've been wondering when

14   you were.  You have a very fast, machine gun kind of

15   delivery.  And we've got to wait until we get an

16   answer.

17        Q.  I apologize to the court reporter, and I

18   will do better, Judge.

19             THE COURT:  I've been looking over at the

20   court reporter several times this morning and

21   wondering how she was coping, but --

22        Q.  I need to improve my behavior.  And I'll do

23   so.  And I apologize.

24             THE COURT:  I think you do.  But you're of

25   a younger generation than I.  And I'm constantly

faced with the same problem that the court reporter
is too in getting everything.  So kind of slow down,
if you can.

Q.  I will endeavor to do some self-improvement,
and let's continue.

The grievances boxes are in, you said, the
controlled area of the housing unit?

A.  Yeah.  They're in the -- the houses at
Lincoln have an A-wing and B-wing.  And the officers
sign in, the control air is in the middle, and the
box is on the wall there.

Q.  Is there a reason why the box is in the
controlled area?

A.  So one offender cannot reach in there and
try to remove another offender's grievance.

Q.  So if the grievances get submitted, they go
where they're supposed to go?

A.  If they're -- if the offender puts the
grievance in the grievance box, within a prescribed
timeframe a counselor should pick it up and initiate
the process of the grievance.

Q.  So every so often, the grievance officer --
excuse me, let me start that question again.  Every
so often, the counselor picks up grievances from the
housing unit from the boxes; right?

1    A.  Yes.  There's an assigned timeframe that he

2    has to pick up.  I can't swear it was 24 or

3    48 hours, but there was a timeframe assigned by the

4    AD and ID that he had to be there to pick these up

5    and initiate the process of hearing them.

6        Q.  And according to IDOC procedures, the

7    counselor is supposed to hold a hearing with a

8    prisoner about their grievance; right?

9        A.  Yes.

10       Q.  And after that hearing concludes, then the

11   grievance is supposed to go up the chain of command

12   past the counselor; right?

13       A.  Yes.

14       Q.  Okay.  And going up the chain of command

15   past the counselor means that grievances are

16   supposed to go to an assistant warden and then the

17   warden; right?

18       A.  To a grievance officer, then to the warden

19   or their designee; yes.

20       Q.  Thanks for correcting that.  So first it

21   goes to the counselor?

22       A.  Mm-hmm.

23       Q.  Then to the grievance officer?

24       A.  Mm-hmm.

25       Q.  Then to an assistant warden?

1    A.  No.

2    Q.  Then to the warden or their designees?

3    A.  Or her designee; yes.

4    Q.  And as you said earlier, you were a designee

5    for the warden as to grievances?

6    A.  Yes.  In the absence of Mr. Hillman or the

7    Programs Warden; yes.

8    Q.  Okay.  And in March of 2011, you were not

9    aware -- you were not aware of any wide-spread

10   problem at Lincoln Correctional Center of grievances

11   not making it where they were supposed to go?

12   A.  Not to my knowledge, no.

13   Q.  So prior to March 31st of 2011, you hadn't

14   had women complain to you, "I filed my grievance,

15   it's gone?"

16   A.  No.

17   Q.  And after the events of March 31st of 2011,

18   there were inmates that told you that they were

19   going to file grievances about those events; right?

20   A.  There were inmates who -- yeah, who stated

21   they were gonna file grievances.

22   Q.  Okay.  And that was more than one inmate who

23   told you, "I'm gonna file a grievance"?

24   A.  I can't tell you the number, but I -- I

25   heard it mentioned when they were being placed in

1    the dayrooms that day; yes.

2        Q.  Well, it was more than one person that you

3    heard say they were gonna file a grievance; right?

4        A.  I can't say that; I just heard it.

5        Q.  Well, it wasn't just one person, it was more

6    than one person; right?

7        A.  I don't think anything was directed to me.

8    It was more talking from offender to offender.

9        Q.  Okay.

10        A.  I mean that's their process.  If they feel

11    they were treated unfairly, that's the facility

12    process, to file a grievance.

13        Q.  That's what they should do?

14        A.  Yes, ma'am.  We encourage it.

15        Q.  And during the events that were taking

16    place, and I understand you're saying they weren't

17    talking to you, but you heard more than one woman

18    say that she was going to file a grievance?

19        A.  I can at least state I heard it at least

20    once.

21        Q.  And after the events of March 31st of 2011,

22    you talked to women who said they had filed -- who

23    said they had filed grievances; right?

24        A.  Not to my knowledge, no.

25        Q.  Is it your testimony that after March 31st

of 2011, you did not talk to offenders who told you
that they had filed grievances?

A. I -- I can't remember. You understand I was
on the housing units every day talking to offenders.
It was -- part of my job was to make sure I was
available to the offender population and listened to
their concerns. Whether it had to do with that
shakedown or contraband taken somewhere else. I
spent a large percentage of my day walking all five
housing units.

Q. So you cannot remember as you sit here
today, sir, whether or not, after March 31st of
2011, you talked to women who said they had filed
grievances about this incident?

A. I remember complaints about the shakedowns
taking so long and issues like that, but whether or
not they said they were filing grievances, I don't
know. And if they felt wronged and wanted to file a
grievance, I would strongly encourage it. That's
the process. We want to know if the offender feels
she's been wronged in our facilities. We want to be
the first person to know.

Q. Would reviewing your deposition refresh your
recollection as to whether or not you talked to
offenders who told you that they filed grievances?

1        A.  Yes, ma'am.

2        Q.  All right.  May I approach the witness, Your

3    Honor?

4             THE COURT:  You may.

5        (Sotto voce discussion among counsel.)

6        Q.  So Judge, for the record, I've shown the

7    witness Plaintiff's Exhibit 47, and I have directed

8    his attention to Page 90, starting I think at Line

9    13.

10             THE COURT:  Okay.

11        Q.  Just tell me when you're done reading that

12    section, sir.

13        A.  Onto the next page?  Okay.

14        Q.  So did reviewing what I just showed you

15    refresh your memory about whether or not, after

16    March 31st of 2011, inmates told you they'd filed

17    grievances?

18        A.  In reading that, it says that I had heard

19    complaints about that specific incident and filing

20    grievances; yes.  And grievances on other incidents

21    in the facility.

22        Q.  Well -- because I just want to be clear.

23    Did it refresh your memory about whether you talked

24    to offenders who said they had filed grievances?

25        A.  I can't tell you the number of offenders or

1   who the offender was.  I mean there were some

2   offenders that were not happy with the shakedown

3   that day.  And that's their right.

4       Q.  My question is a little different.  After

5   reviewing the deposition, does it refresh your

6   memory as to whether or not you talked to offenders

7   who said they had filed grievances?

8       A.  Yes, ma'am.

9       Q.  That did happen?

10      A.  Yes, ma'am.

11      Q.  Okay.  And you don't know how many.  I

12  understand you're telling us that.

13      A.  Yes, ma'am.  I made -- I made a specific

14  trip to go over the next day and walk through 2B and

15  walk through 4B and try to talk to the offender

16  population and ease some of the concerns over

17  contraband and the way things were handled.

18      Q.  You talked to the women about these events;

19  right?

20      A.  Yes, ma'am.

21      Q.  Okay.  And --

22      A.  Before and after.

23      Q.  Okay.  And you were sympathetic to their

24  concerns?  Not that you -- and I don't mean

25  sympathetic in that you agreed that they were

1    justified, but you listened with a listening ear?

2        A.  You always listen.  How do you know what

3    happens in your facility if you're not listening?

4        I mean I don't always agree with their

5    complaints.  Sometimes they're valid, sometimes

6    they're not.  But you always have to listen to your

7    offender population.

8        Q.  But as far as receiving written grievances

9    about this event, you never saw any?

10       A.  No, ma'am.

11       Q.  Now, when you were listening to the inmates

12   about their concerns when you walked Units 2B and

13   Units 4B after March 31st, did you do any

14   investigation into what had occurred on March 31st

15   of 2011?

16       A.  No, ma'am.

17       Q.  Okay.  And when inmates told you that they

18   had filed grievances, did you ever investigate why

19   it is that you never saw those grievances?

20       A.  No, ma'am.  They could have gone through

21   normal channels, gone through the grievance -- a

22   counselor, a grievance officer, and up to the warden

23   or the Assistant Warden of Programs and I would have

24   never known.

25       Q.  It could have gone to Warden Hulett without

 1    you seeing them?

 2         A.  Yes.

 3         Q.  And I guess we haven't covered that in the

 4    your testimony so far, but Warden Hulett was the

 5    Warden in March of 2011; right?

 6         A.  Absolutely, ma'am.

 7         Q.  Okay.  So -- is the reason you weren't

 8    concerned that you never saw those written

 9    grievances because you assumed they could have gone

10    to Warden Hulett without you seeing them?

11         A.  Yes, ma'am.  They could have gone through

12    her or Mr. Hillman for that matter.

13         Q.  So you didn't take any steps to learn what

14    it is that the women specifically had put in those

15    written grievances?

16         A.  No.  I wasn't -- I wasn't privy to those

17    grievances.  I didn't have access to them.

18         Q.  You didn't try to find out what they said?

19         A.  No, ma'am.

20         Q.  I think we talked about this a minute ago.

21    You gave us the name of a person that you thought

22    was the Assistant Program of -- or Assistant Warden

23    of Programs in March of 2011; right?

24         A.  Yes, ma'am.

25         Q.  Now, around that time, that was a position

1    that had been open for some time periods?

2        A.  It had switched -- I mean people had came in

3    and out of that position; yeah.

4        Q.  Right.

5        A.  That's why I was unsure who exactly was the

6    AWP on March 31st of 2011.

7        Q.  There was some period of time where the

8    Assistant Warden of Programs who had been assigned

9    to Lincoln went to another facility; right?

10       A.  Yes.  Yes, ma'am.

11       Q.  Okay.  And during the time that the

12   Assistant Warden of Programs position was open,

13   grievances would have been run past you at that time

14   since there wasn't an Assistant Warden of Programs;

15   right?

16       A.  Well, they could have gone from the

17   grievance officer right to Warden Hulett.  But in

18   her absence or -- they would have came to me as the

19   only Assistant Warden; yes.

20       Q.  Well, if there wasn't an Assistant Warden of

21   Programs, then final dispositions would have run

22   through you before going to the Warden; right?

23       A.  No.  Final disposition is always the Warden.

24   Or her designee.

25       Q.  Okay.  Is it your testimony today that if

1  the programs warden would have been non-filled, that
2  they would not have run final dispositions through
3  you?
4      A.  On normal cases, no.  On normal instances,
5  they would have gone to the Warden.  In her absence,
6  I would have handled them.  If she was gone from the
7  facility for an extended period of time.
8      Q.  Did you ever discuss with Warden Hulett the
9  issue of whether grievances had been filed about
10  what happened on March 31st?
11     A.  No, ma'am.
12     Q.  Okay.  We talked about this a minute ago,
13  but I want to ask you some more questions about
14  this.  You are the person who requested that cadets
15  come to Lincoln Correctional Center to do the
16  shakedown and the strip searches that happened on
17  March 31st; right?
18     A.  I was the person who sent the Outlook to
19  Mr. Polley; yes.  But prior to the Outlook being
20  sent to request the help, I think it was in early
21  February, the first one was, I had had a lengthy
22  discussion with Ms. Hulett and she agreed it was
23  something we wanted to do.
24     I would have never requested outside assistance
25  without the Warden's approval.

Q.  It's her facility; right?

A.  Yes, ma'am.

Q.  So she would have been involved in deciding
exactly what was going to happen?

A.  Yes, ma'am.

Q.  Okay.  Whose idea was it to have a shakedown
and a strip search on March 31st of 2011?

A.  On that day in general?  Or -- I initiated
the process.  I had talked to Ms. Hulett, we
discussed it, I sent the Outlook to Commander Polley
in Springfield.

The first one was denied because they were
already engaged to go somewhere else on the date
they had open.  I think in early March, I'm not sure
exactly the date, I sent another request and said,
"Hey, please keep us in mind.  We could still use
that assistance."  And he replied back.  I think the
Outlook went to both wardens, Warden Dawson at Logan
and Warden Hulett at Lincoln, and then it came back
down to me.

Q.  And I -- let me ask you a better question,
because the question was unclear and it was my
fault.

Whose idea was it to conduct a shakedown and a
strip search of Units 2B and 4B?  Setting aside the

date it was gonna happen, who decided there was
gonna be a strip search and shakedown of those two
units?

    A.  Who initiated the initial request?  Me.

    Q.  Who decided?  That's the question.

    A.  I initiated -- I sent the -- I went to
Ms. Hulett and requested that assistance.  So I
guess I was the one that initiated it.

    Q.  You cleared it with Warden Hulett?

    A.  Yes, ma'am.  Always.

    Q.  But it was your initial idea to address the
issues you're testifying about today, to address
those issues by doing a shakedown and a strip
search?

    A.  Yes, ma'am.  Of our facility, not in general
2B or 4B.  When it happened in February, it could
have been -- my problem areas could have been a
different unit at the time.  I can't swear to it
being 2B and 4B.  But I requested assistance from
the academy.

    Q.  So at the time that you made these requests,
did you have -- you weren't sure exactly what units
were ultimately going to be involved?

    A.  No.  It was not designed, "Hey, Commander
Polley, I need help on 2B and 4B."  It was we needed

1    help in our facility.

2        Q.  But at the time you got the word that the

3    request had been approved, at that point was it you

4    specifically who decided 2B and 4B?

5        A.  No.  I had -- it wasn't me specifically.  I

6    had a meeting with Warden Hulett.  And that was the

7    decision.

8        Q.  Okay.  And was there anybody else besides

9    you and Warden Hulett who made the decision that it

10   was gonna be 2B and 4B?

11       A.  Not to my knowledge; no.

12       It's not something you want to let out where

13   you're going before it happens.

14       Q.  Right.  But was there anybody else who

15   participated in talking about where it was going to

16   be besides you and Warden Hulett?

17       A.  Not to my knowledge.  But understand, I

18   think the two weeks -- now, I can't swear to this,

19   but the best of my recollection, the two weeks prior

20   to the shakedown, I was in Dallas/Fort Worth on

21   vacation.  I think I came back -- the shakedown was

22   on a Wednesday morning, if I'm correct.  And I came

23   back to work on a Monday morning.

24       Q.  Was it on Monday morning before the

25   shakedown that you decided it was gonna be of 2B and

1    4B?

2        A.  It would have been sometime between my

3    return Monday morning and the day of the shakedown

4    itself.

5        Q.  I wouldn't blame you for not thinking about

6    work during your vacation.

7        A.  Oh, no; I checked work.

8        Q.  All right.  But you didn't check work and

9    think about where these events were gonna take

10   place?

11       A.  No.  I think I had limited communications

12   with the facility via Outlook or phone.

13       Q.  Okay.  And you talked about this a minute

14   ago, but I want to make sure I understand.  Your

15   initial request for there to be a shakedown and

16   strip search you said was in early February?

17       A.  I believe so.

18       Q.  And then you said you made a follow-up

19   request in early March?

20       A.  I believe, yes.  Yes.

21       Q.  Is it fair to say that this was kind of to

22   get yourself on the list for the cadets to be used?

23       A.  It was done because we needed assistance to

24   shakedown at the facility.

25       Q.  Right.  Training classes from the academy go

1    to do strip searches and shakedowns at various --

2         A.  Yes, ma'am.

3         Q.  Let me ask you a better question.  They go

4    out to go things in different institutions in IDOC;

5    right?

6         A.  That's my understanding.

7         Q.  They don't just come to you?

8         A.  Oh, no, ma'am.  They could go anywhere the

9    state needs them.

10        Q.  They increase manpower for institutions,

11   like we talked about earlier in your testimony;

12   right?

13        A.  Yes, ma'am.

14        Q.  So they're in demand?

15        A.  Yes, ma'am.

16        Q.  So you kind of gotta make a request and get

17   in their ear to see if they'll come help you?

18        A.  I wasn't thinking about the rest of the

19   state, I was thinking about my facility at the time

20   of the request.

21        Q.  Because at the time you made the request,

22   because they're needed other place, you weren't sure

23   how long it would take them to come?

24        A.  Yes, ma'am.

25        Q.  So it could have taken six months?

1          A.  It could have been never, ma'am.

2          Q.  They could have emailed you the next day and

3     said, "We're coming next week?"

4          A.  Yes, ma'am.

5          Q.  So --

6               THE COURT:  Excuse me just a moment, so I

7     understand here.  When we're talking about "they",

8     are we talking about Orange Crush or are we talking

9     about cadets or are we talking about something else?

10    I'm not truly clear here.

11         Q.  I appreciate that.  I'll make clarification,

12    Judge.

13              THE COURT:  Please.

14         Q.  When you made the request for the cadets,

15    the supervisor of the cadets could have told you the

16    next day, "We can come next week;" right?

17         A.  He could have picked any date; yes.

18         Q.  Or you could have not heard from them ever,

19    as you said.

20         A.  I would have at least expected a response of

21    "No, we're busy" or "No, we can't make it."

22         Q.  But it --

23         A.  It would have been the training academy's

24    discretion.

25         Q.  So they night have not been available to not

1    come for nine months?

2         A.  That's correct, ma'am.

3         Q.  Okay.  So specifically having the cadets

4    come to participate was not -- well, let me ask you

5    a better question.

6         If, at the time you made this request, you had

7    an urgent need to look for contraband, the cadets

8    were not necessarily gonna be a fast way to have

9    that need met; right?

10        A.  It is possible, yes, ma'am.

11        Q.  Because at the time you made the request,

12   you knew that they might never come or might not be

13   able to come for a while?

14        A.  There was a chance I could have been told no

15   or put down the line quite awhile.

16        Q.  Okay.

17        A.  I wasn't sure what response I would get

18   back.

19        Q.  Okay.  And you testified earlier that

20   there's different ways that shakedowns and strip

21   searches take place in terms of personnel at Lincoln

22   Correctional Center; right?

23        A.  Yes, ma'am.

24        Q.  It can be -- it can be the tactical team or

25   it can be COs; right?

1      A.  Yes, ma'am.

2      Q.  Or you can have these cadets come in?

3      A.  Yes, ma'am.

4      Q.  Okay.  And in early February, when you made

5   this request for the cadets, you were okay to wait

6   until you heard from the cadets; right?

7      A.  I had no other choice, ma'am.

8      Q.  Because in the interim, you didn't, for

9   instance, get COs to come in on overtime and do a

10  shakedown and strip search themselves; right?

11     A.  If my memory is correct, we did bring our

12  tactical unit in, I think January of 2011, and did a

13  housing unit shakedown.

14     Q.  Okay.  But you made the request for the

15  cadets in early February; right?

16     A.  Yes.

17     Q.  Okay.  And you --

18     A.  We had made other attempts to control

19  contraband and control our problems before I

20  requested help from the academy.

21     Q.  Okay.  So between early February, when you

22  made this request, and when the cadets ultimately

23  came, in that timeframe, you didn't bring COs in on

24  overtime to do a shakedown and a strip search of

25  Units 2B and 4B; right?

1          A.  No, ma'am, not that I can recall.

2          Q.  Okay.

3              THE COURT:  You gonna start on another

4     subject or what?

5          Q.  I'm sort of am, Judge?  So maybe this is a

6     good time to take our break.

7              THE COURT:  Okay, this --  What's that?

8          Q.  If the Court wants to take a break, I think

9     it's a good time, Judge.

10             THE COURT:  Oh, no, no, I'm not going to

11    take a break.  I want to be sure that before you

12    start on another subject, that we all understand

13    what we're talking about here.  And I'm not totally

14    clear.

15        Now, we've had Orange Crush, we've had the

16    cadets, we have the force, the local officers and so

17    forth that are -- task force or whatever you're

18    talking about.  So -- and now you're asking entirely

19    about requesting the cadets.  And I'm not sure I

20    understand what the lineup here is.

21        Now, if you're gonna have a regular shakedown,

22    what's the normal procedure?  And who do you use?

23        I'm sure that members of the jury feel the same

24    way here; That we don't quite understand the system

25    and how it works and the chain of command.  And

1  that's what I'd like to get clear in my mind.  Okay?

2      Q.  I appreciate that advice from the Court.  So

3  let me ask you some questions along those lines,

4  Assistant Warden.

5      You testified that there are different -- that

6  there are different personnel that are involved in

7  shakedowns at Lincoln Correctional Center depending

8  on when those shakedowns occur; right?

9      A.  Yes, ma'am.

10     Q.  And I think you testified earlier that the

11 decision about who you were going to use is

12 primarily a decision about manpower?

13     A.  It's not primarily manpower, but that's a

14 deciding factor; yes.

15     Q.  Okay.

16     A.  I can't -- I can't use staff if I don't have

17 them.  I mean if I have excessive writs on the road

18 or maybe a road crew going out or there's a special

19 program going on, I don't have staff available.

20     Q.  So --

21     A.  I mean we ran pretty short of manpower.

22     Q.  Okay.  So --

23         THE COURT:  Just let him just explain the

24 whole situation.  I think it would be easier, rather

25 than Q and A, that he can explain to us so that I

can understand what the situation is.

Why don't you just tell us, Warden, what you do when you have to have a shakedown?  What's available to you?  And I understand that you and the Warden have decided there's going to be one.  So once you decide that there's going to be one, then what happens and who's involved?

THE WITNESS:  Okay.  On a normal operating day, dayshift shift commander and second shift shift commander will assign five shift areas at random that haven't been done in that 90-day period. That's the normal shakedowns.  That would be one for each housing unit.

You could typically use excess staff we have. We could do them for line shakedowns on the walks. You can do them for housing shakedowns in the housing units.  You could do open area or yard area searches of unused areas or common areas.

You can bring in your facility tac team.  But that -- you know, what -- if you use your facility tac team, they have two monthly meetings, two hours each.  What you usually do would combine those two meetings into one, make it a mandatory practice, and all your tac members would attend.  But you may only get, at Lincoln Correctional Center, anywhere

between 8 and 12 members show up due to family obligations, being -- working on a shift.

Or you can have outside assistance. And I only requested outside assistance through the academy for that one event that actually happened March 31st, 2011.

I mean we're always -- if we have spare staff, we're always trying to do shakedowns to prevent the movement of contraband and the control of contraband as part of your daily operations to control the safety and security of your facility. It may be, if you have three extra officers, you search ladies on the walk coming out of chow hall or you search them coming back from gym. There's a million ways you search in a facility.

But a search as big as two whole wings of a housing unit would take a lot of personnel.

I hope that clears it up for you.

THE COURT: Well, it certainly helps. I think it takes us down the road a way. But who makes up the Orange Crush?

THE WITNESS: The tactical unit in our facility is volunteer officers. They volunteer. It goes through the Warden for approval. They go to tac practices two hours a day two times a month.

And after they meet minimum hours, and I think it's
40 hours of training, they're sent to our training
academy in Springfield where they take a tactical
course through training academy instructors.  And I
believe that is a week course.

     And at that time, they're certified to be used
inside our facility.  A non-certified member would
never come into a tac operation inside a facility
until he's had his proper training.  He'll have
numerous hours at the facility and that week in
Springfield first before we ever use him inside.  He
can attend practices, he can get training, but in
order to be used inside the facility, whether it be
ours or anywhere in the state, you've got to meet
the certification standards.

          THE COURT:  Okay.  Now, when we -- when we
talk about Orange Crush, are we talking about only
officers within the institution?

          THE WITNESS:  On the day in question, Your
Honor, we only used tactical members from my
facility.  There was only, I think, ten.  We did not
request tac assistance from anywhere else in the
state.

          THE COURT:  All right.  But if you did have
to do that, or if you thought that the problem

1   was -- was wider spread, you could call in and

2   request others to come join who had already gone

3   through the practice and training of Orange Crush?

4          THE WITNESS:  Yes.  It's a very long

5   process.  I would have made the request after

6   consultation with Warden Hulett.  And that request

7   would have gone to Commander Cecil Polley.  He was

8   the statewide commander of our tac team.  And then

9   he would have decided what facilities he used, how

10  many from each facility.  He would have set the

11  timeframes.  And we wouldn't have known they were

12  coming until very shortly before they came.

13      In my years of experience as a tac member,

14  before I -- Majors and above are not allowed to be

15  tac members.  I would get a call out at 4:00 in the

16  morning saying "Mr. Reynolds, you are to be in

17  uniform, tac gear, ready to go at 7:00."  I wouldn't

18  know where I'm going.  I'm in a van driving north.

19  I wouldn't know until I pulled into Stateville that

20  that's where I'm going.  That's how secretive it is.

21      So I hope that clears it up.

22          THE COURT:  It does.  It helps me very

23  much.  And I hope it does jury too to understand the

24  situation.  We don't deal every day in this type --

25          THE WITNESS:  It is a different

1    environment, Your Honor.

2             THE COURT:  It is indeed.  It is indeed.

3        Now, but as far as this situation was

4    concerned, you used only your own Orange Crush crew,

5    without anybody from outside, except the cadets?

6             THE WITNESS:  Correct, sir.

7             THE COURT:  Is that right?

8             THE WITNESS:  And only myself, Ms. Hulett,

9    maybe Deputy Director Denning, Commander Polley, and

10   Commander Dawdy would have known.  Where we were

11   going.

12       The tac members -- my tac members didn't even

13   know they were coming inside our facility.  They

14   were just told to report.

15            THE COURT:  Very good.  All right.  Now,

16   that helps.

17       Now, do you have any other inquiries on this?

18            MS. THOMPSON:  On that particular issue, I

19   don't think so, Your Honor.

20            THE COURT:  I beg your pardon?

21            MS. THOMPSON:  On that particular line of

22   questioning, I don't, Judge.

23            THE COURT:  Let me think a moment before we

24   get off of this.

25       All right.  Now, as far as the cadets are

concerned -- now, Ms. Thompson, I don't want to at
all encroach upon your trial strategy or plan, but
I'm concerned about how the cadets work into this
situation.

So if you want to inquire, you may.  If you
don't, I will.  Because I want to know -- I want to
know just how the cadets fit into this whole scheme
of things.  And how they are integrated into the --
obviously, they are being trained.  They're in the
cadet school.

Now, Ms. McNaught is standing, so that means
that she's got to put an oar in.  And I welcome it
too.  But I want you all to understand what we're
doing here.  I want to -- if I don't understand a
certain situation within the trial, then I know that
some others are with me.  At least I think so.

But I think it's imperative that the jury
understands the entire background here and how it
works.  And so that's -- that's really what I'm
getting at.

Now, Ms. McNaught.

MS. McNAUGHT:  Your Honor, as we -- as
trial lawyers all know, one witness does not
necessarily know all of the answers.  And there are
certainly other personnel here who might be able to

1    explain that at a later time.

2            THE COURT:  Fine.

3            MS. MCNAUGHT:  And so --

4            THE COURT:  I understand that completely.

5    And if we get to your case, I'm sure you will have

6    all of these personnel available.  But while it's

7    here and we have an assistant warden, who is one of

8    the key players.  And he knows the system and he's

9    been, what 29 years, egads.  And the -- it seems to

10   me this is the time when we ought to get an overview

11   and understand where we're -- what we're talking

12   about here.

13       And it seems to me that he certainly has the

14   experience and the knowledge to kind of flesh out

15   this skeleton of understanding for the benefit of

16   all of us.

17           MS. MCNAUGHT:  And, Your Honor, my point

18   was, he may be able to show the skeleton, but I know

19   that Ms. Thompson has other witnesses, other

20   defendants that she's going to call --

21           THE COURT:  I'm sure.

22           MS. MCNAUGHT:  -- that may be able to put

23   flesh on that skeleton.

24           THE COURT:  Good.  Well, I'm confident that

25   will happen.  But if he knows, I'd like to hear it

right here where we're talking about the whole
thing.

    Okay.  Now, does that trigger any more
questions?

        MS. THOMPSON:  I do have some questions
about cadets, Your Honor.  I have a lot of questions
about the cadets.

        THE COURT:  Okay.

        MS. THOMPSON:  I have questions I'd like to
inquire of this witnesses and other witnesses about
that topic, Your Honor.

        THE COURT:  Well, I'm sure that's coming
along the pike, but let's talk to him about this at
the moment.

    Oh, well, it's 12:00 high as a matter of fact.
I know, every one of you were looking at your
watches.  I know it.

    Okay.  Well, let's -- let's take our break for
lunch for an hour and a half.  At 1:30, we'll be
back.

    And, Warden, you can be thinking about this,
because we're going to zero in on the cadets.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  Surely.

    All right.  Please recall my admonition, ladies

1   and gentlemen, about not speaking about this case at

2   all.  And let's be back at 1:30.

3        Have an enjoyable lunch.  Thank you so much.

4        (The jury left the courtroom.)

5        (A lunch recess was taken.)

6        (The jury entered the courtroom.)

7             THE COURT:  Thank you, everyone.

8        All right, we're all in place.  Everybody is in

9   their chair and we're ready to proceed.

10       Ms. Thompson.

11            MS. THOMPSON:  Thank you, Your Honor.

12       Q.  (By Ms. Thompson:)  Assistant Warden

13  Reynolds, I think when we took the break, there were

14  some questions about cadets.  So I've got a couple

15  of questions -- I have a couple of questions for you

16  about that.

17       The training process in the Illinois Department

18  of Corrections is to have cadets first enter a

19  training academy; right?

20       A.  Yes, ma'am.

21       Q.  Okay.  And that academy is in Springfield;

22  right?

23       A.  Yes, ma'am.

24       Q.  Okay.  During their training, there are

25  times when cadets are available to come to

1    institutions to perform certain tasks; right?

2        A.  Yes, ma'am.

3        Q.  They might go to various prisons in the

4    state to do various kinds of things; right?

5        A.  Yes, ma'am.

6        Q.  Okay.  I want to make sure that -- I might

7    have asked you this, but I honestly don't remember.

8        In your time at Lincoln Correctional Center, is

9    this the only time that a cadet class came to the

10   institution?

11       A.  To my recollection; yes.

12       Q.  Okay.  And you, yourself, went through the

13   training academy when you started your career with

14   IDOC; right?

15       A.  Before -- May 7th of 1984.

16       Q.  Okay.  Since your time in the academy since

17   1984, you didn't have any other assignments at the

18   training academy or with the training academy in

19   your career after that; right?

20       A.  Besides selective training classes.  I was

21   never assigned to the academy; no.

22       Q.  So there is some kind of continuing

23   education that IDOC employees might do for the

24   training academy?

25       A.  Yes, ma'am.

1    Q.  Okay.  So other than going to the academy

2    for that kind of continuing education, you haven't

3    had other jobs directly involved with the academy --

4    A.  No, ma'am.

5    Q.  -- since you yourself went through the

6    academy?

7    A.  No, ma'am.

8    Q.  Okay.  So to pick up, I think, where we

9    were, you came back from vacation the Monday before

10   this search happened and learned that the training

11   class was going to be coming to Lincoln Correctional

12   Center; right?

13   A.  Yes.  I think I got an Outlook message while

14   I was on vacation, a state email, stating that they

15   were coming that date.  But if my recollection is

16   correct, I came back from vacation the Monday before

17   the --

18   (Court reporter requested clarification.)

19       THE COURT:  I have a question.  What kind

20   of a message did you receive?

21   A.  It's Outlook.  It's a state email system.

22       THE COURT:  Okay.

23   Q.  The 31st was a Wednesday?

24   A.  I believe.  I can't say for sure.

25   Q.  Okay.  But you came back a couple days

1    before to learn that the cadets were gonna be

2    coming?

3         A.  Yes, ma'am.

4         Q.  And it's Warden Hulett that told you that

5    the cadets -- that the cadets would be coming to

6    Lincoln?

7         A.  I believe I got an Outlook email message

8    while I was on vacation that was from Commander

9    Polley to Warden Dawson of Logan Correctional Center

10   and Warden Hulett of Lincoln Correctional Center,

11   which was forward to me by Warden Hulett.

12        Q.  There were some correctional officers from

13   Lincoln Correctional Center who, the day of the

14   search, came in to work overtime; right?

15        A.  I do not remember.  I can't really.

16        Q.  Did you make any arrangements to have

17   overtime officers come in to be a part of the

18   shakedowns and strip search?

19        A.  Not that I can recall.

20        Q.  Did somebody else do that?

21        A.  It may have been the shift commanders.

22        Q.  Now, after you came back from your trip, did

23   you and Warden Hulett have a meeting to talk about

24   what was gonna happen with these strip searches and

25   the shakedown?

1     A.  Yes, ma'am.

2     Q.  And when did you have that meeting?

3     A.  Somewhere between the time I came back and

4  Tuesday night when I left.

5     Q.  So two meetings?

6     A.  No.  Sometime between Monday, when I came

7  back from vacation, and leaving the facility Tuesday

8  early evening.

9     Q.  How long did you and Warden Hulett talk for

10 in that timeframe about this strip search and

11 shakedown?

12    A.  Approximately 15, 20 minutes.  Half hour at

13 the most.

14    Q.  And in that meeting with Warden Hulett, did

15 you and Warden Hulett talk about whether or not

16 women were gonna be strip-searched as part of -- as

17 part of this operation?

18    A.  Yes, ma'am.

19    Q.  And did you and Warden Hulett make a plan

20 about how it was that the women were gonna be

21 strip-searched?

22    A.  Yes, ma'am.

23    Q.  And did you and Warden Hulett talk about

24 the -- that a shakedown was gonna occur?

25    A.  Yes, ma'am.

1    Q.  And did you talk about how those shakedowns
2    were going to happen?
3    A.  Yes, ma'am.
4    Q.  Did you decide in your meeting with Warden
5    Hulett that the women that were gonna be
6    strip-searched were just gonna be strip-searched in
7    the inmate bathroom of the gym?
8    A.  Yes, that was the initial discussion.
9    Q.  In your discussions with Warden Hulett,
10   would you have talked about any other places to have
11   the inmates strip-searched besides the inmate
12   bathroom?
13   A.  No, ma'am.
14   Q.  And in your meeting with Warden Hulett, did
15   you plan to have Orange Crush be the unit that would
16   come into the housing units and bring the women to
17   the gym to be strip-searched?
18   A.  Yes.  That was one of the design purposes of
19   our tactical unit.
20   Q.  Okay.  And was the plan that you and Warden
21   Hulett developed for Orange Crush to handcuff the
22   women?
23   A.  Yes, ma'am.
24   Q.  Was the plan for the women to be handcuffed
25   at their housing units and brought to the gym in

1    handcuffs?

2        A.  Yes, ma'am.

3        Q.  And was the plan for them to remain

4    handcuffed at the gym until they were

5    strip-searched?

6        A.  No, ma'am.

7        Q.  Now, is it your testimony that the plan was

8    to have the women's cuffs removed as soon as they

9    got to the gym?

10       A.  Yes, ma'am.

11       Q.  Was the plan for the women to stand at the

12   gym waiting to be strip-searched?

13       A.  Stand or sit facing the wall.  We would

14   never make an offender stand if she had medical

15   condition where she couldn't do it.

16       Q.  Well, what if she didn't have a medical

17   condition, she was just physically unable to stand?

18       A.  She would be allowed to sit.  Just facing

19   the wall and remain quiet.

20       Q.  Was it your plan that any women waiting in

21   the gym who wanted to have a seat could just sit

22   down?

23       A.  Sit down.  Not a problem.

24       Q.  And I assume you're gonna tell me that the

25   plan was certainly not for there to be foul language

1    used at the women that were gonna be the subject of

2    these strip searches?

3         A.  Unprofessional conduct is never a plan.

4         Q.  And the plan was not for there to be men who

5    could see women being strip-searched in the gym?

6         A.  No, ma'am.

7         Q.  Okay.  Now, did you and Warden Hulett put

8    together a written plan for how the shakedowns and

9    the strip searches were gonna happen?

10        A.  No, ma'am.

11        Q.  Did you send -- did you take any notes at

12   that meeting memorializing what you and Warden

13   Hulett had talked about?

14        A.  No, ma'am.

15        Q.  So this was something that you and Warden

16   Hulett talked through in 15 or -- 15 to 20

17   minutes --

18        A.  Yes, ma'am.

19        Q.  -- prior to --

20        Well, let me ask you this question instead.  On

21   March 31st then, a bus full of cadets from the

22   academy showed up at Lincoln; correct?

23        A.  Yes, ma'am.

24        Q.  And they showed up with some of the training

25   supervisory chain?

A.  Yes, ma'am, training academy supervisors
were present to.

Q.  Okay.  How many supervisors from -- how many
supervises and training instructors from the academy
came with the cadets?

A.  That I can recall, two.

Q.  Was that Ms. Hatfield?

A.  Correct.

Q.  And Mr. Pasley?

A.  Correct.

Q.  Okay.  How many cadets came with
Ms. Hatfield and Mr. Pasley?

A.  To our facility?  I think approximately 70.

Q.  Okay.  So we talked about this earlier.
There was -- there were cadets on that day that went
to Logan across the road?

A.  Yes.  Yes, ma'am.

Q.  And did all -- all the cadets came together,
I assume?

A.  I don't have the answer to that.  I wasn't
privy to that.

Q.  Okay.  Well, some cadets went to Logan and
some went to Lincoln; right?

A.  Yes, ma'am.

Q.  Okay.  Of the 70 or so cadets that came to

1    Lincoln, how many of them were men?

2         A.  Very small number.  Most of them were

3    female.

4         Q.  So when you say most, what percentage?

5         A.  I can't give you accurate information.  I

6    was not in charge of the cadets, that was the

7    academy instructors would probably be the better

8    person to ask.

9         Q.  Prior to the cadets arriving at the --

10   arriving at Lincoln on March 31st, the Orange Crush

11   team had already met up; right?

12        A.  If my memory serves me correct, they were

13   told to be at the facility at 8:30 a.m.

14        Q.  Did you have any meetings with the Orange

15   Crush team or with Lieutenant Dowdy the morning of

16   March 31st, before the cadets came?

17        A.  Yes.  I would have had a discussion with

18   Commander Troy Dawdy.

19        Q.  When did you have that discussion?

20        A.  Probably when he came in from -- the tac

21   room is outside of the facility.  So they would have

22   dressed outside.  When he got back to the sally port

23   and we -- we would have talked there because that's

24   where the cadet bus came in.

25        Q.  You said you would have talked --

1    A.  Yes, ma'am.

2    Q.  Did you talk with Lieutenant Dawdy?

3    A.  Yes, ma'am.

4    Q.  Okay.  How long did you and Lieutenant Dawdy

5  talk for?

6    A.  From that point on, Commander Dawdy was with

7  me pretty much the whole day.

8    Q.  Well, before the cadets arrived, how long

9  was the conversation you had with Lieutenant Dawdy?

10    A.  Fifteen minutes or so, I'd guess.

11    Q.  And were you filling him in on what you and

12  the Warden had discussed?

13    A.  Yeah, he'd already been briefed on that.  We

14  just covered last minute issues and what we were

15  attempting to accomplish and stuff like that.

16    Q.  How do you know that he'd already been

17  briefed about that?

18    A.  He got -- he would have got an Outlook

19  message saying "This is what we're doing."  He might

20  not have known exactly where we were going inside

21  the facility, but he knew we were doing a shakedown

22  inside our facility.

23    Q.  Did you send an Outlook message to

24  Lieutenant Dawdy saying, you know, "this is

25  generally what we're going to do tomorrow," without

1    giving him the location?

2         A.  I know I sent him an Outlook message prior

3    to the event saying Combine your two monthly

4    practices into one, make it a mandatory practice or

5    mandatory attendance.  And we went from there.

6         Q.  Well, in your Outlook message, did you give

7    him any other information other than get your team

8    together and --

9         A.  No, I didn't.  Very brief.

10        Q.  Okay.  So at the meeting you had with

11   Lieutenant Dawdy for about 15 minutes on the morning

12   of March 31st.  That's when you told him what was

13   gonna happen?

14        A.  Yes, I --

15        Q.  And did you --

16        A.  He may have known some of the details.  That

17   we were going to do a shakedown.  But I think that's

18   when I told him what housing units we were doing and

19   what our timeframes were.

20        Q.  So then when the cadets came, you and Orange

21   Crush and Lieutenant Dawdy and the cadets and the

22   cadets' supervisors, everybody had a meeting; right?

23        A.  There was a brief discussion in the sally

24   port when they got off the bus.  A lot of the cadets

25   had to use the restroom.  We went into the dietary,

1    they took care of that obligation.  We sat down.

2    Warden Hulett introduced herself, you know, made a

3    small -- a small speech.

4         I talked to them, said, "Hey, this is what

5    we're doing, this is where we're going, this is what

6    our problems are."  It was pretty short.  Just make

7    sure we're safe, make sure we're professional, and

8    be about business.

9         Q.  How long did that discussion take?

10        A.  The whole thing probably took less than 15

11   minutes.  And I believe both -- or at least one of

12   the academy instructors spoke to his cadets.

13        Q.  What did the academy instructor tell the

14   cadets at that meeting?

15        A.  It would be better for you to ask him, I

16   don't --

17        Q.  Did you or the academy instructor tell the

18   cadets at that meeting that they were gonna be

19   looking for nuisance contraband?

20        A.  No.  I think I told them we were looking for

21   contraband.

22        Q.  And did you tell them at that meeting that

23   they were gonna be strip-searching women?

24        A.  I think it was given -- they were given

25   instructions that a lot of the female corrections

1   officers and cadets would be sent to the gym for

2   strip searches while the male cadets and male tac

3   team came with me to the house.

4       Q.  Okay.  You said a lot of the male cadets

5   came with you to the housing units.  Was it your

6   testimony earlier that very few of the cadets that

7   came were men?

8       A.  A very small percentage.  I can't give you

9   the exact figure.  Most of the men were sent to

10  Logan, I do believe.

11      Q.  Okay.  So if it's a small percentage of the

12  70 that came, was there more than 10 male cadets

13  there?

14      A.  I can't answer that question.  Maybe the

15  academy staff can.

16      Q.  Okay.  But at least some of the male cadets

17  that came did not go with you to do the shakedown of

18  the housing?

19      A.  No, I think all the male cadets went with me

20  and Mr. Pasley.

21      Q.  When you and Warden Hulett had your meeting

22  to talk about this operation, and you decided that

23  the searches were gonna happen in the inmate

24  bathroom, was that a decision that you and Warden

25  Hulett made together about the location?

1    A.  Yes, ma'am.

2    Q.  And why is it that you selected the inmate

3  bathroom as the place the searches were gonna take

4  place?

5    A.  It's an area with a designed curtain to be

6  closed off for privacy.

7    Q.  Okay.  So after you had this meeting, you

8  and Orange Crush and the cadets that came with you

9  then went into the housing units; right?

10    A.  Housing Unit 2B; yes, ma'am.

11    Q.  You went to 2B first, and then as soon as

12  you could, you went to 4B?

13    A.  Well, yes and no.  We did 2B, finished it,

14  broke the cadets for lunch, and got 4B after that.

15    Q.  When you said you got 4B, what do you mean

16  by that?

17    A.  We went -- same routine we took on 2B.  We

18  went to housing Unit 4B.

19    Q.  Did you finish the whole shakedown of Unit

20  4B before you went to get the women from Unit 2B?

21    A.  Yes, we did.

22    Q.  Okay.  Now, when you came into the units,

23  did you make an announcement to the women that were

24  there?

25    A.  The tactical unit went in first, followed by

Warden Hulett and myself.  I addressed the offenders

from 2B after they were awake, out of bed, pat

searched at the door, cuffed, and lead to the

dayroom.

Q.  So you addressed the offenders in 2B.  Did

you address the offenders in 4B?

A.  Exactly the same, ma'am.

Q.  Okay.  And what did you tell the women when

you addressed them?

A.  I usually -- I think basically, that we were

gonna search the bed areas.  They were gonna be

moved to the gym in a line.  I told them, "You're

allowed to take inhalers, any medical devices you

needed.  If you had medication you were gonna need

to take in the next two to three hours, please take

it with you."

I made sure to tell them "If you have

questions, I'm right here.  I'll make the decisions,

ask me."

Q.  And was Warden Hulett there when you made

that announcement?

A.  I believe so; yes, ma'am.

Q.  Okay.  Now, when you made those

announcements, did you make an announcement to the

women that if they needed to bring an extra sanitary

1   pad with them, they could?

2       A.  I don't think it was designed as sanitary

3   pads.  I said, "If you have any medical issues you

4   need to discuss or take, please see me.  I'm right

5   here, I'm available, I'll make that decision."

6       I would have never denied feminine hygiene

7   products to any inmate, whether it be state-issued

8   or bought, their personal stuff bought from the

9   commissary.

10      Q.  My question is a little different.  Did you

11  specifically mention feminine hygiene products in

12  the announcements you made to the women?

13      A.  No.  I referred them to ask me if there was

14  special issues that they needed.

15      Q.  Okay.  And is it your testimony that at

16  either of the housing units at 4B or 2B, no women

17  asked you, "Can I bring a pad with me?"

18      A.  No, ma'am.  They had them, let they take

19  them.

20      Q.  No one said, "I need to bring a tampon?"

21      A.  No, ma'am.

22      Q.  Did you see any women asking other officers

23  if they could bring those items with them?

24      A.  No, ma'am.

25      Q.  When you came into Unit 4B and Unit 2B, did

1  you tell the women they might be gone from the

2  housing unit for a while?

3      A.  I don't list timeframes.  I think what I

4  phrased it to them, "You will be gone for an

5  extended period of time."

6      Q.  So these women knew they were -- I guess

7  they would interpret extended period of time that

8  they were going to interpret --

9          MS. MCNAUGHT:  Objection to how they would

10  have interpreted something.

11          THE COURT:  Sustained.  Extended.

12      Q.  You wanted to convey to them that they were

13  gonna be gonna for an extended period of time?

14      A.  Yeah.  Not being evasive, but I didn't know

15  how long it was gonna take.  So I used the phase

16  "You're going to be gone from your housing unit for

17  an extended period of time.  This is what we are

18  doing."

19      Q.  Okay.  You testified earlier at your meeting

20  with Warden Hulett that it was you and Warden Hulett

21  who decided that the women were gonna be handcuffed

22  in the housing units to be brought to the gym for

23  the strip searches; right?

24      A.  Yes, ma'am.

25      Q.  So why did you decide that that was what was

1  gonna happen?

2      A.  That's pretty much standard procedure in a

3  tac operation or if you move a line that size.  We

4  were moving a hundred offenders.  Approximately a

5  hundred off 2B and off 4B.

6      Q.  Is it your testimony that any time a hundred

7  women in the prison are walking somewhere together,

8  that they walk handcuffed?

9      A.  No, ma'am, absolutely not.

10      Q.  So what was different about this situation

11  that would require the women to be handcuffed?

12      A.  It was a tac operation, it was a cadet

13  operation, and it was just an overall shakedown of

14  the housing units.  When we designed our plan, they

15  were designed to be handcuffed from the housing unit

16  to the gym.

17      Q.  But why was it designed that way?

18      A.  That was the best way -- best and safest way

19  to secure the facility.  I mean you --

20      Q.  Well, were the handcuffs so the women

21  couldn't hide contraband as they were walking?

22      A.  Part of it.  In part, just to maintain

23  security and control.

24      Q.  So when these women were escorted to the gym

25  from the housing units, they had lines of tactical

1    officers on either side of them; right?

2        A.  Yeah.  There was correctional officers

3    spaced out through the lines.

4        Q.  Okay.  And they had lines of cadets with

5    them too; right?

6        A.  I don't think any of the cadets went with

7    them.  I think it was predominantly moved by the

8    tac.

9        Q.  And your concern was that even though the

10   women were being marched by lines of -- lines of

11   these officers on either side, that you needed

12   handcuffs to ensure the safety and security of the

13   facility?

14       A.  Yes, ma'am.

15       Q.  Okay.  Now, was there a reason why the women

16   couldn't have marched in these lines with their

17   hands on their head in this position?

18       A.  No.  We had decided that restraints would be

19   used in moving them from the housing units to the

20   gym.

21       Q.  Okay.  And the cadets -- I want to make sure

22   I understand your testimony, so correct me if I've

23   misunderstood.  But the cadets were not really

24   involved in the transporting of the women in

25   handcuffs from the housing units to the gym; right?

1      A.  Not to my knowledge.

2      Q.  So there wasn't a training purpose in taking

3  the women that way?

4      A.  No, not to my knowledge.

5      Q.  Okay.  Now, why was the decision made when

6  you were planning this with Warden Hulett, that when

7  the women got to the gym, they were supposed to have

8  their handcuffs taken out?

9      A.  We wanted them in restraints for the least

10  time possible.

11      Q.  And why is that?

12      A.  For safety and security of the facility.  I

13  mean if you have offenders standing, they're seizure

14  prone, bad ankles, bad knees, you know, I don't want

15  them standing with their hands cuffed behind their

16  back for an extended period of time.  I was trying

17  to be the least invasive as I possibly could and

18  still run my operation.

19      Q.  Was it Debbie Denning who said that she

20  wanted these women to have -- be handcuffed for the

21  least amount of time as possible?

22      A.  Any decision made by myself or Warden Hulett

23  would have been ran through Deputy Director Denning.

24      Q.  Did you discuss this operation with Debbie

25  Denning before it took place?

1      A.  No, ma'am.  I was on vacation.

2      Q.  Okay.  So it was your understanding that

3  someone else talked about this with Debbie

4  Denning --

5      A.  I have no --

6          MS. MCNAUGHT:  Objection.

7          THE COURT:  Just a moment.

8          MS. MCNAUGHT:  He wasn't part of the

9  conversation.  She's asking him for something he has

10  no knowledge of.  There's no foundation for --

11          THE COURT:  I'll agree so far.

12      Q.  What is the basis of your understanding that

13  this would have gone through Debbie Denning?

14      A.  A warden -- none of us, a warden or

15  assistant warden wouldn't have made a decision to

16  use the tac team or cadets or anything not a normal

17  operation without consulting the deputy director

18  first, I believe.

19      Q.  You're saying that's something Warden Hulett

20  would have done?

21      A.  Yes, ma'am.  That would have been the

22  Warden's responsibility.

23      Q.  So your plan was never for the women to

24  be --

25          THE COURT:  Now, when we say Deputy

1    Director of what?

2         A.  The Illinois Department of Corrections, sir.

3              THE COURT:  Thank you.

4         Q.  Your plan was never for the women to come to

5    the gym and be in handcuffs for an extended period

6    of time?

7         A.  No, ma'am, that was not the plan.

8         Q.  And you -- it's your testimony that when the

9    women came to the gym, if they wanted to sit down,

10   they could, as long as they were still facing the

11   wall?

12        A.  Yes, ma'am.

13        Q.  And you agree that it serves the same

14   purpose if they're in the gym to have them sitting

15   as well as standing?

16        A.  As long as they sit where they were assigned

17   and face the wall and quiet, wouldn't bother me at

18   all if they sit.

19        Q.  It was your expectation before this

20   operation began that it was gonna -- going to take

21   about four or five hours; right?

22        A.  I would guess that was a correct ballpark

23   figure.

24        Q.  Okay.  This ended up taking longer than you

25   expected; right?

1          A.  No, ma'am.  It was right on just about

2     timeframe.

3          Q.  So is it your testimony today that these

4     searches did not run long?

5          A.  No, ma'am.  We -- the cadets left the

6     academy at eight and had to be back on the road for

7     Springfield by three p.m.

8          Q.  Well, look back at that a second.

9          It's your testimony -- is it your testimony

10    today that after the women were handcuffed at the

11    housing units, that you went to the gym with them?

12         A.  No, ma'am.

13         Q.  In fact, your testimony today is that you

14    stayed at the housing units and supervised the

15    shakedowns that were happening in those units;

16    right?

17         A.  I was never in the gym for housing Unit 2B.

18    I did stop in the gym in the afternoon when 4B was

19    being shook down, but it was late in the afternoon

20    at approximately 2:15 p.m.

21         Q.  That's the first time that day you went to

22    the gym?

23         A.  Yes, ma'am.

24         Q.  Okay.  Now, do you agree that the women were

25    cooperative in the events that were taking place on

1    March 31st?

2         A.  Yes, ma'am.

3              MS. MCNAUGHT:  Objection as to foundation;

4    time, place.

5              THE COURT:  Sustained.

6         Q.  Were the women compliant on the housing

7    units when you and Orange Crush came in, asked the

8    women to be handcuffed, and then to go to the gym in

9    handcuffs?

10        A.  For the most part; yes.

11        Q.  And when you came into the gym at 2:15, you

12   say, did you see the women in the gym being

13   cooperative at that time?

14        A.  Yeah.  There was no concerns.

15        Q.  So during this operation, you were

16   responsible for supervising the cadets and the

17   Orange Crush in the housing units?

18        A.  As Assistant Warden of Operations, it was my

19   responsibility for everything inside that facility.

20   But I figured I could do the facility the most good

21   and alleviate more problems if I stayed with cadets,

22   limited contraband, limited inmate disruptions.  I

23   was trying to put myself in the best place in the

24   facility to serve the needs of our correctional

25   facility.

1    Q.  And so according to -- well, let me ask a

2    better question.  Is it your testimony today then

3    that you were not in the gym prior to 2:15

4    supervising strip searches of the women that were

5    strip-searched?

6    A.  Yes, ma'am.

7    Q.  Who is it that was responsible for

8    supervising the strip searches in the gym?

9    A.  That would have been correctional academy

10   instructors, our female tactical members, our female

11   facility staff, and female cadets.

12   Q.  Okay.  And the training facility staff

13   you're talking about, is that Ms. Hatfield?

14   A.  Correct.

15   Q.  Because Mr. Pasley -- your testimony is

16   Mr. Pasley was with you; right?

17   A.  Yes.  I can't swear he never left my side,

18   but yeah, he was with me throughout most of the day.

19   Or in the same housing unit most of the day.

20   Q.  So prior to 2, or I think you said 2 or 2:15

21   when you went to the gym?

22   A.  Ballpark figure.

23   Q.  Prior to that, you have no idea how searches

24   were being done in the gym?

25   A.  No, I was not present.  I know how they were

1    designed to be done, but I was not present.

2        Q.  Okay.  So you don't know exactly how the

3    women were searched in the gym before you got there?

4        A.  I can't tell you what happened.  I wasn't

5    there, ma'am.

6        Q.  Okay.  You don't know how big the groups of

7    women that were being searched were?

8        A.  No, ma'am.

9        Q.  You don't know if there was profanity being

10   used?

11       A.  No, ma'am.

12       Q.  You don't know if there was disrespectful

13   language being used?

14       A.  No.  I wasn't there.

15       Q.  You don't know if the women actually had to

16   wait in the gym in handcuffs or not?

17       A.  By design, they should not wait.  They were

18   told get them to the gym, line them up, and remove

19   the restraints.

20       Q.  You don't know if the women were given

21   sanitary pads at the gym?

22       A.  I was not in the gym; I can't answer that.

23       Q.  And you don't know whether they were allowed

24   to use the bathroom?

25       A.  I was not in the gym; I can't answer that.

1          Q.  Okay.  When you came into the gym at 2:15,

2     there were women who came up and complained to you;

3     right?

4          A.  Yes, there were.  And it was in regards to

5     how much longer is this going to take.

6          Q.  Well, they complained to you about being

7     shook down and cuffed up and marched to the gym;

8     correct?

9          A.  There was complaints about it, yeah.  There

10    was complaints.

11         Q.  Okay.  They complained to you about some

12    sanitary issues in the gym; right?

13         A.  No.  Never.

14         Q.  I think -- they complained to you that they

15    were in bare feet; right?

16         A.  They did -- they did state that they were

17    forced to put their bare feet on the gym floor.

18         Q.  They felt that was unclean?

19         A.  Yes.

20         Q.  And they complained to you that they wanted

21    to go to the bathroom; right?

22         A.  No.

23         Q.  Your testimony today is that women did not

24    complain to you that they wanted to go to the

25    bathroom?

1    A.  If an offender had asked to use the

2  restroom, I would have made sure they used the

3  restroom.

4    Q.  Did they complain to you that they were

5  hungry?

6    A.  No, not that I recollect.

7    Q.  Okay.  Did they complain to you that they

8  had been standing handcuffed in the gym?

9    A.  No.  They weren't handcuffed when I came in.

10    Q.  Well, they complained to you that they were

11  on their feet too long; right?

12    A.  Yes, they -- some had complained that it was

13  taking too long.  They were allowed to sit if they

14  needed to.

15    Q.  Is it your testimony today that no women

16  complained to you that they were on their feet too

17  long?

18    A.  If there was a complaint about being on your

19  feet, I'd have told them, "please sit down."  I'd

20  have much rather have them sit down than have a

21  medical emergency and have to call a code and have

22  medical unit respond.

23    Q.  So my question for you, sir, is did any

24  women complain to you that they were on their feet

25  too long?

1    A.  Possibly.  I cannot recall.

2    Q.  Okay.  Would looking at a copy of your

3    deposition refresh your memory?

4    A.  Yes.

5    Q.  Your Honor, I showed the witness what's been

6    marked as Plaintiff's Exhibit 47.  And Page 90 over

7    into Page 91.

8         THE COURT:  Very well.

9    Q.  Just let me know when you're done reviewing

10   that section, sir.

11   A.  I'm done.

12   Q.  Did reviewing a copy of your deposition

13   refresh your memory as to whether any women

14   complained to you that they were on their feet too

15   long?

16   A.  Yes.

17   Q.  And they complained to you that they had

18   been waiting three or four hours to be

19   strip-searched; right?

20   A.  That was the complaint.

21   Q.  So after the women complained, did you do

22   anything to speed up the strip searches?

23   A.  No, because it wasn't three or four hours as

24   complained about.

25   Q.  Well, let me ask you this:  When you came

1    into the gym at 2:15 or 2:30, you came into the gym

2    with Warden Hulett; right?

3         A.  Yes, ma'am.

4         Q.  And you were there with her to look at -- to

5    look at the search and see how things were going;

6    right?

7         A.  Yes, ma'am.

8         Q.  Okay.  And the complaints that women made to

9    you at that point when you came in at 2:15, did you

10   do anything to respond to them?

11        A.  Yeah.  If they stated they had been on their

12   feet too long, they're allowed to sit.  If they

13   needed to use the restroom, I would have allowed

14   them to use the restroom.

15        Q.  Okay.  Well, is it your testimony today that

16   when women complained to that you were on their feet

17   to long, you told them "You can sit down"?

18        A.  "You can sit down."  Yes, ma'am.

19        Q.  Because at that point, that was something

20   you needed to tell them to do?  They didn't know it

21   already?

22        A.  I mean they should have been allowed to sit

23   down.  That was by design.

24        Q.  And the complaints that the women made to

25   you at that point when you came into the gym at

1    2:15, those were complaints that you viewed as
2    harping; right?
3        A.  No.  I -- I'm gonna pretty much listen to
4    any complaint.  That's part of being assistant
5    warden is to listen.
6        Q.  Did you view those complaints -- I'm sorry
7    to use this word, but did you view those complaints
8    as bitching?
9        A.  No, ma'am.
10       Q.  Did the women bitch a little bit to you
11   about these issues?
12       A.  Gripe.  Yeah, I mean -- I don't -- I don't
13   like the word bitch, but I may have used the word
14   bitchy.  I mean they had complaints.
15       Q.  Would you characterize it as them bitching a
16   little bit?
17       A.  Possibly.
18       Q.  Well --
19       A.  I don't remember.
20       Q.  Would reviewing a copy of your deposition
21   refresh your recollection, sir?
22       A.  Yes, ma'am.
23       Q.  I've shown the witness Plaintiff's
24   Exhibit 47.  Bottom of Page 63.  And I'll ask you to
25   let me know when you've reviewed that.

1          A.  63.

2          Q.  The bottom of 63, sir.  I can show you the

3    line.

4          A.  I don't disagree with that statement.

5          Q.  Okay.  So they -- you viewed it as bitching?

6          A.  I used griping in that thing and I used

7    bitching.

8          Q.  Okay.

9          A.  And I also stated that any time you change

10   normal procedure for them and change their normal

11   routine, it upsets them.  I mean it's disturbing.

12         Q.  The women that talked to you were upset?

13         A.  Yeah, I'd say that they weren't pleased.

14         Q.  Okay.  And you viewed that as just standard

15   procedure with an inmate; right?

16              MS. MCNAUGHT:  Objection.  Counsel is

17   mischaracterizing the testimony that he gave in his

18   deposition.  If she'd like to read it to him, that's

19   fine, or if she'd like for him to repeat it, that's

20   fine.  But to mischaracterize his testimony in this

21   way is inappropriate.

22              THE COURT:  I agree.  And I sustain.

23         Q.  I would like to show the Court the -- where

24   I'm referencing?

25              THE COURT:  Don't show me.  Read it.

1     Q. All right. Sir, I'm referring to your

2   deposition on September 3rd of 2015. Were you asked

3   this question and did you give this answer. And I'm

4   starting on Line 16.

5     (As read:) So when you supervised the

6   shakedowns on 2B and 4B, um --

7     Answer: Yes.

8     The prisoners that you saw were all compliant

9   with the directions they were given?

10    Answer: Moderately compliant. I mean they

11  didn't like it, but you know, they didn't pose a

12  sit-in. I mean they harped a little bit, bitched a

13  little bit, but that's just standard procedure with

14  inmates. I mean they're doing something besides

15  their normal routine and nobody likes to be shut

16  down and cuffed up and marched to the gym, but it's

17  part of operations.

18    Were you asked those questions and did you give

19  those answers, sir?

20    A. Yes, that's correct.

21    Q. When you came into the gym at 2:15, there

22  were strip searches going on at that time; right?

23    A. Yes, ma'am.

24    Q. Okay. In fact, the searches total took --

25  well, let me ask you a better question.

1       From the time that you guys went into the
2   housing units in the morning to the time when the
3   strip searches were done, in total that took six or
4   seven hours; correct?
5       A.  For both units; yes, ma'am.  From basically
6   9 to 2:30 or so.
7       Q.  And to go back to what we talked about.
8   When you came in at -- to the gym at around 2 or
9   2:15, the shakedowns in the housing Unit 2 were
10  still going on; right?
11      A.  No.  2B was conducted and done before noon.
12      Q.  Well, was 4B still going on at that time?
13      A.  4B was going on in the afternoon; yes,
14  ma'am.
15      Q.  Okay.  And I'm sorry for that correction.
16      A.  I was confused too.
17      Q.  Well, as we talked about a little bit
18  earlier, you thought that these searches were gonna
19  take closer to four or five hours; right?
20      A.  Yeah, they were pretty much right on
21  ballpark figure.  I knew that the cadets would leave
22  the academy at 8 a.m. and had to be on the road by
23  3 p.m.
24      Q.  So these searches took a little longer than
25  you thought; right?

1      A.  No.  You got to figure we had cadets to

2   break for lunch.  They have to get lunch breaks in.

3   And there was a small window between 2B ending and

4   4B starting.  We had to feed the offender

5   population.  When we finished with 2B, we had to

6   feed them.  We had to ensure 4B was fed before we

7   took them over.  So there was a break midday.

8      Q.  When you came into the gym around 2:15, you

9   did not go into any of the areas that were being

10  searched; right?

11     A.  No, ma'am.

12     Q.  And your testimony is at the time you came

13  in at 2:15, that there was some kind of curtain that

14  was in front of that inmate bathroom?

15     A.  Yeah.  It was the curtain in the picture you

16  entered as an exhibit.  It's sitting right there.

17     Q.  And when you came into the gym, were you

18  aware that there were searches going on in the staff

19  bathroom?

20     A.  No.

21     Q.  Did you see anyone going in or out of the

22  staff bathroom when you came in?

23     A.  No, ma'am.

24     Q.  And when you came into the gym, did you see

25  any -- well, let me ask you a better question.  When

1  you came into the gym, did you go into the beauty

2  shop?

3      A.  No, ma'am.

4      Q.  Did you see groups of women going in and out

5  of the beauty shop?

6      A.  I seen a tac member standing as security on

7  the door leading from the gym to the beauty shop and

8  I seen offenders being led to and from the beauty

9  shop.

10      Q.  Was the tac member that was standing at the

11  door a man or woman?

12      A.  I believe it was a woman.

13      Q.  All right.  You don't know what was going on

14  inside the beauty shop; right?

15      A.  You cannot see into the beauty shop from the

16  gym.

17      Q.  Because that door doesn't have a window or

18  anything in it; right?

19      A.  Now that I've seen pictures, yes, it does

20  not have a window.

21      Q.  So there's no way you could see in there?

22      A.  No.  Not from the gym; no.

23      Q.  Okay.  But you knew that the plan as to the

24  women on March 31st, 2011, was for the women to be

25  strip-searched; right?

1        A.  Yes, ma'am.

2        Q.  And you've heard some other testimony as

3   you've sat here about the procedure for doing that;

4   right?

5        A.  Yes, ma'am.

6        Q.  The shaking of the hair, moving your arms,

7   squatting --

8        A.  Yes, ma'am.

9        Q.  -- is that right?

10       A.  Pretty much AD regulations; yes, ma'am.

11       Q.  Okay.  Doing strip searches of women is

12   unpleasant for IDOC staff; right?

13       A.  Yes, ma'am.

14       Q.  Because it is uncomfortable to inspect

15   someone's body?

16       A.  For both parties involved.

17       Q.  Right.  Because you're having to look at

18   somebody else's body very carefully?

19       A.  Yes.

20       Q.  You have to look at areas of somebody's body

21   that you wouldn't otherwise choose to see?

22       A.  Yes, ma'am.

23       Q.  In a search like this, where you're getting

24   women up first thing in the morning, they might not

25   have known this is going to happen; right?

1    A.  Yes.

2    Q.  So you might have women who didn't shower;

3   right?

4    A.  Yes, ma'am.

5    Q.  Or didn't prepare from a hygiene perspective

6   to have someone looking at them?

7    A.  Yes, ma'am.

8    Q.  Now, the inmate bathroom in the gym is not a

9   huge area; right?

10    A.  No, I wouldn't describe it as huge, no.

11    Q.  And the staff bathroom -- I'm sorry --

12    A.  I don't have the exact dimensions, but I

13   would not classify it as huge.

14    Q.  And the staff bathroom in the gym is an even

15   smaller area; right?

16    A.  I believe that to be correct.

17    Q.  And the beauty parlor is not a huge space?

18    A.  Bigger than the female restroom, but not

19   huge by standards, by correctional standards.

20    Q.  And the gym itself had women waiting in it,

21   hundreds of women that day; right?

22    A.  When I entered the gym at 2:15, there would

23   have been approximately a hundred women in the room.

24   Because after they were strip-searched, they were

25   allowed to sit on the bleachers.

1    Q.  So there were a hundred women in there who

2    may or may not have been able to take care of

3    hygiene that morning?

4    A.  Yes, ma'am, there were a hundred women

5    there.

6    Q.  And the officers that were doing the

7    strip-searching, and the cadets that were involved

8    in the strip-searching, they had been in that gym as

9    long as the women being searched?

10    A.  Except for a small break for lunch; yes,

11    ma'am.

12    Q.  So these staff that were performing those

13    tasks were doing something unpleasant; right?

14    A.  Yes, ma'am.

15    Q.  Can I just have one moment, Your Honor?

16        THE COURT:  You may.

17    Q.  One final issue I want to ask you about,

18    Assistant Warden Reynolds.  You've testified already

19    that on that day, it was Renee Hatfield that was

20    responsible for the strip searches; right?

21    A.  As a correctional academy instructor, no,

22    she would not have supervised my correctional staff

23    or my tactical unit.

24    Q.  And you and Warden Hulett were the people

25    who planned through how the shakedown and how the

 1    strip searches were gonna take place; right?

 2        A.  Yes, ma'am.

 3        Q.  Now, on the day of the action, on

 4    March 31st, was there someone who's job it was to

 5    coordinate what was going on in the housing units

 6    and what was going on in the gym?

 7        A.  That would have been my job, ma'am.

 8            MS. THOMPSON:  I don't have any more

 9    questions.  Thank you.

10            THE COURT:  You may cross.

11                    CROSS EXAMINATION

12    BY MS. MCNAUGHT:

13        Q.  Good afternoon, Mr. Reynolds.

14        A.  Good afternoon.

15        Q.  You were asked to refresh your recollection

16    with your deposition that was taken on September 3rd

17    of 2015, about the complaints that you received in

18    the gym when you went there and that it took too

19    long.  Do you remember that?  Do you remember having

20    your recollection refreshed?

21        A.  Yes.

22        Q.  And within that testimony, did you also say

23    during your deposition that one of the main concerns

24    from the inmates was whether or not they were gonna

25    be fed?

1      A.  Yes, ma'am, that was one of the big

2   concerns.  Especially with 2B in the morning

3   because, it was getting -- at noon, you know, it's

4   pretty much pushing the far end of lunch break hour.

5      Q.  The cadets and the correctional officers who

6   were in the gym with the inmates being searched,

7   were they in there for the length of time that

8   the -- well, let me -- strike that and let me start

9   over again.

10      In the morning, the inmates were taken from

11   housing Unit 2B.  A hundred inmates were taken from

12   housing Unit 2B; correct?

13      A.  Approximately a hundred; yes.

14      Q.  And the correctional officers in the gym

15   were on their feet the entire time?

16      A.  Yes, ma'am.

17      Q.  And then when you took the inmates from

18   housing Unit 4B in the gym in the afternoon, the

19   correctional staff and the cadets were on their feet

20   the entire time?

21      A.  Yes.

22          MS. THOMPSON:  Objection, Your Honor.

23          THE COURT:  Why?

24          MS. THOMPSON:  Leading.  She's leading the

25   witness, Your Honor.

1          THE COURT:  She what?

2          MS. THOMPSON:  She is leading the witness,

3    Your Honor.

4       Q.  I was, Your Honor, and I can ask it a

5    different way.

6          THE COURT:  You can, but let's don't,

7    because we'll be here until Christmas.  So let's

8    just move along.

9       Now, I didn't get an answer.  Did we?  Did we

10   get an answer?

11      A.  Yes.

12         THE COURT:  Yes.  Excellent.  That's clear,

13   let's move.

14      Q.  In your testimony on direct examination, you

15   discussed something called a sally port.  Would you

16   tell the ladies and gentlemen of the jury what is a

17   sally port?

18      A.  A sally port is the -- besides the main

19   vehicle entry and exit into the facility, it's a

20   barbed wire, fenced-in area.  It has one gate that

21   opens -- two gates.  The gates are never open at the

22   same time.  Say a delivery truck was coming.  He

23   would drive to the sally port, they would check his

24   identification, let him into the sally port in his

25   vehicle, search him, search his vehicle, look

1   through it, make sure it's safe.  Close that gate,

2   open the other one, and he'd go in and make his

3   delivery with an escort.

4       And that's where, if we moved offenders to like

5   Dwight or the transfer bus.  Court writs went out

6   through the admin building for shakedown reasons.

7   But everything else entering in or out of the

8   facility came through the sally port.  It's a secure

9   area.  It's designed for that.

10      Q.  You also were asked questions about whether

11  it violates IDOC policy to be naked in front of a

12  man.  And I want to talk about emergency

13  circumstances.  Is it a violation of policy to have

14  a male conduct a strip search on a female in an

15  emergency?

16      A.  No, it would not be -- it would not violate

17  policy.  It's -- the IDOC states you should give

18  every reasonable effort to make sure it's done in

19  private by a member of the same sex in a very

20  professional manner.

21      Q.  But the events that occurred on March the

22  31st of 2011, didn't not involve any emergencies,

23  did they?

24      A.  No, ma'am.

25      Q.  Is there a difference between an assault --

1    an assault and a fight?

2        A.  Yes, ma'am.

3        Q.  Would you explain to the ladies and

4    gentlemen of the jury what the difference is?

5        A.  An assault can be one of two things.  Any

6    time a staff member is touched, hit, struck, spit

7    on, urine thrown on, that is a staff assault.

8        You can have an inmate assault.  Any time there

9    is an inmate-on-inmate violence, where one inmate is

10   non-combative and not -- not participating besides

11   curling up as a turtle, that could be an assault.  A

12   fight is two offenders really fighting.

13       Q.  Do inmates ever say that they filed a

14   grievance and, in fact, no grievance was ever filed?

15       A.  Routinely.

16       Q.  And is there some kind of process that's

17   kind of a stopgap or a check so that if an offender

18   doesn't get a response, what happens?  Or what can

19   they do?

20       A.  First, the offender could re-file her

21   grievance.  Or she could -- you know, she could

22   write an inmate request to the Warden or myself and

23   say, "Hey, I filed this grievance, and I never got

24   an answer."  And in that case, the Warden -- we did

25   what was called a weekly call line.  I had a weekly

1   call line.  I would take requests from inmates who

2   had concerns, put them on a schedule, and sit down

3   for three or four hours.  They would be escorted to

4   my office, we would sit down and talk, address the

5   issue.

6       Q.  After the event of March 31st of 2011, did

7   you personally ever receive any requests from

8   inmates to sit down with you so that they could

9   discuss the events that occurred on March the 31st

10  of 2011?

11      A.  No, ma'am.  Not besides the minor issues on

12  the contraband.  Explaining, why did you take this.

13  Can I please get my radio.  Just that common stuff.

14      Q.  Now, I want to talk a little bit more about

15  grievances.  Explain to the ladies and gentlemen of

16  the jury how those grievances can be resolved and at

17  what levels they can be resolved?

18      A.  Okay.  Once the inmate files a grievance,

19  the counselor will go to the housing unit within a

20  prescribed timeframe.  He picks it up.  The housing

21  unit counselor is the first step of the grievance

22  process.

23      He will bring the inmate over, offender over,

24  talk to her, listen to her complaints.  If it's

25  something he can investigate and check with, you

know, if the complaint was Staff A did something, he
would speak to Staff A, speak to other offenders in
the area, conduct his own minor investigation, and
he would write a summary response.  That response
would go to the grievance officer.  And in most
places, that's the clinical service supervisor.

Q.  Well, stop for -- stop there just a minute.
So if a counselor investigated a matter, would
that -- would that counselor then be able to go back
to the inmate and discuss the findings?

A.  It wouldn't be prohibited, but the results
wouldn't be final until it went through the
grievance officer and to the chief administrative
officer or her designee at that time.

Q.  Okay.  So then the counselor gets it and
they send it to the grievance officer; is that
correct?

A.  That is correct.

Q.  And then what does the grievance officer do?

A.  He reviews it again.

Q.  Okay.  And then can he sign off on the
grievance?

A.  He can sign, "I concur," "I don't concur",
but it still from there would go to the Warden or
her designee.

1      Q.  So could the grievance be resolved before it

2   ever gets to the Warden?

3      A.  Yes, but the Warden would still have to sign

4   off on it before the actual physical copy of the

5   grievance was returned to the offender.

6      Q.  When you made the request for assistance for

7   a shakedown, a big shakedown, who did you make your

8   request to?

9      A.  Who -- my request was made, after my meeting

10  with Warden Hulett, to Commander Polley.  And --

11     Q.  And who is Commander Polley?

12     A.  At the time, he was our statewide tac

13  commander, as well as, I think the manager of the

14  training unit down in Springfield.

15     Q.  Okay.  So let's talk about what the

16  statewide commander is.  Explain to the ladies and

17  gentlemen of the jury the different types of

18  tactical units that are available in the various

19  institutions and statewide?

20     A.  The statewide tac commander has several

21  options, several different branches.  He has your

22  regular emergency response team, which are your

23  tactical unit.  He has a cert team, which is -- I

24  don't know what certificate -- more of a rapid

25  response team.  He has a pert team.  He has a sniper

1    team.  He has a hostage response team.  And that

2    might be one officer from here and one from that

3    facility and one from that facility that are

4    specifically trained to handle those kind of

5    situations.

6         Q.  And do you know how they're gathered if they

7    have to respond to something?

8         A.  I'm sure it's through Commander Polley.  I

9    don't have personal knowledge of it; no.

10         Q.  And then so there's a statewide team; is

11   that correct?

12         A.  Every certified tactical member, once you've

13   completed your training at the facility, you have

14   completed your training academy course, you were

15   certified.  That means you're able to be called out

16   inside your facility and anywhere else in the

17   facility that the statewide tac commander would need

18   help at.

19         Q.  Now, if the warden or you wanted to use the

20   tactical team within your institution, would you

21   have to call the statewide tac commander?

22         A.  No.

23         Q.  And who would you consult with besides the

24   Warden?  How would you get that tac team together?

25         A.  I'm sure the Warden would consult with the

                    1    deputy director of the division.  All the logistics

                    2    and operations would be run through Commander Dawdy.

                    3         Q.  Okay.  So someone, a warden or an assistant

                    4    warden, would contact Lieutenant Dawdy?

                    5         A.  Yep.

                    6         Q.  And what are his responsibilities then?

                    7         A.  It's his responsibilities to activate what

                    8    he deemed or what we deem as the amount of staff we

                    9    would need.  Make sure that they're there on time,

                   10    make sure they're properly ready to go and make sure

                   11    they get to the assigned location by the time

                   12    prescribed.  And he would also keep track of all the

                   13    tactical records and paperwork.

                   14         Q.  We talked a little bit -- or you were asked

                   15    a little bit about contraband.  And you gave a list

                   16    of medications and that kind of thing that

                   17    constitute contraband.  What other kinds of things

                   18    constitute contraband that are not medical?

                   19         A.  You want specific items or --

                   20         Q.  Sure.

                   21         A.  It could be gang activity.

                   22         Q.  Does that mean like gang symbols?

                   23         A.  Gang symbols, gang paraphernalia, gang

                   24    literature, gang bylaws, drugs, weapons, alcohol,

                   25    unauthorized medication, unauthorized drugs, elicit

1    drugs.

2         Q.  Well, how does an inmate get alcohol into

3    the institution?

4         A.  It's mostly homebrewed.

5         Q.  And where do you get that stuff for

6    homebrew?

7         A.  They steal it from the dietary.  Or at a

8    meal.  They may have an apple --

9              THE COURT:  Say that again?

10        A.  At noon meal they maybe are issued an apple

11   for lunch.  You take 15 offenders who have apples,

12   you mix in sugar, you get it hot enough, and you

13   will make homemade wine.  They call it hooch?

14        Q.  Hooch?

15        A.  Hooch.

16        Q.  Any other kinds of contraband that you can

17   think of that are non-medical paraphernalia?

18        A.  Could be unauthorized radios, tapes.  An

19   inmate is not allowed to transfer possession of an

20   audiovisual tape, a radio, a Walkman from one

21   offender to another without going through what we

22   call the state loan program.

23        You just couldn't say, "Okay, I'm gonna give

24   this to Offender C when I leave."  It has to go to a

25   state loan program and be issued back out to

1    offender who is on a waiting list.

2        Q.  Any other kinds of paraphernalia that you

3    can think of that might be possessed by inmates?

4        A.  Blankets, food.  It's an entire list.

5    Anything not issued by the state Department of

6    Corrections or sold to an offender through the

7    commissary is contraband.  Gum, tape, anything.

8        Q.  You eat with eating utensils in the kitchen;

9    correct?

10       A.  Yes.

11       Q.  And the eating utensils are issued -- are

12   state-issued, aren't they?

13       A.  Yes, they are.

14       Q.  Are they considered contraband?

15       A.  If in the possession of an inmate's personal

16   property; yes.  Minor contraband.

17       Q.  And what can you do with eating utensils?

18       A.  It's very simple.  They're easy to make

19   weapons out of them.  They're not metal, they're

20   very hard plastic.  Buff, grind them on concrete, a

21   little tape on the handle and you've got quite a

22   little weapon.  We call them shanks.

23       Q.  You were asked about major and minor

24   contraband.  Can you hide major contraband on your

25   body?

1    A.  Yes, ma'am.

2    Q.  And can you hide minor contraband on your

3  body?

4    A.  Yes.

5    Q.  Or can an inmate?

6    A.  Yes, ma'am.

7    Q.  What can you do with extra blankets?

8    A.  Besides maybe covering ropes.  That's the

9  main reason.  You don't want them using them --

10  putting them anywhere there's Concertina wire or

11  raised wire.  A blanket across makes a barrier.

12  Sometimes I have seen them maybe links of rope or

13  extensions where they can throw one thing across,

14  when there is no movement in the house, throw across

15  the hall to someone else.  I've seen all kinds of

16  things made with blankets.

17    Q.  Do they ever look like bodies stuffed in a

18  bed?

19    A.  Oh, yeah.  You can alter your appearance to

20  be -- you know, during count you could shape a

21  blanket or pillow to look like it was a person

22  laying there.

23    Q.  And why is that a problem for correctional

24  institutions?

25    A.  Escape is our number one concern, along with

1  safety and security, is preventing, you know --

2  keeping them incarcerated.

3      Q.  Now, what happens if you have little minor

4  offenses, little fights, little kind of catfights

5  between inmates?

6      A.  If it's non-physical, inmates are arguing or

7  bickering back and forth, most of the times the

8  correctional officers on the housing unit will walk

9  over, talk to both of them.  Address it, break it

10  up, move them.  And unless it gets physical, it's

11  not a minor -- a major issue.  If two ladies had a

12  minor disagreement about what they're watching on

13  TV, chances are they're not get IDR'd --

14      Q.  Tickets?

15      A.  No, they're not gonna get tickets.  Officer

16  is going to try to handle it personally first.

17      Q.  And what happens if it doesn't get handled?

18  I mean, things escalate; then what happens?

19      A.  If we can't control them and they won't, for

20  lack of a better word, behave, there's several ways

21  you can do it.  You can move housing units.  You can

22  transfer a lady across the facility.  Lincoln was

23  quite unique in that it had a high and a low end.

24  The facility was split in half, low end and high

25  end.

1    Q.  What do you mean low end and high end?

2    A.  It was just that.  It was -- Houses 5, 4, 3,

3    2 and 1.  1, 2 and half of 3 were the low end --

4    Q.  Low end meaning what?

5    A.  The far end of the facility; we call it the

6    low end.  We described it as low end and high end --

7    Q.  So low end describes a physical location?

8    A.  Yeah.  House 1, House 2, and part of House

9    3.  The other half of House 3, House 4, and House 5

10   are the high end.  And them two did not recreate

11   together.

12       Unless it was a special outside program.  But

13   yard, gym, all at different times.  So if had KSF,

14   which is keep separate from, we could put one on

15   high end and one on lower end.  In the female

16   facilities, it happened quite a bit.

17       Q.  So there are lists of inmates that you have

18   to keep separate from?

19       A.  They're call --

20           MS. THOMPSON:  Objection, Your Honor.  This

21   testimony --

22           THE COURT:  What is your objection?

23           MS. THOMPSON:  That it is irrelevant.

24           THE COURT:  Oh, I don't think so.  I think

25   the entire complex here of how the correctional

system works is all part of this.  It's certainly

backdrop.

No, I think this is -- I think this is fair

game.

MS. THOMPSON:  Thank you, Your Honor.

Q.  So explain to the ladies and gentlemen of

the jury then what it means to keep separate?  And

how you get on those lists?

A.  Okay.  There's a lot of ways you can get on

a keep separate from list.  The first way would be

if an inmate had had a problem say at Dwight with

another inmate.  Maybe a fight, maybe an assault.

We don't want to put those two on the same end where

they would be recreating together, socializing

together.

So Intel and Internal Affairs have a program.

An inmate can come in and give a specific, logical

reason why I want to be keep separate from Inmate B.

And that record goes in our OTS and it follows

wherever she goes.  So as a facility, to ensure

compliance, ensure security, we don't put those two

inmates together.

Now, the state can put a KSF on.  If we had

inmates that were engaged in unauthorized, for lack

of better, sexual activity or unwanted, you know,

1    girlfriend issues, we are gonna break them up and

2    keep them separate from each other.

3         Q.  Now, you used a term called OTS.  What is

4    OTS?

5         A.  OTS is a computer system designed to have

6    all the information that we need on that offender.

7    It's called Offender Tracking System.  It lists

8    their job, their days off, their visiting records,

9    their assignment records.  Their history in the

10   Department of Corrections; where they have been,

11   what bed they have stayed in, what kind of -- what

12   kind of problems they have.  You get in disciplinary

13   tracking and you could track with the -- all

14   throughout the state.

15        Q.  Does it also track their housing unit or

16   where it is that they moved --

17        A.  Housing unit, bed assignments, job

18   assignments.  And different levels of security in

19   the facility are allowed different access levels to

20   offender tracking.  An officer just can't go in and

21   check records he shouldn't be checking.

22        Q.  So I want to go back to one of the other

23   questions that I asked before.  And that is if you

24   have a small problem and you don't get it taken care

25   of, what can happen?

A.  It festers and becomes a bigger problem.
It's always smartest to address issues when they're
beginning.  And you -- I walk the facility for hours
every day; every housing unit.  I mean it's part of
the duty administrator's responsibility.  We have
48-hour, 24-hour, 72-hour inspections.  You have a
duty warden's log.  You have to be in every building
of that facility at least once every 72 hours.  And
some were designed to be once every 48 hours and
some are designed to be once every 24 hours.
          Q.  Well, so did you have some problems with
housing Units 2B and 4B prior to March the 31st of
2011?
          A.  Yes.  They were some of my bigger problems.
Our two bigger problem areas in the facility.  If my
recollection is correct, I brought a tac unit in
somewhere in January of 2011 for a morning tac
search.  And it was on housing Unit 2B also.
          Q.  And what kinds of problems were you having?
          A.  Inmate arguments, inmate fights, excessive
contraband, disrespect to staff, disrespect to each
other.  It was just --
          Q.  Now, were all of those ticketed offenses?
          A.  No, not all of them; no.
          Q.  Okay.  So at some point, did it get better

1    prior to March the 31st of 2011, or did it kind of

2    continue on?

3         A.  It continued on.

4         Q.  Okay.  And so what did you do?

5         A.  That was the result of requesting the cadets

6    and doing a mass search down and strip search that

7    day.

8         Q.  And in between the time when you made the

9    request and the time when the cadets were actually

10   available to come and help, what did you do?

11        A.  You increase your shakedowns.  When you have

12   staff, you increase your shakedowns.  Simple things.

13   You put seasoned officers on the housing unit.

14        Q.  Did you go over and try and talk with

15   inmates?

16        A.  That was one of the big issues at Lincoln.

17   I would go to the housing units, especially if I

18   knew I wasn't gonna have staff to address the issues

19   in a shakedown way or that way, I'd go to the

20   housing units.  I'd bring all the offenders to the

21   dayroom and I would sit there for an hour and listen

22   to them.  Say "Ladies, we are not gonna have this.

23   We're not gonna tolerate it.  This is out of

24   control."  And I would listen to what their

25   complaints were and what this was.

1    But it was basically, you know, "Hey, this is

2    unacceptable.  It was a problem.  And if we can't

3    correct it some way, we'll address it."

4        Q.  And addressing it meant what?

5        A.  Increased shakedowns, moving offenders,

6    moving them off sides.  And in cases where you

7    couldn't control, you could be shifted to Dwight.

8        Q.  Did it also include a mass shakedown like

9    what happened in 2A and 2B?  Or 4B?

10       A.  Certainly why it happened in 2B and 4B.

11       Q.  Now, after this shakedown on March the 31st

12   of 2011, what happened to the institution?

13       A.  It was quieter for quite a while.

14       Q.  So bringing in the tactical team and the

15   cadets worked?

16       A.  Yeah.  It was very effective from my

17   standpoint.  It -- the whole operation ran pretty

18   smooth.

19       Q.  I have nothing further at this time.

20           THE COURT:  All right.  To you,

21   Ms. Thompson.

22           MS. THOMPSON:  Thank you, Your Honor.

23                  REDIRECT EXAMINATION

24   BY MS. THOMPSON:

25       Q.  At the time that you originally made the

1    request for cadets to come to Lincoln Correctional

2    Center, it was your testimony earlier that you

3    didn't know which housing units you were gonna

4    search with them; right?

5         A.  No.  I mean it could have been six or eight

6    weeks earlier.  I knew I had problems on 2B and 4,

7    but every one of the housing units had problems.

8         Q.  So when did you specifically make the

9    decision that the cadets that you got were gonna go

10   to 2B and 4B?

11        A.  That would have been when I had my meeting

12   with Warden Hulett.

13        Q.  Okay.  Now, you testified that there were

14   some other measures that were taken to try to

15   address the problems that you just described; right?

16        A.  Mm-hmm.

17        Q.  Because you could increase shakedowns when

18   you had available staff like you talked about?

19        A.  Mm-hmm.

20        Q.  You could bring in experienced officers that

21   could handle conflicts when they're there on the

22   unit; right?

23        A.  Mm-hmm.

24        Q.  You can move problem inmates to other

25   facilities or to other housing units; right?

1      A.  We would have tried other housing units

2  first.  You have to really be an aggressive issue to

3  be moved out of the facility.

4      Q.  But if there's truly problem people, there's

5  other places they can go?

6      A.  Yes, we've -- yes, ma'am.

7      Q.  So you had lots of things that you could do

8  to address these problems; right?

9      A.  Yes, ma'am.

10     Q.  Now, you were asked some questions about

11 grievances.  And I believe you told us earlier, when

12 I was asking you some questions, that you had a

13 conversation with some of the women that were

14 strip-searched after March 31st, 2011, where they

15 continued to complain to you about what happened

16 during the strip search; right?

17     A.  It was shortly after; yeah.

18     Q.  Okay.  When they made those complaints to

19 you shortly after, were they complaining to you that

20 they had missed lunch that day?

21     A.  No, ma'am.  Nobody missed lunch that day.

22     Q.  Were they complaining to you when they

23 talked to you after the search that they were upset

24 that lunch had been late that day?

25     A.  They may have complained.  I don't remember.

1    I don't recall.

2        Q.  You don't remember that being the -- part of

3    the things you were hearing about after March 31st;

4    right?

5        A.  No.  It was more the length of the

6    shakedown.  And being on their feet so long.

7        Q.  You were asked some questions about the

8    grievance procedure at Lincoln Correctional Center

9    at the time.  And I believe you said that one of the

10   ways that grievances can be resolved is for the

11   counselor over the units where a person files a

12   grievance could do their own investigation; right?

13       A.  Yeah, grievance officer, he would do an

14   investigation.

15       Q.  So the grievance officer could do an

16   investigation and based on what they investigated

17   could decide that the grievance wouldn't go any

18   further; right?

19       A.  It still had to go further.  He could -- he

20   could issue a finding of "I concur with the

21   offender's grievance."  "I find no merit in

22   offender's grievance."  Or the grievance counselor

23   could have found part of it to be true and he would

24   list that in his -- in his findings.

25       Q.  Did a counselor from Unit 4B ever come to

1    you after March 31st of 2011, to ask you any

2    questions about what happened that day?

3         A.  No, ma'am.

4         Q.  Did you ever hear that a counselor from 2B

5    was investigating what happened on March 31st of

6    2011?

7         A.  No, ma'am.  Not to my knowledge.

8         Q.  Did a counselor from 2B ever come to you to

9    ask you questions about what happened on March 31st?

10        A.  No, ma'am.

11        Q.  Did either counselor ever tell you that they

12   were -- well, let me ask you a better question.

13        Did either counselor ever -- the question I

14   want to ask you is this:  Did you ever see any

15   paperwork indicating that a counselor from 2B or 4B

16   had issued a finding about any grievances related to

17   what happened on March 31st of 2011?

18        A.  No, ma'am.

19        Q.  And do you believe that a counselor from

20   Unit 4B threw away grievances that related to what

21   happened on March 31st?

22        A.  No, ma'am, I don't believe that.

23        Q.  Do you believe that a grievance officer at

24   Lincoln Correctional Center threw away grievances

25   about what happened on March 31st?

1      A.  No, ma'am.

2      Q.  I don't have any more questions.  Thank you,

3  Judge.

4          MS. McNAUGHT:  Briefly.

5          THE COURT:  You, Ms. McNaught.

6                  RECROSS EXAMINATION

7  BY MS. McNAUGHT:

8      Q.  If you don't know about a grievance, what do

9  you do about it?

10     A.  There's nothing you can do about it.  If you

11 don't know it existed.

12     Q.  Nothing further.

13         THE COURT:  One last shot.

14         MS. THOMPSON:  I'm good.  Thank you.

15         THE COURT:  Are you good?

16         MS. THOMPSON:  I'm good.

17         THE COURT:  Everybody finished?  All right,

18 Warden.  Thank you very much.  You may step down.

19     (The witness was excused.)

20         THE COURT:  And you may call another

21 witness.

22         MS. BROWN:  Your Honor, we are gonna call

23 Ms. Adrian Maynor.  But I was wondering if the Court

24 would allow a two-minute bathroom break before we do

25 so.

1      THE COURT:  A two-minute break right now?

2      MS. BROWN:  For the bathroom.

3      THE COURT:  Okay.  Why don't we take our

4 break a little early, because I plan to go through

5 to 5:00.  Everybody knows that.

6      MS. BROWN:  Yes, Your Honor.

7      THE COURT:  All right.  Would anybody

8 object to a five-minute break?

9      Oh, I see a lot of heads being shaken.  Okay.

10 Let's stand in recess for ten minutes.  Give

11 everybody a chance.

12      Please go ahead, ladies and gentlemen.

13      MS. MCNAUGHT:  Judge Mills, before you go.

14      THE COURT:  Fine.  Wait until the jury

15 leaves.

16      (The jury left the courtroom.)

17      THE COURT:  All right.  The jury has left

18 the courtroom.  Fire.

19      MS. MCNAUGHT:  I believe that this witness

20 is an inmate; correct?  So that's the reason for

21 asking for the break.  And once she leaves -- once

22 she finishes, we'll probably also need another break

23 so that she can be escorted.

24      THE COURT:  How long is this testimony

25 going to be?

```
1              MS. BROWN:  That's up to you.

2              THE COURT:  20, 30 minutes.

3              MS. BROWN:  Maybe a little longer than

4    that, but not much longer.

5              THE COURT:  Okay.  We will play it by ear.

6              MS. BROWN:  For the record, it is a

7    bathroom break.

8              THE COURT:  What is that again?

9              MS. THOMPSON:  Ms. Brown needs to use the

10   restroom, Your Honor.  We will make sure that's on

11   the record.

12             THE COURT:  Here is a later, one of the

13   plaintiffs is raising their hand.  What's up.

14             MS. THOMPSON:  We are good, Your Honor.

15             THE COURT:  What.  Everything okay?

16             MS. THOMPSON:  We are good.

17             THE COURT:  Let's take our break.  And

18   we'll take ten minutes.

19        (A recess was taken.)

20        (The jury entered the courtroom.)

21             THE COURT:  Thank you, everyone.

22        All right, we're all in place.  Everyone in

23   their proper seat.  You may proceed.

24             MS. BROWN:  Your Honor, the Plaintiff's

25   call Adrian Maynor.
```

1           THE COURT:  Very well.

2           THE CLERK:  She needs to stand.

3           MS. BROWN:  Could you please stand.

4           THE CLERK:  And raise your right hand.

5       (The witness was sworn.)

6           THE COURT:  Thank you, please be seated.

7               ADRIAN MAYNOR

8    called as a witness herein, having been duly sworn,

9    was examined and testified as follows:

10               DIRECT EXAMINATION

11   BY MS. BROWN:

12       Q.  Good afternoon.

13       A.  Good afternoon.

14       Q.  Please introduce yourself to the jury.

15       A.  My name is Adrian Maynor.

16       Q.  And could you please spell your name for the

17   court reporter?

18       A.  A-d-r-i-a-n, M-a-y-n-o-r.

19       Q.  Ms. Maynor, where are you from?

20       A.  Chicago, Illinois.

21       Q.  And how old are you?

22       A.  39.

23       Q.  Let me call your attention to the date of

24   March 31st, 2011.  where -- do you remember that

25   date?

1      A.  Yes, ma'am.

2      Q.  And where you were living at the time?

3      A.  2B.

4      Q.  And, Ms. Maynor, would you mind pulling your

5  microphone to you a little closer.

6      A.  2B.

7      Q.  Thank you.

8      And was that Unit 2B of a particular

9  correctional center?

10     A.  Lincoln.

11     Q.  Were you at Lincoln Correctional Center for

12  a felony conviction?

13     A.  Yes, ma'am.

14     Q.  And was that a 1999 conviction for murder?

15     A.  Yes, ma'am.

16     Q.  In March 2011, did you have a particular job

17  assignment at Lincoln?

18     A.  I worked 11 to 7, laundry porter.

19     Q.  Okay.  Did you start at 11 a.m. or 11 p.m.?

20     A.  11 p.m.

21     Q.  Okay.  So it was a night shift that you

22  worked?

23     A.  Yes, ma'am.

24     Q.  And what does a laundry porter do?

25     A.  We wash detail clothing for the ones who

1    work on the 7 to 3 shift.

2        Q.  Okay.  And what time did you finish your

3    work as a laundry porter on the night -- or morning

4    of March 31st, 2011?

5        A.  2:00.

6        Q.  Was that 2:00 in the morning?

7        A.  2:00 a.m.

8        Q.  Thank you.  And how were you woken up on the

9    morning March 31st, 2011?

10       A.  A bunch of yelling.

11       Q.  And who was it that was yelling?

12       A.  The Orange Crush.

13       Q.  And where did you see the Orange Crush?

14       A.  They was walking through the dorms.  They

15   had put the light on.  They was walking through the

16   dorms telling us to sit up in our bed.

17       Q.  And I know we're in a court setting, but I'm

18   gonna please ask you to please use the words that

19   you remember hearing the Orange Crush officers use

20   as they come onto your unit?

21       A.  Wake the fuck up.

22       Q.  What orders were you given at that time

23   about where you should stand or sit?

24       A.  In the hallway.  Stand up in the hallway.

25       Q.  Okay.  And where were you taken next?

1    A.  We were handcuffed and walked to the gym.

2    Q.  How were you handcuffed?

3    A.  To the back.

4    Q.  And who put the handcuffs on you?

5    A.  A cadet.

6    Q.  Were the handcuffs placed on you properly?

7    A.  They were tight.

8    Q.  Okay.  And at that time, had you had an

9  opportunity to clean yourself off before you had

10  been handcuffed?

11    A.  No, ma'am.

12    Q.  Had you had an opportunity to use the

13  bathroom?

14    A.  No, ma'am.

15    Q.  When was the last time that you had had an

16  opportunity to use the bathroom?

17    A.  Before I went to bed.  That was around 3

18  a.m.

19    Q.  Okay.  And when you had -- once you were

20  handcuffed, where were you taken at that point?

21    A.  To the gym.

22    Q.  And can you tell the jury about the

23  experience of -- of how you got from the dayroom to

24  the gym?

25    A.  Basically, we were told to walk out our

1  rooms, we were handcuffed, and then we were placed

2  in the hallway of the dayroom until they was ready

3  to walk us to the gym.

4      Q.  Okay.  And what do you remember Orange Crush

5  officers saying as you were walking to the gym?

6      A.  We were told to be quiet, face forward, and

7  the quicker we get to the gym room, the quicker this

8  will be over with.

9      Q.  Okay.  Where were you ordered to stand once

10  you were brought to the gym?

11     A.  In the middle of the gym room.

12     Q.  Okay.  And were you -- how long were you

13  standing before -- from when you were first woken up

14  on the morning of March 31st, 2011, until the next

15  time that you were able to sit down?

16     A.  It took about 45 minutes to get everybody

17  cuffed, and then we was walked over there.  But it

18  took -- I stood in the gym room for about an hour

19  and a half, two hours top.

20     Q.  Okay.  And you had been standing in the

21  dayroom waiting to be cuffed; right?

22     A.  Yes.

23     Q.  And then you were standing and walking to

24  the gym; correct?

25     A.  Yes, ma'am.

1    Q.  When you were in the gym, did you ask to use
2  the bathroom at any time?
3    A.  Yes, ma'am.
4    Q.  And who did you ask to use the bathroom?
5    A.  Several officers.  Dawdy was one.  He
6  ignored it.  Officer Krull was -- I also asked
7  Officer Krull, and she just basically said, "Be
8  patient, it will be over with."
9    Q.  Okay.  And did you see any urine while you
10  were in the gym?
11    A.  It's one female that urinated on herself.
12  She --
13    Q.  Okay.  I'm sorry.  Was that --
14    A.  She urinated on the floor standing -- she
15  had to stand in the same spot where she urinated on
16  herself at.
17    Q.  Okay.  Can you tell the jury, just describe
18  her appearance, her age, what she looked like?
19    A.  She was an older lady.  And she had been
20  complaining, saying she had to use the bathroom.
21  And she was told she had to stand there and be
22  quiet.  And --
23    Q.  Okay.
24    A.  -- she end up urinating on herself.
25    Q.  Okay.  And if you had to estimate her age,

1    how would you estimate her age?

2        A.  Oh, 56, 57.

3        Q.  Okay.  Did you see any employee of the

4    Illinois Department of Corrections respond after she

5    urinated on herself?

6        A.  They laughed and another officer called her

7    nasty.

8        Q.  Now, did you ask any IDOC employees --

9    excuse me, any Department of Corrections employees

10   to sit while you were standing in the gym?

11       A.  Once again, it was several officers that was

12   asked.  And we were told no.  We were told to shut

13   the fuck up and stand in place.

14       Q.  Okay.  And who was it that you remember

15   asking?

16       A.  I asked Officer Krull.

17       Q.  How did your handcuffs feel while you were

18   standing in the gym waiting to be strip-searched?

19       A.  My handcuffs were tight.  They were so

20   tight, my right arm went numb.

21       Q.  Okay.  Did you ask any Department of

22   Corrections employee to loosen your handcuffs at any

23   time?

24       A.  I seen a cadet officer.  He had on brown

25   khakis, I don't know his name.  Never seen him

1  before.  I asked him.  And he told me stop acting

2  like a baby.  Once again I asked Officer Krull could

3  my handcuffs be unloosened.  She told me to quit

4  whining.  And once again, Dawdy just didn't answer

5  at all.

6      Q.  How long did it take from the time that you

7  were first handcuffed before you were able to get

8  your handcuffs loosened?

9      A.  About an hour and 45 minutes.

10     Q.  Okay.  And what happened?

11     A.  A female had a seizure in the gym room and a

12  nurse responded.  And they were familiar with my

13  wrists, because I have a cyst on my wrists and they

14  were familiar.  And I told her about it.  She said

15  my fingers were turning blue.  So she asked them

16  could they loosen my cuffs.

17     Q.  And what did your hands -- your fingers look

18  like at that point?

19     A.  They were blue.  They were turning blue.  My

20  whole right arm was numb; I had no feeling.

21     Q.  Did you see Officer Craig at any time while

22  you were in the gym standing and waiting to be

23  strip-searched?

24     A.  Yes.  He was standing in a huddle with

25  Officer Dawdy and a couple of more officers.

1    Q.  And did you hear Officer Craig saying

2  anything in the gym while you were waiting to be

3  strip-searched?

4    A.  He said it smelled like ass and breath.

5    Q.  When you were in the gym waiting to be

6  strip-searched, could you see any strip searches

7  happening at that time?

8    A.  We could see the strip searches being done

9  in the bathroom.

10   Q.  Okay.  And, Your Honor, may I approach the

11 witness?

12       THE COURT:  You may.  Sure.

13   Q.  And I'd like to show you Plaintiff's

14 Exhibit 239.

15   A.  Yes.  That's the bathroom.

16   Q.  Okay.  Would this exhibit assist you in

17 giving testimony today?

18   A.  Mm-hmm.

19   Q.  Your Honor, may I have permission to

20 publish?

21       THE COURT:  Oh, yes.  Sure, sure.  We have

22 already seen this, haven't we?

23   Q.  Yes, we have?

24       THE COURT:  If it's been admitted before,

25 you don't have to ask again.  Just put 'er up.

1     Q.  Thank you.

2     Ms. Maynor, you said that you could see strip

3  searches taking place during that time.  And do you

4  see where those strip searches were taking place on

5  this picture?

6     A.  Mm-hmm.

7     Q.  Can you just make a mark.  Point and touch

8  it, so that we see where they were happening?

9     A.  Around this area right here.

10     Q.  Okay.  And when you were in the gym, did you

11  ever see a curtain over this door?

12     A.  Not until like later.  But it wasn't even

13  above your waist, from your knee and up was still

14  exposed.  And so by that time, majority of them were

15  done already.  They were getting close to the end.

16  So everyone was still exposed regardless of what.

17     Q.  Okay.  So -- so while you were standing in

18  the gym for a long period of time is it correct to

19  say that you saw nothing covering the bathroom door

20  while strip searches were happening?

21     A.  Yes, ma'am.

22     Q.  Okay.  And you could see women being

23  strip-searched?

24     A.  Yes, ma'am.

25     Q.  And at some point, you saw something go up

1    over that gym door?

2        A.  It was -- you might as well say it wasn't

3    nothing there.

4        Q.  Can you describe what it was?

5        A.  Did -- you know how a paper gown, when you

6    put on, they give you a paper gown at the hospital?

7    Something close to that, but much thinner.  And it

8    was exposed at the bottom part.  You might as well

9    say it really wasn't there because the women were --

10   you could see the women's naked.  Regardless of what

11   they tried to do, you still seen them.

12       Q.  Okay.  And how -- how far did it come up off

13   of the ground?

14       A.  Maybe -- not even close up to the water

15   fountain.  And you see the water fountain?  It

16   wasn't even up that close to the water fountain.

17   You really -- like I said, it maybe covered just the

18   little bottom part of it.  But standing there, you

19   still could just look over and still see taking off

20   their clothes and doing what they was supposed to

21   do.

22       Q.  Okay.  So on women's bodies, approximately

23   how high up did that --

24       A.  I would say to the knees.

25       Q.  To their knees.  Okay, thank you.

1    Was there a time that you were yourself taken

2  to be strip-searched?

3    A.  Yes, ma'am.  I was taken into the beauty

4  shop.

5    Q.  Okay.  And approximately what time was that?

6    A.  I really can't tell you the time that I went

7  in there, but I could really say close to -- to my

8  understanding, I could say probably an hour and a

9  half after we got there.

10    Q.  And how many women were taken with you to be

11  strip-searched in the beauty shop?

12    A.  Me and five other women.

13    Q.  Besides the six of you, who else was in the

14  beauty shop during your strip search?

15    A.  It was three cadet womens and Officer

16  Edmunds.

17    Q.  Okay.  I'd like to show you Plaintiff's 243.

18    A.  Yes.

19    Q.  Would looking at this exhibit assist you in

20  giving testimony today?

21    A.  Yes, ma'am.

22    Q.  When you were being strip-searched, what was

23  the position of the door between the beauty shop and

24  the gym?

25    A.  The door to the beauty shop came out.  So I

1    was right there where you see this door at.  In the

2    middle it were two, I could say four, it was four

3    chairs where the hairdryers was right in the middle.

4    I was on this side, three of us was on this side and

5    three of the others was on the other side.  So the

6    door was open, you could look right and see on each

7    side where we were being strip-searched at.

8        Q.  Okay.  And who was right by the door?

9        A.  It was a cadet, female cadet standing in the

10   doorway.

11       Q.  Did the door remain open during your strip

12   search?

13       A.  During the whole strip search.

14       Q.  Okay.  And how did you feel while you were

15   being strip-searched?

16       A.  Exposed.

17       Q.  Who could see you while you were being

18   strip-searched?

19       A.  Anyone --

20           MS. BAUTISTA:  Objection, Your Honor.

21           THE COURT:  Sustained.  You haven't given

22   the background here.

23       Q.  Okay.  Who could you see while you were

24   being strip-searched?

25       A.  The females sitting on the -- on the

1    bleachers.  Because there were bleachers right here

2    where this space at.  The females sitting on the

3    bleachers and the cadets that was on the side right

4    there that was doing security.

5        Q.  Okay.  Now, inside the beauty shop, can you

6    describe where you were standing relative to the

7    other women who were strip-searched with you?

8        A.  Right next to each other.  We were right

9    next to each other.

10       Q.  Okay.  And can you describe what you were

11   ordered to do during the strip search?

12       A.  We were told to take off clothes and shake

13   our clothes out piece by piece.  We were -- if we

14   had ponytails in our hair or hair clips, we were

15   told to shake out our hair.  Hold up our hands and

16   turn them like this.  We were told to lift up our

17   breasts, lift up our feet.  And we were told to turn

18   around and squat and cough three times.  But we was

19   told to hold our butt cheeks open while we squat and

20   cough three times.

21       Q.  Okay.  And were you all ordered to do that

22   at the same time?

23       A.  Yes, ma'am.

24       Q.  So you were all naked at the same time?

25       A.  Yes, ma'am.

 1    Q.  Was anyone in your group menstruating at the

 2  time of the search?

 3    A.  The female that was standing next to me was

 4  on her menstruation.  She asked for a pad.  And she

 5  was told there isn't any.  The pad she had on was

 6  full.  And when she squatted and coughed, she

 7  splattered.  And she had to put the same pad in her

 8  panties back on.

 9    Q.  And where did she place her sanitary product

10  during the search?

11    A.  She had to place it with her clothes.

12    Q.  Now, you said that when she did -- during

13  the search, she bled; correct?

14    A.  Mm-hmm.

15    Q.  How did the officers respond when that

16  happened?

17    A.  Ms. Edmunds looked at her and said, "What's

18  your nasty ass."  And two of the cadets laughed.

19  But one of them just had a look on her face like she

20  couldn't believe this was going on.

21    Q.  Okay.  And how did the woman who was

22  strip-searched respond?

23    A.  She cried.  She cried during the whole

24  process.

25    Q.  After the strip search happened, what were

1    you instructed to do by the Officers?

2        A.  Get the fuck out.  We were handcuffed back

3    again and we were sent back to the gym.  And we were

4    either told to -- we were told to find a spot where

5    we could find a spot at.

6        Q.  Okay.  And in that time after you had been

7    strip-searched, where you were sitting on the floor,

8    did you hear any Orange Crush officers make any

9    comments?

10        A.  The smell was -- the smell was kinda funky.

11    And they were being -- well, we were being called

12    funky bitches.  We were told would no man want us

13    smelling like that.  And Officer Craig made the

14    comment "That's what prostitutes and crack-heads

15    smell like."

16        Q.  When Officer Craig said, "That's what

17    prostitutes and crack-heads smell like," who -- what

18    other Orange Crush officers were present next to

19    him?

20        A.  Dawdy was there, of course.  Crudup, Officer

21    Crudup was standing around.  And it was a few more

22    cadets standing around.

23        Q.  And how loud were Officer Craig's comments?

24        A.  Loud enough for the females in the gym to

25    hear.  Because once again, we were told we couldn't

1  talk.  We had to sit there and be quiet.

2       Q.  Did you hear Officer Dawdy make any comments

3  at this time?

4       A.  He the one who were really calling people

5  bitches.

6       Q.  Now, what time did -- were you finally

7  ordered to leave the gym?

8       A.  I could say we were in the gym for at least

9  a good three and a half, maybe four hours before we

10 were allowed -- we were allowed to leave and go back

11 to our unit.

12      Q.  Okay.  And where were you taken then?

13      A.  We were ordered to go eat.

14      Q.  Did you eat anything?

15      A.  No, ma'am.

16      Q.  Why not?

17      A.  I was disgusted.  I was disgusted.

18      Q.  And after the -- after the chow hall, where

19 did you go from there?

20      A.  We went back to our units to clean up --

21 clean up the mess that was made of our property.

22      Q.  Did you ever -- after the training exercise

23 was over, did you ever file -- or did you ever write

24 a grievance about what happened?

25      A.  Yes, ma'am.  I filed two grievance.

1    Q.  Okay.  What were the grievances about?

2    A.  My damaged property and the items that was

3    taken from me and about how we was treated and how

4    we were strip-searched.

5    Q.  After March 31st, 2011, did you ever speak

6    with Assistant Warden Reynolds about the strip

7    searches?

8    A.  We -- I seen him two days later and I asked

9    him about it.  And he said -- he asked me did I file

10   a grievance.  And I said yeah.  And I seen him like

11   maybe a week later, and when I asked him about it he

12   said he will check into it.

13   Q.  Okay.  And aside with following up with

14   Assistant Warden Reynolds, did you follow-up with

15   anyone else about your missing grievance?

16   A.  I talked to Counselor Baylis about it.

17   Q.  Okay.  And after speaking with Assistant

18   Warden Reynolds and Counselor Bayles about your

19   grievance, did you ever write a second grievance

20   about the same information?

21   A.  No, ma'am.

22   Q.  And why not?

23   A.  Because the first one got lost.  Well

24   really, it didn't get lost, but the first one wasn't

25   returned.

1        And we were told that the Warden --

2            MS. BAUTISTA:  Objection.

3            THE COURT:  Sustained.

4            MS. BROWN:  No more questions.

5            THE COURT:  Thank you.

6        You may cross.

7            MS. BAUTISTA:  Thank you, Your Honor.

8                    CROSS EXAMINATION

9   BY MS. BAUTISTA:

10       Q.  Good afternoon, Ms. Maynor.

11       A.  Hi.

12       Q.  Now, isn't it true that you weren't housed

13  on Unit 2B on March 31st, 211?

14       A.  No, ma'am.  I said I walk to seg from 2B.

15       Q.  In fact, you were housed on Unit 5A on

16  March 31st, 2011, weren't you?

17       A.  No, ma'am.

18       Q.  You had been housed there since March

19  the 4th; isn't that true?

20       A.  No, ma'am.

21       Q.  You were housed there until March the 23rd

22  of 2012; isn't that true?

23       A.  No, ma'am.

24       Q.  Just one second, Your Honor.

25           THE COURT:  Surely.

1    Q.  Now, you described some statements made by

2  an Officer Krull, I think you said?

3    A.  Mm-hmm.

4    Q.  Can you spell that?

5    A.  I think it's C-r-u-e-l.

6    Q.  Okay.  And can you describe what that

7  officer looked like?

8    A.  She's a female.  She's white.

9    Q.  Okay.  And you said an Officer Edmunds?

10   A.  Yes, ma'am.

11   Q.  And who is that?

12   A.  She's a short, black lady.

13   Q.  And then you talked about Officer Dawdy; is

14  that correct?

15   A.  Yes, ma'am.

16   Q.  And Officer Craig?

17   A.  Yes, ma'am.

18   Q.  And are those all the officers that we

19  talked about that you remember specifically them

20  saying things to you on March 31st, 2011?

21   A.  Yes, ma'am.

22   Q.  Okay.  One second.

23  I have no further questions.

24       THE COURT:  Anything on redirect.

25       MS. BROWN:  Yes, Your Honor.

1                THE COURT:  Fine.

2                REDIRECT EXAMINATION

3    BY MS. BROWN:

4        Q.  Ms. Maynor, you were at Lincoln Correctional

5    Center in January, February, and March of 2011;

6    correct?

7        A.  Yes.

8        Q.  And where were you housed in January of

9    2011?

10       A.  I was on 2A.  And then I got moved to 2B.

11       Q.  Okay.  And when, approximately, did you get

12   moved?

13       A.  I got moved to 2B two weeks after New Years.

14       Q.  Okay.  And before you were at -- in 2A,

15   where had you been before that?

16       A.  5B.

17       Q.  Okay.  No further questions.

18           MS. BAUTISTA:  I have nothing, Your Honor.

19           THE COURT:  Nothing more, all right.  Fine.

20   Very well.

21       Mr. Field, what are you -- are you getting

22   ready to call the next one.

23           MR. FIELD:  Yes, do we want to --

24           THE COURT:  Yes.  I think we'll have to

25   have our witness step down, if you would, please,

1    ma'am.

2        (The witness was excused.)

3            THE COURT:  All right.  You may call your

4    next.

5            MR. FIELD:  Plaintiff's call Lieutenant

6    Dawdy, Your Honor.

7            THE COURT:  Very well.

8        (The witness was sworn.)

9                    TROY DAWDY

10   called as a witness herein, having been duly sworn,

11   was examined and testified as follows:

12                DIRECT EXAMINATION

13   BY MR. FIELD:

14       Q.  Good afternoon.

15       A.  Good afternoon, sir.

16       Q.  Could you please introduce yourself to the

17   jury?

18       A.  Troy Dawdy, T-r-o-y, D-a-w-d-y.

19       Q.  Thank you.  Where do you currently work?

20       A.  Lincoln Correctional Center.

21       Q.  Okay.  How long have you -- or who's -- who

22   is your current employer?

23       A.  Illinois Department of Corrections.

24       Q.  Okay.  How long have you worked for the

25   Illinois Department Of Corrections?

          A.  Going on 19 years.

          Q.  Okay.  And when were you first assigned to
Lincoln Correctional Center?

          A.  The beginning of my employment in March of
1998.

          Q.  So you've been at Lincoln Correctional
Center through your entire career?

          A.  Yes, sir.

          Q.  Okay.  When you were first assigned to
Lincoln Correctional Center, what position were you?

          A.  I was a Correctional Officer.

          Q.  Okay.  And what is your current position?

          A.  Correctional Lieutenant.

          Q.  When did you become a Lieutenant?

          A.  November 2010.

          Q.  When you were first assigned to Lincoln
Correctional Center, was that a female facility?

          A.  No, it was males at the time.

          Q.  When did it switch over to a female
facility?

          A.  I believe that was in October of 2000.

          Q.  And then did it subsequently get switched
back to a male facility?

          A.  Then we switched back again in March of
2013.

1      Q.  And in March of 2011, it was a female

2   facility; correct?

3      A.  Yes, sir.

4      Q.  Okay.  Do you hold another position within

5   the Lincoln Correctional Center besides being

6   Lieutenant?

7      A.  Currently?

8      Q.  Yes?

9      A.  Yes.

10     Q.  What is that position?

11     A.  I'm the Internal Affairs Investigator.

12     Q.  How long have you been in that position?

13     A.  Since I believe it was May of 2013.

14     Q.  Any other positions outside of being

15   Lieutenant?

16     A.  Currently; no.

17     Q.  Okay.  What about previous to becoming the

18   Internal Affairs Investigator?

19     A.  I was the facility's Tactical Unit

20   Commander.

21     Q.  When did you become the Lincoln Correctional

22   Center Tactical Unit Commander?

23     A.  I don't remember the exact month, but I

24   believe it was 2005.  Spring, I believe.

25     Q.  And when did you leave that position?

1          A.  When I was assigned to the Internal Affairs.

2     It was in -- subsequent.  You can't hold -- be on

3     tac and Internal Affairs at the same time, so I had

4     to give up my position on tac to be with Internal

5     Affairs.  So it would have been in May of 2013.

6          Q.  Okay.  Now, we heard some testimony

7     previously that -- well, strike that.  Let me ask

8     you this:  We've heard tactical team, Orange Crush.

9     Are those two -- are we talking about the same thing

10    when we hear those terms?

11         A.  Tactical Team is the official term.  Orange

12    Crust, from what I've always been told, was that was

13    given to the tactical team by the Pontiac inmates

14    back in the day.  It's something that if an inmate

15    or someone refers to Orange Crush, people know that

16    is the Tactical Unit.  That's not something that

17    staff would commonly refer to as the team.

18         Q.  Okay.  Have you ever heard other

19    correctional officers refer to it as Orange Crush?

20         A.  Not to my recollection; no.

21         Q.  Okay.  So I was -- when I took that step

22    back, what I wanted to ask you was, we heard some

23    testimony about how the tactical team was sort of a

24    voluntary thing, you had to volunteer to be on the

25    tactical team; is that right?

         A.   Yeah.   If anybody is interested in becoming

a tactical unit member, you just start coming to

practices.   Everyone on the team holds their regular

rank of officer, lieutenant, whatever else.   It's

not a special, that's not your only job duty.   You

would start coming to practice.

         And then after you receive X amount of hours,

or me as a commander, I decided, hey, this person is

showing up regularly.   They're showing the drive,

the initiative, and they -- they're getting a grasp

of the common knowledge, at that point, we would

schedule them for a 40-hour, it's a 40-hour

certification class down at the academy.   They would

go to the next available class.   And they would go

through with several other members throughout the

state for their certification.

         Q.   Okay.   Is that academy in Springfield?

         A.   Yes, sir.

         Q.   Now, I know you said that they just start

showing up to practice.   But is there any kind of

paperwork or anything like that that they need to

fill out?   Or is it just truly voluntary, just show

up?

         A.   It's volunteer.   We keep track of the hours

because it's is usually -- it's also overtime.   But

1    we keep track of their hours.  Everybody, certified,

2    non-certified, they fill out a sheet, they sign

3    their name, print it.  We keep track because they

4    get credit hours for the practice that they attend.

5         Q.  What about in order to become the commander

6    of the tactical team?  How does one go about doing

7    that?

8         A.  You have to move up the ranks.  I started

9    out as a tac officer.  And then I served as the

10   assistant commander for a few years.  And then when

11   the commander at the time -- actually, I was

12   assistant commander, we had our commander at the

13   time, he was out on a leave of absence for a couple

14   of years.  So I was kind of acting in both roles.

15   He came back, but then didn't continue on with tac.

16   So at that point, the warden and the statewide

17   commander would kind of make a decision as far as,

18   "Hey, you're going to be the new commander."

19        So it's up to the Warden's discretion and

20   statewide commander if they think you're suited to

21   be in the commander position.

22        Q.  Okay.  And just so it's clear, can we kind

23   of go through the period of time that you were with

24   the tactical unit, starting when you started as an

25   officer.  And tell me what years you were an officer

1    and then when you moved into the assistant commander

2    position and then the acting commander position,

3    just so it's clear.

4         A.  I became certified in I think it was July of

5    2001.  At the time, we went to -- we didn't go to

6    the actual training academy at the time.  At that

7    time, you went to different facilities.  And I went

8    to Dixon Correctional Center up north.

9         And we went with -- there was four others from

10   my facility and then there was other officers from

11   different facilities throughout the state.  I think

12   there was probably about 30 of us.  You go through

13   and you train on -- it's a 40-hour course.  And it's

14   not an easy process either.

15        Once you're certified, at that point, I believe

16   I was just a tac -- tac member until, it would have

17   been around I think 2003, 2004, when I was named as

18   the assistant commander because the current

19   assistant commander, he -- I think his words were,

20   "I'm too old for this."  He had been around the

21   department for quite a while.  And so the commander

22   at the time named me as his assistant commander.

23        And then that's where I held the position

24   until -- until that current commander left.  We had

25   another commander come in.  He was a Lieutenant at

the time and I believe the Warden and the Assistant
Warden, they wanted -- I was just an officer.  So
they wanted someone who had been a supervisor to
kind of in a supervisory role to be the commander.

     So -- and I was in that position as the
assistant commander.  And then I was doing both
while he was out on his leave of absence.  I think
he fell at work or something like that, so he was
out on medical.

     Q.  What period of time were you doing both the
assistant commander and acting commander?

     A.  It was probably 2004 until I was named in
2005.  So it was probably close to a year.  I don't
know -- I don't know the exact dates.  I don't
really recall.

     Q.  Sure.  It's been a long time ago?

     A.  It's been awhile ago; yes.

     Q.  So you were officially named commander in
2005?

     A.  Yes, sir.

     Q.  Okay.  And who is responsible for naming the
commander of the tactical unit?

     A.  Ultimately, it's the warden's decision.  I
believe I got my -- my memo, because everything --
any time someone is appointed something, they have

1    to have a memo.  And my memo came from the Assistant
2    Warden of Operations at the time, Don Golden.
3         Q.  Okay.  And you were in the commander
4    position from some time in 2005 to when you moved
5    over to Internal Affairs in 2013; correct?
6         A.  Yes, sir.
7         Q.  Okay.  Thank you.
8         Do you have any knowledge -- I know you said
9    you thought it maybe had been some inmates at
10   Pontiac that started calling the tactical team
11   Orange Crush.  Do you have any knowledge as to why
12   it's called Orange Crush by inmates?
13        A.  I don't know.  We wear orange, so I mean
14   that first part is kind of obvious.  But as far as
15   the crush part, I don't know.  It just -- I don't
16   know.
17        Q.  In March 2011, who was your immediate
18   supervisor?
19        A.  As far as being a Lieutenant or on tac?
20        Q.  Let's start with as far as being a
21   Lieutenant.
22        A.  That would be the -- whoever the Major on
23   grounds was at the time.  The shift supervisor.
24        Q.  Okay.  And what about in your position as
25   commander of the tac team; who would have been your

1    immediate supervisor?

2        A.  At the facility, it would have been Warden

3    Hulett.  And outside the facility, as far as

4    tac-related issues or anything, it would have been

5    be Commander Rob Brady.  He was the Northern Region

6    Commander.

7        Q.  Where would the Assistant Warden of

8    Operations fall into that chain of command?  The one

9    where you've got -- as tactical commander?

10       A.  He had to do with operations, as in his

11   name.  He's the Operations Warden.  But as far as

12   anything going on with -- directly with tac, unless

13   he was the Duty Warden.  If he was the Duty Warden

14   at the time, the Warden was gone, then he would have

15   given directions as far as if we had to do a cell

16   extraction or if there was a riot, escape, hostage

17   situation, something like that.  But as far as

18   reporting, I reported to the Warden herself.

19       Q.  Okay.  What about members of the tac team;

20   did they report directly to you?

21       A.  Yes, sir.

22       Q.  Okay.  In March of 2011, how many members

23   did the tactical team have?

24       A.  Certified members?

25       Q.  Yes.

1          A.  I can't give you an exact number.  It might

2     have been between 15 and 20 possibly.  Our numbers

3     fluctuate.  People come and go.  And we were pretty

4     low at one point; we had four.  So I mean to tell

5     you how many I had certified at the time, I can't

6     give you an exact answer though.

7          Q.  Okay.  But you believe it was somewhere

8     between 15 and 20?

9          A.  Possibly.  20 would probably be high.  It

10     might have been closer to 15.

11          Q.  Okay.  And what about non-certified members?

12          A.  Anybody can show up to tac practice.  So

13     what we would consider as a non-certified member, we

14     might have someone who shows up to kind of just test

15     the waters to see what tac is about.  But we have

16     other people who they want to be on tac, they showed

17     up on a regular basis, they were there every time we

18     had practice.  So I can't tell you.  I mean that

19     number changes also.  Fluctuates.

20          Q.  Okay.  If the tactical team was deployed in

21     the prison for some reason, is that called -- is it

22     an operation?  Is there a term that you use?

23          A.  You just call it detail.

24          Q.  Detail?

25          A.  Yes, sir.

1      Q.  And were the non-certified tac members ever

2   detailed as part of the tac team, or did you have to

3   be certified for that?

4      A.  It depends on what it is.  If it was a cell

5   extraction, they would not be used.  You had to be a

6   certified member.  If we came in for a tac

7   shakedown, just as a practice, because that's -- we

8   would do that as practices.  And this situation that

9   we're talking about in March 31st, 2011, they could

10  be used to assist in a shakedown.

11     Q.  Because the tactical team shakedown in

12  March 2011 was a practice, is that why?

13     A.  We used it as one of our practices.  We have

14  two, two-hour practices a month.  So we actually

15  combined the two into a four Hour and we canceled

16  the other practice.  It allows them -- they get

17  hours, they get training credit that goes towards

18  their eventual certification.

19     Q.  Okay.  But if it -- if it had been a

20  non-training shakedown, would those non-certified

21  tac members have been detailed to it?

22     A.  No.  If it was a cell extraction, like I

23  said, a hostage, riot, if we went somewhere else to

24  another facility, non-certified members won't be

25  used for that.

1     Q.  Okay.  I guess what I'm wondering is if
2  there's a difference between training shakedowns and
3  regular shakedowns?
4     A.  No.  I mean because anybody can do a
5  shakedown.  Any officer can do a shakedown.
6     Q.  So it's -- the tactical team is not
7  necessary to do a shakedown; correct?
8     A.  They're not necessary; no.
9     Q.  Okay.  And it's not required to use the
10  tactical team to do a shakedown; correct?
11     A.  No.
12     Q.  Okay.
13     A.  Depends on what kind of shakedown.  If it's
14  a mass shakedown, yeah, we wouldn't have regular
15  officers doing a mass shakedown.  But just a
16  shakedown, a gym line, or go in, we hear there's
17  something, contraband in a particular area on a
18  housing unit, they could send, two, three, four,
19  five officers over, if they were available, to go
20  shakedown this particular area.
21     Q.  So why would the tactical team be necessary
22  for a mass shakedown?
23     A.  In this instance, we had cadets coming in.
24  And it's to assist them.  And because every facility
25  is different as far as what items are allowed, what

1    items are not.  These are cadets who've never

2    been -- some of them have never been in a facility

3    before.  They don't know what's allowed and what's

4    not.

5        So we're there to assist line movement and

6    worst-case scenario.  If something bad were to start

7    to happen, we're there to immediately -- we're

8    already dressed out ready to go to assist in

9    quelling the disturbance, if there was one.

10       Q.  What about mass shakedowns that do not

11   involve cadets?  Is the tactical team required for

12   that kind of shakedown?

13       A.  They're not required, but if there was a

14   large shakedown and you've really got to define

15   large shakedown.  Because we have went in, on one of

16   our tac practices, we went in and I think we did two

17   months prior in January on 2.B, we came in in one of

18   our tac practices, we came in and shook down housing

19   Unit 2B.

20       Q.  Okay.  When -- do you recall when that was?

21       A.  In January.  I don't remember the exact

22   date, but it was in January of 2011.

23       Q.  Okay.  And did that shakedown in January

24   2011 involve a strip search?

25       A.  No.

1    Q. Did it involve removing the women from Unit
2    2B from the unit?
3    A. I don't think so. I think we just took them
4    out into the dayroom and they waited there. We had
5    limited number. We had a limited number of staff
6    available. So it's not like where we had the
7    cadets, where we would have had a bunch of people to
8    assist in shaking these areas down. So we had
9    limited time, limited staff members to get this task
10   done.
11   Q. Okay. So your recollection was that the
12   women were taken to the dayroom?
13   A. I believe so; yes.
14   Q. And were the women from Unit 2B, in January
15   2011, handcuffed in order to be taken to the
16   dayroom?
17   A. I don't recall. If -- there's a possibility
18   they could have been. I mean it could have went
19   either way, if they were or they weren't. But I
20   don't recall.
21   Q. Okay. Do you recall if they were handcuffed
22   while they were waiting in the dayroom?
23   A. I don't recall. If we -- if they were gonna
24   be handcuffed, we would have handcuffed them as soon
25   as they came out, and they would have waited in the

1    dayroom in handcuffs.  But I don't remember if we

2    used -- if we handcuffed them on that particular

3    shakedown.  I don't remember.

4         Q.  Okay.  Do you recall if the women were

5    required to stand in the dayroom while the unit

6    was --

7         A.  Some of them, yeah.  We didn't have seating

8    for a hundred women in the dayroom.  So some of them

9    would have had to stand up or sit on the floor

10   because we don't have that many chairs in the

11   dayroom.

12        Q.  But they weren't ordered to stand against

13   the wall, for example?

14        A.  To my recollection, no.  But I'm not gonna

15   say that they weren't.  I don't remember exactly.  I

16   don't recall.

17        Q.  Okay.  As the commander of the tactical

18   team, were you responsible for training members of

19   the tac team?

20        A.  Initially, yes.  They go down for their

21   40-hour certification, and then I'm responsible for

22   the continual training on the things that they went

23   down to get trained on.  So --

24        Because they're required -- we have --

25   everything that they get certified on, you have to

1    maintain your certification.  You have to continue

2    to come to practices, you have to maintain

3    70 percent of your training hours.  So it's a

4    continual brushing up on and training on all of the

5    aspects of when you get certified.

6         Q.  So earlier you testified that someone would

7    be sent for their certification course after they

8    had shown regularly interest in the practices;

9    correct?

10        A.  Yes, sir.

11        Q.  Okay.  So those individuals who hadn't yet

12   been sent for the certification course, when they

13   showed up to practice, as the commander, were you

14   responsible for training them?

15        A.  Yes.  We don't send them down to the

16   training academy blind.  You know, they expect --

17   they have to get so many -- it wasn't really a set

18   hours, it was -- every person is different of how

19   well they grasp each aspect of everything.  So we

20   don't send them down their blind.  The academy

21   expects them to have the basics, and then they kind

22   of fine-tune everything.  So yeah, we do train them

23   before they go down there.

24        Q.  And who's responsible for deciding when an

25   individual in that position is ready to go to the

1    certification course?

2        A.  Myself and my Assistant Tac Commander, which

3    was Lieutenant Craig at the time.  And I would speak

4    with the Warden and we would kind of decide, "Hey, I

5    want to send this person down.  We think this

6    person's ready to go."

7        And then once again, operational needs, you

8    know.  We would have to find out when the next class

9    was.  Okay, there's an opening in -- because you're

10   gone for a week.  And the Warden might say, "They're

11   gonna have to wait, we have too much overtime at

12   this point."  Then they're gonna have to wait for

13   the next class.

14       Q.  Okay.  In March of 2011, did you have an

15   Assistant Tac Commander?

16       A.  Yes, sir.

17       Q.  And who was the Assistant Tac Commander in

18   March of 2011?

19       A.  That was Lieutenant Craig.

20       Q.  Okay.  You mentioned that you would have to

21   sort of keep up your certifications once you went

22   through that certification course?

23       A.  Yes, sir.

24       Q.  Can you -- can you explain what are the

25   types of things you're getting certified on when you

1   go to that course?

2       A.  You go through -- the first thing they

3   really drill in is use of force.  You gotta know

4   when you can and cannot use force.  You learn how to

5   do cell extractions; that's another very large

6   portion of it.  How to properly do a calculated --

7   use of force calculated cell extraction.

8       You learn how to properly use batons.  You also

9   get sprayed with -- with OC, so you have to feel the

10  effects of the OC.  Pepper spray, oleoresin

11  capsicum.  Pepper mace is what everybody else would

12  call it.

13      Q.  Hopefully that's not one of the parts you

14  have to keep up with?

15      A.  No.  Once you -- once you get sprayed,

16  you're good, so --

17      Q.  What are the other things you need to be

18  certified on?

19      A.  Those are the main aspects of it.  Cell

20  extractions, batons, marching to -- you have to know

21  marching formations.  How to do the different

22  formations in different situations.

23      Q.  Is there a standard marching formation for

24  the tactical team?

25      A.  Yes.

1    Q.  What is the standard marching formation?

2    A.  It's usually columns of twos.

3    Q.  Columns of twos?

4    A.  Mm-hmm.

5    Q.  Okay.  And is there a sort of a standard

6  marching procedure beyond just lining up in columns

7  of twos?  Is there something else that is standard

8  in terms of how the tactical team would actually

9  move?

10   A.  Yeah.  You have someone -- any commander

11 would be outside calling cadence and keeping

12 everybody in step as you're moving to where you're

13 going.

14   Q.  Would that hold true for both inside and

15 outside a facility?

16   A.  Yes, sir.

17   Q.  Okay.  So if the tactical team needed to be

18 detailed somewhere at than Lincoln Correctional

19 Center, the standard procedure for moving the

20 tactical team to that detail assignment would be to

21 March them in columns of twos with a commander

22 calling out the cadence; is that correct?

23   A.  Yes, sir.

24   Q.  Okay.  Are you able to sort of explain what

25 you mean by calling out cadence?

1      A.  Basically keep everybody in step.  Your
2   left, your left, left, right, left.  To keep
3   everybody in step so you don't have people stepping
4   on each other's heels.
5      Q.  So it's something similar to a sort of
6   military march; is that correct?
7      A.  Similar; yes.
8      Q.  Okay.  And the commander who is calling out
9   this step, what volume are they calling that out at?
10     A.  They have to be pretty loud.  Because if
11  you're -- if you're at a state detail, you might
12  have 200 tac members.  So you have a line of 200
13  that have to hear what you're doing.  So if they
14  decide to stop the line, you have to be pretty loud
15  in your volume.
16     Q.  When you say a state -- just want to make
17  sure I understand the difference.  You said a state
18  detail might have 200 tac members.  What is a state
19  detail?
20     A.  I apologize.  Statewide detail would be when
21  you go to a different facility.  When you're on tac,
22  once you get certified, you can be called
23  anywhere -- anywhere in the state.  So if we had a
24  detail at Pontiac, that's a statewide detail.
25  Because you would have facilities -- you might have

ten different facilities from throughout the --
throughout the state to show up to help conduct
shakedowns.

Q.  Okay.  And what about just -- what about a
tactical team detail within the facility itself?
Same procedure for movement; correct?

A.  Yes, sir.

Q.  Same volume in terms of calling out the
cadence?

A.  Yes.

Q.  Are you able to -- I know we've done this a
couple of times--and I apologize to the Court.  But
are you able to, as a commander, maybe for the
ladies and gentlemen of the jury and everyone
sitting here, kind of give us an idea of what the
volume is for calling out that cadence?

A.  Are we talking about just with a small group
that I would have had that day?

Q.  Yeah.  Detail within the prison itself?

A.  It would have been your left, your left,
your left, right, left.  Loud enough to where they
can hear.  I don't have to scream, I don't have 200
people, but loud enough to where everybody in the
line can hear what I'm saying.

Q.  Okay.  And the -- besides marching in

1   columns, the point of the cadence is so that people

2   march in step; correct?

3       A.  Yes, sir.

4       Q.  Okay.  Anything else to the standard sort of

5   movement procedure besides the marching in step in

6   columns with the commander -- or I guess can the

7   Assistant Commander also call out cadence if

8   necessary?

9       A.  Anybody in -- anybody could call cadence.

10  It's not just hey, the commander is the only one

11  who's allowed to.  So anybody could call cadence.

12  Some people were in the military and they can call

13  really good cadence.  They get out, call the

14  cadence, lead the group along.  So anybody could do

15  it.

16      Q.  Okay.  So in terms of this sort of standard

17  movement procedure, I'm sorry I cut you off when I

18  asked earlier, but besides the marching in columns

19  and in step with each other and calling out cadence,

20  anything else to the movement that is standard

21  procedure?

22      A.  It's more professional.  It doesn't look

23  like just a group of people moving.  It's a

24  structured -- structured movement.

25      Q.  Okay.  What is -- is there a purpose to that

1    structured movement?

2         A.  For structure.

3         Q.  Anything beyond structure?

4         A.  To keep everybody in step, in line, know

5    where we're going.  For structure.

6         Q.  Okay.  That standard marching procedure, you

7    said formations earlier.  There's more than just

8    this one formation; correct?

9         A.  Yes, sir.

10        Q.  You practice other formations as well?

11        A.  Yes, sir.

12        Q.  What are some of the other formations that

13   you practice?

14        A.  I don't know if that's something I can go

15   into with current -- there's current inmates in the

16   room.  So some of these formations are something

17   that might not be any -- I mean you don't discuss in

18   front of inmates.

19        Q.  Just one second.

20        I'll let Lieutenant Dawdy have a drink before I

21   continue.

22        A.  Sorry about that.

23             THE COURT:  That's fine.  It's not quite

24   cocktail time, but --

25        Q.  No, still have some time, Your Honor.

         A.  Okay.

         Q.  It might feel like it, but we're not there
yet.

         So there's one -- just so the record is clear,
there's one current inmate in the room.  Not
inmates, just one?

         A.  Yes, sir.

         Q.  But I don't want you to have to reveal
anything that you're not supposed to.  But fair to
say that there are other formations for the types of
things that you testified to that the tactical team
are involved in like cell extractions and those kind
of things; correct?

         A.  Yes, sir.

         Q.  Are there other formations for things like
shakedowns?

         A.  No.

         Q.  What about for things like strip searches?

         A.  No.

         Q.  So it would be just the standard movement?

         A.  Yes.

         Q.  Okay.  When the tactical team is, again,
standard sort of movement, are they carrying --
well, you know, there's been some testimony on this,
so maybe it would just be easier for the sake of

clarity if we go through what is the standard issue
uniform for a tactical team member?

    A.  You have an orange jumpsuit.  Boots which
are usually just your work boots.  You have a duty
belt, gas mask, stab-proof vest, a baton, and a
helmet.

    Q.  The helmet, is that a riot helmet?

    A.  I don't know if it's called that or not.
It's a black helmet.  Comes over your head, your
ears, and it's got a clear shield on the front of
it.

    Q.  Okay.  What's on the duty belt?

    A.  Depends on the officer.  You're gonna
have -- minimally, you're gonna have a flashlight
holder, which is what you would -- what we call
sling your baton.  So when you're not carrying it,
holding it in your hands, you can put it in there so
you can do something else to where you didn't have
to have it out.

    You're gonna have a cuff case.  Usually a key
clip to put your keys on.  Some people have
flashlight holders.  Some people have a -- like a
multi-tool, a Gerber-type tool, something like that.

    So it really just depends on the officer.  But
minimally, they're gonna have the baton holder, cuff

1    case, and a key holder.

2        Q.  How many sets of cuffs is the standard issue

3    for a tactical team member?

4        A.  Two.

5        Q.  Okay.  Are those sets of cuffs identical or

6    are they two different types of cuffs?

7        A.  They might be different brands.  There's

8    different people make different brands, but as far

9    as that, they're all the same.

10       Q.  Okay.  Is -- does the tactical team use a

11   type of cuffs that are different than the ones used

12   by regular corrections officers?

13       A.  When we would go on state -- like I said,

14   the statewide activations, at some point they

15   started -- we started using orange cuffs that were

16   for the tac unit.  And they used that for cadet

17   training because it got to be quite the pain because

18   everybody brought cuffs from your own facility.  So

19   now, if you had 200 tac members trying to sort out

20   400 cuffs, and you're ready to go at the end of the

21   day, now you have to spend an extra 45 minutes

22   sorting out cuffs.

23       So it made it easier to just have orange cuffs.

24   They brought the cuffs, everybody got issued two.

25   At the end, they would just do a count of the cuffs

1    themselves.  But they weren't different other than

2    being orange.  They were still regular,

3    standard-issue handcuffs.

4        Q.  And were those the cuffs that they would

5    use -- I'm sorry, I'm not sure if you said for

6    statewide tac or was it for the cadet training?

7        A.  Both.

8        Q.  For both?

9        A.  Both, yes.

10       Q.  So the cadets would be used to handcuff

11   inmates using this orange cuffs?

12       A.  I don't know if that's what they used at the

13   training academy or if those were just the cuffs

14   that they would use when they came to the facility

15   to use to cuff the inmates.  But as far as at the

16   facility, or at the training academy, I don't know

17   if those were the ones that they actually used.

18       Q.  Sure.  What about on March 31st, 2011?  Were

19   the cadets given these orange cuffs to use on the

20   women from Unit 2B and 4B?

21       A.  I -- I don't recall if they did or not.

22       Q.  Okay.

23           THE COURT:  Mr. Field, I think it's time

24   for our second ten-minute break.

25           MR. FIELD:  Sounds good, Your Honor.

1          THE COURT:  Is that all right with you?

2          MR. FIELD:  Absolutely.

3          THE COURT:  Let's do that.  Recall my

4   admonition.  Ten-minute break.  And with the

5   ten-minute we had before, that will equal twenty.

6   So we are on time.

7       All right.  We will all stand down for ten

8   minutes.

9       (A recess was taken.)

10         THE COURT:  Thank you, everyone.

11      All right.  We're all back in place.

12      Let 'er rip, Mr. Field.

13         MR. FIELD:  Thank you.

14      Q.  (By Mr. Field)  Just before we took a break,

15  you testified that one of the reasons that the

16  tactical team would have been used in the shakedown

17  in -- on March 31, 2011, was because there were

18  cadets there; is that correct?

19      A.  Yes, that's part of the reason.

20      Q.  Okay.  That's because cadets may never have

21  been to another facility or really know what the

22  facility procedure is; is that the reason?

23      A.  Yes, sir.

24      Q.  Okay.  Is there anything specific to the

25  tactical team that would require the tactical team

 1    to be there to do that?  I mean couldn't the regular

 2    corrections officers do it?

 3         A.  They could, but if we've moving that large a

 4    group of inmates --

 5         If we're moving that large of a group of

 6    inmates during a shakedown, it's best to have the

 7    tactical unit.  I mean could officers have done it?

 8    Yeah.  But that's something that's typically done if

 9    you're moving that large of a group of inmates.

10         Q.  And the number of tactical team members that

11    you had on hand that day, do you recall?

12         A.  Eight to ten, I believe.

13         Q.  Okay.  And was there something about having

14    that number of tactical team members there that day

15    that would aid the movement of that large group of

16    people?  And what I mean is in some way that regular

17    corrections officers couldn't have also done.  The

18    same number of corrections officers, for example?

19         A.  If it got out of hand; yes.

20         Q.  Okay.  And what's the reason for that?

21         A.  Tactical unit members are trained for that

22    particular situation.  If that whole line decided

23    they wanted to stop moving or take off or whatever

24    else, the tactical members are trained to quell a

25    disturbance.

1          Q.  Well, the women were handcuffed behind their

2     backs while they were being moved that day; correct?

3          A.  Yes.

4          Q.  Okay.  So is the movement of that number of

5     women that are handcuffed behind their backs

6     something that regular corrections officers could

7     do?

8          A.  They could have.

9          Q.  The baton that you talked about is a

10    standard issue for the tactical team members, is

11    that something that regular corrections officers

12    also have?

13         A.  No.

14         Q.  Okay.  And what size is that baton?

15         A.  36 inches.

16         Q.  Okay.  So three feet?

17         A.  Yes.

18         Q.  When the -- going back to the questions I

19    had before about the sort of standard movement.

20    Does the tactical team, for lack of a better word,

21    march with their batons out or in that baton holder

22    that you talked about?

23         A.  They'd have it out.

24         Q.  Okay.  And how were they carrying the baton

25    when they moved?

1      A.  They would have had it like this.  It's

2  usually like at a 45-degree angle, left hand up,

3  right hand down.

4      Q.  Okay.  And marching in step like that?

5      A.  Yes.

6      Q.  Okay.  The members of the tactical team at

7  Lincoln Correctional Center were expected to follow

8  your orders; correct?

9      A.  Yes.

10      Q.  Okay.  And were members of the tactical team

11  trained to follow your orders?

12      A.  Yes.

13      Q.  And as the commander of the tactical team,

14  were you responsible for the performance of your

15  tactical team?

16      A.  Yes.

17      Q.  Okay.  And were you responsible for the

18  actions of the members of the tactical team?

19      A.  Yes.

20      Q.  So if tactical team is detailed to any

21  assignment, as Commander, you are responsible for

22  their actions; correct?

23      A.  Yes, sir.

24      Q.  Okay.  The tactical team was detailed to the

25  mass shakedown and strip search on March 31st, 2011;

1 correct?

2     A. Yes, sir.

3     Q. Okay. Did Warden Hulett instruct you on how

4 the tactical team should conduct itself during the

5 shakedown or strip search that occurred on

6 March 31st, 2011, or did she leave that up to you?

7     A. What do you mean by conduct? As far as

8 their behavior or what they were supposed to be

9 doing?

10     Q. What they were supposed to be doing?

11     A. No. She would have discussed that with --

12 her or Assistant Warden Reynolds would have said,

13 "Here's what we're doing, we're shaking down these

14 two housing units. Just make sure that it gets

15 done." She -- they trusted me to direct the tac

16 officers to do what they need to -- do what they

17 need to do.

18     Q. So they would give you the general plan and

19 expect that you would tell the tactical officers

20 to --

21     A. Guide them accordingly; yes, sir.

22     Q. Okay. And did either Warden Hulett or

23 Assistant Warden Reynolds provide you with that

24 general plan?

25     A. I believe so, yes. I don't remember which

1    one, I -- as far as where we were going, I think

2    that was that morning is whenever they said, "Here

3    is where we're going to do."  I knew two days prior

4    that we were gonna be having cadets show up because

5    I had to send something out.  I had to cancel a

6    practice and had to send a memo out to all the

7    certified members letting them know it was a

8    mandatory practice, to be there by 8:30 a.m. that

9    morning.

10        Q.  And you don't recall if the -- if the -- you

11   were informed of the -- of the sort of upcoming

12   detail of the tactical team, you don't recall

13   whether it was Warden Hulett or Warden Reynolds?

14        A.  I don't recall; no.

15        Q.  Okay.  What is the role of the tactical

16   team, just generally speaking, at Lincoln

17   Correctional Center?

18        A.  There's many roles.  To perform cell

19   extractions, forced cell extractions.  For if

20   there's a riot at the institution, hostage

21   situation, escape.  There's different -- when

22   there's an emergency at the facility, we're the --

23   we're the responding forces that come in to quell a

24   disturbance or go out to man escape posts to help

25   find an escaped inmate.  Or if there's a hostage

1    situation, you know, set up, perimeter.

2        Q.  Okay.  So sort of the emergency type

3    situations that you just mentioned; is that correct?

4        A.  Yes, sir.

5        Q.  Okay.  Did the -- well, what was the purpose

6    of the tactical team detail on March 31st, 2011?

7        A.  We were there to provide support for the

8    cadets to come in and shakedown.  Like I said, they

9    don't know what's allowed, what's not, what's

10   contraband, what they can and can't have.  So we

11   were there to assist them.  So if they had

12   questions, "Hey, is this allowed?  Can we have

13   this," we could be there to help them out.  And also

14   escort the lines over to the -- over to the gym.

15       Q.  Any other purpose for the tactical team

16   involvement that day?

17       A.  It was one of our training practices too.

18   So that gave everybody hours for training because it

19   was a shakedown.  And that's another -- that's

20   another thing that we do as tac.  We go on a

21   statewide detail, like I mentioned earlier, that's

22   our primary function is to go shakedown that

23   particular facility.  That's what we're doing all

24   day long is shaking down, moving lines such as in

25   this instance on March 31st, 2011.

1          Q.  And that would be a special assignment

2     because it's statewide involving officers from

3     across the state; right?

4          A.  Yes.

5          Q.  Okay.  And is that kind of operation

6     relatively rare?

7          A.  It depends.  It depends on what's going on

8     throughout the state.  If there's -- at a facility

9     there's a rash of violence, a rash of staff

10    assaults, if they have a bunch of gang issues,

11    weapons, anything like that, they could be called

12    out.  So it's usually, if they're called out,

13    they're calling out 200 staff members, it's usually

14    something going on.

15         Q.  You mentioned earlier about the -- one of

16    the things that you're certified on is the use of

17    force; correct?

18         A.  Yes, sir.

19         Q.  Okay.  And you just testified that the

20    shakedown and strip search on March 31st, 2011, was

21    a training exercise for the tactical team; correct?

22         A.  It was one of our tac practices.

23         Q.  Okay.  And is that the same thing as a

24    training exercise or is it different than that?

25         A.  We have two tac practices a month.  And so

1    this counted as one of our tac -- it was actually a

2    combined.  It counted as our tac practice for the

3    month.

4        Q.  Okay.  And what's the appropriate level of

5    use of force for a practice or training exercise?

6        A.  We wouldn't use -- we wouldn't use force

7    during a training exercise with inmates unless it

8    was warranted.  If an inmate had started to act up

9    or get out of line, physically out of the line, not

10   comply, then at that point, we use the minimal

11   amount of force necessary to compel compliance on

12   the inmate.

13       Q.  Okay.  And nothing like that occurred on

14   March 31st, 2011; correct?

15       A.  No, sir.

16       Q.  The inmates that were moved out of 2B were

17   compliant?

18       A.  For the most part.  We might have had a few

19   that continued to talk and look around and stuff.

20   We might have had to tell them numerous times, "keep

21   looking forward, don't looking around."  But no,

22   nobody -- we didn't have to use physical force that

23   day.

24       Q.  What about the women moved out of Unit 4B,

25   were they compliant?

1     A.  Yes.

2     Q.  Okay.  Now, when you say you have to tell

3  them -- if they were talking or looking round, if

4  one of the inmates were talking, what would be said

5  to that inmate?

6     A.  You tell them hold the noise down, quit

7  talking, look forward.

8     Q.  What about shut up?

9     A.  No.

10    Q.  Okay.  Tell them to look forward?

11    A.  Yes.

12    Q.  Okay.  Anything else besides look forward

13 and keep the noise down?

14    A.  Hold the noise down, keep looking forward,

15 that's pretty much it.

16    Q.  Okay.  And is that something that would be

17 yelled at them or something that would just be said

18 to them?

19    A.  It depends.  If they're in the far back

20 corner and they're talking, and you have to, you

21 know, yell across the dayroom, you'd have to raise

22 your voice.  You couldn't speak in a normal tone

23 because they're not gonna know who they're talking

24 to.  But if you have to yell across -- across a

25 group of a hundred women, then yeah, you might have

1    to raise your voice a little bit.

2        Q.  The -- on the morning of March 31st, 2011,

3    did you meet with the tactical team before it was

4    detailed?

5        A.  Yes.  In the tac room.

6        Q.  Okay.  And around what time was that?

7        A.  I was there, I believe myself and Lieutenant

8    Craig got there around eight, but the rest of the

9    tac team was required to be there by 8:30.

10       Q.  Okay.  And did the rest of the tac team show

11   up at 8:30?

12       A.  Yes, sir.

13       Q.  Okay.

14       A.  Pardon me, it wasn't -- the ones that could

15   show up.  Some people were already working dayshift

16   or couldn't make it, family obligations.  But the

17   ones that were available showed up.  But the rest,

18   the whole team wasn't there.

19       Q.  Right.  So the ones that got detailed that

20   day, they were all there by 8:30?

21       A.  Yes, sir.

22       Q.  Okay.  And did you provide them with any

23   instruction at that meeting?

24       A.  I would have; yes.

25       Q.  Do you recall what you instructed them?

1       A.  I don't remember.  I mean it would have been

2   typical.  At that point, it would have been already

3   discussed with warden Reynolds.  Probably, whenever

4   I showed up, he told me, "Hey, here's where we're

5   going."  Told them the tac members were gonna go in,

6   cadets are gonna show up, we're gonna conduct a

7   shakedown.  I don't remember if I knew at that point

8   where we were going or if I was told later on, once

9   we got inside the facility.

10      Q.  Okay.  Would Assistant Warden Reynolds have

11  been at this meeting with the tac team?

12      A.  No.

13      Q.  Okay.  That was just --

14      A.  It would just have been tac; yes.

15      Q.  Okay.  And you don't recall what you said to

16  the tac team members that day?

17      A.  That we were going to shakedown -- I don't

18  remember specifics, but the general, we're going in

19  to shake down, there's gonna be cadets here, to that

20  effect; yes.

21      Q.  What was the purpose of letting them know

22  there would be cadets involved?

23      A.  Just so they were aware and they knew that

24  they were gonna have to help direct them as far as

25  what was allowed, what was authorized, how -- how to

1    do a proper shakedown of an inmate living area.

2        Q.  Do you recall if you raised the issue of

3    inmate violence with the tactical team that morning?

4        A.  It's always something that's brought up.  I

5    mean, you know, hey, if we're having any issues,

6    we'll deal with that inmate accordingly depending on

7    what they're doing.  If they're just refusing to

8    comply with orders or if they become violent, at

9    that point we react accordingly to what they're

10   doing.

11       Q.  But as you sit here today, do you recall

12   raising that issue --

13       A.  No.

14       Q.  -- the morning of March 31st, 2011?

15       A.  No.

16       Q.  Okay.  How long did that tactical team

17   meeting last approximately, if you can recall?

18       A.  I don't recall.  It might have been 15,

19   20 minutes.  Everybody starts getting there about

20   8:30, they start getting dressed out in their gear.

21   As everybody was getting ready, I probably was

22   discussing what we were doing, what's going on as

23   everybody is getting ready.

24       As soon as everybody was ready, we probably

25   would have waited there until the cadets showed up

1    on grounds so we're not just standing around in the
2    sally port.  Obviously, we're wearing orange, so
3    we'd be highly visible.  We don't want to stand out
4    because then the element of surprise is kind of
5    gone.  So we would have waited in there until they
6    showed up, and we would have driven in a van up to
7    the sally port.
8         Q.  Where is the sally port -- well, let me ask
9    you this:  Did the -- was the tactical team detailed
10   to Unit 2B first or to Unit 4B first?  Or both at
11   the same time?
12        A.  We went to housing Unit 2B first.
13        Q.  Okay.  When you say sally port, was that
14   something -- where is that in relation to Unit 2B?
15        A.  It's probably 300 yards away roughly.  I
16   don't have an exact measurement, obviously, but it's
17   right in line.  When you come in through the sally
18   port, there's a walkway and it goes straight down
19   and straight ahead pretty much is housing Unit 2.
20        Q.  Okay.  And so you talked about the element
21   of surprise.  Do you have to -- in order to maintain
22   that surprise, do you have to march 300 yards
23   relatively quickly?
24        A.  We're not running, but yeah, you want to get
25   there at a fairly decent pace.

1    Q.  Okay.  So you -- when you arrive in the Unit

2  2B, you're arriving quickly; is that correct?

3    A.  Yes, sir.

4    Q.  Okay.

5    So can you describe for me how the tactical

6  team entered Unit 2B the morning of March 31st,

7  2011?

8    A.  We would have went in through the control

9  area, taken a right; the B side is on the right.

10 And we would have came in.  And we -- we would have

11 been loud.  We would have been yelling, "Go to your

12 dorms, go to your dorms."  Once again, it's that

13 kind of element of surprise.  I don't know, shock,

14 if you will, so someone doesn't have time to react.

15 We don't usually walk in, you know, "Hey, go to the

16 back."  It is, it's a come in quick and you're loud

17 to kind of throw them off so they don't have time to

18 react to do -- to hide contraband, get rid of stuff.

19    So when we entered, went in through the dorms,

20 I believe the cadets were directly behind us tac

21 members.  Stationed one tac member in the front of

22 each dorm; there's five dorms.  That way you can

23 look and see, you're telling the inmates, "Get up,

24 get out of bed, get your stuff, get your IDs."

25    If an inmate starts rifling around in their

1   box, appears that they're hiding something, trying
2   to get to something, "what are you doing?  What are
3   you getting?  I'm getting my ID, I'm getting shoes,
4   whatever else," then they can continue on.  But you
5   got make sure they're not trying to hide something.
6   So you have to come in fairly quick and have an eye
7   on everybody in the dorms.
8          Q.  So if you're -- you want to prevent them
9   from hiding contraband; correct?
10         A.  Yes.
11         Q.  If you're telling them to "grab your stuff,"
12  how can you tell whether they're just trying to grab
13  their stuff out of their property box or they're
14  trying to high contraband?
15         A.  There's really not much they're going to
16  have to be getting out of their box.  Their shoes
17  are on the floor, the ID is usually hanging on the
18  bed.  If they start to get into their box, you would
19  ask "what are you doing?  What are you getting?"
20  You don't want them rifling around; you don't know
21  what they're getting.  So at that point, you would
22  address that issue.
23         There's not really a whole a lot they're gonna
24  have to get in their box for.  If they had
25  medication -- because that's something.  If you have

1    medication that you're going to need, you know, over
2    the next couple of hours--nitro, inhaler, you have a
3    medication you take at a certain time--at that point
4    they would get in their box.  And you would keep as
5    good an eye as you possibly could to make sure
6    that's what they're getting out of their box.
7         Q.  Okay.  And you had one -- one tactical
8    officer stationed at each dorm?
9         A.  At least once.
10        Q.  Okay.  And there are 20 women in each of the
11   dorms; is that correct?
12        A.  Yes, sir.
13        Q.  Okay.  And so that tactical officer was
14   responsible for making sure that the 20 women in
15   that dorm are not grabbing anything they're not
16   supposed to have?
17        A.  Yes, sir.
18        Q.  Okay.  Now, you said grab your stuff, what
19   are the kind of things that the women were allowed
20   to grab?
21        A.  Their shoes.  If they -- you know, obviously
22   some of them, it was fairly early in the morning,
23   some were still sleeping, they had to get their
24   shoes.  Medication, as I said.  There's not a whole
25   lot they would have been allowed to take out with

1  them.  Some were trying to grab, you know, candy or

2  whatever else, their water bottle.  "No, you leave

3  that here."

4      So we don't want them taking a whole bunch of

5  stuff out, but any necessary medical items or

6  anything like that.

7      Q.  Okay.  And so once you entered the dorm and,

8  you know, told the women to get up, what did you say

9  next?  What happened next?

10      A.  They line up in columns of twos.  Once

11  everybody was done, they started pulling them out

12  and female cadets and female tac officers were

13  performing pat searches on them.  The inmates got

14  handcuffed.  They were lead out to the dayroom until

15  we got everybody, all five dorms, a hundred women

16  out, and they were taken over to the gym.

17      Q.  Okay.  So how did the women know to line up

18  at the end of their bunks like --

19      A.  We told them "Line up.  Get whatever you

20  need to get and then line up in columns of twos."

21      Q.  Line up at the ends of your bed?

22      A.  It -- they would have been facing -- like if

23  I'm -- at the end of the dorm, there's like the

24  corridor in between the beds, so they would have

25  been lined up in twos all the way down to the end of

1    the dorm.

2         Q.  Facing towards the enter --

3         A.  Facing towards the exit; yes, sir.

4         Q.  Okay.  And then once they were lined up,

5    what was the command from there?

6         A.  They were -- they would have -- they were

7    just told to stay there.  And as we were pulling

8    them out, the female cadets and tac members were pat

9    searching them as they came out to make sure they

10   didn't have anything on them you could detect from

11   just a regular pat search.

12        And then they were handcuffed and then they

13   were told go wait out in the dayroom.  There were

14   tac officers out there waiting, showing them and

15   directing them where they needed to stand.

16        Q.  And were they handcuffed there at the

17   entrance to the dorm or were they handcuffed

18   somewhere else?

19        A.  I believe it was at the dorm.  Once they got

20   done being pat searched, they were handcuffed right

21   there in the hallway.

22        Q.  Okay.  And who was doing the handcuffing?

23   Was it cadets or was it tactical team members?

24        A.  Both.  Both.

25        Q.  Okay.  And how was it determined which would

1    do -- just --

2        A.  However it came out.  You know, you got a

3    cadet, shake someone down.  When they're done, the

4    next person came out.  If a cadet was still shaking

5    down, a tac member would have done the next pat

6    search.

7        Q.  And was there -- once they were handcuffed,

8    what was the -- was there another corrections

9    officer or cadet or tactical officer who was then to

10   walk them to the dayroom?

11       A.  They were just walked up the hallway, and we

12   had tac officers stations lined up the hallway and

13   then out in the dayroom too.  And they would tell

14   them "Okay, come out here, go stand over there."

15   And we just started making rows in the dayroom.

16       Q.  So once they were handcuffed, they were

17   ordered to walk to the dayroom?

18       A.  Yes, sir.

19       Q.  Okay.  So the pat-down searches,

20   approximately how long does that take?

21       A.  Five seconds, if that.

22       Q.  And what about handcuffing?

23       A.  Again, 15, 20 seconds.

24       Q.  So total, with the pat-down and a handcuff,

25   20, 25 seconds?

A.   Roughly; yes.

Q.   Okay.  Now, you can hide contraband in a
package that holds medication; correct?

A.   What do you mean by a package?  Because we
have -- there's boxes, there's blister packs, so
there's different things.

Q.   There is some form of medication that the
women are provided that they could hide contraband
in; is that correct?

A.   Could be, yes.

Q.   Okay.  Are tampons or hygienic napkins
something they would have been allowed to bring with
them if they thought it was necessary?  Is that one
of the things that you when you say "grab your
stuff," is that one of the things they could have
brought with them?

A.   I don't recall.  I don't remember if that
something that was addressed of "Hey, can I bring a
pad."  I knew they were gonna be strip-searched over
in the gym.  That's just something -- because I knew
I wasn't gonna be in gym.  Once we got over there,
that's something the female tac officers were going
to be addressing as far as that.  And we had pads
all over that institution, so that's something that
would have been readily available for them at the

1    gym.

2         Q.  Okay.  Is that something -- well, do you

3    recall if women were allowed to bring those items

4    with them as they left their dorm?

5         A.  I don't recall.

6         Q.  Okay.  And you can hide contraband in a

7    tampon; correct?

8         A.  You could, yes.

9         Q.  And you can hide contraband in a sanitary

10   napkin; correct?

11        A.  You could, yes.

12        Q.  Okay.  So the women who were bringing

13   additional things with them besides their shoes and

14   their identification, did they have their, for

15   example, medication searched to make sure there was

16   no contraband?

17        A.  They should have, yeah.  You should be

18   checking the medication to make sure it's not busted

19   open.  Make sure it's the inmate -- you know, Inmate

20   Smith, check the name, the number, see if it's

21   expired.  So you're checking to see.  Same thing

22   inhaler, nitro pills, whatever else they have, they

23   should have been checking that as they come and say,

24   "hey, here's what I've got."

25        Q.  Well, were they allowed to bring any kind of

1   medication that they had been provided or was it
2   just necessary --
3       A.  Just necessary medication.  If it's
4   something -- we told them, "If you're gonna need
5   medication over the next couple of hours--inhaler,
6   nitro pills or something you're supposed to take in
7   30 minutes--take those pills with you."
8       Q.  And who was making the determination on
9   whether or not the pills that they were trying to
10  take with them were things that were necessary?
11      A.  It would have been whoever the officer was,
12  tac officer doing the pat search, officers -- the
13  other tac officers walking down the hall.  I mean if
14  they would have come up to a cadet, a cadet might
15  not have known if this is something.  So they come
16  out, look at it, tac officer look, make sure "Okay,
17  this is yours, it says take three times a day and
18  has to take this in an hour."  Okay.
19      Q.  So is that something that they -- the tac
20  officers would do for each and every woman who was
21  trying to bring medication with them?
22      A.  It should have been checked; yes.
23      Q.  Okay.  And would they call down, for
24  example, to the Health Care Unit to make sure that
25  was something that had been prescribed to that

inmate?

     A.  No, because there's a sticker on it.  So you
can see if Inmate Smith, for example, B12345,
there's a sticker on there says Smith B12345.
You can tell.  It's a label like on a bottle of
pills, it's got their name and number on it, so you
can tell this is their medication.

     Q.  And would those packages have to be opened
or anything like that to make sure that there was no
contraband in them?

     A.  It's clear.  There's a blister pack.  You
can see through on one side and the other side is
foil, so you're gonna be able to see if there's
something hidden or if it's been peeled apart.  You
would be able to see if it was tampered with.

     Q.  Okay.  But you testified earlier that there
were different -- medications came in different
forms and or in different containers?

     A.  If someone had a cream of some type.  If
they had a foot fungus or something, that's going to
be a bottle.  It's going to be in a box and the
prescription label would be on the outside of the
box or on the tube itself.  So when you were asking
about prescriptions, I didn't know what you were
exactly saying.

1    Q.  Okay.  And would -- would they be allowed to

2    take something like that, those creams, prescribed

3    creams and things like that?

4    A.  That, probably not.  Because it's not a

5    medical emergency if you don't get your foot fungus

6    cream on within an hour.  I mean it's something more

7    of a health concern.  We didn't want an inmate

8    medical emergency falling out or something like

9    that.  Someone had blood pressure medication, that's

10   something we want them to take with them.  But as

11   far as that, some kind of a cream of some sort, we

12   would have said, "Leave that here, you can wait 'til

13   later."

14   Q.  And it was the tactical officer who would

15   decide whether or not that particular inmate

16   required that medication?

17   A.  Yes, sir.

18   Q.  Okay.  And when you testified earlier that

19   it would take about 20 or 25 seconds to pat-down

20   search and handcuff an inmate, does that include

21   checking these medications and whatever else they

22   were trying to bring with them for contraband?

23   A.  It could be in there.  If you've got to

24   really check and look at that, it might take a few

25   more seconds to check and verify the name, number,

1   and make sure it looks all legitimate.

2       Q.  Okay.  And your testimony is that would just

3   take a few seconds to do that?

4       A.  Yes, sir.

5       Q.  Including making sure there's not any

6   contraband hidden in it?

7       A.  Yes, sir.

8       Q.  When you entered Unit 2B on March 31st,

9   2011, did you yourself make any announcements as you

10  walked into the unit?

11      A.  I was probably, along with the other tac

12  officers, telling the inmates that were in the

13  dayroom or in the dorms "Get up, get your stuff

14  together, come on out."  If you had inmates in the

15  dayroom, directing them back.  So yes, I would have

16  also been making announcements.

17      Q.  And would you have been yelling those

18  announcements?

19      A.  Yeah.

20      Q.  Did -- did Assistant Warden Reynolds

21  accompany the tac team into Unit 2B that morning?

22      A.  I believe so; yes.

23      Q.  And was Assistant Commander Craig there as

24  well?

25      A.  Yes, sir.

1      Q.  How many cadets accompanied the tactical

2  team in Unit 2B that morning?

3      A.  I don't recall.  I really don't have any

4  idea.

5      Q.  Was it more than a dozen?

6      A.  Yes.

7      Q.  More than two dozen?

8      A.  It was 50 to 70, but as far as exact number,

9  I can't tell you.

10      Q.  And do you recall the 50 to 70, how many of

11  them were male?

12      A.  I don't recall.

13      Q.  Do you recall how many were female?

14      A.  I don't recall.

15      Q.  Okay.  Now, when you said you were making

16  announcements, can you -- do you recall what those

17  announcements were?

18      A.  If they were in the dayroom, we were telling

19  them to go to the back.  If they were in the dorms,

20  we were telling them to "Get up, get your shoes on,

21  get dressed, get any medication that you may need,

22  get your IDs."

23      Q.  And the types of things that we went through

24  before in terms of ordering them to line up, to grab

25  their stuff, that kind of thing, was that something

1  that you were ordering them to do or was somebody

2  ordering them to do that?

3      A.  Everybody.  In each individual dorm, whoever

4  the tac officer was in that dorm would have been

5  directing the inmates in that dorm what they needed

6  to do.

7      Q.  Okay.  So there would have been multiple tac

8  members yelling out orders to the women at the same

9  time; is that correct?

10     A.  Yes, sir.

11     Q.  Once the women had been handcuffed and

12  brought to the dayroom, then what was the next --

13  what happened next?

14     A.  Once they were all handcuffed out in the

15  dayroom, at that point we started taking them out by

16  rows off the -- off of housing Unit 2.  They were

17  all brought out into -- onto the walk, lined up in

18  columns of two, and escorted to the gymnasium.

19     Q.  Okay.  Were you one of the -- well, did you

20  escort them to the gymnasium yourself?

21     A.  Yes.

22     Q.  Okay.  Was Assistant Warden Reynolds

23  there -- sorry, let me say that again.  Was

24  Assistant Warden Reynolds one of the individuals who

25  also accompanied them or marched them to the gym?

1          A.  I don't recall.  I don't believe so, but I

2     can't tell you 100 percent if he was or wasn't.  But

3     I don't think so.

4          Q.  What about Assistant Commander Craig?

5          A.  I think so, again.  I think we had our whole

6     tac unit going taking them over, escorting the line

7     over to the gym.

8          Q.  Okay.  And the entire unit was moved over to

9     the gym at the same time; correct?

10         A.  Yes.

11         Q.  Okay.

12         A.  Yes.

13         Q.  Now, when you escorted them to the gym, was

14    anything -- did you say anything to the women as

15    they were being escorted to the gym?

16         A.  If they were talking, if they started to

17    talk or something and I had to tell them to "Hold

18    the noise down, no talking, just keep moving

19    forward."

20         Q.  And when the women were being escorted to

21    the gym, is there a standard marching procedure for

22    the tac team for that kind of moment?

23         A.  At that point, we would have been -- the

24    inmates would have been on the walk.  And the walk

25    is only really wide enough for two, so we would have

1    been off in the grass.  So at that point, we're not

2    going to march through the grass.  I wouldn't have

3    been calling cadence.  We just would have been

4    walking along beside, in front, in back of the line.

5        Q.  I'm sorry, did you say you would or would

6    not be calling --

7        A.  No, we wouldn't have been calling cadence.

8        Q.  That's what I thought, I just wanted to make

9    sure.

10       Now, when you -- say you escorted them to the

11   gym; were they -- did the tac team escort them into

12   the gym or just to the gym entrance?  Where were

13   they escorted to?

14       A.  Once we got them inside the gym, we walked

15   in so we could get them all lined up inside the gym.

16       Q.  Okay.  I'll show you what has been marked as

17   Exhibit 201.  Will this assist you in your

18   testimony?

19       A.  Yes.

20       Q.  This has been published previously, Your

21   Honor.

22           THE COURT:  Understood.

23       Q.  Are you able to indicate where on the gym

24   floor plan you would have marched the women into and

25   lined them up?

1    A. Yes.  This is upside down as to -- I can

2    still ID, but for everybody else to see how it's

3    been put up every other time.

4    Q. Is this better?

5    A. Yeah.

6    Q. All right.

7    A. I would have been able to ID, but you know,

8    for everybody else.

9    Q. I appreciate it.

10    A. What was the question again, sir?

11    Q. Sure.  Can you just indicate where on here

12    you would have marched the women into the gym and

13    where you would have lined them up?

14    A. We didn't march the women, they walked.  We

15    didn't have them in cadence or anything.  But we

16    would have came in right there.

17    Q. All right.  And where would they have been

18    lined up?

19    A. I believe we started lining them up right in

20    this area in columns.

21    Q. Okay.  And which way -- were they asked to

22    face in a certain direction?

23    A. Towards the wall.  Towards this end here.

24    Q. Okay.  Did they -- they remained handcuffed

25    at that time; correct?

1      A.  Yes, sir.

2      Q.  Now, were there tactical team members that

3 were then at this point detailed to the gym?

4      A.  The female tac members were.

5      Q.  Any male tactical members detailed to the

6 gym?

7      A.  No.

8      Q.  What about cadets?

9      A.  To my recollection, no.  We went back to go

10 shakedown.  That was our primary function, was to

11 go -- we had a hundred-bed areas to go search.  So

12 that was our primary function now, was to go start

13 searching these bed areas.

14      Q.  Were the cadets involved in marching -- or

15 walking the women over to the gym?

16      A.  The females might have been walking with us

17 because they knew they now had to go over and start

18 strip-searching these inmates.  So as far as would

19 they have been providing security?  No.  They were

20 probably trailing behind the line, but I can't tell

21 you a hundred percent.

22      Q.  Okay.  So how long after you walked the

23 women in -- well, how long did you personally stay

24 in the gym once you walked these women into there?

25      A.  Once they got them all in, once we got all

1    the inmates in the gym, within the next few minutes,
2    I left.  Because I had to go back, start assisting
3    with the shakedown on housing Unit 2B.
4        Q.  And the male tactical officers, it's your
5    testimony that they left with you; correct?
6        A.  Yes, sir.
7        Q.  Okay.  Before you left, did you remove the
8    handcuffs from the women that you had just lined up
9    in columns in the gym?
10       A.  They were still cuffed up when I left.
11       Q.  Okay.  The tactical officers that were
12   detailed to the gym, did you provide them with
13   orders to remove the handcuffs?
14       A.  They knew that they -- at that point that
15   they were to start strip-searching.  As far as when
16   the cuffs got removed, I don't recall if we told
17   them to go ahead and start removing them or if they
18   were told to wait until they took them in for strip
19   search.  I don't recall what the -- when we told
20   them to remove them.
21       Q.  Would that have been your call to make as
22   the tac --
23       A.  Not necessarily.  I had other tac members,
24   the female tac members in there to -- they're
25   certified members.  They can -- they can make

1   decisions on their own.  So if they, at that point,
2   if it was directed from the Warden if she was over
3   there, or Deputy Director Denning or the training
4   academy, if they said, "Hey, we're gonna start
5   uncuffing them now," at that point, they could have
6   started doing it.
7       Q.  Well, let me ask it this way:  If you had
8   ordered them to start removing the handcuffs, would
9   the tactical members detailed to the gym, would they
10  have been required to remove the handcuffs?
11      A.  Yes.
12      Q.  Okay.  Would you have had to seek approval
13  from anybody else before making that order?
14      A.  Yes.
15      Q.  Who would you have had to seek approval
16  from?
17      A.  I probably would have asked Assistant Warden
18  Reynolds or the Warden.
19      Q.  Okay.  But that's not something that you
20  did; correct?
21      A.  No.
22      Q.  Okay.  What about whether the women were
23  allowed to sit down?  Is that -- did you -- did you
24  provide any instructions to the female tac officers
25  who were detailed to the gym on whether or not the

1  women that you had just walked in were allowed to
2  sit down at all?
3      A.  I gave no instruction.
4      Q.  Okay.  Was that an order you could have
5  given to those members of the tac team?
6      A.  I could have; yes.
7      Q.  And is that something that they would have
8  been required to follow?
9      A.  Yes.
10     Q.  Is that something that you would have had to
11 seek approval for before making that -- before
12 giving that order?
13     A.  I would have; yes.
14     Q.  And who would have had to seek approval
15 from?
16     A.  Either Assistant Warden Reynolds or Warden
17 Hulett.
18     Q.  Okay.  And that's not something you did;
19 correct?
20     A.  No.
21     Q.  Okay.  What was your understanding of how
22 long it would take to do the shakedown in Unit 2B?
23     A.  Couple hours possibly.
24     Q.  Okay.  So fair to say that you knew when you
25 left the gym that there were gonna be many women

1    standing at least for a couple of hours in handcuffs
2    waiting to be stripped searched?
3         A.  They were gonna start the strip searches as
4    soon as we left.  So as far as if they were gonna be
5    standing there in handcuffs the whole time, I don't
6    know.
7         Q.  Okay.  Is that something that you took into
8    consideration when you were giving your orders that
9    morning?
10        A.  No.
11        Q.  At any point that day did you return to the
12   gym?
13        A.  Later on, once we -- once the strip searches
14   were done, we -- I went over and I got --
15        Once they said, yes, they're done
16   strip-searching, we still had some shakedowns to do.
17   I went over and we swapped out, brought some male
18   cadets over to the gym to provide security just as
19   provide bodies in there for officer presence, and we
20   took the female cadets over to the living unit to
21   shakedown.
22        So they weren't only there, all they did all
23   day was strip search.  Now they got to actually go
24   through a property box and see what their allowed to
25   have and the proper ways to look for -- for

1    contraband.

2        Q.  You testified earlier that after you walked

3    the women into the gym, you thought you were in the

4    gym for a few minutes; is that correct?

5        A.  A few minutes; yes.

6        Q.  Okay.  So is it your testimony here today

7    that those few minutes are the only time that you

8    spent in the gym during this entire detail?

9        A.  Until I went over to get the -- to switch

10   out the female cadets with the male cadets.  And

11   then again when we took House 4, it was the same

12   process, same procedure.

13       Q.  Well, did you switch out the male cadets or

14   female cadets before or after you got House 4?

15       A.  I believe it would have been before, before

16   we got House 4 because I think they were done doing

17   the strip searches before we were done shaking down.

18   I mean it takes a long time to shakedown all this

19   property.  So it would have been before.

20       Q.  The entire operation, what time did it end

21   that day?

22       A.  It might have been 2, 2:30 or so.  I know

23   the biggest -- they kept saying the cadets had to be

24   on the road by three.  That was the biggest thing,

25   was they had to be on the road by 3:00.

1          Q.  Okay.  And what time was it the last time

2     that you entered the gym?  Around what time was it?

3          A.  I don't recall.

4          Q.  Okay.  Was it in the morning, in the

5     afternoon?

6          A.  It would have been in the afternoon.

7          Q.  Okay.  Were they still doing strip searches

8     at that point?

9          A.  No.  It would have been, again, once they're

10    done doing strip searches, swap out the females

11    again, get them back over so they could assist, and

12    now new officers to go stand security.

13         Q.  The period of time that you were in housing

14    Unit 2B, did you -- do you recall ever seeing Warden

15    Hulett in the housing unit?

16         A.  She was there the very beginning, when we

17    first went over in the morning on House 2B; yes.

18         Q.  Did you see her at any time in the housing

19    unit after that?

20         A.  I don't -- I don't recall.

21         Q.  What about in -- in Unit 4B?  Did you see

22    Warden Hulett in that unit?

23         A.  I don't believe so.  But again, I don't

24    recall if she was there or not.

25         Q.  Okay.  Just to step back for a minute, I'm

1    not sure if I asked you this and I just want to

2    clarify.  When the women were being handcuffed in

3    the dorms, was it members of the tactical team that

4    were supervising the handcuffing?

5        A.  Yes.

6        Q.  Okay.

7        A.  We would have had the -- the training

8    academy counselors also there checking and making

9    sure that they're done correctly also.

10        Q.  So the -- sort of jointly supervised by the

11    tac team and the training academy; is that correct?

12        A.  Yes, sir.

13        Q.  Okay.  When you brought the women over from

14    Unit 4B to the gym, had you finished the shakedown

15    in Unit 2B?

16        A.  I believe so; yes.

17        Q.  Okay.  So it's your testimony here today

18    that the shakedown in Unit 2B had been completed

19    before the women from Unit 4B were brought over to

20    the gym?

21        A.  I believe so; yes.

22        Q.  Okay.  And when you brought the women from

23    4B over to the gym, was there any strip searches of

24    the women from 2B ongoing?

25        A.  No.  House 2B was cleared out.  There were

1    no inmates from 2B left in the gym when we brought

2    the 4B inmates over.

3         Q.  So is -- your testimony then is that the

4    shakedown and strip search of Unit 4B only occurred

5    after the shakedown and strip search of Unit 2B; is

6    that correct?

7         A.  That's correct.

8         Q.  Okay.  Do you recall what time it was when

9    you brought Unit 4B into the gym?

10        A.  It -- I don't remember exactly.  It might

11   have been right around noon, 12:30ish.  I don't

12   remember exactly what time.

13        Q.  Okay.  Could have been later than that?

14        A.  It could have been, but I don't think it

15   was.

16        Q.  Okay.  So somewhere in the 12 to 12:30 --

17        A.  Around in there; yes.

18        Q.  Okay.  Going back to the shakedown in Unit

19   2B.  Once you've already brought the women from Unit

20   2B over to the -- to the gym, you -- was the next

21   thing you did was go back to the Unit 2B to start

22   the shakedowns?

23        A.  Yes, sir.

24        Q.  Okay.  And what was the role of Orange Crush

25   or the tactical team in the shakedowns of Unit 2B?

1        A.  To assist the cadets in items that are

2   authorized, items that are allowed, where to look,

3   where to search, common hiding places for things,

4   make sure --  make sure you checked this book,

5   pulled all the way open, pull pen caps off.  Where

6   to check for common hiding places.

7        Q.  So were the tactical members actually

8   involved in -- physically involved in the shakedown

9   or were they simply supervising?

10       A.  Would have been both.

11       Q.  Okay.  What is involved in shaking down a

12  unit like that?

13       A.  You go through all their property.  They

14  have a property box and you start pulling things

15  out.  Their clothing is in there, you pull -- all

16  their shirts are folded up and rolled out; you shake

17  them out.  You check boxes of food.  They have a

18  correspondence box which is a smaller box, but

19  they're allowed magazines, letters, books and so

20  forth.  You go through all that to make sure that

21  there's no contraband.

22       And then you check under the bunks.  There's

23  little crevices and hiding places.  You check in the

24  lights.  Bunk beds, there's little holes and nooks

25  and crannies and stuff in there too.  So going

1  through that thoroughly shaking down the whole bed

2  area.

3      Q.  I got you, Your Honor.  Thank you.

4          THE COURT:  We all finished with him or --

5          MR. FIELD:  No, I've still got additional

6  questions, but we'll recall him tomorrow.

7          THE COURT:  All right, that will be fine.

8      Time to go home.  Have -- any objections?

9      Not at all, okay.

10     All right.  Please recall the admonition,

11 ladies and gentlemen.  And we will stand in recess

12 until 10:00 tomorrow morning.  Please be ready

13 again.

14     Thank you.  Have a pleasant evening.

15     (The jury left the courtroom.)

16         MS. THOMPSON:  I apologize, Your Honor.  I

17 had one brief thing I wanted to make the Court aware

18 of before we break for the evening.  And that's

19 this:  I know we intend to start at 9:30 tomorrow to

20 do the offer of proof with our expert.

21         THE COURT:  Right.

22         MS. THOMPSON:  I want to make sure that

23 we're able to finish our expert tomorrow on the

24 stand.  And I expect she might be a long witness.  I

25 have conferred with defense about this, and I think

1   we are okay with doing the offer of proof for

2   Ms. Still, putting her on, and then recalling

3   Mr. Dawdy out of order.  But I want to make sure the

4   Court is okay with that.

5          THE COURT:  Well, of course.  We're going

6   to have to do that.  But you have an offer of proof

7   that's going to be done outside the presence of the

8   jury.  And are you telling me that that's going to

9   be more than 30 minutes?

10          MS. THOMPSON:  No, Your Honor, but I meant

11  that we'll do the offer of proof, we'd like to call

12  Ms. Still in front of the jury, and then we will

13  recall Mr. Dawdy, if the Court is accepting of that.

14          THE COURT:  Oh, I have no problem.  What

15  about the counsel on the other side?

16          MS. BARNES:  No, I spoke to Ms. Thompson.

17          THE COURT:  That's perfectly okay with me.

18  Any way to accommodate and make sure we get

19  everything in, even if it's out of order.

20          MS. THOMPSON:  We appreciate that, Your

21  Honor.

22          THE COURT:  Yeah, no sweat at all on that.

23  But when we have our offer of proof in the morning,

24  I expect to go through fast.  And I don't want any

25  delay because that jury is not gonna sit out here

1    and pick their noses past 10:00 in the morning.

2             MS. THOMPSON:  Understood.

3             THE COURT:  We're gonna go.  And so if

4    you've got to call the expert, that's just the way

5    the ball bounces.  We've got to hustle.

6        And by the way, I'm going to re-read all the

7    data on your expert tomorrow morning, and I'm going

8    to re-read that tonight, and so I'll be loaded for

9    bear.  So let's make sure we understand that we're

10   gonna cut this as short as possible, and we're not

11   going to make a federal case out of it.

12        Okay?  Very good.

13            MS. THOMPSON:  Can I ask the Court one

14   other question?

15            THE COURT:  Fire.

16            MS. THOMPSON:  We -- and I should have

17   conferred with the Court about this before we began,

18   so I apologize.  But the other cases that I have

19   done, we've shown all of our evidence during the

20   trial and then at the conclusion of our case, we've

21   offered into evidence the things that we believe

22   ought to be entered into evidence and potentially,

23   you know, dealt with that way.

24        I realize there's some -- we've been using a

25   lot of demonstratives, but there are some pieces of

actual evidence that I think we haven't potentially

offered into evidence that we intend to do that

with.  I don't know if the Court wants us to sort of

catch-up in the morning or if you want us to wait

until the end.

            THE COURT:  No, no, no.  When we've got

witnesses, they take precedence.  So we zoom right

through.

     As a matter of fact, the exhibits never prove

to be that much of a problem.  There may be one or

two that we'll have some argument about, but for the

vast majority of them, we won't have any difficulty.

We'll do that at the end of the case.  I want to get

the people out of here and the jury gone, you know,

on recess and so forth.

            MS. THOMPSON:  Thank you.

            THE COURT:  I don't think we will have any

difficult in that.

     But I want to caution you, let's don't string

this thing out in the morning.  You got 30 minutes

and that's all to get her on and get this taken care

of.  And so I'll be loaded for bear.

            MS. THOMPSON:  Thank you, Your Honor.

            THE COURT:  You bet you.  Good night,

everyone.  Have a pleasant evening.

1     (Court was recessed in for the day.)

2   I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

3   Reporter, certify that the foregoing is a correct

4   transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8

9

10                  This transcript contains the

11                  digital signature of:

12

13                  Kathy J. Sullivan, CSR, RPR, CRR

14                  License #084-002768B

15

16

17

18

19

20

21

22

23

24

25