1                IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF ILLINOIS
2                   SPRINGFIELD DIVISION

3

BEVERLY THROGMORTON, ET    )
4  AL.,                   )
                      )  12-CV-3087
5          PLAINTIFFS,   )
                      )  JURY TRIAL
6       VS.            )
                      )  SPRINGFIELD, ILLINOIS
7  REYNOLDS, ET AL.,    )
                      )
8         DEFENDANTS.   )

9

              TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE RICHARD MILLS
            UNITED STATES DISTRICT JUDGE
11

NOVEMBER 16, 2016
12

A P P E A R A N C E S:
13

  FOR THE PLAINTIFFS:  VINCENZO FIELD
14                       RUTH Z. BROWN
                       TARA ELIZABETH THOMPSON
15                      LOEVY & LOEVY
                       3RD FLOOR
16                      311 NORTH ABERDEEN STREET
                      CHICAGO, ILLINOIS
17

18

  FOR THE DEFENDANTS:  KAREN L. MCNAUGHT
19                       DEBORAH L. BARNES
                       LAURA K. BAUTISTA
20                      ILLINOIS ATTORNEY GENERAL
                      500 S. SECOND STREET
21                      SPRINGFIELD, ILLINOIS

22

23  COURT REPORTER:      KATHY J. SULLIVAN, CSR, RPR, CRR
                      OFFICIAL COURT REPORTER
24                      600 E. MONROE
                      SPRINGFIELD, ILLINOIS
25                      (217)492-4810

1                    I N D E X

2    WITNESS                            PAGE

3       WENDY STILL
            Direct Examination        16-20
4           Cross Examination         16-89
            Redirect Examination      16-111
5           Recross Examination       16-115

6       TROY DAWDY
            Direct Examination (Cont'd)  16-116
7           Cross Examination         16-147
            Redirect Examination      16-155

8       MELODY HULETT
9           Direct Examination        16-160

10

11

12

13

14   PLAINTIFFS EXHIBIT
     NUMBER
15       Exhibit 33                    16-51
         Exhibit 229                   16-158

16

17

18

19   DEFENDANTS EXHIBIT
     NUMBER                 IDENTIFIED   ADMITTED

20

21

22

23

24

25

<pre>
 1              P R O C E E D I N G S

 2       *   *   *   *   *   *   *   *   *   *   *

 3       (The following proceedings were held outside

 4       the presence of the jury.)

 5           THE COURT:  Thank you, Madam Clerk.  Good

 6   morning, everyone.  Sorry to be a couple of minutes

 7   late, but was on the phone.  Phone calls come in, as

 8   we all know.

 9       Well, we're all present, except for the jury;

10   they are not in the courtroom.  Or it is not in the

11   courtroom, to be more grammatically correct.

12       But I see we have Mr. Corrigan with us.

13           MR. CORRIGAN:  Good morning, Your Honor.

14           THE COURT:  Good morning, good morning.

15   Terence Corrigan appears here today.  And you are

16   appearing on behalf of the defendants?

17           MR. CORRIGAN:  Yes, Your Honor.

18           THE COURT:  All right.  Are you here for a

19   limited purpose, since you haven't been here during

20   the course of the trial?

21           MR. CORRIGAN:  Yes, Your Honor, just for

22   the issues with the offer of proof.

23           THE COURT:  Very good.  Well then, that is

24   our purpose before the jury comes in, is to handle

25   the question of the scope of the testimony of the
</pre>

1    plaintiff's expert, Wendy Still.

2        Is Ms. Still here?

3            THE WITNESS:  Yes, Your Honor.

4            THE COURT:  All right.  Ms. Still, nice to

5    have you in the courtroom.

6            THE WITNESS:  Thank you, Your Honor.

7            THE COURT:  You're a long way from home.

8    If we were out there, we'd be a long way from home.

9    So it all averages out in the end.

10       Very well.  Well, it is my understanding that

11   we are here for an offer of proof as to Ms. Still's

12   testimony as an expert on behalf of the plaintiffs.

13   I will tell you that I have read, last night, in

14   detail, your entire -- well, it's even more than a

15   curriculum vitae.  It deals with this case in total.

16       So I have read your 32-page report in this

17   matter.  So I am acquainted with the background and

18   the extensive experience that Ms. Still has had.

19       We are here to determine the extent and the

20   depth of her testimony here in this cause.  And I

21   think, Mr. Corrigan, that is the reason why you are

22   here in this capacity as an Assistant Attorney

23   General of Illinois appearing on behalf of the

24   defendants for this limited purpose today; is that

25   right?

1          MR. CORRIGAN:  Yes, Your Honor.

2          THE COURT:  Excellent, excellent.

3      Well good, we've got ourselves focused.  That's

4  the main thing.

5      Now, I think we should probably ask

6  Ms. Thompson if she would like to set the ground

7  rules here?  Set the stage on behalf of the

8  plaintiffs?  And then we will go to Mr. Corrigan.

9      And then we will determine how much, if any,

10  we're talking about in this report.  And the extent

11  of the testimony that Ms. Still will give here and

12  the boundaries of her testimony as an expert.

13      Come on up -- Well, I guess you could stay

14  right there as long as that microphone is working.

15          MS. THOMPSON:  Let me just say this, Your

16  Honor, Ms. Brown intends to address this issue for

17  the plaintiffs.  So with your permission, I will

18  allow Ms. Brown address this.

19          THE COURT:  Of course I will.

20          MS. THOMPSON:  Thank you.

21          THE COURT:  Of course.  I'm sorry,

22  Ms. Brown, to preempt like that.

23      All right, fine.  Thank you very much.

24          MS. BROWN:  Thank you, Judge.

25      We will not be asking Ms. Still to testify

1  about whether the plaintiffs are telling the truth

2  or not.  We do not intend to ask them to -- ask

3  Ms. Still to testify whether the defendants' account

4  is true or not.  Ms. Still is not gonna offer any

5  opinions about what actually happened during the

6  mass strip search.

7      And she will not offer any opinions about

8  whether the plaintiffs suffered any damages.  She

9  will not offer any opinions about whether the

10 plaintiffs have histories of trauma or abuse.  She

11 will not offer any opinions about whether the

12 defendants were deliberately indifferent or the

13 defendants' state of mind or anything of that

14 nature.

15     What she will provide testimony on is what is

16 considered a nationally accepted practice or

17 standard in the field of corrections as it relates

18 to various kinds of practices, such as conducting

19 strip searches.  You know, who is able to view strip

20 searches.  What kind of restraints should be used

21 during strip searches.  And for an extended period

22 of time, you know, asking women to stand for long

23 periods of time during strip searches.  Practices

24 such as using unprofessional language during strip

25 searches.

The generally accepted standards for planning a
mass strip search of 200 women.  The generally
accepted standards and practices for monitoring and
supervising a mass strip search.  The generally
accepted reasons for why a mass strip search of 200
women would take place.

And, you know, that's just kind of an overview
of the testimony that we intend to offer.

THE COURT:  All right.  Mr. Corrigan, if
you'd like to respond.

MR. CORRIGAN:  Your Honor, within those
parameters, that certainly eliminates some of our
concerns, but we still have some.

As we understand the basis of the Court's
ruling that the Court previously made in regarding
to limiting the testimony to standards, that the
testimony that the defendants ignored or violated an
applicable standard or practice could go to the
question of the defendants' motive or intent.

That if they knew of a standard and didn't
comply with it, it might bear on the defendants'
intent.  At least that's certainly my understanding
for the Court's opinion.  Because this case, as the
Court knows, is not about whether or not there was
compliance with standards, but whether or not the

defendants acted with the requisite mental state in
order to violate the 8th Amendment.

So that within that scope, the defendants have
no problem with the idea that the plaintiffs can
testify to certainly the -- the PREA standards,
which are the Prison Rape Elimination Act rules.
And with the understanding that they weren't
officially in place until after the search at issue,
but that they were promulgated in draft form before
that.  And we have no problem with the jury hearing
about those standards; the written standards that
are reflected in the opinion.

We do have a problem with the idea that the
expert can testify about generally accepted
practices in some other prison system because that's
not something that she can testify or any witness
will testify that the defendants ever knew about
those standards or practices.

And to go into the question that, for example,
there has to be a written battle plan is one of her
opinions.  That is not in any written standard,
including the standards that this witness said that
she helped draft for California.  It's not in any
written form.  There's not gonna be any testimony
that anybody ever told any of the defendants that

that's a necessary requirement.  So that them not
complying with it basically has no bearing on their
mental state.

As another example, the witness offered in her
opinion that certain persons should have been
present for supervising or monitoring the search.
There's no standard that requires that that we have
been put on notice of in the opinion.  We've looked
at the cited standards, that's not there.  There's
no testimony that any defendant was ever told that
these persons have to be there for supervising a
search and that it's -- lower level supervisors are
not acceptable.  That has never been conveyed to the
defendants, and so it cannot bear on their mental
state.

The question of generally accepted reasons for
a strip search.  The question is not whether or not
the witness believes that the search furthered
legitimate penological reasons, but whether or not
the defendants believed it.  And the question goes
to the specific intent.

And so that given the fact that those generally
accepted reasons are not in any guideline or
standard, we object to going into that testimony and
believe that it should be limited to the written

 1    guidelines and something that the defendants were
 2    put on notice of.
 3         There will be defendants who would candidly
 4    admit they knew about the PREA standards.  And so
 5    that that testimony is certainly relevant.  To go on
 6    in far-reaching opinions about "this is the way
 7    prisons should be run", has no bearing on the
 8    defendants' mental state if they didn't know about
 9    those standards.  And there won't be testimony that
10    they did.  Not standards, if they didn't know about
11    those practices.
12         And without that, there's no foundation for
13    relevance of any of that testimony.  It -- to be
14    relevant, it has to be related to the mental state.
15         And, Your Honor, as one additional point with
16    regard to the testimony, we believe -- excuse me,
17    while I grab something, Your Honor?
18              THE COURT:  Sure.
19              MR. CORRIGAN:  Well, before -- actually,
20    before I get to this, one other point.
21         The Court has -- has indicated in the latest
22    ruling with regard to the motion in limine that
23    plaintiffs would be allowed to pose essentially
24    hypotheticals, and if this was true would, it
25    violate these standards?

1      It's the defendants' position that that

2  testimony will unnecessarily prolong the

3  proceedings, add nothing to it, and possibly confuse

4  the jury.  Because if the standards are clear and

5  unambiguous, the witness's interpretation of those

6  standards will add nothing.  If the standards are

7  not clear and unambiguous, then the witness's

8  interpretation, which was never shared with the

9  defendants, would not be relevant to the defendants'

10  mental state.

11      We certainly have no problem with the witness,

12  in short and cursory fashion, saying that as a

13  conclusion, that searches of -- cross-gender

14  searches or searches that allowed voyeurism would

15  violate the standards.  But for us to have -- I

16  think, counsel indicated that this witness would

17  testify for a number of hours.  I cannot imagine how

18  we can have testimony that takes that long that

19  doesn't confuse the jury as to the issues in the

20  case.

21      And with respect to the question of jury

22  confusion, we would ask the Court to give a limiting

23  instruction before the witness testifies.  I have a

24  draft version of a limiting instruction that I've

25  got that I would like to share with the Court.

1          THE COURT:  I've already seen that.

2          MR. CORRIGAN:  All right.  Your Honor, one

3    thing.  I discussed this with plaintiff's counsel,

4    who had some concern about in the second line, as it

5    relates to the word intent, that the word intent was

6    not broad enough to cover the issue of deliberately

7    indifferent, which is not that they intended this

8    consequence, but that they were indifferent to it.

9    And I would have no objection to this being modified

10   to say mental state or intent, in order to cover any

11   possible basis.  But it would focus the jury and

12   avoid confusion of the issues.

13         THE COURT:  Well, okay.  Let's hear from --

14   now Ms. Brown?  Gonna be Ms. Thompson.

15         MS. THOMPSON:  Well, I discussed the jury

16   instruction with defense counsel, so I would -- I

17   would address that point.  And I think Ms. Brown can

18   address the other issue.

19         THE COURT:  All right.

20         MS. THOMPSON:  There is a Seventh Circuit

21   pattern jury instruction on how a jury should

22   consider testimony that conduct either complied with

23   certain policies or procedures, or violated it.

24   It's Pattern Instruction 7.04.

25         THE COURT:  That's true.

1          MS. THOMPSON:  And this instruction, one of
2     my concerns is it doesn't really -- in a very vague
3     way, it tracks the pattern instruction but does not
4     clearly track of pattern instruction.
5          The pattern instruction doesn't have any
6     inclusion in it that the jury should be instructed
7     that you should consider -- that you should consider
8     it solely for the purposes that counsel indicated.
9     And I did tell defense counsel that one of my
10    concerns about this language is that it unfairly
11    limits what they can consider it for.
12         The pattern instruction, which the Court may
13    have in front of it, just says, you've heard
14    evidence about whether the defendants violated
15    statutes, regulations or policies; I'm paraphrasing
16    that slightly.  It doesn't include anything about
17    consider it only for a limited -- you know, for this
18    certain purpose.  It just says that you should
19    remind the jury that the issue is whether defendants
20    violated whatever the conduct is.  And here I agree
21    that the question is whether the defendants violated
22    the plaintiffs' 8th amendment rights.
23         So I'm concerned that this instruction does not
24    track the pattern instruction.  I don't object to
25    the jury being reminded, as is appropriate, that

1    they're about to hear testimony that may not be

2    relevant to all issues in the case, Your Honor.

3              THE COURT:  All right.  Well, number --

4              MR. CORRIGAN:  Your Honor, could I --

5              THE COURT:  Up here, Mr. Corrigan.

6              MR. CORRIGAN:  Just to respond to the issue

7    about the instruction.  I did draft that with -- as

8    an in-court version of essentially the kind of

9    instruction that is given after the case.

10         I did modify it because one of the concerns

11   I've always had with the pattern instruction--and as

12   the Court knows, the pattern instructions are not

13   mandatory and have never been formally adopted as --

14   as something that the Court's supposed to give.

15   But --

16             THE COURT:  Well, you know that the Seventh

17   Circuit has consistently said that these are

18   favored.  There's no question about it.

19         Well, let's just shorten this up.  We're gonna

20   use the pattern instruction.  But I'm going to be

21   very lenient and allow both of you to get together,

22   and if you want to modify it in some way at the

23   proper time, that's fine.  But let's don't take it

24   up now.

25             MR. CORRIGAN:  Okay.  Your Honor, just to

1    clarify the reason that I modified it, and so that

2    the Court -- I've always been concerned about the

3    pattern instruction that is essentially a limiting

4    instruction that says you can consider this, but

5    doesn't tell them what they can consider it for.

6    And that's why I've always had problems with that

7    pattern instruction.

8              THE COURT:  Well, many of us have had.

9              MR. CORRIGAN:  And I do note that the

10   introduction to the pattern instructions said --

11   says that these instructions are not mandatory.  The

12   Court's suppose to follow the law, not the

13   instructions.

14             THE COURT:  That's true.

15             MR. CORRIGAN:  And I think a limiting

16   instruction, according to the law, should say what

17   the evidence can be used for.

18             THE COURT:  Well, in the best of all

19   worlds, Mr. Corrigan, I really think you're

20   absolutely correct.  But unfortunately, we don't

21   have the time to sit here and contemplate our navels

22   for the balance of the month until after

23   Thanksgiving.  We've got to move.  And here we are

24   just five minutes before the jury is to be in here,

25   and I want to get this resolved fast.

1    So what I'm going to do is that at the proper

2 time, we will give the limiting instruction, but it

3 will be the pattern instruction.  And if the two of

4 you can agree on a modification of the wording, that

5 will be swell.  But if you can't, you'll both give

6 me your suggested modifications, and then I'll make

7 the decision.  Since that's my job.  Okay?

8    Good.  Now, let's get back to where we are.

9 And that is the testimony of Ms. Still.  She will

10 not be able, of course, to give her conclusion as to

11 whether what took place here was right or wrong.

12 And she is going to testify only as to her concept

13 of what the generally accepted practices are on a

14 nationwide basis.

15    Now, it's obvious that she is not totally

16 experienced in the Illinois situation, the State of

17 Illinois situation with DOC.  She is from

18 California.  According to her curriculum vitae, she

19 has testified four times, I believe, as an expert in

20 Court.  Is that correct?

21    THE WITNESS:  I've testified --

22    THE COURT:  Say again.

23    THE WITNESS:  I've actually given testimony

24 one time in court.

25    THE COURT:  One time.

1          THE WITNESS:  One time in court.

2          THE COURT:  All right, fine.  But is there

3    any objection by the -- by the defendants as to her

4    qualifications?

5          MR. CORRIGAN:  Your Honor, not to testify

6    as to standards.

7          THE COURT:  Good.  That's exactly our area.

8        So rather than have you -- rather than have the

9    jury in, and have us go through all of these things

10   and questions of you on the stand, and then have

11   these matters all brought up.  And then have to send

12   the jury out, and then we have to discuss them, I

13   want to get these done at the head end so that

14   everybody knows what the -- what the playbook says.

15       And so when you testify, I'll expect you to

16   give us a brief narrative of your background and

17   your experience and so forth.  But I read your vitae

18   here, and it's quite impressive.  You've done a hell

19   of a lot of work in this penal field.  So I have no

20   problem in accepting you as an expert in this area.

21       But we've got to understand that you cannot

22   take the position of the jury and tell them, under

23   these circumstances, that they are guilty.  You

24   understand that?

25       So this is -- you're giving a generally

1   background of what the acceptable practice is

2   throughout the country.  Okay.

3       I think that's where -- about where we are.

4       Now, Ms. Thompson, have I missed anything?

5   Ms. Brown?

6           MS. THOMPSON:  I think we understand the

7   Court's ruling and we will follow it.

8           THE COURT:  Okay, great.  Do you have any

9   problem with that Ms. McNaught or Mr. Corrigan?

10          MR. CORRIGAN:  We understand the Court's

11  ruling.

12          THE COURT:  Okay, swell.  Do I don't -- if

13  there's anything that is disruptive or breaks into

14  the concentration of the jury, who are the ultimate

15  fact-finders here.  They make the decision.  And we

16  don't want them to be confused.  And that's why I

17  like to get this expert witness business taken care

18  of out of their presence and at the head end so that

19  before you testify we don't have to have a lot of

20  objections and so forth.

21      So do we have a pretty good idea of where

22  the -- the parameters of where we are now?

23          MS. THOMPSON:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MS. McNAUGHT:  Yes, Your Honor.  And I see,

1    Your Honor, it's about 30 seconds until ten.  If I

2    could have been 60 seconds to talk with Ms. Thompson

3    prior to the jury coming in.

4           THE COURT:  Oh, absolutely.  In fact, we'll

5    stand in recess for five minutes until you get a

6    chance then.  And then I'll ring.  I'll ring in

7    about six minutes.  Okay?

8           MS. MCNAUGHT:  Thank you.

9           THE COURT:  Thank you very much.

10      (A recess was taken.)

11      (The jury entered the courtroom.)

12           THE COURT:  Thank you, Madam Clerk.  Good

13   morning, everyone in the jury.  It is 25 after ten,

14   and we are just a smidgeon late in getting started.

15   But I can tell you, ladies and gentlemen, that your

16   time has not been wasted.  While you were in the

17   jury room, we had some administrative matters that

18   we had to take care of out of your presence.  We

19   have been resolved, and I think it will shorten your

20   time.

21      So everyone is currently present and here and

22   ready to go.  And so I think we will call now upon

23   the defense -- I mean upon the plaintiff.

24   Ms. Brown?

25           MS. BROWN:  Thank you, Your Honor.  The

1    plaintiffs Chief Wendy Still.

2         THE COURT:  Ms. Still, if you would stand,

3    please, raise your right hand and be sworn by the

4    Clerk.

5         (The witness was sworn.)

6         THE COURT:  Thank you.  Please be seated.

7                     WENDY STILL

8    called as a witness herein, having been duly sworn,

9    was examined and testified as follows:

10                  DIRECT EXAMINATION

11   BY MS. THOMPSON:

12        Q.  Good morning, Ms. Still.

13        A.  Good morning.

14        Q.  Can you please state and spell your name for

15   the record?

16        A.  Wendy Still.  W-e-n-d-y.  S-t-i-l-l.

17        Q.  Chief Still, what field has your career been

18   in?

19        A.  My career field has been corrections,

20   criminal justice for the past 32 years.

21        Q.  And in that time, have you developed an

22   expertise in the operation and management of women's

23   prisons?

24        A.  Yes, I have.

25        Q.  I apologize, Your Honor, the instruction.

1      THE COURT:  That's all right.  I was gonna
2  let you give her background, and then I was going to
3  give the instruction.  Go right ahead.
4      Q.  I understand.  Thank you, Your Honor.
5      Chief Still, were you hired by the plaintiffs
6  to provide opinions in this case about nationally
7  accepted correctional practices and standards?
8      A.  Yes, I was.
9      Q.  Now, you don't have any opinion on whether
10  the plaintiffs are telling the truth or the
11  defendants are telling the truth; correct?
12      A.  No, I don't.
13      Q.  But you did reach some opinions in this case
14  about nationally accepted correctional standards and
15  practices?
16      A.  Yes, I have.
17      Q.  Now, we're gonna get into your opinions in a
18  minute, but before that, I'd like to talk about your
19  background.
20      How long have you been working in the field of
21  criminal justice?
22      A.  Approximately 32 years.
23      Q.  And what do you currently do for a living?
24      A.  I'm the Chief Probation Officer for the
25  County of Alameda in California.

1    Q.  And how long did you work in the prison

2  system in California?

3    A.  For over 25 years.

4    Q.  And please tell the jury about your

5  experience working directly in prisons?

6    A.  My prison -- my prison experience, I worked

7  in three different prisons, three actual male

8  prisons.  Variety of assignments from business

9  manager to associate warden to chief deputy warden

10  and acting warden on numerous an ongoing occasions.

11  That was my direct in-prison experience.

12    Q.  Thank you.  And what experience do you have

13  operating and managing prisons?

14    A.  I've had a variety of experience in managing

15  prisons.  The most prisons I ever had management and

16  oversight responsibilities for was ten.  40,000

17  inmates, approximately 15,000 staff, and over a wide

18  geographic area.

19    Q.  And can you give us -- can you tell the jury

20  about the range of prisons that were under your

21  management?

22    A.  Yes.  I have managed male and female

23  prisons.  Had oversight responsibility for and

24  levels of security all the way from condemned down

25  to the lowest level security, which would be

community corrections.

Q. And have you been hired to serve as a consulting expert in any other situations?

A. Yes. I am currently under contract, and have been so for about five years, for the Department of Homeland Security. I do conditions of confinement investigations related to detention standards for Homeland Security. And also for the Department of Justice. I do prison investigations in women's prisons primarily for the Department of Justice.

Q. Do you also do any expert investigation in jails?

A. Yes, I do. The expert investigations I do in jails are pretty much for Homeland Security. And that relates to their detention facilities are leased. Sometimes, you know, through the local jails, as well as in private correctional facilities.

Q. And have you designed or drafted any prison policies and laws over the course of your career?

A. Yes, I have. I participated in drafting numerous penal code changes in California. And specifically Penal Code 3430, with Assemblyman Sally Lieber relative to gender-responsible practices in

1    women's prisons.

2        Q.  Have you drafted any laws that address body

3    searches of incarcerated people?

4        A.  Yes, I have.  As the Associate Director of

5    Female Offender Programs and Services, I wrote the

6    Title 15, which is California Prison Regulations as

7    it related to the elimination of cross-gender pat

8    searching and the title regulation related to it.

9        Q.  Please tell the jury about the educational

10   degrees that you have received?

11       A.  I have a -- my undergraduate is in

12   organizational development and behavior, and my

13   Master's Degree is in criminology.  And the focus of

14   my Master's Degree thesis was gender-responsive

15   operating practices in female prisons.

16       Q.  Are you a member of any professional

17   corrections organizations?

18       A.  Yes.  A long-standing member of the American

19   Correctional Association and also the American

20   Probation and Parole Association.

21       Q.  Okay.  And do you attend or speak at

22   conferences on correctional issues across the

23   nation?

24       A.  Yes, I do.  On a regular and ongoing basis.

25       Q.  What are some of the awards that you have

1  received during your career?

2      A.  I've received, in 2014, a Governing

3  Magazine's Administrator of the Year Award for the

4  innovative practices in community corrections.  I

5  have also received numerous letters of

6  acknowledgment from various directors of

7  corrections.

8      And also in 2014 -- no, excuse me, 2015, San

9  Francisco, the -- named March 23rd, 2015, as Wendy

10  Still Day upon my retirement from the San Francisco,

11  recognizing my contributions to the criminal justice

12  system.  I received an award from the District

13  Attorney in the California system for my work

14  relative to improving criminal justice practices.

15      I'm gonna leave it at that.

16      Q.  Thank you.

17      What national expertise do you have in

18  corrections outside of California?

19      A.  Well, I've participated in a variety of

20  National Institute of Corrections operational

21  practices discussions, policy-making, panels.  In

22  addition to that, I've testified before the Prison

23  Rape Elimination Act Commission as they were

24  debating, deliberating on what the actual Prison

25  Rape Elimination Act regulations were gonna be.

1      I've testified before that commission twice

2   while they were developing the PREA regulations

3   because of my work in that area.

4      I currently basically work for the Department

5   of Justice, working with them on investigations

6   inside prisons in various states where they have

7   concerns regarding potential abusive practices.

8      Q.  Okay.  And can you tell the jury what your

9   responsibilities were when you were managing and

10  supervising prisons in California during that time

11  of your career?

12     A.  Well, I had overall responsibility for all

13  the prison operations.  Everything from fiscal to

14  operational to investigations to ensuring conditions

15  of confinement met departmental and all standards

16  regulations.

17     Specifically, when I was the associate director

18  of the female prison system, and at that time we had

19  about 11,470 in three different women's prison, I

20  was responsible for the revision of all of our

21  operational practices.  Transforming them from being

22  gender neutral to being gender responsive,

23  recognizing the difference between male and female

24  inmates.

25     Q.  Thank you.  And you testified earlier that

 1    you served as an expert for the Department of

 2    Homeland Security and the Department of Justice.

 3    Have you testified as an expert before any

 4    legislative bodies?

 5        A.  I've probably given testimony in over 300

 6    hearings for the California legislature.  I have

 7    testified on behalf of the Department of Corrections

 8    in terms of as their operational expert on

 9    everything from financial issues to operational

10    issues to specifically issues in women's prisons.

11        In addition to that, I have testified on behalf

12    of the Chair of the public safety -- the Senate

13    Public Safety Committee, as well as testified on

14    behalf of the Assembly's Public Safety Committee as

15    their correctional expert because of the number of

16    years that I've had working in managing in the

17    prison system.

18        Q.  Thank you.

19        Have you testified before on behalf of

20    government entities, prisons, or institutions, as

21    opposed to on behalf of people who are incarcerated?

22        A.  Oh, the vast majority of my testimony,

23    certainly in the legislative arena, was all on

24    behalf of governmental agencies, whether it be the

25    legislature or whether it be the Governor, the

Department of Corrections.  I've also testified on
behalf of the Attorney General in prison litigation,
litigation against the Department of Corrections as
the Attorney General's correctional expert.

Q.  Okay.  During your expert work for the
Department of Justice and the Department of Homeland
Security, have you found in favor of both the
institutions and the individuals who are alleging
problems in those institutions?

A.  Yes, I have.

Q.  Okay.  Your Honor, I would like to tender
Ms. Still as an expert in corrections?

MS. MCNAUGHT:  No objection.

THE COURT:  Thank you very much.

Then before she testifies, I would like to
advise you, ladies and gentlemen, that the testimony
of this witness is being admitted for a limited
purpose.

You may hear evidence about whether defendants'
conduct complied with generally accepted national
correctional standards.  You may consider this
evidence as it relates to one or more defendant's
motive or intent, but remember that the issue is
whether one or more defendants violated plaintiffs'
8th amendment rights, not whether generally accepted

1    national correctional standards may have been
2    complied with.
3         All right?  Very good.
4         Please continue your examination of Ms. Still.
5         Q.  Thank you, Judge.
6         Chief Still, what are nationally accepted
7    correctional -- excuse me, what are nationally
8    accepted correctional standards?
9         A.  They're a variety of different standards.
10   There is the National Health Care Correctional
11   Standards.  Those are the American Public Health
12   Association, the American Correctional Association
13   has the Adult Correctional Institutional Standards.
14   There are the American Bar Association Treatment of
15   Prisoners and there are the Prison Rape Elimination
16   Act Standards.  Those are four of the distinct
17   standards.
18        There are also correctional practices issued by
19   the National Institution of Corrections where
20   operational practitioners publish, say, for example,
21   the gender-responsive strategies and associated
22   policy briefs in a variety of topics.
23        Q.  Okay.  And can you tell the jury what
24   nationally accepted correctional practices are?
25        A.  Nationally accepted correctional practices

1    can be based upon the actual standards itself as

2    they're written, or they can be based upon a broad

3    body of publications, researched practices, as well

4    as publications such as from the National Institute

5    of Corrections.

6        Q.  And how do professionals in your field

7    become aware of national accepted correctional

8    practices and standards?

9        A.  Well, the national -- the national standards

10   are published.  And so those are -- those are

11   something that -- they're not revised that

12   frequently; they're pretty set.  They're revised

13   from time to time.  But the operational correctional

14   practices that are nationally recognized, that's a

15   continuing changing body of knowledge.  And that's

16   what the charges from the National Institute of

17   Corrections, they bring operational practitioners

18   in, basically, that then publicize.

19       And it's just not that, researchers also, based

20   on research.  Like for example, a lot of the PREA

21   regulations themselves were promulgated based upon

22   research that had been conducted, testimony by

23   correctional experts, to get to what national

24   recognized standards are.

25       Q.  Okay.  And what sources did you rely on --

or do you rely on as a general matter to identify

national -- nationally accepted correctional

practices?

        A.   All of what I've mentioned as the standards.

National Institute of Corrections, the policy briefs

that are published through there.  There are also a

variety of other correctional publications.  And in

addition to that, keeping standard on what the

research tells us.  Especially as it relates to

knowledge on female inmates and trauma and

practices, operational practices, and the impacts.

        Q.   Now, are nationally accepted correctional

standards and practices the same thing as, you know,

best practices, or what you would do under ideal

circumstances, sort of the gold standard, or are

they something else?

        A.   Well, I'd say that you have your national --

you have best practices, which would be your gold

standard.  And then you have those practices that

are recognized across correctional systems,

regardless of where they're at in the nation, as to

what a standard practice would be.  And that is not

a formally -- it's not always a formally written

standard, it's a standard practice based upon the

practitioner's body of knowledge that may be

1    published, as well as experience.

2        Q.  Thank you.

3        Chief Still, in this case, were you provided

4    materials to review?

5        A.  Yes, I was.

6        Q.  And what were the primary materials that you

7    reviewed?

8        A.  I reviewed plaintiff and defendant

9    statements.  I reviewed the actual -- the actual

10   complaint filing.  And a variety of testimony that

11   had been provided by the defendants.  And of course,

12   the standards and the best practice -- the

13   correctional generally accepted National Institute

14   of Corrections, the current literature, all of that.

15       Q.  Thank you.  And you don't have any

16   first-hand knowledge as to whether the plaintiffs'

17   allegations in this case are true; right?

18       A.  No, I do not.

19       Q.  And you don't have any first-hand knowledge

20   as to whether the defendants' testimony in this case

21   is true; correct?

22       A.  No, I do not.

23       Q.  But you relied on those documents for

24   context; correct?

25       A.  That is correct.

1          Q.  The opinions that you reached in this case

2     about nationally accepted correctional practices and

3     standards are not dependent on a belief by you that

4     anything particular happened during the incident at

5     issue in this case; correct?

6          A.  That is correct.

7          Q.  And you have no opinion about what actually

8     occurred on March 31st, 2011?

9          A.  That is correct.

10         Q.  How much have you been paid to date for your

11    work on this case?

12         A.  Approximately $6100.

13         Q.  Okay.  And what did your work primarily

14    consist of?

15         A.  Is reviewing materials and writing an

16    opinion.

17         Q.  What was your hourly rate of pay?

18         A.  $190 an hour.

19         Q.  And is that a customary and reasonable rate

20    of pay for a corrections expert performing the kind

21    of work that you did in this case?

22         A.  It is.  And it's under what my normal

23    standard rate is.  Considerably.

24         Q.  In your field, do you need to physically

25    visit prisons, a prison, in order to give an opinion

 1    about correctional standards and practices that are

 2    nationally accepted?

 3         A.  No, I do not.

 4         Q.  And in your field, do you need to interview

 5    witnesses to give opinions about what is nationally

 6    accepted in your field?

 7         A.  No, I do not.

 8         Q.  Okay.  Changing subjects, let's talk about

 9    national correctional standards and practices that

10    relate to how somebody would plan and monitor a mass

11    strip search of 200 women.

12         Can you please explain to the jury what's the

13    difference between a planned operational mass strip

14    search and an emergency search?

15         A.  Well, in an emergency search, you have,

16    generally, situations that exist where there is a

17    significant security risk and a safety risk.

18    Generally, there has been some type of major

19    incident.  It could be involving only two, but there

20    could be a concern for weapons or other type

21    material that could pose a safety and security risk.

22    And that would be something that would create an

23    exigent or emergency circumstance.

24         Q.  So the rules are different in terms of

25    what's nationally accepted in a strip search when

1    there is an emergency or an exigent circumstance and

2    when there is not; is that right?

3        A.  That is correct.

4        Q.  Okay.  Now, are there nationally accepted

5    standards or practices that relate to what kind of

6    planning is required in your field before a mass

7    strip search of 200 women is implemented in a

8    non-emergency setting?

9        A.  There's not specific do X, Y, and Z before,

10   in terms of a published standard as it relates to

11   strip searches.  But what there is is there is a

12   large body of knowledge relative to how invasive

13   strip searches are.  And so what the generally

14   accepted --

15           MS. MCNAUGHT:  Objection, Your Honor, to

16   this.  If there are no accepted standards, then what

17   her testimony is is irrelevant.

18           MS. BROWN:  I believe she said there was no

19   accepted standard -- excuse me, standards.  But then

20   she's explaining there are accepted practices.

21       A.  Generally accepted correctional practices.

22           THE COURT:  I thought she said there were

23   no published standards.  Isn't that -- did I miss --

24   would you read that back, Madam Reporter.

25       (The requested material was read.)

           THE COURT:  Thank you.  All right, I think
that clarifies it.

      All right, she may testify to the -- to her
understanding of what the general ones are because
there are no published or specifically agreed upon
standards.

      Now, that's my understanding of what her
testimony is; is that right?

           MS. BROWN:  Thank you, Judge.  Yes.

           THE COURT:  Do you agree with that?

           MS. BROWN:  Yes, I do agree.  That there is
no published standards --

           THE COURT:  That's right.

           MS. BROWN:  -- but I believe she is gonna
opine on what are the understood practices.

           THE COURT:  Exactly.  Okay, that's what we
all understand.

      A.  Okay.  And there is -- there's the how you
conduct a search, a strip search, versus who
conducts a strip search.

      The Prison Rape Elimination Act clearly states
that there should be -- there will be no visual
observation, or you'll have no, for example, male
staff or staff of the opposite gender conducting a
strip search.  That's published.

1    But in terms of operationally how a strip

2 search is conducted, that is what is generally

3 accepted practice and how searches are conducted.

4    Q.  Thank you.

5    Now, can you tell the jury what are considered

6 to be the nationally accepted practices with regard

7 to planning and making a written plan for a mass

8 strip search of 200 women when there's no emergency?

9    A.  Well, a mass strip search when there is no

10 emergency is not a generally accepted correctional

11 practice.

12    Q.  Thank you.  And -- but if someone was going

13 to implement that, a mass strip search of 200 women

14 that they knew was gonna happen in advance, what

15 kind of written planning is considered to be a

16 generally accepted in your field?

17    A.  A mass strip search, a planned mass strip

18 search of 200 individuals would generally require

19 and it would be the accepted practice is to create a

20 written plan.  And a -- a written plan so that you

21 have a planned, organized, managed strip search

22 should such occur.

23    That's a significant action, and there are many

24 consideration to take into account.  And the written

25 plan provides clear direction to staff who is to do

1    what and when.  And if circumstances occur, what

2    staff are authorized to do or not.

3         Q.  Okay.  And can you tell the jury in more

4    detail what kind of information is considered to be

5    required in your field to be in that kind of a plan?

6         A.  In that kind of plan you would want to -- it

7    would include who was gonna conduct the search.

8    Which inmates are going to be searched.  What the

9    search is focused on.  The type of search, the

10   nature of the search.  Basically what you're

11   searching for.  The anticipated duration of the

12   search.  Who is gonna supervise the search.

13        And also such specifics as medical needs.  Is

14   medical personnel going to be available.  Also, if

15   you're searching female inmates, then the

16   accommodation or such things as personal hygiene

17   needs that are specific to women.

18        Q.  Okay.  And is it considered required in your

19   field to put in such a plan any specific information

20   about the -- about the procedures that will be used

21   during the mass strip search?

22        A.  Yes, it would be.  The type of force to be

23   used, for example.  And when I say that, in terms of

24   for example, handcuffing, that is a level of force.

25   And so that would be included in there.

         Also, who's going to be participating in the
search, conducting it.  You know, what security
personnel.  And what the scope of supervision of the
personnel would be.  Where the search is gonna be
conducted at.

         Q.  Okay.  What about transportation of
prisoners or staging of prisoners?  Are -- any of
those kinds of operational details expected --
accepted, excuse me, in your field, as being
required in such a plan?

         A.  Well, what you would generally have in your
plan is what is the area to be searched.  And where
is the population going to be at staged.  And then
what type of search will be conducted.  And by whom.
And if -- what type of force is authorized.  And
when I say force, again, it's just because of the
fact that handcuffing is a use of force.

         Q.  And would the fact that training academy
cadets are gonna be used during the mass strip
search factor into your decision -- into your
opinion of what's required to be in a written
operational plan?

         A.  Yes, it would.

         Q.  And why is that?

         A.  Because they are trainees.

1      Q.  Would the fact that a particular mass strip

2  search of 200 women is the first of its kind

3  recently at the institution factor into your opinion

4  of what's required to be in a written plan?

5      A.  Yes, it would be.  Because the facility

6  wouldn't have had -- a facility, any facility, if

7  they're doing anything of that large of nature for

8  the first time, it's gonna be really important.  And

9  if you're bringing trainees in also to be part of

10  that search operation, it's gonna be really

11  important that there is clear instruction as who was

12  authorized to do what in what circumstances during

13  what timeframe.

14      Q.  Thank you.

15      What risks are generally understood in your

16  field to be present when 200 women are

17  strip-searched without a written plan in a

18  non-emergency situation?

19      A.  Well, the -- the risks are multiple.  For

20  example, if you don't have a written plan, then

21  what -- then there's no really clear direction on

22  what type of --

23          MS. MCNAUGHT:  Your Honor, I object to

24  this.  This goes beyond the nationally accepted

25  policies, principles, standards, contingencies.

1          MS. BROWN:  I would disagree with that,

2     Your Honor, because I believe what she still

3     testifying to is what informs those generally

4     accepted standards and practices.  What -- in other

5     words, why they are there.  Why they are the way

6     they are.

7          THE COURT:  I'm going to overrule.

8          Now, we're at the point where there should have

9     been a written plan.  That was the last point.

10         MS. BROWN:  Yes, Your Honor.

11         THE COURT:  Let's explore that with Chief

12    Still.  Explore this now, I want this fleshed out.

13        Q.  (By Ms. Brown)  so what risks are generally

14    understood in your field to be present when a mass

15    strip search of 200 women takes place?  And we're

16    not talking about an emergency setting, but that

17    takes place without a written operational plan?

18        A.  Well, first of all, it's really important

19    that the privacy of the female inmates be respected

20    in terms of -- and the PREA standards does require

21    you would not want to have anyone in the area of the

22    search that could visually see the women in a state

23    of undress if they were not directly involved in the

24    search for one.

25         And two, you would not want to have male staff

be able to view the females while they were being strip-searched.

Three, the plan's important because you do want to have specifically what level of force is authorized and for what period of time. For example, if you were going to handcuff, then under what circumstances would it be? Just during a transportation period, or would they be expected to remain handcuffed and for what periods of time.

Again, you have inexperienced cadets that are actually participating in this. And if you have inexperienced cadets, then you really want to make sure that you have the clear parameters.

Also, a search plan is really important as it relates to medical conditions and ensuring that medical conditions, under any circumstance, whether it's a search or not, that adequate medical staff are on site or available, or medical needs are taking place. For example, if you have inmates that are on medication and a search takes place over a long period of time, how are those medications gonna be administered? When are they going to be and by whom?

Feeding, your plan would talk about feeding. You know, how long the search was gonna go on. Was

1     that going to be during a feeding period.  If so,

2     how were the inmates gonna be fed, on paper trays or

3     not.  Those type of specifics.

4         Q.  Okay.  Now, prison supervisors are very busy

5     people and they have a lot to do.  Would it be

6     considered acceptable in your field for a prison

7     supervisor conducting a non-emergency, mass strip

8     search to just kind of wing it on the fly and do it

9     that way?

10        A.  The answer is no.  And the reason being is I

11    will answer that based upon what generally has been

12    experienced in prisons.  When you don't have clear

13    direction to staff in something of that serious of a

14    nature of a large search, then that's when there are

15    great risks.  And that's when things tend to go

16    wrong, because there is not clear direction.

17        Q.  Okay.  Let's talk about supervision and

18    monitoring during a strip search according to

19    nationally accepted correctional standards and

20    practices.

21        Now, in your field, what information would a

22    written operational plan include about the chain of

23    command during a strip search?

24        A.  Who had responsibility for supervising and

25    providing oversight of the search operation.

1      Q.  And why is it considered required in your
2   field to have a chain of command established during
3   the mass strip search of 200 women?
4      A.  To ensure that staff are adhering to the
5   exact specific authorization of the warden for how
6   the search is to occur, when it's to occur.  And
7   ensure that the requirements of the search,
8   basically the parameters, that staff stay within
9   those parameters.
10     Q.  Okay.  And why is that important?
11     A.  Because if staff do not have clear direction
12  as to who is allowed to do what, that is when
13  unauthorized actions take place.
14     Q.  In addition to creating a written
15  operational search plan and establishing a chain of
16  command, how -- what else is considered generally
17  accepted in your field to monitor a strip search of
18  200 women?
19     A.  Is to have appropriate management oversight
20  of that type of an operation.  To -- again, to
21  ensure that the elements of the plan are being
22  complied with.
23     Q.  Now, you know, as we said, assistant
24  wardens, wardens, prison supervisors are busy
25  people.  Would it be considered acceptable in your

1    field for them to just rely on line staff to carry

2    out a mass strip search of 200 women?

3         A.  Well, line staff need to have adequate

4    supervision and oversight.  So I would say any mass

5    search of 200, that significant of nature, in -- and

6    that had not been conducted before, even if it had

7    been conducted before, requires that management

8    oversight.  It's a significant action.  And if it's

9    not handled correctly, there could be an incident

10   that happens as a result of staff not adhering to

11   what the plan is.

12        Q.  Okay.  Changing subjects, let's talk about

13   who is able to view strip searches of women

14   prisoners according to generally accepted standards

15   and practices in your field.

16        Now, what are the generally accepted standards

17   regarding who should be able to view women being

18   stripped in a non-emergency setting?

19        A.  Well, in any setting, PREA applies in terms

20   of women being strip-searched.  Even women being pat

21   searched.  PREA does not allow for or restricts

22   those type of searches to female-only personnel.

23        Q.  Can you tell jury what PREA is?

24        A.  PREA is the Prison Rape Elimination Act.

25   And it was -- it was basically promulgated in 2003.

And over a period of time, there were a number of
hearings, and regulations were created to prevent,
detect, investigate, intervene, and to eliminate
prison rape and sexual abuse in correctional
institutions.

Q. Does -- do the PREA standards reflect
nationally accepted correctional practices?

A. Yes, they do.

Q. Can you explain why that is?

A. Because -- well, the standards were created
with input. Basically, there was a commission that
was created, the National Price Rape Elimination Act
Commission. The commissioners were from a variety
of fields. The commissioners took testimony over a
period of time, over a period of years actually.
And then promulgated regulations.

And the process, they had written -- or they
had in-person testimony. They also took written
testimony from practitioner -- correctional
practitioners and others throughout the nation. And
based upon that, they promulgated the regulations.
And that's why it's considered a national standard.

Q. Now, as of March 2011, would it have
comported with generally accepted national
correctional standards and practices to conduct

1    strip searches of women in view of men?

2        A.  No, it would not have.

3        Q.  And why is male viewing of female strip

4    searches prohibited in your field according to

5    accepted standards and practices?

6        A.  Because basically, societal norms,

7    correctional norms are you do not have male staff

8    searching, whether it's pat searching or whether it

9    is strip-searching, view a women's body in a state

10   of undress.

11       Q.  And what is behind -- what's the reason for

12   why that is the nationally accepted practice?

13       A.  Privacy, for one.  Privacy, as well as the

14   trauma in and of itself it would create by virtue of

15   that.  And the standard, it also recognizes -- part

16   of the testimony that was given to the PREA

17   Commission was the fact of trauma.

18       You know, there's a large body of knowledge,

19   the gender-responsive strategies really began to

20   publish that in 2003.  So, you know, PREA also was

21   passed in 2003.  The laws though, the regulations,

22   were not in effect until much later.  And the

23   regulations, in fact, were published after 2011.  I

24   think it was actually in 2012.

25       But the body of knowledge and the generally

1  accepted practices that were testified to in the --

2  and that were adhered to, recognized that long

3  before that time.

4      Q.  Now, based on your knowledge of national

5  correctional standards and practices is it

6  considered proper for strip searches to take place

7  in view of people who are not participating in

8  conducting the search in a non-emergency setting?

9      A.  No, it is not.  You only have the

10 individuals involved, that are directly involved in

11 that search.

12     Q.  And according to nationally accepted

13 correctional standards and practices is it

14 considered proper in your field to strip search

15 women in groups of four to ten women at the same

16 time where they can view each other naked?

17     A.  Generally, the best practice is you do an

18 individual one-on-one.  Sometimes because of staff,

19 personnel, that you -- you do larger, you do the

20 groups four to six.  But generally accepted, you

21 want to have the privacy partition screening.  And

22 that doesn't have to be an actual physical

23 structure, it could be a privacy scene curtain, in

24 order to protect their privacy.  But there is no

25 written standard that mandates that.

1    Q.  Okay.  And you know, in terms of nationally

2  accepted correctional practices, you know, what are

3  the ways in which it's accepted to ensure privacy

4  when you're strip-searching women in groups?

5    A.  Well, you have the -- you clearly identify

6  where the strip searches are going to go on.  Who is

7  gonna conduct the strip search.  How it is to be

8  conducted.  And also, bar any non-involved personnel

9  from the area.  Also, make sure that there are no

10  windows or no -- you can't visually see into where

11  the strip search is going to be at.

12    And also ensuring, as you're conducting the

13  strip search, that you have ensured that you have

14  the supplies on hand for the women as they are being

15  searched out.  The hygienic supplies they would

16  need.

17    Q.  Okay.  Thank you.

18    In your work for this case, did you review the

19  Illinois Administrative Code provision that governs

20  strip searches of women in prison?

21    A.  Yes, I did.

22    Q.  Okay.  I'd like to show you Plaintiff's

23  Exhibit 33.

24        THE COURT:  Do you have a copy for me here?

25    Q.  Yes, Your Honor.  It is Plaintiff's

1    Exhibit 33, and we'll get you a copy.

2            THE COURT:  All right.

3        Q.  Could viewing this policy assist you in

4    giving testimony today?

5        A.  Yes, it would.

6        Q.  Your Honor, permission to publish?

7            THE COURT:  Well, I haven't even seen it

8    yet.  Why don't you bring it up here to me right now

9    and let me glance at it.

10           MS. BROWN:  Sure.

11           THE COURT:  I don't have a copy.  Now, do

12   you have a copy in front of you?

13           MS. BROWN:  Yes.

14           THE COURT:  Okay, fine, go right ahead.

15           MS. BROWN:  Thank you, permission to

16   publish this.

17           THE COURT:  Beg you pardon?

18           MS. BROWN:  Do I have permission to publish

19   this?

20           THE COURT:  Any objection?

21           MS. MCNAUGHT:  No objection.

22           THE COURT:  Fine.  You may publish.  Put it

23   right on the screen.

24           MS. MCNAUGHT:  Your Honor, actually, I

25   think the appropriate way to publish it is maybe to

1  ask that it be entered into evidence and then to
2  publish it.
3        THE COURT:  Well, I assume --
4        MS. MCNAUGHT:  And I have no objection to
5  it being entered into evidence.
6        THE COURT:  Excellent.  Then we will make
7  sure that all of the i's are dotted and t's crossed.
8  And it is hereby admitted into evidence with no
9  objection.
10      (Plaintiffs' Exhibit 33 admitted.)
11      MS. BROWN:  Thank you, Your Honor.  And
12  defense counsel --
13      THE COURT:  Very good.
14    You may publish.  Is it working?
15      THE CLERK:  It is, Judge.  It just needs to
16  be turned on.
17      THE COURT:  There we go.
18    Q.  (By Ms. Brown)  okay.  So is this -- does
19  this -- this section of the Illinois Administrative
20  Code that relates to searches for and disposition of
21  contraband?
22    A.  Yes.
23    Q.  And did you rely on this document in doing
24  your work on this case?
25    A.  Yes, I did.

1          Q.  Okay.  Looking at the third page.

2               THE COURT:  Page 3, did you say?

3          Q.  Yes, Your Honor.

4               THE COURT:  Mm-hmm.

5          Q.  Okay.  Do you see where it says (as read:)

6     Strip searches and visual searches of anal or

7     vaginal body cavities of committed persons shall be

8     conducted by persons of the same sex as the

9     committed person and in an area where the search

10    cannot be observed by persons not conducting the

11    search except in cases of an emergency?

12         A.  Yes, I did.

13         Q.  And you know, what -- looking at that, is

14    that policy consistent with generally accepted

15    national standards and practices?

16         A.  Yes, it is.

17         Q.  Is it consistent with that policy to strip

18    search women in view of men?  In a non-emergency

19    setting?

20         A.  No, it is not.

21         Q.  Is it consistent with that policy to strip

22    search women in view of people not conducting the

23    search in a non-emergency setting?

24         A.  No, it is not.

25         Q.  According to national correctional standards

1    and practices, would it be considered acceptable for

2    a prison administrator to leave it to line staff to

3    decide, you know, where and how to conduct a strip

4    search of 200 women as it relates to who will be

5    able to view them while they are naked?

6         A.  Can you repeat that question, please?

7         Q.  Sure.  In your professional experience, is

8    it considered acceptable according to, you know, the

9    national standards and practices in your field,

10   to -- for a prison administrator to leave it up to

11   line officers to decide where and how to strip

12   search 200 women?

13        A.  No, it is not.

14        Q.  And why is that?

15        A.  Because line Officers basically follow the

16   direction of -- and need appropriate supervision,

17   management and oversight.  And strip searches and

18   visual searches, the reason why Illinois' law and

19   generally accepted standards are very specific about

20   who and when and how they can be conducted, it's to

21   protect -- it recognizes that -- that

22   strip-searching is one of the most intrusive things

23   that can happen to an individual when it's in

24   prison; right.

25        And so it's really important when you're

conducting a mass strip search of 200 individuals

that there is clear direction to staff, there is

clear oversight, and that it's -- the search is

being monitored to ensure that staff are staying

within those parameters.

Q.  Okay.  Let's talk next about language used

during strip searches.  In your professional

experience, are there nationally accepted standards

and practices that relate to what kind of language

can be used at a facility?

A.  Yes, there are.

Q.  Can you tell the jury what those standards

and practices are?

A.  Well, PREA -- excuse me, PREA standards

would apply, as would American Correctional

Association Standards.  And where I think the

overarching standard in the American Correctional

Association Standards is for professional conduct.

Basically, for staff to have professional conduct.

In addition to that, PREA is very specific

about not using language that is derogatory, that is

sexual in nature.

So I think between the two of them, it --

clearly, there is an expectation.  And the national

standard--and every correctional agency will have

them--is the standard is to have correctional

standards to have -- to define what professional

conduct is within that correctional agency and the

national generally accepted practice.

And every one that I've ever read--which I've

read a lot over 30 years throughout the United

States--it talks about professional conduct

behavior, language.

Q.  Now, why is it generally understood in your

field that professional conduct and professional

language are required?

A.  One is because the -- the staffer -- or at a

facility, to ensure the safety and security -- to

ensure that safety and security is met, but also,

they're not there to punish the inmates within the

facility.  The law is the punishment.  And the staff

are there to maintain order and to ensure adherence

to, you know, whatever the state's rules are.

Subjecting an inmate to derogatory language,

foul language, verbally abusive language basically

can do several things.  One, especially for women,

it can act as a trauma trigger basically.  And it

can escalate the situation.  And you don't want to

do that.  It can create an incident.

And the other part of it is it's just part of

any code of conduct within a correctional agency is
the fair and respectful treatment of inmates.

Q. Okay. Now, you just used the word trauma
trigger. Can you just describe what that means to
the jury?

A. Sure. Women inmates, there is research,
there is National Institute of Corrections, there's
a large body of evidence where research that's taken
place really since 2003, before that, but even as of
2003, a significant amount of research by very
well-respected individuals that has identified that
approximately 59 to 90 percent--depending on what
study that you read--of women inmates have been
subjected to verbal, physical, and sexual abuse.
Various forms of that.

And so there are -- there are actions that can
act as a trauma trigger to re-traumatize,
immediately put that inmate back into that state of
whatever that trauma is, trigger that trauma, and
then have an associated reaction by the inmate. And
it could be emotional, the trauma trigger could
result in emotional distress, it could result in the
inmate acting out, a variety of behaviors.

Q. Okay. And I understand that you have no
opinions about the actual -- you know, any trauma

1    that has to do with this case, but --

2        A.  No.

3        Q.  -- just as a general matter, across the

4    nation, what does the research say -- you know, what

5    is the prevalence of trauma in the female

6    correctional population?

7            MS. MCNAUGHT:  Objection, Your Honor.  This

8    goes beyond the policies and standards.

9            THE COURT:  Yes.  I'll sustain that.

10       Q.  Very well.

11           THE COURT:  Let's just stick to the main

12   line.

13       Q.  Yes, Judge.

14       Now, Chief Still, some people might say that

15   correctional officers have tough jobs and prison is

16   a tough place.  Is it accepted in your field to use

17   unprofessional language for that reason?

18       A.  No, it is not.

19       Q.  Would it be considered acceptable in your

20   field to use unprofessional language at the start of

21   a strip search to shock prisoners into compliance?

22       A.  No, it would not.

23       Q.  And why is that?

24       A.  Because using derogatory language has the

25   potential to escalate a situation.  You want a calm,

1 controlled, planned course of action, and -- and

2 using obscenities or derogatory language is not

3 going to create that type of environment.

4     Q.  Now, during a mass strip search of 200

5 women, you know, are there national standards and

6 practices that relate to supervision of line staff

7 with regard to the professionalism of their conduct?

8     A.  Well, related to -- there's not a specific

9 standard that says, you know, when strip-searching

10 200 individuals, do X, Y, and Z.  But there are

11 standards regarding providing adequate, appropriate,

12 supervision.

13     Q.  And what are those accepted standards and

14 practices?

15     A.  Well, it's too ensure that you have adequate

16 number of staff, supervisors on hand to supervise

17 the actual staff, and generally accepted

18 standards -- actually, generally accepted practices,

19 you would want to have, in a large-scale search, you

20 would want to make sure that you absolutely had an

21 adequate number of supervisors or management

22 oversight, especially in any circumstance when you

23 bring cadets in to participate in a large-scale

24 effort such as, well 200 involved in a search of 200

25 inmates, because of the fact that they're in

1    training.  You know, and so they need to be

2    adequately supervised and oversight and -- by the

3    facility.

4        If you're bringing -- in any circumstance where

5    you would bring cadets from outside, or trainees,

6    into any major operation, is that you would want to

7    make sure that you had adequate institutional

8    supervisors, managers on hand.  Because basically,

9    they're coming into your prison and they're doing --

10   you know, involved in whatever the mass search or

11   the mass exercise is.  And you want to make sure

12   that your own supervisor managerial staff--whatever

13   the appropriate level--are on hand because they

14   don't know your institution.

15       And in the event that something has never

16   occurred before, you want to make sure that it's

17   well-coordinated and supervised.

18       Q.  Thank you.

19       And is unprofessional language, you know, words

20   like, excuse me, the B-word, the F-word, you know,

21   calling prisoners animals, saying that prisoners

22   stink or they're disgusting, you know, saying that

23   this is what crack heads and prostitutes smell like;

24   is that the kind of language that is generally

25   accepted in your field that if a supervisor would

1    hear it, a supervisor would address it?

2        A.  Absolutely a supervise would be expected to

3    address it.  And in terms of the American

4    Correctional Associate Standards of Conduct, it

5    would violate professional standards of conduct.

6        Q.  Now, let's turn to national standards and

7    practices for strip-searching women who are

8    menstruating.  What kind of advanced planning is --

9    is required in your field, according to generally

10   accepted standards and practices, for a supervisor

11   to undertake when implementing a mass strip search

12   of 200 women?

13       A.  Well, the mass strip search plan which is

14   developed by the management--overseen by supervisor

15   or manager--should include anticipating that women

16   who are strip-searched, a number of them, some

17   percentage, are going to be menstruating.

18       So if they are requiring -- if the strip

19   requires, as does a strip search, the removal of

20   pads or tampons, then the plan must include having

21   adequate sanitary supplies on hand to address what

22   the females' hygiene needs are when they are

23   directed to remove the pads or tampons.

24       Q.  Okay.  And are there accepted standards and

25   practices that relate to where a prisoner who is

menstruating should be strip-searched?

     A.  There is -- there is no standard.  In terms
of privacy and in line with the expectation of only
viewing those that are involved with it, a woman who
was menstruating and required to remove a pad or
tampon, a generally accepted practice--not a
standard--is that you would do that in private so
that they're not having to remove that.

     And it's two-fold.  It's not only for the
privacy aspect of it, but they're going to have
bodily fluids that -- basically, blood that they're
gonna be exposed to, as well as others could
potentially be exposed to.  So you want to make sure
that they -- that the bodily fluid is not
transferred or other inmates or staff are exposed to
it.

     Q.  And what are the generally accepted
practices to ensure sanitation during strip searches
of menstruating women other than what you just
described; you know, strip-searching them in a
separate location?

     A.  There are a couple of ways that you can
sanitize in any type of a search.  Is that when you
have a large scale number being conducted, is that
you could have brown butcher paper.  You could have

1    the women stand on the butcher paper right --

2    strip-searched out.  And then the woman is basically

3    clothed and is moved off of the paper, that's thrown

4    away.  That's one way.

5        Another way is to conduct the searches, and

6    then after each search, then have a janitorial crew,

7    somebody responsible for cleaning the floor or

8    cleaning up any bodily fluids that had been

9    basically -- that had went to the floor or any other

10   place within the strip search area.

11       So basically, what you're doing is you're

12   constantly cleaning up bodily fluid so that you

13   don't have women in bare feet subjected to, and in a

14   state of undress, bodily fluids anywhere throughout

15   their body.

16       Q.  Now, Chief Still, some people might say that

17   prisons are not supposed to be luxurious places.  Is

18   accommodating menstruating prisoners, you know,

19   considered to be a luxury in prisons?

20       A.  No.  It's really considered common decency.

21       Q.  Some people also may think that, you know, a

22   male supervisor of a mass strip search of 200 women

23   shouldn't have to think about periods, and that it's

24   okay for a male supervisor to just leave it to

25   female line staff to deal with this kind of a

1  situation.  Would that kind of thinking be

2  considered accepted in your field?

3       A.  Well, whoever is responsible for crafting

4  the strip search plan is doing so on behalf of the

5  warden.  It's a warden's delegated responsibility;

6  generally, anything that goes on within a facility.

7  And the gender of that individual that has been

8  delegated the responsibility for the overall search

9  of a mass scale search is responsible for all

10  aspects of -- anticipating all aspects of the plan.

11       Q.  Let's turn to the topic of handcuffing and

12  restraints of women during a mass strip search.  Can

13  you explain to the jury what restraints are?

14       A.  Restraints, there can be a variety of

15  restraints.  Handcuff is one form of restraint.

16  There can be other more physically intrusive

17  restraints, but typically, handcuffs are the most

18  commonly used restraints.  There can be leg irons,

19  there can be belly chains, but those are also other

20  forms of restraints.

21       Q.  Okay.  And what are the generally accepted

22  correctional practices and standards that relate to

23  when you should handcuff prisoners?  As a generally

24  matter?

25       A.  Well, any use of force, any use of

1      restraint, you want to use them for the least amount

2      of time and you want to use the most least

3      restrictive method.

4          Q.  Would it violate nationally accepted

5      correctional practices and standards to handcuff

6      women for periods of several hours in a

7      non-emergency setting during a mass strip search?

8          A.  That is not a generally accepted

9      correctional standard to handcuff women for long

10     periods of time, for hours -- for a period of hours

11     in a non-emergent situation.

12         Q.  What factors would a reasonable prison

13     administrator in your field consider before using

14     handcuffs for an extended period of time during a

15     mass strip search?

16             MS. MCNAUGHT:  Objection, Your Honor, as to

17     what a reasonable person would do.  That's not

18     what --

19         Q.  I can rephrase.

20             THE COURT:  Yeah, please.  Thank you.

21         Q.  What factors are considered accepted in your

22     field for a prison administrator to consider before

23     using handcuffs for an extended period of time

24     during a strip search?

25         A.  One of the most basic considerations is the

1    inmate population being compliant.  And if the -- if

2    the inmate population is being compliant, then there

3    is not a need to use any type of restraint for a

4    long period of time.

5         You usually use restraints -- the generally

6    accepted correctional practices is when you have,

7    one, a concern, a safety or security concern.  And

8    that's generally because of the inmate is being

9    noncompliant or really the potential to be

10   noncompliant, and there's a basis for anticipating

11   that to happen.

12        Q.  Now, is it considered generally accepted in

13   your field to handcuff women for several hours as a

14   way of preventing them from getting rid of

15   contraband prior to a strip search?

16        A.  No.

17        Q.  And what alternatives are available to make

18   sure that women are not discarding contraband prior

19   to a mass strip search other than restraining them

20   for several hours?

21        A.  Well, the period of time that you would

22   restrain basically ties along with how your search

23   plan is constructed in terms of how many units are

24   you gonna do at a time, how many staff do you have

25   on -- have available to provided oversight and

1    direct supervision.  And there should be enough

2    staff to have direct supervision of the population

3    at any given time during any type of a mass search.

4         And if you have direct observation, and the

5    inmate population are being compliant, they don't

6    really have the opportunity to get rid of any type

7    of a contraband because you're directly -- you're

8    directly observing them, you're seeing exactly what

9    they're doing.  And if you would go to -- and you

10   can instruct them, which is totally appropriate,

11   that their hands are to remain at a side, they're to

12   be looking in a certain direction, all facing in a

13   direction, what you're gonna see is you're gonna see

14   any type of furtive movement.  You know, where any

15   movement is gonna -- you're gonna visually see that.

16   And then the staff would then, at that time, pull

17   that person out of the line and then could see what

18   was going on.

19        And in terms of for what duration that you

20   would have anybody handcuffed, it would, again,

21   depend upon the dynamics of the population.  Were

22   they being compliant or not?  Were they -- how are

23   you staging them?  And do you do one unit at a time

24   or not?  All of that comes into play with how long

25   you have someone in any kind of state of restraint

1  or even frozen movement.

2       Q.  Is it considered accepted in your field to

3  handcuff women for several hours during a mass strip

4  search solely to provide a training opportunity for

5  cadets?

6       A.  No.

7       Q.  Why is that?

8       A.  Because the handcuffing women, or any

9  inmate, for any long period of time, doesn't provide

10  any training.  I mean that -- the actual initial

11  handcuff, yes, that provides a training.  But

12  correctional academies teach handcuffing in their

13  actual training classes, so --

14       But in terms of as part of a training exercise,

15  the handcuffing, that would be one activity.  But a

16  long duration -- you know, to remain handcuffed for

17  any long period of time would really serve no

18  purpose.  Training purpose.

19       Q.  Thank you.

20       Let's talk next about, you know, practices with

21  regard to standing for extended periods of time in a

22  non-emergency setting.  Is it considered acceptable

23  is your field, according to nationally accepted

24  correctional standards and practices, to require

25  handcuffed women to stand for a period of hours

1    during a non-emergency mass strip search?

2        A.  No, it is not considered standard.

3        Q.  And why is that?

4        A.  From -- well, if you look at health

5    standards and you consider the health aspect of

6    having anyone stand in any circumstance for a long

7    period of time handcuffed, and you've got up to 200

8    individuals of unknown -- with unknown physical

9    impairments, medical conditions, that type of a

10   thing is that there's not a need to make them stand

11   for that period of time, especially in a handcuffed

12   situation.

13       And accounting for any kind of medical, if

14   anyone did have a medical concern, being in that

15   state could certainly exacerbate whatever that

16   medical issue was.

17       You could accomplish the same thing by

18   having -- especially -- depending upon also on how

19   you configure the search.  You know, you may have

20   the group that's pre-search and you may have the

21   group that's all post-search.  And if you have them

22   all contained in a given area, and you have them all

23   standing, well, if you've already searched them,

24   then you've already conducted that, you could stage

25   and should stage them in another area.  And it could

1    be in the same area, just say on the opposite side

2    of whatever the area is, and allow them to sit down.

3    They've already been searched for contraband.

4         Q.  What health needs and bodily functions,

5    other than what you've described, may be impacted by

6    a procedure that requires inmates to stand for a

7    period of several hours that are handcuffed?

8         A.  Well, one is the ability for women to use

9    the restroom.  If they're standing for hours

10   handcuffed, then how are they going to use the

11   restroom?  That's one thing.

12        Also, if any inmate is standing for long

13   periods of hours, how are they gonna be fed?  That

14   would be another concern.

15        Also, do any have medical concerns, such as

16   diabetes or any other thing where they would have to

17   have a certain amount of food intake given in

18   incremental periods of time.

19        All of those things could come into play and be

20   affected by having women just stand or any inmate

21   stand for hours on end handcuffed.

22        Q.  Would it be considered acceptable in your

23   field to ignore the need for women to use the

24   bathroom during a non-emergency mass strip search?

25        A.  No.  Not under any circumstance.

1        Q.  And why is that?

2        A.  Because it's a bodily -- it's a bodily

3   function that women have to use -- women or men have

4   to use the restroom.  And from a medical standpoint,

5   if they are required to basically not be able to use

6   the restroom, it can create other medical conditions

7   such as the beginning of a bladder infection or --

8   or a woman having -- a woman having an accident

9   because they can't hold it any longer.

10       Q.  And why is that an outcome that

11  professionals in your field aim to avoid?

12       A.  Well, because one, part of the

13  responsibility of any correctional administrator is

14  the health, safety, and wellbeing of any inmate

15  under their supervision.

16       Q.  Okay.  As our final topic, let's discuss

17  what is generally required in your field to warrant

18  a mass strip search of 200 women.

19       You know, according to nationally accepted

20  standards and practices in corrections is it

21  considered acceptable in your field to strip search

22  200 women to send a message that misbehavior will

23  not be tolerated?

24       A.  No.  Strip searches, mass strip searches,

25  strip searches of any kind are not to be used to be

1  punitive in nature.

2      Q.  Okay.  And would it be considered acceptable

3  to your field to strip search 200 women to send the

4  message that there will be repercussions for

5  misbehavior?

6      A.  No, that would be considered retaliation.

7  And under the American Correctional Standards.  And

8  retaliation is not -- is not considered -- it would

9  violate the standard.

10      Q.  Would it be considered acceptable in your

11  field to strip search 200 women to send a message

12  that, you know, the prison staff is in control of

13  the inmate population?

14      A.  No.  I guess I would never use a strip

15  search.  Maybe let me talk about why I would in the

16  circumstance, in a generally accepted circumstance,

17  why you use -- why you conduct strip searches is you

18  are concerned that there is dangerous or other type

19  of contraband that can't be basically found any

20  other way than basically conducting a strip search.

21  Because there are other levels of searches that you

22  can do.  You can --

23      Q.  What are the other levels of strip searches

24  that you can do?

25      A.  You can do a pat search.  And depending upon

1    what the nature of the search is, emergency or not,

2    I think I said earlier, exigent circumstances.

3    Basically, you would then strip search 200 in

4    exigent circumstances.  You're gonna take care of

5    whatever that emergency situation is because there's

6    a risk to -- to life, safety.  Generally, that's a

7    circumstance that's involved when -- to create

8    exigent circumstances.

9         But when you're searching for contraband or

10   when you're -- that's a whole different

11   consideration.  You know, as part of your searching

12   and your plan and consideration in any generally

13   accepted system and practice is what are you

14   searching for?  What kind of contraband?  And how

15   did the contraband -- you know, what's the situation

16   that lead to the contraband.  Because that's gonna

17   determine the parameters of how you conduct the

18   search, where you conduct the search, which units

19   you conduct the search in, and how many inmates are

20   involved in the actual search.

21        Q.  What other kinds of examples of exigent

22   circumstances, dangerous contraband that's

23   considered accepted in your field as requiring a

24   strip search of 200 women?

25        A.  Well, if -- if basically, you had

1    intelligence that there were weapons on the yard, or

2    that there were weapons, that basically, you would

3    conduct -- you could conduct a strip search.

4         You would certainly conduct a search of all the

5    cells in that circumstance too.  And then your

6    intelligence -- general intelligence will direct you

7    to given areas, given housing units, given yards.

8    Not in all cases.  Sometimes you have to do a mass

9    strip search of the institution.  But then part of

10   that, you're looking at, well, how did that

11   circumstance come to be; right?  If you're having to

12   do this mass search for contraband, how did large

13   caches of contraband come about.  Right?  And where

14   did the weapons stock come from if you're looking to

15   search for weapons.

16        Q.  Would a suspected accumulation of nuisance

17   contraband be considered accepted in your field as a

18   justification for a mass strip search?

19             MS. MCNAUGHT:  Objection; lack of

20   foundation.

21             THE COURT:  Yeah, I think so.

22        While we're on the topic, Ms. Brown, of this

23   contraband.  We've got weapons talked about.  Shall

24   we go forward while we're on the subject of

25   contraband and weapons, what else is included in

1  that area of contrabands only found by strip search.

2  That's the topic that we're talking about.

3      Q.  Yes, Your Honor.

4          THE COURT:  All right.  She's testified to

5  weapons.  Now, what else, what other contraband

6  would be falling in that category.

7      Q.  Yes.  So what other kinds of -- besides a

8  weapon, what other kinds of contraband are

9  considered serious enough, according to nationally

10 accepted correctional practices in your field, that

11 would justify a strip search?  A mass strip search?

12     A.  If keys had been lost.

13         THE COURT:  What's that?

14     A.  If keys, keys to the facility had -- keys

15 had been lost.  You might conduct -- you certainly

16 would conduct a mass search.  You may do a strip

17 search, depending upon the circumstance of

18 information if you're looking for keys.

19         Other things such as that may not be considered

20 a weapon, but may pose a security risk, such as a

21 file or tools.  If tools were missing out of plant

22 operations.  Those type of -- you know, that isn't a

23 weapon, but it certainly is a threat to the safety

24 and security of the institution.  Those are some

25 other examples.

1    Q.  Now, can you tell the jury what nuisance

2  contraband is?

3    A.  Nuisance contraband is typically thought of

4  in a correctional environment as you have too much

5  issue of something.  Where you have too many

6  clothes, you have more clothes than what the

7  authorized amount is.  You have more bedding, more

8  sheets, more towels.  You may even have more

9  commissary than what's -- than what's allowed.

10    One of the other things also adding to that

11  contraband that you would do a mass search for would

12  be a cell phone.  A cell phone showing up within the

13  institution.

14    But any -- nuisance contraband would be

15  contraband that would be built up that basically

16  isn't considered to be necessarily a safety or

17  security risk, but basically, the inmates are not

18  supposed to have them.  They're supposed to have an

19  allotted amount for very good reasons.  And you're

20  searching to take away the excesses of what that

21  contraband is.

22    THE COURT:  Now, when up say contraband,

23  what are you referring back to?

24    A.  Contraband can be any item that is not

25  authorized to be in an inmate's possession.

THE COURT: Such as the clothes and the
bedding and the towels and the cell phone and so
forth?

A. Correct. And it could also be -- contraband
could be more food than what they were allowed --

And generally, like not allowing fruits or
vegetables like oranges or stuff, right, to be
brought from food services, but yet finding oranges,
so to speak, in a cell. And that's considered to be
contraband, one, because the rules state that you
can't have it, but two, because inmates make pruno
of it.

And so that's why it's contraband. One is
because it's not allowed to be in their cells.
Also, contraband could be one inmate having the
property of another inmate, such as a radio or
something that's not on their property list, but
it's in their cell. That could be considered
contraband.

Q. And in your field, what are the -- what is
accepted knowledge about -- what are the
contributing factors that lead to an accumulation of
nuisance contraband within a prison?

A. The factors that generally lead to that is
the -- it's determined by the frequency of cell

1    searches.  Because if cell searches are conducted on

2    a regular and frequent -- and frequent basis, then

3    the contraband cannot build up.  It's when the cell

4    searches are not occurring is when the contraband

5    builds up.

6        I mean contraband can build up in a day, but

7    large caches of contraband are built up over a

8    period of time.

9        Q.  Okay.  And how -- what are the accepted ways

10   in your field of addressing a problem of an

11   accumulation of nuisance contraband within a unit?

12       A.  Within the unit itself, nuisance contraband,

13   generally what you do is if a large cache had been

14   built up, you could conduct a unit-wide or you could

15   also conduct a prison-wide cell search.

16       And basically where you're searching for

17   contraband, anything that's not authorized on their

18   property list or is over what the stated allowed

19   amount is per the institution's rules.

20       Q.  Thank you.

21       So would a suspected accumulation of nuisance

22   contraband be considered, in your field according to

23   nationally accepted correctional practices and

24   standards, an acceptable reason to strip search 200

25   women?

1        A.  Based upon what we know about trauma, trauma

2   trigger, looking for nuisance contraband would not

3   be a generally accepted practice that you would

4   strip search out.  There generally would be

5   something more serious that you were searching for.

6        Q.  And where is nuisance contraband known in

7   your field to be typically maintained?

8        A.  Well, typically where you find your caches

9   of nuisance contraband is within the cells

10  themselves.  That's where their property, the inmate

11  property is at.  You know, within the cells is

12  typically where you have the nuisance contraband

13  build up.  That's not the only location that you can

14  find it, but that's the typical location.

15       Q.  Okay.  And what if it's concealed on a

16  person's body?  What is considered the acceptable

17  way to do a search to identify nuisance contraband?

18       A.  Well, you could -- you could do a search a

19  couple of different ways.  You could do a pat

20  search; and staff should be doing pat searches on a

21  regular basis.  You know, patting them down.

22       And when the inmates also are not expected to

23  be patted down.  So it's not like you pat them down

24  at the same time every day, you know, for the same

25  reason.  You may do that, but also, you're going to

1    do pat-downs infrequently just so the inmates won't

2    know when to expect that.  And that's another way to

3    detect nuisance contraband.

4         Q.  Okay.  Let's talk about expired medications

5    for a minute.  What would -- you know, what are the

6    contributing factors that would lead to an

7    accumulation of expired medications on prisoners?

8         A.  Well, there are a variety of factors that

9    could account for that.  Lack of medication control

10   and oversight.  How much medication is being

11   dispensed to the inmates.  How much and how it's

12   being dispensed in terms of is it direct observation

13   meds.  Are they being directly observed.

14        Some medications are generally accepted, well,

15   health standards are that they are directly

16   observed.  Others are, no, basically where they have

17   take away pills or medical supplies.

18        And so in terms of monitoring that, staff also

19   should be monitoring during -- during any cell

20   searches, looking for excess expired or medications

21   that don't belong to a given inmate.  That's part of

22   the ongoing cell searches that should be happening.

23        They certainly could be doing pat searches.

24   And depending upon the intelligence that's received,

25   you know, is there wide-spread caches, large-scale

1    medication.  And that could be a contributing factor

2    to why you would conduct a strip search.  But it

3    goes back to the intelligence of do you have that?

4    You know, you do have specific intelligence that

5    tells you that you have that widespread problem.

6    And is it widespread within one unit or is it

7    widespread within multiple units.  You know, why do

8    you have that?

9         Again, going back to strip-searching is the

10    most invasive type of search in connection also with

11    body cavity searches.  And that's why the laws are

12    written such as they are.  It's to recognize not

13    only laws and standards that a strip search is very

14    invasive.  And in some circumstances, you might

15    conduct a strip search looking for expired

16    medication, but it goes back to what kind of

17    intelligence do you have.

18         And if these regular searches were going on,

19    then that -- and the medications were appropriately

20    administered and maintained and controlled, then

21    you've also got another issue if you've got a

22    widespread issue with expired medications.

23         Q.  Now, you mentioned in your testimony that

24    there's a difference between what are called

25    generally observation medications and takeaway

medications.  Can you explain that to the jury?

    A.  Yeah.  Some medications, because of the
nature of them, they are a direct observation
medications.  And other medication, it's where
there's -- there's a prescribed amount that the
inmate has -- can have in their possession.

    Q.  Can you give us some examples of what are
general observation medications?

    A.  Any type of medication that part of the
prescription by the -- whoever the health care
professional is, is to be directly observed.  And it
could be something that has narcotics in it that you
would want to have controlled and you would want to
have directly observed.  So again, the inmates
couldn't not take the medication or not take the
pills right, and then do something else with it.
That's one.

    The other is to ensure that medications that
the inmates are taking because there could be
serious ramifications to their health if they don't,
such as seizure medications type of thing.  And
there are other general kind of medications that
inmate can have and take with them that don't pose a
risk to their health or safety if they don't take
them.  And also, they have no value in the prison

1    for any other purposes.

2         Q.  All right.  Are you talking about, you know,

3    being abused?

4         A.  Yes.

5         Q.  When you say value?

6         A.  Yes, I am.

7         Q.  Okay.  Now, you testified earlier that, you

8    know, if a prison administrator gets intelligence

9    about a specific weapon or keys or a cell phone

10   being missing, that would be considered an accepted

11   justification for a mass strip search; is that

12   right?

13        A.  Yes, I did.

14        Q.  What if there was an uptick in verbal

15   confrontations, verbal fights on the unit?  Would

16   that be considered an acceptable reason to do a mass

17   strip search?

18        A.  No, because -- as long as there was no

19   weapons involved, there would be no direct link or

20   correlation between doing a strip search and

21   arguments that were happening.

22        Q.  And why is that?  What's the purpose of

23   doing a strip search?

24        A.  A strip search is you're specifically

25   looking for some type of contraband.  And when

1    you're in verbal disagreements, there is no

2    contraband involved in that circumstance.

3          Now, if that -- if those incidents, those

4    disagreements had included weapons, that's a

5    different story.  Then, of course, you would be

6    looking for weapons.

7          Q.  Okay.  And if there was an uptick in fights

8    on a unit, physical fights that don't rise to the

9    level of assaults, but no intelligence about any

10   weapons, would the uptick in fighting be considered

11   in your field an acceptable justification for a mass

12   strip search?

13         A.  Not if there hadn't been any weapons

14   involved.  Generally accepted practices, what you

15   would do is you begin to take away -- you would

16   begin to take away privileges.  If, in fact, there

17   was large scale disagreements, and I don't mean a

18   one-on-one.  I mean multiple disagreements with

19   multiple inmates involved within a unit.  A

20   generally accepted practice is you begin to take

21   away privileges until you get the behavior that is

22   conforming to whatever the policy.

23         And take away privileges could be such things

24   as taking away TV time, taking away some of the time

25   that they basically are allowed to be in the -- in

1  the outer, the open room.  This is a dorm, so you

2  would maybe have more time where they were confined

3  to the bed.  Not segregated, but basically where

4  they had less freedom of movement time.

5      Q.  In addition to taking away privileges, what

6  are other accepted actions to take in your field to

7  address an increase in verbal fights or fights?

8      A.  Well, absolutely there would be generally

9  accepted practice and standards would be issuing

10  disciplinaries to the individuals that were involved

11  specifically.  And then depending upon what the

12  disciplinary hearing found, is then a level --

13  assessing a level of penalty to those that were

14  involved in the specific disagreements.

15      Q.  And, Chief Still, would training cadets be

16  considered a generally accepted reason in your field

17  to conduct a mass strip search of 200 women?

18      A.  No, it would not be.

19      Q.  And why is that?

20      A.  Because of the trauma -- because of the

21  trauma histories that women have had.  To use the

22  most -- one of the most invasive type of strip --

23  well, type of searches to train cadets, when they've

24  had no experience on that, you basically risk and it

25  will re-traumatize because of the abuse.  And so

that's why it wouldn't be a generally accepted practice within my correctional -- within the correctional profession to strip search mass numbers of women basically for training purposes.

So basically, what that would say is if it was a generally accepted practice, that it's okay for training purposes to traumatize female inmates.  And that's not okay under any circumstances.

Q.  No further questions.  Thank you.

MS. THOMPSON:  Just one second, Your Honor.

Q.  Oh, maybe.

Oh, were all the standards and practices that you testified here today in existence in March of 2011?

A.  Well, the PREA regulations were not in force and in effect until, I think, 2012.  The draft standards were out there, the knowledge was out there in terms of like the use of derogatory, demeaning, you know, foul language, that type of thing.  That was a generally accepted standard through the ACA, is that professional conduct and you're not violating that.

The having male staff observe, you know, strip searches, that's been a long-standing practice. Correctional systems have changed their rules and

regulations 2005, and that was cross-gender pat

searches, not strip searches.  I don't know when

this Illinois code went into -- you know, was

promulgated into law, but codes throughout this

country and various states mandated basically

same-gender strip searches for a period of years,

probably well over -- well before the 2012, and most

likely around the 2003, 4, 5 timeframe.

PREA actually, in the Prison Rape Elimination

Act and the whole body, that was published

originally in 2003.  The law.  And what the law

required is that standards were promulgated, but the

law was in effect in 2003.  However, compliance to

the full standards, the standards weren't even

published until 2012.  But the essence of what was

included in the standards in terms of, you know, not

harassing, you know, not verbally harassing,

physically harassing, certainly not sexual abuse.

Prior to that time, for example, is PREA, of

course, no staff or other inmate can have sex with

an inmate.  Correct?  That was against the law prior

to PREA being promulgated.  If that makes sense.

Q.  So -- so is it your testimony that PREA

was -- is reflective of what were already known to

be generally accepted standards and practices?

1     A.  Generally, yes.  PREA did come up with some

2  more very specific requirements that hadn't been set

3  before that time.  For example, the requirement to

4  review your staffing annually basically.  And to

5  review the placement of cameras; you know, part of a

6  detention and prevention.  You know, those things

7  were not mandated in any standard and were not

8  considered a generally accepted practice prior to

9  that time.  But there were other components and

10  elements of PREA that were.

11     Q.  Okay.  And aside from those that you just

12  discussed, were all of the correctional standards

13  and practices -- excuse me, all of the correctional

14  practices that you testified about here today

15  well-known to be in existence in March 2011?

16       MS. MCNAUGHT:  Objection, Your Honor.

17  That's been asked and answered, and she gave a very

18  narrative answer for her last two answers that

19  responded to that.

20       THE COURT:  I kind of think I'll sustain

21  that objection.  I think technically that is

22  correct.

23       MS. BROWN:  Okay.  Thank you.

24    No further questions.

25       THE COURT:  Fine.  Thank you, Ms. Brown.

1    All right.  Well, rather than to get into

2    cross, it is just a matter of a couple of minutes

3    until twelve.  I think we'll take our luncheon

4    recess at this time, ladies and gentlemen.

5        So please recall the admonition of the Court

6    and don't discuss the case at all.  We'll see you,

7    and please go right ahead.

8        (The jury left the courtroom.)

9            THE COURT:  All right.  The jury has left

10   the courtroom.  Ms. Brown, a copy of Plaintiff's

11   Exhibit 33, which is also Defendant's Exhibit G.

12           MS. BROWN:  Thank you, Your Honor.

13           THE COURT:  And, Chief, if you would not

14   mind, please do not discuss the case with any of

15   counsel during the break in the lunch.

16           THE WITNESS:  Yes, Your Honor.

17           THE COURT:  Because this is simply a break

18   before taking the cross-examination.  Okay?

19           THE WITNESS:  Yes, Your Honor.

20           THE COURT:  Very good.  Thank you.  Enjoy

21   your lunch, everyone.  Back at 1:30.

22       (A lunch recess was taken.)

23       (The jury entered the courtroom.)

24           THE COURT:  Thank you, everyone.  Please

25   have a seat.  And we're all back in place after

1    luncheon recess and ready for cross.

2            MS. MCNAUGHT:  Thank you, Your Honor.

3            THE COURT:  You're quite welcome,

4    Ms. McNaught.

5                    CROSS EXAMINATION

6    BY MS. MCNAUGHT:

7        Q.  Good afternoon, Ms. Still.

8        A.  Good afternoon.

9        Q.  Have you been paid for all of your testimony

10   to date?

11       A.  Yes, I have.

12       Q.  You're not an chief anymore, are you?

13       A.  Yes, I am.

14       Q.  Oh, you are.  You're still in the probation

15   department?

16       A.  I'm a chief probation officer for Alameda

17   County.

18       Q.  You've been in a supervisory capacity

19   before?

20       A.  For about 20 years.

21       Q.  And you've been a supervisor in a

22   paramilitary organization in the past; correct?

23       A.  That is correct.

24       Q.  You've never been a warden in a female

25   facility though, have you?

1    A.  I have never been a Warden inside a female

2    facility.

3    Q.  Have you ever worked security in a female

4    facility?

5    A.  Yes.  I have worked various operations

6    inside a female facility.

7    Q.  Have you ever been a correctional officer in

8    a female facility?

9    A.  I have never been a correctional officer

10   period.

11   Q.  Do you have any experience in a dorm setting

12   prison as opposed to cells?

13   A.  Yes, I do.

14   Q.  Okay.  And in that dorm setting, were

15   approximately 20 inmates or more with -- confined in

16   that one room?

17   A.  300.

18   Q.  Okay.  Now, in a prison facility, the warden

19   needs to be able to trust her subordinates, doesn't

20   she?

21   A.  That is correct.

22   Q.  And an assistant warden also needs to be

23   able to trust his subordinates to do their jobs;

24   correct?

25   A.  That is correct.

1           Q.  And that's what a paramilitary structure is;

2     correct?

3           A.  Trust and verify.

4           Q.  And that helps them do their jobs; correct?

5           A.  That is correct.

6           Q.  And it's important to trust your supervisors

7     so that if your institution requires that you're

8     attention be drawn to something else, you can go

9     ahead and do that something else; correct?

10          A.  It depends upon the context.

11          Q.  But generally, you would agree with me on

12    that, wouldn't you?

13          A.  Generally, trust and having -- that's part

14    of it I would say, absolutely.

15          Q.  Because you can't be everywhere at the same

16    time, can you?

17          A.  That is correct.

18          Q.  Now, control in a -- control of contraband

19    in a prison setting is of major concern, isn't it?

20          A.  Controlling contraband, yes, is a basic

21    tenant of correctional practice.

22          Q.  And it's important to take care of small

23    things before they become big things in a

24    correctional facility, isn't it?

25          A.  Correct.

1    Q.  And it's also important for correctional

2  staff to be in control of inmates, isn't it?

3    A.  That is correct.

4    Q.  You don't want the inmates controlling the

5  correctional staff, do you?

6    A.  Correct.

7    Q.  Everything that an inmate possesses in an

8  institution has some kind of value, doesn't it?

9    A.  That is correct.

10    Q.  So her clothes have value --

11    A.  Yes.

12    Q.  -- correct?

13    A.  Correct.

14    Q.  Her bedding has value; correct?

15    A.  Correct.

16    Q.  Her commissary items have value; correct?

17    A.  Correct.

18    Q.  Her medications have value; correct?

19    A.  Correct.  To a point.  Correct to a point;

20  depending upon the type of medication.

21    Q.  Things such as fragrance in a magazine can

22  be of value; correct?

23    A.  Correct.

24    Q.  Even the person herself, the inmate herself,

25  has some kind of penological value, doesn't she?

1        She can have; right?

2        A.  Well, can you define what penological value

3    is?

4        Q.  Sure.  In a penal institution, the inmate

5    herself can have value; correct?

6        A.  Correct.

7        Q.  And inmates use their possessions to barter;

8    correct?

9        A.  Some can.

10       Q.  Inmates can use possessions could gamble,

11   can't they?

12       A.  Yes, they can.

13       Q.  Inmates can use their possessions to make

14   friends, can't they?

15       A.  Yes, they can.

16       Q.  Inmates can fight over possessions, can't

17   they?

18       A.  Yes, they can.

19       Q.  Inmates can be ingenious on ways that they

20   hide contraband, can't they?

21       A.  Yes, they can.

22       Q.  They can cheek their meds; right?

23       A.  Right.

24       Q.  And cheek means hide them in their cheeks;

25   right?

```
 1        A.  Correct; they can.

 2        Q.  And then they can regurgitate medicine;

 3   correct?

 4        A.  They can.

 5        Q.  They can hide weapons on their person, can't

 6   they?

 7        A.  They can.

 8        Q.  They can be ingenious on how to make

 9   weapons, can't they?

10        A.  Yes, they can.

11        Q.  They can be ingenious on how to hide those

12   weapons, can't they?

13        A.  Yes, they can.

14        Q.  They can make -- we call it hooch here in

15   Illinois.  PREA is that what you call it in

16   California?

17        A.  No, not PREA.

18        Q.  I'm sorry, not PREA.  What do you call it in

19   California?

20        A.  Hooch is fine.  I understand what you're

21   talking about.

22        Q.  But you called it something else in your

23   direct, what was that?

24        A.  Yeah, well there's a variety of things that

25   you can call it, but it's basically inmate
```

1    manufactured alcohol.

2        Q.  Right.  What I'm trying to get at is I want

3    the ladies and gentlemen to know that the term you

4    used previously is the same thing we're calling

5    hooch.  So what term was it that you used?

6        A.  Probably pruno.

7        Q.  Pruno.

8            THE COURT:  Wait a minute, before we get

9    there, how do you spell that?

10       A.  P-r-u-n-o.

11           THE COURT:  T?

12       A.  No, P as in Paul, r-u-n-o.

13           THE COURT:  P, I see.  Spell it again.

14       A.  P-r-u-n-o.

15           THE COURT:  Oh, like prunes without the E

16   or the S.  All right.

17       Q.  And Hooch is h-o-o-c-h.

18           THE COURT:  Okay.  I think I got that one a

19   little better.  Go ahead.

20       Q.  Pruno or hooch is made from fruit and sugar;

21   right?

22       A.  Correct.  And yeast.

23       Q.  So breed in a correctional setting; correct?

24       A.  Correct.

25       Q.  Correction staff can't be confident on what

1    kind of contraband exists until they actually find

2    it; isn't that correct?

3         A.  That is correct.

4         Q.  And you can't know where contraband is until

5    you actually find it; correct?

6         A.  That is correct.

7         Q.  In some instances, you may know where to

8    look, but you don't necessarily always know where to

9    look for contraband; right?

10        A.  That is correct.  Sometimes you have

11   intelligence that directs you to a given area.

12   Other times you are generally searching.

13        Q.  It's just seek and find; right?

14        A.  Yes.

15        Q.  And if corrections staff finds contraband,

16   no matter what kind it is, it should be confiscated;

17   isn't that correct?

18        A.  Yes, it should be.

19        Q.  So it doesn't matter if it's major

20   contraband such as weapons or whether it's minor

21   contraband such as an extra blanket or, I don't

22   know, something else; right?

23        A.  That is correct.

24        Q.  Medicines can be major contraband, can't

25   they?

1          A.   It can be, depending upon the type of

2    medication.

3          Q.   Hooch can be major contraband, can't it?

4          A.   Yes, it can be.

5          Q.   Now, you've worked in -- or you've been in a

6    facility where inmates are both in a cell, where

7    there's one or two inmates in a cell, and also in a

8    facility where there are multiple inmates, I think

9    you said 300 inmates in a dormitory style; right?

10         A.   That is correct.

11         Q.   And would you agree with me that it is much

12   easier to search a cell with one or two inmates than

13   it is a dorm style?

14         A.   It depends upon the -- the configuration.

15   And it depends on how many staff that you have.

16         Q.   Right.  So if the staff to inmate ratio is

17   more like 5 to 1 in a dorm setting than it is one to

18   two in a cell, wouldn't you agree to me that it's

19   easier to search in the cell as opposed to the dorm?

20         A.   It can be.

21         Q.   Even with regular pat-down searches and

22   shakedowns, contraband can still be redistributed or

23   can accumulate -- accumulate, can't it?

24         A.   Contraband can be accumulated at any time.

25         Q.   Even if you do the regular pat-down

1    searches; right?

2         A.  That is correct.

3         Q.  Now, menstruating women in a prison, that's

4    something that officials need to be constantly aware

5    of; correct?

6         A.  That is correct.

7         Q.  It's not just that they need to be concerned

8    about it when there's a strip search; correct?

9         A.  That is correct.  Different circumstances.

10   In a strip search though, in relationship to what

11   the normal circumstance is.  And the reason being is

12   when you're doing strip searches in mass, that you

13   have generally frozen movement, so to speak, so the

14   women don't have access to menstrual supplies as

15   easily as they would have say if they'd be in their

16   own cell or their own dormitory.

17        So there's a different level that you pay

18   attention to depending upon the physical place where

19   the woman is at and the access to those type of

20   supplies.

21        Q.  So in other words, inmates may be able to

22   obtain supplies in the commissary; correct?

23        A.  They may be able --

24        Q.  Sanitary products in -- in -- at the

25   commissary; right?

1          A.  Correct.  But it's also something that it's

2     a basic supply that the facility, any facility would

3     provide and be mandated to provide to the inmates.

4     They don't have to be purchased in the commissary.

5          Q.  Correct.  That's -- yes, that was the point

6     that I was trying to make.  Thank you.

7          You can use -- it's acceptable under --

8     generally acceptable in American Correctional

9     Standards to transport inmates in handcuffs;

10    correct?

11         A.  Yes, it is.

12         Q.  And that would be true even if they're being

13    compliant; isn't that correct?

14         A.  Yes, it is true.

15         Q.  Issuing tickets for possession of

16    contraband, that can constitute punishment; correct?

17         A.  Are you talking about disciplinary

18    infraction tickets?

19         Q.  Yes.  Sorry, in Illinois we call them

20    disciplinary tickets.

21         A.  I don't constitute -- I don't think that

22    that's seen as punishment.  What that's seen as is

23    disciplinary, and there's a difference between

24    disciplinary and punishment.

25         Q.  If an inmate receives a ticket for some kind

1    of contraband and is placed in segregation, that is

2    a form of discipline; correct?

3         A.  Correct.

4         Q.  And it can be punishment; correct?

5         A.  No, not -- not in a -- in a correctional

6    world, it's discipline.  You're never punishing an

7    inmate.  That is not the purpose of correctional

8    facilities or staff.  Discipline is holding them

9    accountable for their action.  And that's really --

10   I know it's -- it's a distinct difference and

11   finite, but it's an important difference.

12        Q.  So in other words, punishment, in your

13   definition would be something like withholding food

14   or water?

15        A.  That would definitely be punishment.

16        Q.  But placing someone in segregation for

17   misbehavior is not considered punishment; correct?

18        A.  That is correct.

19        Q.  And searching someone for -- well, let me --

20   let me approach it a different way.

21        Taking away privileges is a form of discipline;

22   correct?

23        A.  It can be.

24        Q.  Now, not all women inmates in prison have

25   been traumatized, have they?

1        A.  The studies show between 59 and 90 percent

2    of women have basically been subject to trauma

3    abuse, physical or otherwise.

4        Q.  Actually, isn't it that they have reported

5    that they have been traumatized?

6        A.  That is correct.

7        Q.  Some women in prison can actually be the

8    traumatizers, can't they?

9        A.  They can be.

10       Q.  And that can change over time?  Sometimes

11   they might be traumatized, but then they can become

12   traumatizers; correct?

13       A.  That's correct.

14       Q.  You're not a psychologist; right?

15       A.  I am not a psychologist.

16       Q.  And you're not trained in psychiatry either?

17       A.  I am not a psychiatrist.

18       Q.  You weren't present at Logan Correctional

19   Center on March 31st of 2011?

20       A.  No, I was not.

21       Q.  You don't know the mental state of any of

22   the defendants in this case, do you?

23       A.  No, I do not.

24       Q.  You don't -- you didn't personally talk to

25   any of the defendants in this case, did you?

1        A.  No, I did not.

2        Q.  You didn't personally interview any of the

3   plaintiffs in this case, did you?

4        A.  I did not.

5        Q.  You didn't personally interview any of the

6   class members in this case, did you?

7        A.  No, I did not.

8        Q.  And in fact, you and I have never spoken

9   except outside the presence of the courtroom, when I

10  asked you about your -- your -- where you live now;

11  right?

12       A.  That is correct.

13       Q.  You have, however, spoken to the plaintiffs'

14  lawyers; correct?

15       A.  Yes, I have.

16       Q.  And they provided you with the materials

17  that you used to rely upon in order to render your

18  opinions; right?

19       A.  That's correct.

20       Q.  And they were the only ones who supplied you

21  with the information from this case; is that

22  correct?

23       A.  That is correct.

24       Q.  You are not offering any opinions on whether

25  the March 31st, 2011, search at Lincoln Correctional

1    Center was in compliance with generally accepted

2    American correctional standards, are you?

3        A.  Can you repeat that again?

4        Q.  Sure.  You are not offering any opinions on

5    whether the March 31st, 2011, search at Lincoln

6    Correctional Center was in compliance with generally

7    accepted American correctional standards?

8        A.  That is correct.  I am offering my opinions

9    on what generally accepted correctional practices,

10   principles and standards are.

11       Q.  And it is the plaintiffs' counsel who asked

12   you to provide those opinions; right?

13       A.  That is correct.

14       Q.  You talked about ways to make conditions for

15   a search of a -- a strip search of a menstruating

16   woman more sanitary?

17       A.  That is correct.

18       Q.  And I believe you said use of butcher paper

19   or having somebody standing there with a mop to

20   clean up if a spill should happen; correct?

21       A.  And the individual is not inside the room.

22   They're basically there available to be called in to

23   clean in between.  That is correct.

24       Q.  But those were your two examples; right?

25       A.  That is correct.

1    Q.  And it would also be acceptable to take an

2    inmate into a bathroom and let her expel over a

3    toilet; correct?

4    A.  That is correct.

5    Can I ask one follow-up question clarifying

6    that?

7    Q.  No, that's not the way testimony works.

8    A.  I just wanted to make sure I understood your

9    expel.

10       THE COURT:  It doesn't work that way.  The

11   plaintiffs will have an opportunity to redirect.

12   A.  Okay.

13   Q.  You were shown Plaintiffs' Exhibit 33.  That

14   is the Illinois guides.  Actually, Your Honor, may I

15   approach just to make sure --

16       THE COURT:  Yes, of course you may.

17   Q.  Would you agree with me that you were

18   previously shown those Illinois Administrative Code

19   provisions?

20   A.  Yes, I was.

21   Q.  And that exhibit defines what a body search

22   is; is that right?

23   A.  That is correct.

24   Q.  It defines contraband?

25   A.  Yes, it does.

1      Q.  It defines strip search?

2      A.  Yes, it does.

3      Q.  And those definitions all fit within the

4   generally accepted American correctional standards,

5   don't they?

6      A.  That's correct.

7      Q.  And then I'm going to show you another

8   provision of that Administrative Code.  That would

9   be Section 501.220(b)(1).  And it says (as read:)

10  Searches of committed persons.  All committed

11  persons and their clothing, property, housing, and

12  work assignments are subject to search at any time.

13     A.  That is correct.

14     Q.  And that also complies with generally

15  accepted American correctional standards, doesn't

16  it?

17     A.  That's correct.

18     Q.  And then let's go on to 501.220(a) -- how

19  about 501.220(b)(2).

20     A.  I can't see it on here.

21     Q.  Oh, I'm sorry.

22     A.  All I see at the top is 2.  I don't see any

23  (b).

24     Q.  Here, I'll show you the previous page.

25     A.  Okay.  Yes.

1          Q.  And that provision complies with the

2    generally accepted American correctional standards,

3    doesn't it?

4          A.  That's correct.

5          Q.  Now, you talked about PREA, the Prison Rape

6    Elimination Act; correct?

7          A.  Correct.

8          Q.  And that was actually signed into law by

9    President Bush in 2003; right?

10         A.  Correct.

11         Q.  And although it was a law, there weren't any

12   regulations immediately after the passage of that

13   act; correct?

14         A.  That is correct.

15         Q.  And so those regulations were not required

16   by correctional facilities to comply with; right?

17         A.  That is correct.

18         Q.  And they weren't required -- correctional

19   facilities were not required to comply with PREA

20   until the regulations were finalized; correct?

21         A.  That is correct.

22         Q.  And that occurred -- the finalization of

23   those regulations occurred in 2012; right?

24         A.  That is correct.

25         Q.  Okay.  And this incident occurred in March

1  of 2011; correct?

2      A.  Yes, that's correct.

3      Q.  And so PREA wasn't really effective until

4  2012, a year later; correct?

5      A.  The formal PREA.

6      Q.  But certainly there were procedures and

7  standards that had been in effect for a long time;

8  correct?

9      A.  For many years.

10      Q.  And in fact, Plaintiff's Exhibit 33, the

11  regulations that you said were in compliance with

12  generally accepted American correctional standards

13  had been in effect since 1987; correct?

14      A.  Correct.  Well, I'll have to -- yeah.

15      Q.  PREA is the gold standard, is that what you

16  testified to?

17      A.  No.  PREA -- PREA really sets what the --

18  the floor, the floor of compliance is.  Gold

19  standard would really be above that.  But it sets

20  the floor as what the professional standards are

21  expected by the federal government.

22      Q.  And in your opinions that you presented to

23  the plaintiffs, you cited to the -- the PREA

24  standards at 28-CFR-155 -- I'm sorry, the 115

25  series; is that correct?

1      A.  115.5 to 115.93.

2      Q.  And you selected certain standards or

3  sections from those Codes of Federal Regulations

4  that you relied upon in opining in this case;

5  correct?

6      A.  That is correct.

7      Q.  And those would be Sections 115.6, .15, .22

8  and .31 and .51; correct?

9      A.  That is correction.

10      Q.  Now, in none of those regulations does it

11  say that there has to be a written operations plan?

12      A.  That is correct.

13      Q.  And in none of those regulations does it say

14  that use of force needs to be in a written plan,

15  does it?

16      A.  No.  Use of force standards are in the

17  American -- the American Correctional Association

18  standards.

19      Q.  And nothing in these PREA regulations say

20  that an inmate can't be strip-searched with multiple

21  other inmates who are also involved in the strip

22  search, does it?

23      A.  That is correct.  Privacy is spoken to.

24      Q.  Inmates can be strip-searched in a group

25  behind a curtain or a closed door, can't they?

1          A.  In privacy, and -- as reiterated in your

2     Illinois Code.

3          Q.  So if a group of inmates were behind a

4     curtain or behind a closed door, that would be

5     acceptable; correct?

6          A.  As long as they couldn't be visually seen by

7     any other staff not involved in the search.

8          Q.  And if they were in a separate room, but

9     there were men on the other side of the curtain or

10    the door, that would be acceptable, wouldn't it?  As

11    long as the men couldn't see inside the curtain?

12         A.  Correct.  When the door was opening or

13    closing or any of that.

14         Q.  It is acceptable to be proactive in security

15    as opposed to reactive in nature; correct?

16         A.  That's a pretty broad statement.

17         Q.  Well, okay, let's narrow it down to

18    contraband.  It would be a good idea to be proactive

19    on getting rid of contraband rather than reactive on

20    the other side; correct?

21         A.  Well, proactive.  You can't get rid of

22    something that's not there.  That would be

23    proactive.  But constantly, vigilantly searching is,

24    yes, absolutely a good practice.

25         Q.  And -- and trying to find contraband can

1    include pat-down searches; correct?

2        A.  It can.

3        Q.  They can include strip searches; correct?

4        A.  They can.

5        Q.  And they can include mass strip searches;

6    correct?

7        A.  They -- they can.

8        Q.  A moment, Your Honor.

9            THE COURT:  Surely.

10       Q.  Ms. Still, apparently, when I was

11   questioning you, I asked you whether you'd ever been

12   to Logan Correctional Center, and this case involved

13   Lincoln Correctional Center.  Did you understand my

14   questions to mean Lincoln Correctional Center as

15   opposed to Logan Correctional Center?

16       A.  I did.

17       Q.  Okay.  And would your answers be the same if

18   I had asked about Lincoln Correctional Center as

19   opposed to Logan Correctional Center?

20       A.  They would.

21           MS. McNAUGHT nothing further, Your Honor.

22           THE COURT:  Very well.  Thank you.

23   You may redirect.

24           MS. BROWN:  Thank you, Your Honor.

25

1                    REDIRECT EXAMINATION

2   BY MS. BROWN:

3        Q.  Chief Still, you have national experience in

4   corrections; is that right?

5        A.  That is correct.  I actually have also

6   international experience.

7        Q.  When you consult as an expert for the

8   department of Homeland Security and the Department

9   of Justice, are you applying California specific

10  policies and practices, or something else?

11            MS. MCNAUGHT:  Your Honor, I object to

12  this.  It's beyond my scope of cross-examination.

13            THE COURT:  I must -- I must agree.

14       Q.  You were asked about punishment by the

15  opposing counsel.  What is the difference between

16  punishment and discipline?

17       A.  Punishment is the sentence that the inmate

18  gets when they're sent to prison.  That's the

19  punishment for their crimes.  Discipline is in

20  response to any behavior while the inmate is in the

21  facility.  Breaking, violating a rule, then

22  discipline is imposed through a very standardized

23  discipline process.  So it's in response to

24  something that's been done, but it's not done for

25  punishment, it's done basically to uphold the rules

1    of the facility.

2        Q.  Are there situations in which handcuffing

3    can be used as punishment by correctional officers?

4        A.  Yes, they can.

5        Q.  And is it generally accepted in your field

6    to use handcuffs or restraints as a form of

7    punishment?

8        A.  No, it is not.

9        Q.  You were asked about the source for your

10   testimony that a written operational plan is

11   considered to be a generally accepted national

12   practice that's required when conducting a mass

13   strip search of 200 women.  What is the source for

14   your opinion?

15       A.  32 years of experience across the country,

16   interaction with National Institute of Corrections,

17   and participation in many American Correctional

18   Association conferences.  Interactions with other

19   national experts.  A combination of all of those, as

20   well as publications, research that's been done.

21       Q.  Okay.  You also testified today about

22   cross-gender viewing of strip searches, and the use

23   of unprofessional language during strip searches,

24   and there being a basis in the Prison Rape

25   Elimination Act disallowing those; is that right.

1          MS. MCNAUGHT:  Objection, Your Honor.  This

2    goes beyond the scope of my cross-examination.

3          THE COURT:  Correct, it does.  Sustained.

4     Q.  The practices and standards in the Prison

5    Rape Elimination Act that you testified to today;

6    which of those were considered to be nationally

7    accepted standards and practices as of March 2011,

8    and which were not?

9     A.  I would have to go rule by rule.  But what I

10   would say is where those standards came from, where

11   the PREA regulations came from, is generally

12   accepted correctional practices.  Practitioners from

13   all over the country, they testified before the

14   National PREA Commission as to what their generally

15   accepted practices are.

16         There were things that went above, you know,

17   what the national practices was.  Like very

18   specific, doing an annual staffing analysis.  You

19   know, doing an annual camera review.  And those kind

20   of things were added on.  But there was also base,

21   core practices that had been in existence since --

22   you know, one example provided during when I was

23   being cross-examined was 1987.  But some of those

24   practices had been in place for, you know, a couple

25   decades before that.

1    So it was a combination of the years of what

2    the generally accepted practices had been, as well

3    as additional add-ons for the prevention -- you

4    know, this prevention, PREA is prevention, detect,

5    intervention, investigation.  And so it was -- PREA

6    is a combination of those practices that had been in

7    existence for a very long time, as well as new added

8    on standards and requirements to be adhered to.

9        Q.  Thank you.  No further questions?

10            MS. THOMPSON:  One moment, Your Honor.

11        Q.  Sorry.  Another question.

12    Is it generally accepted in the field of

13    corrections to have an inmate expel over the toilet

14    when other inmates are present?

15        A.  The expel, that's what I was asking for some

16    clarification about that.  What I can say is if

17    you're talking about is it a generally accepted

18    practice for inmates to use the toilet facilities

19    for their personal practices, they -- yes, that can

20    be.  That is a generally accepted practice.

21        Most facilities have privacy partitions, not

22    all facilities have privacy partitions.  Any

23    facilities that are built today have privacy

24    partitions.

25        Q.  Okay.  Thank you.

1          THE COURT:  Recross.

2               RECROSS EXAMINATION

3     BY MS. MCNAUGHT:

4          Q.  DID Illinois also participate in providing

5     information in support of PREA?

6          A.  I can't tell you specifically what testimony

7     or if they did.

8          Q.  Okay.  Thank you.  Nothing further.

9          THE COURT:  All right.  Does that trigger

10    anything else for re-redirect?

11         MS. BROWN:  No, Your Honor.

12         THE COURT:  Very well.

13    Thank you, Chief.  You may step down.

14         THE WITNESS:  Thank you, Your Honor.

15         THE COURT:  And is this witness now

16    excused, or is -- will there be any recall?

17         MS. BROWN:  Not on behalf of the

18    plaintiffs; no.

19         MS. MCNAUGHT:  We have no reason to call

20    her.

21         THE COURT:  Excellent.  Very well.  Then

22    you are excused at this time, Chief Still.

23         THE WITNESS:  Thank you.

24         THE COURT:  And you may feel free to leave

25    if you wish or stay.  It's entirely up to you.

1          THE WITNESS:  Thank you.

2      (The witness was excused.)

3          THE COURT:  All right.  You may call your

4   next witness.  Mr. Field.

5          MR. FIELD:  Thank you, Your Honor.  The

6   Plaintiffs recall Lieutenant Dawdy.

7          THE COURT:  All right.

8                   TROY DAWDY

9   recalled as a witness herein, having been duly

10  sworn, was examined and testified as follows:

11                DIRECT EXAMINATION

12  BY MR. FIELD:  (Cont'd)

13      Q.  Good afternoon, Lieutenant.

14      A.  Good afternoon, sir.

15      Q.  I wanted to pick up kind of where we left

16  off yesterday afternoon.  I had been asking you some

17  questions about the positioning of your tactical

18  officers in the housing units when you were getting

19  the women lined up to be handcuffed and brought to

20  the dayroom.

21      I just want to make sure I've got your

22  testimony right.  Was -- did you testify that there

23  was a tactical officer that was placed at the

24  entrance of each of the dorms?

25      A.  We should have had at least one.  We had

 1    enough tact members to where we could have one in

 2    each dorm area.

 3        Q.  Okay.  And for -- if we just use Unit 2B as

 4    an example, there were five dorm areas in that unit?

 5        A.  Yes, sir.

 6        Q.  Okay.  So there would have been at least

 7    one, as you said, tac team member --

 8        A.  Yes, sir.

 9        Q.  -- in each of the dorms.  Okay.

10        And after getting the women --

11            THE COURT:  Excuse me.  At what juncture?

12    Where was this physically?

13        Q.  This was in housing Unit 2B, Your Honor.

14            THE COURT:  In 2B.  And this was at the

15    door?

16        Q.  In the dorm itself; yes.

17            THE COURT:  Thank you.

18        Q.  When you had the women lined up in twos

19    facing the -- I think you said it was facing the

20    entrance into the unit; is that correct?

21        A.  Yes, sir.

22        Q.  Okay.  And your testimony was that I guess

23    the two women at the front of the line were being

24    handcuffed simultaneously; is that correct?

25        A.  They would have been pulled out and pat

searched, and then checked anything they had with them that we discussed; if you have any medication. That would have been checked first, pat searched, and then they would have been handcuffed. They had been pulled out of -- out of the dorm into the hallway area and then cuffed; yes.

Q. Okay. And that -- those pat searches would have been done two at a time; is that correct?

A. Depending on the staffing; yes. But I believe we had enough tact members and female cadets that they could pull two out at a time. And they would go stand on either side of the doorway, do the pat search, and then handcuff them; yes.

Q. Okay. But you weren't doing more than two at a time?

A. Not in each dorm; no.

Q. Well, I just want to make sure I've got this correct. So was there a line of women waiting to be handcuffed in each dorm, or was it just one line in twos in the unit?

A. In each dorm. The five dorms, there would have been two lines in each dorm. There would have been at least two staff stationed in front of each dorm. And then the two female staff would have the first two come out, they would pat search them. And

1     this would be going on in front of dorm -- on the B

2     side, it was 6, 7, 8, 9, and 10.  So each dorm would

3     have been going on at the same time.

4           Q.  Okay.  So there would have been -- and each

5     dorm had 20 women in it?

6           A.  That's correct.

7           Q.  Okay.  And your testimony is that there

8     would have been at least two tactical team members

9     stationed at the entrance of that dorm?

10          A.  There might another have been -- yes, that's

11    correct.

12          Q.  Okay.  The pat down searches were conducted

13    by female officers or cadets?

14          A.  That's correct; yes.

15          Q.  Okay.  You testified yesterday about the

16    importance of the element of surprise.  You wanted

17    to get into the Unit 2B as quickly as possible; is

18    that correct?

19          A.  Yes, sir.

20          Q.  Okay.  And you went into the unit through

21    the sally port of that unit?

22          A.  That's correct.  Um, the sally port of the

23    facility.  There's not --

24          Q.  Of the facility.  So it's -- the facility in

25    general has a sally port, it's not that each housing

1    unit has a sally port?

2         A.  That's correct, sir.

3         Q.  Okay.  And how far is Unit 4B from Unit 2B?

4         A.  150, 200 yards possibly.

5         Q.  Okay.  And once you -- do you recall

6    Assistant Warden Reynolds testifying yesterday that

7    word gets around a prison faster than it does on the

8    internet?

9         A.  Extremely quick; yes.

10        Q.  Okay.  So fair to say that once the tac team

11   entered Unit 2B, the other inmates in the facility

12   would know that you were there for some kind of

13   operation?

14        A.  There's a -- extremely likely; yes.

15        Q.  Okay.  Also fair to say then that your goal

16   was to get from 2B to 4B as quickly as possible?

17        A.  Yes.

18        Q.  Okay.  And that was because you wanted to

19   make sure that women in 4B couldn't get rid of

20   contraband, for example?

21        A.  Yes, sir.

22        Q.  Okay.  So you would have wanted to do those

23   two housing units as simultaneously as possible?

24        A.  As quickly as we could; yes, sir.

25        Q.  Okay.  And you testified yesterday, I think,

1  that there were approximately 50 to 70 cadets that

2  were that involved in this operation?

3          THE COURT:  Before we get there, Mr. Field.

4          MR. FIELD:  Yes, Your Honor.

5          THE COURT:  I'm trying to visualize, and I

6  think probably the jury is too, about the physical

7  relationship between 2B and 4B.  We just had

8  testimony that it's about 150 yards apart.  And so

9  these would be facilities -- do we have a sketch

10 or --

11         MR. FIELD:  We do, Your Honor.  We have an

12 overhead view of the prison as a demonstrative that

13 I can put up right now.

14         THE COURT:  Let's do that right now.

15         MR. FIELD:  Okay.  Do we have a sketch?

16 Permission to publish, Your Honor?

17         THE COURT:  Of course, put it up there.

18     Is that an exhibit?

19         MR. FIELD:  Yes, it's Plaintiffs'

20 Exhibit 202.

21         THE COURT:  Okay.

22     Q.  (By Mr. Field)  Before I ask you to point

23 out where the units are, is it better oriented like

24 this or there is a way I should flip it?

25     A.  Either way is fine.

1    Q.  Fine, okay.  So can you point out where
2  housing Unit 2B is on this overhead?
3    A.  Right there.
4    Q.  Okay.  And what about housing Unit 4B?
5    A.  Right there.
6        THE COURT:  And what's in between them
7  there is what?
8    A.  That's housing Unit 3 is in between housing
9  Unit 2 and housing Unit 4.
10        THE COURT:  I would have thought so, but I
11  didn't want to make that conclusion.
12    Q.  I just want to be -- so you're absolutely
13  certain that the first unit that you pointed out is
14  housing Unit 2B and that second one is 4B?
15    A.  That is correct.
16        THE COURT:  May I ask if this is a
17  depiction of the entire institution?
18    Q.  Sure.
19    A.  That is correct.
20    Q.  Okay.  And can you tell me where the sally
21  port is?
22    A.  Right there.
23    Q.  Okay.  So you would have had to -- the
24  tactical team would have entered the facility from
25  that sally port and marched across this portion here

1    towards Unit 2B?

2        A.  That's correct, sir.

3        Q.  Okay.  And then once -- and it then would

4    march to Unit 4B?

5        A.  Once we were completed with our task on

6    housing Unit 2B, we would have left housing Unit 2B

7    and went to housing Unit 4, yes.

8        Q.  Okay.  Are you able to point out on this

9    overhead where the gymnasium is?

10       A.  Right there.

11       Q.  Okay.  I'm sorry, just before we started

12   looking at this overhead, I was asking you about the

13   number of cadets that were assigned to the training

14   exercise that day.  Was your testimony yesterday

15   that it was somewhere in the neighborhood of 50 to

16   70?

17       A.  Yeah.  I don't have an exact number, but I

18   would estimate it between 50 and 70 possibly.

19       Q.  Okay.  And do you recall how many of those

20   cadets were female?

21       A.  I don't recall, no.

22       Q.  Do you recall how many were male?

23       A.  I don't recall, no.

24       Q.  I asked you some -- we heard some testimony

25   about shakedown slips.  I asked you some questions

about shakedown slips.  What is a shakedown slip?

A.  It's basically a receipt for an inmate.  Any time there are -- they are shooken down, their bed area, whether property is or isn't taken, that is their receipt to say they were -- they were -- their area was shook down.

If something is taken, if it's contraband, something they're not authorized to have, it would be listed on the shakedown slip itself.  They will write down if there's an incident report and if there was a disciplinary report issued also.

Q.  Okay.  And is one of those -- is a shakedown -- is a shakedown slip required to be issued for any item of property that is taken from an inmate during a shakedown?

A.  Yes.

Q.  Okay.  And as you said, it acts as a receipt so the inmate knows what has been taken?

A.  That's correct, sir.

Q.  And who fills out the shakedown slips?

A.  The person actually doing the -- doing the shakedown itself.  Or if somebody's there and they witness it, they can attest to this was done and these items were taken.

Q.  Okay.  But somebody involved in the

shakedown must fill out the shakedown slip?

A. That's correct, sir.

Q. Okay. Were there shakedown slips that were issued during the mass shakedown on March 31st, 2011?

A. Yes, there were.

Q. Do you recall how many shakedown slips were issued on March 31st, 2011?

A. I didn't take an actual count; no.

Q. Okay. Are you able to estimate the number of shakedown slips that were issued on March 11th -- or March 31st, 2011? Sorry.

A. No. Because if an item is taken, each individual has to get their own copy. Whereas if a bed area itself, there's none found, one can be left. You could have a whole dorm shook down and if there's no contraband, you can have one slip for the whole dorm.

So I can't say, yeah, there were 200 inmates shook down -- or excuse me, on one house, a hundred inmates, so there were a hundred shakedown slips. It's gonna vary depending on how many contraband was taken.

Q. Sure. And so if there's, you know, not a lot of contraband taken, there's not gonna be a lot

1  of shakedown slips?

2      A.  Exactly.

3      Q.  And so if there's no contraband taken, there

4  would be a single shakedown slip?

5      A.  That's correct, sir.

6      Q.  Okay.  Does the shakedown slip that's used

7  in the Illinois Department of --

8          THE COURT:  Wait a minute.  If no

9  contraband is taken, you say there's no -- there's

10  one slip?

11      A.  That's correct.  It's just basically a

12  receipt saying the area was shook down.  And they

13  will write down there is nothing found.

14          THE COURT:  Nothing found, okay.  Thank

15  you.

16      Q.  Okay.  And this shakedown slip -- well, you

17  know, I will -- I'd like to show you what is marked

18  as Plaintiffs' Exhibit 221.

19      Are these Illinois Department of Correction

20  shakedown slips?

21      A.  Yes, they are.

22      Q.  Permission to publish, Your Honor?

23          THE COURT:  Sure.  Let's do that.

24      But keep that other exhibit.  Well, they've got

25  copies.  When you give the number --

1        Mr. Field, when you give the number of the

2   exhibit, copies are already there.  They know -- all

3   they have to do is pull up the number.

4        (Sotto voce discussion among counsel.)

5        Q.  I apologize, Your Honor.  This was an

6   exhibit that is not going to be published to the

7   jury.  It was a previous agreement.  So I will just

8   leave a copy of one of these slips with Lieutenant

9   Dawdy so I can ask him some questions about it.

10            THE COURT:  Okay.

11       Q.  Does the -- is it -- I'll ask the question

12  again, just so it's clear.  The document that you

13  have in your hand, is that an Illinois Department of

14  Corrections shakedown slip?

15       A.  That is correct.

16       Q.  Okay.  And these are -- these would be the

17  types of slips that were issued during the mass

18  shakedown on March 31st, 2011?

19       A.  Yes, sir.

20       Q.  Okay.  And does that shakedown slip include

21  sort of a box-checking system where you can check

22  off whether --

23            THE COURT:  Even if it's not going to be

24  put into evidence, we're talking about the shakedown

25  slips.  And if something is taken, as I understand

1 it, a slip is given.  But in this case, there were

2 no -- nothing was taken, but they still have one

3 slip -- shakedown slip; is that right?  That's --

4   Q.  I don't think that was his testimony, Your

5 Honor.

6     THE COURT:  I'm sorry.

7   Q.  I believe that Lieutenant Dawdy was

8 testifying that in -- sort of just generally

9 speaking, if there's no contraband found, they would

10 issue a single shakedown slip as a receipt to the

11 unit.  But in cases where contraband is actually

12 found and confiscated, there'd be one shakedown slip

13 for each piece of contraband that has actually been

14 taken.

15     THE COURT:  But if there's no slips issued

16 and nothing is found, there's still a slip issued.

17 One.  And that is for the entire shakedown.  Is that

18 right?

19   Well then, why can't we see a copy of that

20 slip?  I think that we ought to see one.  Put a

21 blank one up here.  Let's see what we're talking

22 about, folks.

23   Oh, you don't have a blank one.

24     MR. FIELD:  I don't have a blank one, Your

25 Honor.  Just the ones that were issued.

1          THE COURT:  Okay.  Cut this off, Madam,

2     Clerk.

3          (The following sidebar discussion was held at

4          the bench, out of the hearing of the jury.)

5          MS. MCNAUGHT:  It's just a procedure

6     thing.  If it's going to be shown to the

7     jury, it should be admitted in evidence.

8     That's my point.  And so if they want to

9     move --

10         MR. FIELD:  No, it's not blank.  There

11    aren't any --

12         THE COURT:  I'm sorry, that's what I

13    thought that you were --

14         MR. FIELD:  Sorry, Your Honor.

15         THE COURT:  All right.  Thank you very

16    much.  Now, I don't want -- I don't want

17    you to think for a minute that I'm trying

18    to run your case.  But as things come up,

19    if I don't understand, I feel that there

20    are members of the jury who can't, so I

21    want to try to get it clarified.

22    Especially something like that that's

23    innocuous.  I thought you were talking

24    about a blank one.

25         MR. FIELD:  I apologize, Your Honor.

1          THE COURT:  No, you shouldn't at all.

2          MR. FIELD:  I appreciate the

3     clarification as well.

4          THE COURT:  All right.

5     (The following proceedings were held in open

6     court.)

7          THE COURT:  Just disregard that.  I thought

8     we had a blank form, but we don't.  We all

9     understand now what we're talking about.

10         Go ahead.  Mr. Field.

11         MR. FIELD:  Thank you, Your Honor.

12         Q.  (By Mr. Field)  Lieutenant Dawdy, I think I

13    was asking you, does the standard Illinois

14    Department of Corrections shakedown slip have sort

15    of a box check system where you -- the individual

16    filing out the form checks off whether the

17    contraband that is confiscated is either major

18    contraband or minor contraband?

19         A.  The staff -- the staff doing the shakedown

20    wouldn't do that.  That would be up to the shift

21    supervisor.  Staff taking it, all they do is

22    basically, on the left side, see where there's that

23    horizontal line.

24         Q.  Sure.

25         A.  Excuse me, vertical line.  They're the only

1    one the staff fills out, the left side.  The right

2    side would be where the shift supervisors--if you

3    see there--they would write if it's major or minor.

4         Q.  Okay.

5         A.  So the staff itself, like the line officer,

6    they don't mark that.

7         Q.  So the staff -- the staff member who was

8    confiscating the contraband would indicate on the

9    form what it is that they're confiscating, the date

10   that they confiscated it on, the time.  They would

11   sign their name.  And then that would go to the

12   shift supervisor; is that correct?

13        A.  Yes.  And then they would make the

14   determination if it was minor or major.

15        Q.  Okay.  And that would be based on the

16   description that was provided by the officer who had

17   actually confiscated -- who was involved in the

18   shakedown and had confiscated the contraband?

19        A.  They would -- the shift supervisor would

20   actually have the item with it.  The shakedown slip

21   goes with the item so they can actually look at it.

22   Sometimes, you know, you look at one thing, you

23   describe it one way.  Well, they want to see exactly

24   what it is that was taken so they can determine the

25   nature of it.

1     Q.  Okay.  I'm gonna provide you with the rest

2  of this exhibit.  If you will just take a moment to

3  flip through those.

4     A.  Okay.

5     Q.  Does reviewing that -- those documents

6  refresh your memory on the number of shakedown slips

7  that were issued during the mass shakedown an

8  March 31st, 2011?

9     A.  I still couldn't tell you how many were

10  issued that day.  I mean I can see from the dates

11  and times that these were written on that date in

12  question, but as far as, oh, yes, now I remember,

13  there was 112; no.

14     Q.  Well, there's not 112 in front of you

15  though; correct?

16     A.  No, that's correct.  That's correct.

17     Q.  How many would you estimate are in front of

18  you?

19     A.  I didn't count when I went through, but 30

20  possibly.  I didn't count when I went through.

21     Q.  Okay.  And those were issued on March 31st,

22  2011; correct?

23     A.  That's correct.

24     Q.  And they were issued for Unit 2B and 4B;

25  correct?

1    A.  That's correct.

2    Q.  Okay.  And it was during the time period of

3  the mass shakedown on March 31st, 2011; correct?

4    A.  That's correct.

5    Q.  Do any of those shakedown slips indicate

6  that the contraband that was confiscated that day

7  was major contraband?

8    A.  Give me just a second.  I wasn't -- I was

9  looking at the items taken, I wasn't looking at the

10  minor or major, so give me just a second.

11    Q.  Absolutely.  Take your time.

12    A.  No, none of them are major contraband.

13    Q.  They all indicate that the contraband that

14  was confiscated that day in Unit 2B and 4B is minor

15  contraband; is that correct?

16    A.  That's correct, sir.

17    Q.  Okay.  So we've heard some testimony about

18  minor contraband, nuisance contraband, major

19  contraband.  Fair to say that minor contraband is

20  the same as nuisance contraband?

21    A.  To me, nuisance contraband isn't even an

22  official term.  It's something that -- it's just a

23  nuisance.  It's excess property, clothing, something

24  like that.  To whereas something that's minor

25  contraband, it's contraband still in effect, but

1    it's something that could be -- it's not detrimental

2    to the safety and security of the institution.  But

3    it's not something that you -- oh, this person has a

4    T-shirt with a picture drawn on it.

5         But it's still something you don't want the

6    inmate to have that could possibly pose a risk.

7    Medication is a good example.  Medication.  I'm not

8    a doctor or pharmacist, but I know that some

9    medication -- it's got an expiration date for a

10   reason.  Some medication might get stronger the

11   older it gets.  You don't want someone to have that

12   because you don't know.  There's an expiration date

13   for a reason.

14        So nuisance contraband is just that, it's a

15   nuisance.  It's nothing that really might necessary

16   pose a risk, but it's something that you don't want

17   because then it starts piling up over time.

18        Some people keep trash.  That's nuisance

19   contraband--wrappers, packages.  You don't want

20   that.

21        Q.  So is it your testimony that minor

22   contraband may still pose a risk to the safety of

23   the institution?

24        A.  It could; yes.

25        Q.  Okay.  So can you indicate on -- in terms of

the property that was confiscated and that's listed
on those forms, which property would pose a risk to
the facility and why?

A.  I see medication, there's medication.
There's one here where there's an inmate that pulled
a green pill and two pink pills out of her vagina
when she was being searched.  I mean she obviously
wanted to conceal it pretty well if she's willing to
go to that length.

More medication.  Another pill found.  I can't
pronounce it, chlorpheniramine.

A small copper wire.  A small copper wire can
be used for multiple things.  Depending on how thick
it is, it could be used as a weapon, it could be
used to --

Q.  Well, if something -- if something could be
used as a weapon, wouldn't it be considered major
contraband?

A.  It could be.  Depending on the size.  And
there's nothing -- it just says small copper wire.
So could it be?  Yeah.  But it could also be used --
minor by itself could be minor, but it could be
major because it's used to alter a hot pot which
would now allow the hot pot to boil, and now you
have boiling water that could be thrown on somebody.

So it's not something that you want floating around
the institution.

Q.  Sure.  Let me ask you this, because there
was some testimony yesterday about major forms of
contraband like guns and knives and shivs, those
kinds of things.  Are those types of items listed on
those forms?

A.  Not that I saw; no.

Q.  Okay.  And if those kind of things had been
found, those would certainly be major contraband;
correct?

A.  Absolutely; yes.

Q.  And as far as, there was some testimony
about different types of medications.  The
medications that you have to actually line up for
every day and you don't get a supply of; the
narcotics, those kinds of things.  If those had been
found, that would be major contraband as well?

A.  Yes, because those are -- what's called, I
believe watch take or something.  You have to watch
it, you can't take them back to the unit.  So at
that point, especially if it's a medication that's
not prescribed to you, then yes, that would be.

Q.  Okay.  And that's major contraband?

A.  Yes.

1      Q.  And none of that was on any of those forms;

2   correct?

3      A.  Not that I saw.

4      Q.  Okay.  And there was -- there's been a lot

5   of testimony about hooch.  Is hooch major

6   contraband?

7      A.  Yes, it would be.

8      Q.  Okay.  And so there was no hooch that was

9   confiscated that day?

10      A.  No.

11      Q.  No pruno, I think was the other term that

12   was used?

13      A.  No.

14      Q.  Okay.  There was some testimony earlier

15   today where the term line officer was referenced.

16   And you know we've been talking about corrections

17   officers and Orange Crush members and tactical team

18   members, so I just want to make sure it's clear;

19   what is a line officer?

20      A.  That's a correctional officer doing their

21   daily duties.  Now, a line officer, if they're a

22   certified tact member, they can go from line officer

23   to a tac officer, because now if we have an

24   emergency, someone relieves them, go get dressed,

25   get into your gear.

So a line officer is just daily, generally duties. You're a housing unit officer, you're on the gym, walk, so on and so forth. They're just doing their daily duties.

Q. Line officers are not supervisors though; is that correct?

A. Generally, no. No. It would just be a correctional officer.

Q. You testified yesterday that your assistant tac commander, was it Lieutenant Craig?

A. That's correct, sir.

Q. Okay. Can you -- I asked you a little bit about the sort of duties or role of -- that you had as a tac commander. Can you tell me what the duties of the assistant tac commander are?

A. He's to fill in my absence. He's kind of my right-hand man if I need. If there's any issues, problems, he would take care of them for me. If I can't hold a tact practice, he would hold the tact practice. If I'm gonna be gone on vacation, if I need an inventory done and -- because I'm gone on vacation. So he's just that, he's the assistant to the commander.

Q. Okay. And what about during a tac team detail? Are the tact officers expected to take

1  orders from the assistant tac commander if he gives

2  them an order?

3       A.  Yes.

4       Q.  Okay.  Early in your testimony yesterday you

5  talked about your experience as a tac officer and

6  that you had a number of years of experience in

7  the -- on the tac team; correct?

8       A.  Yes.

9       Q.  How many years of experience did you have

10 working on the tactical team in March 2011?

11      A.  Would have been, at that point, ten years.

12 Just as certified tac.  I got certified in, I

13 believe, July of 2001.

14      Q.  Okay.  So fair to say at that point you were

15 an experience tactical team member?

16      A.  That's correct, sir.

17      Q.  And how long had you been commander in March

18 of 2011?

19      A.  For approximately five years.

20      Q.  Okay.  And so you were more than capable in

21 March 2011 of supervising the tac team on your own;

22 correct?

23      A.  That's correct.

24      Q.  Okay.  You didn't require, for example,

25 Assistant Warden Reynolds to supervise the tac team

1    for you?

2         A.  No.

3         Q.  Okay.  And you were more than -- your tac

4    team was more than capable of helping or assisting

5    with the cadets who were doing a training exercise

6    that day; correct?

7         A.  Yes.

8         Q.  You wouldn't have required Assistant Warden

9    Reynolds' supervision for that either?

10        A.  No.

11        Q.  I apologize if I asked you this yesterday,

12   but I don't recall, so I'm gonna ask if again.  Were

13   there tac team members who were detailed to the gym?

14        A.  Yes, sir.

15        Q.  Okay.  Now, I know you testified that you

16   were -- yesterday -- or please correct me if I get

17   this wrong.  But I believe you testified yesterday

18   that you were in the gym a number of times

19   throughout the day on March 31st, 2011; is that

20   correct?

21        A.  No.  I was in the gym initially when we

22   brought the inmates over.  We got them lined up.  At

23   that point, that's whenever I instructed the female

24   tac members, because their purpose was to do the

25   strip searches.  My purpose was when we initially

1  went in, get the inmates lined up, get them to the

2  gym, and then assist with the shakedown.  I didn't

3  return to the gym until later on, when we actually

4  switched out -- when the strip searches were

5  completed, we switched out the male and female

6  cadets so the cadets -- the female cadets had an

7  experience to come back and go through inmate

8  property and actually shake it down.

9       So that was the next time that I was over in

10  the gym, was when the strip searches were complaint,

11  to do that swap out; to take male cadets over and

12  bring the female cadets over to the building.

13       Q.  Sure.  I apologize if I wasn't being clear.

14  I mean throughout -- I thought your testimony

15  yesterday was that throughout the mass shakedown and

16  strip search yesterday -- or on March 31st, 2011,

17  you had gone to the gym more than the one time that

18  you marched the women over there in the morning?

19       A.  Yes, I was there more than one time.

20       Q.  Okay.  Now, I know you just described the

21  second time.  Wasn't there a third time that you had

22  gone back to the gym as well?

23       A.  Whenever we had to take housing to 4B over;

24  yes.

25       Q.  Okay.  But as you said just a few moments

1    ago, there were tac team members under your command

2    who were detailed to the gym; correct?

3        A.  That's correct.

4        Q.  And they would have been detailed to the gym

5    throughout the day?

6        A.  Yes.

7        Q.  Okay.  Now, the tac team members that were

8    detailed to the gym were still under your command

9    even if you were in the housing unit?

10       A.  Yes.

11       Q.  Okay.  So yesterday I asked you some

12   questions about your training, and you talked about

13   the certification and that kind of thing.  And I'm

14   talking about the tactical team training at this

15   point.  At any part of your training are you trained

16   to yell at inmates?

17       A.  We're not trained.  But during the tactical

18   exercises, you're expected to speak loud, speak

19   clear.  To speak loud enough.  It's officer

20   presence, it's a commanding presence.  So to get

21   your point across.  What you expect someone to do.

22   Loud enough.

23       Especially going into a housing unit.  Housing

24   units are loud.  There's a hundred people that you

25   need to make sure that hear what you expect, you

have to speak loud.

Q. And you want to show officer presence even in the context of a training exercise?

A. You want officer presence all the time; yes.

Q. And are you -- as part of your training, are you trained to swear or cuss at inmates?

A. No.

Q. Are you trained to force inmates to stand for hours with their hands handcuffed behind their backs?

A. It's not something we're trained to do, but if it -- if during a situation like this, here's what we are going to do, we're gonna cuff, we're gonna bring them out, we're gonna line them up in the dayroom. But it's not part of a training curriculum of here's how you do this.

Every operation, every detail, every exercise is gonna be different. It's gonna depend on the situation at hand what you're going to do. But it's not a written guideline, a training curriculum or anything like that as to here's how this is done.

Q. So is it your testimony that there is no written guideline that says you should not handcuff inmates behind their backs and have them stand for hours on end?

1      A.  To my knowledge, no.

2      Q.  Okay.  Have you ever been trained to do

3  that?

4      A.  To leave them --

5      Q.  Handcuffed behind their backs, standing --

6      A.  Not trained; no.  It's not like a training,

7  hey, here's what we're gonna do.  No.

8      Q.  And is it your testimony that the situation

9  on March 31st, 2011, required inmates to stand for

10  hours on end with their hands handcuffed behind

11  their backs?

12      A.  They're -- to get them out of the dayroom or

13  out of their dorms into the dayrooms and escorted

14  over to the gym.  It wasn't a requirement, it wasn't

15  something we saw fit, okay, we're gonna leave them

16  cuffed for hours.  That wasn't a plan, it wasn't the

17  initial -- it wasn't the intent.  But to have them

18  during transport to the gym and once they got over

19  there, yeah, they were to be handcuffed.

20      Q.  Okay.  So it wasn't the plan or intent, but

21  it was the result?

22      A.  It was the plan to cuff them during

23  transport.  Cuff them as when they came out of the

24  dorm, wait in the dayroom and then taken to the gym;

25  yes.

1      Q.  Okay.  And what about standing in the gym

2   handcuffed for hours on end?  Was that -- did the

3   situation on March 31st, 2011, require that?

4      A.  In the -- while they were in the gym?  It

5   didn't necessarily require it, no.  It wasn't a plan

6   of we're gonna leave them cuffed the whole time

7   while we're shaking down.

8      Q.  But that's what occurred; correct?

9      A.  I don't know when they were uncuffed.  I

10  wasn't in the gym.  So I don't know if they were

11  uncuffed two minutes later or an hour later.  So I

12  don't know how soon after I left that they were

13  uncuffed.

14     Q.  Or three hours later?

15     A.  It could have been.  I wasn't over there, so

16  I don't know.

17     Q.  Sure.  Have you ever sworn or cussed at a

18  female inmate at Lincoln Correctional Center?

19     A.  No, sir.

20     Q.  Have you ever used derogatory language

21  towards a female inmate at Lincoln Correctional

22  Center?

23     A.  No, sir.

24     Q.  Have you ever been verbally abusive towards

25  a female inmate at Lincoln Correctional Center?

1      A.  No, sir.

2      Q.  Is it because doing those things would

3   violate Illinois Department of Corrections policy?

4      A.  Partly, yes.

5      Q.  Okay.  What are the other reasons why?

6      A.  There's no need for it.  It's --

7      When you're dealing with anybody in general,

8   inmates or the general public, there's the old

9   saying you can attract more bees with honey than you

10  can vinegar; right?  Being loud is one thing, but

11  being obnoxious, rude, or name-calling is not going

12  to get anything accomplished.  Especially in a large

13  group, it's not gonna do anything.

14     Q.  Sure so --

15     A.  It's only gonna anger them and cause more

16  issues, cause more problems.

17     And for somebody, anybody to say that -- that

18  that happened, especially in front of cadets,

19  academy trainers, the warden, the assistant warden

20  and the deputy director, absolutely not.  I would

21  have been pulled out that situation and I probably

22  would have been replaced at the tac commander.  It

23  wouldn't have been -- it wouldn't have been -- I

24  would have been dealt with.

25     Q.  Well, let me ask it to you this way:  There

1  was nothing about the situation on March 31st, 2011,

2  that required officers, whether they were

3  correctional officers, tac members, or cadets, to

4  swear or cuss at female inmates; is that correct?

5      A.  Yeah, there wasn't any reason.

6      Q.  Okay.  And there was nothing about the

7  situation on March 31st, 2011, that would have

8  required officers, cadets, or tac members to be

9  verbally abusive to female inmates?

10      A.  No, there was not.

11       MR. FIELD:  Okay.  No further questions for

12  this witness, Your Honor.

13       THE COURT:  Thank you, Mr. Field.

14      All right.  You may -- what is this, recross or

15  redirect?

16       MS. BARNES:  It's cross.  I haven't had a

17  chance yet.

18       THE COURT:  Well then, it is not just re,

19  it is cross.

20       MS. BARNES:  Right.

21       THE COURT:  All right, Ms. Barnes.

22              CROSS EXAMINATION

23  BY MS. BARNES:

24      Q.  Lieutenant Dawdy, counsel asked you about

25  your demeanor toward the inmates.  Would you have

1    tolerated that kind of behavior from the tac members

2    you supervised?

3         A.  No, ma'am.

4         Q.  What about the cadets, if you had seen it?

5         A.  No, ma'am.

6         Q.  How long were you in the gym on the

7    instances that you said you were in there?

8         A.  Just long enough to once all the inmates got

9    in.  I mean it might have taken a little bit to get

10   a hundred inmates filed in through the door.  Once

11   they got lined up, shortly after that, I left the

12   gym.  Because now my primary function, the first

13   part was over, get the inmates to the gym.  And now

14   I had to go back to housing Unit 2B to start with

15   the shakedown.  So there would have been no reason

16   for me to linger around in the gym.

17        Q.  All right.  So if I hear you correctly,

18   taking the handcuffs off was left to someone else?

19        A.  That's correct.

20        Q.  When and how and how long, okay.

21        Counsel also asked you about line officers.

22   And I think you responded that these are just

23   correctional officers doing their daily duties.

24   Were the tac team members -- I mean were they

25   considered line officers?

A.  Yeah, while they're in tac gear; no.  But they could be.  I mean Officer Jones, for example, is a tac officer.  But the next day, they could be working housing unit.  The tac officers aren't -- that's not their only assignment.  They're regular officers who have an additional duty of tac, so --

Q.  So they were wearing the hat of the tac officer on that day?

A.  Yes, that's correct.

Q.  Okay.  And these men and women were trained to do strip searches; isn't that right?

A.  That's correct.

Q.  Just like every other line officer?

A.  Yes, ma'am.

Q.  And if the line -- if the tac members --

MR. FIELD:  Objection, Your Honor.  She -- this is leading the witness.

THE COURT:  What?

MR. FIELD:  Leading the witness.

Q.  All I said was if the tac officer --

THE COURT:  No, I don't think that's leading.  I'll overrule, go ahead.

Q.  If a tac officer had seen a cadet doing something, what would you expect that tac -- doing something wrong, what would you expect, if anything,

 1    for that tac officer to do?

 2        A.  Is to stop whatever they're doing, correct

 3    it, and notify the training academy instructors of

 4    what was going on.

 5        Q.  Okay.  Was anything reported to you that day

 6    with respect to the conduct or improper conduct of

 7    any cadet?

 8        A.  No, ma'am.

 9        Q.  Was anything reported to you that day with

10    respect to the conduct of any of the tac officers

11    under your supervision?

12        A.  No, ma'am.

13        Q.  I want to talk about that diagram that --

14            THE COURT:  Let's put it back up.

15        Q.  Is that in the same position it was when you

16    were looking at it before?

17        A.  No.  Do you -- there you go.

18            THE COURT:  There we are.

19        Q.  Okay.  Lieutenant Dawdy, let's point out the

20    gym again.  Where's the outside doors to the gym?

21        A.  Right there to the left of the arrow.  You

22    see that walk leads up to it.

23        Q.  And what is here?

24        A.  Talking about like the sidewalk there?

25        Q.  No.  What's outside that door?  Anything?

1   A. No. It's just a concrete area. It's just

2 the walkway leading up to the gym. It's a concrete

3 pad.

4   Q. Okay. And what is on the other side of that

5 building?

6   A. On the backside?

7   Q. Here?

8   A. Oh, there's a walk part of the way around

9 that leads to -- or led to our industries building.

10 But it's just -- it's grass. That's -- nobody is

11 ever back there. That's kind of a no go area.

12   Q. Lieutenant Dawdy, do you -- where's the door

13 to the beauty shop?

14   A. It would be right -- right to the left of

15 that. Right where you can see where it says

16 "correctional". It's upside-down, but about where

17 the O is in correctional.

18   Yeah, it would be just a little bit to the

19 right of that.

20   Q. Okay. What is right here?

21   A. That's --

22   Q. Outside the door?

23   A. That's the Health Care Unit. It's the side

24 of the building.

25   Q. A brick wall?

1     A.  That's correct.

2     Q.  Okay.  So someone looking out -- is the

3 door -- does that door have a window in it?

4     A.  The beauty shop door?

5     Q.  To the outside?

6     A.  Yes.

7     Q.  So someone looking out that door would see a

8 brick wall?

9     A.  Yes.  They would see the side of the health

10 care building.  A brick wall.

11     Q.  Okay.  And what about this area here?  Is

12 that an area where --

13     A.  There's -- there's a small walkway.  But

14 again, that's the corner of the facility that

15 nobody -- nobody is ever there.  Unless they're

16 going to or from the beauty shop itself.  Once they

17 go around the corner, inmates aren't allowed around

18 that corner unless there's staff back there, for the

19 sole purpose of coming in out of our multipurpose

20 building.  There's doors back there.

21     Q.  Okay.

22     A.  It's a little off the beaten path, if you

23 will.  It's kind of not a lot of people in that

24 area.

25     Q.  Okay.

1      THE COURT:  Point out the all-purpose

2  building.

3      A.  It's right where that second arrow is, sir.

4  It's actually above.  It's the second level above

5  the beauty shop and our industries.  So it's in the

6  same building as the gym, it's just upstairs.

7      THE COURT:  Second floor.

8      A.  Yes, sir.

9      THE COURT:  Thank you.

10     Q.  Mr. Field asked you yesterday about whether

11  the tac team was ever used for non-emergency

12  purposes.  Is it?

13     A.  99 percent of what the tac team is used for

14  is considered non-emergency.

15     Q.  And was that the case on March 31st, 2011?

16     A.  Yes, ma'am.

17     Q.  What other -- well, could you explain that

18  to the jury?  How the tac team is used frequently

19  for non-emergency procedures?

20     A.  We might -- even if it's a statewide detail

21  to Pontiac, where you have 10 other facilities and

22  200.  That's still considered non-emergency.  That

23  might be they found weapons or there's been a bunch

24  of fights or they need to move people.  It's not

25  necessarily a drop what you're doing, go now.  Riot,

hostages, escape, something like that, that's an emergency. But just a regular tac detail, where you're going to go do a shakedown, which is what we did, it's just on a smaller scale, it would be considered a non-emergency.

If there was ever a true emergency, you might be called out 2:00 in the morning. Hey, there's a riot at Pontiac, get there as soon as you can. And that's very, very far and few between.

Q. Okay. Mr. Field also asked you yesterday about whether you had told the inmates to shut up. And I think your response was "We don't say shut up." Would you -- would you explain to the jury why you don't say shut up to inmates?

A. Again, it's not necessary. Hold the noise down, be quiet, that's what you're gonna tell them. Again, shut up, it's not -- shut up is not necessarily derogatory, but it's just, it's not necessary to get the point across. You can say be quiet in a loud tone and get the same effect as shut up.

Q. I think that's all I have right now. Thank you.

THE COURT: Thank you.

Redirect, Mr. Field?

1          MR. FIELD:  Yes, Your Honor.

2                REDIRECT EXAMINATION

3    BY MR. FIELD:

4        Q.  You were just asked some questions about

5    whether or not it was your responsibility to remove

6    the handcuffs from the women once they were brought

7    into the gym.  Do you remember that question?

8        A.  Yes, sir.

9        Q.  Okay.  And your response was that it wasn't

10   your responsibility; correct?

11       A.  That's correct.

12       Q.  But wasn't it left to tac team members under

13   your command to remove those handcuffs?

14       A.  That was part of the responsibility in the

15   gym; yes.

16       Q.  Right.  And those tac team members detailed

17   to the gym were under your command?

18       A.  Yes, sir.

19       Q.  And if you had commanded them to remove the

20   handcuffs, they would have done so?

21       A.  Yes, sir.

22       Q.  The testimony that you just provided about

23   the overhead view in terms of where the doors are

24   and those kind of things.  Where the gym is.

25       A.  Yes.

1     Q.  That doesn't change your earlier testimony

2    about the necessity for the element of surprise,

3    does it?

4     A.  No.

5     Q.  Okay.  And there's nothing about that

6    testimony that you've just given that changes your

7    earlier testimony about the distance between Unit 2B

8    and Unit 4B; is that correct?

9     A.  Yes.

10     Q.  Okay.  I'm gonna show you Plaintiff's

11   Exhibit 201.  Now, you were just asked some

12   questions about the door leading to the beauty shop.

13   And you were pointing out where that was on the

14   overhead view.  That's this door right here that you

15   were talking about; correct?

16     A.  Yes, sir.

17     Q.  Okay.  And that door goes to the outside;

18   correct?

19     A.  Yes, sir.

20     Q.  Okay.  I'm gonna show you what is marked as

21   Plaintiff's 229.  Permission to publish, Your Honor?

22         THE COURT:  You may.

23         MS. MCNAUGHT:  Well, you have to --

24     Q.  Will this photo aid you in your testimony

25   here today?

1      A.  Depends on what you're asking me.

2      Q.  I'm gonna ask you some photos -- some

3  questions about the outside of that beauty shop

4  door.

5      A.  Okay.

6      Q.  So it will help you?

7      A.  Yes.

8          MS. BARNES:  Your Honor, I have no

9  objection to this picture being admitted into

10 evidence if that's what he is trying to do.

11         THE COURT:  Well, we've been testifying

12 from this document a number of times.

13         MR. FIELD:  Well, Your Honor, they're

14 referring to a different document, Exhibit 229.  But

15 it's a demonstrative, so it's not being admitted

16 into evidence.  It's being used for demonstrative

17 purposes.

18         MS. BARNES:  But if it's published to the

19 jury, it needs to be in evidence.

20         THE COURT:  Oh, absolutely it does.  And

21 if -- if you aren't moving it, I'm gonna admit it on

22 my own.

23         MR. FIELD:  I will move to admit it into

24 evidence then, Your Honor.

25         THE COURT:  We've got a lot of testifying

1    from this dude, and I want it in.

2            MR. FIELD:  I can certainly take a hint,

3    Your Honor.  And I will move to admit this into

4    evidence.

5            THE COURT:  Well, now, wait a minute.

6    That's not the one that's on the viewgraph, is it?

7            MR. FIELD:  No, Your Honor.  Would you like

8    to see it?

9            THE COURT:  No, no, just put it right on

10   the viewgraph, because it's gonna be admitted.

11           MR. FIELD:  Yes.

12           MS. BARNES:  No objection.

13           THE COURT:  There we go.  Now, see, in

14   living color.  Isn't that great.  Okay.

15       (Plaintiffs' Exhibit 229 admitted.)

16       Q.  (By Mr. FIELD)  Is this that area that you

17   just testified to that's outside the beauty shop

18   door going to the outside?

19       A.  Yes, sir.

20       Q.  Okay.  And that's a walkway there?

21       A.  Yes, sir.

22       Q.  Okay.  And at the back of that walkway, is

23   that a picnic table?

24       A.  Right there?

25       Q.  Yeah.

1          A.  Possibly; yes.

2              MR. FIELD:  Okay.  No further questions,

3    Your Honor.

4              THE COURT:  Okay.

5              MS. BARNES:  I have nothing else.

6              THE COURT:  Recross, none.

7              MS. BARNES:  No.

8              THE COURT:  Thank you, Lieutenant.  You may

9    step down.

10         (The witness was excused.)

11             THE COURT:  What do you think, everybody?

12   Think -- is this a good time to take our break?

13   15 minutes.

14         Okay, let's do it.  Please recall my

15   admonition.  And we will stand in recess for 15 --

16   make it 20 minutes.

17         (The jury left the courtroom.)

18         (A recess was taken.)

19         (The jury entered the courtroom.)

20             THE COURT:  Thank you, everyone.

21         You probably all wonder why it is that once the

22   bell is rung, it takes me so long to get here on the

23   bench.  You do, don't you?  Be honest with me.  You

24   wonder why is there that delay between the time the

25   bell goes and we get in here, and we have to wait.

1        It's because I've got a long ramp that I have

2   to walk up from chambers to get here.  When this was

3   designed and built, OSHA came into effect.  So they

4   have this long ramp there in case there comes a time

5   when I go into a wheelchair.

6        So that's what we have to live within this --

7   so that's the reason.  I know that you were

8   wondering.

9        Okay.  Well, we are all in place ready to

10  proceed.  Mr. Field.

11            MR. FIELD:  Thank you, Your Honor.

12       The plaintiffs would like to call Warden

13  Hulett.

14            THE COURT:  Very well.  Warden, if you

15  would come up here and be sworn, please.

16       (The witness was sworn.)

17            THE COURT:  Right up here, please.

18                  MELODY HULETT

19  called as a witness herein, having been duly sworn,

20  was examined and testified as follows:

21                DIRECT EXAMINATION

22  BY MR. FIELD:

23       Q.  Good afternoon, ma'am.

24       A.  Good afternoon.

25       Q.  Could you please introduce yourself to the

1    jury?

2        A.  My name is Melody Hulett.  And that is

3    M-e-l-o-d-y, H-u-l-e-t-t.

4        Q.  In March of 2011, Warden Hulett, were you

5    the Warden at Lincoln Correctional Center?

6        A.  I was.

7        Q.  When did you become the Warden at Lincoln

8    Correctional Center?

9        A.  January of 2009.

10       Q.  Okay.  And are you currently the Warden of

11   Lincoln Correctional Center?

12       A.  No, I am not.

13       Q.  Okay.  Do you currently work for the

14   Illinois Department of Corrections?

15       A.  I do not.

16       Q.  Okay.  When did you leave Lincoln

17   Correctional Center?

18       A.  September 30th, 2013.

19       Q.  And you left -- when you left, you were

20   still in the position of Warden; is that correct?

21       A.  No, I was not.

22       Q.  What position were you?

23       A.  Assistant Warden of Programs at Logan

24   Correctional Center.

25       Q.  Okay, I see.  So when you said you left in

1    September 2013, that's when you left the Illinois
2    Department of Corrections?
3        A.  Yes.  Were you asking me about Lincoln?
4        Q.  Yeah.
5        A.  I'm sorry.
6        Q.  It's my -- I probably just asked it wrong.
7        A.  When -- when we transferred over, when they
8    combined the facilities, Dwight and Lincoln
9    together, I took a voluntary reduction because of
10   health reasons to Assistant Warden of Programs to
11   Logan Correctional Center on March of 2013.  In
12   March of 2013.
13       Q.  Okay, thank you.
14       When did you first begin working for the
15   Illinois Department of Corrections?
16       A.  September of 1996.
17       Q.  In what position did you start in?
18       A.  Correctional officer trainee.
19       Q.  Okay.  And from September of 1996 through
20   when you left the Department of Corrections in 2013,
21   did you work during that entire period for the
22   Illinois Department of Corrections?
23       A.  I did.
24       Q.  Okay.  Previous to becoming the Warden at
25   Lincoln Correctional Center in 2009, what position

did you hold in the Illinois Department of
Corrections?

    A.  I started off as a correctional officer
trainee.  Then after my six weeks training, my
probation period as a correctional officer trainee,
I became a criminal officer.  I served in the
capacity of correctional officer for ten years.  I'm
sorry, seven years.  And then I was promoted to
Administrative Assistant to the Warden of
Jacksonville Correctional Center.  And I did that
for three years.

    Then they promoted me to the Assistant Warden
of Programs at Decatur Correctional Center.  And I
worked there approximately about 22 months before I
was promoted to the Warden of Lincoln Correctional
Center, where I served as the warden there for four
years.

    Q.  What year were you promoted to the Assistant
Warden of Programs at Decatur?

    A.  I was Acting Assistant Warden of Programs in
March of 2007.  They made me the actual Warden --
Assistant Warden of Programs July 7th of 2007.

    Q.  Have you held any other warden or assistant
warden positions besides the ones that you just
testified to?

1        A.  No, I have not.

2        Q.  Okay.  Did you go directly from being the

3   Assistant Warden of Programs at Decatur to Lincoln

4   Correctional Center or did you serve as Warden in

5   another facility in between those two?

6        A.  I did not.

7        Q.  Okay.  Were you ever the Warden of

8   Jacksonville Correctional Center?

9        A.  No, I was not.

10        Q.  Okay.  So you said approximately 22 months

11   as the Assistant Warden of Programs at Decatur;

12   correct?

13        A.  I believe so.

14        Q.  Okay.  And then you became -- you were

15   promoted to the Warden of Lincoln Correctional

16   Center?

17        A.  Correct.

18        Q.  Okay.  So from March 2007 through when you

19   left the IDOC in September of 2013, you served as

20   either an Assistant Warden or a Warden; is that

21   correct?

22        A.  Correct.

23        Q.  Okay.

24             THE COURT:  Excuse.  Me, what is the

25   difference, ma'am, between Lincoln and Logan?  Are

 1    there differences.

 2        A.  Well now, yes.  Lincoln -- they're across

 3    the road from each other.  When I was the Warden at

 4    Lincoln, it was all female.  There was a major

 5    transition where they closed down Dwight and they

 6    combined the Dwight offenders with the Lincoln

 7    offenders and we moved across the road to Logan.

 8    And now Lincoln is -- and then Lincoln became once

 9    again a male facility.

10            THE COURT:  Very good.  Thank you.  Sorry

11    to interrupt you, Mr. Field.

12        Q.  No problem, Your Honor.

13        So you served for approximately six or seven

14    years as either a Warden or Assistant Warden in the

15    Illinois Department of Corrections; is that correct?

16        A.  Correct.

17        Q.  When you were the Assistant Warden of

18    Programs at Decatur was that also a female facility?

19        A.  Correct.

20        Q.  Okay.  Fair to say in March 2011, when you

21    were the Warden at Lincoln Correctional Center, at

22    that point in your career you were an experienced

23    Warden; is that fair?

24        A.  Yes.

25        Q.  And you were familiar with the Illinois

1        Department of Corrections?

2            A.  Yes.

3            Q.  Okay.  And that would include policies

4        regarding mass shakedowns?

5            A.  Correct.

6            Q.  And it would also include policies regarding

7        mass strip searches?

8            A.  Correct.

9            Q.  Ask you some questions about the sort of

10       duties of a Warden.  The warden is the highest

11       authority within any given facility; is that

12       correct?

13           A.  Yes.

14           Q.  So at Lincoln Correctional Center, you would

15       have been the highest ranking official?

16           A.  Yes.

17           Q.  Okay.  The Assistant Warden of Operations --

18       well, let me ask it this way:  Assistant wardens

19       report directly to the Warden; correct?

20           A.  Yes.

21           Q.  So the Assistant Warden of Operations at

22       Lincoln Correctional Center would have reported

23       directly to you?

24           A.  Yes.

25           Q.  Okay.  And during the period of time --

1  well, there's also a position called the Assistant
2  Warden of Programs; is that correct?
3       A.  Yes.
4       Q.  Now, I think the testimony was a little
5  fuzzy on this, so I'm gonna ask you.  During the
6  period of time that you were the Warden at Lincoln
7  Correctional Center was there somebody in that
8  position of Assistant Warden of Programs?
9       A.  My four years as Warden?
10       Q.  Yes.
11       A.  There was multiple individuals that served
12  in the capacity of Assistant Warden of Programs.
13       Q.  Okay.  Was there ever a period -- ever a
14  period of time within those four years that there
15  was nobody in that position?
16       A.  Not that I can recall.
17       Q.  Okay.  But in any case, the Assistant Warden
18  of Programs would have reported directly to you as
19  well; correct?
20       A.  Yes.
21       Q.  And did you have -- during the four years
22  that you were Warden at Lincoln Correctional Center,
23  did you have more than one individual serve in the
24  capacity as your Assistant Warden of Operations?
25       A.  Yes.

 1    Q.  In March 2011, your Assistant Warden of

 2  Operations was Assistant Warden Reynolds?

 3    A.  Yes.

 4    Q.  Okay.  How long had -- did Mr. -- did

 5  Assistant Warden Reynolds serve in that capacity?

 6    A.  I believe about a year and a half.

 7    Q.  Okay.  The Warden is ultimately responsible

 8  for everything that goes on within their facility;

 9  correct?

10    A.  Correct.

11    Q.  Okay.  And being a Warden is a tough job;

12  right?

13    A.  It's a demanding job.

14    Q.  That's a better word.  Thank you.  And

15  running a prison is a demanding job too?

16    A.  Yes, it is.

17    Q.  I think the comment was made earlier that

18  the Warden can't be everywhere at the same time;

19  correct?

20    A.  This is correct.

21    Q.  Okay.  And because of that, you have to

22  depend on your subordinates to inform you about

23  what's going on in the prison?

24    A.  Yes.

25    Q.  Okay.  In fact, it's essential that your

1    subordinates inform you about what's going on in the
2    prison; is that correct?
3         A.  Yes.
4         Q.  And that's so that you can, as Warden, run
5    the prison effectively?
6         A.  Yes.
7         Q.  So if you get bad information, it makes it
8    even more demanding for you to do your job?
9         A.  Yes.
10        Q.  You also need to depend on the -- your
11   subordinates to carry out the orders that you give
12   them; correct?
13        A.  Yes.
14        Q.  And again, because you can't be everywhere
15   in the facility at once, you're also allowed as
16   Warden to delegate your authority to certain of your
17   subordinates; is that correct?
18        A.  Yes.
19        Q.  In fact, the Illinois Department of
20   Corrections -- Illinois Department of Corrections
21   policies and procedures allow you specifically to
22   delegate your authority as Warden to certain of your
23   subordinates; is that correct?
24        A.  Yes.
25        Q.  So, for example, you could delegate your

1    authority in terms of the safety and security of the

2    prison to your Assistant Warden of Operations; is

3    that correct?

4         A.  Correct.

5         Q.  Okay.  And that -- the Warden delegating

6    authority over safety and security of the facility

7    to the Assistant Warden of Operations is standard

8    operating procedure in the Illinois Department of

9    Corrections; isn't that true?

10        A.  This is true.

11        Q.  Okay.  And so during the period of time that

12   Assistant Warden Reynolds was your Assistant Warden

13   of Operations, you had delegated authority to him as

14   Warden over the safety and security of the facility;

15   is that correct?

16        A.  Yes.

17        Q.  You depended on him --

18        A.  Yes.  Yes.

19        Q.  Okay.  And so if there were issues relating

20   to safety and security, you depended on him to

21   provide you with that information?

22        A.  Yes.

23        Q.  Well, so I want to -- I saw you hesitated,

24   so I want to make sure because I think maybe I'm not

25   being clear.  Obviously, as Warden, you have the

1    final authority in the facility?

2        A.  Correct.

3        Q.  So you could override your assistant wardens

4    if you needed to?

5        A.  Yes.

6        Q.  But again, you depend on your assistant

7    wardens to carry out your orders?

8        A.  Yes.

9        Q.  And in fact, you couldn't do your job as

10   Warden if you could not depend on your assistant

11   wardens to carry out your orders as you provide them

12   to them?

13       A.  Correct.

14       Q.  And so Assistant Warden Reynolds reported

15   directly to you; correct?

16       A.  Yes, he did.

17       Q.  Okay.  And you expected, under your

18   authority, for Assistant Warden Reynolds to handle

19   safety and security in the facility?

20       A.  Yes.

21       Q.  And did that include overseeing the

22   Orange -- the tactical team.  I guess -- sorry, let

23   me ask it in a better way.

24       Was the Assistant Warden of Operations

25   responsible for overseeing the -- as part of his

1  duties for safety -- over safety and security in the

2  facility was one of those duties overseeing the

3  tactical team?

4      A.  The tactical team reported directly to me,

5  but there was times where I assigned him the

6  responsibility of overseeing particular things that

7  included the tactical unit.

8      Q.  Okay.  And just so that the -- so that I

9  have it clear, and the record, I guess.  When you

10  say him, your mean Assistant Warden Reynolds?

11     A.  Assistant Warden Reynolds.

12     Q.  Okay.  So there were times -- again, you

13  have -- per IDOC policies and procedures, you have

14  the authority to delegate some of your authority as

15  warden to your assistant wardens.  And so your

16  testimony is that there were times where you

17  delegated authority over the tactical team to

18  Assistant Warden Reynolds?

19     A.  Correct.

20     Q.  Okay.  And was one of the times that you

21  delegated authority over the tactical team to

22  Assistant Warden Reynolds the mass shakedown and

23  strip search on March 31st, 2011?

24     A.  If I remember correctly, I believe that

25  Dawdy worked directly -- we conversed directly

together, he and I.  If I remember correctly.

Q.  Okay.  Going back to your ability to
delegate authority is -- were you able, as Warden,
to delegate authority over inmate grievances, for
example?

A.  Yes.  Both -- both of my assistant wardens
had signature authority.  That means that they had
the authority to sign grievances on my behalf.

Q.  Okay.  So what that means is--I think, and
please correct me if I'm wrong--if an inmate were to
file a grievance and it went through the normal
channels, it's possible that that grievance would
never have ended up on your desk as Warden?

A.  This is correct.

Q.  Okay.  So for certain issues, it's possible
that sort of the end of the line for the response to
the grievance would have been your one of your
assistant wardens; is that correct?

A.  Yes.

Q.  Okay.

THE COURT:  Mr. Field, this one of your
assistant wardens.

Q.  Sure.

THE COURT:  I'm not sure I understand
completely the TO&E here.  How many assistant

1    wardens are there and what are their primary

2    functions?  Could you flesh that out for us.

3         Q.  Absolutely, Your Honor.

4              THE COURT:  Thank you.

5         Q.  How many assistant wardens did you have when

6    you were the Warden at Lincoln correctional center?

7         A.  I had two Assistant Warden.  One an

8    Assistant Warden of Programs who oversaw -- would

9    oversee all the programs for the offender

10   population.  I had an Assistant Warden of Operations

11   who assisted me with the safety and security of the

12   facility.

13        Q.  And it's your testimony that both the

14   Assistant Warden of Operations and the Assistant

15   Warden of Programs had your signing authority when

16   it came to inmate grievances?

17        A.  Yes.  They had my signature authority to

18   sign off on grievances.

19        Q.  Okay.  And again, per the Illinois

20   Department of Corrections policy and procedures, you

21   were allowed, as Warden, to delegate that signing

22   authority to your assistant wardens; correct?

23        A.  Yes.

24        Q.  Fair to say then that if a grievance dealt

25   with operations in the facility, that that

1  grievance, if it was gonna make it to the Assistant

2  Warden, it would go to the Assistant Warden of

3  Operations to respond to?

4       A.  That would be the ideal process, but that's

5  not necessarily what always happened.

6       Q.  Sure.  And in -- in the sort of the flip

7  side of that is if the grievance dealt with

8  programs, ideally it would end up on the desk of the

9  Assistant Warden of Programs?

10      A.  That's a possibility that has not always

11 happened.

12      Q.  Sure.  Sometimes, for example, the grievance

13 counselor could respond to the grievance?

14      A.  Correct.

15      Q.  Okay.  But generally speaking, if it was

16 gonna make it to the Assistant Warden, grievances

17 dealing with operations, safety and security, that

18 kind of thing, would end up with the Assistant

19 Warden of Operations; correct?

20      A.  Ideally, yes.

21      Q.  Okay.  In March 2011, had you delegated that

22 signatory authority to your assistant wardens over

23 grievances?

24      A.  Yes.

25      Q.  Again, that's -- in terms of wardens in the

 1    Illinois Department of Corrections, that's pretty

 2    much standard operating procedure; correct?

 3         A.  Correct.

 4         Q.  So it's possible that an inmate grievance

 5    might end up on your desk to be reviewed, but it's

 6    also completely possible it would not, depending on

 7    what the grievance was about?

 8         A.  Yes.

 9         Q.  And if a grievance ended up on Assistant

10    Warden Reynolds' desk, he had the authority,

11    assuming it's not an emergency grievance, he had the

12    authority to provide the final decision for the

13    facility on that particular grievance; is that

14    correct?

15         A.  Correct.

16         Q.  So I know you testified that you've been

17    both an Assistant Warden and a Warden.  And the

18    facilities that you've worked on in those positions

19    have been female facilities; correct?

20         A.  Yes.

21         Q.  Now, you also have a lengthy career as a

22    corrections officer.  Did you, during that career,

23    also work in any male facilities?

24         A.  I started off at Jacksonville Correctional

25    Center.  So ten of those years in my IDOC career I

worked at a male facility.

Q. So fair to say that you have experience, or extensive experience, in both male and female facilities?

A. Yes.

Q. Okay. Have you received any specialized training for working with female inmates?

A. When I promoted to Assistant Warden of Programs at Decatur Correctional Center, Deputy Director Denning suggested and offered me the opportunity to go to training at -- I'm trying to think of the name.

It was in Oklahoma. And it was designed for the female population. The training was specifically designed for wardens, assistant wardens, individuals that are working with the female population.

Illinois Corrections Association, that's who was the umbrella over this training. And it was in Oklahoma. And I believe I was there from four to seven days, and received training as, you know -- she wanted to ensure, I believe--she's not here to speak for herself--but I believe, my impression was Denning wanted us to understand the population we were serving.

1        Q.  And did you take that course shortly after

2    being promoted to the being Assistant Warden at

3    Decatur?

4        A.  Yes.

5        Q.  Okay.  Are there differences in the manner

6    in which female inmates should be treated when

7    compared to male inmates?

8            MS. MCNAUGHT:  Objection.

9            THE COURT:  Beg your pardon?

10           MS. MCNAUGHT:  Objection.  That's a broad

11   question without any foundation.

12           THE COURT:  Yeah, it's awful broad.  Narrow

13   that down.  You're heading in the right direction,

14   but narrow that down a little bit.  I think we'd all

15   like to hear that.  Just what the general approach

16   is male versus female and the unique situations.

17       Yeah, go ahead, go ahead.

18       Q.  Thank you, Your Honor.

19       Why don't we start with what you learned at

20   that four to seven-day course in terms of dealing

21   with the female inmate population?

22       A.  Well, I learned that there's -- there is a

23   difference in how you handle the population, but

24   nothing as relates to the security aspect of it.

25   You know, the same foundation was still there as

1    relates to safety and security of the facility.

2         And you know, the emotional piece, because of

3    what has been noted as, you know, in several

4    reports, how women have, you know, experienced

5    certain abuse.  Not to say men have not, but the

6    training was specifically designed to learn your

7    population as a female -- dealing with female

8    offender.

9         Q.  Okay.  And when you say -- I'm sorry, I

10   can't recall the exact word that you used, but maybe

11   the sensitivity of it in relation to past abuse; was

12   that it?

13        A.  The experience of what women have

14   experienced in the past.  Abuse that they have

15   experienced.  Not to say that men have not

16   experienced abuse, but the whole training was

17   focused on understanding your population, the female

18   population.

19        Q.  Okay.  And based on that sort of history of

20   abuse, what were the kinds of things that you

21   learned at this course in terms of how you should

22   treat the female inmate population?

23        A.  It was a long time ago.

24        Q.  To the best of your recollection?

25        A.  Okay.  I don't have any specifics.  And --

1    I'm gonna -- I don't recall, because I don't want to

2    guesstimate.  I really don't recall.  That was quite

3    a time -- 2007 is quite a long time ago.

4        Q.  Fair to say, though, that there are

5    differences in how you should treat the female

6    population versus the male population?

7        A.  Yes.

8        Q.  Okay.  Would you need to be more aware of

9    this sort of background of abuse that you testified

10   about in terms -- in order to -- to provide -- well,

11   sort of in dealing with female inmate population?

12   Is it good to be aware of that background?

13       A.  Yes, it is good to be aware of that

14   background.

15       Q.  Okay.  What about -- was there any training

16   at this course in terms of temperament or anything

17   like that in relation to dealing with female

18   inmates?

19       A.  I do not recall.

20       Q.  Okay.  Well, let me ask it this way.  As the

21   Warden of a female facility, did you make it a

22   priority to be mindful of the differences in terms

23   of how you should treat the female versus the male

24   population?

25       A.  Are you saying a priority for me or for my

1    staff itself?

2         Q.  We'll start with you.

3         A.  Yes.

4         Q.  Okay.  And is that something that you

5    communicated to your staff?

6         A.  My staff knew my expectations.

7         Q.  Okay.  And your expectations, I think --

8    well, were your expectations that they would be

9    mindful of the differences between dealing with a

10   female and a male inmate population?

11        A.  I can't recall.

12        Q.  But your testimony is that that is something

13   that was a priority for you?

14        A.  Yes.

15        Q.  Okay.  And you said that your subordinates

16   understood what your expectations were?

17        A.  As relates to professionalism.

18        Q.  Okay.  So if there were priorities for you

19   in terms of how your staff should deal with the

20   inmate population, that's something that you would

21   have communicated to your staff?

22        A.  Yes.

23        Q.  Okay.  And would you have expected your

24   assistant wardens to do the same thing?  Communicate

25   those priorities to your staff?

1      A.  Yes.

2      Q.  And you -- fair to say that you trusted that

3  your assistant wardens would communicate those

4  priorities to your staff?

5      A.  Yes.

6      Q.  Okay.  And fair to say that that's because

7  you took your job as Warden of a female facility --

8  as Warden at Lincoln Correctional Center very

9  seriously?

10      A.  Yes, I did.

11      Q.  And you cared about, as Warden, who's gone

12  for specialized training, you cared about your

13  female inmate population?

14      A.  Yes.

15      Q.  Ms. Still testified earlier this morning

16  that it should be a priority for any prison

17  administrator -- or a priority for any prison

18  administrator should be the health, safety, and

19  wellbeing of any inmate under their supervision.  Do

20  you recall her testifying about that?

21      A.  Yes.

22      Q.  Fair to say that the health, safety, and

23  wellbeing of the inmates under your care was a

24  priority during the time that you were Warden of

25  Lincoln Correctional Center?

1          A.  Yes.

2          Q.  Inmates at Lincoln Correctional Center were,

3    as Warden, your inmates?

4          A.  My inmates?

5          Q.  Under your care and supervision?

6          A.  They were under my care and supervision.

7          Q.  Okay.  And there wellbeing was a priority

8    for you?

9          A.  Yes, it was.

10         Q.  So there's -- there's been a bunch of

11   testimony--I think a number of people have said it

12   since we started trial--that prison is a hard place.

13   Would you agree with that?

14             MS. MCNAUGHT:  Objection, Your Honor.

15         Q.  Is prison a --

16             THE COURT:  Wait a minute, wait a minute,

17   let her give the grounds.

18         Q.  Sure.  Sorry.

19             MS. MCNAUGHT:  Opinion testimony and

20   bolstering other -- and commenting on other people's

21   testimony.

22             THE COURT:  Sustained.

23         Q.  I'll just ask it as a question, Your Honor?

24             THE COURT:  Please.

25         Q.  Is prison a hard place?

1     A.  It's a demanding place.

2     Q.  Demanding for both the staff and the

3  inmates; correct?

4     A.  Correct.

5     Q.  And do prisons have issues with contraband?

6     A.  Yes.

7     Q.  Okay.  And there are sometimes fights in

8  prisons; correct?

9     A.  Yes.

10     Q.  And fair to say that you have to be vigilant

11  to make sure that those types of issues--contraband,

12  fighting--are kept to a minimum?

13     A.  Yes.

14     Q.  And part of being vigilant included having

15  regular shakedowns?

16     A.  Correct.

17     Q.  And there are different types of shakedowns;

18  correct?

19     A.  Yes.

20     Q.  You can have a shakedown of a person?

21     A.  Yes.

22     Q.  Okay.  And you can do a shakedown of a

23  housing unit?

24     A.  Yes.

25     Q.  And you can also do a shakedown of an

1    inmate's property boxes?

2         A.  Yes.

3         Q.  Okay.  And part of being vigilant includes

4    having regular strip searches?

5         A.  Yes.

6         Q.  Okay.  And so some of the female inmates at

7    Lincoln Correctional Center, during the period of

8    time that you were Warden, would have been

9    strip-searched on a regular basis as part of their

10   job, for example?

11        A.  Yes.

12        Q.  So if they were going to industry, they

13   maybe strip-searched before going in or coming out

14   of the industry?

15        A.  Yes.

16        Q.  Okay.  And they would have been

17   strip-searched for visitation, for example?

18        A.  Yes.

19        Q.  Okay.  And as warden, you could order a mass

20   shakedown or strip search of the facility simply as

21   part of this -- of wanting to be vigilant of

22   contraband and these other things that we talked

23   about; is that correct?

24        A.  Yes.

25        Q.  Okay.  And --

1           THE COURT:  Why don't we get a definition
2    between shakedowns and the other.  What's the
3    difference.
4         Q.  Sure.  Would you like to describe -- or
5    please describe what a shakedown is.
6         A.  What a shakedown is?
7         Q.  Yes.
8         A.  Of a person or property or --
9         Q.  Your Honor, is the question do you want her
10   to describe the three different types of shakedowns,
11   or do you want --
12          THE COURT:  You've been talking about
13   shakedowns and strip searches, so let's get -- you
14   know, broad part.  If she's got three different
15   kinds of shakedowns, let's talk about them.  If
16   we've got three different kinds of -- what's the
17   other one.
18        Q.  Strip search.
19          THE COURT:  Strip search.  Let's get this
20   all so we know what we're talking about.
21        Q.  Absolutely.
22        Do you want to start by defining or describing
23   what a shakedown is generally?
24        A.  A shakedown of a person?
25        Q.  Sure, we can start there.

1          A.   Okay.   Shakedown of a person is -- it could

2     be their outer garment, pat search shakedown of

3     their outer garment.   Shakedown of property is the

4     inmate property boxes.   As you've heard before, they

5     have a -- they have particular property boxes in

6     their possession, so those -- those things could be

7     shaken down as far as their property is concerned.

8          There are strip searches where those particular

9     strip searches, the individuals remove their

10    clothes, they lift up bodily parts that are not

11    visible to the eye.   They will also do what's called

12    a squat and cough where they squat and they cough.

13         Then there's the facility shakedown, where

14    we're on grounds and we're actually shaking down the

15    facility itself.   If we were given some type of

16    notification or heard something that there may be a

17    shank on grounds, there may be a gun on grounds,

18    there may be a phone on ground, there may be hooch

19    somewhere, then we may take -- do a shakedown of

20    that particular area itself.

21         Is that --

22         Q.   Does that clarify it, Your Honor.

23              THE COURT:   Well, it certainly helps

24    clarify all of this.

25         Q.   Sure.

1            THE COURT:  I guess the one thing that I

2     don't quite completely understand is the shakedown

3     of a person as compared to a strip search of a

4     person.  What -- is this a pat down?

5         A.  It's a pat search.

6            THE COURT:  Patting only?

7         A.  Yes.  I may have used the wrong term.

8         Q.  For a shakedown of a person, is it possible

9     that they would have to remove any layer of

10    clothing?

11        A.  If it was a strip search.

12        Q.  Strip search only?

13        A.  Uh-huh, strip search only.

14        Q.  So for a shakedown of a person, it never

15    involves removing any clothing?

16        A.  No.  A pat search.  I think I miswrote that.

17            THE COURT:  I think I've got it.  Have we

18    got it?

19        A.  Yes.  I think misworded that.  Yes.

20            THE COURT:  Okay.  Everybody's got it.  Go

21    ahead.

22        Q.  As Warden of Lincoln Correctional Center,

23    you were vigilant to keep contraband to an absolute

24    minimum; is that correct?

25        A.  Yes.

1          Q.  And as Warden of Lincoln Correctional

2     Center, you were vigilant to keep inmate fighting to

3     an absolute minimum; is that right?

4          A.  Correct; yes.

5          Q.  And that's, in part, because, as you

6     testified earlier, you took your job as Warden very

7     seriously?

8          A.  Yes.

9          Q.  Gonna ask you some questions about the mass

10    shakedown and strip search that occurred on

11    March 31st, 2011.

12          What was the reason for ordering a mass strip

13    search and shakedown on that day?

14          A.  I don't remember specifics, but I -- I

15    believe if we had ordered a mass shakedown, it would

16    have been because we had a reason to believe that

17    there was either contraband that needed to be

18    located or there was an increase in fights or there

19    was an increase in staff disrespect.

20          But I don't know the specifics to -- I don't

21    remember, I'm sorry, I do not remember or recall the

22    specifics to that particular shakedown.

23          To why we --

24          Q.  You provided a deposition in this case on

25    the 10th of August of 2015; is that correct?

1          A.  Yes.

2          Q.  Okay.  Would reviewing your deposition

3     testimony in this case refresh your recollection as

4     to why the mass shakedown and strip search was

5     ordered on March 31st, 2011?

6          A.  It may.

7          Q.  This is Page 76 of your deposition

8     testimony, starting at Line 7.

9          Does reviewing your deposition help refresh

10    your recollection as to the reason for ordering the

11    mass shakedown and strip search on March 31st, 2011?

12         A.  No.  In the deposition it says that I did

13    not recall.  There was a question asked about

14    training, other than training, and I said I -- I

15    could not.

16         Q.  Okay.  So the question was -- and again,

17    just for the record, this is Plaintiff's Exhibit --

18              MS. MCNAUGHT:  Well --

19              THE COURT:  Wait just a second.

20              MS. MCNAUGHT:  Objection.  If this is an

21    attempt to impeach.  Because her answer in the

22    deposition was that she didn't recall, and now he

23    wants to try and impeach her with her consistent

24    answer here that she doesn't recall and that she

25    didn't recall in her deposition, so --

1      THE COURT:  Now, is that --

2      MS. MCNAUGHT:  -- it's improper

3   impeachment.

4      THE COURT:  Is that right, Mr. Field?

5      MR. FIELD:  I believe the testimony in her

6   deposition does impeach what she just said, but I'll

7   ask a question to get us closer to where I think we

8   need to be before I read from the deposition.

9      THE COURT:  If you ever get there.

10      MR. FIELD:  If I ever get there.  That's

11   right.

12      THE COURT:  Okay.  Let's give her a stab.

13      Q.  (BY Mr. Field)  All right.  Was training one

14   of the reasons why a mass strip search and shakedown

15   were ordered for March 31st, 2011?

16      A.  Yes.

17      Q.  And do you remember any other reasons

18   besides training for the ordering of the mass strip

19   search and shakedown at Lincoln Correctional Center

20   on March 31st, 2011?

21      A.  I do not recall.

22      Q.  Who made the decision on which housing units

23   would -- would go through that mass shakedown and

24   strip search on March 31st, 2011?

25      A.  I believe that was a discussion between --

1    and a decision between AW Reynolds and myself.

2        Q.  Assistant Warden Reynolds?

3        A.  Assistant Warden.

4        Q.  Okay.  And do you recall the -- did you

5    recall the conversation that you had with Assistant

6    Warden Reynolds that day?

7        A.  I do not recall.

8        Q.  Okay.  But you believe that the decision was

9    made between yourself and Assistant Warden Reynolds;

10   correct?

11       A.  Yes.

12       Q.  Okay.  Assistant Warden Reynolds testified

13   yesterday that in terms of the mass strip search and

14   shakedown, that he initiated the process.  Do you

15   recall him testifying to that?

16       A.  Say that again?  Can you repeat that?

17       Q.  Sure.  Assistant Warden Reynolds testified

18   yesterday that in terms of the mass strip search and

19   shakedown that occurred on March 31st, 2011, that he

20   was the individual within the facility who initiated

21   the process.  Do you recall that testimony?

22       A.  Yes.

23       Q.  Okay.  Do you agree with that testimony?

24       A.  Yes.

25       Q.  Okay.  So was it Assistant Warden Reynolds

who recommended to you that housing Units 2B and 4B

go through the shakedown and strip search?

    A.  Yes.

    Q.  Okay.  And isn't it true that there were no

other factors other than the training of cadets that

went into deciding which units to shakedown and

strip search that day?

    A.  I do not recall.

    Q.  Well, would reviewing your deposition

testimony refresh your recollection on this issue?

        MS. MCNAUGHT:  Your Honor, I object.  This

has been asked, it's been answered.  He tried it

once before, it didn't work, and now he's trying it

again.

        THE COURT:  Well, what do you say to that,

Mr. Field?

        MR. FIELD:  The question before, Your

Honor, was on the decision to do a mass strip search

and shakedown.  I'm now asking her about the

specific decision to do that with Units 2B and 4B.

        THE COURT:  Okay.  I'll allow it.

    (Sotto voce discussion among the parties.)

    Q.  (BY Mr. Field)  did you have a chance to

review that?

    A.  I did.

1    Q.  Okay.  And does this -- the review of your

2  deposition testimony, Pages 91 and 92, refresh your

3  recollection as to why Units 2B and 4B were selected

4  for the mass shakedown and strip search on

5  March 31st, 2011?

6    A.  I do not recall the specifics to why we did

7  the mass shakedowns of 2B and 4B.

8    Q.  Okay.  Well, you would remember if there was

9  something major going on in the facility that would

10 have lead to the selection of those two units for

11 the mass shakedown and strip search; is that

12 correct?

13   A.  If there was -- are you saying when they

14 asked for -- when Reynolds asked for the shakedown,

15 if there was something major going on, I would

16 remember why he asked for that mass shakedown?

17 Am I -- I want to make sure I understand your

18 question.

19   Q.  Sure.  What I'm asking is that if, at the

20 time that the decision was made to strip search and

21 shakedown Units 2B and 4B, if there was something

22 major going on in those units, you would recall

23 that?

24   A.  Yes.

25   Q.  Okay.  And there was nothing major going on

1    in these units when the decision was made to

2    shakedown and strip search those units on

3    March 31st, 2011?

4         A.  I do not recall.

5         Q.  And if there were any major issues in those

6    units at that time, you would remember?

7         A.  Yes.

8         Q.  And you don't recall?

9         A.  I do not recall.

10        Q.  I asked you some questions a couple minutes

11   ago about the decision to do a mass shakedown and

12   strip search and the -- well, actually strike that.

13        The -- the -- when was the decision made to do

14   the strip search and shakedown of 2B and 4B?

15        A.  I do not recall the exact dates, but I

16   believe that the final discussion, if I remember

17   correctly, was a few days before we actually

18   completed the shakedown.

19        Q.  Okay.  And so Assistant Warden Reynolds'

20   testimony was that he thought that meeting occurred

21   on a Monday when he came back from vacation, and

22   then the strip search and shakedown occurred on

23   Wednesday.  Any reason to disagree with that?

24        A.  No.

25        Q.  And besides -- beyond deciding which units

1    would go through the shakedown and strip search, did

2    you also discuss at that meeting how the strip

3    search would take place?

4         A.  I do not recall the specifics to my

5    conversation with Assistant Warden Reynolds, so I

6    really -- I cannot answer that question.  I do not

7    recall the specifics to that conversation.

8         Q.  Okay.  Well, as your Assistant Warden of

9    Operations, who you delegated authority to over

10   safety and security, would it have been Assistant

11   Warden Reynolds' duty to inform you how the strip

12   search would take place?

13        A.  Yes.

14        Q.  Okay.  So he would determine -- it would be

15   his job as the Assistant Warden of Operations to

16   determine exactly how that strip search would take

17   place; correct?

18        A.  We would decide together, after having

19   conversation, on how the strip search would be

20   implemented and completed.

21        Q.  And as Assistant Warden of Operations, he

22   would bring his plan for the strip search to you for

23   your approval?

24        A.  He would -- yes, he would bring his ideas

25   and what he would, you know, expect or want to be

1  done.  He would bring his plans to me for us to

2  discuss and for a final outcome and decision to be

3  made.

4      Q.  Okay.  So he -- would he have been the one

5  responsible for proposing that the strip searches

6  occur in the bathroom of the gymnasium?

7      A.  Yes.

8      Q.  And as Assistant Warden of Operations, would

9  he have been the one who was responsible for making

10  sure that the strip searches in the bathroom of the

11  gymnasium took place in accordance with the Illinois

12  Department of Corrections policies and procedures?

13      A.  Yes.

14      Q.  So if there was gonna be an issue with

15  privacy, for example, he would have been the one

16  responsible for making sure -- or ensuring the

17  privacy of those inmates who were strip-searched?

18      A.  After discussion with me; yes.

19      Q.  Okay.  But whatever factors you decided, for

20  example, in that discussion were necessary to

21  preserve the privacy, he would have been responsible

22  for putting those things into place?

23      A.  Yes.

24      Q.  And again, as you testified earlier, you had

25  to depend on your assistant wardens to carry out

1  your orders?

2      A.  Yes.

3      Q.  So if your had authorized the use of certain

4  mechanisms to protect the privacy of female inmates

5  during the strip search, you would have depended on

6  Warden Reynolds to put those in place?

7      A.  Yes.

8      Q.  Again, because you can't be everywhere?

9      A.  Yes.

10     Q.  You need to depend on your subordinates

11  carrying out your orders?

12     A.  Yes.

13     Q.  What about the decision to have the women

14  handcuffed while they were marched from the housing

15  units to the gym?  Is that also something that would

16  have been proposed to you by Warden Reynolds?

17     A.  Yes, that would have been proposed to me by

18  Warden Reynolds.  I'm sure, in my practices and

19  things that I did before, I'm sure I would have had

20  a conversation with Dawdy as well, so -- but the

21  final decision would have been between Reynolds and

22  myself.

23     Q.  Okay.  And as the Assistant Warden of

24  Operations, Assistant Warden Reynolds would have

25  been the individual who proposes that plan to you?

1      A.  Yes.

2      Q.  Okay.  And what about the decision to line

3  women up in the gym and leave them handcuffed while

4  they're in the gym waiting to be strip-searched; is

5  that something that would have been proposed to you

6  by Assistant Warden Reynolds?

7      A.  That was never -- that was never proposed to

8  me.

9      Q.  Okay.

10      A.  Yes.

11      Q.  Well, do you recall what Assistant Warden

12  Reynolds did propose to you in terms of bringing the

13  women into the gym so they would be wait to be

14  strip-searched?

15      A.  I do not remember the specifics, but I know

16  that we discussed and agreed to, when the women

17  entered the gymnasium, they would be uncuffed.  If I

18  remember correctly.

19      As -- when they entered inside the gymnasium,

20  the cuffs would be removed, if I remember correctly.

21      Q.  Okay.  And as you sit here today, is it your

22  testimony that you believe that the cuffs were

23  removed as they entered the gymnasium?

24      A.  I do believe that they were removed.

25      Q.  Okay.  And what is the basis for that

1  belief?

2      A.  Because the first line that was moved from

3  housing Unit 2 to the gymnasium, I actually

4  monitored that myself.

5      Q.  When you say you monitored it, can you

6  explain what you mean?

7      A.  When I left -- when I left -- when we left

8  dietary, went to housing Unit 2, I was on grounds

9  with Deputy Director Denning in housing Unit 2, and

10  I watched the first line of movement with the

11  offender population from 2 to the gymnasium.

12      Q.  When you say the first line of movement, can

13  you -- I just want -- I guess what I'm trying to

14  figure out is do you mean all of Unit 2B being moved

15  over to the gym or just a portion of it?

16      A.  A portion of women that were escorted from

17  housing Unit 2 to the gymnasium.

18      Q.  Okay.  And do you recall what size -- the

19  number, I guess --

20      A.  I do not recall the number.

21      Q.  Okay.  But it was not the entire unit?

22      A.  It was not the entire unit.

23      Q.  Okay.  Possible that it was one of the

24  dorms?

25      A.  I can't remember.

1    Q.  Okay.  Well, was it 20 women, more than 20

2    women, less?

3    A.  I do not recall.

4    Q.  Okay.  So your testimony is that you

5    accompanied that first group of women as they were

6    walked into the gym; is that correct?

7    A.  Yes.

8    Q.  And you entered the gym with those women?

9    A.  After they entered the gym; yes.

10   Q.  Okay.  And so where -- is your testimony

11   that the handcuffs were removed as they were walking

12   into the gym?

13   A.  No.  When they -- when they lined up in the

14   areas where they were asked to stand, the handcuffs

15   were then removed.

16   Q.  Okay.  And who removed those handcuffs?

17   A.  I do not recall exactly who removed those

18   handcuffs.

19   Q.  Okay.  And just so I'm clear--I can't

20   remember what you said--did you say you walked into

21   the gym with those women?

22   A.  After the line went through, after they

23   passed us, we stood on the walk and watched and

24   observed the movement of the offenders.  Once they

25   all entered the gym, we then went into the gym

1    behind them.

2        Q.  Okay.  When you say they all, you mean just

3    that first --

4        A.  That first line of movement.

5        Q.  Okay.  And that's not -- that wasn't all of

6    Unit 2B, that was just that first line?

7        A.  Yes.

8        Q.  Okay.  And you -- your testimony is that you

9    do not recall the number of women --

10       A.  I do not recall the number of women.

11       Q.  Okay.  And Unit 2B, previous testimony is

12   that it consisted of a hundred women; is that

13   correct?

14       A.  Correct.

15       Q.  Because it would have been 20 women per

16   dorm?

17       A.  Correct.

18       Q.  Okay.  And how long did you stay in the gym

19   after that first line of movement was brought into

20   the gym?

21       A.  Maybe 10 to 15 minutes.

22       Q.  And after that 10 or 15 minutes, where did

23   you go?

24       A.  I went to my office.

25       Q.  Okay.  And once you got back to your office,

1  did you return to either housing Unit 2B or 4B

2  during the shakedown and strip search that day?

3      A.  I do not recall returning to either of the

4  housing units that day.

5      Q.  Okay.  And do you recall whether or not you

6  returned to the gym that day?

7      A.  I do not recall returning to the gym that

8  day.

9      Q.  So fair to say then that you don't know if

10  the rest of the women after that first line who were

11  marched in the gym had their handcuffs removed or

12  not?

13      A.  I do not know.

14      Q.  Okay.  So it's completely possible that they

15  did not have them removed?

16          MS. MCNAUGHT:  Objection.  Asks her to

17  speculate.  And she's already stated she doesn't

18  know.

19          THE COURT:  Sustained.

20      Q.  I just want to make sure your testimony is

21  clear.  After you left the gym, is it your testimony

22  that you went directly back to your office?

23      A.  That is correct.

24      Q.  Okay.  And to the best of your recollection,

25  you did not return to the gym or either of the

1    housing units that day during the shakedown and

2    strip search?

3        A.  Yes.

4        Q.  The -- that Monday meeting that we were --

5    or the meeting a couple days -- I don't want to hold

6    you to it being on Monday, but the meeting that

7    occurred a couple of days before the strip search

8    and shakedown on March 31st, 2011.  The plan that

9    was proposed to you by Assistant Warden Reynolds,

10   you counted on him as your Assistant Warden to carry

11   out that plan as it was described to you; correct?

12       A.  Yes.

13       Q.  Okay.  So you counted on him or expected

14   that Assistant Warden Reynolds would carry out the

15   shakedown and strip search as you had authorized it?

16       A.  Yes.

17           MS. MCNAUGHT:  Your Honor, I object to

18   this.  We've been over this twice now.

19           THE COURT:  Yes.  I think we're being

20   repetitive.

21       Q.  Assistant Warden Reynolds was the individual

22   in charge of the mass shakedown and strip search

23   that day; correct?

24           MS. MCNAUGHT:  Objection; asked and

25   answered.

1          THE COURT:  It has been.

2      Q.  I asked you a question about how you

3   expected Warden Reynolds to carry out the strip

4   searches you had authorized.  Fair to say that you

5   also expected him to carry out that strip search in

6   a professional manner?

7      A.  Yes.

8      Q.  Okay.  And to carry it out in a manner that

9   was not degrading?

10     A.  Yes.

11     Q.  Okay.  And in a manner that afforded the

12  women involved privacy?

13     A.  Can you -- what do you mean by privacy?

14  What do you mean?

15     Q.  Well, in a manner that they would not be

16  viewed by others who were not conducting the strip

17  search?

18     A.  Yes.

19     Q.  Okay.  So they would not be viewed by male

20  officers and cadets?

21     A.  Yes.

22     Q.  Okay.  And so if those things happened, the

23  strip search would have occurred in a way that you

24  had not authorized?

25          MS. MCNAUGHT:  Objection.  There's no

1    foundation.

2         Q.  We've gone through the different aspects of

3    the strip search that --

4              THE COURT:  I understand completely,

5    Mr. Field.  This is one of those borderline, real

6    tight.  You've covered this.

7         Q.  I can move on if it helps push it over the

8    border to their side.

9              THE COURT:  I think it will help.  Go

10   ahead.

11        Q.  We talked about your authority as Warden to

12   delegate responsibility to some of your

13   subordinates.  Was there anybody else besides

14   Assistant Warden Reynolds that you delegated

15   authority for the mass strip search and shakedown on

16   March 31st, 2011?

17        A.  No.

18        Q.  Was the March 31st, 2011, shakedown and

19   strip search the only mass shakedown and strip

20   search to occur at Lincoln Correctional Center

21   under -- during the period of time that you were the

22   Warden there?

23        A.  Yes.

24        Q.  Okay.  And had you ever -- just during the

25   period of time that you were the Warden of Lincoln

1      Correctional Center, had you ever brought in cadets

2      for a training exercise outside of this -- the

3      exercise that occurred on March 31st, 2011?

4          A.  No.

5          Q.  Okay.  Who was in charge of monitoring the

6      cadets during the shakedown and strip search on

7      March 31st, 2011?

8          A.  The training academy supervisor.

9          Q.  And who was that?

10         A.  Mr. Pasley and his team.  His staff.

11         Q.  Do you recall who was on his staff in terms

12     of supervision?

13         A.  I do not.

14         Q.  Okay.  Mr. Pasley was one of the --

15         A.  Yes.

16         Q.  Was he the main --

17         A.  He was the main person in charge.

18         Q.  Okay.  And you expected that Mr. Pasley

19     would make sure that the cadets would conduct

20     themselves both during the strip search and the

21     shakedown in a manner that was in accordance with

22     IDOC policies and procedures?

23         A.  Yes.

24         Q.  Okay.  And in a manner that was in

25     accordance with the shakedown and strip search that

1    you had authorized?

2        A.  Yes.

3        Q.  Did you make any attempt to check that day

4    to make sure that the cadets were conducting

5    themselves in that manner?

6        A.  Not that I can recall.

7        Q.  Okay.  You depended on your subordinates

8    to --

9        A.  I did, yes.

10       Q.  Okay.  The morning of the shakedown and

11   strip search, did you provide any instructions to

12   your -- the staff members who were going to take

13   part in that shakedown and strip search before the

14   operation started?

15       A.  Not that I recall.

16       Q.  Okay.  Did Assistant Warden Reynolds provide

17   the staff any instruction?

18       A.  Not that I recall.

19       Q.  Did you also depend on Assistant Warden

20   Reynolds to monitor the conduct of the cadets that

21   day?

22       A.  Yes.

23       Q.  Okay.  And what about Tactical Team

24   Commander Dawdy, did you also depend on him to

25   monitor the conduct of the cadets that day?

1      A.  Yes.

2      Q.  Okay.  Going back to the -- was it

3  Corrections Association course --

4      A.  Illinois Corrections Association.

5      Q.  Thank you.  Illinois Corrections Association

6  course that you took on dealing with the female

7  inmate population, you heard Ms. Still testify this

8  morning about trauma triggers.  Is that something

9  that you learned about during that four to seven day

10 course that you talked about?

11     A.  I do not recall.

12     Q.  Well, as the -- someone who had served as

13 both a warden and an assistant warden in female

14 facilities, fair to say that in March 2011, you knew

15 that abusive language directed towards female

16 inmates could lead to trauma?

17     A.  Yes.

18     Q.  Okay.  And fair to say that, again, as

19 someone who served as Warden and Assistant Warden in

20 a female facility, that derogatory language is

21 something -- directed at female inmates, that could

22 lead to one of these trauma triggers?

23     A.  Yes.

24     Q.  And your knowledge of these issues is, fair

25 to say, something that you attempted to impart to

1   your subordinates?

2       A.  Yes.

3       Q.  Okay.  And fair to say that it's something

4   that you expected your subordinates to apply in

5   their -- during operations at Lincoln Correctional

6   Center?

7       A.  Yes.

8       Q.  I'm gonna show you what has been marked as

9   Plaintiff's Exhibit 33.  This is the Illinois

10  Administrative Code in relation to searches and

11  disposition of contraband.  I'll let you see this.

12      Have you had a chance to review it?

13      A.  Mm-hmm.

14      Q.  Like I said, this is the Illinois

15  Administrative Code in relation to searches and

16  disposition of contraband.  As Warden of Lincoln

17  Correctional Center, fair to say that this was a

18  policy that you were very familiar with?

19      A.  Yes.

20      Q.  Okay.  And this policy deals with strip

21  searches and other intrusive searches of female --

22  well, of all offenders; correct?

23      A.  Yes.

24      Q.  Okay.  And fair to say that the information

25  contained in this policy is something that you would

1    have conveyed to or expected your assistant wardens

2    to know?

3         A.  Yes.

4         Q.  Okay.  And you would have expected them to

5    follow it as well?

6         A.  Yes.

7         Q.  Just want to be clear.  Your testimony is

8    that you left the gym on March 31st, 2011, before

9    any of the strip searches began; correct?

10        A.  Yes.

11        Q.  Okay.  So you weren't in the gym long enough

12   to know whether the women were strip-searched in

13   large groups, for example?

14        A.  Correct.

15        Q.  Okay.  And were you aware that women were

16   strip-searched in the beauty shop?

17        A.  I was not aware.

18        Q.  Okay.  And were you aware that women were

19   strip-searched in the staff bathroom?

20        A.  I was not aware.

21        Q.  Okay.  And was strip-searching women in the

22   beauty shop a part of the plan that was proposed to

23   you by Warden Reynolds a couple of days earlier?

24        A.  I do not believe so.  I cannot recall, but I

25   do not believe -- no, no.  I'm gonna say no.

         Q.  Okay.  And that was not something that you
had approved?

         A.  No.

         Q.  Okay.  And fair to say that strip searching
women in the staff bathroom was not something that
was part of the plan that Assistant Warden Reynolds
proposed to you a couple of days before the strip
search?

         A.  Correct.

         Q.  And that was not something that you
approved?

         A.  Correct.

         Q.  Was one of the reasons why you didn't
approve strip searches in the beauty shop the fact
that it had a window to the outside?

             MS. MCNAUGHT:  Objection, Your Honor.  It
lacks foundation.  She hasn't said that she wouldn't
approve it, she just said she hadn't, she didn't
approve it when it was -- at the time.

             THE COURT:  Sustained.

         Q.  Did the beauty shop have a door to the
outside?

         A.  Yes.

         Q.  And did that door have a window?

         A.  Yes.

1    Q.  Okay.  And was there also a window in the

2  beauty shop?

3    A.  Yes.

4    Q.  Both looked to the outside; correct?

5    A.  Correct.

6    Q.  Okay.  Would you have approved group strip

7  searches in the beauty shop?

8    A.  I may have.

9    Q.  And under what circumstances?

10    A.  Time constraints.

11    Q.  Despite the fact that there are those

12  windows?

13    A.  I would have made -- well, movement stopped

14  during mass shakedown.  There's no movement.

15  There's no movement in that area.  There would have

16  been no movement in that area.  There would be no

17  movement.  So that wouldn't have been a major

18  concern for me at that time -- at that time.

19    Q.  Well, when you say no movement, you mean no

20  inmate movement?

21    A.  No inmate movement, no staff movement.

22  Staff only -- only authorized staff was allowed to

23  be in that area.

24    Q.  Sure.  So any of the staff who were involved

25  in the strip search or shakedown were authorized to

1    be in that area; is that correct?

2        A.  That is correct.

3        Q.  Okay.  So there were 50 to 70 cadets, a

4    tactical team, and corrections officers who were

5    authorized to be in that area?

6        A.  Male -- I do not know the specifics to what

7    we had written out.  I do not recall that.  But male

8    staff were not to be present when female offenders

9    were being strip-searched.

10        Q.  Okay.  But male staff were -- whether they

11    were part of the tactical team, part of the cadets,

12    or the corrections officers, involved or detailed to

13    the strip search and shakedown that day, they were

14    allowed in that area?  They were allowed movement?

15        A.  They were allowed movement.

16        Q.  Okay.  So they could have been in the area

17    of the beauty shop?

18        A.  They should not have been in the area of the

19    beauty shop.

20        Q.  But they were allowed movement in that area?

21        A.  They were allowed movement, but they should

22    have not been in that area.

23        Q.  When the cadets arrived at the facility that

24    morning, did you meet them as they arrived?

25        A.  I did.

1      Q.  Okay.  And do you recall the number of

2   female cadets in relation to --

3      A.  I do not.

4         THE COURT:  What's that?

5      Q.  I'm sorry, I cut you off.

6         THE COURT:  I did not understand.  I didn't

7   hear.

8      A.  I did not.

9         THE COURT:  Thank you.

10      Q.  As the Assistant Warden of Operations, would

11   it have been Assistant Warden Reynolds' duty to

12   report to you, after the strip search and shakedown

13   had taken place, the results of that exercise?

14      A.  Yes.

15      Q.  Okay.  And do you recall as you sit here

16   today Assistant Warden Reynolds reporting to you

17   about the results of the strip search and shakedown

18   that day?

19      A.  I -- yes.

20      Q.  Okay.  And what do you recall him reporting?

21      A.  I do not recall the specifics to what he

22   reported --

23      Q.  Okay.

24      A.  -- but I recall him reporting to me after

25   the shakedown.

1      Q.  And was a written report created to your

2   knowledge?

3      A.  I do not recall, but that would have been

4   normal procedures for me to request a written

5   report.

6      Q.  Okay.  But you don't recall if you requested

7   one in this case?

8      A.  I do not recall.

9      Q.  After the shakedown and strip search on

10  March 31st, 2011, did female inmates from Units 2B

11  and 4B complain to you about the strip search and

12  shakedown that day?

13     A.  I believe so.  I do not recall completely

14  when it was reported to me, how it was reported to

15  me specifically, but I believe that I did have an

16  offender or two report to me that that occurred.

17     Q.  You said an offender or two?

18     A.  Yes.

19     Q.  Okay.  Well, did Assistant Warden Reynolds

20  inform you that any of the female inmates from 2B or

21  4B had complained to him?

22     A.  I do not recall that.

23     Q.  Okay.  What about any of your other

24  subordinates, did they report to you that the women

25  from Unit 2B or 4B had complained about the strip

1  search and shakedown?

2       A.  I do not recall that.

3       Q.  Okay.  Well, for the complaints that were

4  brought to your attention, did you instruct

5  Assistant Warden Reynolds to follow-up on those

6  complaints?

7       A.  I do not recall.

8       Q.  Did you yourself as Warden of the facility

9  follow-up on those complaints?

10      A.  I would have.  As the Warden of that

11 facility, I would have inquired about that

12 complaint.

13      Q.  Okay.  Well, so as you sit here today, can

14 you tell me the things that you did to follow-up on

15 the complaints that were brought to your attention?

16      A.  I do not remember the specifics to what I

17 did specifically as relates to those complaints.

18      Q.  Now, you testified that your practice was

19 that you would have followed up; correct?

20      A.  Correct.

21      Q.  Okay.  Well, do you recall whether you did

22 or did not follow-up?

23      A.  I recall that I looked into the matter.

24      Q.  Okay.  And what did you do to look into it?

25      A.  I would have -- if it was reported to me

1    that a grievance was filed, I would have reached out

2    to the Grievance Officer to see if they had those

3    grievances in their possession.

4        Q.  But I asked you about inmates that

5    complained directly to you?

6        A.  Complained directly to me.  I would have

7    asked -- I would ask Reynolds had he heard any

8    complaints of such.  And I would have -- whoever

9    they had mentioned, what officer, I would have named

10   to Reynolds who -- the particulars about the

11   specific officer that they complained about.  I

12   would have asked Reynolds about that day and about

13   what would have occurred that day.

14       Q.  Okay.  So I just want to make sure that I

15   have your testimony clear.  I thought you testified

16   that your memory was an offender or two did complain

17   to you?

18       A.  An offender or two I believe did complain to

19   me.

20       Q.  Okay.  When you say complained to you,

21   did -- I just want to make sure that we're on the

22   same page.  Do you mean filing a grievance or do you

23   mean coming directly to you to --

24       A.  When I made my rounds, they addressed --

25   they approached me then, when I made my rounds on

1    the housing unit, if I remember correctly.

2        Q.  Okay.  And did you instruct Assistant Warden

3    Reynolds to follow-up on those complaints?

4        A.  I believe that I did.

5        Q.  Okay.  And do you recall Assistant Warden

6    Reynolds reporting back to you the results of his

7    investigation?

8        A.  I believe so.  I believe he told me that

9    there was nothing -- he couldn't validate -- he

10   could not validate what was become reported.

11       Q.  Okay.  What about during the shakedown and

12   strip search itself were there any women that

13   complained to you?

14       A.  That day?

15       Q.  Yes.

16       A.  Not that I recall.

17       Q.  Have you ever seen a written report related

18   to this strip search?

19           MS. MCNAUGHT:  Objection --

20           THE COURT:  No, I think -- is this new or

21   what?

22           MR. FIELD:  I asked about written reports

23   earlier.

24           MS. MCNAUGHT:  It lacks foundation much.

25           MR. FIELD:  Wait a minute, wait a minute.

1        MS. McNAUGHT:  Okay.

2        THE COURT:  Now, what do you say,

3   Mr. Field?

4        MR. FIELD:  I asked her earlier whether

5   there should have been a report created as part of

6   Illinois Department of Corrections policies and

7   procedures.  She said yes.  I'm now asking her

8   she -- if such a policy was created, and then I'll

9   ask her if she had seen that policy.  If such a

10  report was created and then whether she ever saw the

11  report.

12       THE COURT:  All right.

13       A.  I do not recall seeing the report.

14       Q.  Do you recall if a report was written?

15       A.  I do not recall if a report was written.

16       Q.  Okay.  And you do not recall seeing such a

17  report either?

18       A.  I do not recall seeing a report.

19       Q.  You testified a few minutes ago that

20  there -- under certain circumstances, you may have

21  approved strip searches to occur in the beauty shop;

22  correct?

23       A.  Yes.

24       Q.  Okay.  But on the -- on March 31st, 2011,

25  you did not approve strip searches taking place in

1    the beauty shop?

2        A.  I did not.

3        Q.  Okay.  The Corrections Officers who were

4    detailed to the gym on March 31st, 2011; who was in

5    charge of overseeing those officers?

6        A.  Reynolds would have been in charge of the

7    officers conducting the strip search.

8        Q.  Okay.  So the officers detailed to the gym

9    would have been under Reynolds --

10       A.  Supervision, mm-hmm.

11       Q.  Okay.  Did you communicate to either

12   Assistant Warden Reynolds or to Tactical Team

13   Commander Dawdy that they were to be responsible for

14   the conduct of the tactical team during the mass

15   strip search on March 31st, 2011?

16       A.  I do not recall specifically, but that's

17   something that I would have done.

18       Q.  Okay.  Well, as the Tactical Commander,

19   Lieutenant Dawdy would have been responsible for the

20   conduct of his officers?

21       A.  Yes.

22       Q.  Okay.  And would he have -- well, would he

23   have been under the supervision of Assistant Warden

24   Reynolds that day?

25       A.  Yes.

1      Q.  You indicated a few minutes ago that an

2   offender or two complained to you about the strip --

3   mass strip search that day; correct?

4      A.  Correct.

5      Q.  And this occurred during your rounds of the

6   facility?

7      A.  Correct.

8      Q.  Okay.  What did the offenders complain to

9   you about?

10     A.  I don't remember the specifics.

11     Q.  Well, is it fair to say that if you asked

12  Assistant Warden Reynolds to follow-up on those

13  complaints, that the complaints were serious enough

14  to merit follow-up?

15          MS. MCNAUGHT:  Objection.  Asked and

16  answered.  And he's asking her to speculate.

17          THE COURT:  Yeah, on the speculation.

18  Seems to me that we've covered this territory,

19  haven't we, Mr. Field?

20     Q.  I can move on, Your Honor, that's fine.

21     I'm also about to start a different section,

22  I'm not sure if you want to --

23          THE COURT:  Oh, fine.  If we're gonna start

24  a separate section, we've got two minutes to five.

25  I think we'll give you two minutes tonight.

1          MR. FIELD:  Give me two minutes --

2          THE COURT:  No, no.  We're gonna take the

3    two minutes from you and we're going to stand in

4    recess until tomorrow morning.

5          MR. FIELD:  Fair enough.

6          THE COURT:  Please recall the admonition,

7    ladies and gentlemen.  10:00 tomorrow morning, if

8    you would all please be here.

9       We will stand in recess until then, Madam

10   Clerk.

11      (The jury left the courtroom.)

12         THE COURT:  All right.  The jury has left

13   the courtroom.  Anything, any housekeeping matters

14   that we need to talk about here?

15         MR. FIELD:  No, Your Honor.  Not from

16   plaintiffs.

17         THE COURT:  Everything all in shape?  We

18   will be back to you then in the morning, Warden.  If

19   you'll just be back there on the stand.

20      Anything else?  Any problems?  Are we moving

21   along pretty well?  What do you think?

22         MS. MCNAUGHT:  No.

23         MR. FIELD:  They're anxious to get to their

24   case, Your Honor, I guess.

25         THE COURT:  Of course, of course.

1    Everybody is.

2        Okay.  No problems.  Don't surprise me in the

3    morning at five minutes until ten.

4             MS. MCNAUGHT:  We're done with that.  We're

5    done.

6             THE COURT:  Good.  We want to get rolling

7    with that jury.

8             MS. MCNAUGHT:  We want to get to the meat

9    potatoes.

10             THE COURT:  And don't forget we have

11    Thanksgiving next week.

12        All right.  Thank you.  Have a pleasant

13    evening, everyone.  See you tomorrow.

14        (Court was recessed for the day.)

15    I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

16    Reporter, certify that the foregoing is a correct

17    transcript from the record of proceedings in the

18    above-entitled matter.

19

20                  This transcript contains the

21                  digital signature of:

22

23                  Kathy J. Sullivan, CSR, RPR, CRR

24                  License #084-002768

25