```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                   SPRINGFIELD DIVISION

 3
   BEVERLY THROGMORTON, ET      )
 4 AL.,                         )
                               )  12-CV-3087
 5           PLAINTIFFS,        )
                               )  JURY TRIAL
 6        VS.                   )
                               )  SPRINGFIELD, ILLINOIS
 7 REYNOLDS, ET AL.,            )
                               )
 8           DEFENDANTS.        )

 9
                TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE RICHARD MILLS
               UNITED STATES DISTRICT JUDGE
11
   NOVEMBER 17, 2016
12
   A P P E A R A N C E S:
13
     FOR THE PLAINTIFFS:   VINCENZO FIELD
14                         RUTH Z. BROWN
                           TARA ELIZABETH THOMPSON
15                         LOEVY & LOEVY
                           3RD FLOOR
16                         311 NORTH ABERDEEN STREET
                           CHICAGO, ILLINOIS
17

18
     FOR THE DEFENDANTS:   KAREN L. MCNAUGHT
19                         DEBORAH L. BARNES
                           LAURA K. BAUTISTA
20                         ILLINOIS ATTORNEY GENERAL
                           500 S. SECOND STREET
21                         SPRINGFIELD, ILLINOIS

22

23 COURT REPORTER:         KATHY J. SULLIVAN, CSR, RPR, CRR
                           OFFICIAL COURT REPORTER
24                         600 E. MONROE
                           SPRINGFIELD, ILLINOIS
25                         (217)492-4810
```

1                          I N D E X
         WITNESS                              PAGE
2
             MELODY HULETT
3                 Direct Examination           17-3
                  Cross Examination            17-22
4                 Redirect Examination         17-46
                  Recross Examination          17-52
5            RENEE HATFIELD
                  Direct Examination           17-54
6                 Cross Examination            17-96
                  Redirect Examination         17-101
7            MELODY HULETT
             (Outside the presence of the jury.)
8                 Direct Examination           17-115
                  Cross Examination            17-122
9                 Redirect Examination         17-123
             (Before the jury)
10                Redirect Examination         17-143
                  Recross Examination          17-145
11           ALAN PASLEY
                  Direct Examination           17-146
12                Cross Examination            17-163
             MILLIE LEE
13                Direct Examination           17-169
                  Cross Examination            17-185
14                Redirect Examination         17-186
             TROY DAWDY
15                Direct Examination           17-196
                  Cross Examination            17-212
16                Redirect Examination         17-219
             RUSSELL CRAIG
17                Direct Examination           17-220
                  Cross Examination            17-231
18           RENEE HATFIELD
                  Direct Examination           17-242
19                Cross Examination            17-249
                  Redirect Examination         17-253
20                Recross Examination          17-259

21

22

23

24

25

P R O C E E D I N G S

          *    *    *    *    *    *    *    *    *    *    *

     (The jury entered the courtroom.)

          THE COURT:  Thank you very much, Madam
Clerk.  Good morning, everyone.

     Beautiful day out there, isn't that stunning?
Oh, my.  A shame we have to be inside.  But at least
there's no rain and there's no heavy lifting.

     Okay.  We're all in place.  Everyone is in
place.  And, Mr. Field, you may continue.

          MR. FIELD:  Thank you.  Your Honor.

                    MELODY HULETT
recalled as a witness herein, having been previously
sworn, was examined and testified as follows:

                DIRECT EXAMINATION
BY MR. FIELD:  (Cont'd)

     Q.  Good morning, Warden Hulett.

     A.  Good morning.

     Q.  I meant to ask you yesterday, since we've
been identifying where everything is on the map.
This is Plaintiff's Exhibit 202.  I think it was
this building right here that was identified
yesterday as the gymnasium; is that correct?

     A.  Yes.

     Q.  Okay.  Can you indicate where on that

1    overhead view your office is located?  Or was

2    located in March 2011?

3         A.  It's in the admin building.  And I don't

4    even -- because this would be the hub, so it would

5    be in this building.  Right in that area.

6         Q.  In this building right here?

7         A.  Yes.

8         Q.  Okay.  And that you said is the admin

9    building?

10        A.  Yes.

11        Q.  Okay.  Thank you.

12        As Warden at Lincoln Correctional Center, were

13   you familiar with shakedown slips?

14        A.  Yes.

15        Q.  Okay.  And is that something that you would

16   have seen as Warden of Lincoln Correctional Center?

17        A.  Yes.

18        Q.  Okay.  And are you familiar with how those

19   documents are completed?

20        A.  Yes.

21        Q.  And are you familiar with the process in

22   which the document is provided to the inmate who's

23   had an item of contraband confiscated?

24        A.  Yes.

25        Q.  Okay.  So there was some testimony on this

1 yesterday.  And I think it might just clarify if we

2 kind of went through one and how it was filled out.

3   So I'm going to move to have Plaintiff's

4 Exhibit 221 admitted into evidence.

5     MS. MCNAUGHT:  Could I take a look at those

6 real quick?

7     MR. FIELD:  Sure.

8   (Sotto voce discussion among counsel.)

9     THE COURT:  Let me see Exhibit 221?

10     MS. MCNAUGHT:  Your Honor, these aren't in

11 Bate order.  I just want to make sure that all of

12 the pages are here.  That's what --

13     THE COURT:  That's fine.  Just let me see

14 it.

15     MR. FIELD:  I've got a copy here, Your

16 Honor.  They're the shakedown slips that we

17 discussed yesterday.

18     THE COURT:  I believe there are 33 pages of

19 this one?

20     MR. FIELD:  That's correct, Your Honor.

21     THE COURT:  All right.  Here you are,

22 Mr. Field.

23     MS. MCNAUGHT:  No objection.

24     THE COURT:  Fine.

25     MR. FIELD:  As I moved them into evidence,

1    Your Honor, I'd ask for permission to publish.
2         THE COURT:  Surely.  Please, please do.
3    It's upside-down.
4       There you go.  Pull it down a little bit.
5    There we are.
6       Q.  Are you able to -- to see that, Warden
7    Reynolds?  Or sorry, Warden Hulett.
8       A.  Yes.
9       Q.  I apologize.
10      I believe the testimony yesterday was that this
11   portion of the form here is filled out by the
12   individual who has found and confiscated the
13   contraband; is that correct?
14      A.  Yes.
15      Q.  Okay.  And then this -- this part of the
16   form on this side is filled out at a later time,
17   after the -- what has been confiscated has been
18   reviewed; is that correct?
19      A.  Yes.
20      Q.  Okay.  At the time that the -- this part of
21   the form is filled out, once it has been filled out,
22   is that left with the inmate?
23      A.  A copy of the shakedown slip should go to at
24   the inmate.
25      Q.  Okay.  And is it -- so, for example, when --

1    that's what I'm trying to figure out, is when the

2    copy is provided to the inmate.  It is left where

3    the contraband was found on the inmate's bed or

4    wherever it's left at the time that it's -- at the

5    time this is completed or is it at some later time?

6         A.  If I remember correctly, a shakedown slip is

7    to be left with an offender after the shakedown is

8    done.  It has copies to it, if I remember correctly.

9         Q.  Okay.  So the form would be left --

10        A.  At the time that the officer completed the

11   shakedown.

12        Q.  Okay.  And then the copy that the officer is

13   taking with them is then reviewed, along with what

14   was actually confiscated, in order to fill out this

15   portion of the form; is that correct?

16        A.  Correct.

17        Q.  Okay.  And it's the officer who is

18   confiscating the contraband who would fill out this

19   top portion of this form; is that correct?

20        A.  Yes.

21        Q.  Okay.  So the date is, you know, when that

22   particular piece of contraband was confiscated; is

23   that correct?

24        A.  Correct.

25        Q.  Okay.  And the time would be when that piece

 1    of contraband was found?

 2         A.  Yes.

 3         Q.  Okay.  And then this would indicate in what

 4    unit the contraband was found in?

 5         A.  Yes.

 6         Q.  Okay.  And then the living area, that's the

 7    sort of dorm and bed number?

 8         A.  Yes.

 9         Q.  Okay.  And then this portion of the form

10    here is where the officer who's confiscating the

11    contraband would describe what has been found; is

12    that correct?

13         A.  Correct.

14         Q.  Okay.  And this portion of the form at the

15    bottom here, is this the time in which the form is

16    actually left with the inmate?  Or left where the

17    contraband was confiscated?

18         A.  You asked me two different questions.

19         Q.  So I'm trying to figure out when exactly

20    this portion of the bottom of the form is filled

21    out?  I see that there are two different times.  And

22    so is this just before the form is left with the

23    inmate this part is filled out?

24         A.  You know what, I don't recall the rule

25    behind that, but I would think that it would be

1  filled out the time of the drop-off of the document,

2  I mean to the shift commander, so the shift

3  commander would know and be able to track when that

4  actually was left for him to review it.

5      Q.  Who is the individual who -- and it doesn't

6  have to be by name but in terms of their position

7  within the facility, who does the -- the later

8  review?

9      A.  That would be the shift supervisor.

10     Q.  Okay.  So if the shift supervisor is filing

11 out this portion of the form, I guess it's not clear

12 to me why this -- they would also be filling out

13 that -- this bottom portion of the form here?  Is

14 that -- are you -- as you sit here today, is --

15     A.  Is that two different -- is that the

16 officer's signature or the -- I can't -- what are

17 you -- how do you -- how do you -- I'm trying to

18 figure out what you're asking here.  I'm confused.

19     Q.  So is it the officer who has confiscated the

20 contraband who is signing this bottom portion of the

21 form?

22     A.  Yes, that should be the officer's signature.

23     Q.  Okay.  So they will put the date -- they

24 will put the date and the time of when the officer

25 confiscating the contraband has signed the form; is

1  that correct?

2      A.  Is what I remember; yes.

3      Q.  Okay.

4          THE COURT:  Warden, how many copies are

5  there to this document?

6      A.  I -- I want to believe there were -- there

7  were two; one for the offender and one for the

8  contraband.  I want to say there was a white copy

9  and a yellow copy.  And the yellow copy went to the

10 offender, I believe.

11     Q.  This is one of the shakedown slips from the

12 March 31st, 2011, mass shakedown and strip search at

13 Lincoln Correctional Center; correct?

14     A.  It appears to be.

15     Q.  Okay.  Well, after the March 31st, 2011,

16 shakedown, did Assistant Warden Reynolds discuss

17 with you the types of contraband that had been found

18 during the shakedown?

19     A.  I don't -- I don't recall the specifics, but

20 that would have been something--if there was major

21 contraband found--he would have shared with me what

22 those were.

23     Q.  Okay.  And would reviewing the shakedown

24 slips from the March 31st, 2011, shakedown refresh

25 your recollection on the types of contraband that

1    were found?

2         A.  I assume, yes.

3         Q.  This is Plaintiff's Exhibit -- I'm sorry,

4    one second.  221.

5         A.  Okay.

6         Q.  Thank you.

7              THE COURT:  We are going to have to move

8    along, Mr. Field.

9              MR. FIELD:  Okay, Your Honor.  I just

10   wanted to give her an opportunity to review those

11   documents.

12             MS. McNAUGHT:  Your Honor, in order to

13   speed this up, we will agree that all of these

14   tickets indicate that the box marked as minor

15   contraband was marked.  If that will speed it up,

16   we'll admit it.

17             THE COURT:  All right.  And how many do we

18   have there?  There are 33?

19             MR. FIELD:  33, Your Honor.

20             THE COURT:  Okay.  You got all that.  And

21   they all deal with the March 31 shakedown; isn't

22   that right?

23             MR. FIELD:  That is correct.

24             THE COURT:  Just a moment.

25             JUROR:  May I have an opportunity to glance

1    at that more closely?

2           THE COURT:  Beg your Pardon?

3           JUROR:  May I have an opportunity to glance

4    at that more closely?

5           THE COURT:  Oh, yes, because of your sight

6    and everything.

7           JUROR:  I just can't read the writing on --

8           THE COURT:  All right, fine.  We will

9    definitely have copies for you in just a few

10   moments.  We will.

11       Let me have the brightest one that you have.

12   Counsel, get together here.  This is all -- this is

13   all busywork.  So let's get things going and we'll

14   take a copy.  And, Madam Clerk, if you will have

15   copies made specifically for each of the members of

16   the jury.

17          THE CLERK:  Yes, sir.

18          THE COURT:  Which one do you want?  Do you

19   want the first one?

20          MS. MCNAUGHT:  No, the whole packet, Judge.

21          THE COURT:  Oh, my lord.

22          MR. FIELD:  The first one is fine is

23   plaintiffs.

24          THE COURT:  Huh?

25          MR. FIELD:  Just doing the first one is

1    fine with plaintiffs.

2            THE COURT:  Well, the main thing is let's

3    get this form so they can see it.  Let's take the

4    first one, and that is Exhibit A.  Take Page 1 and

5    let's take eight copies for the jury.  And be sure

6    that you dial that so that it gets the most vivid

7    copy.  These are copies of copies.

8            THE CLERK:  Yes, sir.

9            THE COURT:  All right.  We will have those

10   in just a second.

11       Thank you for calling that to our attention.

12   Sometimes it's terribly difficult to read at a

13   distance, especially on these monitors.

14       Well, go ahead.  Go ahead.  Let's move.

15       Q.  (BY Mr. Field)  okay.  So as was said, all

16   33 were marked as minor contraband.  But there was

17   some testimony yesterday, Warden Hulett, on the

18   types of things that were find.  So I'd like to get

19   some -- go through some of these examples --

20           THE COURT:  Yea, go through them.

21       Q.  All right.  So is this an Axe body wash and

22   deodorant that was confiscated on March 31st, 2011?

23       A.  Are you asking me that's what -- that's what

24   it states, yes.

25       Q.  Okay.  And that's minor contraband; correct?

1     A.  Yes.

2     Q.  And this is one sleeve thermal with a

3 basketball in the right corner and the word Lakers;

4 is that correct?

5     A.  Yes.

6     Q.  And that had a -- well --

7     A.  And some kind of heart.

8     Q.  Yes.  And the word Heather or the name

9 Heather was written --

10     A.  Mm-hmm.

11     Q.  -- in -- drawn with pink and purple hearts.

12 Minor contraband?

13     A.  Yes.

14     Q.  Okay.  Again, one cassette tape of A-l-i

15 motion picture soundtrack and a James Brown 70s Funk

16 Classics.  Again, minor contraband?

17     A.  Yes.

18     Q.  Okay.  Could this slip, shakedown slip, this

19 is also one of the shakedown slips from March

20 31st -- March 31st, 2011 --

21          THE COURT:  Now, Mr. Field, there's only

22 been one shakedown that we're talking about.  We

23 don't need to keep referring to the date and so

24 forth.

25     Q.  Point taken, Your Honor.

```
 1            THE COURT:  The shakedown.  The shakedown.
 2        Q.  The shakedown.  This slip was issued in the
 3   gymnasium; is that correct?
 4        A.  Yes, it appears.
 5        Q.  Okay.  And in -- for this particular slip,
 6   they found some pills; is that correct?
 7        A.  Correct.
 8        Q.  Okay.  And this shakedown slip was also
 9   issued in the gym; is that correct?
10        A.  That's what slip it appears.
11        Q.  Okay.  And it's -- and they found -- it was
12   an altered T-shirt; is that correct?
13        A.  Yes.
14        Q.  Okay.
15            THE COURT:  Thank you, Madam Clerk.  Will
16   you pass them out.  Pass them out to the members of
17   the jury.
18        Are they clear enough, ladies and gentlemen?
19   Clear enough that you can read them?
20        Good, thank you.
21        All right, Mr. Field.  Everybody has got a copy
22   in front of them of the first page of that exhibit
23   --
24        Q.  Sure.
25            THE COURT:  -- out of the 33 pages.
```

Q. And the entire exhibit has been moved into evidence, so the jury will be able to review the remainder of them. But thank you, Your Honor.

THE COURT: All right.

Q. There was some testimony yesterday about some pills being found during the shakedown in the gym inside the vagina of one of the inmates. Do you recall that testimony?

A. I do.

Q. Okay. Were there any other pills that were found like that on any of the inmates in 2B and 4B that were -- went through the shakedown and strip search that day?

A. I do not recall.

Q. Well, did any of the shakedown slips indicate that that had been found?

A. Not that I reviewed.

Q. Okay. The shakedown slips indicate that there was some medication -- or expired medication found in the units during the shakedown; correct?

A. Correct.

Q. Okay. But that was the only -- those were the only medications -- or that -- the pills that we talked about that were found in the gym were the only medication that was indicated in the slips

1    found in the gym; is that correct?

2        A.  Correct.

3        Q.  Okay.  And the shakedown slips indicate that

4    of the 33, there was only one where the contraband

5    was found on the inmate themselves; is that correct?

6        A.  According to what I reviewed; yes.

7        Q.  Okay.  I asked you some questions yesterday

8    about the grievance process and your authority as

9    Warden to provide signature authority to your

10   subordinates.  You remember those questions?

11       A.  Yes.

12       Q.  Now, when you say -- well, I believe your

13   testimony yesterday was that the assistant wardens,

14   both the Assistant Warden of Operations and the

15   Assistant Warden of Programs had your signatory

16   authority on grievances; is that correct?

17       A.  Yes.

18       Q.  Okay.  That doesn't mean that they could

19   actually physically sign your name, it just means

20   that they could make the financial decision in your

21   name; is that correct?

22       A.  No, they actually signed it in my name.

23       Q.  They would sign your name?

24       A.  Mm-hmm.

25       Q.  And if they had signed your name, would they

1  indicate with initials or --

2  A.  Yes.

3  Q.  -- something like that that they had signed

4  for you?

5  A.  Yes.

6  Q.  Okay.  And so if a grievance has just your

7  signature and no initials, that would be something

8  that you had signed yourself?

9  A.  Yes.

10  Q.  Okay.  Do you ever recall advising an inmate

11  shortly before the shakedown that the policy of the

12  institution was that no strip searches should occur

13  as a collective group?

14  A.  I do not recall that -- that.

15  Q.  Would the ability to review some

16  correspondence in relation to that refresh your

17  recollection as to whether you advised an inmate

18  that the policy of the institution was that there

19  should be no strip searches as a collective group?

20  A.  I would like to see that.

21  Q.  This is Plaintiff's Exhibit 39.  Have you

22  had a chance to review it?

23  A.  Mm-hmm, yes.

24  Q.  Okay.  Does the review of Plaintiff's

25  Exhibit 39 refresh your recollection that on

1    March 21st, 2011, you responded to an inmate who was

2    grieving about being stripe-searched in a group in

3    dietary.  And your response to the grievance was

4    that there should be no strip searches as a

5    collective group.  That that was the policy of the

6    institution; is that correct?

7         A.  Yes.

8         Q.  Okay.  And that inmate was grieving that

9    they had been, again, strip-searched in a group in

10   the dietary building; is that correct?

11        A.  Yes.

12        Q.  Okay.  And did that grievance also complain

13   about Corrections Officer Edmondson?

14        A.  Yes.

15        Q.  And did the -- the grievant also complained

16   about being forced -- being on her period and being

17   forced to remove her tampon in front of other

18   inmates who were being strip-searched; is that

19   correct?

20        A.  Yes.

21        Q.  Okay.  Do -- your response to the grievance

22   also indicated that there would be some follow-up or

23   discussion about strip searches because of this

24   grievance; is that correct?

25        A.  That I would follow-up with individuals

1  concerning the strip search.

2      Q.  Okay.  As you sit here today, do you recall

3  following up with anybody about this particular

4  issue?

5      A.  I do not recall the specific, but that's

6  something I would have done.

7      Q.  Okay.  Officer Edmondson was one of the

8  officers who was involved in the mass shakedown and

9  strip search on March 31st, 2011?

10     A.  She was.

11     Q.  Okay.  And so ten days earlier, you had been

12  informed that there was an issue where she forced an

13  inmate to remove her tampon in a group strip search

14  in dietary; is that correct?

15     A.  Yes.

16     Q.  Okay.  But you can't recall whether you

17  followed up with officer Edmondson?

18     A.  I would have followed up with Officer

19  Edmondson.

20     Q.  You said that --

21     A.  I would have followed up.  I would have had

22  her subordinate, I would ask her subordinate to have

23  a conversation with her concerning the matter.  And

24  I would have followed up with that.  I do not recall

25  specifics, but that I would have followed up with

1    that.

2         Q.  Okay.  So you think that that's something

3    you would have followed up with, but as you sit here

4    today, you can't recall whether you did or not; is

5    that fair?

6         A.  That's something that I would have done.

7         Q.  Okay.  I'm trying to understand if it's

8    something that you recall that you actually did or

9    if it was something that, you know, your practice

10   generally speaking was to do that?

11        A.  That was my practice generally speaking,

12   that was what I would have done.

13        Q.  Okay.  Just one clarification.  You said

14   your practice was that you would have had a

15   subordinate follow-up with her.  I just wanted to

16   make it clear.  You mean one of your subordinates

17   but --

18        A.  No, no, mine.  My AW of Operations.

19        Q.  Which would have been Assistant Warden

20   Reynolds; correct?

21        A.  Yes.

22        Q.  Okay.  Thank you.  No further questions for

23   this witness, Your Honor.

24             THE COURT:  Very well.  Ms. McNaught, you

25   may cross.

1          MS. MCNAUGHT:  Thank you.

2                   CROSS EXAMINATION

3     BY MS. MCNAUGHT:

4          Q.  Good morning.

5          A.  Good morning.

6          Q.  Do you have Plaintiff's Exhibit 39 in front

7     of you?

8          A.  I do not.

9          Q.  Do you have it?

10         If you'll look at the third page of that

11    exhibit.  Is the chief administrative officer --

12    chief administrative officer's response contained on

13    that?

14         A.  Yes.

15         Q.  And does that bear your signature?

16         A.  Yes.

17         Q.  And is that where it says that offenders

18    shouldn't be strip-searched as a collective group

19    and that there was some security concerns with that?

20         A.  Yes.

21         Q.  Would you explain to the ladies and

22    gentlemen of the jury why you didn't concur with the

23    Grievance Officer's report and what that meant?

24    What you meant by that?

25         A.  Yes.  I did not agree with the strip search

1  itself because the ratio between one officer and

2  five offenders threatened the security of the

3  institution.

4      Q.  So just to make sure, what was the problem

5  with one officer and five offenders?

6      A.  Well, it could -- it threatened the

7  officer's security.  And then it also could have

8  potentially caused a hostage situation.  It could

9  have caused her bodily harm.  It could have caused

10  the institution a major concern had she been taken

11  hostage as well.

12      Q.  So as long as there was more than one

13  correctional officer for the five inmates being

14  strip-searched -- strip-searched in a group, that

15  would have been acceptable?

16      A.  Yes.

17      Q.  Do you have Exhibit 221.

18      Melody, I'd like to show you Plaintiff's

19  Exhibit 221.

20      A.  Okay.

21      Q.  And if you'll look at that first page, on

22  the bottom, does it show what the distribution items

23  are?

24      A.  Distribution items?  Oh, here.  Yes.

25      Q.  Can you read that to the jury, please?

1          A.   Item tag, supervisor, employee, disciplinary
2     report, violator.
3          Q.   Okay.  So in reading that, does that refresh
4     your recollection that there's an original and four
5     copies?
6          A.   Yes.
7          Q.   The offender gets one of the copies?
8          A.   Yes.
9          Q.   And then the original goes where?
10          A.   The original goes with the -- I'm trying to
11     think.
12          Q.   Does the original go with the evidence?  The
13     contraband?
14          A.   Yes.
15          Q.   Okay.  And where is the contraband kept?
16          A.   In a secure place in the supervisor area.
17     Operations.
18          Q.   So there's an original and four copies?
19          A.   Yes.
20          Q.   One of the copies is left with the offender?
21          A.   Yes.
22          Q.   Okay.
23          A.   Yes.
24          Q.   Okay.  You were asked questions about
25     whether you knew that the beauty shop was being used

1  just off the gym.  Do you remember those questions

2  yesterday?

3       A.  Yes.

4       Q.  Had you -- and your response was that you

5  didn't know that the beauty shop was being used; is

6  that correct?

7       A.  Correct.

8       Q.  Had you known that they -- that your

9  officers wanted or needed to use the beauty shop for

10  time constraints would that have been acceptable to

11  you?

12       A.  Yes.

13       Q.  And would you have approved that?

14       A.  Yes.

15       Q.  In 2011, how many female institutions were

16  there in Illinois?

17       A.  Three.

18       Q.  And where were they?

19       A.  Dwight, Illinois, Decatur, Illinois, and

20  Lincoln, Illinois.

21       Q.  And do the female facilities have

22  classifications, security classifications?

23       A.  Yes.

24       Q.  What classification, what security

25  classification was Dwight?

1          A.   Max.

2          Q.   Maximum meaning the most violent offenders

3     are --

4          A.   Correct.

5          Q.   -- housed at Dwight?

6          A.   Correct.

7          Q.   And then what was Lincoln Correctional

8     Center?

9          A.   Medium.

10         Q.   Meaning kind of in between?

11         A.   Yes.

12         Q.   And then what was -- what classification was

13    Decatur?

14         A.   Minimum.

15         Q.   Those would be the less aggressive

16    offenders?

17         A.   Yes, mm-hmm.

18         Q.   Or offenders with less time?

19         A.   Both.

20         Q.   Can you explain to the ladies and gentlemen

21    of the jury what it means to be in an acting

22    capacity in the Illinois Department of Corrections,

23    such as an acting warden or an acting assistant

24    warden?

25         A.   Well, acting warden has the same

1    responsibility as if they were actually in that

2    particular position.  We're just pretty much waiting

3    on the documentations, the final paperwork, to put

4    that person in that official title.

5        Q.  Lincoln Correctional Center has been

6    described as a dorm-style facility.  What does that

7    mean?

8        A.  That means that there is -- there are

9    dormitory-type settings as far as there are 20

10   offenders to one room.  There are pods, they are

11   considered housing units.  Housing units that are

12   divided in 100 on one side, 100 offenders on the

13   other side.  But every dorm -- each dorm houses up

14   to 20 offenders.

15       Q.  And we've heard some testimony about 2A --

16   I'm sorry, 2B and 4B.  Is there a 2A?

17       A.  Yes.

18       Q.  And where is that in relation to 2B?

19       A.  It's in the same building, it's just on the

20   opposite side.

21       Q.  And is there some kind of separation between

22   2A behind 2B?

23       A.  As far as there's -- when you walk into the

24   institution -- into that particular unit, when you

25   walk in, B is always to the right, A is always to

the left.  There's an officer desk that sits right
in the center, and that officer is responsible for
both -- for both sides.

Q.  And let's take just one side of the housing
unit.  What is contained on that housing unit?

A.  On 2A?

Q.  Or 2B.

A.  Okay, 2B.  What's contained on --

Q.  Right.  What kinds of things, besides the
dorms, what else is located on that -- on that
housing unit?

A.  Okay.  Well, 2A was considered a specialized
unit, a therapeutic unit.  And it was there for
women -- they were programmed as women of victory.
These women had two years or less sentencing.  They
were specialized programming.  They -- they did
things that were unique to their particular unit.

And then housing at 2 -- I mean 2B had a
regular population.

Q.  As you walk in the housing unit, either 2A
or 2B, is there a dayroom?

A.  There's a dayroom.

Q.  Okay.  What other things are there for the
ladies?

A.  A bathroom.  The shower, which if I remember

correctly can hold about six women at a time.  Then

when you went down the hall, there were the housing

units, the actual rooms where the actual women

slept, lived.  Their dorm rooms.  And there was

five -- five of them on each side.

Q.  And the showers, were they kind of like a

locker room style where everybody takes a shower,

it's not --

A.  Yes, locker room style.  However, adjacent

to the door there was a curtain to shield the

protection from anyone in the dayroom or anyone

walking through for -- to avoid them being able to

see inside of the shower itself while the women were

actually showering.

Q.  But once you got in the shower, it was all

open?

A.  It was all open.

Q.  Okay.  And what about the bathrooms?  Tell

the ladies and gentlemen of the jury what they

looked like?

A.  The bathrooms had, I want to believe four,

four toilets.  And there was a wall, a half wall

that allowed them to have privacy.  But at any given

moment, they could stand up and still see.  But they

still had their privacy blockage where they can

1    actually, if I recall correctly, that they could

2    actually have their own private area.

3        But the door -- there was no doors in front of

4    the actual stall itself.

5        Q.  And then were there sinks to wash hands?

6        A.  Sink to wash hands and --

7        Q.  Where are those located?

8        A.  Across from the actual toilet stations where

9    they were actually.

10       Q.  Now, the Illinois Department of Corrections

11   also has facilities that have cells; correct?

12       A.  Yes.

13       Q.  And explain to the ladies and gentlemen of

14   the jury -- you've worked in an institution that had

15   cells; right?

16       A.  Well, I actually worked at Jacksonville

17   Correctional Center, which is actually built exactly

18   like Lincoln.  So I've never really worked -- the

19   cells we have on grounds was at -- in segregation.

20   Yes.

21       Q.  You were asked some questions about having

22   more than one Assistant Warden of Programs.  Is

23   there more than one Assistant Warden of Programs at

24   a time?

25       A.  No.

1      Q.  Okay.  So you would have one Assistant

2   Warden of Operations and one Assistant Warden of

3   Programs --

4      A.  At one given time.

5      Q.  At one given time?

6      A.  Yes.

7      Q.  Okay.  Explain to the ladies and gentlemen

8   of the jury what an Assistant Warden of Operations

9   duties are?

10      A.  Simple.  It's to maintain the safety and

11   security.  To help the warden maintain the safety

12   and security of the facility.

13      Q.  And what is the -- what are the duties of an

14   Assistant Warden of Programs?

15      A.  To -- specifically, to oversee all the

16   operational input of the facility.  Anything from

17   maintenance to Internal Affairs to -- to aid me in

18   ensuring that the -- the facility functions and

19   operates in the capacity with a safe and secure

20   environment.

21      Whenever I'm away, that individual takes on my

22   full responsibilities from administration all the

23   way to operations.  That individual is -- also gives

24   input of -- having the opportunity to give input of

25   anything that needs to be adjusted -- adjustments

1    made.  They make rounds.  We all made rounds, we all

2    were responsible for making rounds.  There was --

3    they were responsible for keeping the facility

4    clean.  Responsible for the staff conduct, as well

5    as the offender population.

6           You know, I hope that's --

7           Q.  That's the job duties, in a nutshell, of the

8    Assistant Warden of Operations?

9           A.  Correct.

10          Q.  Okay.  What are the job duties and how do

11   they differ for the Assistant Warden of Programs?

12          A.  Assistant Warden of Programs, their

13   responsibilities is to ensure that the offenders are

14   being -- receiving programs that benefit them.  That

15   help make these individuals self-reliant,

16   self-sufficient.  That they're able to be an asset

17   when they leave the facility.  Go back to return to

18   the community.  That they have -- are able to be

19   self-reliant, self-sufficient, an asset to their

20   community and the society that they're returning to.

21          Q.  Now, you were asked some questions about the

22   differences between men and women and the types of

23   things in a facility that might be different.

24          And one of the things that you said was that

25   security, safety and security doesn't change, but

there are some other things that are -- there are
some other differences.  What types of differences
are there?

A.  Programming.  Such as programming.  When
you're programming a female offender.  When we
programmed our female offender, we offer programs
such as self-esteem building.  Seek and safety.
Seek and safety was a program that offender
individuals who had suffered some form of abuse to
get into this particular classes and work --
trainings to be able to effectively deal with those
issues.

There were mom and me camps.  We held mom and
me camps where the child of the offender and their
caregiver will actually come on grounds and spend
hours with mom in a therapeutic environment where
they got to do things that they wouldn't normally
have an opportunity to do in a visiting room
setting, such as painting, reading books together,
drawing, artwork.  You know, even activities in the
gym where they got to do fun activities with the LTS
officers and volunteers that were actually on
grounds as well.  Lots of games.  And just a
different type of bonding experience with their
child on grounds.

1    Q.  And that's not something that is offered to

2    men?

3    A.  At this time --

4    Q.  Male inmates --

5    A.  Not saying that men would not, you know,

6    benefit from that as well.  But at that particular

7    time, because of the training that we had received

8    in the women's -- the women's division, those were

9    some of the things that we implemented because of

10   the needs of the female population.

11   Q.  When inmates made grievances, did you like

12   to be informed, be kept informed about the types of

13   grievances that were coming in?

14   A.  Yes.

15   Q.  Why was that?

16   A.  Because then I had a more of a -- I was

17   more -- more of an awareness of what was actually

18   going on in my institution.

19   Q.  Did you ever receive any grievances from any

20   inmates about the March 31st, 2011, shakedown?

21   A.  No.

22   Q.  And those would be written grievances that

23   you were referring to; correct?

24   A.  Yes.

25   Q.  Did you tour any of the housing units,

1    either 2B or 4B, after March 31st of 2011?

2        A.  Yes.

3        Q.  And were there some inmates who came in

4    and -- came up to you and complained?

5        A.  One or two, like I said yesterday.

6        Q.  And tell us what it is that you recall about

7    that?

8        A.  I -- I don't recall the specifics, but I

9    do -- I do believe that if they had brought it to my

10   attention, I would have picked up the phone and

11   called my AW and asked, "Hey, did you know about

12   this?  Did something unusual happen yesterday that I

13   need to know about?"  Or I would have told the women

14   I would check into it.

15       The -- and my follow-up would have been a call

16   line.  I would have -- you know, I would have talked

17   to my AW, received any information that I had

18   available to me.  If he was unaware, I would have

19   asked him to look into it, get back to me, let me

20   know.  I would have followed up with that offender

21   on a call line and shared what I found, what

22   information I may have found out.

23       Q.  Do you recall an inmate ever coming up to

24   you and asking you whether you had received a

25   grievance about the March 31st shakedown?

1      A.  Yes, but it wouldn't have been the next day.

2      Q.  Okay.  What do you remember about that

3   incident?

4      A.  I remember if they asked -- if they asked

5   me, I would have, again, I would have contacted my

6   grievance officer and I would have asked my

7   grievance officer did he have these grievances in

8   his possession.  Or had he seen them or -- you know,

9   I would have followed up and looked for those

10  grievances.

11     Q.  And if the inmate had said that they filed a

12  grievance and you hadn't received it, what would you

13  have told that offender?

14     A.  That I didn't receive it if I didn't receive

15  it.

16     Q.  And was the offender then free to file

17  another grievance?

18     A.  Yes.  Free to file another grievance and

19  even -- I believe this particular -- I believe one

20  offender said to me, "You know, then I'll just -- at

21  this -- you know, at this point, I'll just send it

22  to Springfield."  That's what they called our

23  higher-ups, because the hub was in Springfield.

24     Q.  And is that the ARB?

25     A.  I believe so.

1    Q.  The Administrative Review Board?

2    A.  Yes.

3    Q.  Now, yesterday you were asked some questions

4    about the types of searches that are done in a

5    facility.  And you mentioned pat-down.  And you

6    mentioned --

7    A.  Contraband.

8    Q.  No.  Well, what's a pat down?

9    A.  Pat down is on the outer garments when

10   you're -- you know, you just pat down the person's

11   body with their fully clothed.  On top of the

12   clothing.

13   Q.  And does the officer pat -- or use hands --

14   A.  Yes.

15   Q.  -- to --

16   A.  Rub over the clothing.

17   Q.  Rub over the arms?

18   A.  Arms.

19   Q.  Okay.

20   A.  Body parts.  I mean --

21   Q.  The torso?

22   A.  Torso, yes.

23   Q.  And then the legs?

24   A.  The legs.

25   Q.  And then are -- do they have to take off

1    their shoes?

2         A.  Yes.

3         Q.  And then there's a little bit more intrusive

4    search called the strip search?

5         A.  Strip search; yes.

6         Q.  You talked about trying to be vigilant to

7    keep contraband to a minor -- or to --

8         A.  A minimum.

9         Q.  To a minimum?

10        A.  Yes.

11        Q.  Even if you're vigilant, what kinds of

12   things can you still find if you do a shakedown?

13        A.  I know yesterday, the individual, the

14   expert, she mentioned certain drugs that were

15   actually taken onsite at the health -- the Health

16   Care Unit.  There have been times where even though

17   the health care personnel watched that particular

18   person put that pill in their mouth, there are still

19   times we have found they have been regurgitated, or

20   they checked them, they hid them in their check, the

21   corner of their check and they were unable to be

22   visually seen to later to be found in another

23   individual's possession.

24        Q.  And what kinds -- what kinds of things can

25   you do with pills?

1    A.  Well, if it is something such as --

2  something that an individual is taking for psyche

3  meds or whatever, they --

4    Q.  Psychological meds?

5    A.  The psychological meds.  They will crush

6  them, they will snort them.  They would take them.

7  And if that's not prescribed for you and you don't

8  have that condition, it can cause a really good high

9  or a -- it could also cause even additional health,

10  you know, effects.  Negative effects as well.

11    Q.  Can an inmate sell or barter --

12    A.  Yes, they can sell.

13    (Parties speaking simultaneously, court

14    reporter requested clarification.)

15    A.  I'm sorry.  Yes, they can sell or barter it;

16  yes.

17    Q.  When you were Warden, did you ever take

18  notes?

19    A.  Yes, I did.

20    Q.  And what -- where did you keep your notes

21  that you took?

22    A.  I carried -- when I made my rounds or

23  whenever I had discussions and there were key things

24  that I wanted to just remember, I will carry a

25  little notepad, about three by five notepad with me

1    around to -- with a pen, to be able to take -- jot

2    down those things to bring things to my remembrance.

3        Q.  And have you recently reviewed that notepad

4    for March the 31st of 2011?

5            MS. THOMPSON:  Objection, Your Honor.  Can

6    we be heard at sidebar?

7            THE COURT:  Sure, come on up.  I've never

8    said no yet, have I?

9        Wait a second.  One of the jurors needs to

10   leave the room for a minute.  So we're gonna stand

11   in recess for five minutes.  Anybody else need to

12   make a pit stop?

13       We're gonna stand in recess five minutes.

14       (The jury left the courtroom.)

15           THE COURT:  All right.  Let's go.  Come on.

16   Come on.

17           MS. THOMPSON:  I'll admit I don't know what

18   this witness -- necessarily what this witness's

19   response to that question is going to be, but if

20   this witness has documents that are covered by our

21   discovery request for documents related to this date

22   that were never produced that she's going to talk

23   about --

24           THE COURT:  The notebook?

25           MS. THOMPSON:  -- I have a concern about

1    that.  We have never had any notebook produced to

2    us.

3           MS. MCNAUGHT:  Judge, she refreshed her

4    recollection last night.  She notes that 60 cadets

5    came in --

6           THE COURT:  She what?

7           MS. MCNAUGHT:  She notes there are 60

8    cadets that came in.

9           MS. THOMPSON:  We never receive those notes

10    in discovery.  I don't object to the content of

11    that, but we have notes that we never saw.  That is

12    a real problem.

13           THE COURT:  Where is it?

14           MS. MCNAUGHT:  I think it's at her house.

15           THE COURT:  Well, ask her now.  Just ask

16    her off the record.

17           MS. MCNAUGHT:  It's in her car.

18           THE COURT:  It's what?

19           MS. MCNAUGHT:  It's in her car.

20           MS. THOMPSON:  Can I suggest, Judge, that I

21    don't want to delay proceeding.  My suggestion is if

22    they have other questions, they can ask questions,

23    we're fine with that, but she should produce that to

24    us.

25           THE COURT:  Sure.

1          MS. MCNAUGHT:  We are going to move on to

2     another issue.

3          THE COURT:  At lunch, she can go to her car

4     and get the notebook, and then the two of you can go

5     over it and decide what you want to do.  And if it's

6     something we can make copies of, that's fine.

7          MS. MCNAUGHT:  Judge, I can get the 60

8     cadets in with somebody else.  It's fine.  It's just

9     they had asked how many there were and --

10         MS. THOMPSON:  But that documents --

11         THE COURT:  That doesn't quite cover the

12    whole story.  If she's got a notebook, this is the

13    first time you've heard about, they're entitled to

14    see it.

15         MS. THOMPSON:  Well, this is extreme

16    prejudice.  That the defendant has notes that were

17    not produced, that were never produced, that we have

18    never seen.

19         THE COURT:  We don't need to get too worked

20    up about it until we see it.  Now, if we see it and

21    then we see you have justification, then we will go

22    to the mat.  But if not, if it's just an innocuous

23    thing.  If it's just a routine thing that nobody

24    knew about until today, that's no big deal.  We'll

25    work it out.  We'll work it out.

1          MS. THOMPSON:  Fine, Judge.

2          THE COURT:  Good.  Anything else we want to

3    put on the record out of the presence of the jury?

4      Okay, swell.  All right.

5      (The jury entered the courtroom.)

6          THE COURT:  All right.  Can we hold it for

7    noon?  As you can readily see, a trial doesn't go in

8    real life like it does on TV.

9      Okay, we're all back together.  Back on the

10   record.  Okay.

11         MS. MCNAUGHT:  Thank you, Your Honor.

12     Q.  (By Ms. McNaught)  Ms. Hulett, did you go to

13   the gym on March the 31st of 2011, in --

14     A.  Yes.

15     Q.  -- the morning?

16     A.  Yes.

17     Q.  And what do you recall about going into the

18   gym that morning?

19     A.  After walking in, I -- I wanted to ensure

20   that the barrier was in place to ensure the privacy

21   of the offender.  So I walked over to where the

22   bathroom was and the barrier was there.

23     I do not remember specifically about the

24   availability of sanitary napkins or pads, but there

25   would have been a plan in place because that's

1   something that I knew was important to have on hand

2   for the women when they were -- after being

3   strip-searched.

4       Q. Were there sanitary napkins kept in the gym?

5       A. Yes.

6       Q. And where were they kept?

7       A. In the supply closet.

8       Q. And where is the supply closings?

9       A. The bathroom area where the offender

10  bathroom is.

11      Q. Ms. Hulett, I want to show you Defendants'

12  Exhibit 81. Does Defendants' Exhibit 81 portray the

13  inmate bathroom as you remembered it on March

14  the 31st of 2011?

15      A. Yes, it does.

16      Q. And how does Exhibit 81 -- what does it

17  depict?

18      A. It depicts that the bathroom was -- had the

19  barrier in place to ensure that the women that were

20  being searched were not -- there weren't any

21  violations in the rules of conduct and how the strip

22  search would actually occur.

23      Q. Your Honor, I move for the admission of

24  Defendants' Exhibit 81.

25          THE COURT: Any objection?

1          MR. FIELD:  No, Your Honor.

2          THE COURT:  It's admitted.  You may

3     publish.

4          (Defendants' Exhibit 81 admitted.)

5          Q.  Melody, can you please tell the ladies and

6     gentlemen of the jury what that white curtain is?

7          A.  That is the -- it appears to be what I

8     witnessed on March 31st; a curtain that covers the

9     bathroom.  The barrier that I would have requested

10    to be in place and actually observed being in place

11    when I went to the actual gym itself.

12         Q.  And is the supply cabinet actually in that

13    bathroom then?

14         A.  Yes, it's inside of that bathroom.

15         Q.  Did you ever hear any complaints of female

16    offenders claiming to be traumatized after the

17    March 31st, 2011, events?

18         A.  No.

19         Q.  Did you have meetings with your assistant

20    wardens?

21         A.  Yes.

22         Q.  And that would be both the Assistant Warden

23    of Programs and the Assistant Warden of Operations?

24         A.  Yes.

25         Q.  When did you hold your meetings?

1      A.  Every Monday morning.

2      Q.  And did you have meetings in addition to

3  those Monday morning meetings?

4      A.  Yes.  Whenever anything arise, we had our

5  monthly department head meetings and they were

6  involved with that.  And whenever an issue arrived

7  and we needed to have discussions, we met.

8      Q.  So that would be throughout the day?

9      A.  Throughout the day; yes.

10         MS. MCNAUGHT:  Nothing further.

11         THE COURT:  All right.  Thank you.

12  You may cross.  Or actually, it's redirect.

13         MR. FIELD:  Thank you, Your Honor.

14                REDIRECT EXAMINATION

15  BY MR. FIELD:

16      Q.  Do you still have Plaintiff's Exhibit 39 in

17  front of you?

18      A.  Yes.

19      Q.  Okay.  Now, you were asked some questions

20  about your response to that grievance; correct?

21      A.  Yes.

22      Q.  Okay.  And you didn't concur with the

23  grievance officer's findings on that grievance;

24  correct?

25      A.  I did not concur with the actual strip

1   search itself.

2       Q.  Okay.  And the reason that you didn't concur

3   with the strip search was because, as you indicated

4   on the grievance form, that strip searches should

5   not be conducted in a collective group; correct?

6       A.  That's what I stated on the form; yes.

7       Q.  It doesn't say anything about security or

8   the number of officers?

9       A.  It does not state that.

10      Q.  Okay.  The -- it says only that strip

11  searches should not be conducted in a collective

12  group?

13      A.  That's what it says; yes.

14      Q.  Okay.  You were asked some questions about

15  whether or not you would have approved strip

16  searches in the beauty shop; correct?

17      A.  Yes.

18      Q.  Okay.  And your testimony was that you would

19  have approved those strip searches?

20      A.  Yes.

21      Q.  But you're not saying that you would have

22  approved strip searches in the beauty shop without

23  any measures being put in place to protect privacy

24  of the women involved; correct?

25      A.  Correct.

1    Q.  There were two windows in that beauty shop;

2  correct?

3    A.  Yes.

4    Q.  So if someone asked for your permission to

5  strip search in the beauty shop, you wouldn't have

6  just said yes, you would have told them to put

7  measures in place to protect the privacy of the

8  women involved; correct?

9    A.  Correct.

10    Q.  And if those measures were not put in place,

11  you would not have approved strip searches in the

12  beauty shop?

13    A.  Correct.

14    Q.  You were asked some questions about

15  grievances and whether you received any grievances

16  after March 31st, 2011, in relation to the mass

17  strip search.  Do you remember those questions?

18    A.  Yes.

19    Q.  Okay.  And you said that you would have

20  followed up if you received grievances; correct?

21    A.  Yes.

22    Q.  Okay.  But do you have any recollection as

23  you sit here today of actually following up on any

24  grievance that you saw in relation to the strip

25  search on March 31st, 2011?

1          A.  No.

2          Q.  You were asked some questions about the

3    difference between pat-down searches and strip

4    searches; correct?

5          A.  Yes.

6          Q.  And a pat-down search is just a search over

7    an inmate's clothing; correct?

8          A.  Correct.

9          Q.  And a strip search is a search that involves

10   removing all of the inmate's clothing; correct?

11         A.  Yes.

12         Q.  And it involves looking at the inmate's body

13   cavities; correct?

14         A.  Correct.

15         Q.  Okay.  Actually, the Illinois Department of

16   Correction policies requires that the body cavities

17   be examined?  Is that correct?

18         A.  Yes, if -- yes.

19         Q.  Okay.  And I think that counsel described

20   strip searches--and you agreed--as a little bit more

21   intrusive than a pat-down search.  Wouldn't you

22   agree that body cavity examination of a fully naked

23   person is much more intrusive than just searching

24   over their clothing?

25         A.  It's intrusive.

1      Q.  Much more intrusive than a pat-down search?

2      A.  Yes.

3      Q.  You testified that in terms of sanitary

4  napkins in the gym for the strip search on

5  March 31st, 2011, that there would have been a plan

6  in place to make sure that women who were on their

7  period got sanitary napkins; correct?

8      A.  Yes.

9      Q.  Again, you would have.  But do you recall as

10  you sit here today whether a plan was put in place

11  to make sure that women got sanitary napkins?

12      A.  I do not recall.

13      Q.  Okay.  And you testified that sanitary

14  napkins were kept in the supply closet; is that

15  correct?

16      A.  Yes.

17      Q.  Do you have any memory as you sit here today

18  of whether or not there were sanitary napkins in

19  that supply closet?

20      A.  I do not recall.

21      Q.  Okay.  Who had keys to the supply closet?

22      A.  Assistant wardens, majors, shift commanders,

23  lieutenants, officers assigned to ensure that those

24  closets are stocked.

25      Q.  So, for example, if anyone had complained to

1   Assistant Warden Reynolds that they needed a

2   sanitary napkin, he had the key to get one in the

3   supply closest if they were indeed in that closest?

4       A.  He had the key to get those, as well as

5   direct staff, subordinate staff to do so -- to

6   obtain those.

7       Q.  Sure.  For example, Tactical Commander Dawdy

8   would have also had keys to that closest; is that

9   correct?

10      A.  I cannot say that Dawdy would have had keys

11  that day or access to that room.

12      Q.  So lieutenants would not have had --

13      A.  Lieutenants could have access to that -- to

14  that, but I'm not for certain if Dawdy had keys that

15  day.

16      Q.  Okay.  But other staff did?

17      A.  Yes.

18      Q.  And if they had been complained to, they

19  could have opened the supply closet --

20      A.  Yes.

21      Q.  -- and gotten sanitary napkins?

22      A.  Yes.

23      Q.  Okay.  The curtain that you testified to was

24  in place in front of the gym bathroom when you were

25  in the gym that morning, was that curtain in place

1   when you left the gym?

2       A.  Yes.

3       Q.  Okay.  And your testimony is that you never

4   returned back to the gym at all that day; is that

5   correct?

6       A.  Correct.

7       Q.  So you don't know for the rest of the day

8   whether or not that curtain was in place; is that

9   correct?

10      A.  Yes.

11      Q.  Okay.  No further questions, Your Honor.

12              THE COURT:  Thank you.  Ms. McNaught.

13                  RECROSS EXAMINATION

14  BY MS. MCNAUGHT:

15      Q.  Ms. Hulett, a body -- explain what a body

16  cavity search is?

17      A.  A body cavity search is usually done in the

18  health care if it's something that's really -- that

19  we find -- that we believe that the offender is

20  hiding something in a cavity, you know, private area

21  that needs a cavity search.  Which is done in the

22  Health Care Unit.

23      Q.  By a physician?

24      A.  By a physician, yes.

25      Q.  And a squat and cough, that's not a body

1    safety search, is it?

2         A.  That is not a body cavity search.

3         Q.  It is part of the strip search though?

4         A.  Part of the strip search.

5         Q.  You mentioned that correctional officers

6    assigned to a unit -- or I'm sorry, assigned to an

7    area would have keys to that utility closest that

8    had the sanitary napkins in it?

9         A.  Yes.  Inside grounds crew also.

10        Q.  So would that include correctional officers?

11        A.  Yes.

12        Q.  Correctional sergeants?

13        A.  Yes.

14        Q.  And if assigned to the area, a correctional

15   lieutenant?

16        A.  Correct.

17        Q.  And where are those keys normally kept?

18        A.  The person assigned, they will -- they have

19   to check them out that day.

20        Q.  From where?

21        A.  The armory.

22        Q.  And then they're responsible for returning

23   them to --

24        A.  Returning at the end of their shift; yes.

25        Q.  And when are they required to return them to

1   the armory?

2       A.  At the end of their shift.

3       Q.  Would you explain to the ladies and

4   gentlemen of the jury how you can follow-up with a

5   grievance that you have not received?

6       A.  You cannot follow-up on a grievance that you

7   have not received in your possession.

8       Q.  Nothing further.

9           MR. FIELD:  No further questions, Your

10  Honor.

11          THE COURT:  Thank you.

12      Thank you, Warden.  You may step down.

13      (The witness was excused.)

14          THE COURT:  And you may call your next.

15          MS. THOMPSON:  Thank you, Your Honor.  We

16  call Renee Hatfield.

17          THE COURT:  Very well.

18      (The witness was sworn.)

19                  RENEE HATFIELD

20  called as a witness herein, having been duly sworn,

21  was examined and testified as follows:

22                  DIRECT EXAMINATION

23  BY MS. THOMPSON:

24      Q.  Good morning, Ms. Hatfield.

25      A.  Good morning.

1    Q.  Can you please identify yourself for the

2  jury and maybe spell your first and last name,

3  please.

4    A.  Okay.  My formal name is Elizabeth Renee

5  Hatfield.  Elizabeth with a z.  Renee, R-e-n-e-e.

6  Hatfield as in Hatfield and McCoys.

7    Q.  And, Ms. Hatfield, are you currently an

8  employee of the Illinois Department of Corrections?

9    A.  Yes, I am.

10    Q.  Okay.  You've worked at Illinois Department

11  of Corrections since 2000; do I have that right?

12    A.  I started in 2000.

13    Q.  Okay.  And you started -- well, let me ask

14  you this:  Your current position is a Staff

15  Development Specialist?

16    A.  Correct.

17    Q.  Okay.  And when you started at IDOC, you did

18  something else for about six months, and then you

19  became a Staff Development Specialist; is that

20  right?

21    A.  The duties were the same but the official

22  title was a Public Administrative Intern.  And then

23  it became official as an SDS, an instructor.

24    Q.  So you've been an instructor since 2000?

25    A.  Correct.

1    Q. Okay. Now, you are not a correctional
2  officer; right?
3    A. Correct.
4    Q. Okay. You have never been a correctional
5  officer?
6    A. No, I have not.
7    Q. And you have never worked in a correctional
8  facility other than at the cadet training academy;
9  right.
10    A. I've been in facilities numerous times, but
11  I did not work in one.
12    Q. You've been there with cadets?
13    A. Correct. And for other reasons.
14    Q. Okay. Now, as a Staff Development
15  Specialist, you are a trainer at the Illinois
16  Department of Corrections Academy; right?
17    A. Correct.
18    Q. Okay. And what are the primary subjects
19  that you teach at the academy?
20    A. My primary would be the control tactics,
21  defensive tactics, chemical agent instructor. But I
22  have gone through all of the training that the
23  cadets go through.
24    Q. Okay. Can you explain to the jury what
25  control tactics are?

1      A.  It's a defensive tactics class.  I don't

2    feel comfortable going into details.

3      Q.  But it's physical skills related to their

4    jobs as --

5      A.  It's worst-case scenario defending yourself,

6    but it also starts with officer presence, how you

7    carry yourself, being professional at all times,

8    respectful.  Your communication skills.  We go by a

9    saying called your approach determines response.  So

10   basically, what that means is that if you carry

11   yourself professionally, confidentially, you treat

12   the inmates with respect, dignity, that in most

13   cases, if you're fair, firm, and consistent with

14   inmates, in most cases you will gain voluntary

15   compliance.  But should you not, we have to be

16   prepared to protect ourselves.

17     Q.  And you said you also were a chemical agent

18   instructor.  That's pepper-spraying, basically?

19     A.  Correct.  That's a portion of it; yes.

20     Q.  Okay.  Now, you're essentially a civilian

21   employee of the Illinois Department of Corrections;

22   right?

23     A.  Yes.

24     Q.  You're not a sworn officer?

25     A.  I am not.

 1        Q.  So you're not a law enforcement officer?

 2        A.  Not technically; no.

 3        Q.  Well, you're not; right?

 4        A.  Correct.

 5        Q.  Okay.  And what is -- what does it mean to

 6    be a sworn officer with the Illinois Department of

 7    Corrections?

 8        A.  Well, the cadets have gone through six weeks

 9    of training and then they become a sworn officer at

10    the end of their six weeks.

11        Q.  Right.  So they're not sworn officers in the

12    academy either; right?

13        A.  Not until they've completed their six weeks.

14        Q.  Okay.  And if you're not a sworn officer,

15    then you cannot have custody of an inmate; right?

16        A.  I don't believe so.

17        Q.  So that means that you could not be the

18    person specifically responsible for an inmate of the

19    Illinois Department of Corrections; right?

20        A.  I do not know.

21        Q.  Well, you couldn't be alone in a room with

22    an inmate as a civilian employee of the Illinois

23    Department of Corrections; right?

24        A.  That is not my understanding.

25        Q.  Have you ever been alone in a room with an

1  inmate of the Illinois Department of Corrections at

2  a correctional facility?

3       A.  Not that I recall.

4       Q.  And a cadet would never be alone in a room

5  with an inmate of the Illinois Department of

6  Corrections; right?

7       A.  Not necessarily.

8       Q.  Have you in your experience being in many

9  facilities ever seen a cadet alone in a room with an

10 inmate?

11      A.  No.  Not to my recollection.

12      Q.  As part of your work at the Illinois

13 Department of Corrections Training Academy--and I

14 don't want you to go into specifics; I understand

15 why you don't want to do that--but do you teach

16 handcuffing?

17      A.  That has been incorporated into our class;

18 yes.

19      Q.  A class that you're teaching?

20      A.  Correct.

21      Q.  Okay.  And when you teach handcuffing at the

22 academy is part of the way that you teach it by

23 having cadets practice handcuffing on another

24 person?

25      A.  Correct.

1        Q.  So they can practice handcuffing at the

2    academy?

3        A.  Correct.  And they also go through another

4    week that has cuffing involved with that week as

5    well.

6        Q.  Okay.  One of the curricula at the training

7    academy is a personal search curricula; right?

8        A.  Correct.

9        Q.  And you said you're familiar with all of the

10   various subjects that the training academy teaches?

11       A.  Correct.

12       Q.  So you're familiar with that curriculum;

13   right?

14       A.  Yes, I am.

15       Q.  And is the curriculum that is taught at the

16   academy consistent with the Illinois Department of

17   Corrections policy and practices about personal

18   searches?

19       A.  Yes.

20       Q.  I mean you're teaching the policies to the

21   cadets; right?

22       A.  Administrative directives; yes.

23       Q.  Okay.  And when you're teaching cadets at

24   the training academy how to do personal searches,

25   you teach the cadets to be thorough; right?

1          A.  Correct.

2          Q.  And you teach the cadets to not talk to

3     other people while they're doing a personal search;

4     right?

5          A.  That's part of being thorough is to stay

6     focused on the task at hand; yes.

7          Q.  You want to pay attention to what you're

8     doing; right?

9          A.  Exactly.  It's for safety and security --

10         Q.  You don't want to --

11         A.  -- of everyone.

12         Q.  -- be distracted?

13         A.  Correct.

14         Q.  And so the curriculum will teach cadets to

15    take their time with that; right?

16         A.  Within reason; yes.

17         Q.  I mean taking too long is also a problem, so

18    you don't want to teach them to take forever; right?

19         A.  Correct.

20         Q.  But they want to be thorough?

21         A.  Yes.

22         Q.  Okay.  And you were talking about this

23    earlier.  One of the things that you're teaching

24    cadets is to maintain a professional attitude;

25    right?

1      A.  Absolutely.

2      Q.  Because when you're doing a personal search,

3  the purpose of a personal search should not be to

4  punish; right?

5      A.  Correct.

6      Q.  It's for security?  It should be; right?

7      A.  Correct.

8      Q.  And so one of the things you teach the

9  cadets in the academy is not to make remarks that

10  might degrade or offend the person being searched;

11  right?

12      A.  Absolutely.

13      Q.  Because that might upset the person being

14  searched?

15      A.  Correct.

16      Q.  And it could upset other inmates who might

17  hear those comments; right?

18      A.  Correct.

19      Q.  So there's really no benefit to

20  institutional security to be making comments to

21  inmates that are offensive?

22      A.  It's completely unprofessional and

23  inappropriate and not tolerated by the academy.

24      Q.  Now, we've talked some about the differences

25  between pat-down searches and strip searches.  Is it

1    the Illinois Department of Corrections' policy that

2    if there is no emergency, only women should do a

3    pat-down search of a female inmate?

4        A.  Correct.  Males will not pat down a female.

5    Nor will they strip search.

6        Q.  And that, obviously, was -- all of the

7    policies we've just been talking about, those were

8    the policies in 2011 too; right?

9        A.  Correct.

10       Q.  Okay.  And would you agree that there is no

11   correctional purpose that is served for teaching

12   cadets how to do strip searches the wrong way?

13       A.  Correct.

14       Q.  And there's no institutional purpose in

15   letting them practice strip searches that are being

16   done incorrectly?

17       A.  Correct.

18       Q.  Because that just teaches them how to do it

19   wrong?

20       A.  Correct.

21       Q.  One of your goals in the training academy is

22   to try to have cadets participate in searches before

23   they graduate from their training; right?

24       A.  Yes, ma'am.

25       Q.  But the training is pretty short, relatively

1    speaking; right?

2        A.  Six week.

3        Q.  Six weeks.  And so in that six weeks, it is

4    not a necessary part of the curriculum for cadets to

5    have an opportunity to participate in a live strip

6    search at an institution; right?

7        A.  It's to their advantage.

8        Q.  It would be better if they could; right?

9        A.  Yes.

10       Q.  But it's not a necessary part of the

11   curriculum?

12       A.  It's part of the curriculum; yes.

13       Q.  If those opportunities are available?

14       A.  I guess repeat the question.  I'm not

15   understanding.

16       Q.  Sure.  There are many cadets that graduate

17   from the training academy that don't have an

18   opportunity to do a live strip search while they're

19   there; right?

20       A.  As far as the females?  Yes.

21       Q.  Thanks for that clarification.  And so for

22   female cadets who can only practice on female

23   inmates, many of them graduate without having that

24   opportunity; right?

25       A.  Correct.

1    Q.  And so they get that training other ways

2  besides doing a live practice; right?

3    A.  Simulated at the academy.

4    Q.  Right.  So they're simulating on clothed

5  people.  Practicing as though the person was naked;

6  right?

7    A.  Yes.

8    Q.  And in fact, in your experience at the

9  training academy between 2000 and 2011, other than,

10  obviously, the events we're talking about today,

11  there's only one other time that you remember cadets

12  going to a female prison; right?

13    A.  That is incorrect.

14    Q.  So is it your testimony today that between

15  2000 and 2011, cadets went to -- other than this,

16  cadets went to -- cadets went to more than one other

17  institutions to do strip searches?

18    A.  I apologize.  Before 2011?

19    Q.  Between 2000 and 2011.  Thanks for

20  clarifying.

21    A.  Approximately one, maybe two.

22    Q.  Okay.  So between 2000 and 2011, obviously,

23  this event happened; right?

24    A.  Correct.

25    Q.  And then there was one other trip to Decatur

1    maybe?

2         A.  Correct.

3         Q.  And that's the minimum security facility we

4    were just talking about a minute ago?

5         A.  Yes, it is.

6         Q.  Okay.

7         All right.  Let's talk about March of 2011

8    then.  There was a cadet class at the academy on

9    March 31st of 2011; right?

10        A.  Yes.

11        Q.  Okay.  And obviously, cadets from the

12   academy, as we've been talking about, went to

13   Lincoln Correctional Center that day; right?

14        A.  Correct.

15        Q.  Okay.  And was -- were there also cadets

16   that day that went to Logan Correctional Center?

17        A.  Yes.

18        Q.  Okay.  So only some of the class went to

19   Lincoln?

20        A.  That is correct.

21        Q.  And you went to Lincoln as well; right?

22        A.  Yes.  Being a female; yes.

23        Q.  So how big was the cadet class on March 31st

24   of 2011?

25        A.  I don't recall exact numbers, but our

1  classes have ranged from 120 to 140 cadets.

2       Q.  Okay.  You don't recall --

3       A.  I believe it was around 120.

4       Q.  Okay.  Do you remember how many of that

5  cadet -- what percentage of that cadet class was

6  women?

7       A.  I believe 20 to 25.

8       Q.  And how many of the 20 to 25 women in the

9  cadet class went to Lincoln Correctional Center that

10 day?

11      A.  They all would have gone to Lincoln

12 Correctional Center.

13      Q.  Okay.  And do you remember how many male

14 cadets went to Lincoln that day?

15      A.  I would imagine we split the class in half,

16 so 60/60, you figure another what, 35, 40.

17      Q.  So 20 to 25 female cadets and 35 to 40 male

18 cadets?

19      A.  Approximately.

20      Q.  I understand you're estimating, you don't

21 have the exact figures in your head; is that right?

22      A.  I'd have to get the calculator out.

23      Q.  Okay.

24           THE COURT:  Ms. Thompson, you have a very

25 fast delivery.  Like a machine gun.  Could you --

1    and my old ears.  Could you kind of slow down just a

2    little bit.

3        Q.  I told the Court I would endeavor to

4    improve.  And I'm gonna obviously need to still do

5    that and I will improve further, Judge.

6            THE COURT:  No criticism intended, it's

7    just a matter of you speak very, very rapidly.

8        Q.  I appreciate what the Court is telling me.

9    I will do better.

10            THE COURT:  Thank you.

11       Q.  The cadets that went to Lincoln Correctional

12   Center on March 31st, they had the personal search

13   curriculum taught to them before they did that;

14   right?

15       A.  Correct.

16       Q.  And you didn't teach that, but somebody else

17   did?

18       A.  Correct.  One of the instructors.

19       Q.  Okay.  And you were the only female cadet

20   training specialist that went with the cadets to

21   Lincoln?

22       A.  Correct.

23       Q.  There was another female training

24   specialist, but she was on maternity leave, so she

25   did not go with you?

1     A. Correct.

2     Q. Now, prior to going to Lincoln Correctional

3 Center on March 31st, did you know what you were

4 going there to do?  And I guess by you, I mean you

5 and the cadet class?

6     A. Yes.  We were assisting the facility with a

7 shakedown.

8     Q. Was it your understanding before you got

9 there on March 31st that that shakedown was going to

10 include strip searches?

11     A. Yes.

12     Q. And other than knowing you were going there

13 to do a shakedown and to do strip searches, did you

14 know any other information about what was going to

15 happen?

16     A. Not that I recall.

17     Q. Was there other kinds of information that

18 you would typically receive before taking cadets to

19 an institution other than knowing generally what it

20 is you were going there to do?

21     A. No.  We try and keep it very, I guess on the

22 DL, if you will, so that it doesn't get out and

23 there's preparation, the facility finds out about

24 it, as far as the staff, the inmates.  So we want it

25 to be unannounced.

1      Q.  It's for security?

2      A.  Exactly.

3      Q.  Because you -- even though it's unlikely,

4  you don't know if somehow you telling someone could

5  lead back to someone; right?

6      A.  Correct.

7      Q.  So you really don't get very much

8  information before you get there; right?

9      A.  No.  There have been times that the manager

10  of the training academy may have advised us that a

11  facility has had an issue with contraband, but I

12  don't recall exactly on that date --

13      Q.  Well, so --

14      A.  -- that was the case.

15      Q.  Do you remember being told this time that

16  you were going there to look for contraband?

17      A.  I don't recall.

18      Q.  Do you --

19      A.  But we know we are going to.  That's the

20  purpose of the shakedown, to shakedown the facility,

21  the areas that the facility has directed us to

22  shakedown.  So you're always looking for contraband

23  for the safety and security of the facility, the

24  staff, and the inmates.

25      Q.  Contraband is always in the mix if you're

1   going to search; right?

2       A.  Correct.

3       Q.  And other than your background knowledge

4   about contraband, as you sit here today, do you have

5   a memory that there was any other specific reason

6   that you and the cadets were going to Lincoln that

7   day?

8       A.  Not that I recall.

9       Q.  Okay.  Do you know who from the facility

10  requested that the cadet class or part of the cadet

11  class come?

12      A.  No.  That's above my level.

13      Q.  Okay.  Other than the regular personal

14  search curriculum that you teach at the academy was

15  there any other specific training that you gave to

16  the cadets to prepare them to go to Lincoln

17  Correctional Center?

18      A.  Well, the handcuffing is a part of it as

19  well.

20      Q.  So other than sort of -- other than the

21  general curriculum you would be teaching cadets at

22  the academy, was there anything specific that you

23  trained them for before going to Lincoln?

24      A.  Just to conduct the search properly,

25  thoroughly, professionally.  which is part of the

1  curriculum.

2      Q.  So other than the curriculum, that's what

3  they needed to know; right?

4      A.  Correct.

5      Q.  Okay.  So when you went to Lincoln on

6  March 31st, you and the cadet class got there at

7  about 8 or 8:30; is that right?

8      A.  We usually depart around eight.  Takes about

9  a half hour to get to Lincoln, maybe a little

10  longer.  Cadets ride on a bus, so they don't go

11  quite as fast as I do.  And we may have gotten there

12  around 8:30ish, quarter 'til nine.

13      Q.  They didn't make you ride on the bus; right?

14      A.  No, I believe we were in a car.

15      Q.  Okay.  So your memory is you got there

16  around 8:30?

17      A.  Correct.

18      Q.  All right.  I'm showing you again

19  Plaintiff's 202.  Can you see it okay where you are,

20  Ms. Hatfield?

21      A.  Yes.

22      Q.  Do you recognize this --

23      A.  It might be upside down.  Sorry.

24      Q.  Just let me know what view you want to look

25  at it.  Is that better?

1    A.  Yes.

2    Q.  Okay.  Do you recognize this as an aerial

3    view of Lincoln Correctional Center?

4    A.  I've never had an aerial view of Lincoln

5    Correctional Center until now.  So yes.

6    Q.  Well, let me ask you this:  When you and the

7    cadets came on March 31st, where did you go?

8    A.  We would have gone into the sally port --

9    sally port area.

10   Q.  And do you see the sally port area on this

11   aerial map?

12   A.  I'm not familiar with the layout of Lincoln.

13   Q.  Do you remember was the sally port area in

14   the front of the institution or the back?

15   A.  It appears to be right here.

16   Q.  So when you got to the sally port area is

17   that where you parked the bus?

18   A.  I did not drive the bus.

19   Q.  Is that where the cadet bus was left?  Or

20   did it go somewhere else?

21   A.  I don't recall.

22   Q.  Okay.  Well, what did you do when you

23   personally got to the sally port area?

24   A.  We go into the facility.

25   Q.  Okay.  And were there any other training --

1    let me ask you a better question.

2         Other than the cadets, is there anybody else

3    from the training academy besides you that came with

4    to Lincoln?

5         A.  Yes.  Mr. Pasley.

6         Q.  Who is Mr. Pasley?

7         A.  Alan Pasley was a co-worker at the time.  A

8    Staff Development Specialist.

9         Q.  Was he your supervisor on March 31st?

10        A.  Not quite yet.

11        Q.  Was he senior to you on March 31st in terms

12   of experience at the academy?

13        A.  As far as the hierarchy?

14        Q.  Yes.

15        A.  We were equivalent.

16        Q.  You had the same job at that time?

17        A.  Correct.

18        Q.  Now, he later became the supervisor of -- he

19   later took a more supervisory role at the academy;

20   right?

21        A.  He became the manager of the training

22   academy.

23        Q.  Okay.  But on that date, he wasn't the

24   manager?

25        A.  Correct.

1      Q.  Was he an acting manager on that day?

2      A.  I don't believe so.

3      Q.  Okay.

4      A.  No, he was not.

5      Q.  Okay.  And other than Mr. Pasley, were there

6   any other trainers or staff development specialists

7   or supervisors for the cadets that came with you?

8      A.  I don't recall.

9      Q.  You don't remember anybody specific being

10   there besides you and Mr. Pasley as you sit there?

11      A.  There may have been another instructor.

12      Q.  Was there another instructor that you

13   remember?

14      A.  I don't recall exactly, but I would have

15   thought we had more than two.

16      Q.  Why is that?

17      A.  Because we probably had at that time maybe

18   eight instructors.  So most likely, we would have

19   split them up, if they were available.  We also have

20   counselors that would have been with us.

21      Q.  When you say they would have been with you.

22   As you sit here today, do you specifically remember

23   any counselors being with you at Lincoln

24   Correctional Center?

25      A.  We always have counselors on our shakedown.

1     Q.  Right, but I'm asking you a different
2   question.  Which is, as you sit here today, do you
3   have a specific memory of counselors being there?
4     A.  I do not recall.
5     Q.  Okay.  And as you sit here today, do you
6   have a specific memory of any other instructors
7   being there?
8     A.  I can't say a hundred percent.
9     Q.  Okay.  You said when you got to the sally
10  port you would have gone -- you went inside the
11  institution?
12    A.  Correct.
13    Q.  Okay.  Where did you go when you got inside?
14    A.  We would have -- would have gone to an area
15  to get briefed.  I believe it was dietary.  I don't
16  know for sure.
17    Q.  So is dietary the cafeteria?
18    A.  Yes.  I'm sorry; yes.
19    Q.  Okay.  Just so the jury understands.  So you
20  went to the cafeteria to have a meeting?
21    A.  Correct.  To be briefed.
22    Q.  Okay.  Who was present at the briefing?
23    A.  All the cadets, the tac team is usually
24  there, the warden or their designee, the
25  instructors.

1      Q.  Okay.  And you said the warden is usually
2   there.  Was the Warden there for that meeting?
3      A.  I believe so; yes.
4      Q.  What Warden?
5      A.  Warden Hulett.
6      Q.  And was Warden Reynolds there?
7      A.  I don't recall.  I believe so, but I can't
8   picture him there.
9      Q.  Do you specifically remember Warden Hulett
10  being there?
11     A.  Yes.
12     Q.  And do you specifically remember the tac
13  team being there?
14     A.  Yes.
15     Q.  Do you remember any other correctional
16  officers besides possibly Warden Reynolds, Warden
17  Hulett being there for sure, and the tac team?  And
18  you and the cadets?
19     A.  Mr. Pasley.  And possibly an additional
20  staff member.
21     Q.  Okay.  But in terms of other correctional
22  officers besides the people you just named, do you
23  remember other correctional officers being there?
24     A.  There may be facility correctional officers,
25  but I cannot recall one hundred percent.

1      Q.   Okay.  Who was it that spoke at the briefing

2  meeting in the cafeteria?

3      A.   Well, it would have been Warden Hulett.  And

4  possibly somebody from tac to go over the logistics.

5      Q.   Did you or Mr. Pasley address the briefing?

6      A.   I know I did not.

7      Q.   Did Mr. Pasley?

8      A.   I don't recall.

9      Q.   Did Mr. Pasley give instructions at the

10 briefing?

11     A.   I don't recall.

12     Q.   Did either you or Mr. Pasley say, "Here's

13 how we're going to do these shakedowns and strip

14 searches."  Explain the procedure to everybody?

15     A.   I'm sorry, I don't recall.

16     Q.   Well, would you have done that?

17     A.   I'm not saying that we couldn't, but

18 typically, it's the facility staff that addresses

19 the cadets.  But we still, being over the cadets,

20 would be able to brief them as well.

21     Q.   To brief the cadets; right?

22     A.   Correct.

23     Q.   But you're not briefing the tac team on what

24 the tac team is supposed to be doing that day?

25     A.   Correct.

1      Q.  You're certainly not telling Warden Hulett,

2  "Warden Hulett, here's what's going on here today"?

3      A.  Correct.

4      Q.  That wouldn't be your place?

5      A.  Correct.

6      Q.  Okay.  And what did Warden Hulett say at

7  this briefing?

8      A.  I don't recall.  Typically, it's welcoming

9  the cadets.  Making sure that they handle themselves

10  appropriately, professionally.  Keep safety in mind

11  of everyone involved.  And then like I said, someone

12  from the facility goes over the logistics; where

13  we're gonna be searching, things of that nature.

14      Q.  So is it your testimony today that Alan

15  Pasley possibly spoke at this briefing?

16      A.  It's possible.

17      Q.  Okay.  Did you give a deposition in this

18  case?

19      A.  Yes, I did.

20      Q.  Okay.  And obviously, it's a piece of sworn

21  testimony?  You swore to tell the truth?

22      A.  Yes.

23      Q.  Okay.  And that deposition was given on

24  August 27th of 2015; right?

25      A.  Correct.

1      Q.  Your Honor, do you want me to show the

2    document to the witness?

3            THE COURT:  No.

4      Q.  Okay.  Ms. Hatfield, at your deposition,

5    were you asked these questions and did you give this

6    answer.  These answers, excuse me.

7      (As read:)  Question:  Do you remember who gave

8    the briefing?

9      Answer:  I cannot say a hundred percent.

10     Question:  In your experience, would it have

11   been a warden or assistant warden who typically gave

12   the briefing?

13     Answer:  Most likely the warden would.  Yes,

14   most likely.

15     Question:  It wasn't a member of the training

16   academy; correct?

17     Answer:  Correct.

18     Were you asked those questions and did you give

19   those answers?

20           MS. BARNES:  I object, Your Honor.  I'm

21   puzzled as to why this is impeachment.  It's

22   consistent with what she just said.

23           THE COURT:  I'm wondering too.  What's the

24   problem?

25     Q.  The question is who it is that gave the

1  briefing that day, Your Honor.

2      And maybe I need to clarify something with the

3  witness.  If I can inquire, I'll clarify, Your

4  Honor?

5          THE COURT:  Okay, fine.  Please do.  Please

6  do.

7      Q.  So you're saying Mr. Pasley might have

8  spoken -- might have addressed the cadets at this

9  briefing?

10     A.  It's a possibility.

11     Q.  Okay.  But he didn't give the briefing;

12  right?

13     A.  Warden Hulett would have spoken to the

14  cadets.

15     Q.  So she gave the briefing?

16     A.  Well, it could be a collaborative effort.  I

17  don't recall besides Warden Hulett for sure.

18         MS. BARNES:  Your Honor, I object.  At this

19  point, she was just arguing with the witness.

20         THE COURT:  I agree with you.

21     Q.  I'll move on, Your Honor.

22         THE COURT:  Yeah, you better.

23     Q.  You did not create a plan for how the strip

24  searches on March 31st were going to be done; right?

25     A.  No, that's not my responsibility.

1        Q.  Because you weren't in charge of the strip

2   searches that happened at the gym at Lincoln

3   Correctional Center on March 31st?

4        A.  Correct.

5        Q.  You didn't decide where in the gym women

6   were gonna be searched?

7        A.  Correct.

8        Q.  That's something the facility decides?

9        A.  Correct.

10       Q.  And you had never done a mass strip search

11  at Lincoln Correctional Center before March 31st of

12  2011; right?

13       A.  That's correct.

14       Q.  So you weren't familiar with the specific

15  layout of the institution?

16       A.  Correct.

17       Q.  You didn't know the specific equipment or

18  supplies the institution had?

19       A.  The supplies that are always provided by the

20  facility would be gloves, the forms that are

21  necessary, and in a female facility it's going to be

22  sanitary napkins.

23       Q.  Those are all things you would expect the

24  facility to provide; right?

25       A.  Correct.

1      Q.  Because you don't bring them with?

2      A.  Correct.

3      Q.  Okay.  So after this briefing, you then went

4  to the gym at Lincoln Correctional Center?

5      A.  I believe so.

6      Q.  You didn't go to the housing units?

7      A.  Not that I recall.

8      Q.  You have no memory of doing that?

9      A.  No.

10      Q.  Okay.  And when you went to the gym, did

11  some of the cadets go with you?

12      A.  I believe so.

13      Q.  Okay.  And was it both male and female

14  cadets or only one or the other?

15      A.  I believe it was only the female cadets.

16      Q.  Did all of the female cadets go with you?

17      A.  I don't recall exactly.

18      Q.  Well, how many of them went with you?

19      A.  I don't recall.

20      Q.  Did any of the female cadets go to the

21  housing units?

22      A.  There may have been a handful.

23      Q.  Okay.  And after you went to the gym, after

24  some period of time there were female inmates that

25  were brought into the gym by the tactical team;

1    right?

2         A.  Correct.

3         Q.  Okay.  And how long did it take for the

4    inmates to get to the gym after you went there from

5    the briefing?

6         A.  I don't recall exactly.

7         Q.  Okay.  And it's your memory that when the

8    female inmates were brought into the center of the

9    gym by the tactical team, those women were standing;

10   right?

11        A.  I believe so.

12        Q.  Okay.  You don't recall any of those women

13   sitting down?

14        A.  No, I believe that some, if they needed to

15   sit down were allowed to sit down.

16        Q.  So it is your memory today that you remember

17   seeing women sitting down?

18        A.  I know they were standing.  And I believe if

19   they needed to sit down, they were allowed to sit

20   down.

21        Q.  So at some point after the tactical team

22   brought the inmates into the gym, strip searches

23   began; right?

24        A.  Yes.

25        Q.  Okay.  And the strip searches were being

1    done in the inmate restroom?

2         A.  That's correct.

3         Q.  Okay.  And you've seen -- well, give me just

4    one minute.

5         You don't remember the exact sizes of the

6    groups of women that were being brought into the

7    bathroom to be strip-searched?

8         A.  Not exactly.  I believe it was four to six

9    approximately.

10        Q.  And after the women had been strip-searched,

11   they then went to the gym, obviously putting their

12   clothes back on, and they waited; right?

13        A.  Correct.

14        Q.  Now, you did go into the bathroom of the gym

15   while these strip searches were going on; right?

16        A.  On occasion to check on the cadets; yes.

17        Q.  So you had responsibilities other than in

18   the bathroom; right?

19        A.  Correct.

20        Q.  So what else were you doing in the gym

21   besides going into the bathroom on occasion, as you

22   say?

23        A.  Well, I would have been in the gym where the

24   cadets were with the inmates.

25        Q.  What were the cadets doing in the gym with

1    the inmates?

2        A.  Well, they would have been observing to make

3    sure that everyone is safe.  And waiting for the

4    next group of inmates to go into the restroom.  They

5    may have been escorting them to the restroom.

6        Q.  So there were some cadets whose job it was

7    to stand and observe in the gym?

8        A.  To -- yeah, to keep an eye on the inmates;

9    yes.

10       Q.  They were standing and watching the inmates?

11       A.  Correct.

12       Q.  Okay.  And there were some that you said

13   were escorting inmates?

14       A.  Yes, they would have escorted the four,

15   five, six into the restroom.

16       Q.  Okay.  So of the time that you spent in the

17   gym on March 31st, how much of it was spent in the

18   bathroom?

19       A.  I don't recall exactly.  I would go there

20   occasionally to check on the cadets, ensure that

21   they were conducting the searches properly,

22   professionally.  I didn't want to stand around in

23   the bathroom, be an extra person.  And then I would

24   go back to the gym area.

25       Q.  The cadets that were doing the searches were

1   in the bathroom with female tactical officers;
2   right?
3        A.  I believe so, there were female tac; yes.
4        Q.  I mean you weren't gonna leaving cadets in
5   the bathroom alone with inmates; right?
6        A.  Correct.
7        Q.  Okay.  So in the time you were not in the
8   bathroom, those cadets were being supervised by the
9   female tactical officers?
10       A.  That's correct.
11       Q.  Okay.  And you did not go into the beauty
12  shop that day; right?
13       A.  No, I did not.
14       Q.  So you have no idea what was going on with
15  searches in the beauty shop?
16       A.  No, I do not.
17       Q.  Okay.  And you never made a decision to
18  start searching inmates in the beauty shop?
19       A.  No, I did not.
20       Q.  The cadets that came from the academy that
21  day, what were they wearing?
22       A.  I don't recall if they would have had their
23  uniforms yet or not.  If they didn't, they would
24  have been in their uniform that they wear as a
25  cadet, which would be tan -- tan cargo-type pants

1    with a shirt, T-shirt.

2         Q.  And what were the female tactical officers

3    that you saw in the bathroom wearing?

4         A.  They would be wearing orange.

5         Q.  They're wearing the orange --

6         A.  Their uniform.

7         Q.  Okay.  What were you wearing that day?

8         A.  I would have been wearing my tan.

9         Q.  Do you wear -- is your uniform a t-shirt

10   like the cadets possibly, or do you have a tan

11   uniform?

12        A.  I'm tan uniform.

13        Q.  Okay.  And the searches that you saw the

14   times you were in the bathroom, those were one cadet

15   to one inmate; right?

16        A.  That's correct.

17        Q.  And were there any additional cadets in the

18   bathroom besides cadets that were in that one-to-one

19   ratio with the inmates?

20        A.  Not that I recall.

21        Q.  Okay.  Did you see any of these searches in

22   the bathroom being done by the Orange Crush tactical

23   members?

24        A.  I believe so.

25        Q.  So some of them were being done by cadets

 1   and some by --

 2        A.  Or they were facility staff, I don't recall

 3   exactly.  I know that the tac team was present.  Not

 4   the team, a female.

 5        Q.  So your cadets were still learning how to do

 6   strip searches; right?

 7        A.  They were on-the-job training.

 8        Q.  Right.  This is the first time they had done

 9   it in a real setting?

10        A.  Correct.

11        Q.  Okay.  So they're trying to be thorough?

12        A.  Correct.

13        Q.  So they're slow?

14        A.  Not necessarily.

15        Q.  They're trying to be thorough, they're

16   learning, but they're not slow?

17        A.  Correct.  I -- I probably would have

18   mentioned something to them if they were taking too

19   long.

20        Q.  Well, as you sit here, do you remember

21   telling anybody they needed to, you know, move it

22   along?

23        A.  No, I do not.

24        Q.  Okay.  Part of what you were doing out in

25   the gym was giving the cadets advise on escorting

1    the women?

2         A.  I believe so, and also just ensuring the

3    safety of them as well as the inmates.

4         Q.  And when you were out in the gym were there

5    any specific inmates that you said, "you can sit

6    down" to?

7         A.  I may have, but I don't recall exactly.

8         Q.  Was there anybody else who asked you to go

9    to the bathroom?

10        A.  I do not recall.

11        Q.  So as you sit here, you don't have a memory

12   of taking any inmates to the bathroom; right?

13        A.  Not that I recall.

14        Q.  On March 31st, you did not make any

15   decisions about how the strip searches in the gym

16   were going to be conducted; right?

17        A.  Correct.

18        Q.  I mean you trained your inmates on how to do

19   the searches, but the logistics of it, you didn't

20   make those decisions?

21        A.  We don't train the inmates, it's the cadets.

22        Q.  Right.  So you didn't decide how big the

23   groups of women to be searched were going to be;

24   right?

25        A.  That's correct.

1          Q.  And you didn't really make any decisions

2     about how the custody of the inmates in the gym was

3     going to be handled at all; right?

4          A.  Correct.

5          Q.  From the time of the briefing in the

6     cafeteria you just talked about, until the end of

7     the strip searches that day, you spent the entirety

8     of your time at the gym; right?

9          A.  I believe so.  I may have left for lunch to

10    the chow hall.  Dietary.

11         Q.  But other than lunch, you were in the gym?

12         A.  Correct.

13         Q.  And then when the strip searches were done,

14    did you leave?  Like leave Lincoln Correctional

15    Center?

16         A.  We would have been debriefed most likely by

17    a facility staff member.  The warden, assistant

18    warden.

19         Q.  As you sit here, do you remember the

20    debriefing on March 31st?

21         A.  I do not.  That's typical.

22         Q.  It's normal policy, procedure?

23         A.  Correct.

24         Q.  Okay.  While you were at the gym, did any

25    women complain to you about the conditions that were

1   going on in the gym?

2       A.  No.

3       Q.  No one came up to you and said they were

4   tired?

5       A.  Not that I recall; no.

6       Q.  Nobody said that they didn't appreciate how

7   they were being treated?

8       A.  No.

9       Q.  Now, Lincoln Correctional Center has its own

10  chain of command for correctional officers; right?

11      A.  Correct.

12      Q.  So if you had seen something at the gym that

13  was a concern to you, what would you have done about

14  that?

15      A.  I would have mentioned it to one of the

16  staff members of the facility.

17      Q.  When you say you would have mentioned it to

18  one of the staff members, who could you have told if

19  there was something that you saw that was

20  concerning?

21      A.  I could have mentioned it to one of the

22  female tac members or if there was a facility CO, I

23  could still mention it to them or I could go up to a

24  supervisor.

25      Q.  So there's no reason that you couldn't have

 1    raised a concern with somebody if you wanted to;

 2    right?

 3        A.  Correct.

 4        Q.  Okay.  When you were at the gym on March

 5    31st, did you ever see Warden Reynolds in the gym?

 6        A.  I don't recall.

 7        Q.  And did you ever see Lieutenant Dawdy in the

 8    gym?

 9        A.  I don't recall seeing them.

10        Q.  What about Warden Hulett?

11        A.  Yes.

12        Q.  When did you see Warden Hulett in the gym?

13        A.  I believe it was some time early on.  I

14    don't recall exactly.

15        Q.  And what did you see Warden Hulett doing in

16    the gym early on?

17        A.  She would have been there to check the

18    search, the inmates, the staff.

19        Q.  You're saying she would have been there, but

20    what do you remember Warden Hulett doing in the gym

21    that day?

22        A.  I remember her presence being there, so --

23        Q.  Okay.  But you don't remember what she was

24    doing other than that she was present?

25        A.  Correct.

 1          Q.  Okay.  When you were there at the gym on

 2     March 31st, you do not remember seeing any feminine

 3     sanitary supplies; right?

 4          A.  Not personally.

 5          Q.  Okay.  And you don't remember being in the

 6     bathroom for any strip searches where sanitary

 7     materials were being given to inmates; right?

 8          A.  I don't recall, but they provide them, so --

 9          Q.  They should have been distributed; right?

10          A.  Yes.

11          Q.  But you did not see them being distributed?

12          A.  I don't recall personally seeing them; no.

13          Q.  Okay.  So you don't know one way or another

14     if -- based on your memory, if there were actually

15     sanitary supplies to distribute to the women that

16     day?

17          A.  Correct.

18          Q.  And you did not personally make any reports

19     about any conduct that you saw in the gym on

20     March 31st; right?

21          A.  No, I did not.  If I had seen that, that had

22     been brought to my attention, I would have done

23     something immediately.  Or reported it.

24          Q.  Did you see Alan Pasley in the gym at all on

25     March 31st?

1     A.  No, I did not.

2         THE COURT:  See who?

3     Q.  Alan Pasley, Your Honor.

4         THE COURT:  Thank you.

5     Q.  After March 31st, did anybody from Lincoln

6  Correctional Center ever contact you to say that

7  they were investigating the searches that occurred

8  on March 31st?

9     A.  No, they did not.

10    Q.  Did anyone after March 31st, from the

11  institution, reach out to have any conversation

12  about the events of March 31st?

13    A.  No, they did not.

14    Q.  One moment, Your Honor?

15        THE COURT:  Sure.

16    Q.  During the briefing that happened in the

17  cafeteria was it your understanding that the

18  shakedowns that were going to be conducted that day

19  were going to have a pat-down component at -- in the

20  housing units?

21    A.  I don't recall.

22    Q.  Okay.  Well, did you ever learn there had

23  been pat-downs done in the housing units in

24  connection with the shakedowns on March 31st?

25    A.  No, I do not remember.

1          Q.  Okay.  But according to IDOC policy as you

2     understand it, if there were pat-downs done, those

3     needed to be done by a female either correctional

4     officer or cadet?

5          A.  That's correct.

6          Q.  All right.  I have no further questions

7     right now.  Thank you, Your Honor.

8               THE COURT:  Surely.

9          All right.  We have a few minutes, we can have

10    some cross.  Ms. Barnes.

11                    CROSS EXAMINATION

12    BY MS. BARNES:

13         Q.  Good morning, Ms. Hatfield.

14         A.  Good morning.

15         Q.  Ms. Thompson asked you about your teaching

16    the cadets about how to speak to inmates.  And you

17    said that is -- I believe your testimony was that

18    would not be tolerated by the academy.  Do you

19    remember that?

20         A.  If they were speaking unprofessionally or

21    any type of derogatory comments were made,

22    absolutely not tolerated by the academy.

23         Q.  Did you, at any point during this event that

24    we're talking about today, hear the cadets you

25    trained speak in a degrading manner to the inmates?

1      A.  Absolutely not.  If I had, I would have

2  pulled them out immediately and had a discussion

3  with them.  And depending on what it was, I may have

4  even reported it, put it in writing.

5      Q.  Okay.  If a cadet had been reported making

6  repeated or even a degrading remark to an inmate

7  during an exercise of this size, of this type, what

8  would have been the consequences for that cadet?

9      A.  Well, the report would have been given to my

10  supervisor, the next chain of command, and they may

11  have been recommended for termination.

12      Q.  Now, let's talk about you hearing such a

13  behavior and not reporting it.

14      A.  Absolutely not.

15      Q.  What would have happened to you?

16      A.  I could possibly be disciplined.  I have to

17  report it.

18      Q.  Ms. Thompson also asked you about the fact

19  that these cadets -- some cadet classes get to have

20  a real-life strip search and some don't.  Do you

21  remember that testimony?

22      A.  Yes.

23      Q.  Okay.  If a female cadet does not get an

24  opportunity to conduct a strip search during her

25  training, would it be fair to say then that she

 1    would perform her first strip search on the job as a

 2    sworn officer?  Isn't that -- wouldn't that be

 3    right?

 4         A.  If she goes to a female facility.

 5         Q.  Right.

 6         A.  If she doesn't go to a female facility, she

 7    would not be conducting strip searches at all.

 8         Q.  Okay.  But this whole trial is about strip

 9    searches of females.  So if -- what is preferable to

10    you as an instructor, having a cadet do -- under the

11    tutelage or supervision of a sworn officer do a

12    strip search or doing her first strip search for the

13    first time on the job?

14         A.  First time on the job.

15         Q.  So doing it as a training exercise like this

16    is not beneficial; is that what you're telling this

17    jury?

18         A.  No, it's beneficial.  It's on-the-job

19    training.  It's allowing the cadets to put into

20    practice the skills, the knowledge that they have

21    obtained by being at the training academy.  It's

22    preparing them for the work environment which

23    they're going into.  And then it also assisted the

24    facility to be able to conduct a mass shakedown.

25         Q.  So at some point, every cadet is going to do

their first strip search.  Would that be fair to
say?

    A.  If it's the same sex; yes.

    Q.  Right.  And in this instance, these cadets,
isn't it fair to say, had the benefit of experienced
officers overlooking their conduct?

    A.  Yes.

    Q.  And if any of these experienced officers had
noticed something, what would you have expected them
to do?

    A.  They would have reported it to me.
Immediately.

    Q.  And if you had learned that experienced
officers were permitting cadets to degrade inmates
or treating them in any -- in any manner that was
humiliating, and hadn't told you, what would you
have done?

    A.  If I wasn't aware of it?

    Q.  No.  If you had learned that someone was
aware of it and hadn't reported it to you?

    A.  I would be very upset.

    Q.  Okay.

    A.  And I would have to take that up my chain of
command.  We would have to discuss it.

    Q.  Again.  That did not happened?

1      A.  No, it did not.  That's something I would

2  remember.  It would stand out.

3      Q.  You spent your whole time at the gym, I

4  think you testified?

5      A.  Yes.

6      Q.  In and out of the bathroom?

7      A.  Correct.

8      Q.  Did you see inmates standing on the floor in

9  their own menstrual blood?

10     A.  I did not --

11     Q.  Urine?

12     A.  -- I would have reported that immediately.

13     Q.  Okay.  Did you see dirty pads and tampons

14  all over the floor in the bathroom?

15     A.  Absolutely not.

16     Q.  Did you, when you were in the gym, see any

17  correctional officers tracking blood or bodily

18  fluids into the gym from the bathroom?

19     A.  No, I did not.  That would be reported.

20  That's a safety health hazard for everyone involved.

21     Q.  All right.  Do you remember seeing a curtain

22  in front of the bathroom?

23     A.  I remembered some partition, some barrier;

24  yes.

25     Q.  Okay.  One moment, Your Honor?

1          THE COURT:  Surely.

2          MS. BARNES:  Thank you, Ms. Hatfield.

3          THE COURT:  Thank you.  All right.

4     Ms. Thompson.

5          MS. THOMPSON:  I have a couple of quick

6     questions.

7          THE COURT:  Can we wrap up?  Excellent,

8     let's do that.

9                    REDIRECT EXAMINATION

10    BY MS. THOMPSON:

11       Q.  Ms. Hatfield, you said that there's an

12    academy class -- well, let me start again.

13       The training takes six weeks at the academy;

14    correct?

15       A.  Correct.

16       Q.  And then are there some weeks that there's

17    no class?  There's no academy class at the academy?

18       A.  Hasn't been for a while.

19       Q.  Well, between 2000 and 2011, how many

20    academy classes were there?

21       A.  I know when I first started, we were running

22    double classes or overlapping classes.  I don't

23    recall when that had stopped.  There was a short

24    period of time where we did not run classes.  Maybe

25    a couple years.  And then it's pretty much been

either overlapping or back-to-back.

Q. So between 2000 and 2011, there were dozens
of academy classes; right?

A. Yes.

Q. And in that time, there's only three --
possibly two or three strip searches at female
institutions that you can recall cadets getting to
experience; right?

A. Correct.

Q. Okay. I think that's all the questions I
have, Judge. Thank you. Thanks Ms. Hatfield.

THE COURT: Anything else, Ms. Barnes?

MS. BARNES: No, Your Honor.

THE COURT: All right. Look at that, five
minutes after twelve and we disposed of another
witness. Thank you very much. You may step down.

(The witness was excused.)

THE COURT: And we're all going to go to
lunch. We will be back here at 1:35. I don't want
to cheat you.

All right. Everybody enjoy their lunch. Thank
you very much. And we will see you at 1:35.

(A lunch recess was taken.)

(The following proceedings were held outside
the presence of the jury.)

1          THE COURT:  Thank you, everyone.  Please be

2     seated.

3          The record may show it is 1:30 sharp.  The jury

4     is not, is not in the courtroom.  And I believe that

5     we have a discovery matter to make of record here.

6          Lay it on me.

7          MS. THOMPSON:  Thank you, Your Honor.

8          As the Court knows, when Ms. Hulett was on the

9     stand, after I had finished my examination of her

10    and while she was being examined by her on counsel,

11    she -- counsel elicited testimony from Ms. Hulett

12    about a notebook which he testified she kept and

13    carried around the grounds.

14         She testified not only that she made notes

15    about this event, but that she generally made notes

16    about conversations she had and things that she did.

17    And obviously, I'm paraphrasing her testimony, but

18    that was essentially what she said.

19         In our request for production of documents to

20    the defense which we served on October 5th of 2012,

21    one of the things that we asked for in discovery was

22    all documents, including any physical evidence which

23    relate to, support, and/or rebutted any of the

24    allegations or claims in plaintiffs' complaint.

25         Discovery is what it is and things happen.  I

have two concerns. One is, from the tenor of the
questions, it appears to us that, obviously,
defendants knew about the existence of this notebook
at whatever time they prepared Ms. Hulett to
testify. For starters. So counsel knew when they
were preparing her she had a notebook.

At that point, certainly, and we'll -- we'll go
beyond, at that point certainly, counsel had a duty
to tell us that she had notes related to this
incident she was going to testify about.

That is extremely concerning because the
questions we might have asked her --

THE COURT: If counsel knew about it.

MS. THOMPSON: Right. And my point is,
they elicited from her that she had a notebook; she
didn't spontaneously offer that. So it was
something that was known about.

Ms. Hulett herself has an obligation to respond
to discovery. And certainly that comes from her
counsel conferring with her, but --

THE COURT: Sure.

MS. THOMPSON: -- since 2012, we have asked
for documents that were going to be relied on to
rebut our claims or that would support our claims.

So here we are now, having -- we're one witness

1    away from finishing your case, maybe two witnesses

2    away from finishing our case, and now we're learning

3    there are notes from the warden.

4        The second concern -- I have a second concern,

5    Judge, but --

6             THE COURT:  Okay.  We'll wait for your

7    second.  To your first concern is this a surprise to

8    everybody?  I mean do we know about this?

9             MS. THOMPSON:  No.

10            THE COURT:  Did anybody know about this?  I

11   mean -- and then number two, how significant is it?

12   I haven't seen it.  Have you seen it?

13            MS. THOMPSON:  It was given to me at some

14   point during the lunch break.  I would estimate

15   about 20 minutes before we came in here.

16            THE COURT:  All right, fine.  Let's work it

17   out.

18        What do you say over there on this?  It seemed

19   to me from the testimony this morning that this was

20   something that nobody even thought about.  But let's

21   iron it out.  And let's not make a mountain out of a

22   molehill at this moment until we know it is a

23   mountain.

24            MS. MCNAUGHT:  Your Honor, this morning,

25   just before Ms. Hulett got back on the witness

stand, I was asking her some questions.  And one of

the things that she told me was that she looked at

her notebook last night that she kept and she saw

the number 60 in it, and so she thought that there

were approximately 60 cadets that were coming to her

institution.  And so I asked her if she felt

comfortable in testifying as to how many cadets were

supposed to come to the institution and she said

that she was.

That's the reason why I elicited the question

about where it was that she obtained her information

and how that refreshed her recollection.  So I

did -- I don't believe that this document -- and

were you provided with a copy of the two pages?

THE COURT:  Yes.  I have in right in front

of me.

MS. MCNAUGHT:  Okay.  So I did not see the

notebook before I -- before Ms. Hulett got on the

witness stand.  I asked her --

THE COURT:  Did you know of its existence?

MS. MCNAUGHT:  Only that she said that she

had used something to refresh her recollection.

THE COURT:  All right, go ahead.

MS. MCNAUGHT:  And so over the lunch hour,

I asked her to retrieve the document.  I gave -- I

1   looked through the notebook.  It contained two pages

2   that seemed to have some kind of information that

3   may have been relevant to this case.  It's an

4   undated note, but it seems to be within the time

5   frame.

6       So the notes are not anything different than

7   what she's previously testified to.  I -- again, I

8   would note that when we responded to the discovery

9   requests, there was an objection, and then we

10  provided at least 304 documents to the plaintiffs.

11  There was no request for us to provide anything

12  else.

13      Obviously, if we had known about this prior to

14  this morning, we would have had an obligation to

15  provide it to counsel.  But I don't know that

16  there's any prejudice to counsel because the notes

17  don't show anything differently than what the Warden

18  has testified to.  She only used that notebook to

19  refresh her recollection that there were 60 coming.

20  Or actually, I think it may be 60 to be searched or

21  something like that.  But I don't believe that

22  there's any prejudice to the plaintiffs.

23          THE COURT:  Thank you.  Back to you,

24  Ms. Thompson.

25          MS. THOMPSON:  Judge, I intend to be brief,

but there really are two things I need to say.

One is this:  What counsel said initially was that -- and what Ms. Hulett said on the stand was she had looked at her notebook and refreshed her memory.  And if counsel knew this morning that there was a notebook available, they didn't inform us of that.  They asked questions about this notebook on the stand to elicit information from the witness without telling us there was something else out there.  We weren't even finished with the exam of the witness.

I'll say two things about prejudice.  It is very different to have contemporaneous notes from a witness from the event because what tells the jury, for starters is that is what I was saying at the time.  We asked questions of other witnesses about planning of this event, about intentions, and about numbers and those are all things that appear to be covered by these two pages.

Moreover, I asked counsel if I could look at the remainder of the notebook.  And they told me in no uncertain terms that it's not something that we have a right to see.  I have additional concerns because there is testimony from numerous people about what was supposedly going on at the

1  institution in terms of other incidents, other

2  violence concerns.  There's testimony that that's

3  something that Assistant Warden Reynolds discussed

4  with Warden Hulett.  That this was something that

5  was of great concern to the institution.

6       And so if there are no notes about those

7  issues, that's certainly relevant to us.  And if

8  there are notes about them, then that's potentially

9  relevant to the issues in this case.

10      And the Court knows what I'm gonna say, which

11 is, had we received these notes in discovery, we

12 might have litigated differently.  We would have

13 potentially tried this case differently if this

14 Warden was gonna say, "I have contemporaneous notes

15 that refresh my memory about what was happening with

16 this search."  And so there is great prejudice.  And

17 there's probably prejudice about documents which are

18 relevant which we hadn't seen.

19      And of course, we didn't ask to follow-up on

20 our request because we assumed that defense counsel

21 recognizes their duty to seasonably supplement.  And

22 further, we can't ask for something that we don't

23 know about.

24      So I don't know that this is an issue of

25 intentional -- I'm not suggesting intentionally

withholding prior to them learning about it from
Warden Hulett last night, if that's the time that
they learned about it, but I am very concerned that
they would put a witness on the stand, elicit
testimony from her about a document that they know
exists, and then think that handing that to us, you
know, after the conclusion of our examination does
not cause significant prejudice.

So I'm concerned about what we are just seeing,
I'm concerned about the documents that we haven't
seen, Judge.

THE COURT:  Well, I quite understand that
surprise is always surprise.  I mean it conjures up
all kinds of problems.

But it seemed to me, the way the testimony
went, that everybody was surprised to know that
there was a notebook.  And that she kept it in the
car, it's in the car.  So you have a copy of it now.
You've had an opportunity to go over it.  She made
reference to it in her testimony.

But until I am absolutely sure that there is
intentional fiddle-faddle around in here, I'm not
going to jump to a conclusion that we have some
skullduggery involved.  I'm not going to allow any
of that to go before the jury.

Now, I do not know what the background is.  I
have before me two copies of two pages from -- or
one copy of two pages from the so-called notebook.
If you wish to inquire and talk to her about it, I
think that's the thing to do.  And then see of what
relevance there is here to the situation.

And I can see at the bottom of the second page
it says 31st, so I would assume it is the date that
we're talking about here.  But I do not know.  And I
don't think any of us do until we have some inquiry
about it.

Now, as to the question of surprise, I don't
know if there is intentional, but I would be
extremely surprised if there was any intentional
holding back or playing Sneaky Pete or laying in the
weeds about these things.  Ms. McNaught has -- and
Ms. Barnes have tried cases before me before, and so
I -- I know of their quality and conduct.  So I have
no initial feeling on this except that it's got to
have been some oversight or human mistake.  And I'm
not going to allow it to be built-up into some
terrible specter in front of this jury until we know
the full basis of it.

Now, we have two alternatives.  The first is,
out of the presence of the jury, make a finding or

inquiry of Warden Hulett in this regard. And the second is to agree that it wasn't a problem and just go right on and you can, in front of the jury, make inquiry as to this, these two pages from her notebook. And if you wish to, you can go into the background of what it is. Here you've got a notebook, do you keep this in your car, or whatever the case may be. I'm not going to tell you how to do it, but I'm going to tell you that we've got two alternate methods of accomplishing it.

But until there appears to be some purposeful holding back, I'm not going to ruin my record here before this jury and cause a problem. I'm just not gonna do it.

Now, if I'm in error in my assumption, I will admit it and we will back up and do everything possible to make a correction. But let's don't jump off half-cocked on this thing.

Now, how do you want to proceed?

MS. THOMPSON: To be clear, I have no information that would suggest that prior to whenever counsel spoke to Ms. Hulett, that they knew of this document. And I don't been to imply that. I've, in general during this trial, found that counsel and our side have been able to cooperate

1    together quite well, and I'm grateful for that.

2        My concern --

3            THE COURT:  You did say in general.

4            MS. THOMPSON:  Well, my concern is that if

5    Warden Hulett told them, "I have a notebook and that

6    reminded me that there's 60 cadets," I am concerned

7    we weren't told that before her exam, Judge.  But I

8    respect what the Court is saying.

9            THE COURT:  And if that is true, I would be

10   concerned as well.

11           MS. THOMPSON:  So what we're asking for in

12   terms of relief, we are asking for the rest of the

13   notebook.  The notebook seems to cover a number of

14   issues around this time, which as I described, are

15   relevant to other issues in the case.  We have these

16   two pages, but we would like to see the rest of the

17   notebook, Judge.

18           THE COURT:  Well, what do you say,

19   Ms. McNaught?

20           MS. MCNAUGHT:  Your Honor, I have reviewed

21   the rest of the notebook, I have inquired of

22   Ms. Hulett about the contents of the rest of the

23   notebook.  She assures me that it really has

24   absolutely nothing responsive to the request for

25   production of documents.  Had it been disclosed back

1    in 2012, before Ms. Hulett was even a defendant in

2    this case, but when the responses were provided,

3    those pages would not have been provided because

4    they're not responsive.

5         But if Your Honor would like to take a look at

6    the notebook and review it to see whether there --

7    the Court believes that there's anything responsive,

8    we'd welcome that.  The problem is that there may be

9    some things in that notebook that are security risks

10   that are not relevant to this case.  And for that

11   reason, we don't believe that plaintiffs' counsel

12   should be able to look at it.

13        THE COURT:  Well, then I think that the

14   thing for us to do is to, out of the presence of the

15   jury, have an offer of proof there and take a look

16   at this situation and get it responded to.

17        Warden Hulett, you're still on the stand.  No,

18   you're not, you were off the stand.  But you're

19   still under oath.  Would you mind coming up here,

20   please.  Do you have the notebook with you?

21        MS. MCNAUGHT:  I have it, Your Honor.

22        THE COURT:  Okay, you have it.

23        MS. MCNAUGHT:  And I would also like to

24   explain to the Court that I had not seen the

25   notebook, I did not have possession of it until she

1    gave it to me this afternoon.

2            THE COURT:  Okay.

3            MS. MCNAUGHT:  She did tell me that she had

4    reviewed it.  This morning she told me that.  That

5    was the first that I knew of it.

6            THE COURT:  And I think she also stated on

7    the stand that it was in her car?

8            MS. HULETT:  Well, when you guys were

9    having a discussion up here, she turned around and

10    asked me did I have it and I said I believe it's in

11    my car.

12            THE COURT:  All right, fine.

13        Well, in any event, go ahead and proceed on

14    this.  How do you want to handle it?

15            MS. THOMPSON:  I'll inquire.

16            THE COURT:  This is your motion.  So you

17    move right ahead.

18            MS. THOMPSON:  Thank you, Your Honor.

19                    MELODY HULETT

20    recalled as a witness herein, having been previously

21    sworn, was examined and testified as follows:

22                  DIRECT EXAMINATION

23    BY MS. THOMPSON:

24        Q.  Ms. Hulett, there was some testimony earlier

25    about a notebook that you kept at the institution;

1  is that right?

2     A.  Yes.

3     Q.  What time period does your notebook cover?

4     A.  March 31st through -- the last date is

5  4/10/11.

6     Q.  So is it your testimony that the first pages

7  of the notebook are related to March 31st?

8     A.  I'm sorry.  March 21st, '11.  And the last

9  page ends April 10th, 2011.

10     Q.  Okay.  And I understand that you -- there

11  may be specific issues in the notebook that for

12  security reasons you don't want to describe here.

13  But for the time leading up to March 31st that's in

14  your notebook, do your notes reflect your

15  impressions or understandings of issues going on in

16  the institution?

17     A.  Yes.  There's just notes that I would --

18  this notebook is something that I would take on

19  rounds with me.  I always had something to write

20  with to take notes to jog my memory of things that

21  were said to me or things that were -- I felt that

22  was important.

23     So this is a particular notebook that I --

24  during that time period that I shared with you, that

25  I kept on my person whenever I went inside the

1  institution.  Or if I stopped at a staff office or

2  had a conversation and they told me something that I

3  felt I might need to remember, to help refresh or

4  keep my memory fresh on something.

5      Q.  For the days before March 31st, are there

6  notes in your notebook that relate to prison

7  discipline or inmate violence issues at the prison?

8      A.  Yes.

9      Q.  Okay.  And what are those notes?

10     A.  Talks about we had a railroad closing --

11  closure that we had that was coming up, some

12  evacuation processes, notifications to IEMA.

13  Disaster intelligence.  Private concerns about

14  offenders.

15     Information, conversation it appears with

16  certain sergeants.  Information about the movement

17  of Dwight offenders.  Central office discussion

18  regarding policies and procedures.  Discussion with

19  the union, upcoming meetings with the union.

20     Q.  And I'm asking about pre-March 31st.  So if

21  you've gone past there --

22     A.  Okay, I'm sorry.

23     Q.  And it's your testimony that there are no

24  notes after March 31st that relate to looking back

25  at the strip search or shakedown on March 31st?

1          A.  No.

2          Q.  Are there -- and you don't have to go

3     through them as you just did, but are there notes

4     after March 31st that relate to inmate violence or

5     inmate infraction issues?

6          A.  Yes.

7          Q.  Okay.

8          A.  Inmate infractions, hm-mm.

9          Q.  Okay.  Is there anything in the notebook

10    generally that talks about levels of violence or

11    inmate infractions specifically concerning either

12    Units 2B or 4B?

13         A.  No.  Doesn't appear to be.

14         Q.  Okay.  And are there any notes that indicate

15    conversations that you had with Warden Reynolds

16    about either Units 2B or 4B, other than the two

17    pages that have been tendered already?

18         A.  No.

19         Q.  Is there anything that reflects any

20    follow-up -- or any conversations that you had with

21    Warden Reynolds about the inmate grievance about the

22    searches at dietary from March 21st, 2011?

23         A.  No.

24         Q.  So there was some testimony by you earlier

25    that you asked Warden Reynolds to follow-up on the

1   dietary strip search that an inmate complained

2   about.  Do you recall that testimony?

3        A.  Yes.

4        Q.  Okay.  And there's nothing in the notebook

5   having to do with that follow-up at all?

6        A.  No.

7        Q.  Now, do you have the two pages in front of

8   you that were tendered?

9        A.  Hold on one second, let me get to it.  Yes.

10       Q.  The second page of what was tendered that

11  says needs?

12       A.  Hm-mm.

13       Q.  Do you know what these notes -- what these

14  notes were taken in reference to?

15       A.  Not specifically, but it appears that it was

16  part of some notes that I may have received or some

17  information or maybe a brief discussion about

18  planning team -- the meeting for the actual upcoming

19  shakedown.

20       Q.  Okay.  So -- I guess I'm looking at the

21  first page where it says needs.  Does planning team

22  meetings refer to meetings on this --

23       A.  Yes.

24       Q.  -- strip search?

25       A.  Mm-hmm.

1        Q.  Okay.  What does small team for mass care;
2   what does that mean?
3        A.  You know, I do not recall.  But the mass
4   care would probably coincide with the mass
5   shakedown.
6        Q.  Okay.
7        A.  If it was a small team, it probably would
8   have been with -- with maybe making sure health care
9   staff was available in case we had someone that got
10  ill or something like that.  It wouldn't have been
11  the -- a major -- a big team of planning.  Yeah.
12       Q.  On this first page where it says gym and is
13  the word after that attendance?
14       A.  Yes.
15       Q.  What does that mean?
16       A.  I think I was speaking to the attendance of
17  the -- maybe the cadets or who were gonna be in
18  attendance at the gym.
19       Q.  Okay.  And the note that says 60 inmates at
20  a time out; what does that mean?
21       A.  The movement.  It probably would refer to
22  the movement or a suggestion or recommendations of
23  the movement of the offenders.
24       Q.  What's the property?  There's property and
25  then it looks like maintenance, something I can't

 1    read, and then strip search?

 2        A.  It probably was just a little something to

 3    jog my memory to follow-up with something probably

 4    pertaining to maintenance, dietary, and strip search

 5    property.  I'm not sure exactly.

 6        Q.  Okay.  And then it says shakedown 252.  What

 7    does that mean?

 8        A.  I do not recall what that means.  252 ahead

 9    of time, it could have been a number of a building

10    or, you know -- I don't know.

11        Q.  Is there a building at the institution that

12    is referred to by the term 252?

13        A.  No, no, huh-uh.

14        Q.  All right.  Does your notebook reflect that

15    after March 31st of 2011, you discussed any private

16    concerns from offenders about the strip search?

17        A.  No.

18        Q.  And is this the only notebook that you

19    took -- that you have that contains notes from

20    January of 2011 to March of 2011?

21        A.  Yes.

22        Q.  Your Honor, I want to ask the question of

23    the witness of when it is that she told her counsel

24    that she had this notebook.  I would like to know

25    the answer to that.

1          THE COURT:  Well, sure.

2     Q.  When did you inform your present counsel

3  that you had a notebook that you had looked at in

4  reference to this case?

5     A.  This morning.

6     Q.  All right.  And what time this morning?

7     A.  This morning when I arrived, a little after

8  nine.

9     Q.  Okay.  Judge, those are the questions I

10  have.  I have some comments.  I don't know if you

11  want Ms. McNaught to inquire of the witness or --

12          THE COURT:  Oh yes, yes.

13                  CROSS EXAMINATION

14  BY MS. McNAUGHT:

15     Q.  Ms. Hulett, when you told me about the

16  notebook this morning, did you give me possession of

17  it at that time?

18     A.  No.  I didn't have it with me.

19     Q.  And what did you use that notebook for?

20     A.  Just to take notes to jog my memory of

21  things.

22     Q.  When you looked -- when did you look at it?

23     A.  Yesterday.

24     Q.  And when you looked at it, what did you look

25  at it for the purpose of?

1          A.  Well, I was concerned about sitting in court
2     and hearing about there was no written plan.  And --
3     because me being a person of detail and -- I went
4     looking actually in my documents in my garage for
5     something, an email or something, that could suggest
6     or show that there was a written plan.  I could not
7     find an email copy of anything, but I did come
8     across this notebook.
9          Q.  And at any time did Ms. Barnes,
10    Ms. Bautista, or I ask you to look for that
11    yesterday afternoon after your testimony?
12         A.  No one knew that I was looking for that.
13         Q.  Prior to your testimony yesterday, had you
14    ever shared that notebook with anyone from the
15    Illinois Attorney General's Office?
16         A.  No.
17         Q.  Nothing further, Your Honor.
18              MS. THOMPSON:  Very, very briefly, Your
19    Honor.
20                    REDIRECT EXAMINATION
21    BY MS. THOMPSON:
22         Q.  I don't want to make an inappropriate
23    attorney-client request, so I'll ask my question,
24    but I don't intend to do anything the Court doesn't
25    want me to do.

1          THE COURT:  Proceed.

2      Q.  Did you participate in responding to the

3  plaintiffs' first set of requests for production in

4  this case that were issued on October 5th of 2012?

5      A.  What do you mean participate?  No one has

6  ever asked me for any documents.

7      Q.  Okay.  So prior to the conversations you had

8  about this document, did any of your counsel ever

9  ask if you had any records that related to the strip

10 search that happened on March 31st of 2011?

11     A.  I do not remember or recall anyone asking me

12 that.

13     Q.  Okay.  I don't have anything else, Judge.

14         THE COURT:  Okay.  Where does this leave

15 us, folks?  The Court cannot speak unless it is

16 spoken to.  So talk to me, talk to me.

17         MS. THOMPSON:  Things happen in litigation,

18 Judge.

19         THE COURT:  They sure do.  And they all

20 happen to me.  Believe me.  Every single one of

21 them.

22         MS. THOMPSON:  They happen to me too.  And

23 so I think it's my intention to talk about

24 shortcomings here without intending to unpleasant

25 about it.  But I've heard concerning things from the

witness.

I heard she was never consulted by her counsel. And counsel suggested she wasn't a defendant at the time of these document requests. That's not accurate; she was.

And Ms. Hulett has said that she was not -- she was not contacted by her counsel to respond to those requests. I don't -- and I don't mean to look at the witness, it's not my place to look at her about this. But it seems that, obviously, a witness can't respond to requests they're not made aware of, they're not consulted about. So I don't find fault with the witness. I'm concerned about that.

I am concerned that this witness said that she informed her counsel at 9:00 she had a notebook. And again, we learned about it for the first time on the stand. So those issues are what they are.

It's our concern--and the questions I asked her go to this point--that she has notes that reflect planning. She doesn't have notes that reflect many of the things which there's been testimony that occurred. And she's testified she's a careful person, she made notes. There's not notes that support that. That is certainly all cross-examination that we would want to get into.

1          I don't want to be dramatic about this.  It is
2     our concern that knowing that there had been these
3     notes would have driven different decisions in
4     discovery, would have, you know, impacted
5     potentially how we litigated this case, what we did
6     with experts, what we did with other issues.  And I
7     do think it is essentially concerning issue.
8          Obviously, we've been able to have this trial,
9     we put on a case.  But we were denied information
10    that are essentially contemporaneous notes about
11    what was going on in this period from the person who
12    is the warden of the institution where this
13    happened.  That is a prejudice that knowing how this
14    trial would proceed differently with knowing that
15    information is obviously something that's very
16    difficult for us to say.  I don't want to be
17    dramatic, I don't want to -- you know, we will press
18    on if the Court tells us to press on.  But I believe
19    this is something that rises to the magnitude of
20    potentially a new trial, Judge.
21         The Court will rule, that is our position.
22              THE COURT:  Are you making a motion for new
23    trial?
24              MS. THOMPSON:  I am, Judge.  We'd like an
25    opportunity to conduct additional discovery in light

1  of what the witness has disclosed.  There may be

2  other things out there we didn't get.  I'm concerned

3  that other people potentially weren't consulted

4  about this same issue by counsel.  This raises a

5  number of questions that as I stand here today I

6  can't resolve.

7       All right, Ms. McNaught?

8            MS. McNAUGHT:  Your Honor, the plaintiffs

9  trial team took depositions in this case.  They

10  deposed Ms. Hulett ad nauseam.  They could have

11  asked her if she had any documents.  They could have

12  elicited -- elicited all kinds of information from

13  her at that deposition.  That's usually the way that

14  other things are found in discovery.  That's what

15  the purpose of discovery is.

16       There are no members of the trial team here

17  from the defendants' perspective or from the defense

18  team who were involved in the discovery production

19  at the time that it was produced.  But I don't

20  believe that two pages--they're not even full

21  pages--of notes elicited any more memory from the

22  witness than what she already testified to other

23  than the fact that she came up with the number 60.

24       That has absolutely nothing to do with the way

25  that the plaintiffs claim that they would have

prepared for the case.  There's absolutely nothing
in those notes that would have changed the way that
they would have prepared this case.  Especially in
light of the fact that they had ample opportunity to
depose all kinds of defendants in this case.

So for them to stand here and say, "Oh, we
would have done this case totally different, and now
we have to start all over with all of our discovery"
is ludicrous.  And for that reason, I believe that
the motion for a mistrial should be denied.

THE COURT:  You may respond briefly.

MS. THOMPSON:  The Court has been very,
very generous in giving us time to address this.

It isn't just about these two pages, it's about
the absence of other notes.  And I hope that that
point is clear.  There's a lot of testimony about
concerning things happening in the prison that don't
appear.

Obviously, if we had this document, it's
something we would have asked the Warden about at
her deposition.  And we didn't.  And we have the
right to rely on counsel to make a timely
production.

And I fully respect what counsel is saying.
They were not the people who did discovery in this

1    case.  I don't mean to suggest that they were.

2    Again, I remain very concerned that at 9:00, we were

3    not told there was this notebook so that we could

4    address this while Warden Hulett was on the stand.

5    It's also prejudicial for it to come out on cross

6    and make it seem like something we weren't -- you

7    know, that we weren't aware of that was being

8    addressed.

9         There is a real issue with the 60 cuffs.  And

10   let me say this in closing, Judge.  What these notes

11   suggest, and this is actually the point that -- that

12   the defense has been building during this case, is

13   that each of the inmates comes with a pair of cuffs

14   -- excuse me, the cadets.  Each of the cadets come

15   from pair of 60 cuffs, and so the suggestion here is

16   you can only have as many people moving as there are

17   cuffs.  That's something that we weren't hearing

18   until this trial.

19        And so counsel is right, could we have done

20   other discovery that might have revealed that?  Of

21   course.  But this is one source of where we would

22   have gotten that information.  And again, we got it

23   for the first time on the stand from a witness on

24   direct -- you know, on examination from their

25   counsel, who knew about it before we did.

1    We will proceed with this trial, Judge.

2    Obviously, we're not gonna make reference of this to

3    the jury, if that's the Court instruction to us.  We

4    don't intend to delay this trial.  But this is an

5    essentially prejudicial issue to us, Judge.

6            THE COURT:  Well, that is a conclusionary

7    statement.  It is not part of a motion.  And let

8    me -- let me tell you how I view the situation.

9        It seems to me that this was not a deliberate

10   situation that has arisen just because somebody has

11   tried to keep something from you.  I don't think

12   that that's -- that for a moment.

13       From everything that has been said by way of

14   either counsel or of Warden Hulett, this is just one

15   of those things.  They happen in life whether you

16   like it or not.  And preferably you would have liked

17   to have been those two pages perhaps during

18   discovery.

19           Now, this is a 2012 case.  It's now 2016.  And

20   we have tons of discovery and loads of documents.

21   Now, you've got two small pages here.  And we're

22   gonna give you every opportunity to recall Warden

23   Hulett to the stand and talk about these and talk

24   about these and ask all the questions you want.

25           Now that's what I'm going to do.  But your

1    motion is denied.  Clearly so.  I don't read into

2    this situation all of the points that you've made

3    and that possibly could have been.  But that is not

4    my job to do that.  You have a job to do,

5    Ms. Thompson, I'm gonna let you do it however you

6    determine under these --

7         This is a human element situation.  And now

8    listen, I've had I can't tell you, countless times

9    over my career when I've had these very same little

10   surprises come up.  And they are not purposeful, but

11   they do come up.  Now, once in a blue moon you'll

12   get one that is, and it's Sneaky Pete laying in the

13   weeds and not coming out in the proper time in

14   discovery.  But that does not appear to me to be

15   that.

16        Now, the jury is not in the box, and I'm just

17   saying that these kinds of things do occur in human

18   life.  We have them happen all the time.  In your

19   own life, every second something happens that you

20   don't plan on and that you wish would be otherwise.

21   And so would I.  And so I'm sure would Ms. McNaught,

22   Ms. Barnes, the same thing.  This is a wrinkle that

23   comes up in a trial, but I'm not going to allow it

24   to derail the train.

25        So we're gonna do the best we can.  And that is

1    to give you an opportunity to recall Warden Hulett

2    and go into this very thing.

3            MS. THOMPSON:  I understand the Court has

4    denied my motion for a new trial.  I respect the

5    Court's ruling.  I am concerned about the bolstering

6    impact that actually introducing these notes into

7    evidence would provide in this situation.  My

8    intention is to recall Warden Hulett to ask her

9    general questions about her note-keeping practices

10   and things that are not in the notes, but I'm not

11   asking the Court not to allow these notes to be

12   admitted into evidence.  As they were late provided.

13           MS. MCNAUGHT:  No objection.

14           THE COURT:  All right.

15       Now, they must be, however, made of record

16   because we've got an issue here.  And I think I've

17   explained my view of it.  But these two pages will

18   be marked as Court's Exhibit 1.  Court's Exhibit 1.

19   And it will be -- they will be filed and made of

20   record here, just to preserve our situation so

21   that -- for future reference.

22           MS. THOMPSON:  And along those lines,

23   Judge, do I understand that the Court has denied our

24   request to review Ms. Hulett's notebook?

25           THE COURT:  Well, let's talk about that.

Ms. McNaught, come on up here.  What do you think?

No, no, you stay here too, Ms. Thompson.  We're all talking about the same thing.

MS. MCNAUGHT:  I don't believe that it's appropriate to allow plaintiffs' counsel to review the additional notes that are contained in the notebook to the extent that there are any security issues.

THE COURT:  Well, let me see the notebook.  Where is the notebook?  Thank you very much.

Well, this isn't a notebook at all.  This is a small tablet.  And there are many, many things in here; many dates and many, many other things.

And it seems to me that if we were to go through this, and we're talking about, gosh, there's got to be about 25 pages, maybe 30 here.  Goes back, the first date looks like March 21 of 2011, and that's on the first page.  Then there are other dates.  Here's 3/27/11, 3/28/11, 3/28/11.  And then it jumps to 4/4/11.

Now, Warden, are the two pages that you referred to where you talk about needs and the following page, are those the only two that would refer to the March 31st incident.

MS. HULETT:  Yes, sir.

1    THE COURT:  The only ones?

2    MS. HULETT:  The only ones.

3    THE COURT:  You've looked at these, again,

4  your notes before and after those two pages?

5    MS. HULETT:  Yes.

6    THE COURT:  Do they have anything at all --

7  any of the other pages have anything at all to do

8  with what took place on March 31st?

9    MS. HULETT:  No, sir.

10    THE COURT:  You're positive?

11    MS. HULETT:  I'm positive.

12    THE COURT:  And are these just your

13  personal notes that you keep --

14    MS. HULETT:  Yes.

15    THE COURT:  -- as a matter of course?

16    MS. HULETT:  Yes.

17    THE COURT:  Have you done that throughout

18  your career?

19    MS. HULETT:  I have.

20    THE COURT:  And you have many more

21  notebooks like this?

22    MS. HULETT:  Well --

23    THE COURT:  Or similar.

24    MS. HULETT:  Similar.  I was cleaning out

25  my garage.  I don't anything past that date.  I had

1    cleaned out my garage this past weekend and threw

2    way some corrections stuff.  And I still have four

3    or five boxes that relate to those types of

4    notebooks.  That was the last box of those that I

5    showed.

6              THE COURT:  Okay.  Any further inquiry?

7              MS. THOMPSON:  Well, obviously, our

8    argument is that there may be notebooks that relate

9    to the full timeframe where it was Warden Reynolds's

10   position that, you know, he and Warden Hulett were

11   discussing violence in Units 2B and 4B.  So we would

12   want to inquire about notebooks from this timeframe

13   generally.

14        I understand if the Court is not -- does not

15   believe that that's discovery we're entitled to, I

16   respect that.  That is our request.

17        But what I would ask is for the Court to order

18   defense counsel to preserve any such notes.  This

19   notebook and any notes from the time period of

20   January, which I think was Warden Reynolds's

21   testimony about when these concerns began, through

22   the time period of this search.  And preserve those

23   until the conclusion of these proceedings -- well,

24   until the conclusion of this case, whenever that is.

25   I have concerns that there's things out there that

we didn't get that if we receive discovery in the
future, we will want.  I'm asking the Court to order
those to be preserved.

I respect the Court's ruling.  That's what I'd
ask for future -- to preserve any future issues that
may come up with those notes, Judge.

THE COURT:  Mm-hmm.  Ms. McNaught?

MS. MCNAUGHT:  This is the first that I
have heard that there were any other notebooks.  So
I assume that the Warden wouldn't have any objection
to turning them over to me.

MS. HULETT:  Sure.

MS. MCNAUGHT:  And we'll make sure that
they're kept.

MS. HULETT:  Sure.

THE COURT:  All right, fine.  Then we'll do
that.  Where do you live, Warden Hulett?

MS. HULETT:  I live here in Springfield.

THE COURT:  Good.  Can you get all of this
data to Ms. McNaught --

MS. HULETT:  I can --

THE COURT:  Today?

MS. HULETT:  Today?

THE COURT:  After Court.

MS. HULETT:  Sure.

1          THE COURT:  Okay, let's do that.

2      And whatever you can identify that might have

3  anything to do with this and what Ms. Thompson has

4  just said, the parameters there, let's get together

5  and try to get that -- get that discovery issue

6  worked out.  Okay?

7      Very good.

8      But, as of now, motion for new trial is denied.

9  And we're going to proceed with this.  I think that

10  we should make this notebook or these few notes,

11  these 30 pages of notes, I think that they should be

12  held by the Court.

13      Do you have any objection to that?

14          MS. HULETT:  I do not.

15          THE COURT:  Very good.  Very good.

16      Then it seems to me -- now, we're not going to

17  go out on a ghost -- you understand that?

18          MS. THOMPSON:  My intention with the

19  witness is simply to ask her -- there was testimony

20  already that she had notes.  I'm simply going to ask

21  her the time period that her notes cover.  I'm gonna

22  ask her if the notes include any information about

23  inmate issues in Units 2B or 4B, or any notes about

24  an increase in inmate violence in those units.  I

25  think we understand from this proffer what the

1    answer is going to be to those questions.

2        We respect the Court's ruling.  That's all the

3    questions we would ask.  And if the Court rules that

4    this should not be brought into evidence, which is

5    our belief, I think that will conclude the matter

6    for now, Judge.

7        And I should add, there will be one more

8    question which I'll ask her.  Which is there was

9    some testimony that after that inmate grievance that

10   she was asked about, that she asked Warden Reynolds

11   to follow-up.  And I will ask her -- I will inquire

12   of her as to whether her notes indicate any

13   conversations that she had with Reynolds about that

14   follow-up.

15       Those will be the questions we'll ask, Judge.

16   And I guess it will be Mr. Field; this is his

17   witness.  But those will be the questions we will

18   inquire of the witness about.

19            THE COURT:  Ms. McNaught?

20            MS. McNAUGHT:  Sure.

21            THE COURT:  All right.  Let's do that.

22       Now, when we had our lunch break, Ms. Hatfield

23   was on the stand; right?  So she is technically

24   still on the stand.  No?

25            MS. BARNES:  Ms. Hatfield was finished.

1          THE COURT:  Very well.  She was finished,
2     okay.
3        Then we will, at this time, call the jury in --
4     oh, no.  Ms. McNaught?
5          MS. MCNAUGHT:  Your Honor, just one thing.
6          THE COURT:  Yeah.
7          MS. MCNAUGHT:  If these notes don't come
8     in, I want to make sure that counsel doesn't make
9     some kind of argument in closing saying, "Oh, the
10    notes are missing."
11         MS. THOMPSON:  Of course not.
12         THE COURT:  No, she wouldn't do that.  And
13    I wouldn't permit her to do that.
14         MS. MCNAUGHT:  Okay.
15         THE COURT:  And if she did, it would be a
16    donnybrook here in front of the jury.  We don't want
17    that.
18         MS. THOMPSON:  I appreciate how much time
19    the Court devoted to this issue.  We're grateful.
20    We understand how to move forward in light of the
21    Court's rulings.
22         THE COURT:  Ms. Thompson, this is my job.
23    That's what I get paid for and I've been doing it a
24    long time.  So these surprises, you may be
25    interested to know, are not just little glitches

1    that cause problems, but they are also something

2    that bring tremendous interest to me.  Believe me,

3    this is where I get my kicks.  They may not be

4    yours, but they are mine.

5         So now -- my law clerk reminds me that we did

6    have a question from Juror Kristine Schulte.  And

7    she says, "Is there any estimate how long this will

8    last?  [No scheduling problems, just curious.]

9              MS. THOMPSON:  We have a short exam of

10   Mr. Pasley and a short exam of another witness,

11   Millie Lee, and then we will make sure we got all

12   our evidence admitted into evidence and then we

13   intend to rest, Judge.

14             THE COURT:  All right, fine.

15             MS. MCNAUGHT:  But we'll be going along

16   with Ms. Hulett now; is that correct?

17             MS. THOMPSON:  Yes.

18             MS. MCNAUGHT:  I just wanted to make sure

19   she could stay in the witness box, that's all.

20             THE COURT:  She can.  She can indeed.  And

21   of course, she's already sworn, so there's no

22   problem with that.

23        All right.  Then as far as length is concerned,

24   what is your anticipation for next week?  Let us

25   assume that we're finished with the plaintiff

1  tomorrow.  Or maybe possibly this afternoon?

2          MR. FIELD:  Yes.

3          MS. THOMPSON:  We will be concluded this

4  afternoon, Judge.

5          THE COURT:  Okay.  So concluded this

6  afternoon.  Then what do you anticipate

7  Ms. McNaught?

8          MS. MCNAUGHT:  Depending on when this

9  afternoon, we're ready to go a witness today.  We'll

10  have witnesses tomorrow.  We have witnesses

11  scheduled on Monday.  We can move at a fairly rapid

12  pace.

13          THE COURT:  Good, good.  So we all might

14  expect that if we hustle, we can finish up on

15  Wednesday -- I mean on Tuesday?  What do you think?

16          MS. MCNAUGHT:  That's certainly our hope.

17  I don't know if plaintiffs have rebuttal or not,

18  but --

19          THE COURT:  Well, we'll just have to play

20  it by ear.  But let's push and hope that we can.

21      I would like to let the jury be free on

22  Wednesday.  But if necessary, we'll come back the

23  following week.  That's no problem as far as I'm

24  concerned.  Now, it may be with other folks, but --

25  but keep that in mind.  Okay?

1          All right, fine.  Well, let's bring in the

2     jury.  All set to go.

3          (The jury entered the courtroom.)

4          THE COURT:  Please be seated, ladies and

5     gentlemen.

6          All right, fine.  The record may show the jury

7     has returned to the courtroom and we are all in

8     place.

9          Ladies and gentlemen, let me, number one, tell

10    you that we're sorry to keep you waiting for some

11    40 minutes, but there was some matters that we had

12    to take care of out of your presence.  We have

13    attended to them and now we're ready to proceed.

14         Number two, Kristine, is that Schulte?

15         JUROR:  Yes.

16         THE COURT:  How do you pronounce it.

17         JUROR:  Schulte.

18         THE COURT:  Schulte.  Thank you.

19    We have your question.  And we'd love to give

20    you an answer.  A definitive one.  But I'm afraid we

21    can't quite do that.

22         JUROR:  That's fine.

23         THE COURT:  But we -- Ms. Thompson and

24    Mr. Field and Ms. Brown have advised that they will

25    be completing their case probably without too much

1    ado.  And we don't know exactly how long we're going

2    to take on the other side.  But we're all pushing,

3    we're all pushing about Thanksgiving.

4        Now, we have not forgotten that.  That is in

5    the uppermost part of everyone's mind I think.  But

6    we're gonna do the best we can.  That's the best we

7    can say.

8        Thank you.

9        All right.  Now, Ms. Hulett, Warden Hulett is

10   now back on the stand.  You are under oath, of

11   course.

12       Mr. Field, you may proceed.

13           MR. FIELD:  Thank you, very much, Your

14   Honor.

15                   REDIRECT EXAMINATION

16   BY MR. FIELD:

17       Q.  Good afternoon, Warden Hulett.

18       A.  Good morning.

19       Q.  You provided some testimony this morning

20   about some notes that you recently reviewed in

21   relation to or possibly in relation to the strip

22   search and shakedown on March 31st, 2011?

23       A.  Yes.

24       Q.  Okay.  Can you tell me what dates are

25   covered in those notes?

1          A.  If I remember from just looking at it,

2     March 21st, 2011, through April 4th, 2011.

3          Q.  Okay.

4              THE COURT:  Let me give Warden Hulett her

5     notebook so she will have that to refresh her

6     memory.

7          Q.  Thank you, Your Honor.

8          Do you want to check the notes to make sure of

9     those dates?

10         A.  Yes.

11         Q.  Thank you.

12         A.  4/10/11.

13         Q.  So March 21st, 2011, until April 10th, 2011?

14         A.  Yes.

15         Q.  Okay.  And in your review of those notes,

16    are there any notes that indicate any issues in

17    relation to violence or contraband related to Units

18    2B or 4B?

19         A.  No.

20         Q.  Okay.  And in your review of those notes,

21    are there any -- well, you provided some testimony

22    earlier about a March 21st, 2011, grievance about a

23    strip search in the dietary.  Do you recall that

24    testimony?

25         A.  Yes.

1    Q.  Okay.  And you testified that you would have

2 followed up with Assistant Warden Reynolds; is that

3 correct?

4    A.  Correct.

5    Q.  Okay.  Were there any notes in your notebook

6 which also start on March 21st, 2011, the day of

7 your response to that grievance, any notes about

8 following up with Warden Reynolds?

9    A.  No.

10        MR. FIELD:  No further questions, Your

11 Honor.

12        THE COURT:  Very well.  Ms. McNaught.

13              RECROSS EXAMINATION

14 BY MS. McNAUGHT:

15    Q.  Warden, what kinds of things do you keep in

16 your notebook?

17    A.  Just things to jog my memory.  Nothing

18 specific.

19    Q.  Nothing further.

20        THE COURT:  Very well.  Mr. Field?

21        MR. FIELD:  Nothing from Plaintiff, Your

22 Honor.

23        THE COURT:  Very good.  Thank you.

24    Very well, Warden, you may step down.  Thank

25 you very much.

1      Yes, thank you very much.

2      (The witness was excused.)

3          THE COURT:  All right.  You may call your

4  next.

5          MS. BROWN:  Your Honor, the plaintiffs call

6  Alan Pasley.

7          THE COURT:  Very well.

8      (The witness was sworn.)

9                    ALAN PASLEY

10  called as a witness herein, having been duly sworn,

11  was examined and testified as follows:

12                DIRECT EXAMINATION

13  BY MS. BROWN:

14      Q.  Good afternoon, sir.  Can you please spell

15  your name for the record?

16      A.  My name is Alan Pasley.  A-l-a-n,

17  P-a-s-l-e-y.

18      Q.  And, Mr. Pasley, on March 31st, 2011, you

19  were a Staff Development Specialist for the Illinois

20  Department of Corrections; correct?

21      A.  Yes.

22      Q.  And on that day you went to Lincoln

23  Correctional Center for a mass strip search?

24      A.  I went there for a shakedown; yes.

25      Q.  And in addition to yourself, Training

 1    Specialist Renee Hatfield was present?

 2        A.  Yes.

 3        Q.  And Training Specialist Richard Huffman was

 4    present?

 5        A.  Based on a review of schedules; yes.

 6        Q.  And it was only the three of you from the

 7    training academy that went to Lincoln for the

 8    March 31st, 2011, training exercise?

 9        A.  Those are the only staff I recall.

10        Q.  Was anyone in charge between the three of

11    you?

12        A.  No.  We were equals.

13        Q.  Now, you and Mr. Huffman did not set foot in

14    the gym on March 31st, 2011; correct?

15        A.  I can't speak for Mr. Huffman, but I can say

16    that I was not in the gym at Lincoln Correctional

17    Center.

18        Q.  Well, you didn't set foot in the gym; right?

19        A.  Correct.

20        Q.  And Mr. Huffman was with you throughout the

21    day; correct?

22        A.  I can't account for him for every minute of

23    the day, but I did not see him go towards the gym or

24    leave to the gym.

25        Q.  And he was with you throughout the day;

1    correct?

2         A.   Throughout the day he would have been with

3    me; yes.

4         Q.   But Ms. Hatfield was specifically stationed

5    in the gym to supervise cadets conducting strip

6    searches; right?

7         A.   Can you repeat the question?

8         Q.   Sure.  Ms. Hatfield was specifically

9    stationed in the gym to supervise the cadets

10   conducting strip searches?

11        A.   Her job as a trainer would have been, yes,

12   to supervise the cadets.  And yes, she was in the

13   gymnasium.

14        Q.   And she was the only female from the

15   training academy that was a supervisor that was

16   present; correct?

17        A.   Correct.  She would be the only trainer that

18   was present that was a female.

19        Q.   And she actually initially had a different

20   assignment with the Department of Juvenile Justice

21   on March 31st, 2011; right?

22        A.   Yes; that is correct.

23        Q.   And she was specifically freed up from that

24   assignment to go to Lincoln Correctional Center

25   because she was the only female training instructor

1    available; right?

2        A.  I was not the manager of the training

3    academy at that time, so I can't speak as to why she

4    was freed up.

5        Q.  You gave a deposition in this case in 2013;

6    correct?

7        A.  Yes, I did.

8        Q.  Would reviewing your testimony refresh your

9    memory about why Ms. Hatfield was freed up to go to

10   Lincoln?

11       A.  Yes, it would.

12       (Sotto voce discussion among counsel.)

13       A.  Okay.

14       Q.  And does that refresh your recollection as

15   to whether Ms. Hatfield was freed up to be present

16   at Lincoln because she was the only female training

17   instructor present?

18       A.  Yes, it does.

19       Q.  And so that's a correct statement?

20       A.  Yes, it is.

21       Q.  Now, you were not, at that time, responsible

22   for overseeing the cadets in the gym; is that right?

23       A.  That would be correct.

24       Q.  And you have no idea whether Ms. Hatfield

25   was overseeing the cadets in the gym; right?

1          A.  No.  I would have no idea.

2          Q.  You saw Assistant Warden Reynolds during the

3      training exercise; right?

4          A.  Yes, I did see him.

5          Q.  It was Assistant Warden Reynolds who told

6      you at the start of the day where the cadets should

7      go and what was gonna happen?

8          A.  Yes, it would be.

9          Q.  Now, in your experience, typically, written

10     plans for a cadet training exercise of this nature

11     are completed prior to the arrival of the training

12     staff; correct?

13         A.  Yes.  My experience shows that over the

14     years being involved in this, that written plans are

15     completed.  I cannot attest to every shakedown that

16     I have been on, but it is a regular occurrence.

17         Q.  And you were never shown a written plan for

18     the strip search on March 31st, 2011; right?

19         A.  Not that I recall; no.

20         Q.  You weren't shown one before that date;

21     correct?

22         A.  No, I was not.

23         Q.  And you weren't shown one on that date;

24     correct?

25         A.  No, not that I recall.

1    Q.  You had no involvement in the planning for

2    the strip search; correct?

3    A.  No, I would not.

4    Q.  And your received your direction about the

5    plan for the strip search from Assistant Warden

6    Reynolds; right?

7    A.  The plan in regards to -- at our arrival;

8    yes.  But I would have been instructed by training

9    academy administrative staff as to times of

10   departure, where we were going, along that line.

11       But upon arrival at Lincoln Correctional

12   Center, for specifics as to where we would be going

13   and how it would be done in regards to where

14   searches would be done, that would be at the

15   direction of Lincoln Correctional Center.

16   Q.  Okay.  And specifically, Assistant Warden

17   Reynolds; correct?

18   A.  Yes.

19   Q.  Once the cadets arrived at Lincoln,

20   Assistant Warden Reynolds was running the training

21   exercise; right?

22   A.  I would not say necessarily that he was

23   running the training exercise.  I would say that it

24   falls under the direction of Lincoln Correctional

25   Center.  And there would be aspects of it that he

1    would be in charge of.

2        The things such as making sure that cadets

3    utilized the restroom on time, that cadets would get

4    their meals, those things fell back on myself in

5    regards to making sure that they arrived where they

6    were supposed to be.

7        Q.  But he was the one who was running the

8    exercise as it relates to the procedures that were

9    to be used, where the searches would happen, who --

10   you know, who would go where and when, aside from

11   the logistics of the cadets; correct?

12       A.  Yes.

13       Q.  Assistant Warden Reynolds was not -- you

14   were in the living units during the entirety of the

15   event; correct?

16       A.  Yes, I would be.

17       Q.  And Assistant Warden Reynolds wasn't with

18   you the entire time; correct?

19       A.  Once again, I saw Assistant Warden Reynolds

20   in the dormitories during the shakedowns, but I

21   would not account for him for the full time; no.

22       Q.  Because he came in and out; right?

23       A.  Yes.

24       Q.  And it was Assistant Warden Reynolds that

25   gave you direction on the morning of March 31st

1    about what the cadets would look for; correct?

2         A.  Yes and no.  Direction in regards to as a

3    correctional employee, when you go into a shakedown,

4    it's very generic unless we're looking for something

5    specific.  I know in my time with the department and

6    in the manner in which I've trained staff that we

7    are always on the lookout for contraband.  And that

8    can be from very general, from weapon's making

9    material to narcotics to prescription medications to

10   what you've referred to as nuisance contraband.  But

11   no, no specific item per se were we looking for.

12   But yes, he did give direction in regards to the

13   fact that we were looking for contraband.

14        Q.  Well, didn't he tell you that you were

15   looking specifically for nuisance contraband and

16   expired medications?

17        A.  Yes.  And he went on further to say that

18   nuisance contraband to include extra clothing, extra

19   commissary, extra bedding, extra coats, things along

20   that line.

21        Q.  And he was specific about those items;

22   correct?

23        A.  Yes.

24        Q.  And he didn't raise any concern with you

25   about any other contraband at that time; correct?

1     A.  No, but we always have that concern for

2  contraband.

3     Q.  Okay.  But he didn't say that you were

4  looking for a weapon; correct?

5     A.  Correct.

6     Q.  And he didn't mention that there were a lot

7  of fights happening at the institution at the time;

8  correct?

9     A.  No, he did not.  Not that I recall.

10     Q.  The specifics of his briefing were basically

11  thank for coming and the cadets were gonna be

12  looking for expired medication and general nuisance

13  contraband; correct?

14     A.  Yes.

15     Q.  It was Assistant Warden Reynolds who gave

16  instructions to you and to his tactical team

17  commander during the training exercise; correct?

18     A.  Can you be more specific as to what those

19  directions would be towards myself?

20     Q.  I mean instructions about where the cadets

21  should go and what they should do?

22     A.  Yes.  In very general terms; yes.

23     Q.  And you heard him give instructions to his

24  tactical team too; correct?

25     A.  No, I did not.

1    Q.  Well, it wasn't the training staff that was

2    giving instructions to the tactical team; correct?

3    A.  No, we would not.

4    Q.  Okay.  Is it -- so you were on the housing

5    units when Units 2B and 4B were searched for

6    contraband; correct?

7    A.  Yes, I was.

8    Q.  And is it fair to say that the training

9    academy had brought something like 60 cadets to

10   Lincoln on that day?

11   A.  That would be an estimate, but I would

12   assume right around that number of 60.

13   Q.  Okay.  And there was testimony earlier that

14   about 20 to 25 of those cadets were female.  Would

15   you agree with that estimate?

16   A.  Yeah, that would be reasonable; yes.

17   Q.  Can you give a ballpark estimate of how many

18   cadets were with you doing the shakedowns of the

19   living areas?

20   A.  If I had to -- a very general estimate, I

21   would assume anywhere between, you know, 30 and 45,

22   depending on the time of the day, depending on

23   basically where we stood on at the search.

24   Q.  Okay.  I'd like to show you what's been

25   marked as Plaintiff's Exhibit 221.

1          So I'd just like to see if I can understand

2    from you what's the procedure for completing a

3    shakedown slip like this.

4          Can you tell me if this is correct.  Is it true

5    that when a cadet finds an item of contraband, that

6    they would then fill out the upper left portion of

7    the shakedown slip?

8          A.  They would fill out the entire left-hand

9    portion of the shakedown slip.

10         Q.  Okay.  And -- but first -- so there's a time

11   at the top; correct?

12         A.  Correct.

13         Q.  And what does that time refer to?

14         A.  That would be the time that the search

15   began.

16         Q.  Is that the time that they found the item?

17         A.  No, not necessarily.

18         Q.  So it's the time that they began their

19   search of a particular bed in the housing unit?

20         A.  Correct.

21         Q.  Okay.  And so they do the search.  Let's say

22   they find something.  They fill out the -- a

23   description of the item that was found; correct?

24         A.  Yes.

25         Q.  And then is it correct that they then take

1    the contraband and the contraband form to a
2    supervisor present at the same location?
3         A.  That's not typically how we do it with cadet
4    shakedowns.  We usually rely upon the hosting
5    facility to assign a staff member who would gather
6    that information.  It would not necessarily be a
7    supervisor per se, but we would have one individual
8    who would collection all those items from the cadets
9    as paperwork is completed and as contraband is
10   found.
11        Q.  Okay.  So not a supervisor, but a
12   correctional employee?
13        A.  Yes.
14        Q.  Okay.  So that the cadet would take the item
15   of contraband and the slip to a correctional
16   employee that's present in the same location?
17        A.  Yes, they would.
18        Q.  Okay.  And then both the cadet and the
19   correctional employee would sign the form?
20        A.  No, not necessarily.  The employee that
21   would be receiving it at that point is more just a
22   record keeping to make sure that everything is
23   gathered and then taken all at once to the shift
24   supervisor, as opposed to taking, you know, dozens
25   of these individually.  That one person would just

1  be vested with gathering it all up, transporting it.

2      Any second signature would merely be a witness

3  as to who witnessed the contraband.  It may have

4  been that employee that it was turned over to or it

5  may have been any other employee that would have

6  been in the area during the search.

7      Q.  I see.  So the cadet that was filing out the

8  contraband form would sign it at the bottom.  And

9  there might be another witness signature, but

10  certainly the cadet would sign it?

11      A.  Yes.

12      Q.  Okay.  And what does the time at the bottom

13  of the form reflect?  And here it says 11:35.  What

14  does that reflect?

15      A.  That would typically reflect the time in

16  which the form was completed.  So we know that that

17  search was conducted -- that it began sometime at

18  10:50 a.m., and that would have been fully completed

19  with all paperwork done at 11:35 a.m.

20      Q.  Okay.  Thank you.

21      Now, the cadets finished filling out their

22  shakedown slips at different times; right?

23      A.  Yes.

24      Q.  This was new to them?

25      A.  Yes.

Q. They were trainees so some of them took --
were a little slow when they filled out the
paperwork and did the search; right?

A. Actually, we find that cadets are relatively
quick at this because this has been pounded into
them at training. This is actually training that is
covered throughout their six weeks leading up to it.
And they're typically very versed in this by this
point. They've filled out numerous shakedown slips
in training up to this point.

Q. Okay. So is it your testimony that, you
know, right when they're trained, they're the best
at this. And then over the course of their career,
they sort of slow down?

A. No, not that they necessarily slow down.
But they are very versed at this because they've
regularly done this. Many employees can go through
periods of time where they may not fill out a
shakedown slip for months at a time, where cadets
have -- they have regularly been filling those out
over the six-week period.

Q. Okay, thank you.

The cadets that were searching the housing
units, they didn't stay together as one group in the
same building while doing the living area strip

1    searches -- living area searches; correct?

2         A.  Correct.

3         Q.  Groups of cadets who finished their

4    individual searches from the first building moved on

5    in smaller groups to the second building; correct?

6         A.  Not that I recall.  Typically, we don't

7    start the second building until the first building

8    is complete.  Oftentimes it's where I come into

9    play.  Where when I see a cadet without something to

10   do, I find them something to do; whether it be

11   assisting with contraband, cleaning up garbage,

12   getting others assembled perhaps.  Just going

13   through and making sure that the area is generally

14   cleaned.  I may send them to have their lunch at

15   that time or to use a restroom at that time.  We try

16   to keep them moving along as quickly as possible,

17   but we don't like to separate them out into separate

18   buildings.

19        Q.  So is it your testimony here today that the

20   cadets did not move on in smaller groups to the next

21   building while the initial set of cadets were still

22   conducting shakedowns of that building?

23        A.  Not that I recall; no.

24        Q.  Would it refresh your recollection to see

25   your deposition testimony from 2013?

1          A.  Yes.

2          Okay.

3          Q.  So does that refresh your recollection as to

4     whether the cadets that were conducting the searches

5     of the living areas stayed together as a group in

6     one building during the entire shakedown?

7          A.  Yes.  Typically what happens, and based on

8     my statement in that deposition, if I'm a cadet and

9     I've conducted a search in which I -- I did not find

10    contraband would mean I wouldn't have any additional

11    paperwork to do, such as disciplinary report or an

12    incident report.  So then once enough of those would

13    be gathered and we would have enough to cover an

14    entire new unit, then yes, they would move on.

15         But if I found contraband, that would require

16    additional paperwork.  A lot of times, those

17    individuals would be placed in a different location

18    to complete their paperwork.  So they could be

19    separated, yes, but we would not move on to a new

20    area until we had enough staff to cover that area.

21         Q.  Well, so are you telling me that during the

22    March 31st, 2011, strip search, you know, the cadets

23    that were doing the living area shakedowns in 2B did

24    not -- no cadets went to 4B before everyone was done

25    at 2B?

1        A.  Now, everyone -- when you say done.  The

2   search would be completed, but just because the

3   search is completed does not mean that the -- that

4   the search is completed.  Because there would still

5   be additional paperwork.  Like I said, that could

6   include writing a disciplinary report, writing an

7   incident report.

8        So the search, the physical search would be

9   completed before others would move on, but there

10  would be additional paperwork for some of the cadets

11  involved.

12       Q.  Okay.  So if I understand your testimony,

13  it's that some of the cadets went on to begin

14  searching the living areas of Unit 4B while there

15  were still cadets completing their paperwork at Unit

16  2B; is that correct?

17       A.  Yes, that could be the case.

18       Q.  And in fact, that was the case; correct?

19       A.  I don't remember if we left them to complete

20  their paperwork in 2B, but there would have been

21  cadets that would not be done yet with their

22  paperwork when we began 4B.

23       Q.  Okay.  You were there during the training

24  exercise when the Orange Crush officers entered the

25  housing units to remove the women; correct?

1      A.  Yes, I was present when the tactical team

2  entered the unit.

3      Q.  Okay.  And it was the training academy

4  cadets who handcuffed the women before they were

5  taken to the gym; correct?

6      A.  Yes, that's the way I recall it.

7      Q.  And the training academy cadets were under

8  your supervision?

9      A.  Yes, they were.

10      Q.  And even though the cadets that you were

11  supervising that went to the gym, you yourself did

12  not set foot in the gym at any time; correct?

13      A.  No, I did not.

14      Q.  All the women that you observed during the

15  incident on March 31st, 2011, were compliant with

16  all the orders that were given to them; right?

17      A.  Yes, they were.

18      Q.  Thanks.  No more questions.

19          THE COURT:  Ms. Bautista.

20          MS. BAUTISTA:  Thank you.

21                CROSS EXAMINATION

22  BY MS. BAUTISTA:

23      Q.  Good afternoon, Mr. Pasley.

24      A.  Good afternoon.

25      Q.  You're gonna need your glasses.

1      A.  Oh, let me put them back on.

2      Q.  So this is Plaintiff's Exhibit 221, the

3  third page.  So you were asked questions about the

4  times in relation to shakedown slips that were filed

5  out on the housing unit.  And now I'm showing you a

6  shakedown slip that was filled out in regards to the

7  gym.  Can you see it on your screen?

8      A.  Yes, I can.

9      Q.  Okay.  So can you describe to the jury the

10  times that we have on this shakedown slip and what

11  those mean?

12      A.  Once again, the top time, 11:55 a.m., would

13  be the time in which the search would have began.

14  And 12:03 would have been the time in which the form

15  was completed.

16      Q.  And this is a different search than the ones

17  that we were talking about on a housing unit; is

18  that right?

19      A.  Correct.  This appears to be a search of an

20  individual in which pills were pulled out of an

21  offender.

22      Q.  So can you conclude anything from that in

23  regards to what type of search it was?

24      A.  Yes.  I would assume this was conducted from

25  a strip search, based on the fact that the -- that

1   the pills were pulled out from the offender during

2   the search.

3       Q.  Okay.  And does it indicate on her who

4   pulled the pills out?

5       A.  Yes.  It states that Inmate Chris pulled

6   them out herself.

7       Q.  Now, you were asked questions about cadets

8   handcuffing the inmates after the tactical team

9   entered the housing unit; do you recall that?

10      A.  Yes, I do.

11      Q.  Were you present for the handcuffing both of

12  the women on Unit 2B and for the women on Unit 4B?

13      A.  Yes, I was.

14      Q.  And you were asked questions about the

15  cadets being under your supervision; do you recall

16  that?

17      A.  Yes, I do.

18      Q.  Can you describe to the ladies and gentlemen

19  of the jury how you supervised the cadets who were

20  handcuffing the inmates?

21      A.  A regular thing that I do as a trainer when

22  we go on an exercise such as this is I monitor both

23  the application of the handcuffs, but more

24  importantly, the fit at the completion of cuffing.

25  And I would have stood at the end of the hallway as

1    the offenders left the dormitory area into the

2    dayroom area.  And I myself would -- would randomly

3    check offenders to make sure that their cuffs fit

4    regularly by placing my pinky finger between the

5    wrist of the offender and the handcuff to ensure

6    proper fit, to ensure that cadets under my charge

7    were applying those handcuffs properly.

8         Q.  You said you would have done this.  Do you

9    specifically recall doing this on March 31st of

10   2011?

11        A.  Yes, I do.

12        Q.  And why is it important to check the fit of

13   handcuffs?

14        A.  Improper placement of handcuffs can lead to

15   a couple different issues; the primary one being

16   typically people get very caught up in the fact that

17   handcuffs can be applied too tightly, and that can

18   cause issues.  But by applying them too loosely can

19   also create issues.

20        A handcuff is designed to be oblong, similar to

21   your wrist, and if it's applied too loosely, it

22   allows the offender to twist their wrist, which will

23   cause bruising and redness.

24        So as an instructor, not only do I instruct,

25   but I also follow-up and check my cadets to make

sure they're applied properly. Not too tightly, but
also just as importantly, not to loosely. And we do
monitor that very closely.

Q. Now, you were asked some questions regarding
Assistant Warden Reynolds and comments that he made
prior to the search; do you recall that?

A. Yes, I do.

Q. And I believe the testimony was that
Assistant Warden Reynolds instructed how the
searches were to be done; is that right?

A. Yes.

Q. And did this include both the shakedown and
the strip searches?

A. As far as I recall, essentially, it was
where this was to occur, where -- the location being
where the searches were to occur, where the inmates
would be taken, and essentially, left at that.

Q. Did he specifically direct for males to be
present with no barriers while females were being
strip-searched?

A. No, he did not.

Q. Did he specifically instruct for women to be
directed to throw used sanitary products on the
floor of the bathroom or the floor of anywhere in
the gym?

1          A.  No, he did not.

2          Q.  Just one moment.

3      I have nothing further at this time.

4              THE COURT:  Redirect?

5              MS. BROWN:  Nothing from plaintiffs.

6              THE COURT:  Very good.  Thank you very

7      much, Mr. Pasley.  You may step down.

8          (The witness was excused.)

9              THE COURT:  Call your next.

10             MS. THOMPSON:  Your Honor, we have a

11     witness that I believe needs to come from the front

12     of the courtroom.  It's Ms. Millie Lee.

13             THE COURT:  Fine.  Come right up here,

14     ma'am.

15         And would you raise your right hand and be

16     sworn by Madam Clerk.

17         (The witness was sworn.)

18             THE COURT:  Please be seated.  And speak

19     right into that microphone, would you please.

20         All right, Ms. Thompson.

21             MS. THOMPSON:  Thank you, Your Honor.

22                     MILLIE LEE

23     called as a witness herein, having been duly sworn,

24     was examined and testified as follows:

25

DIRECT EXAMINATION

BY MS. THOMPSON:

Q.  Good afternoon, Ms. Lee.  You're gonna need
to lean forward and talk into that microphone, okay?
If you need to adjust your chair to do that, please
do.

Ms. Lee, can you please introduce yourself to
the jury and please spell your first name?

A.  My name is Millie Lee.  M-i-l-l-i-e.  Lee,
L-e-e.

Q.  Okay.  Now, Ms. Lee, in 1982, were you
convicted of murder?

A.  Yes.

Q.  And have you been in the Illinois Department
of Corrections since the time that you were
convicted?

A.  Yes.

Q.  In 2011, were you an inmate at Lincoln
Correctional Center?

A.  Yes.

Q.  Okay.  And as of 2011, how long had you been
at Lincoln Correctional Center?

A.  I did 18 years in Dwight and we transferred
to Lincoln.  I did 13 years there.

Q.  Okay.  So in March of 2011, what housing

1    unit were you living in at Lincoln Correctional

2    Center?

3         A.  4B.

4         Q.  Okay.  In March of 2011, did you have a job

5    at Lincoln Correctional Center?

6         A.  Yes.

7         Q.  What was your job?

8         A.  I believe I was working at the sewing

9    industry.

10        Q.  And what did you do in the sewing industry?

11        A.  I was a sew serger.

12        Q.  What hours did you work in March of 2011?

13        A.  Eight to like 2:30 in the afternoon.

14        Q.  As part of your job in the sewing industry,

15   were you subjected to strip searches?

16        A.  Pat-downs.  Almost every day.  And if

17   something came up missing, like a tool or whatever,

18   then we'd be strip-searched.

19        Q.  And before March of 2011, how long had your

20   worked in the industries?

21        A.  Off and on like years at a time.

22        Q.  And I'm talking just about your time at

23   Lincoln Correctional Center --

24        A.  Right.

25        Q.  -- but prior to 2011, how many times had you

1    been strip-searched because of some issue having to

2    do with your industry job?

3        A.  I think maybe two times.

4        Q.  Now, Ms. Lee, on March 31st of 2011, did you

5    go to your job at the industry?

6        A.  Yes.

7        Q.  What time did you go to the industry?

8        A.  About 8:00 in the morning.

9        Q.  And I'm gonna show you -- one moment.

10        Ms. Lee, I'm gonna show you -- I'm gonna show

11    you what's been marked as Plaintiffs' Exhibit 201.

12        The industry job that you worked at, was that

13    in the gym building at Lincoln Correctional Center?

14        A.  Yes.

15        Q.  Okay.  And using the screen in front of you,

16    if you touch your hand to screen, it will leave a --

17    it makes an electronic mark.

18        Can you indicate for the jury where on this

19    diagram your industry job was?

20        A.  Here.

21        Q.  While you were at your job at the industry

22    on March 11th -- excuse me, on March 31st of 2011,

23    did anything unusual happen?

24        A.  Yes.

25        Q.  Can you describe for the jury what happened?

1        A. Well, that morning, house 2B was in the gym.

2    And we all went to the door to try to see what was

3    going on, and we discovered that the Orange Crush

4    had come in.  And they were getting striped -- that

5    they were getting strip-searched.

6        Q. Okay.  Let me stop you there.

7        When you say that 2B was in the gym.  How do

8    you know that 2B was in the gym?

9        A. Because they were kneeling down on the floor

10    in the gym area.  And that was the house that some

11    of my friends lived on.

12        Q. Okay.  And did you -- is this something that

13    you personally saw?

14        A. Yes.

15        Q. And how were you able to see that?

16        A. We snuck to the door and we peeked out.

17        Q. Can you indicate on this map where the door

18    is that you peeked out?

19        A. Here.

20        Q. How long had you been at work before you --

21    how long had you been at work when you heard this

22    commotion?

23        A. We had just ate lunch.  So it was like from

24    8 to like 10:30 or something like that.

25        Q. Okay.  And what happened after that?

1      A.  Well, we were chased from the door.  And

2  then we went back to work.

3      Q.  And how long did you remain at work that

4  day?

5      A.  Until they called us and told us that we had

6  to go back to 4B.  All inmates had -- who lived on

7  4B had to go back to 4B.

8      Q.  Did you then go back to 4B?

9      A.  Yes.

10     Q.  And what happened when you got to back to

11  4B?

12     A.  They told us to go to our room.

13         THE COURT:  To do what, ma'am?

14     A.  They told us to go to our rooms.  Our dorms.

15         THE COURT:  Thank you.

16     Q.  Okay.  And did you do that?

17     A.  Yes.

18     Q.  And what happened after you went to your

19  dorm?

20     A.  When we went to our dorms, we were informed

21  that we were supposed to stay in our dorms until

22  further notified.

23     Q.  Okay.  And what happened after you went to

24  your dorm until further notified?

25     A.  Well, we went to the dorm.  Warden Reynolds

1    came down the wing, and then we heard all these

2    other footsteps.  And that's when the Orange Crush

3    and the new cadets or whatever came down the wings.

4         And Warden Reynolds came into our dorm.  He

5    walked from the front of the dorm back to the window

6    and back up and told us to stand at the end of our

7    beds.  And when we were called from our beds, to go

8    out and be shook down by a new cadet.  And then we

9    would be handcuffed and taken to the gym.

10        Q.  And you said that Orange Crush came in.  How

11   do you know that Orange Crush came in?

12        A.  They had on orange uniforms.  The tactical

13   unit.  They had on orange jumpsuits with black vest

14   pieces and helmets and sticks.

15        Q.  So were you, in fact, handcuffed and taken

16   to the dayroom?

17        A.  I was shaken down by a cadet who I had never

18   seen before.  And I was told to turn around and cuff

19   up.  And so I cuffed up, she locked my cuffs.  It

20   was a lady, I believe she was working with the

21   tactical team from Springfield, she was standing

22   there telling her the correct way to handcuff me.

23   Then I was handed off to another officer who was in

24   Orange Crush and escorted down the hallway.

25        Q.  Now, can you describe how your handcuffs --

well, let me ask you a different question.

When you put your handcuffs on, how did they feel?

A. They were tight. I had been working all day, so my hands were probably swollen. I had a little carpal tunnel.

Q. All right. At some point after you were handcuffed and taken into the dayroom, did you go to the gym?

A. Yes.

Q. Did you go to the gym with anyone?

A. A group of people. About ten other inmates. We were escorted on the walkway to the gym. From our housing unit to the gym.

Q. And did you walk with any specific inmates that you knew?

A. Yes. I walked with Ms. Sanchez. Along size Ms. Sanchez.

Q. Why did you walk alongside Ms. Sanchez?

A. Because something was wrong with her leg and her hip and she couldn't hardly walk by herself. So I put my shoulder up against hers so that she could lean on me.

Q. Why did you put your shoulder up against her so she lean on you?

1    A.  Because I didn't want her to fall.

2    Q.  Now, were you handcuffed at this time?

3    A.  Yes.

4    Q.  And was Ms. Sanchez handcuffed?

5    A.  Yes.

6    Q.  Do you know how old Ms. Sanchez was at this

7    time?

8    A.  I'm 53, she had to have been in her late

9    sixties.

10   Q.  Now ultimately, when you got to the gym,

11   were you strip-searched?

12   A.  Yes.

13   Q.  And where in the gym were you

14   strip-searched?

15   A.  I was strip-searched in the bathroom.

16   Q.  I'm gonna ask you again to refer to the

17   diagram in front of you.  Can you touch the screen

18   to indicate where it is that you were

19   strip-searched?

20   Now, were any other women in the bathroom with

21   you when you were searched?

22   A.  Yes.

23   Q.  Who else was in the bathroom with you?

24   A.  About eight or nine other women.

25   Q.  And was it eight or nine other inmates or

1  eight or nine other women total?

2      A.  It was eight or nine other inmates and about

3  five or six cadets and different people from

4  Springfield.

5      Q.  Were there any inmates in the bathroom with

6  you that you knew?

7      A.  Yes.

8      Q.  Who did you know?

9      A.  Ms. Sanchez and Ms. Crisp.

10     Q.  And who was Ms. Crisp?

11     A.  Ms. Crisp was an older, African-American

12  lady who had gray hair that came down to about right

13  here.

14     Q.  And was Ms. Crisp somebody that lived on

15  your housing unit?

16     A.  Yes.

17     Q.  Were -- can you describe for the jury how

18  you were strip-searched in the bathroom?

19     A.  They told us all to take our clothes off and

20  stand there until an officer came over to us.  But

21  we had to -- you want me to just describe everything

22  that happened during that particular time?

23     Q.  Please describe what happened when you were

24  strip-searched?

25     A.  We had to take off all of our clothes.

1    Stand there butt naked.  I had to open my mouth, I

2    had to pull back my ears so that they could see I

3    had nothing in my ears or whatever.  I had to lift

4    up my breasts.  I had to squat and cough.  I had to

5    turn around and pull my butt cheeks apart and squat

6    and cough.

7        Q.  What were the other women in the bathroom

8    doing when you were doing the things that you just

9    described?

10       A.  They were doing the same thing.

11       Q.  Was there anyone in the bathroom -- well,

12   let me ask a better question.  When you and the

13   women in the bathroom were being strip-searched, was

14   there any contraband that was discovered?

15       A.  Yes.

16       Q.  And can you describe for the jury what

17   happened when that contraband was discovered?

18       A.  Ms. Crisp, she had pills she had tried to

19   hide inside her vaginal cavity.

20           THE COURT:  What was that, I didn't hear

21   that?

22       A.  Ms. Crisp had pills that she had wrapped in

23   plastic and she stuffed them inside her vaginal

24   cavity.  She tried to conceal them, she tried to

25   hide the pills.  And when she squatted, the pills

1      fell out.

2          Q.  What happened when the pills were

3      discovered?

4          A.  She was told to pick the pills up.  They

5      picked the pills up and they took her out of there.

6      She got dressed, she went through the strip search,

7      they picked her up, they took her out of there.

8          Q.  And what was the reaction of the people in

9      the bathroom, the reaction that you observed when

10     the pills were discovered?

11         A.  Everybody was like they couldn't believe it.

12         Q.  You said that you were in there, in the

13     bathroom with eight or nine other inmates, and then

14     you said five or six other people were in there?

15         A.  Yes.

16         Q.  And can you describe the other five or six

17     other people who were in there?

18         A.  I think it was like two ladies from the tac

19     team.  They were telling the cadets what to do

20     and --  the cadets that was in there monitoring the

21     strip search.

22         Q.  So it was two leaders and then --

23         A.  Yes.  It was an African-American woman and

24     there was a short Caucasian woman with dark care

25     that came almost like to her shoulder.

1      Q.  And was the short Caucasian woman also

2   someone from the tac team?

3      A.  I believe she may have been a squad leader

4   or something like that.  She was an authority

5   because she was telling them what to do and what to

6   look for.

7      Q.  And what was she wearing?

8      A.  She had on tan.  Tan khaki pants and khaki

9   shirt, a black jacket, and boots.

10     Q.  Now, Ms. Hatfield -- or excuse me, I

11  apologize about that, Ms. Lee.  I'm sorry, Ms. Lee.

12     I have a picture that I want to show you.

13     Ms. Lee, I'm showing you what's been marked as

14  Plaintiffs' Exhibit 250.  Is this the door to the

15  inmate bathroom at the gym?

16     A.  Yes.

17     Q.  And do you see that the door in this photo

18  has a curtain over it?

19     A.  Yes.

20     Q.  Now, at the time that you were in the

21  bathroom being strip-searched was there anything

22  covering the door?

23     A.  No.  It was -- after everybody came in, it

24  was put over the door.  And while we were in there,

25  the African-American lady was standing in between

1    the curtain.  Was standing in between this curtain.

2    And she was standing with the curtain partially

3    open.

4         Q.  And can you describe how the curtain was

5    partially open?

6         A.  It was pulled back.  She was standing in

7    between the two poles, pulled back.

8         Q.  Can you -- I'm gonna clear the mark you just

9    made.  Can you draw on top of this curtain which

10   portions of the curtain were open when the person

11   was standing in the middle of the curtain?

12        A.  This part was pulled back.  And she was

13   standing with this part of the curtain -- this part

14   of the curtain was open.

15        Q.  So can you indicate -- this picture shows

16   the curtain closed; right?

17        A.  Yes.

18        Q.  Can you show on the drawing what areas of

19   the curtain were not closed when the person was

20   standing in the door?

21        A.  The part in the middle.  The part in the

22   middle, this part.

23        Q.  So when you were in the bathroom, could you

24   see out into the gym?

25        A.  Yes.

1    Q.  And that's because the curtain was open?

2    A.  Yes.

3    Q.  Partially?

4    A.  Yes.

5    Q.  Okay.  What could you see when you looked

6  out?

7    A.  I saw the officer walking around the gym.

8    Q.  And can you describe the officer that you

9  saw walking around the gym?

10    A.  He was Caucasian male.

11    Q.  And when you were naked inside the bathroom,

12  were you able to look outside in the gym?

13    A.  Yes.

14    Q.  And what did you see when you were naked

15  looking outside in the gym?

16    A.  I saw the male officer.

17    Q.  And at the time you were in the bathroom,

18  did that male officer say anything?

19    A.  Yes.

20    Q.  What did he say?

21    A.  He told the lady to close the curtain, that

22  he could see inside the curtain.

23    Q.  What happened when he said that?

24    A.  She used some derogatory language, said she

25  didn't care, and she kept standing there with the

1    curtain open.

2        Q.  Can you tell the jury those -- if you know,

3    the specific language that the woman used?

4        A.  I have to curse.

5        Q.  I'm sorry, but yes.

6        A.  She said she didn't give a fuck that they

7    saw us.

8        And she kept yelling back out to whomever it

9    was she was trying to talk to?

10       Q.  At some point, you left the bathroom?

11       A.  At some point.

12       Q.  And then what did you do then?

13       A.  After we all got dressed, we went and sat on

14   the bleachers.

15       Q.  And then at some point, did you leave the

16   gym?

17       A.  After everybody had been strip-searched.

18       Q.  And how much time passed between when you

19   left the bathroom and when you left the gym?

20       A.  Maybe an hour, hour and a half.

21       Q.  And during the entire time that you were in

22   the gym, did you see any men in the gym?

23       A.  Yes.

24       Q.  Who did you see?

25       A.  I saw officer Anderson.  I saw Officer

1    Dilley.  I saw Officer Crudup, she's a female,

2    African-American female.  I saw some people I did

3    not know.

4        Q.  Officer Anderson and Officer Dilley that you

5    mentioned, are those both Lincoln Correctional

6    Center officers?

7        A.  Yes.

8        Q.  And are those tactical officers?

9        A.  No.  They had on their uniforms.

10       Q.  They were not wearing the orange crush

11   uniforms?

12       A.  No.

13       Q.  Did you have a normal time that your housing

14   unit went to lunch in March of 2011?

15       A.  It was different every day.  Sometimes they

16   would start on the high end, which is House 5, and

17   they may go first.  And if you lived on House 1,

18   sometimes you'd go first.  I was on House 4.  So if

19   I wasn't at work, I would go after House 5.

20       Q.  And do you remember -- well, let me ask you

21   this:  After you left the gym, did you go to lunch?

22       A.  No.  I had ate lunch on my job.  They bought

23   our lunches to us.

24       Q.  So did you go to the dietary unit after you

25   left the gym?

1          A.  Yes, I believe they did take us to eat.

2          Q.  And when you went to dietary, were they

3     still serving lunch?

4          A.  I don't think they was serving lunch.  I

5     think they just served us some food.

6          Q.  Okay.  One moment, Your Honor.

7              THE COURT:  Hm-mmm.

8          Q.  Just one point to clarify.  Officer Anderson

9     and Officer Dilley that you described, those are

10    both men?

11         A.  Yes.

12         Q.  Okay.  No further questions, Your Honor.

13             THE COURT:  Thank you.  You may cross.

14                       CROSS EXAMINATION

15    BY MS. BAUTISTA:

16         Q.  Good afternoon, Ms. Lee.

17         A.  Hi.

18         Q.  Now, you testified that you had one

19    conviction of murder in 1982; is that correct?

20         A.  No, I have two.

21         Q.  Right.  Two convictions for murder, both

22    from the same year; right?

23         A.  Yes.

24         Q.  And you testified that you went to your job

25    at 8:00 a.m.; is that right?

1      A.  Approximately 8:00 after count cleared.

2      Q.  And you go in through the front door of the

3  gym?

4      A.  No.  We go around the side.

5      Q.  Through the multipurpose entrance?

6      A.  No.  It's a -- a walkway around, and then

7  you go back around the corner, then you go back

8  around and we go through the back.

9      Q.  No one was in the gym when you started your

10  job at 8 a.m.; is that right?

11      A.  I didn't pay any attention.

12      Q.  You certainly didn't see anyone in the gym

13  at 8:00 a.m.; is that right?

14      A.  I probably wasn't looking up.  I was

15  probably just trying to get to my job.

16      Q.  Just one moment, Your Honor.

17      Nothing further.

18          THE COURT:  Back to you.

19                  REDIRECT EXAMINATION

20  BY MS. THOMPSON:

21      Q.  Just one question.  Let me -- I'm showing

22  the witness Plaintiffs' Exhibit 201 again.

23      Ms. Lee, on this -- on this map, can you

24  indicate where the entrance is to industry where you

25  came into your job that morning?

1      A.  Here.

2      Q.  Now, this diagram shows -- the diagram there

3  has sort of a black line there; correct?

4      A.  Yes.

5      Q.  But the door that you marked, that door goes

6  into the industry?

7      A.  Yes.

8      Q.  So do you see the door that I just pointed

9  at on this map?

10     A.  Can you do it again?

11     Q.  That is not where you came into work that

12  day; right?

13     A.  No.

14     Q.  Okay.  Thank you, Ms. Lee.

15          THE COURT:  Anything further?

16          MS. BAUTISTA:  No, Your Honor.

17          THE COURT:  Very well.  Thank you, Ms. Lee.

18  You may step down.

19     Thank you, Officers.

20     (The witness was excused.)

21          THE COURT:  All right.  In view of the

22  lateness of our starting, ladies and gentlemen, I

23  think we'll go through for another 15 minutes before

24  we take our break, if that's okay.

25     Okay.  Call your next.

1          MS. THOMPSON:  We have some exhibits that

2    were previously shown to the jury that we just want

3    to make sure for the record are admitted into

4    evidence.  And at that, we will close, Your Honor.

5          THE COURT:  All right, fine.  Well then,

6    let's get that squared aware.

7          MS. THOMPSON:  We have given a list to the

8    defendants and I think we're in agreement.

9          MS. BAUTISTA:  I haven't had a chance to

10   look at it.

11         MS. THOMPSON:  Okay.  They may need just to

12   briefly review our list to make sure we're in

13   agreement as to what's going should go in, Judge.

14   Then we're ready.

15         THE COURT:  All right, fine.

16         MS. THOMPSON:  To make sure our record is

17   clear, Judge, plaintiffs are seeking to have the

18   following exhibits be admitted as evidence in this

19   matter.

20      Plaintiffs' Exhibit 33, 201, 202, 203, 221,

21   226, 229, 233, 235, 236, 237, 238, 239, 243, and

22   250.  And those are our exhibits, Your Honor.  And

23   if those exhibits are admitted.

24         MS. MCNAUGHT:  No objection.

25         THE COURT:  No objection, Ms. McNaught,

1      very good.  Then all of those -- without objection,

2      all of those exhibits for the Plaintiff are admitted

3      into evidence.

4           (Plaintiffs' Exhibits 33, 201, 202, 203, 221,

5           226, 229, 233, 235, 236, 237, 238, 239, 243

6           and 250 admitted.)

7           MS. THOMPSON:  And with that, Your Honor,

8      the Plaintiffs rest their case.

9           THE COURT:  Very well, the plaintiffs have

10     rested their case, ladies and gentlemen.

11          So I think probably it would be best if we took

12     our break now, rather than to break in the

13     continuity.

14          So we will turn -- as soon as we finish our

15     break, we will turn to the defendants for their case

16     in chief.

17          Thank you very much.  And we'll stand in

18     recess.  Fifteen minutes.

19          (The jury left the courtroom.)

20          THE COURT:  All right.  The jury has left

21     the courtroom.  We're going to stand in recess.  But

22     counsel, I'm going to be asking you how we're going

23     to handle, as a housekeeping matter, the notebook

24     and the two pages out of that notebook as far as the

25     record is concerned.

1        Now, I have to preserve these for the record.

2   But as far as going ahead with it, it's entirely up

3   to you.  So I want you to be thinking about how

4   we're gonna handle this, the mechanics of the

5   handling of this for my record.  Understood?

6            MS. THOMPSON:  We'll confer about that,

7   Your Honor.

8            THE COURT:  Please do.

9            MS. MCNAUGHT:  Your Honor?

10           THE COURT:  Yes.

11           MS. MCNAUGHT:  We have a motion.

12           THE COURT:  You file your motion.

13           MS. MCNAUGHT:  Okay.  Just for the record

14  then, we're making a motion for judgment as a matter

15  of law.

16           THE COURT:  Very well.  The motion is

17  denied.

18       Thank you.  We'll stand in recess.

19  Fifteen minutes, everyone.

20           MS. MCNAUGHT:  Your Honor, just to be sure,

21  we're moving on qualified immunity.

22           THE COURT:  Beg your pardon?

23           MS. MCNAUGHT:  We're moving -- the motion

24  for judgment as a matter of law is based upon

25  qualified immunity.

1          THE COURT:  Very well.  Excellent.  That

2   will -- you've preserved your record.

3          MS. MCNAUGHT:  Thank you.

4          THE COURT:  All right, we'll take fifteen.

5     (A recess was taken.)

6     (The following proceedings were held outside

7     the presence of the jury.)

8          THE COURT:  Thank you, everyone.  The

9   record may show the jury is not, n-o-t, in the

10  courtroom.  And we have a matter to take care of out

11  of their presence.

12         MS. THOMPSON:  I will be -- I will be

13  brief, Judge.

14    Over the break, defense counsel told me that

15  they have additional demonstratives they intend to

16  use.  It appears they have two sets of handcuffs--a

17  silver set and an orange set--that they're gonna use

18  as evidence.  And they gave me a list of

19  measurements that appropriately one of the

20  defendants took in the Lincoln Correctional Center

21  areas; I assume relatively recently.

22    The purpose of the civil rules are not to have

23  a trial by surprise.  And again, you know, we

24  conferred about demonstratives before this trial and

25  we worked out many things.  You know, we discussed

evidence.

I'm hearing now, for the first time, right
before their case begins, that they have more --
more measurements and more physical evidence that
they're gonna use.  We have a discovery request that
included, you know, evidence.  I understand they're
using the cuffs as a demonstrative, but they're --
you know, they're cuffs.  They're gonna say these
are orange cuffs and these are silver cuffs.

This evidence should be barred, Judge.

THE COURT:  All right.  Ms. Barnes.

MS. BARNES:  Your Honor, yes, we asked Troy
Dawdy to take measurements of the gym restroom and
the --

THE COURT:  Measurements of what?

MS. BARNES:  Measurement of how big the gym
restroom is and how big the beauty shop is.

THE COURT:  Now, wait a minute,
Ms. Thompson hasn't talked about that, she's only
talked about silver and orange cuffs.

MS. BARNES:  Yeah, she did mention that,
but --

THE COURT:  Why don't you come up here to
this mic.  Both of you stand right there.  That's
the ticket.

1      So what's the surprise?  I mean I don't

2  understand.  We've had a lot of testimony as to

3  cuffs and orange cuffs.  We've had testimony as to

4  the gym.  We've had all kinds of testimony here.

5  What -- what is the problem?  What's the surprise?

6          MS. THOMPSON:  The surprise is they have

7  actual measurements of these areas that they're

8  gonna offer into evidence that they're giving right

9  now that -- these are not areas that are available

10  to us.  They're in the defendants' -- not these

11  particular defendants, but certainly in the Attorney

12  General's control.  I can't go measure a gym.

13      It is true that we discussed, you know, prior

14  to trial, we took some photographs of areas.  But

15  again, I mean we worked out demonstratives in

16  advance of this trial.  We've had no opportunity to

17  bring in cuffs of our own or to do any discovery on

18  the training cuffs.  And now they're gonna show the

19  jury cuffs and say, "These are the cuffs the cadets

20  use, you know, these are the measurements of the

21  gym," without giving us any opportunity to, you

22  know, develop evidence on our side that would relate

23  to these issues.

24      It's a trial by surprise and it's

25  inappropriate.

1            MS. BARNES:  No, it's not.  The inmates

2    testified about this was some kind of difference

3    between the silver cuffs and the orange cuffs, and

4    oh, these orange cuffs were heavier and different.

5    And the point of showing the jury these cuffs is to

6    show them that they are exactly the same.  And the

7    testimony is going to be the only reason that

8    they're orange is so these guys can keep them

9    separate and segregated, and they can put them back

10   in the box they belong to and take them back to the

11   academy.

12        So that's the purpose of that.  And the inmates

13   testified about that for the first time.

14        With respect to the measurements, they were

15   present last Monday when we took photographs.  If

16   they wanted to take measurements at that time, they

17   absolutely could have done that.  So I see no

18   surprise here.

19            THE COURT:  Well, quite frankly,

20   Ms. Thompson, I don't either.  It seems to me that,

21   first of all, from the standpoint of

22   measurements--and I'm not talking about the cuffs,

23   I'm talking only about the floor plan and

24   everything--you've got these pictures, and there's

25   nothing at all scientifically to figuring out

1    measurements by looking at the photos and making --

2    making the measurements on the photos.  This is done

3    constantly all the time.

4         So measurements doesn't seem to me there's any

5    surprise here.

6         And we've had loads of testimony regarding

7    cuffs.  And if you had wanted to see the cuffs or

8    check the cuffs or examine them, you certainly have

9    had all this time to do it.  My God, this is a 2012

10   case.

11        MS. THOMPSON:  And if the defendants had

12   ever said that they had cuffs they intended to use

13   at trial, we would have asked to examine them more

14   than five minutes before they put on a witness to

15   testify about them, Judge.

16        THE COURT:  No, no, that isn't the point.

17   The point is you have known about these cuffs and

18   both kinds all through discovery.  And all of the

19   time of trial here we've had testimony regarding

20   them.  Both kinds.

21        I don't see any surprise here whatever.  If you

22   had wanted to see those cuffs, you could have made a

23   request and done so.  In fact, you could have had a

24   pair of each that DOC would have provided for you as

25   long as you signed for them.

1          MS. THOMPSON:  I understand the Court's

2    ruling.

3          THE COURT:  All right.  Now, got that all

4    squared away?  Whether or not -- motion denied.

5       All right.  Are we ready to go?  Any problems?

6       Very good.  All right.  Then we will start

7    right in.  Marshal, please bring in the jury.

8       (The jury entered the courtroom.)

9          THE COURT:  Thank you, ladies and

10   gentlemen, please be seated.

11      All right.  I believe we're ready to proceed

12   with the defendants' case.  The plaintiffs having

13   rested.

14      Ms. Barnes, you may proceed.

15          MS. BARNES:  The defendants call Troy

16   Dawdy.

17          THE COURT:  Very well.

18      (The witness was sworn.)

19                    TROY DAWDY

20   called as a witness herein, having been duly sworn,

21   was examined and testified as follows:

22                 DIRECT EXAMINATION

23   BY MS. BARNES:

24      Q.  Mr. Dawdy, you are the same Troy Dawdy that

25   testified earlier in this matter?

1          A.  Yes, ma'am.

2          Q.  All right.  I want to clear up some

3    testimony that came in during the plaintiffs' case.

4          Did you ever deny Ms. Hegwood an opportunity to

5    wash her hands?

6          A.  Not to my knowledge, no.

7          Q.  All right.  We -- I think we've gone through

8    this too, but Delores Henry testified that you

9    called the inmates bitches.  Did you do that?

10         A.  No, ma'am.

11         Q.  She also testified that you told the women

12   to shut up or they'd be taken to seg, when you were

13   in the dayroom.  Did you do that?

14         A.  No, ma'am, I did not.

15         Q.  Did you ever tell Ms. Hegwood that if she

16   was lying about her front cuff permit, you would

17   take her to segregation?

18         A.  I might have told her she might have got a

19   disciplinary report for false information, but that

20   wouldn't have been a segable offense; no.

21         Q.  Okay.  Did Adrian Maynor -- she testified

22   that you -- she asked you if she could use the

23   bathroom and you ignored her.  Did you -- did you

24   recall anything like that?

25         A.  I don't recall doing that; no.

1    Q.  Okay.  And again, just very briefly, why

2  would you not tell women to shut up and call them

3  bitches?

4    A.  Again, it's not -- it's not productive.

5  You're not gonna get the end result.  You need to be

6  stern, loud when giving direction, but to actually

7  call an inmate, excuse me, but a bitch or an animal

8  is not gonna get the end result.  You're gonna get

9  more pushback, if you will, if you're speaking in

10  that tone.

11    And in my -- in my 19 years with the

12  department, 13 of which with the female inmates,

13  I've never called an inmate a bitch -- male or

14  female, a bitch or an animal.

15    Q.  Okay.  How many times have you -- let's see,

16  you worked at Lincoln how long?

17    A.  Going on 19 years.

18    Q.  All right.  Are you familiar then with the

19  inside of the gym?

20    A.  Yes, ma'am.

21    Q.  How many times you been in there?

22    A.  Numerous.  I can't give you a number.

23    Q.  Okay.  Is -- the door to industry, I want

24  you to keep that in your head.

25    A.  Yes.

1      Q.  Is that -- as a matter of practice, is that

2  locked or unlocked?

3      A.  It's always locked.

4      Q.  And who has a key to that door?

5      A.  Usually that would have been majors or above

6  have a key to that.  Zone lieutenants didn't even

7  have a key to that door.

8          THE COURT:  Are we talking about in the

9  gym, from the gym to the sewing --

10     Q.  Yes, Your Honor.

11         THE COURT:  Okay.

12     Q.  All right.  The door to industry is -- from

13  the gym is here; right?

14     A.  Yes, ma'am; right there.

15     Q.  Okay.  And that's a door that's always kept

16  locked you just said?

17     A.  Yes.

18     Q.  Okay.  Is that a solid door?

19     A.  Yes.  It's actually -- it's actually double

20  door.  It's two doors that close.  One side was

21  always closed.  If they needed to bring -- I believe

22  sometimes they would bring some of the supplies in

23  there, the bolsters of clothing and stuff, and then

24  at that time, they would unlock the doors, open them

25  both up to bring the items in.

Q.  Now, the doors then around the perimeter of the gym here, were those locked or unlocked?

A.  The only other entrance to the actual gymnasium itself is right there.

Q.  Okay.  What about the door to the outside from these areas here?

A.  They would always be locked.

Q.  All right.  When the search was going on, I believe testimony was that movement stopped; right?

A.  Yes, ma'am.  During anything like this, where we would have been bringing a large amount of cadets or anything, we would have stopped movement, ran everybody, any non-essentials back.  Usually just dietary so they could cook the food.  But anybody else would have been ran back to their units.  And at that point, we would have been on a -- possibly a Level 1 or Level 2 lockdown.  Visits would have still been able to be ran, but they would have been escorted from their housing unit to the visiting room and back.

Q.  Okay.  Now, there has also been some testimony about the inside of the beauty shop.  Have you been inside of the beauty shop?

A.  Yes, ma'am.

Q.  Do you recognize that?

1    A.  Yes, ma'am.

2    Q.  What is it?

3    A.  It's the -- at the time, it was the beauty

4    shop.  It's now our training room, but at the time,

5    it was the beauty shop.

6    Q.  Okay.  It -- what difference, in that

7    picture, exists now than in 2011, when it was a

8    beauty shop?

9    A.  They used to have sinks in there so whenever

10   they washed their hair they could lean back in.

11   Like a beauty -- a typical beauty shop type sink.

12   Those are no longer in there.  They had hairdryers

13   and beauty shop chairs around.  And they had mirrors

14   up on the walls in front of the chairs too.

15   Q.  Okay.  But this is the same room?

16   A.  Yes, ma'am, it's the same room.

17   Q.  Your Honor, I'd like to publish this to the

18   jury and admit it into evidence.

19        THE COURT:  Very well.

20        MS. BARNES:  This is Defendants' 87.

21        THE COURT:  Thank you.

22        MS. THOMPSON:  We don't object.

23        THE COURT:  Thank you.

24   (Defendants' Exhibit 87 admitted.)

25   Q.  Where's the door that went out to the gym?

1    A.  It's actually -- this photo was probably

2    taken from that doorway.  It would have been behind

3    where this -- if you were standing in that doorway,

4    you would have been looking this way.

5        Q.  Okay.  What's this?

6        A.  That's a storage closet.

7        Q.  What is -- is there an outside door in that

8    picture?

9        A.  It would be to the left over here.  You

10   can't see it, it would have been to the left.

11       Q.  Okay.  Is that a solid door?

12       A.  No, it was not.

13       Q.  Okay.  There's been some testimony about a

14   window.  Was that window -- could you see through

15   that window in 2011?

16       A.  The window in the wall or the window in the

17   door?

18       Q.  The window in the door?

19       A.  No; it was covered by the mirrors.  There's

20   actually two of them, but they were covered by the

21   mirrors.  There was a big full-length long, ten-foot

22   mirror probably that was up on the walls in front of

23   the chairs themselves.

24       Q.  Okay.  So someone from the outside could not

25   see in?

1      A.  No.  If they were looking out, they would
2  have seen the pack of a mirror.  You couldn't see --
3  plus there's screens over them.  You can't see in
4  them really very well anyway.
5      Q.  Okay.  I asked you some time, week or so
6  ago, to take some measurements, did I not?
7      A.  Yes, ma'am.
8      Q.  Okay.  And I asked you to measure the gym
9  itself?
10      A.  Yes.
11      Q.  The bathroom that the women -- the gym
12  bathroom that the --
13      A.  Yes, ma'am.
14      Q.  And the beauty shop?
15      A.  Yes, ma'am.
16      Q.  Okay.  Did you do that?
17      A.  Yes, ma'am.
18      Q.  Do you have those measurements with you?
19      A.  Yes, ma'am.
20      Q.  Would you tell the jury how big the gym is,
21  just to give them some --
22      A.  The gymnasium is 84 foot by 78 foot 5
23  inches.
24      Q.  Okay.  Now, let's talk about how -- there's
25  been a lot of testimony from the inmates about how

1    they were crowded together in the gym bathroom.  And

2    I would like to show the jury how big the gym

3    bathroom was?

4         A.  Okay.

5         Q.  So, Your Honor, we'd like to measure or show

6    the jury how big that bathroom was, and we have a

7    tape measurer.  And I think Mr. Dawdy could be on

8    one end of it and Ms. McNaught can be on the other

9    end of it.

10              THE COURT:  That's fine.  Go ahead.

11        Q.  Why don't we get into the record, Mr. Dawdy,

12   how big the gym bathroom was?  Or is?

13        A.  11 foot eight inches by 15 foot.

14        Q.  Okay.  Could the two of you show the jury

15   how big that is?

16        What are you doing first, 15 feet?

17        A.  Yes.

18        Q.  Okay.  Are you -- is your tape measure

19   reflecting 15 feet from where Ms. McNaught is

20   standing.

21        A.  15 foot right where my thumb is.

22        Q.  Okay.  Now, could you pivot and show the

23   jury the other dimension, which would have been

24   what?

25        A.  11 foot 8 inches.

1      11 foot 8 inches is right where my thumb is.

2      Q.  All right.  I'd like the record to reflect

3  Mr. Dawdy has marked out 11 foot 8 inches as the

4  other dimension of the bathroom.

5      Okay.  Thank you.

6      Now I want you to show the jury how big the

7  beauty shop was?  How big was the beauty shop, Troy?

8      A.  It was 20 foot by 32 foot 3 inches.

9          THE COURT:  20 by what?

10     A.  20 foot by 32 foot 3 inches.

11         THE COURT:  Thank you.

12     A.  Do the 20 first?

13     Q.  Yeah.  And which one is that?

14     A.  It's 20-foot.

15     Q.  20 feet, okay.  Now pivot and show the jury

16  the other dimension of the beauty shop.

17     A.  This tape measure is not gonna be long

18  enough.

19     Q.  What is your measurement?

20     A.  It is 32 foot 3 inch.  This is 25 foot.

21  It's 25 foot right there.

22     Q.  So --

23     A.  We got another 7 foot.

24         THE COURT:  Can you back up?  Or is that

25  the end of --

1      A.  This is the end of the tape measurer.

2           THE COURT:  Oh, it's the tape measurer.

3      Q.  Okay.  So from where the clerk is sitting,

4  Ms. McNaught can walk towards you and measure out

5  seven more feet?

6      Okay.  So that's 32 feet.

7      A.  Yes, ma'am.

8      Q.  Okay.  So we've got the dimensions and the

9  sort of visual of how big the rooms were.  Thank

10  you.

11      Just so the jury can see what we're talking

12  about.  Do you recognize this?

13      A.  Yes, ma'am.

14      Q.  What is it?

15      A.  That's another view of the beauty shop.

16      Q.  Okay.  What is this?

17      A.  That's a window.

18      Q.  Is that the window you were talking about?

19      A.  Yes, the one that was covered up by the

20  mirrors.  You can actually see these black dots.

21  That's still glue from where the mirrors were glued

22  up to the wall.

23      Q.  Okay.  One moment and I think I'm done.

24      Very quickly, Mr. Dawdy, could you tell the

25  jury what you -- what you did that day when you

1    arrived with the tactical team?

2        A.  I was down --

3        Q.  First of all, what time did you arrive?

4        A.  I got there myself, and my Assistant

5    Lieutenant Craig got there around problem 8, 8:15.

6    We always got there before the team did.

7        At that point, we would have discussed -- by

8    then I would have heard from either Assistant Warden

9    Reynolds or Warden Hulett, "Here are the areas that

10   we're gonna do."  So that way I can let the team

11   know that we're doing, cadets are going to be here.

12       The team would have showed up about 8:30.  I

13   would have briefed them, "Here's what we're doing,

14   here's where we're gonna go."  The procedures that

15   would have let the female tac members know that they

16   were going in be over in the gym in charge of

17   conducting the strip search with the female cadets.

18       And the male tac members, with myself and

19   Assistant Craig -- Assistant Commander Craig would

20   have been in charge of assisting the cadets on the

21   units with the shakedowns of the living areas

22   themselves.

23       Q.  Okay.  About what time -- so you started

24   with 2B first, I think the testimony has been?

25       A.  Yes, ma'am.

 1      Q.  Okay.  And how many -- were you there when

 2  you went to 2B?

 3      A.  Yes, ma'am.

 4      Q.  How many -- was everybody there, your tac

 5  team?

 6      A.  Yes, ma'am.

 7      Q.  Okay.  And how many was that?

 8      A.  Eight to ten, I believe.

 9      Q.  And how -- how did you escort the women from

10  their dormitory to the dayroom?

11      A.  We would have been -- there would have been

12  several tac members stationed throughout.  With

13  eight to ten, we had enough to have two per dorm.

14  So we would have had people.  And then we would have

15  myself and Craig probably would have been roaming

16  back and forth up and down the hallways.  Make sure

17  the inmates are lining up and getting out and

18  everything is getting in control.

19      At that point, once they were lined up, they

20  got any medication they needed, asthma inhalers or

21  anything like that, then they would have started

22  pulling them out, probably by twos.  And the female

23  cadets and/or the female tac members would have

24  started doing a body pat-search of them.

25      Once they were pat-searched, they would have

1  applied cuffs and they would have been escorted out

2  to the dayroom where they would have been standing

3  in columns or rows.

4       Q.  And about how -- do you know about how long

5  they stood in the dayroom?

6       A.  30, maybe 45 minutes, it would have been.

7  Tops.

8       Q.  And then after that what happened?

9       A.  After that, after we got everybody, we would

10 have escorted them over to the gym.

11      Q.  And when you were in -- when you arrived at

12 the gym, then what did you do?

13      A.  Once we got in over to the gym, we

14 instructed the inmates where they needed to go.

15 They needed to lineup, I believe it was the closest

16 wall right when you walk in the gym to the left

17 there was a set of bleachers there.  And they lined

18 up again in columns at that point.  In rows.

19      Q.  And again, did you hear any name-calling

20 or -- from your -- your tac team members?

21      A.  No, ma'am.  On the way over, to my best

22 recollection, it was -- it was fairly quiet.  There

23 might have been somebody casually looking around.

24 There might have been a little whispering that would

25 have had to been addressed, "Hold the noise down, no

talking."  But there wasn't anybody cussing, yelling.

And that was kind of by design.  It went off, there was no issues.  Everybody was compliant because we had given clear instruction:  This is what you're to do when we go over, you're not to talk, you're not to be looking around.

And just mere -- what's called officer presence.  Just being there with -- with tac and the officers escorting the line is going to be enough to quell anything.  It's no different than you're driving down the road and you see a state trooper in the middle in the median, you're going to slow down if you're speeding.  He doesn't have to be behind you with his lights on pulling you over, you're gonna slow down.  Just the presence of that officer is gonna make you slow down.  It's the same thing. Just being present alone is going to stop a lot of things from happening.

Q.  Okay.  And what about their batons?  Were they --

A.  Batons would have been out.  Walking like this.

Q.  Are they waiving them around?

A.  No.  No, ma'am.

Q. Okay. Are -- how are they trained to walk
with their batons?

A. Just like this, at 45-degree angle. Left
hand up, right hand down.

Q. Unless there's a need to use --

A. Unless there's a need. And that's so --
it's called an en guard position. If something
happens, if an inmate was to rush you, or if -- when
we go into -- if there was an emergent situation,
that baton, it's a defensive tool. If something
gets thrown at you, someone comes at with a broom
handle, a mop stick, throws a trash can, you use it
to block something. So if an inmate was to rush out
of a line, you could use that to keep them -- in
between you and them.

Q. Okay. And I think the testimony has been
that the women were compliant. Do you agree with
that?

A. Yes, ma'am.

Q. Okay. Once you got to the gym and you made
sure everything was going all right --

A. Once they got lined up, at that point, as
far as the strip search procedures was turned over.
There was four of my female tac team members were in
there. At that point, that was their job was to get

started with the strip search.

I left because now I had to go back to the housing unit to help get everybody lined out on the actual shakedown of the living unit.  We had a hundred beds and bed areas and boxes to go through which was gonna take awhile.

Q.  Okay.  Thank you.

THE COURT:  Mr. Field, you may cross.

MR. FIELD:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. FIELD:

Q.  Good afternoon, Lieutenant.

A.  Good afternoon, sir.

Q.  I just want to make sure that we're all talking about the same thing here.  So the door to the industry that you're saying is always locked is this door right here?

A.  Yes, sir.

Q.  Okay.  Show Plaintiffs' 246.  Permission to publish Plaintiffs' 246, Your Honor?

THE COURT:  Surely.

MS. BARNES:  No objection.

Q.  Is this the door to the industry that you were talking about?

A.  Yes, it is.

1      Q.  The door that's always closed and locked?

2      A.  Well, it's no longer an industries building

3   with knives and tools and razor blades.  It's now a

4   weight room.  So it doesn't have to remain secured

5   anymore.

6      Q.  Well, with big heavy weights and things like

7   that; right?

8      A.  Well, we give the inmates big heavy weights

9   every day.

10      Q.  Okay.  And you also allowed inmates into the

11   industry every day when it was industry?

12      A.  The inmate workers; yes.

13      Q.  Now again for clarification, when you did

14   your measurements of the gym was it just this

15   portion of the gym or did it include the new weight

16   area as well?

17      A.  No, it was -- it was just the gymnasium

18   itself.

19      Q.  Okay.  So just these four walls here?

20      A.  Yes, sir.

21      Q.  Okay.  And when you did those measurements,

22   were you using that same 25-foot tape measure or did

23   you have something else that was a little longer

24   than that?

25      A.  No, it was actually the measurements

1    themselves were done by two of our industry workers.

2    Whenever they ran them off, I looked at the end.

3    They used a giant, I believe it was like a hundred

4    foot tape, like a reel tape.  And they would get the

5    measurements, and at that point, I would see, he

6    would call it off, I would write down what the

7    measurements were.

8         Q.  Okay.  Now, what about when you did the

9    measurements in the bathroom?  Were those wall to

10   wall or did you take into consideration the sinks

11   and those kind of things?

12        A.  It was wall to wall.

13        Q.  Okay.  So this is Plaintiffs' Exhibit 237.

14   There are sinks and toilets in that bathroom;

15   correct?

16        A.  Yes.

17        Q.  And I believe there was testimony earlier

18   that there is a closet in that bathroom as well;

19   correct?

20        A.  Yes.

21        Q.  And there would have been -- there's a

22   garbage bin in there?

23        A.  Sometimes there might be.  I believe

24   usually, yes, there is.

25        Q.  Okay.  And your testimony -- well, let me

1    ask you this about the beauty shop:  Those

2    measurements were wall to wall as well?

3         A.  Yes.

4         Q.  Okay.  And I believe you said that there

5    were hairdryers in the beauty shop?

6         A.  Yes.

7         Q.  Again, March 2011 obviously, not now?

8         A.  Yes.

9         Q.  There were chairs for styling hair?

10        A.  Yes.

11        Q.  Okay.  And there were sinks in there as

12   well?

13        A.  Yes.  The sinks were actually in between --

14   right there in between the restroom and that closet.

15        Q.  Okay.  And where were the chairs?

16        A.  They were right where it says beauty parlor.

17   They were in the middle.

18        Q.  Okay.  What about the hairdryers?

19        A.  I'm sorry, I thought that's what you meant

20   by the chairs.  They were -- they would have been

21   right there in the middle there where it says beauty

22   parlor.

23        Q.  Okay.  And there was a desk in that room as

24   well?

25        A.  Yes, there was.

           Q.  Okay.  Where was that?

           A.  I believe it was right in that area.  It was
    closer to the wall, but it was back in that area.

           Q.  Okay.  And there were -- this is the area
    where you said that there were the chairs?

           A.  Yes, sir.

           Q.  Okay.  You said something about when you
    were marching or walking the women over from Unit 2B
    to the -- to the gymnasium, that officer presence
    alone was enough.  Is that your testimony?

           A.  It's -- I didn't say it's enough, but it
    helps.  Officer presence being there, it's always a
    deterrent for anything to happen; yes.

           Q.  Sure.  And you compared it to sort of a
    state trooper on the highway; everyone is gonna slow
    down when you see a state trooper on the highway?

           A.  Exactly.  Just seeing them there is gone
    make you slow down.

           Q.  State troopers are not in riot gear; right?

           A.  They can be.

           Q.  When they're setting on the highway, they're
    unlikely to be in riot gear?

           A.  That's true.

           Q.  Yeah.  So regular corrections officers,
    probably their presence is enough as well; right?

1      A.  It could.

2      Q.  Right.  So you didn't -- sort of tactical

3  team with riot gear on is not necessary to have the

4  officer presence that you're talking about?

5      A.  It's not necessary, but it couldn't hurt.

6      Q.  But your testimony isn't that regular COs,

7  their presence is not enough to keep inmates in the

8  prison compliant?

9      A.  Not necessarily, no.

10     Q.  Just to be absolutely clear on your

11  measurements of the gymnasium was it just the

12  basketball court area or did it include also just

13  sort of area where in some of the photos there were

14  some --

15     A.  It was the -- it was the full gym wall,

16  completely wall to wall.  It wasn't just -- no, it

17  wasn't just like the center court.

18     Q.  Okay.  And I was asking you about certain

19  items that were in the beauty shop.  There was a

20  washer-dryer in the beauty shop as well; correct?

21     A.  Yeah, you know, I think there was.

22     Q.  Do you recall where that was in the beauty

23  shop?

24     A.  I think it was right over there.  I think it

25  was beside the desk.

1    Q. Okay. And you're testimony was the desk was
2  right here?
3    A. Yeah. It was like right when you walk --
4  actually, where's that -- the picture that was
5  showing the door leading to the outside. The desk
6  would have been in the same area.
7    Q. Before I put it up, I just want to make
8  sure --
9    A. Yes. It was a different style. That's an
10 L-shape desk, but it was -- that's where -- the desk
11 at the time would have been like right there. Like
12 where this one, if you pushed it back further.
13 There wasn't an L-shaped desk there.
14   Q. Okay. So again, the desk was about here?
15 Maybe a little further back?
16   A. Yeah, a little bit further back.
17   Q. About there?
18   A. Yeah, possibly.
19   Q. And then there were chairs here?
20   A. Yes.
21   Q. Sinks?
22   A. Yes.
23   Q. Where was the washer-dryer?
24   A. It was right over by the restroom.
25   Q. So right here?

1      A.  Kind of right over there.  It was right on
2  the other side of the desk.
3      Q.  Okay.  No further questions, Your Honor.
4          THE COURT:  Thank you, Mr. Field.  Back to
5  you, Ms. Barnes.
6                  REDIRECT EXAMINATION
7  BY MS. BARNES:
8      Q.  I just want to make it clear to the jury.
9  These photos were taken a few days ago, end of last
10  week; right?
11     A.  I believe it was last -- it was last week
12  sometime.
13     Q.  Okay.  And Lincoln has been a male
14  institution for how long?
15     A.  Since March of 2013.
16     Q.  Okay.  Thank you.
17         MR. FIELD:  Nothing further, Your Honor.
18         THE COURT:  Fine.  Thank you very much.
19     All right, Lieutenant, you may step down.
20  Thank you.
21     (The witness was excused.)
22         THE COURT:  You may call your next.
23         MS. BAUTISTA:  We call Russell Craig to the
24  stand.
25     (The witness was sworn.)

1          THE COURT:  Have a seat, please.

2          THE WITNESS:  Thank you, sir.

3                    RUSSELL CRAIG

4    called as a witness herein, having been duly sworn,

5    was examined and testified as follows:

6                  DIRECT EXAMINATION

7    BY MS. BAUTISTA:

8          Q.  Good afternoon.

9          A.  Good afternoon, ma'am.

10         Q.  Can you state your name for the record,

11   please?

12         A.  My name is Russell Craig.  R-u-s-s-e-l.

13   Craig, C-r-a-i-g.

14         Q.  And you're an employee of the Illinois

15   Department of Corrections; is that right?

16         A.  Yes, ma'am.

17         Q.  When did you start with the Department of

18   Corrections?

19         A.  I believe it was August 14th of 2000.

20         Q.  You started as a correctional officer?

21         A.  I started as a correctional officer trainee.

22         Q.  That's also referred to as a cadet, as we've

23   heard throughout this trial?

24         A.  That is correct.

25         Q.  Okay.  Would you describe your career with

1    the Department of Corrections with the ladies and

2    gentlemen, including institutions and positions that

3    you've held?

4         A.  Do you mean all positions that I've held?

5         Q.  Yeah.

6         A.  I started out as a correctional officer.  I

7    have -- promoted to Lieutenant.  I was the Facility

8    Assistant Tac Commander.  I was the Armory

9    Coordinator.  I was a back-up Training Coordinator.

10   CPA instructor.  And Firearms Range instructor.

11        Q.  When did you get promoted to Lieutenant?

12        A.  I believe it was February of 2011.

13        Q.  And how about the position of Assistant Tac

14   Commander, when did you -- when did you become in

15   that role?

16        A.  It was probably around 2005, 2004 area.

17        Q.  And you said you're the back-up training

18   coordinator?

19        A.  I have been back-up training coordinator, I

20   am not currently at this time.

21        Q.  Okay.  When were you the back-up training

22   coordinator?

23        A.  It was when I was on -- when I was assigned

24   to the 7 to 3 shift.  And I don't remember when I

25   got my letter, but it was probably -- probably 2012

1    or 2013 area.

2        Q.  Have you been at Lincoln Correctional Center

3    for your entire career with DOC?

4        A.  Yes, ma'am, I have.

5        Q.  So in March of 2011, you were a Lieutenant

6    at that time?

7        A.  That is correct.

8        Q.  You were also the Assistant Tac Commander?

9        A.  That is correct.

10       Q.  What shift were you working at that time?

11       A.  I believe I was possibly on the 3 p.m. to 11

12   p.m. shift.

13       Q.  On March 31st of 2011, did you work your

14   usual 3 p.m. to 11 p.m. shift?

15       A.  I believe so, but I can't recall at this

16   time.

17       Q.  Okay.  Were you present for the shakedown

18   and strip search on March 31st, 2011?

19       A.  Yes, ma'am, I was.

20       Q.  Okay.  Can you describe what time you got to

21   Lincoln that day?

22       A.  It was approximately 8:00, 8:15 area, ma'am.

23       Q.  And that -- was that your normal shift?

24       A.  No, it was not.

25       Q.  Why were you there?

1    A.  Because I was told that we were going to

2  have a mandatory tac practice.  And I was instructed

3  by Lieutenant Dawdy to report at current time around

4  8:00 in the morning.

5    Q.  Okay.  And what did you do after arriving at

6  the facility?

7    A.  I drove to the -- went to the tactical unit

8  room.  And Lieutenant Dawdy and I met and we started

9  unlocking the lockers for the people that were

10  instructed to come down and dress out in our

11  tactical gear.

12    Q.  We've heard some descriptions of the

13  tactical gear and what tactical team members wear.

14  What were you wearing that day?

15    A.  I was dressed out in the orange uniform, the

16  stab vest, I had my utility belt on, my baton.  And

17  I believe I was wearing a ball cap when we -- when

18  we went in.

19    Q.  So you were not wearing the helmet that

20  we've heard described?

21    A.  No, I was not at the time.

22    Q.  Did you have a gas mask with you that day?

23    A.  Yes.  It would have been part of my utility

24  belt and my -- it would have been on my belt.

25    Q.  What did you do after arriving and dressing

1    out in your tactical uniform?

2         A.  I report -- the tactical unit reported to

3    the dietary area.

4         Q.  And what happened next?

5         A.  We were -- we met the cadets, and we were

6    briefed on the situation that we were going to be

7    doing.

8         Q.  Who briefed you?

9         A.  I cannot recall.  I believe it was Warden

10   Hulett and Warden Reynolds, I believe.

11        Q.  Do you recall what was said?

12        A.  Just the areas where we were going and where

13   we were gonna be shaking down.

14        Q.  Do you recall what areas and what you were

15   going to be shaking down?

16        A.  It was housing Unit 2B and housing Unit 4B.

17        Q.  And after being briefed on the situation,

18   what happened next?

19        A.  We -- we went to housing Unit 2B, entered

20   the dayroom area, and told all the inmates to get

21   back to their dorms.

22        Q.  Did you specifically make those statements?

23        A.  I believe everybody in the conglomerate,

24   everyone that walked in made the same statement.

25        Q.  Who all walked in?

1      A.  It would have been the -- all the tac

2   members, followed by the cadets.

3      Q.  Did you hear any cadets making statements

4   when you entered the unit?

5      A.  No, I did not.

6      Q.  And after you entered the unit and I think

7   you said you ordered everyone back to their dorms?

8      A.  Yes, ma'am.

9      Q.  What happened?

10     A.  Everybody went back to their dorms and the

11  dayroom area was cleared.

12     Q.  And what did you do next?

13     A.  We instructed the female offenders to line

14  up in columns of two in their dorm area.

15     Q.  Did you say, "Line up in columns of two like

16  animals or like the animals you are?"

17     A.  No, I did not.

18     Q.  Did you hear anyone else make that

19  statement?

20     A.  No, I did not.

21     Q.  Would that have been acceptable to you?

22     A.  No, it would not.

23     Q.  Why not?

24     A.  Because I don't want to be called an animal,

25  and I don't think anybody else would like to be

1    called an animal either.

2        Q.  After the women in the dorms were instructed

3    to line up, what happened next?

4        A.  They were told to come out of their dorms.

5    They were pat-searched by a female cadet or a female

6    tac member, cuffed behind the back and then told to

7    go in the dayroom area and wait.

8        Q.  What were you doing while the women were

9    being pat-searched and handcuffed?

10        A.  I was pretty much walking up and down the

11    hallway making sure that -- that everyone was pretty

12    much doing the same thing and acting accordingly.

13        Q.  Did you see any corrections officers,

14    cadets, or other Department of Correction employees

15    doing anything inappropriate while you were walking

16    up and down the dorm hallway?

17        A.  No, I did not.

18        Q.  As the Assistant Tac Commander, would you

19    have done something if you had seen something?

20        A.  Yes, I would have.

21        Q.  Why?

22        A.  Because it's my job as a supervisor to take

23    corrective action if I see anything that's

24    inappropriate.

25        Q.  After the women were pat-searched and

1    handcuffed, what happened next?

2         A.  After they were pat-searched and handcuffed,

3    they were told to go to the dayroom area and wait.

4         Q.  And what did you do after that?

5         A.  I was pretty much walking up and down the

6    hallway making sure that order was maintained until

7    all the female offenders were out in the dayroom

8    area.

9         Q.  And order was maintained?

10        A.  Yes.

11        Q.  The women were taken out of the dayroom; is

12   that right?

13        A.  That is correct.

14        Q.  Is that what happened next in -- after they

15   were brought out into dayroom, is that they left?

16        A.  Yes.

17        Q.  Did you leave with them?

18        A.  I do not recall.  I may have been one of the

19   last people in line to take them over.

20        Q.  Take them over where?

21        A.  Take them over to the gymnasium.

22        Q.  So what do you recall doing at that time?

23        A.  I recall pretty much maybe approximately

24   90 percent of the females were entering the gym.

25   There was still a couple officers there while they

were entering the gym.  And then I went back to
housing Unit 2B.

Q.  Did you go into the gym at that time?

A.  No, I did not.

Q.  So it's your testimony today that you walked
over with female inmates to the gym and before going
inside the gym, you came back over to Unit 2B?

A.  It is possible; yes.

Q.  No, I'm asking you what happened that day?

A.  Yes, I believe so.

Q.  And what did you do once arriving at Unit
2B?

A.  I pretty much entered the -- went in and out
of many of the dorm areas asking anyone if they had
any questions of what was to be taken, what was not
to be taken.  And if they had any questions on where
they actually needed to search.  If there was any
areas that they may have missed.

Q.  So you were helping to supervisor the
shakedown of Unit 2B?

A.  That's correct.

Q.  Okay.  And at some time, that shakedown was
complete; is that right?

A.  Yes, ma'am.

Q.  And what did you do next?

1    A.  Then I went to housing Unit 4B.

2    Q.  And what did you do there?

3    A.  I pretty much did exactly the same thing I

4  did on housing Unit 2B.

5    Q.  So when you arrived on housing Unit 4B, were

6  there still female inmates there?

7    A.  I believe so; yes.

8    Q.  Did you go into the gym with any of the

9  women from Unit 4B?

10   A.  No, I did not.

11   Q.  Now, we've heard testimony that you were in

12  the gym outside of the bathroom on March 31st, 2011,

13  when women were being strip-searched.  Is that true?

14   A.  No, that is not true.

15   Q.  There was testimony that you were in the gym

16  while Unit 2B was there, while they were in the

17  process of strip-searching them; is that true?

18   A.  No, that is not true.

19   Q.  There was testimony that you were in the gym

20  with Lieutenant Dawdy and that you made a comment

21  that it smelled like ass and breathe; is that true?

22   A.  No, that is not.

23   Q.  Would you make a comment like that?

24   A.  No, I would not.

25   Q.  Why not?

1      A.  Because you do not gain any respect from any

2   of your peers, anyone that you supervisor, or any of

3   the people that supervisor you by making comments

4   such as that.

5      Q.  Is it important to have respect of the

6   people that you supervise?

7      A.  Yes.

8      Q.  Why is that?

9      A.  Because if you don't have any -- if they

10   don't respect your authority or they don't respect

11   you, then -- then you're not a good supervisor is my

12   mind.

13      Q.  There was also testimony that you said that

14   this is was prostitutes and crack-heads smell like.

15   Did you say that?

16      A.  No, I did not.

17      Q.  In any of your positions or in March of

18   2011, do you have anything to do with inmate

19   grievances?

20      A.  No, I do not.

21      Q.  Just one moment.

22   Nothing further.

23         THE COURT:  Thank you.

24   You may cross.

25         MR. FIELD:  Thank you, Your Honor.

                      CROSS EXAMINATION

BY MR. FIELD:

    Q.  Good afternoon, Lieutenant Craig.

    A.  Good afternoon, sir.

    Q.  Could you tell me what are some of the

reasons why you joined the tactical team?

    A.  Part of helping myself gain supervisory

skills.

    Q.  Is it a way to promotion, is that what you

mean?

    A.  No, it is just that I was wanting to

somewhat better myself at the time.

    Q.  Okay.  Any other reason why you joined the

tactical team?

    A.  No, sir.

    Q.  Just to better yourself?

    A.  Correct.

    Q.  Why is the tactical team called Orange

Crush?

    A.  I do not know why the tactical team is

called Orange Crush, sir.

    Q.  Is that something you've heard inmates refer

to it as?

    A.  It's a possibility.

    Q.  As you sit here today, you don't recall any

1    inmate referring to the tactical team as Orange

2    Crush?

3         A.  I believe so.  I believe I've been on a

4    different facility shakedown and I believe I have

5    heard an inmate say Orange Crush.

6         Q.  Have you heard other corrections officers

7    refer to it as Orange Crush?

8         A.  No, I have not.

9         Q.  You were asked some questions about briefing

10   that you received from, I think you said you

11   believed it was Warden Hulett and Assistant Warden

12   Reynolds, just before shakedown?

13        A.  That's correct.

14        Q.  Okay.  And your testimony was that the

15   briefing -- your memory of the briefing is what

16   areas were gonna be going through the shakedown and

17   strip search that day; is that correct?

18        A.  That's correct.

19        Q.  So you don't recall being briefed on any

20   issues with inmate violence that day; is that

21   correct?

22        A.  No, I do not.

23        Q.  And you don't recall being briefed on any

24   issues with excessive contraband or anything like

25   that in relation to those issues that day; is that

1   correct?

2       A.  No, I do not.

3       Q.  When you say you do not; you mean you don't

4   recall that; is that correct?

5       A.  I don't recall everything that was in the

6   briefing.

7       Q.  Okay.  Your memory is only that you were

8   told you would be going into 2B and 4B?

9       A.  That's correct.

10      Q.  I just want to make sure that it's clear.

11  The tactical team, when it went into Unit 2B, it

12  went first into the dayroom; is that correct?

13      A.  I believe so.  The dayroom is the first --

14  when you enter through the door, that is the

15  dayroom, you're in the dayroom.

16      Q.  Okay.  And as the tac team went into the

17  dayroom, the tac team members were ordering that the

18  women get back to their dorms?

19      A.  That's correct.

20      Q.  Okay.  And as Lieutenant Dawdy testified

21  yesterday, that's something that you have to do at

22  high volume; is that correct?

23      A.  That's correct.

24      Q.  Okay.  And everyone is doing it at the same

25  time together; correct?  All the tactical members?

17

1    A.  Yes.

2    Q.  And they're saying, you know, "Get back to

3    your dorm;" correct?

4    A.  That's correct.

5    Q.  Are you just saying it once or are they

6    saying it over and over again?

7    A.  You're somewhat saying it over because

8    you're making sure that, you know, you do have

9    hearing-impaired inmates that are in the facility,

10   and you're making sure that everyone else hears you.

11   Q.  So you -- you're yelling it over and over

12   again for the benefit of hearing-impaired inmates;

13   is that your testimony?

14   A.  That's making sure everyone can hear you.

15   Because if you're at the -- if you're entering the

16   dayroom, possibly someone in the far back dorm may

17   not be able to hear you.

18   Q.  What about when you went into the dorm area

19   and you were ordering the women to line up?  Was

20   that something that all the tactical team members

21   were saying at the same time?

22   A.  It was pretty much each -- people were

23   addressing dorms.  You just say, "Look, line up in

24   columns of twos."

25   Q.  Okay.  And was that something that was,

again, as Lieutenant Dawdy testified yesterday, that
needed to be said at high volume?

     A.  No, because -- not necessarily at a high --
it's at a little bit higher volume, but you're in
front of the dorm.  But you also want to be sure
that everyone that is in the dorm area can hear you.

     Q.  Okay.  And so there were tactical team
members that were assigned -- or that went into each
of the five different dorms that make up Unit 2B; is
that correct?

     A.  They were standing outside the door as far
as I can recall.

     Q.  Correct, okay.

     And so I think Lieutenant Dawdy testified
yesterday that the five dorms in Unit 2B were
numbered 6, 7, 8, 9, 10; is that correct?

     A.  That's correct.

     Q.  Okay.  So if the tactical team member is
standing in the doorway of Dorm 6, are they gonna
hear what the tactical team members in doorway of
Dorm 10 are saying?

     A.  Yes, because Dorm 6 is on one side and Dorm
10 would be just a little bit in front of Dorm 6.

     Q.  It's across the hall from it?

     A.  It would be across the hall and just a

1  little bit closer to the dayroom.

2       Q.  And what about then -- so which dorm is

3  furthest away from Dorm 6?

4       A.  That would be Dorm 7 and Dorm 8.

5       Q.  Okay.  And so is Dorm 8 further away from

6  Dorm 6 than Dorm 7?

7       A.  Dorm 7 and Dorm 8 are right across the

8  hallway from each other at the end of the hallway.

9       Q.  Okay.  So the tactical team members that

10  are -- that are telling the women in Dorm 6 to line

11  up, are they going to hear what the tactical team

12  members in those other dorms are saying?

13       A.  It's a possibility.

14       Q.  Okay.  But not necessarily so?  If it's loud

15  in there like Lieutenant Dawdy testified yesterday?

16       A.  Can you please ask the question again.

17       Q.  Sure.  Is the tactical team member that's

18  standing in the door -- the doorway of Dorm 6 going

19  to overhear what the tactical team members are

20  saying that are standing in the doorways of Dorm 7

21  and 8?

22       A.  They should; yes.

23       Q.  No matter how loud it is in there?

24       A.  Yes.

25       Q.  Okay.  So even if tactical team members are

1  saying "line up, line up, line up," and it's loud in

2  there, they're still going to overhear what their

3  other tactical team members are saying; is that your

4  testimony?

5      A.  Depending on how loud they are, you can

6  overhear other people; yes.

7      Q.  Okay.  And if it's not loud enough, you're

8  not going to overhear them; correct?

9      A.  If it's too -- if it is excessively loud,

10 you may not be able to hear; correct.

11     Q.  Now, I think your testimony was that you

12 don't recall if you escorted the women from Unit 2B

13 over to the gym?

14     A.  I don't -- I pretty much would have either

15 stayed on the unit or I may have been the last

16 person in the line to help escort.

17     Q.  So you don't know as you sit here today

18 whether you actually escorted the women to the gym

19 or not?

20     A.  No, I can't recall that.

21     Q.  And your testimony is that you never went

22 into the gym; is that correct?

23     A.  That is correct.

24     Q.  Okay.  So you didn't see whether or not the

25 gym bathroom had a curtain in front of it, for

1    example?

2        A.  No, I would not have seen that.

3        Q.  And you didn't see whether the women were

4    forced to stand in the gym while they were waiting

5    to be strip-searched?

6        A.  No, I did not.

7        Q.  And you wouldn't have seen whether the women

8    were forced to stand handcuffed while they were in

9    the gym waiting to be strip-searched?

10       A.  No, I would not.

11       Q.  You testified that you were the Assistant

12   Tac Team Commander that day; is that correct?

13       A.  That is correct.

14       Q.  Okay.  And there were tac team members that

15   were detailed to the gym; correct?

16       A.  Female tac team members; correct.

17       Q.  Right.  But you were the second in command

18   of the tactical team that day; is that correct?

19       A.  That's correct.

20       Q.  Okay.  And whether the tac team members

21   under you are male or female, as second in command,

22   you're still in command over those members?

23       A.  That is correct.

24       Q.  Okay.  So the tac team members that were

25   detailed to the gym were under your command?

1      A.  That's correct.

2      Q.  You did not check on those tac team members

3  that did, did you?

4      A.  I did not feel it necessary because I

5  believed Commander Dawdy addressed those people.

6      Q.  And you believed if Commander Dawdy gave

7  them an order, they would follow that order; is that

8  correct?

9      A.  That's correct.

10     Q.  Now, you testified that when you went from

11 Unit 2B to 4B, you believe that there were no longer

12 women in unit 4B; is that correct?

13     A.  That's correct.

14     Q.  As you sit here today, you don't know for

15 sure one way or the other whether there's women in

16 Unit 4B?

17     A.  I cannot recall if there was anybody -- any

18 women in 4B at the time I entered.

19     Q.  So they could have been there or they could

20 have already been taken out of there; is that

21 correct?

22     A.  I do not remember going on 4B.  I do

23 remember 2B, but I don't remember entering housing

24 unit 4B.

25     Q.  Okay.  Now, you testified about why it's not

appoint to cuss and to use abusive language towards
female inmates; do you remember that testimony?

     A.  Yes, I do.

     Q.  Okay.  And you said, you know, one of the
reasons for doing that is it doesn't get the sort of
reaction that you're looking for; is that correct?

     A.  I believe I said it's not respectful.

     Q.  Okay.  And another reason for not doing that
is that if your subordinates seeing you doing it,
they'll think it's okay to do it as well; is that
correct?

     A.  That's correct.

     Q.  If you don't recall going into Unit 4B, do
you recall where you went after you were in Unit 2B?

     A.  I possibly may have went to the chow hall to
eat chow.

     Q.  Okay.  Is it also possible that you had have
to the gym?

     A.  No, it's not.

     Q.  Okay.  That you remember for sure?

     A.  Yes.  I remember I did not enter the gym on
that day.

     Q.  Okay.  But don't recall where you went after
2B?

     A.  I would have either went to the chow hall

1    and then 4B or I would have gone directly to housing

2    Unit 4B.

3         Q.  Okay.  But again, you're saying what you

4    would have done, but I'm asking you what you recall

5    actually doing that day?  Your testimony, and

6    correct me if I'm wrong, is that you don't recall

7    what you did after you were in 2B that day?  Is that

8    correct?

9         A.  I believe I said I would have either went to

10   the chow hall or housing Unit 4B.

11        Q.  You don't know which one of those ones that

12   you did?

13        A.  I don't remember if I went to 4B first or if

14   I went to the chow all first, sir.

15        Q.  Well now, are you saying that you did both

16   of those things or you don't recall which one you

17   did?

18        A.  I believe I did both because we were granted

19   a lunch break during that shakedown.

20        Q.  Okay.  And so did the -- did you -- were you

21   finished up in 2B late enough that it was time to go

22   to lunch?

23        A.  That's a possibility, sir.

24        Q.  But you don't recall what time it was when

25   you were finished in 2B; correct?

1      A.  No, I don't recall.

2      Q.  Okay.  No further questions for this

3   witness, Your Honor.

4           THE COURT:  Thank you, Mr. Field.

5           MS. BAUTISTA:  Nothing further.

6           THE COURT:  Very good.  Thank you very

7   much, Lieutenant, you may step down.

8      (The witness was excused.)

9           THE COURT:  Call your next.

10           MS. MCNAUGHT:  Renee Hatfield.

11      (The witness was sworn.)

12                   RENEE HATFIELD

13   called as a witness herein, having been duly sworn,

14   was examined and testified as follows:

15                 DIRECT EXAMINATION

16   BY MS. MCNAUGHT:

17      Q.  Good afternoon.

18      A.  Good afternoon.

19      Q.  What is your position at the Illinois

20   Department of Corrections?

21      A.  I'm a Staff Development Specialist, also

22   known as an instructor.

23      Q.  And how long have you been a Staff

24   Development Specialist?

25      A.  Since 2000, July of 2000, so 16 and a half

1    years.

2         Q.  And what do you have to do in order to

3    become a trainer?

4         A.  I applied.  And I had to have a college

5    degree and some background in the area that they

6    were looking to hire me for.

7         Q.  Which is what?

8         A.  I had a marshal arts background and I had

9    taught cardio kickboxing.  And they were primarily

10   wanting me to come in and teach the control tactics

11   to cadets, the defensive tactics.

12        Q.  Do you have to take any classroom

13   instruction?

14        A.  I took instruction when I got hired.  The

15   same instruction the cadets go through.

16        Q.  And explain what that instruction consists

17   of?

18        A.  Well, basically, the entire six weeks.  The

19   first week -- actually, the first full day of the

20   week is professionalism, professional conduct,

21   sexual harassment, discrimination.  We went through

22   use of force, legal issues.  I had to qualify with

23   all the weapons that are used in the department.  I

24   went through the personal search week.  Controlled

25   tactics week.  The other week was the range.  And

1 then in the fifth and sixth week were -- the class

2 is altogether and it's a variety of classes.

3     Q. And then did you also have to go to an

4 institution and do some on-the-job training?

5     A. I did that for a few days; yes.

6     Q. Do you remember where you went in?

7     A. I believe it was Logan. And I believe it

8 was when they were co-ed.

9     Q. Where is Logan?

10     A. Oh, I'm sorry. It's in Lincoln, Illinois,

11 right across the street from Lincoln Correctional

12 Center.

13     Q. Now, how is that you can have a co-ed

14 facility?

15     A. It was like that when I started, and after

16 so many years, they decided to change that.

17     Q. Were the men and the women housed together

18 at Logan?

19     A. No.

20     Q. Much ado was made when you previously

21 testified that you are not a security -- you're

22 not -- you're not security. In your position, do

23 you have to be a security officer?

24     A. No, I do not. That's not a requirement of

25 the job.

1      Q.  Are there some trainers who are security

2  officers?

3      A.  Yes.  My entire career they have had -- it's

4  usually about a 50/50 ratio, where we've had those

5  who have come from the facility and those who have

6  not.

7      Q.  I'd like to show you what's been previously

8  identified and admitted as Defendants' Exhibit 81.

9      Do you recognize that photograph?

10     A.  From here.  From being here, yes.

11     Q.  The curtain that is across the -- the wall;

12 do you see that?

13     A.  Yes, I do.

14     Q.  And was that a -- substantially the same

15 kind of curtain or a similar curtain or the curtain

16 that was over the bathroom door of the gym on

17 March 31st of 2011, when you were present in the

18 gym?

19     A.  I don't recall exactly it being that

20 curtain, but I know there was something up that

21 served as a barrier.

22     Q.  And did it look something like that?

23     A.  I believe so.

24     Q.  So it was that tall?

25     A.  Yes.

 1     Q.  Now, do you recall being in the bathroom
 2  with Dominique Crudup?
 3     A.  No, I do not.
 4     Q.  Do you know Dominique Crudup?
 5     A.  I've heard the name.  I'd have to see her.
 6  I don't recall.  I meet a lot of people throughout
 7  the years with classes and staff.
 8     Q.  Do you remember an incident in the bathroom
 9  when Dominique Crudup allegedly said, "Get these
10  bitches out of here"?
11     A.  No, I do not.
12     Q.  So would you -- did you laugh --
13     A.  Absolutely not.  I have never laughed during
14  an exercise like this.
15     Q.  And why not?
16     A.  Because it's inappropriate.  It's
17  unprofessional.  I lead by example.
18     Q.  Would you be subject to discipline if --
19     A.  Absolutely.
20     Q.  And why is that?
21     A.  Because that's inappropriate,
22  unprofessional, conduct unbecoming.
23     Q.  And similarly, if you had had -- if you had
24  witnessed or observed any kind of inappropriate
25  conduct on March the 31st of 2011, what would have

1    been your reporting requirements?

2        A.  I would have to report it on an incident

3    report.

4        Q.  And then what would happened to that?

5        A.  I would have turned it over to either their

6    supervisor or my supervisor.

7        Q.  Now, are you familiar with the handcuffs

8    used at the training academy?

9        A.  Yes, I am.

10       Q.  And is there anything different about -- I'm

11   sorry, are you familiar with handcuffs used at

12   facilities?

13       A.  Yes.

14       Q.  Have you used both handcuffs at the training

15   facility and -- or the training academy and at an

16   institution?

17       A.  Yes.

18       Q.  I'd like to show you two sets of cuffs.

19           Would you identify for the ladies and gentlemen

20   of the jury what standard cuffs are at an

21   institutional facility?

22       A.  A lot of them look like this, the silver

23   cuffs.  There may be a slight variation.  But

24   they're all the same nomenclature.

25       Q.  And is there a chain between the two silver

1    cuffs?

2        A.  Yes, there is.

3        Q.  And how many links?

4        A.  Two links.

5        Q.  Two links?

6        A.  Mm-hmm.

7        Q.  And then do you also have a set of a cuffs

8    that are used at the training academy?

9        A.  Well, we use the silver cuffs at the

10   training academy, as well as the orange cuffs.

11       Q.  Is there any difference between the orange

12   cuffs and the silver cuffs that are used at

13   institutional -- institutions?

14       A.  The only differences is they are painted

15   orange.

16       Q.  And would you explain to the ladies and

17   gentlemen of the jury why it is that they're painted

18   orange?

19       A.  That way when we go on our shakedowns, we

20   can identify them very easily so that we can take an

21   inventory and bring them back to the academy with

22   them.  And we don't get them mixed up with the cuffs

23   for the facility.

24       Q.  And why is that important?

25       A.  Well, that could take a lot of time to try

1    and work that out, iron that out.  And they have an

2    inventory they have to keep.  It's accountability.

3         Q.  The weight of the orange cuffs, how does

4    that compare with the weight of the silver cuffs?

5         A.  There's no difference.

6         Q.  Your Honor, at this time, I would ask that

7    the lady and gentlemen be able to see the handcuffs

8    and handle them?

9              THE COURT:  Of course.

10        A.  I don't know if they're double-locked so

11   they don't move.  Yeah.

12        Q.  The orange cuffs that you've identified, are

13   those the same type of orange cuffs that were used

14   on March 31st of 2011, at the Lincoln Correctional

15   Center shakedown?

16        A.  Yes.

17             MS. MCNAUGHT:  Nothing further.

18             MS. THOMPSON:  I need to use those.

19             MS. MCNAUGHT:  Oh, sure.

20             THE COURT:  All right.  Ms. Thompson.

21                  CROSS EXAMINATION

22   BY MS. THOMPSON:

23        Q.  Now, Ms. Hatfield, one of the things you

24   said as these are being handed to the jury was "Be

25   careful, these are double-locked for a reason."  Can

you explain about the double-locking these cuffs?

A. Yes. That's to ensure that once you get the cuffs on, they don't move, they don't tighten up on the inmate's wrists.

Q. Because if you don't double-lock them it can get very painful for somebody who has them on; right?

A. If they're moved and adjusted; yes.

Q. Because this can gradually tighten if you're moving your wrists while you're wearing them if they're not double-locked?

A. That could happen; yes.

Q. I mean that's why you teach the cadets to double-lock them, so that won't happen; right?

A. Correct.

Q. And are both of these sets of cuffs sets that you brought from the training academy?

A. No. We would have brought only the orange.

Q. I'm saying these actual cuffs, did you bring these with you today?

A. Yes.

Q. Okay. So these cuffs came from the training academy?

A. Yes, they did.

Q. Okay. Now, there are different kinds of

1  cuffs that are used in correctional -- in

2  correctional -- well, in prisons in Illinois; right?

3      A.  Different kinds?

4      Q.  There are some -- there are additional kinds

5  of cuffs besides these --

6      A.  Yes, you mean like leg irons, belly chains,

7  black box?

8      Q.  Right.

9      A.  Or are you referring to handcuffs?

10     Q.  Well, there's different styles of handcuffs

11 that are used besides just the sets you're showing

12 now; right?

13     A.  Sure.  There's a hinge cuff as well.

14     Q.  What's a hinge cuff?

15     A.  It doesn't have the chain link in between.

16     Q.  And then there's --

17     A.  So it's on a hinge.

18     Q.  There's a procedure you can use where you

19 double cuff somebody; right?

20     A.  Yes, if necessary.

21     Q.  If you have an inmate who might be a larger

22 person, you might use two sets of handcuffs if they

23 can't get their hands behind their back; right?

24     A.  That's a possibility; yes.

25     Q.  But it's something that's done by

1    correctional officers; right?

2        A.  Yes.

3        Q.  And there's other things that correctional

4    officers do for people for whom one set of handcuffs

5    is inappropriate; right?

6        A.  Yes.

7        Q.  When you were in the gym, do you recall

8    seeing an officer with a bandanna over their face?

9        A.  No, I do not.

10       Q.  And you -- there was some testimony about

11   what would happen if you had been in the bathroom

12   and Officer Crudup laughed and you laughed.  Do you

13   remember that testimony that you gave?

14       A.  I did not laugh.

15       Q.  I know, but I'm saying do you remember some

16   testimony about whether or not you had laughed?

17       A.  Oh, yes, yes.

18       Q.  And I understand your testimony is you did

19   not?

20       A.  Okay.

21       Q.  But in that -- if that had occurred, if you

22   had been in the bathroom with Officer Crudup and

23   with cadets, and Officer Crudup had laughed and you

24   had laughed, then the only people who could have

25   reported you for that were cadets; right?

A.   I guess so.   If they saw it or heard it.

Q.   Or inmates; right?

A.   Or inmates; yes.

Q.   Because no one else would have seen it?

A.   Correct.

Q.   And there were some questions about you not
needing to be a sworn -- a security officer because
of your position at the academy.  You don't have to
be a security officer for your position because
you're teaching cadets; right?

A.   I teach others as well.

Q.   Right.  But you don't take care of inmates?

A.   Correct.

Q.   Okay.  No further questions.

THE COURT:  Ms. McNaught.

REDIRECT EXAMINATION

BY MS. MCNAUGHT:

Q.   The silver cuffs, where did they come from?

A.   The restraint room at the training academy.

Q.   And the orange cuffs, where did they come
from?

A.   The restraint room at the training academy.

Q.   How is it that an officer applying cuffs
ensures that the cuffs don't move or get tighter or
are too loose?

A. Well, after the cuffs are hopefully correctly applied, they do a check for fit. They use a pinky test, the wrist, in between the wrist and the cuff, and then they would double-lock them.

Q. Are you able to demonstrate that?

A. I don't have a cuff key. I could kind of describe it possibly.

Q. Do you want to come down here?

A. Excuse me, my hands are cold.

THE COURT: Okay. Ms. Bautista, you're gonna do double duty here today. Okay.

Q. Just explain what you're doing?

A. As you can see, they are already double-locked. The single blade will not go through the double bar here, so they will not move. So I'm going to go ahead and release that by applying the cuff key in the keyhole.

So now the cuff is open. We never leave the cuff open, that's dangerous. But they no longer are deadlocked. See how the single blade goes in through the double bars? So now I'm doing that with the opposite cuff. You can't apply them if they're already double-locked, otherwise, that would be very painful.

May I ask you to hold this for me, please?

Okay.  So how we train our cadets is they would
have a cuff case on their belt, on their duty belts.
We show them how to load them, the cuff cases that
we have.  There are different cuff cases.  And they
would -- it would be their discretion to get their
own cuff case that works best for them.

Q.  Renee, what's a cuff case?

A.  I'm sorry.  It's a pouch that holds -- may I
ask one of the officers to -- you don't have one.

Okay, the Lieutenant does.  That is a cuff case
or cuff pouch.  It secures and holds your cuffs.
And as you can see, he had a snap with his so that
helps that should something occur, you fall down,
you don't lose them.

Okay.  We show them to go ahead and load them
in the cuff case a certain way.  The double bar
would be facing the individual, single blade is
forward.  We would have it to where the keyholes
face out.  So see how they face out?  Such as this.

All right.  So I would have that in my cuff
case.  And then I would give the inmate instructions
and I would inform her that I'm going to cuff her.
And I would ask her to please turn around.  She
already got in position, so -- you just want me to
apply --

1      Q.  Have at it.

2      A.  She's ready to go.  If I had to, I would

3  have asked her to spread her feet apart, maybe just

4  a little further apart.  Just to get them off

5  balance, not so much they fall down.  But that's for

6  my safety, okay.

7      If you could go this way because the way I

8  approach is basically from a 45-degree angle.  So I

9  would then have the cuffs in my hand such as this.

10  I would ask her to go ahead and please put your

11  hands behind your back, thumbs up, palms back.  The

12  back of your hands touching.  Very good.

13      If you would bend over slightly, please, and

14  look away from my voice.  Okay.  Stay right there.

15  I would approach.  I'm going to take the opposite

16  hand from holding onto the cuffs.  We call this a

17  reverse handshake.  So I'm going to gain control of

18  the hand and I'm going to apply the first cuff.

19  Okay.  Then I would go ahead, maintain control of

20  the cuff, apply the second cuff.

21      Then what I'm going to do is I'm going to check

22  for fit.  I'm going to make sure that I can get my

23  pinky in there on both sides, okay.  Then I would

24  maintain control of the cuff, not the length,

25  because if I do that and she tries to manipulate her

1    hands, she could then pinch my hand, grab my hand or

2    my fingers, so I want to maintain control of the

3    cuff itself, such as this.  But I don't want to

4    squeeze down on that single blade or that's when

5    they can tighten up before I get them double-locked.

6         I would then take my cuff key, and we call this

7    the spike end.  And there are different cuff keys.

8    They're all the same except one might be longer,

9    bigger, different make, okay.  In this case these

10   cuffs have what we call a push pin.  So right here I

11   would then take the spike -- I'm not used to the

12   smaller cuff here.  And my hands are cold, I

13   apologize.  And I would push it in and I'm gonna

14   check it.  I know that this is double-locked.  I'll

15   do the same with the opposite side.  So now I know

16   these cuffs are secure.  Thank you.

17        And then when we escort them, the outside hand

18   would go approximately above the elbow.  The inside

19   hand would actually hold onto the cuff.  And then we

20   would walk with them, and we're holding their arm

21   and such so should they trip or fall, we are able to

22   get them, grab them.

23        Is that what you're looking for?

24        Q.  Yes.  You want out?

25           MS. BAUTISTA:  Yeah.

1          A.   Okay.   What's the magic word.

2               THE COURT:   You do have a key?

3          A.   Yes, I do.

4               THE COURT:   All right.

5          A.   So then I -- when we got to our destination,

6     if she was facing me I would ask her to please turn

7     around, spread her feet apart, bend over slightly,

8     look away from my voice.   Now I'm going to go ahead

9     and put the tab or the flag end of the cuff key and

10    I'm going to go ahead and I'm going to remove this

11    cuff.

12         When I do so, please put your left hand on your

13    head.   And I'm going to immediately close it up,

14    because if I don't and she gets loose, we have a

15    major weapon there.   Even if I do close it and I

16    don't maintain control of the cuff, it's a weapon,

17    okay.   So I want to maintain control of this cuff.

18         I'm gonna come out here.   This way I can still

19    keep a visual on the inmate.   I'm safe, I'm at a

20    safer distance.   I have my strong side back.   And

21    I'm going to remove this cuff.   My hands are so

22    cold, I apologize.

23         As I remove it, go ahead, ask her to put her

24    hand on the head.   I step back, create distance, and

25    then that's when I will deal with removing the key

1    from the cuff, because now I've created distance for

2    safety reasons.

3        Q.  Nothing further.

4            THE COURT:  Thank you.  Ms. Thompson.

5                    RECROSS EXAMINATION

6    BY MS. THOMPSON:

7        Q.  Ms. Hatfield, when you were doing the

8    cuffing demonstration just a minute ago, you said,

9    "I'm not used to the smaller cuff."  What is the

10   smaller cuff.

11       A.  Cuff key.

12       Q.  So what are the typical cuff keys that are

13   used?

14       A.  I actually think I have one on my key chain

15   in my pocket of my coat.

16       Don't take my keys.

17       Q.  So this is what cuff keys can also look

18   like?

19       A.  Yes.

20       That just helps for that when you're trying to

21   remove the cuff and get into the keyhole, having the

22   longer -- when you're not in there so close.

23       Q.  And you said that these have, I forget what

24   you described this portion on the end.  A pin?

25       A.  A push pin.

1      Q.  A push pin.  Are there other styles of cuffs

2   for locking the cuff?

3      A.  Yes.  There's another style.  I don't think

4   the orange ones are like that.

5      Q.  Do you want to examine the orange ones?

6      A.  Yes, please.

7      No, these are -- these are push pin as well.

8      It has a bar.  It almost looks like, for lack

9   of a better description, it's kind of an oblong

10  silhouette that has a bar in it, a very small bar.

11  And you would take the spike end of the cuff key,

12  get behind it, and push it -- actually, if the --

13  the cuffs are on the inmate, it would be towards

14  their back and that would double-lock.

15     Q.  And is that another style of cuff that's

16  used in the Illinois Department of Corrections?

17     A.  Yes.

18     Q.  Okay.  So there's different kinds of cuffs

19  that are used in IDOC?

20     A.  Correct.

21     Q.  They have different mechanisms?

22     A.  No, same mechanisms, it's -- well, I guess

23  the double lock; yes.

24     Q.  Handcuffs are handcuffs, but there are

25  different ways to operate them; right?

1          A.  Correct.

2          Q.  Okay.  And do you teach cadets at the

3   academy about how to operate those pins and those

4   double cuffing mechanisms?

5          A.  Yes, we do.

6          Q.  Because that's complicated; right?

7          A.  I don't know if it's complicated, but it's

8   something they need to learn.  And it's important.

9          Q.  How long did it take you right there to get

10  those cuffs unpinned?

11         A.  Not very long.

12         Q.  You're an expert, so you probably do that

13  faster than other people; right?

14             MS. MCNAUGHT:  Objection, Your Honor.

15  There was -- she was also stopping and talking while

16  she did it.  I mean --

17             THE COURT:  Well, I think we all understand

18  the situation.  Go ahead.

19         Q.  And when you are having cadets practice

20  cuffing, would you want to check every single set of

21  cuffs that a cadet did to make sure that none of

22  those were too tight?

23         A.  I know that we do random checks; yes.  They

24  have been cuffing throughout their entire six weeks,

25  so --

1       Q.  So when they get to do this on actual

2   inmates, you just trust that they know how to do it

3   by then?

4       A.  Yes, but if -- if an inmate comes to us --

5   or goes to the cadet and says, "These are too

6   tight", and I'm around, I may check it with my

7   pinky.  And if I feel that they are -- the pinky

8   test, the fit, that they're okay, then we're not

9   gonna loosen them up.  But if not, then yes, I have

10  no problem loosening them up.

11      Q.  But they can also get tighter over time?

12      A.  Not if they were applied correctly.

13      Q.  Right.  But if they weren't applied

14  correctly, they could get tighter over time; right?

15      A.  If you didn't double-lock them I guess; yes.

16          MS. THOMPSON:  No further questions.

17          MS. McNAUGHT:  Nothing further.

18          THE COURT:  Very good.

19      All right, then we're going to stand in recess

20  for the evening and see you tomorrow morning at

21  10:00, ladies and gentlemen.  Have a very pleasant

22  time, recall my admonition.  And enjoy the weather.

23      Thank you very much.  You may leave.

24      (The jury left the courtroom.)

25          THE COURT:  All right.  The jury has left

1    the courtroom.  Two matters.

2        Number one, don't get away with those

3    cufflinks, those -- I said cufflinks.  With those

4    handcuffs.  I want a -- a copy made of them.  Xerox

5    or whatever.  Open them up and close them up.  I'll

6    trust you two to get together to get that done.

7            MS. THOMPSON:  We obviously object to the

8    evidence, but I understand the Court's ruling on

9    that and we'll cooperate in getting it done, Judge.

10           THE COURT:  All right.  And have them both,

11   copies open and closes.  Okay.

12           MS. MCNAUGHT:  You want --

13           THE COURT:  Two of them.

14           MS. MCNAUGHT:  No, no --

15           THE COURT:  I want them next to each other.

16           THE WITNESS:  This is acceptable, to have

17   one closed and one open?

18           THE COURT:  That would be fine.  For each

19   of them.  So then we can make them a court exhibit

20   here of record.

21       Number two is the question of the warden's

22   notes.  And I am going to make this Court's

23   Exhibit 1.  And I'm going to have this of record so

24   that it's preserved here.  Not only the entire

25   note -- the entire notebook, of course, and the copy

1      that you all made for me.

2           So that will be Court's Exhibit 1, Madam Clerk.

3           All right.  Anything else before we wrap up?

4                MS. MCNAUGHT:  Judge, will that be under

5      seal?

6                THE COURT:  Oh, yes.  These will be -- this

7      will be under seal.

8                MS. MCNAUGHT:  Yes.

9                THE COURT:  Okay.  Absolutely, because

10     there's a lot of other material in there that is not

11     material to this case.

12               MS. MCNAUGHT:  Correct.  And I don't have a

13     copy, so I just want to make sure it's under seal so

14     that nothing changes so that --

15               THE COURT:  Oh, yes, yeah, it will be.  But

16     if, under supervision, you want to make a copy of

17     this before it goes to Madam Clerk's official stuff,

18     that's entirely up to you.  I'm sure she will

19     accommodate.

20               MS. MCNAUGHT:  Understood.  Thank you.

21               THE COURT:  I just want to get this

22     preserved because of the issue.

23          Now, is there anything else we need to do

24     tonight?

25               MS. THOMPSON:  The only thing I'd ask,

1    Judge.  Obviously, there were some delays today
2    because of evidence coming out.  And if there's
3    going to be anything additional tomorrow, I'd prefer
4    to take it up in the morning.
5         So if there's more that the state -- or that
6    the defense is going to use that we haven't seen,
7    obviously, we would like to see that in the morning
8    so we can address any issues and have a productive
9    day, Judge.
10             MS. MCNAUGHT:  I know of nothing.
11             THE COURT:  Okay.
12             MS. THOMPSON:  Thank you, Your Honor.
13             THE COURT:  Then see you all at 10:00.
14   Have a pleasant evening.
15        (Court was recessed for the day.)
16   I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court
17   Reporter, certify that the foregoing is a correct
18   transcript from the record of proceedings in the
19   above-entitled matter.
20
21             This transcript contains the
22             digital signature of:
23
24             Kathy J. Sullivan, CSR, RPR, CRR
25             License #084-002768