1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF ILLINOIS

3            SPRINGFIELD DIVISION

4

5   BEVERLY THROGMORTON, et al.,  )
                                 )
6                   Plaintiffs,  )
                                 )
7         -vs-                   )   NO. 12-3087
                                 )
8   FORMER ASSISTANT WARDEN      )   JURY TRIAL
    REYNOLDS, et al.,            )
9                                )
                    Defendants.  )

10

11          TRANSCRIPT OF PROCEEDINGS

12     BEFORE THE HONORABLE RICHARD MILLS

13            U.S. DISTRICT JUDGE

14

15   NOVEMBER 14, 2016

16   A P P E A R A N C E S:

17   FOR PLAINTIFFS:          Ms. Ruth Z. Brown
                              Ms. Tara Elizabeth Thompson
18                            Mr. Vincenzo Field
                              311 N. Aberdeen St.
19                            3rd Floor
                              Chicago, IL 60607
20
     FOR DEFENDANTS:          Ms. Karen L. McNaught
21                            Ms. Deborah L. Barnes
                              Ms. Laura K. Bautista
22                            500 S. Second St.
                              Springfield, IL 62706
23

24   COURT REPORTER:          Ms. Dorothy J. Hart, CSR, RPR
                              Illinois CSR No. 084-001390
25

                        INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Delores Henry | 14-56 | 14-117 | 14-128 | |
| Ieshia Brown | 14-134 | 14-203 | 14-211 | |
| Jacqueline Hegwood | 14-215 | 14-248 | 14-255 | |
| Patricia Phillips | 14-260 | | | |

| EXHIBITS | IDENTIFIED | ADMITTED |
|---|---|---|
| Plaintiffs' Exhibit 78 | 14-3 | |
| Plaintiffs' Exhibit 201 | 14-74 | |
| Plaintiffs' Exhibit 203 | 14-63 | |
| Plaintiffs' Exhibit 226 | 14-279 | |
| Plaintiffs' Exhibit 233 | 14-178 | |
| Plaintiffs' Exhibit 235 | 14-212 | |
| Plaintiffs' Exhibit 236 | 14-154 | |
| Plaintiffs' Exhibit 237 | 14-85 | |
| Plaintiffs' Exhibit 238 | 14-84 | |
| Plaintiffs' Exhibit 239 | 14-83 | |
| Plaintiffs' Exhibit 243 | 14-282 | |
| Plaintiffs' Exhibit 250 | 14-180 | |
| Defendants' Exhibit 11 | 14-204 | |
| Defendants' Exhibit 25 | 14-250 | |
| Defendants' Exhibit 26 | 14-127 | |

P R O C E E D I N G S

(The following proceedings were

out of the presence of the jury.)

THE COURT:  We're in the Throgmorton

case, but it is prior to trial, before the jury

comes in.  I wanted to make sure that we all knew

where we were going to be seated since there are so

many plaintiffs and defendants and so forth.  So, I

wanted to get this on the record and understood

where everybody is going to sit.  That was my major

point in coming out here.

So, now, I understand that there's a

problem with the named plaintiff of Beverly

Throgmorton.  Is that correct, Counsel?

MS. THOMPSON:  I don't know that it's a

problem, but there is an issue I want to address, I

want to make the Court aware of.

THE COURT:  Okay, fine.  Let 'er rip.

MS. THOMPSON:  Your Honor, we just

advised defense counsel about this a few minutes

ago, but in preparing for trial late last night and

this morning, we determined that there is an

exhibit in our documents that -- the exhibits that

we had submitted to the Court for this trial.  It's

Exhibit Number 78, which is a declaration that is

signed by Beverly Throgmorton.  We've determined in our preparation that that is an exhibit that we need to withdraw, that we're seeking to withdraw from trial and withdraw from the record in this case.

THE COURT:  All right.  What does the DOC say?

MS. McNAUGHT:  As long as it's with prejudice, we have no objection.

THE COURT:  As long as it's what?

MS. McNAUGHT:  With prejudice.

THE COURT:  Uh-huh.

MS. McNAUGHT:  We have no objection.

THE COURT:  All right.  How's that, Counsel?

MS. THOMPSON:  I think that addresses the issue as to the exhibit, Your Honor.

THE COURT:  And that's all right with you?  I mean --

MS. THOMPSON:  Yes.

THE COURT:  -- do you have any problem with prejudice?

MS. THOMPSON:  We're not seeking to dismiss Ms. Throgmorton as a plaintiff at this time.  Candidly, we learned of this issue, we need

1    to determine what to do, but we are withdrawing any

2    reliance on Exhibit 78, and that is with prejudice,

3    Your Honor.

4              THE COURT:  Okay.  So, that is

5    withdrawn with prejudice.

6              MS. McNAUGHT:  Actually, Your Honor, I

7    thought we were talking about dismissing her as a

8    party, so I apologize for that.

9              I think that we can use the declaration

10   for impeachment purposes still --

11             THE COURT:  Uh-huh.

12             MS. McNAUGHT:  -- even though

13   plaintiffs may withdraw their reliance upon the

14   declaration.

15             THE COURT:  Well, of course, I don't

16   know what it is and I haven't seen it, so I have no

17   idea.

18             MS. BAUTISTA:  Your Honor, we can show

19   you what it is.

20             THE COURT:  Well, I would certainly

21   like to see it.  Oh, that's fine.  Thank you very

22   much.

23             And, Ms. McNaught, would you mind

24   standing right here at the podium too?  It's so

25   much easier for me to hear when I -- when you're

there at the podium.

Okay.  This is the declaration of
Beverly Throgmorton, who is the named plaintiff in
this case.  It is two pages in length.  It's dated
February the 22nd of 2013.

All right.  Very well.  So, the motion
is to withdraw this.  And the government or the DOC
has no problem with that as long as it's with
prejudice.

MS. McNAUGHT:  No, Your Honor.

THE COURT:  No?

MS. McNAUGHT:  I think I confused you
because initially --

THE COURT:  You must have.

MS. McNAUGHT:  -- I thought that they
were dismissing Ms. Throgmorton as a party.

THE COURT:  Oh, I'm sorry.  I'm sorry.

MS. McNAUGHT:  No, that was my mistake.
And so, let's just kind of go -- fast-forward.

THE COURT:  Yeah.

MS. McNAUGHT:  I understand that
plaintiffs want to withdraw Exhibit 78 as one of
their exhibits.  We have no objection to their
withdrawal.  However, to the extent that we can use
it for impeachment purposes, I think that it's

1 still fair game.

2          THE COURT:  All right.

3          MS. THOMPSON:  I don't disagree, Your

4 Honor.

5          THE COURT:  That's all right with you?

6          MS. THOMPSON:  Yes.

7          THE COURT:  Fine.  All right.  Well, so

8 be it and so ordered.  That'll be fine.  I'll

9 return the copy.

10          Thank you, Ms. McNaught.

11          MS. McNAUGHT:  Thank you, Your Honor.

12          THE COURT:  All right.  Now, let's get

13 back.  What's the next thing?

14          MS. THOMPSON:  Well, that is the issue,

15 Your Honor.  As far as whether that requires us to

16 take other steps in the case, I -- we're

17 determining what else, if anything, we should do,

18 but we are withdrawing any reliance on that

19 exhibit.  And we're prepared to open and to begin

20 trial today.

21          THE COURT:  All right.  Fine.

22          Now, Ms. McNaught, are you all ready?

23          MS. McNAUGHT:  We are, Your Honor.

24          THE COURT:  Everything ready to go?

25 Okay.

1          Now, let's get our lineup here and

2   where people are going to sit because I don't want

3   this to look like a cattle call.

4          All right.  Now, we have -- we have

5   plaintiffs' counsel, Ms. Thompson, Ms. Brown, and

6   Mr. Field.

7          MR. FIELD:  Yes.

8          THE COURT:  All right.  And are we in

9   that order?

10          MS. THOMPSON:  We're in Ms. Thompson,

11   Mr. Field, Ms. Brown.

12          THE COURT:  Okay.  Well, we don't have

13   them in that order, but that's where they're going

14   to sit.  That'll be fine.

15          All right.  Now, how about our

16   plaintiffs?

17          MS. THOMPSON:  We have Ms. Henry.

18          THE COURT:  Who?

19          MS. THOMPSON:  Delores Henry.

20          THE COURT:  Delores Henry.  That's you?

21          MS. HENRY:  Yes, sir.

22          THE COURT:  Let me call them off.

23          Thank you, Ms. Henry.

24          And Patricia Phillips?

25          MS. PHILLIPS:  Yes, sir.

1          THE COURT:  Thank you.

2          And Jacqueline Hegwood?

3          MS. HEGWOOD:  Yes, sir.

4          THE COURT:  Thank you.

5          And Ieshia Brown --

6          MS. IESHIA BROWN:  Yes, sir.

7          THE COURT:  -- at the end.

8          Thank you very much, ladies.  All

9    right.  We have them all there.

10          Now, we do not have Beverly

11   Throgmorton.

12          MS. THOMPSON:  She is not sitting in

13   the courtroom, Your Honor.  She is here in the

14   courthouse.

15          THE COURT:  She is here.  All right.

16   Now, where are you going to put her?  And is she in

17   custody?

18          MS. THOMPSON:  She's not, Your Honor.

19   This is -- this relates to the issue with

20   withdrawing her declaration.

21          THE COURT:  Well, tell me about it.  I

22   don't like surprises.  No judge likes surprises.

23   We all want to come in here and know where

24   everybody is sitting and who they are and the role

25   that they play and where we're going to go.  And I

1    don't want anything happening before this jury

2    that's going to screw up this case.  Now, it's just

3    as simple as that, folks.

4              Now, tell me, what about Ms.

5    Throgmorton?  This really intrigues me.

6              MS. THOMPSON:  Your Honor, the reason

7    that we're seeking to withdraw reliance on Exhibit

8    78 --

9              THE COURT:  Yeah.

10              MS. THOMPSON:  -- obviously relates to

11    our duty of candor to the Court to, you know, not

12    rely on exhibits that we determine we can't rely

13    on.  And so we're seeking to withdraw our reliance

14    on that exhibit.  I am not intending to be vague

15    with the Court.  Obviously, I have an attorney-

16    client privilege with Ms. Throgmorton, and so I'm

17    endeavoring to be candid and I'm -- I don't mean to

18    be vague, but that's I feel the issue.  That's what

19    I feel that I can say about it, Your Honor.

20              THE COURT:  Well, you deserve an A-plus

21    at this point.  Now, let's go on and fill it out,

22    fill out the rest of the situation to me.  Now,

23    we're not before the jury.

24              MS. THOMPSON:  I understand, Your

25    Honor.

1          THE COURT:  And this is just trying to
2    clean up here so that I understand where
3    everybody's going to be.  And here this comes as a
4    surprise.  I mean, this is indeed a last-minute
5    surprise.  It is two minutes until 10 when the jury
6    is supposed to be coming in here to the box and we
7    start off on this case.  Now, as I say, we don't
8    like surprises.  So, give it, lay it out to me.
9    We're not -- we're not doing it before the jury.
10   And you tell me as much as you can in your capacity
11   as counsel.
12          MS. THOMPSON:  We learned about the
13   issues that caused us to withdraw the affidavit
14   relatively recently and I apologize for bringing
15   this to the attention of the Court shortly before
16   the jury comes out.  We advised counsel about it
17   this morning when we determined that this was a
18   step we needed to take.
19          We don't know whether this would
20   require us to withdraw -- to seek to withdraw Ms.
21   Throgmorton as a class representative, to seek to
22   withdraw her as a plaintiff.  That's something we
23   want to resolve.  But we learned of this when we
24   did.  We are attempting to be as candid with the
25   Court as we can about what we know, but that's not

1    a decision that, to be candid, Your Honor, we have

2    been able to make, and so we're here to tell the

3    Court where we stand.

4              Ms. Throgmorton is here.  It was our

5    intention to not reference her during opening

6    statements and to not have her sitting at counsel

7    table.  But we'll do what the Court directs.  So,

8    that's the position -- that's the issue as I see

9    it, Your Honor.

10             THE COURT:  Well, this is called a

11   last-minute surprise.  And this jury has been

12   picked with Throgmorton's name as the lead

13   plaintiff.  And in the books this case will go down

14   as Throgmorton versus Former Assistant Warden, et

15   cetera, et cetera, et cetera.  Now, I want to know

16   why we're going to be doing this and what the

17   problems are here.  Because this jury has already

18   been picked on the premise that Throgmorton is the

19   lead plaintiff.  She's been introduced.  The jury

20   has seen.

21             Now, what are we going to do, guys?

22             MS. THOMPSON:  Ms. Throgmorton was not

23   here for jury selection, Your Honor.

24             THE COURT:  Yeah, but her name was

25   used.

1    MS. THOMPSON:  That's true.

2    THE COURT:  And it was explained that
3  she was the lead plaintiff.  So, there are.  So,
4  what are we going to do?  What is your suggestion?
5  I mean, we didn't create this, neither did the
6  defendants, nor the Court.  Your side did.  Now,
7  what are we going to do about it?

8    MS. THOMPSON:  Ms. Throgmorton is one
9  of -- at this point one of several representatives
10  for the class.  Ms. Throgmorton -- at this point,
11  since we can't decide how things are going to
12  proceed, we can have Ms. Throgmorton here for
13  opening statements today.  It's not our intention
14  as we sit here today for her to provide testimony
15  in this matter, at least in support of plaintiffs'
16  case.  I want to be fair to the members of the
17  class that we represent and, obviously, I have
18  duties to Ms. Throgmorton as well, so ...

19    It would be better, Your Honor, if I
20  come here and say here's what we're doing.  And I
21  apologize to the Court that I -- that I haven't
22  been able to do that.  I learned the information
23  when I did and this is where we're at.

24    So, I guess my suggestion in light of
25  what the Court is advising us would be that Ms.

1   Throgmorton be here for opening statements and

2   we'll address her situation when it makes sense to

3   do so.

4          THE COURT:  Well, I kind of think that

5   it makes sense to do so right now at the head end

6   of this thing.  Unless opposing counsel have some

7   suggestions here.  What do you say?

8          Now, listen, we've got a jury sitting

9   out here picking their noses waiting to go.  And I

10  don't like this last-minute business.  Nobody does.

11  And we're all sitting here and every -- and we

12  haven't even gotten the seating arrangements

13  finished yet and we're already two minutes after

14  10.  Now, let me have it.

15         Ms. McNaught, what's the government's

16  position?

17         MS. McNAUGHT:  Your Honor, I think this

18  is probably an issue more -- better addressed by

19  the Court and plaintiffs' counsel.  I do have a few

20  concerns about Ms. Throgmorton making appearances

21  and then maybe being a class member and maybe not

22  being a class member.  So, I think plaintiffs'

23  counsel kind of needs to make a decision pretty

24  quickly, before the jury comes in, on whether

25  she --

1          THE COURT:  I can make very quick

2     decisions, Ms. McNaught, as you know from years of

3     being in the well of my court.  I should say courts

4     plural.  So, no, there's no problem with that at

5     all.  We'll make it right here and now before we

6     ever get that jury seated in the courtroom to begin

7     the trial in chief.  So, that's -- that's no

8     problem.

9          What bothers me is that if she is going

10    to be coming as a witness and if she is a -- and

11    she is the lead plaintiff, the named lead

12    plaintiff, the head of the case, and I've got

13    correctional officers sitting in here and she's the

14    only reason why they're here --

15          MS. McNAUGHT:  She is not, Your Honor.

16          THE COURT:  She is not?

17          MS. McNAUGHT:  No.  It is Ms. Brown who

18    is that issue.

19          THE COURT:  Oh, all right, fine.  Then

20    that's a separate issue then.  All right, very

21    good.

22          MS. McNAUGHT:  It's just, you know, if

23    -- as I see it, if she's just going to be a

24    witness, then she probably doesn't need to be in

25    here.  If she is going to be a named plaintiff,

1   then she --

2                   THE COURT:  What's going on?  Shut the

3   door.  Shut the door.

4                   MARSHAL:  Yes, sir.  I was making sure

5   everybody is here.

6                   THE COURT:  Well, you come in this way

7   then.

8                   MARSHAL:  Yes, sir.

9                   THE COURT:  All right.  Then we're

10  going to strike her as the lead plaintiff in this

11  cause.  Because she is not; is that correct?

12                  MS. THOMPSON:  Given what the Court has

13  indicated and given where we stand, I think it

14  would be our motion at this time to withdraw Ms.

15  Throgmorton as a class representative.  We don't

16  intend to call her as a witness.

17                  THE COURT:  All right.  That'll

18  simplify that.  So, she will not be here at all,

19  period.  Understood?  Everybody on the same page?

20                  MS. McNAUGHT:  And that's with

21  prejudice?

22                  THE COURT:  And that's with prejudice,

23  absolutely.

24                  MS. THOMPSON:  It is our belief that

25  she remains a member of the class.  But as a

1    representative, we agree.

2              THE COURT:  Yeah, as a representative

3    of --

4              MS. THOMPSON:  Yes, Your Honor.

5              THE COURT:  -- the class.

6              All right, fine.  We're in good shape

7    then.  Okay.  Well, that's taken care of.

8              Now, the question is:  Are we going to

9    continue to name her officially in this case?

10   Because I will call the case for trial before this

11   jury for the trial in chief by the name of the

12   case.  I will identify it.  So, what are we going

13   to do?

14             MS. THOMPSON:  I think it is the

15   suggestion of both parties that it remain

16   Throgmorton v. Reynolds.  There are actually other

17   class representatives whose names appear in the

18   caption who are not here, including Ms. Brown.

19             Obviously, Ms. Throgmorton is not a

20   representative any longer, but I think we continue

21   to call it that.

22             THE COURT:  All right.  It's going to

23   be Throgmorton versus Reynolds.  Is that right?

24             MS. THOMPSON:  Yes, Your Honor.

25             THE COURT:  All right.  That's the

1    name.  There we are, Madam Reporter.  Okay.  We've

2    got it clear.

3             Okay.  Now, as to the seating, let's

4    get from the plaintiffs over to the defendants.

5    And how are we sat there?

6             MS. McNAUGHT:  Your Honor, from you to

7    the end of the well, it is Debbie Barnes --

8             THE COURT:  Uh-huh.

9             MS. McNAUGHT:  -- Karen McNaught --

10            THE COURT:  Right.

11            MS. McNAUGHT:  -- Laura Bautista.

12            THE COURT:  Okay.  Very good.

13            MS. McNAUGHT:  Russ Reynolds is the

14   first named defendant.

15            THE COURT:  All right.

16            MS. McNAUGHT:  Melody Hulett is at the

17   table.

18            THE COURT:  Yes, ma'am.

19            MS. McNAUGHT:  And then from left to

20   right, Troy Dawdy --

21            THE COURT:  All right.  Mr. Dawdy.

22            MS. McNAUGHT:  -- Russell Craig --

23            THE COURT:  Russell Craig, very good.

24            MS. McNAUGHT:  -- Renee Hatfield --

25            THE COURT:  Renee Hatfield.

1          MS. McNAUGHT:  -- and Alan Pasley.

2          THE COURT:  And Alan Pasley.

3          Very good.  All right.  I think that's

4    fine everybody sitting there so we don't get too

5    crowded at these tables.  It's hard to get up and

6    move about.

7          Now, on the plaintiffs we don't have

8    Beverly Throgmorton.  She's out.

9          Now, how many people here were present

10   at the time that the jury was selected by Judge

11   Schanzle-Haskins?  Raise your hands.

12         Uh-huh.  Almost everybody, not quite.

13   Okay.  Then I think I'm going to introduce you all

14   again to the jury when we come in in the case in

15   chief.  Understood?  All right.

16         Now, anything else we need to decide

17   before we get this show on the road?

18         MS. THOMPSON:  There's just one brief

19   issue I would advise the Court about, which is the

20   defendants filed some updated jury instructions, I

21   believe yesterday, that reflect some changes given

22   the changes in the parties, the changes in the

23   position of the case, as many of the defendants

24   were dismissed out last week.  We want to file

25   updated versions of our instructions too.  We

1    haven't had time to do that, but we'll try to do so

2    today after court, Your Honor.

3              THE COURT:  That'll be fine.  That'll

4    be fine.  That'll give us plenty of time.

5              MS. THOMPSON:  Thank you, Your Honor.

6              THE COURT:  Yeah.

7              Anything else, Ms. McNaught?

8              MS. McNAUGHT:  No, Your Honor.

9              THE COURT:  Very good.  Now, are you

10   going to be speaking most of the time or what's the

11   scoop?  Ms. Barnes is or what?

12             MS. McNAUGHT:  We have divided the

13   witnesses and the duties, the assigned duties.  So,

14   Ms. Barnes will be doing the opening.

15             THE COURT:  Okay.

16             MS. McNAUGHT:  I believe I may have one

17   of the first witnesses.

18             THE COURT:  Yeah.  That's fine.  The

19   main thing that I'm concerned about is the opening

20   right now.  Okay.

21             All right, Ms. Barnes, we'll be looking

22   to you for that.

23             And, Ms. Brown, you're going to make

24   the opening?

25             MS. THOMPSON:  Ms. Thompson.  Yes, I

1  will.

2          THE COURT:  I'm sorry.  Ms. Thompson.

3  All right.  Very good.

4          All right.  Last pit stop before we

5  take off.  So, I'll give you five minutes.

6                  (Court was in recess.)

7                  (The following proceedings were

8                  out of the presence of the jury.)

9          THE COURT:  Thank you, Madam Clerk.

10         CLERK:  You're welcome, Judge.

11         THE COURT:  Good morning, everyone.

12         The record may show that the jury is

13  not in the courtroom.

14         CLERK:  Do you want the jury to be

15  brought in?

16         THE COURT:  No, I do not want them just

17  yet.

18         Now, is there anything that we need to

19  discuss before the jury comes in?  I think we

20  covered the waterfront before.

21         MS. THOMPSON:  Nothing on plaintiffs'

22  side, Your Honor.

23         MS. McNAUGHT:  No, Your Honor.

24         THE COURT:  Thank you.  All right.

25  Very well.

1          Marshall, would you bring the jury in,

2     please.

3          MARSHAL:  Yes, Your Honor.

4               (The jury entered the courtroom.)

5          THE COURT:  Please be seated, everyone.

6          The record may show that the jury has

7     entered the courtroom and have taken their

8     respective positions in the jury box as we are

9     prepared now to proceed in the jury trial of

10    Throgmorton versus Reynolds, et al..

11         And I would note, ladies and gentlemen,

12    there may have been some little change in the

13    roster since you were selected before Judge

14    Schanzle-Haskins.

15         By the way, I thank Judge

16    Schanzle-Haskins very much for handling the jury

17    selection in this cause.

18         And we welcome all of you here to the

19    jury box in Courtroom Number 2 of the United States

20    District Court for the Central District of

21    Illinois, Springfield Division.

22         Now, to make sure that we all

23    understand the lineup of who everyone is at this --

24    at the two tables, because I believe that some of

25    the personnel or people or parties have changed

     1    from the time that you were selected, so I'm going
     2    to introduce them all at this time.
     3              So, counsel will please stand as I
     4    introduce you.
     5              And at plaintiffs' counsel table we
     6    have Ms. Tara Thompson.  Thank you, Ms. Thompson.
     7              Ms. Ruth Brown.  Thank you, Ms. Brown.
     8              And Mr. Vincenzo Field.  Mr. Field.
     9              And present at their table for the
    10    plaintiffs, Delores Henry and Patricia Phillips,
    11    and Jacqueline Hegwood.
    12              MS. HEGWOOD:  Good morning.
    13              THE COURT:  Thank you, Ms. Hegwood.
    14              And Ieshia Brown.  Ms. Brown, thank
    15    you.
    16              And moving over to the defendants'
    17    tables, their counsel, Deborah Brown -- Barnes --
    18    Ms. Barnes, thank you -- Ms. Karen McNaught, and
    19    Ms. Laura Bautista.  Thank you.
    20              Now, I believe that the defendants that
    21    are present are not all at the table, but they are
    22    in this area.  And so, the first is Russell
    23    Reynolds -- Mr. Reynolds -- and Troy Dawdy, and
    24    Russell Craig, Melody Hulett -- thank you -- Alan
    25    Pasley, and Renee Hatfield.  Thank you, everyone.

1          All right.  Those identify those who

2   are present at the tables or in the immediate area

3   in chairs.

4          Now, ladies and gentlemen, as Judge

5   Schanzle-Haskins told you during jury selection,

6   this case is a civil case and a class action.  The

7   plaintiffs in this case are representatives of

8   approximately 200 women who were prisoners housed

9   on Units 2B and 4B of the Lincoln Correctional

10  Center on March the 31st of 2011.  The defendants

11  in this case are current and former employees of

12  the Illinois Department of Corrections.

13         This lawsuit concerns strip searches

14  conducted at Lincoln Correctional Center on March

15  31, 2011, and the plaintiffs allege that the manner

16  in which the strip searches were conducted violated

17  plaintiffs' rights under the Eighth Amendment of

18  the United States Constitution to be free from

19  cruel and unusual punishment.  Plaintiffs allege

20  that they were damaged as a result.

21         Defendants deny plaintiffs' allegations

22  and deny that plaintiffs suffered any damages.

23         You are now the jury in this case, and

24  I want to take a few minutes to tell you something

25  about your duties as jurors and to give you some

1    instructions.  At the end of the trial, I will give

2    you more detailed instructions, and those

3    instructions will control your deliberations.

4            But one of your -- one of my duties is

5    to decide all questions of law and procedure.  From

6    time to time during the trial and at the end of the

7    trial, I will instruct you on the rules of law that

8    you must follow in making your decision.  You

9    should not take anything I may say or do during the

10   trial as indicating what I think of the evidence or

11   what your verdict should be.

12           It is your duty to determine the facts

13   and to determine them from the evidence produced in

14   open court.  You are to consider only the evidence

15   received in this case.

16           The evidence consists of the testimony

17   of the witnesses, the exhibits received in

18   evidence, and any facts that I may instruct you to

19   find or to which the parties agree or stipulate.

20           You'll have to decide whether the

21   testimony of each of the witnesses is truthful and

22   accurate, in part, in whole, or not at all.  You

23   also have to decide what weight, if any, you give

24   to the testimony of each witness.

25           The trial will proceed in the following

1   manner:

2           First, plaintiffs' attorney may make an

3   opening statement.  Next, defendants' attorney may

4   make an opening statement.

5           An opening statement is not evidence

6   but is simply a summary of what the attorney

7   expects the evidence to be.

8           After the opening statements,

9   plaintiffs will call witnesses and present

10  evidence.  Then defendants will have an opportunity

11  to call witnesses and present evidence.

12          After the evidence has been presented,

13  the attorneys will make closing arguments and I

14  will instruct you on the law that applies to the

15  case.

16          After that, you'll go to the jury room

17  to deliberate on your verdict.

18          Now, you as jurors must decide this

19  case based solely on the evidence presented here

20  within the four walls of this courtroom.  This

21  means that during the trial you must not conduct

22  any independent research about this case, the

23  matters in the case, or the individuals involved in

24  the case.  In other words, you should not consult

25  dictionaries or reference materials, search the

Internet, websites or blogs, or use any other
electronic tools to obtain information about this
case or to help you decide the case. Please do not
try to find out any information from any source
outside the confines of this courtroom. Anything
you may have seen or heard outside the courtroom is
not evidence and must be disregarded. Otherwise,
it wouldn't be fair.

Now, until you retire to deliberate at
the end of the case, you may not discuss this case
with anyone, even among yourselves, your own fellow
jurors. You may not permit others to discuss the
case with you. If anyone approaches you and tries
to talk to you about the case, please let me know
about it immediately.

In order to avoid any potential
problems, I have instructed the attorneys and the
parties not to greet you or to interact with you in
any way, in the hallways, on the street, wherever.
Do not take offense if an attorney or a party in
this case does not acknowledge you or otherwise
extend to you a common courtesy. They're only
following my instructions.

Now, I know that many of you use cell
phones, the Internet, other tools of technology.

1  The security officers were required to ensure that

2  you did not bring any electronic devices into the

3  courthouse, including cell phones.  Now, if you

4  have a cell phone or any other electronic device in

5  your possession, let me know immediately and it

6  will be held in safekeeping for you.

7       Do any of you have any on you, on your

8  persons at this time?

9       (No positive responses)

10      THE COURT:  Very good.  Thank you.

11      Now, after you retire to deliberate,

12  you may begin discussing the case with your fellow

13  jurors, but you cannot discuss the case with anyone

14  else until you have a returned verdict and the case

15  is at an end.  Until you have deliberated with your

16  fellow jurors and returned a verdict, you must not

17  talk to anyone else at any time about this case,

18  including communicating electronically with anyone

19  about the case.  This includes your family and

20  friends.  You may not communicate with anyone about

21  the case on your cell phone, through e-mail,

22  Blackberry, iPhone, text-messaging, or on Twitter,

23  or through any blog or website, including Facebook,

24  Google, LinkedIn, or YouTube.  You may not use any

25  similar technology of social media, even if I have

1 not specifically mentioned it here.

2       I expect you will inform me as soon as

3 you become aware of another juror's violation of

4 these instructions. A juror who violates these

5 instructions jeopardizes the fairness of these

6 proceedings and a mistrial could result, which

7 would require the entire trial process to start

8 over.

9       Finally, do not form any opinion until

10 all of the evidence is in. Keep an open mind until

11 you start your deliberations at the end of the

12 case.

13       I hope that all of you will find this a

14 most interesting and noteworthy experience.

15       Fairness is the key word in this

16 courtroom, right down the dead center of the

17 courtroom. Fair.

18       All right. Now, before we begin, let

19 me give you a little housekeeping matter, and that

20 is our timing. It is my customary practice to have

21 a solid two hours in the morning, from 10:00 until

22 noon, no breaks.

23       And the reason for that is that we used

24 to start earlier and then we'd take a break in the

25 middle of the morning, and we'd say, well,

1    15-minute break.  Well, a 15-minute break in the

2    middle of the morning is always extended out to 30

3    minutes before you ever get back in and get back at

4    the action.  So, I've found that making this change

5    has helped a great many so we've got two solid

6    hours.

7            Now, that's on a normal morning.  As

8    you'll notice this morning, we didn't get on until

9    15 after.  And that's because counsel and I had

10   some last-minute details to work out and make sure

11   that everything was ready for you when you did come

12   in and that we wouldn't waste any more time.  So,

13   that's the reason.

14           Now, we will break at lunch for one

15   hour and 30 minutes, from 12 to 1:30, and then we

16   will have a short break in the middle of the

17   afternoon at about 3:15, and go till 5.  And at 5

18   we're out of here.  Okay?

19           Now, I'm not sure until -- I haven't

20   checked all of the details on which counties you're

21   from and so forth, but I will in a few minutes.

22           Oh, you've got that there.  Oh, great.

23   Thank you.

24           But I want to make sure that anyone who

25   comes from as far away as Quincy -- anybody from

1    Quincy?

2                    (No positive response)

3              THE COURT:  No?  Okay.

4              That we have adequate time for you to

5    get home, make that choice and have that option of

6    going home or deciding to stay here.  And the jury

7    clerk will, of course, make arrangements if you

8    decide that you want to stay overnight here in

9    Springfield.  So, I leave that entirely up to your

10   decisions.  So, keep that in mind.

11             All right.  Very well.  I believe we

12   are ready to proceed with our opening statements,

13   and I will call first upon Attorney Tara Elizabeth

14   Thompson on behalf of the plaintiffs.

15             MS. THOMPSON:  May it please the Court.

16             THE COURT:  It does.

17             MS. THOMPSON:  Counsel, ladies and

18   gentlemen, and ladies and gentlemen of the jury,

19   good morning.

20             As Judge Mills told you last week when

21   you came here to be selected for jury service and

22   as he told you this morning, the question in this

23   case is whether a mass strip search of about 200

24   women at Lincoln Correctional Center on March 31st

25   of 2011 violated the Eighth Amendment of the

1    Constitution.

2              We are a nation of laws.  And the most

3    -- at the center of all of that is the

4    Constitution.  You all know the words of the Eighth

5    Amendment.  It prohibits what's called cruel and

6    unusual punishment.

7              The judge gave you some instructions

8    about this case and he will instruct you on the law

9    that you ought to apply in this case.  But what the

10   Eighth Amendment in this country means is that when

11   people are convicted of a crime, when they go to

12   prison, we don't abuse people.  We don't inflict

13   cruelty on people in prison.  We don't degrade

14   people in prison.  We don't humiliate people in

15   prison.  We don't do any of those things to women

16   who are in prison.

17             I want to let you know a couple things

18   off the bat that you're going to hear in the

19   evidence in this case.  And the first one is

20   something that you may already know to be true.

21   And that is that when people go to prison they give

22   up some rights.  People in prison don't have all

23   the rights that people out on the street do.

24   Prison is a hard place.  It's a place where there

25   have to be certain rules and procedures.  And

1    that's for everyone's safety.  That's for the

2    safety of women that are in prison and it's for the

3    safety of prison employees so that they can go home

4    to their families at night.

5              Here are two other things that you may

6    not know that you're going to hear in the evidence

7    in this case.

8              One is that these class

9    representatives, the women that you're going to

10   hear from in the course of this trial, had

11   experienced what are called shakedowns in prison

12   before March 31st of 2011.  They understood that

13   those shakedowns sometimes happened.  And in a

14   shakedown, what you're going to hear about in this

15   trial, IDOC staff would come to the housing area

16   where women lived in the prison, what was called a

17   dorm or housing unit, and sometimes the women had

18   to leave or step out, sometimes they would stay

19   there, sometimes they would be handcuffed for a

20   short period of time, and IDOC would go through

21   their room and make sure that there wasn't

22   something there that the women weren't supposed to

23   have.  That happened regularly and the women here

24   are not here to tell you that shakedowns shouldn't

25   have occurred.

1    You're also going to hear that prior to

2  March 31st of 2011 these women had been what's

3  called strip-searched.  If you had a job in the

4  prison, which most women did, you would be

5  strip-searched before you went to your job, if you

6  had certain jobs, and you would be strip-searched

7  when you came back.  You would be strip-searched if

8  you had an visitor come to the prison.  You would

9  be strip-searched if you were going out to a

10  medical appointment outside of the prison.  You

11  would be strip-searched if you were going to court.

12    And in a strip search, as you'll learn,

13  the strip searches that these women experienced

14  before March 31st of 2011, they would be taken to a

15  private area.  Sometime, with their permission, a

16  couple of other women who were inmates would come

17  into the room too.  There would be female IDOC

18  staff there.  The women would -- the women that

19  were inmates would remove their clothes.  The IDOC

20  staff might inspect their clothes, check them.  The

21  women would be naked.  They would shake their hair

22  out.  They would show their naked body to a female

23  IDOC person who was acting professionally.  They

24  might have to crouch down and show intimate areas

25  of their body to the female IDOC staff.  They would

have to show the bottom half of their body to this
person.  And the IDOC staff wouldn't touch them,
but they would look at their body.  And they would
be doing that to make sure that there was nothing
that the women had that they shouldn't have.

These women that you're going to hear,
this class of women, understood that in prison
there were going to be times that their bodies were
going to be viewed by female staff in a respectful
way.  That was going to be necessary at times.
And these women are not here to tell you that that
wasn't necessary or that that's something they're
complaining about in front you.

This case is about something different
than those kinds of things.  The women are here to
tell you about some terrible things that happened
to them on March 31st of 2011.  Some of these
things are unpleasant, as you can tell by some of
what I've told you before.  They're things that
women do not typically discuss in mixed company,
that they might only discuss with their friends.
They're things that would be unusual to discuss in
the kind of setting that we're in today.  I'm sorry
that you have to hear about them.  I'm sorry we
have to tell you about them.  But that's what this

1    case is about and that's what we need to discuss

2    with you today.

3           And that is just one of the many

4    reasons that we appreciate your service on this

5    jury. We know you all have other things to do. We

6    know some of you have traveled from great

7    distances. We know that there's a holiday coming

8    up. We know that if you weren't here you would be

9    at your job, you would be with your family. You

10    have lives. And we appreciate you taking the time

11    and listening to our clients' claims and deciding

12    what happened in this case.

13           These women are not here to make petty

14    complaints to you. They're here to talk to you

15    about violations of their constitutional rights.

16    And what they're going to tell you is that on March

17    31st of 2011, as some of these women were getting

18    up, as they were coming back from work, the

19    tactical team at Lincoln Correctional Center came

20    into two housing units where these women lived.

21    And the tactical team went by the name of Orange

22    Crush. And you're going to hear in this case why

23    the tactical team was called Orange Crush. The

24    tactical team came into the dorms and they were

25    yelling and they were marching and they were

1   banging on things with batons that they carried.

2   They wear orange outfits.  And you'll hear more

3   about the outfits that they were wearing.  They

4   were swearing.  They were yelling at the women that

5   lived in these housing units.

6          And you're going to hear, and it's not

7   going to be disputed, that there wasn't a riot

8   going to on, there wasn't an emergency going on.

9   And you're going to hear that all of the women

10   complied with what they were asked to do by Orange

11   Crush and by other IDOC people that were involved

12   in these events.

13          These women were taken to the dayrooms

14   in the housing units where they stayed at and they

15   were handcuffed ultimately.  You'll hear from women

16   describing, each of them, their experiences, but

17   the women were handcuffed painfully.  They were

18   handcuffed for hours.  They were handcuffed, most

19   of them, behind their backs.  These handcuffs were

20   applied primarily by cadets from the Illinois

21   Department of Corrections training center.  And

22   you'll hear that there were cadets that were here

23   to assist in the shakedown and assist in the mass

24   strip search that happened.  Some of these cadets

25   didn't know what they were doing and so these

1    handcuffs weren't put on properly and that's one of

2    the reasons why they hurt the women because they

3    were done incorrectly.

4              The women were told to face the wall in

5    their respective dayrooms.  And you'll hear from

6    the women that that happened to many of the women.

7    And there was more yelling.  There was more

8    threats.  And the women had to stay standing in

9    that position, told not to turn around, told they

10   would go to segregation if they did anything.  They

11   were compliant and they were yelled at.

12             They were then marched to the gym area

13   of the Lincoln Correctional Center.  And you'll see

14   some photos that will help you determine what this

15   gym area looked like.  Again, these women had to

16   stand in handcuffs with their hands tightly behind

17   their backs for hours.  That sounds like a long

18   time and you'll hear that that's not an

19   exaggeration.  They stood for hours.  It was

20   painful.  There were women of all ages.  And we'll

21   introduce you to the plaintiffs in a minute.  These

22   women weren't able to use the bathroom.  They had

23   to stand.  They had to wait.

24             At some point, the people that were

25   there, which were some people from Lincoln

1   Correctional Center, some of these cadets and their

2   supervisors, began to be subjected to strip

3   searches.  And you'll hear about those strip

4   searches.  You'll hear that there were a couple

5   areas next to the gym where women were

6   strip-searched.  You will hear that these women --

7   some of these women were taken in groups to a

8   beauty shop or to a bathroom where they were

9   strip-searched in the presence of other women that

10  they didn't give their consent to be in there,

11  other inmates, that they were strip-searched in

12  front of these cadets and these IDOC employees.

13  You'll hear that some of these women were

14  strip-searched while men were watching them, while

15  male IDOC employees stood there and looked at them,

16  or while they looked out windows or openings and

17  could see male employees looking at them.  You will

18  hear that there were some civilian employees that

19  worked at the prison that also were present for

20  these searches.

21          You will hear that all of these women

22  stood and waited.  And as they stood and waited,

23  they were aware that other women were being

24  strip-searched.  The women that were waiting, some

25  of them could see other women being strip-searched.

1    The women that were waiting could -- some of them

2    could see men that were seeing other women being

3    strip-searched.

4              This is a prison where there were women

5    and some of these women were on their menstrual

6    cycles.  They were on their periods.  You will hear

7    that what was typical before March 31st in the

8    experiences of these women was that when they were

9    strip-searched they would need to remove whatever

10   sanitary -- whatever hygienic equipment that they

11   had.  If they were wearing pads or tampons, that

12   they would have to remove those in a search but

13   that they would be given replacement sanitary

14   materials when they were done.  And you will hear

15   that the women that were on their periods when they

16   were searched in this case that women that -- women

17   that are going to testify in front of you will tell

18   you that they saw other women ask, "Can I have a

19   pad?  Can I have something?" and were told no, that

20   there was nothing available.  You will hear that

21   those women had to go sit in the gym after they

22   were searched and wait for everyone else to be

23   done.  And we know what happens when someone has to

24   sit in that situation.  They bled on their

25   clothing.  They bled in front of other people.  And

1    women saw other women in that condition.

2              Because of that, some of the women who

3    were searched will tell you that they were searched

4    in areas where there was blood on the floor, that

5    they were searched in areas where they got other

6    people's bodily fluids on them during the strip

7    searches.  Because some of these women were

8    searched in very tight quarters, standing really

9    near one another during the search.

10             As I said before, no one is going to

11   tell you that these women were anything but

12   compliant with what the cadets were asking them to

13   do, with what the IDOC employees were asking them

14   to do.  But you're going to hear that, setting that

15   aside, over the time that it took for this

16   shakedown and this mass search to occur that IDOC

17   guards and cadets screamed at these women, swore at

18   them, that they used words like the B word and the

19   F word, that there were IDOC guards and cadets that

20   made comments about these women, that they made

21   comments that these women smelled, that their

22   bodies were unpleasant, that they were disgusting.

23   And these women heard -- all of these women heard

24   statements being made about other women.  They

25   heard -- some of them heard statements made about

1  themselves and some of them heard statements made

2  generally about other women that were in the

3  search.  For some women, as they stood there naked,

4  this is the language that they were hearing.

5           You're going to hear the facts about

6  what happened on March 31st and you're going to

7  have to decide if what happened to these women

8  violated the Eighth Amendment.

9           I want to introduce you to the class

10 representatives that you're going to hear from

11 during the course of this trial.  As the judge

12 said, this is a class action, and so you'll be

13 deciding the claims of not only these women but of

14 the class itself.  And the judge will instruct you

15 on the law about that.  And you're going to have to

16 decide if the defendants violated their rights.

17 Let me introduce you to the representatives here.

18           This is Delores Henry.  She lives in

19 Peru, Illinois.  I know it's not polite to talk

20 about a woman's age in public, but Ms. Henry is in

21 her sixties.  She's missing medical appointments to

22 be here and she'll tell you that that's because of

23 the importance that she attaches to this case.

24           This is Jacqueline Hegwood.  You'll

25 hear from her later in this case too.  She lives in

Chicago.  She's in her early fifties.  She works as
a cook in a restaurant.

This is Patricia Phillips.  She'll
testify in this trial too.  She lives in
Washington, Illinois.  She's 49.  She works at the
Washington Family Restaurant.

And this is Ieshia Brown.  She is still
in prison.  She works as a janitor in the prison.
And she is in her sixties.

All of these women were at Lincoln
Correctional Center on March 31st of 2011, and all
of them experienced the conduct that we're talking
about in this case.  And you'll hear them tell
their different stories about what happened to each
person.

There are defendants in this case, too,
and the defense may tell you more about them.
These are the people that participated in violating
the plaintiffs' and the class's rights.  They did
that in several ways.  And again, the Court is
going to instruct you on the law.

But you're going to hear that these
defendants violated these women's rights by
directly violating their Eighth Amendment right, by
supervising other employees and knowing that those

1   people were violating the plaintiffs' rights and

2   doing nothing about it.

3                   And finally, they all were something

4   that's called deliberately indifferent.  And the

5   Court is going to explain to you what deliberately

6   indifferent means.  But that's something you're

7   going to have to think about during this trial,

8   whether the defendants knew that there was a

9   reasonable risk that something that was

10  unconstitutional was happening and whether they

11  deliberately disregarded that risk and failed to

12  take reasonable measures to prevent these women's

13  rights from being violated.  The Court is going to

14  tell you what deliberate indifferent means --

15  deliberate indifference means, but that's something

16  you're going to have to think about in the context

17  of this case.

18                  You're going to hear that these women

19  and other class members in this case filed what's

20  called grievances.  And we'll explain to you what

21  grievances are, but it's what it sounds like, it's

22  a complaint, a written complaint where you say

23  something happened to me and you ask the

24  institution to address it.

25                  You're going to hear about the policies

1   for grievances at Lincoln Correctional Center.

2   You're going to hear that when a person files a

3   grievance, whether the institution agrees that

4   something needs to be done or whether they

5   determine that there's nothing to do about the

6   issue that a person is raising, that the grievance

7   is supposed to be returned to the person who made

8   the grievance with some indication of what's going

9   to happen with that grievance.

10          You're going to hear that although

11  these women, dozens and dozens of women, filed

12  grievances, that those grievances were never

13  returned to them.  You're going to hear that

14  although they asked for this situation to be

15  investigated, for something to be done, that these

16  grievances disappeared, and as far as these women

17  know, there was never an investigation by the

18  Illinois Department of Corrections about what

19  happened.  You're going to have to decide what that

20  means.  You're going to have to decide, if the

21  defendants explain to you the situation about that,

22  what that means.

23          You will hear from a corrections

24  expert.  Her name is Wendy Still.  She is a

25  long-time prison administrator and she has

1   expertise in what we would call national standards

2   for corrections.  She's going to tell you that what

3   the defendants did in this case, their conduct,

4   violated generally accepted standards for

5   correctional work, and she's going to explain to

6   you why it violated those standards.

7           MS. BARNES:  Your Honor, this is

8   beyond --

9           THE COURT:  In the mic.

10          MS. BARNES:  Your Honor, this is not

11  compliant with the order you entered with respect

12  to Ms. Still's testimony.

13          THE COURT:  What do you say, Counsel?

14          MS. THOMPSON:  I think the motion in

15  limine ruling said that that was what she could

16  address.  But I can move on, Your Honor.

17          THE COURT:  Yeah, fine.

18          MS. THOMPSON:  Thank you.

19          THE COURT:  Let's do that.

20          MS. THOMPSON:  I will.

21          You're going to hear from the

22  defendants in this case, as I said, and you may

23  hear a version from them about what happened.  Let

24  me tell you that in their version of events

25  something different occurred on March 31st.  And

1    obviously, one of the things for you determine is

2    what really happened on that day.  You might hear a

3    couple of things from them and from other people in

4    this case.

5           The defendants might tell you that

6    there's something in the prison called nuisance

7    contraband.  And you'll hear what that is.

8    Nuisance contraband doesn't mean weapons.  It

9    doesn't mean, you know, illegal drugs, illicit

10   substances like we would think about.  Nuisance

11   contraband means when an inmate has something

12   they're not supposed to have, like food, expired

13   medication, like expired antihistamines, extra

14   blankets, extra clothing, things like that.  And

15   you might hear that part of what the defendants

16   were doing on March 31st was to look for something

17   called nuisance contraband.

18          You might hear that part of the reason

19   for what the defendants did on March 31st was to

20   give cadets at the training academy practice, that

21   the cadets were there to train, to learn how to put

22   on handcuffs, to learn how to do strip searches, to

23   learn how to do shakedowns.

24          You might hear that what happened on

25   March 31st was part of an effort to protect the

security of Lincoln Correctional Center.

But when you hear the evidence in this case, we ask you to consider this:  In a strip search, when a person is forced to squat down in front of someone else and to show not just their naked body but intimate parts of their body, that's one of the most intimate things really that a government can ask a person to do in front of a government employee.  And the plaintiffs aren't here because they think that that is never appropriate.  They're not here because they think that they have some right to have nuisance contraband.  They're not here because they think that security in a prison isn't important. They're not here because they don't think the officers need to be trained.  They're here because what happened on March 31st, 2011, was different. It was degrading, humiliating.  It was painful physically and painful psychologically for these women.

You're going to hear the evidence in the case, and as the finders of fact, it will be up to you to decide what happened.  But we're confident that as you hear this evidence over the next several days, as you consider the evidence,

1    that you will make a finding that these defendants

2    violated these women's Eighth Amendment rights and

3    that they are liable.

4              Thank you very much.

5              THE COURT:  Thank you, Ms. Thompson.

6              Very well.  And now to the defendants.

7    Ms. Barnes, you may proceed with your opening.

8              MS. BARNES:  Thank you.  May it please

9    the Court.

10             THE COURT:  It does.

11             MS. BARNES:  Members of the jury,

12   Counsel.

13             This is a case about whether these six

14   men and women supervised the strip search that you

15   just heard about in March 2011 at Lincoln

16   Correctional Center and purposefully permitted the

17   correctional officers and cadets under their

18   supervision to harass and humiliate the women they

19   were required to search.  Every single one of these

20   men and women are going to tell you that one of the

21   centerpieces of their training is to respect the

22   dignity of inmates under circumstances that can be

23   embarrassing and uncomfortable.

24             You're going to hear a lot of evidence

25   from these correctional professionals about what is

1    necessary to maintain the safety and security of a

2    prison.  And managing a prison that houses inmates

3    that have been convicted of serious crimes requires

4    control of contraband.  And it requires control of

5    contraband under a number of different settings.

6                Ms. Tara Thompson advised that these

7    women had experienced strip searches before and

8    they were dismayed by this strip search.  These men

9    and women are going to tell you why that strip

10   search in the way that it took place in a group was

11   necessary for the safety and security of Lincoln

12   Correctional Center.

13               Now, even a women's prison houses

14   inmates who have been convicted of murder and other

15   serious crimes.  And they hide materials they

16   aren't supposed to have.  They hide it where they

17   live and where they sleep, and they hide it on

18   their bodies.  And finding this requires -- this

19   contraband requires, as you heard, a procedure

20   called a shakedown and it sometimes requires strip

21   searches.  These procedures aren't pleasant for

22   inmates and they're embarrassing for both parties.

23   But the evidence is going to show you why it is

24   important that these types of measures are taken.

25   They are mandated by the need to maintain security.

1        And this trial is about whether these

2   men and women presided over what the plaintiffs

3   would have you believe was a free-for-all,

4   unbounded by any respect for these inmates'

5   dignity.  And the evidence is going to show and

6   these men and women are going to tell you that it

7   was not.

8        Melody Hulett was the prison warden.

9   Russ Reynolds was the assistant warden.  Troy Dawdy

10  was the head of the tac team you heard about.

11  Russell Craig was part of the tac team.  And Alan

12  Pasley and Renee Hatfield are in -- were in charge

13  at that time of training and they were on the

14  scene.

15        Ms. Hatfield will explain to you that

16  she was in charge of these cadets that the

17  plaintiffs accuse of hurting them and humiliating

18  them, and she watched them.

19        They're going to provide you the facts

20  that will help you understand why one of their

21  paramount concerns is safety and security, not only

22  of the correctional officers but of the inmates.

23  And they're going to show you that these men and

24  women go through extensive training in prison

25  safety and security.  And one of the primary issues

1   they train on is maintaining professionalism.  And

2   there's a common phrase that approach determines

3   response.  And what that means is they are taught

4   that the correctional officer's approach to the

5   inmates determines the response that they receive

6   from the inmates.  And all six of these people will

7   explain to you that this means new cadets are

8   trained that their approach to an inmate determines

9   the response they're going to get.  This includes

10  during strip searches.

11              These searches, the facts are going to

12  show you that they are uncomfortable but they are a

13  fact of life in the prison setting, and sometimes

14  it cannot be avoided that they be done in groups.

15  And each one of these men and women will tell you

16  what was taken -- what steps were taken to ensure

17  that the searches were done with every degree of

18  dignity that could possibly be afforded them.

19              They're conducted on a regular basis

20  because inmates feel free to hide razor blades,

21  homemade weapons.  They harbor medication that they

22  use as barter.  They possess extra items such as

23  blankets that can be used to fashion ropes, escape

24  over a barbed wire fence, or rolled up to make it

25  look as if someone's sleeping in the bed.  That's

1    why the shakedowns have to occur.  And sometimes,

2    as the facts are going to show, that they hide

3    contraband on their bodies.  That is what

4    necessitates the strip search.

5                These correctional professionals will

6    give you the facts on why prisoners don't get to

7    demand that prison officials notify them in advance

8    that a shakedown is going to take place or a strip

9    search or demand that such a shakedown or a strip

10   search be done in the middle of the afternoon at a

11   time that's convenient for them.  They will tell

12   you why that would give prisoners an opportunity to

13   hide or discard the contraband that's the very

14   purpose of the search.

15               This search had a reason.  You will

16   hear that evidence that contraband was indeed

17   recovered during this shakedown.  And the loss of

18   privacy that occurs during a strip search is one of

19   the necessary incidences of prison life.  These --

20   our defendants will tell you that if anything had

21   happened the way that the plaintiffs claim it had

22   happened these supervisors would have put a stop to

23   it.

24               You'll see pictures of the gym where

25   the strip searches took place and you'll see how

1    the inmates were taken to a bathroom off the gym

2    and another room used as a beauty shop.  They were

3    large rooms.  They were not packed in there like

4    sardines.  A large curtain was put in front of the

5    bathroom and the opening in the gym where the

6    searches took place so those not involved in the

7    actual search could not see in.  The door to the

8    room used as a beauty shop where the searches took

9    place was closed.  Only women cadets and

10   correctional officers conducted the search.

11              And you've probably concluded that this

12   trial is going to be about who's telling the truth

13   about how the shakedown and the strip searches were

14   conducted.  And the facts are going to show that

15   these supervisors, one, did not conduct the

16   shakedown and search for any other purpose but to

17   maintain the safety and security of Lincoln

18   Correctional Center; two, they did not depart from

19   the training that is designed to ensure that these

20   uncomfortable and embarrassing procedures are done

21   with professionalism; and three, they did not

22   permit correctional officers, the tactical team,

23   the cadets, anyone involved to jeer and taunt these

24   women, make fun of them, humiliate them, or in any

25   way conduct this search for no penological reason.

1          And when you hear all of the evidence

2    and you have a chance to go back to the jury room

3    and discuss what you've seen and heard, we hope

4    that you'll conclude that these correctional

5    officers did not condone the kind of conduct that

6    the plaintiffs claim happened and return a verdict

7    in their favor.

8          Thank you.

9          THE COURT:  Thank you, Ms. Barnes.

10         All right, ladies and gentlemen, you've

11   heard the opening statements of both the plaintiffs

12   and the defendants, and we will now proceed to the

13   case in chief on the part of the plaintiffs.

14         And you may call your first witness,

15   Mr. Field.

16         MR. FIELD:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MR. FIELD:  Good morning, ladies and

19   gentlemen.

20         Your Honor, the first witness is

21   Ms. Delores Henry.

22         THE COURT:  Very well.  Ms. Henry, if

23   you would stand and come right up over here.  Stop

24   right there and raise your right hand and Madam

25   Clerk will administer the oath.

DELORES HENRY,

of lawful age, produced, sworn, and examined on

behalf of the Plaintiffs, testifies and says:

THE COURT:  Please right up here and

have a seat.  And if you will lean right into that

microphone so that everybody can hear.

THE WITNESS:  Okay.

THE COURT:  All right, Mr. Field.

MR. FIELD:  Thank you, Your Honor.

DIRECT EXAMINATION

QUESTIONS BY MR. FIELD:

Q.  Good morning, Ms. Henry.  Can you

introduce yourself to the jury and please spell

your first name?

A.  Hi.  Delores Henry, D-e-l-o-r-e-s.

Q.  Ms. Henry, are you one of the class

representatives in this case?

A.  Yes, sir.

Q.  Where do you currently live?

A.  Peru, Illinois.

Q.  How long have you lived in Peru?

A.  Twenty-five years.

Q.  And are you currently employed?

A.  No, sir.

Q.  And why is it that you're not currently

1    employed?

2            A.    Disability, small cell lung cancer,

3    non-small-cell lung cancer.

4            Q.    When were you diagnosed with cancer?

5            A.    Three and a half years ago.

6            Q.    And I know Ms. Thompson introduced you

7    earlier, but how old are you?

8            A.    Sixty-one.

9            Q.    So, how old were you during the time of

10   the strip search in March 2011?

11           A.    Fifty-six.

12           Q.    And in March 2011 were you

13   incarcerated?

14           A.    Yes, sir.

15           Q.    Where were you incarcerated?

16           A.    Lincoln Correctional.

17           Q.    Okay.  And what were you incarcerated

18   for at Lincoln Correctional Center?

19           A.    Aggravated DUI.

20           Q.    And when were you released?

21           A.    December of --

22           Q.    To the best of your knowledge.

23           A.    -- '10 -- '12.  '10 I think.

24           Q.    Since your release from Lincoln

25   Correctional Center for the aggravated DUI that you

1   just mentioned, have you been back to prison for

2   any reason?

3          A.   No, sir.

4          Q.   And do you recall in March 2011

5   approximately how long you'd been incarcerated at

6   Lincoln Correctional Center?

7          A.   About four months.

8          Q.   Okay.  And what housing were you housed

9   in at Lincoln Correctional Center in March 2011?

10         A.   2B.

11         Q.   Okay.  And was Unit 2B divided into

12  dorms?

13         A.   Yes.

14         Q.   Okay.  And how many dorms were there in

15  Unit 2B?

16         A.   Five.

17         Q.   Okay.  And did those dorms -- were they

18  labeled any particular number or letter or anything

19  like that?

20         A.   Yeah.  1 through 5 was on one side and

21  5 through 10 was on the other.

22         Q.   Okay.  And what number dorm were you

23  in?

24         A.   9.

25         Q.   Okay.  And how many women approximately

1  were in each dorm?

2       A.   Twenty.

3       Q.   Okay.  And so, if there were 20 women

4  in each dorm, Unit 2B, fair to say, had about a

5  hundred women in it?

6       A.   Yes, sir.

7       Q.   Okay.  I'm not sure if you're able to

8  remember, but the sort of age range of the women

9  that were housed in Unit 2B with you, do you have

10 any memory of that?

11      A.   Assorted ages.  Younger is 17,

12 18-year-old girls, up to 50, 60, 70.

13      Q.   Okay.  In March 2011, when you were at

14 Lincoln Correctional Center, were you employed in

15 the prison?

16      A.   Yes.

17      Q.   Okay.  And what were you -- what was

18 your job in the prison?

19      A.   I worked industry and I also did road

20 crew.

21      Q.   What is the road crew?

22      A.   The road crew is where they take you

23 out and you clean the roads and you do the parks

24 and the festivals and clean up around the town.

25      Q.   Okay.  Are you required to leave the

1  prison to do that?

2          A.   Yes, sir.

3          Q.   Okay.  And what about your job in the

4  industry, what did you do there?

5          A.   In industry I did computer chairs and

6  couches and stuff for Department of Corrections and

7  the state.

8          Q.   Okay.  And that was something that you

9  did within the prison?

10         A.   Yes.  Well, it was outside the gate,

11  but it was industry from the prison, yes.

12         Q.   Okay.  So, you had to leave -- you had

13  to go outside the gate to be able to do that job?

14         A.   Yes.

15         Q.   Okay.  You heard Ms. Thompson talk

16  about a strip search from March 31st, 2011.  Were

17  you strip-searched during that mass strip search as

18  well?

19         A.   Yes, sir.

20         Q.   Okay.  I would like to ask you some

21  questions about that, if I could.

22              Going back to March 31st, 2011, do you

23  recall what time it was when you woke up that

24  morning?

25         A.   I got up probably early because I went

1    to industry that day.  They brought us back from

2    industry about 8:30 to perform this search.  We all

3    got brought back in in order to be -- the whole

4    unit to be searched.  Anybody that was on that unit

5    came back in.

6            Q.   Okay.  So, in terms of the time you

7    would have gotten up that morning, what time did

8    you have to be at your industry job?

9            A.   I'm not real positive on exact time.

10   7, 7:30.

11           Q.   Okay.  And you're saying that they

12   brought you back from your industry job to the

13   unit --

14           A.   Yes.

15           Q.   -- in order to do the shakedown --

16           A.   Yes.

17           Q.   -- and strip search; is that correct?

18           A.   Yes, sir.

19           Q.   Okay.  And that you believe was around

20   8:30?

21           A.   Yes, sir.

22           Q.   Okay.  When you were brought back to

23   Unit 2B, how long was it before the shakedown

24   started?

25           A.   To the best of my knowledge, I can't

1   remember them kind of things, but within an hour or

2   so I'd say it started.

3           Q.   Okay.

4           A.   Fairly soon after we got back.

5           Q.   Okay.  And can you describe sort of how

6   it started?

7           A.   Heard running down the hall, Orange

8   Crush screaming, come to the units, told us all to

9   get in line in rows of two.  And when the women

10  would say something like, "What's going on?  Why

11  are we -- why are you doing this?"  "Shut up or

12  we'll take you to seg."  They would cuff two women

13  at a time, walk them down to the dayroom, come

14  back, take two more women, strip search them -- I

15  mean not strip search them.  Cuff them, take them

16  to the dayroom, and then just keep continuing till

17  they cleared every unit out.

18          Q.   Sure.  You mentioned that Orange Crush

19  came in.  Can you describe what they were wearing?

20          A.   Completely in orange suits, masks,

21  batons.

22               MR. FIELD:  Your Honor, I have a photo

23  that's one of the exhibits this case.  May I

24  approach?

25               THE COURT:  You surely may.

1           MS. McNAUGHT:  Can I see it, first?

2           MR. FIELD:  It's Exhibit 203.

3      Q.   Ms. Henry, would this photo aid you in

4  your testimony?

5      A.   Yes, sir.

6           MR. FIELD:  Permission to publish this

7  exhibit, Your Honor?

8           THE COURT:  Any objection here?

9           MS. McNAUGHT:  No objection.

10          THE COURT:  Very well.  It may be

11  published.

12          MR. FIELD:  Thank you, Your Honor.

13     Q.   Are you able to see that, Ms. Henry?

14     A.   Yes, sir.

15     Q.   Okay.

16          MR. FIELD:  Your Honor, it doesn't look

17  like the monitor here is on.

18          THE COURT:  Beg pardon?

19          MR. FIELD:  It doesn't look like the

20  monitor for the jury is turned on, so we're going

21  to get that turned on before --

22          THE COURT:  Yeah.  We need to get that

23  -- there we go.  All right.  That's working.

24          Now, is everybody else's monitor -- is

25  it showing the picture?

1           MS. McNAUGHT:  Yes, Your Honor.

2           MS. THOMPSON:  Yes, Your Honor.

3           THE COURT:  All right.  It's awfully

4    dull.

5           MR. FIELD:  Sorry about that, Your

6    Honor.  It's not the greatest photo in the world.

7    Does that help at all?

8           THE COURT:  Is that a dull photo?

9           MR. FIELD:  Yes.

10          THE COURT:  All right.  We'll go with

11   it as it is then.

12          MR. FIELD:  Okay.  Thank you.

13       Q.  Are these, to your knowledge, members

14   of the Orange Crush as you recall them, Ms. Henry?

15       A.  I can't see their faces, but --

16       Q.  I mean in terms of what they were

17   wearing.

18       A.  Oh, yes, sir.

19       Q.  Okay.  So, the Orange Crush that came

20   into Unit 2B on March 31st, 2011, is this the sort

21   of gear that they were wearing?

22       A.  Yes, sir.

23       Q.  They had the orange jumpsuits on?

24       A.  (Nodded head up and down.)

25       Q.  Yes?

1          A.   Yeah.   They've been -- they came in the

2     prison a few times.   That wasn't the only time.

3          Q.   Right.   But on March 31st, 2011, were

4     they wearing --

5          A.   Yes.

6          Q.   -- those orange jumpsuits?

7          A.   Yes.

8          Q.   Did they have the sort of riot gear

9     helmets?

10          A.   Yes.

11          Q.   The batons?

12          A.   Yes.

13          MR. FIELD:   Your Honor, since it is

14     such a dull photo, permission to sort of pass it

15     around the jury box?

16          THE COURT:   Yeah, sure.   No problem

17     with that.

18          MR. FIELD:   Any objection?

19          THE COURT:   That's all right.   Go

20     ahead.   Go ahead.

21          MR. FIELD:   Thank you, Your Honor.

22          Q.   How many members of the Orange Crush

23     came into Unit 2B that morning, Ms. Henry?

24          A.   I never counted.   I didn't take time to

25     count everybody there.   I'd say there was five or

1    six, seven.

2         Q.   Okay.

3         A.   The normal amount.  There's only a

4    certain amount.  They all come and it's always the

5    same ones.

6         Q.   Okay.  And what were they doing that

7    they came into Unit 2B?

8         A.   They came in to handcuff us up and take

9    us to the gym.

10        Q.   Okay.  But on their way into the unit

11   were they saying anything, were they doing

12   anything, or did they just march right in?  How did

13   that work?

14        A.   Marched --

15             MS. McNAUGHT:  Objection, Your Honor,

16   to the leading nature.

17             THE COURT:  Yeah, it is.  I'll sustain

18   that.

19             MR. FIELD:  All right, Your Honor.  I

20   can rephrase.

21             THE COURT:  Ask her how they came in.

22             MR. FIELD:  Sure.

23        Q.   How did Orange Crush come in that

24   morning, Ms. Henry?

25        A.   After we were brought back from work,

1   we were told to go to our units.  I already knew

2   they were coming.  I seen them dressed and come in

3   when I come in from work.  But they just stormed

4   the unit and started dorm by dorm just taking us

5   out.

6           Q.   Okay.  And were they accompanied by

7   anybody else?

8           A.   Officers, Assistant Warden Reynolds,

9   Dawdy, Craig -- Officer Dawdy, Officer Craig.

10          Q.   Officer Dawdy, was he a member of

11  the --

12          A.   Orange Crush.

13          Q.   -- Orange Crush?

14               Officer Craig, was he a member of the

15  Orange Crush?

16          A.   I'm not sure.

17          Q.   Okay.  Were there cadets there as well?

18          A.   Yes.

19          Q.   Do you recall how many cadets there

20  were?

21          A.   No.

22          Q.   Okay.  Did Orange Crush members or any

23  of the officers that came into Unit 2B that

24  morning, before they started handcuffing women, did

25  they say anything to you?

1    A.  Yeah.  "Get in line, all of you, two at

2  a time.  Row up, just like the animals you are, two

3  at a time.  Let's go."  And then if you tried to

4  ask them something or say something, they told you

5  to shut up, go to the dayroom, or they'll take you

6  to seg.

7    Q.  Okay.  And in terms of getting women

8  handcuffed, how did they -- how did that work?  How

9  did they do that?

10    A.  We were lined up down through the dorm

11  two people deep, and as they walked two down to the

12  dayroom, the next two would move up and they would

13  get handcuffed.  So, they handcuffed two at a time.

14    When they were cuffing me, I asked for

15  another set of handcuffs because I had a torn rotor

16  (sic) cuff, which I still have, in my shoulder, and

17  I asked the guy for another set of cuffs because he

18  was hurting my arm, and he said no.

19    MS. McNAUGHT:  Objection to what he

20  said.  He's not a defendant.

21    THE COURT:  Sustained.

22    Q.  Okay.  Were any of the officers that

23  you just mentioned as recalling being there, were

24  they giving instructions to the other officers and

25  cadets?

1        A.   Were the officers?

2        Q.   Yeah.  Any of the people that you

3   remember being there, was there anyone who was

4   instructing others on what to do?

5        A.   Well, I'm sure, yeah, they were

6   telling, you know --

7             MS. McNAUGHT:  Objection.

8        A.   Okay.  I don't know how to answer the

9   question.

10            THE COURT:  Ms. McNaught, you'll have

11  to pull that microphone in close to you there.

12            MS. McNAUGHT:  It wasn't on.  Sorry,

13  Judge.

14            THE COURT:  Yeah.  Okay.  It's on now?

15            MS. McNAUGHT:  It is.

16            THE COURT:  Repeat what you said.

17            MS. McNAUGHT:  I objected.

18            THE COURT:  All right.  Fine.

19            MR. FIELD:  The basis for the objection

20  is what I'm waiting for.

21            THE COURT:  What's your basis?

22            MS. McNAUGHT:  Hearsay.

23            THE COURT:  I'll sustain.  Let's back

24  up and get it cleared up.

25            MR. FIELD:  Sure.  I can move on, Your

1    Honor.  That's fine.  I think we're -- I think

2    we're fine on that.

3              THE COURT:  Okay.

4              MR. FIELD:  Okay.

5              THE COURT:  Move on.

6         Q.  Did you say anything to any of the

7    officers as they came in?

8              MS. McNAUGHT:  Objection, hearsay.

9              MR. FIELD:  I'm asking if she --

10             THE COURT:  No, no, I don't think so.

11   That's overruled.  She may answer.

12        A.  I asked them what was going on and why

13   were they doing this to us.

14        Q.  And what was the response?

15        A.  Shut up.

16             MS. McNAUGHT:  Objection.  She has --

17   there's no foundation -- there's no foundation for

18   who said it.  If it's a non-party, it's hearsay.

19             THE COURT:  You're correct in that.

20             MR. FIELD:  Your Honor --

21             THE COURT:  Let's understand now, we're

22   talking about a whole group of people.  This is not

23   just a one-on-one type of situation.  So, let's be

24   as specific as we can as to who was talking to her

25   and who she was talking to as best we can do it

1   now.  Now, we know that there are a bunch of orange

2   suits around.

3           MR. FIELD:  Right.

4           THE COURT:  And we have a number of

5   inmates.  So, this is not -- this is not just a

6   one-on-one thing.  So, let's get the context in

7   here.

8           Go ahead.

9           MR. FIELD:  Okay.  And obviously, Your

10   Honor, the Orange Crush were wearing, you know,

11   masks and things like that, so I think there's some

12   leeway that needs to be given in terms of

13   identifying the specific individual.  But we can

14   deal with that when we get to it.

15           THE COURT:  Well, we may be to it right

16   now.  So, let's -- let's get the ground rules

17   understood, Counsel.  This is not a simple

18   one-on-one type of situation, as I understand it.

19   So, I'm going to be a bit lenient in how we bring

20   this in.  But we're going to have to be better than

21   what you've got --

22           MR. FIELD:  Sure.

23           THE COURT:  -- Mr. Field, so far.

24   We've got to get some identification and know.  We

25   can't just be talking about they.

1          MR. FIELD:  Sure.

2          THE COURT:  Okay?

3          MR. FIELD:  I'll ask specific

4    defendants -- if she overheard a specific defendant

5    say anything to the group.

6          THE COURT:  Specific defendant and

7    identify anybody if we can.

8          MR. FIELD:  Sure.

9     Q.   Ms. Henry, you testified that Assistant

10   Warden Reynolds was there that morning; is that

11   correct?

12    A.   Yes, sir.

13    Q.   Okay.  And did you overhear Assistant

14   Warden Reynolds say anything to the women in Unit

15   2B while he was there that morning?

16    A.   Yes.  They -- him and Officer Dawdy was

17   telling us to shut up, don't say a word or we were

18   going to be taken to seg.

19    Q.   Okay.

20    A.   Anytime we asked what was going on.

21    Q.   Okay.  Now, you testified that you were

22   handcuffed at a certain point; correct?

23    A.   Yes.

24    Q.   Okay.  After you were handcuffed, what

25   happened?

1      A.   We were taken to the dayroom, stood

2   there for hours -- seemed like hours, waiting for

3   them to cuff up the whole unit.

4      Q.   Okay.  And when you say you were

5   standing in the dayroom, where in the dayroom were

6   you standing?

7      A.   Facing the wall.

8      Q.   Okay.  And you said you were waiting

9   for the rest of the unit to be cuffed and brought

10  into the dayroom?

11     A.   Yes.

12     Q.   Okay.  And how long -- again, are you

13  able to approximate how long you were waiting in

14  the dayroom?

15     A.   Couple hours, an hour.  An hour or two.

16     Q.   Okay.  And were you handcuffed the

17  entire time?

18     A.   Yes.

19     Q.   And were you forced to stand the entire

20  time?

21     A.   Yes.

22     Q.   Okay.  You mentioned earlier that you

23  were threatened with seg.  Can you just explain for

24  the jury what that is?

25     A.   When we were walking from the housing

1    unit to the gym, we were all cuffed and walking in

2    rows of two, and every once in a while someone

3    would say, "What's going on?"  I even asked what's

4    going on again.  And they were talking vile

5    language at us.  It's hard to explain who said what

6    because they -- most of them had masks on.  How do

7    you know where the voices were coming from?  But we

8    were told to shut up, walk forward in lines of two

9    and don't say nothing or we'll be taken to seg.

10        Q.   Okay.  But when you say seg, what are

11   you referring to?

12        A.   Segregation where they put you in -- I

13   never made it to seg when I was there, but my -- my

14   thought of seg is --

15             MS. McNAUGHT:  Objection, Your Honor.

16             THE COURT:  Sustained.

17             MR. FIELD:  That's fine.

18        Q.   When they were done with cuffing the

19   women and bringing them to the dayroom, what did

20   they do next?

21        A.   Then we were all marched to the gym

22   where we stood facing the wall, cuffed behind our

23   back, and strip-searched.

24        Q.   Your Honor, may I approach with Exhibit

25   201, which is a floor plan of the gymnasium?

1          THE COURT:  Surely.

2          MS. McNAUGHT:  No objection, Your

3 Honor.

4          THE COURT:  Very well.

5     Q.  Ms. Henry, will this exhibit aid you

6 with your testimony here this morning?

7     A.  Yes, sir.

8     Q.  Okay.

9          MR. FIELD:  Permission to publish, Your

10 Honor.

11          THE COURT:  You may.

12     Q.  Does this floor plan --

13     A.  Looks like the gym.

14     Q.  Okay.  It's not to scale obviously;

15 correct?

16     A.  Correct.

17     Q.  And you weren't asked to review any

18 sort of architectural drawings or anything like

19 that; correct?

20     A.  No.

21     Q.  But this is the gym as you remember it?

22     A.  Yes.

23     Q.  Are you able to point to the screen for

24 the jury in terms of where -- when you were marched

25 into the gym where you were marched into, like what

1   door you came into?  If you want, I can make that

2   bigger.

3        A.   It seems backwards to me.  I know the

4   bathrooms were here and I think the front door

5   coming in is right here.

6        Q.   Can you -- if you actually point to the

7   screen, you can make a mark on it.

8        A.   I did.  This is coming in.  Unless

9   we're backwards on the screen.

10       Q.   Oh, sure.  Is it easier for you if I do

11   it this way?  Does that --

12       A.   Does that say beauty shop and --

13       Q.   Here, I can make that bigger for you.

14       A.   Can I have my glasses, please?

15       Q.   Sure.  There you go.

16       A.   Thank you.

17       THE COURT:  Now, this is perpendicular.

18   Can you make it horizontal?

19         MR. FIELD:  I sure can.

20       THE COURT:  Can we see this better?

21       A.   Yeah.  It needs to be turned completely

22   around.

23       Q.   Like this?

24       A.   There you go.

25       THE COURT:  Now drop it down just a

1  smidge.

2          Q.   There we go.

3          A.   How do I get rid of the marks that are

4  there already?  Clear all.

5          Q.   I'm going to try to make this as big as

6  possible since we've got it this way.

7          THE COURT:  There we go.

8          A.   This is the door coming into the gym.

9          Q.   Okay.  And that's where you were

10 marched into?

11         A.   Yes.

12         Q.   Okay.  And when you were marched into

13 the gym through that door, what happened?

14         A.   We were all lined up down through here

15 in rows.

16         Q.   Okay.  Rows of how many?

17         A.   I'm not exactly sure.  I didn't start

18 counting rows, but there was quite a few rows.

19         Q.   Okay.

20         A.   Going all the way back toward the gym.

21 The bleachers are over here.  Industry no one used.

22 But the beauty parlor right here, there was women

23 being searched in there too.

24         Q.   When you were marched into the gym in

25 rows, you know, how long were you asked to stand

1   there?

2        A.   We had to stand there -- after they

3   brought 2B over, we had to stand there until they

4   went and got 4 and brought them over.

5        Q.   Okay.  Can you estimate approximately

6   how much time you spent standing in the gym?

7        A.   Through the whole ordeal or just while

8   we were waiting to be strip-searched?

9        Q.   Waiting to be strip-searched.

10        A.   Couple hours.

11        Q.   Okay.

12             THE COURT:  How long?

13        A.   A couple of hours.

14             THE COURT:  Thank you.

15        Q.   And you had to stand the entire time?

16        A.   Yes.

17        Q.   Okay.

18        A.   Until after you got strip-searched.

19   Then you were allowed to go sit on the bleachers.

20        Q.   Okay.  The entire time that you were

21   standing in the gym did you talk to any of the

22   officers that were in the gym?

23        A.   I tried to.

24        Q.   What did you say to the officers?

25        A.   "What's going on?  How long we got to

1   stand here?  Why are we doing this?"

2         Q.  Did you get any response?

3         A.  "Shut up."

4         MS. McNAUGHT:  Objection.  No

5   foundation.  It's -- they're not parties.  It's

6   hearsay.

7         A.  All I know is we were not -- we were

8   told --

9         MS. McNAUGHT:  Objection, Your Honor.

10        THE COURT:  Wait, wait, wait, ma'am.

11   You just can't blurt out anything.

12         A.  Okay.  I'm sorry.

13        THE COURT:  You have got to wait until

14   there's a question.

15        And we're going to take care of this.

16   I agree.  We don't have any specific ID of any one

17   defendant.

18        MR. FIELD:  Sure.

19        THE COURT:  So, absolutely.  So, wipe

20   that out, disregard that, ladies and gentlemen.

21        Okay, start again, Mr. Field, and let's

22   keep it neat and clean and close.  Now, we can't

23   have these rambling explanations.

24        MR. FIELD:  Sure, Your Honor.

25         Q.  Let's take a step back to --

1          THE COURT:  Wait, wait.  I think
2    Ms. Thompson wanted to confer with you.
3          Q.   I just want to take a step back to when
4    you were standing in the dayroom.  Did -- was
5    Assistant Warden Reynolds in the dayroom at any
6    time while you were in the dayroom?
7          A.   Yes.
8          Q.   And did he say anything while he was in
9    the dayroom?
10         A.   Not that I can recall.
11         Q.   Okay.  What about Officer Dawdy, was he
12   in the dayroom at any time?
13         A.   Yes.
14         Q.   And did he say anything while he was in
15   the dayroom?
16         A.   It's been -- I can't recall.
17         Q.   Okay.  And what about -- you said you
18   were marched from the dayroom to the gym.  Did --
19   was officer -- or, sorry -- was Assistant Warden
20   Reynolds one of the individuals that marched you to
21   the gym?
22         A.   Yes.
23         Q.   And did Assistant Warden Reynolds say
24   anything while he was marching the women from 2B
25   into the gym?

1    A.   Like before, all I can remember of my

2  recollection, my memory is when we asked a

3  question, we were told to shut up.  That's all I

4  can remember is we never ever got an answer to any

5  question.

6    Q.   Okay.  And now going back to the period

7  of time that you were standing along the wall here

8  that you've sketched out on this floor plan, was

9  Assistant Warden Reynolds in the gym at any time?

10    A.   Yes.

11    Q.   And did you hear Assistant Warden

12  Reynolds say anything?

13    A.   Not that I can recall.  There was so

14  many -- too much chaos, too much to remember.  No,

15  I don't -- I can't recall anything or can tell you

16  which person said it.

17    Q.   Okay.  Do you recall if Warden Hulett

18  came into the gym at any point?

19    A.   Yes.

20    Q.   Okay.  And do you recall hearing Warden

21  Hulett say anything?

22    A.   Warden -- Warden Hulett asked Reynolds,

23  "Who approved this?"

24    Q.   Okay.  Did you overhear Warden Hulett

25  say anything else?

1        A.   She said, "Please get somebody from LTS

2    to cover the bathroom door."  Because we were being

3    strip-searched without a curtain on the door in the

4    beginning until Mrs. Hulett came in and had them

5    cover the door.

6        Q.   Okay.  And did you overhear Warden

7    Hulett ask somebody to get a curtain to cover the

8    door before or after you were strip-searched?

9        A.   After.

10       Q.   It was after you were strip-searched?

11       A.   Yes.

12       Q.   Okay.  So, during the period of time

13   that you were strip -- well, let me ask you this:

14   Were you strip-searched in the bathroom of the gym?

15       A.   Yes.

16       Q.   Can you point out --

17       A.   Yes, sir.

18       Q.   -- on the floor plan where that is?

19       A.   Right there.  I was searched in this

20   area right here.

21       Q.   Okay.  And does that bathroom have a

22   door on it?

23       A.   Yes.  This whole area right here is the

24   door.

25       Q.   Okay.  So, is that -- does it actually

1  have a physical door or is that just the

2  entranceway?

3       A.  Just the entrance, not a door.

4       Q.  Okay.

5            MR. FIELD:  Your Honor, I would like to

6  show you her a photo.  It's Exhibit 239, which is a

7  photo of that entrance to the bathroom.  Permission

8  to approach.

9            THE COURT:  Surely.

10           MR. FIELD:  Any objection to Exhibit

11  239?

12           MS. McNAUGHT:  No, I don't have any

13  objection.  Go ahead.

14      Q.  Ms. Henry, would this photo aid you in

15  your testimony here this morning?

16      A.  Yes, sir.

17      Q.  Is this a photo, Ms. Henry, of the

18  entranceway to the gym bathroom where you were

19  strip-searched?

20      A.  Yes, sir.

21      Q.  Okay.  And during the period of time

22  that you were strip-searched, was there anything

23  covering that entranceway?

24      A.  No, sir.

25      Q.  Okay.  Do you recall approximately when

1    it was when Warden Hulett came into the gym?

2          A.   A lot of the women had already been

3    strip-searched.  She came in after it already began

4    and had been going on probably I'm estimating about

5    an hour.

6          Q.   Okay.  How many of the women you think

7    were strip-searched --

8          A.   About half of our unit was done

9    already.

10         Q.   Had been already strip-searched?

11         A.   Yeah.  Because they started moving them

12   to the beauty shop.  They were searching them there

13   too.

14         Q.   Okay.  And so, how -- you think --

15   you're estimating that half of the women in your

16   unit were strip-searched in the bathroom before --

17         A.   Without a door.

18         Q.   -- without anything covering the

19   entranceway?

20         A.   Yes, sir.

21         MR. FIELD:  Okay.  Your Honor, I would

22   like to approach with a couple of additional

23   photos.

24         THE COURT:  You may.

25         MR. FIELD:  These are Exhibits 238 and

1    237.  Any objection to either of these?

2                MS. McNAUGHT:  No objection.

3                THE COURT:  Very well.

4         Q.   Ms. Henry, would this photo that's

5    marked as Exhibit 237 aid you in your testimony?

6         A.   Inside the bathroom.

7         Q.   And what about this photo?

8         A.   Inside the bathroom.

9         Q.   Okay.

10                MR. FIELD:  Permission to publish, Your

11   Honor?

12                THE COURT:  Sure, put them on.

13        Q.   Ms. Henry, is this a closer-up photo of

14   the entranceway into the gym bathroom?

15        A.   Yes, sir.

16        Q.   Okay.  And that's the bathroom that you

17   were strip-searched in; correct?

18        A.   Yes, sir.

19        Q.   Okay.  And is this a photo of the

20   interior of that same bathroom?

21        A.   Yes, sir.

22        Q.   Okay.  Can you indicate on this photo

23   where -- well, strike that.

24                Let me ask you this first:  When it

25   came time for you to be strip-searched, you were

1  brought into this bathroom; correct?

2      A.   Yes, sir.

3      Q.   How many other -- well, were you

4  brought in there alone?

5      A.   No, sir.

6      Q.   How many other inmates were you brought

7  in there with?

8      A.   I couldn't be positive about my answer,

9  but I know we were so crowded we were touching.

10  I'd say four to five women at a time.

11      Q.   Okay.  And are you able to indicate --

12  well, actually, were there officers in there as

13  well?

14      A.   Yes.

15      Q.   Were there Orange Crush members in

16  there as well?

17      A.   Yes.

18      Q.   Were there cadets in there as well?

19      A.   Yes.

20      Q.   Are you able to estimate the number of

21  officers, cadets, and Orange Crush that were --

22      A.   Three or four people where they were

23  searching.

24      Q.   Okay.  Are you able to indicate on this

25  photo where you were asked to stand when you were

being strip-searched?

      A.   Right about there.

      Q.   Okay.  And which direction were you facing?

      A.   The mirrors.

      Q.   And when you say the mirrors, do you mean the --

      A.   Above the sink there.

      Q.   Okay.  Now I'll ask you to do the same thing for Exhibit 238.  Can you indicate where on that photo you were asked to stand?

      A.   I was standing about right there.

      Q.   Again, facing the mirrors above the sink?

      A.   Yes, sir.

      Q.   Okay.  When you were brought into the gym bathroom with these other women, what happened next?

      A.   We were told to strip down, spread our cheeks and squat and cough.

      Q.   Okay.  When you say you were told to strip down, which articles of clothing were you asked to remove?

      A.   You had to remove all your clothing. If you had a sanitary napkin, you had to take that

1  out.  If you had a tampon, you had to take that

2  out.  And then you had to squat and cough until

3  they decided you had done it probably.

4        Q.   Now, when you say you had to strip off,

5  were you completely naked --

6        A.   Yes, sir.

7        Q.   -- when you took your clothes off?

8             Okay.  Had a number of women already

9  been strip-searched in the bathroom before you were

10 brought in there?

11       A.   Yes, sir.

12       Q.   Are you able to estimate about what

13 percentage of your unit had been strip-searched in

14 there?

15       A.   About 20 percent.  20 percent of us.  I

16 was fairly close to the front of the row before I

17 -- I was getting -- I got there -- my time was

18 right before the curtain went up.

19       Q.   Okay.

20       A.   So, it had been about an hour.

21       Q.   Okay.  And at what point -- well, let

22 me ask you this:  When you were marched into the

23 bathroom, were you still in handcuffs?

24       A.   Yes.  No.  Well, they took the

25 handcuffs off so you could get undressed.

1     Q.   Okay.  So, did they do that just

2  outside the bathroom or --

3     A.   Yeah.

4     Q.   -- in the bathroom?

5     A.   Because you got to spread them and

6  cough, and you can't do that with handcuffs on.

7     Q.   Okay.  So, they took them off before

8  you went into the bathroom?

9     A.   Yes.

10     Q.   Okay.  And you were asked to remove all

11  of your clothing?

12     A.   Yes.

13     Q.   And then what did you do with your

14  clothing once you removed them?

15     A.   Set them on the floor.

16     Q.   What was the condition of the floor

17  when you set your clothes down on it?

18     A.   It was hard to avoid feces, urine, and

19  blood on the floor.  Because when people would have

20  -- and you were so close together, there was other

21  people's fluids on the floor, and it was hard to

22  avoid them.

23     Q.   Okay.  Had you been in this bathroom

24  previous to the strip search?

25     A.   Yes, sir.

1     Q.   Okay.  And was the state of the

2   bathroom previously the same as what you've just

3   described or was it different on March 31st, 2011?

4     A.   It was different on March 31st.  They

5   kept the bathroom -- they had -- the prison was

6   clean.

7     Q.   Okay.  And so were you forced to put

8   your clothing in the bodily fluids of other

9   inmates?

10     A.   I'm not sure what I set them on top of.

11   You were just told to take your clothes off, set

12   them down, bend, squat, spread your cheeks and

13   cough.  I don't know what got on them.  We were

14   just told to go get dressed and go sit down.

15     Q.   Were you forced to stand in other

16   inmates' bodily fluids when you were --

17     A.   Of course.

18     Q.   Okay.

19     A.   Yes, sir.

20     Q.   When you say that you were asked to

21   squat and cough, can you describe for the jury what

22   that consists of?

23     A.   That means you grab your buttocks and

24   you pull your buttocks apart and you bend over and

25   squat and cough in case anybody has contraband

1    inside of them, so it can come out.

2         Q.   When you say you have to squat, how low

3    do you have to squat?

4         A.   To the ground.  You have to squat and

5    cough and you got to bend over and let them look up

6    your vagina and anus.

7         Q.   And were you asked -- how many times

8    were you asked to do that?

9         A.   Twice.

10         Q.   Okay.  And why were you asked to do

11    that twice?

12         A.   Because the girl fell on me next to me.

13    We were so close in there that I didn't do it to

14    her -- I didn't do it good enough.

15         Q.   Can you estimate approximately how much

16    time you spent in this bathroom naked?

17         A.   Fifteen minutes.

18         Q.   Okay.  Besides the squatting and

19    coughing, what else did the strip search consist

20    of?  Did you have to -- for example, did you have

21    to show other parts of your body?

22         A.   Yeah.  You had to pick up your hair.

23    You had to open your mouth, let them look under

24    your tongue.  It was a complete search of your

25    body.

1         Q.   Okay.   Did you see any of the women who

2 were in the bathroom with you being strip-searched

3 disobeying any of the orders that they were given?

4         A.   No.

5         Q.   Do you recall, Ms. Henry, the names of

6 any of the officers that were in the bathroom with

7 you during your strip search?

8         A.   I can't remember the pronunciation of

9 her name.   She was an officer.   She could have even

10 been Orange Crush.   Her name was Crup (phonetic) or

11 Curup (phonetic), something like that.

12         Q.   Okay.

13         A.   She was in there, was making derogative

14 statements.   She came out with a ski mask across

15 her nose and called us all --

16         MS. McNAUGHT:   Objection.   She's not a

17 defendant.

18         MR. FIELD:   She's identified the

19 individual, Your Honor.

20         THE COURT:   Yes.   Let's identify her.

21         MR. FIELD:   She's identified her as

22 officer --

23         A.   Curup (phonetic).

24         THE COURT:   Cruit (phonetic)?

25         A.   Officer Curup(phonetic).

1    MR. FIELD:  She's saying Curup

2    (phonetic).

3        THE COURT:  All right.  Let's get the

4    name.  We've got to have identification.

5        MR. FIELD:  She said it's Officer Curup

6    (phonetic), Your Honor.  That's to the best of her

7    recollection.

8        THE COURT:  How do you spell it?  Any

9    idea, folks?

10       A.   C-u-r-u-p.  Curup.  Curup.  Crew --

11   C-r-u-p, "crew up".

12       THE COURT:  C-r-u-p.  All right.  I

13   think that's -- that's adequate.

14       MR. FIELD:  She can testify to it?

15       THE COURT:  She can.

16       MR. FIELD:  Okay.

17       Q.   Did the officer that you've just

18   identified say anything to the women that were,

19   including yourself while you were in the bathroom,

20   being strip-searched?

21       A.   Yeah.  She said to another officer that

22   she thinks -- "Are you sure you're ready for this?

23   Because this is what you're going to have to go

24   through all day, the way these women smell."

25   Because she came out with a mask across her face

1   saying that we stunk.

2           Q.   Okay.  Did she say anything else to

3   your recollection?

4           A.   Just that we stunk.  These women stink.

5           Q.   Okay.  During the time that you were

6   strip-searched in the bathroom, were there male

7   corrections officers in the gym?

8           A.   Yes, sir.

9           Q.   Okay.  And you could see them?

10          A.   I could see them in the gym and I could

11  see the officers' faces in the mirrors.  While I

12  was looking in the mirrors, I could see the

13  officers' faces looking into the mirrors.  And I

14  could also look out of the hall -- the entryway

15  there and they were all over the gym.

16          Q.   Okay.  And you could see male officers

17  looking in while you were being strip-searched?

18          A.   Yes.

19          Q.   Okay.  The male officers that were in

20  the gym at that time, do you recall any of the

21  officers specifically?

22          A.   Officer Craig, Reynolds, Dawdy, Warden

23  Hulett was there for a little while.

24          Q.   Do you recall Officer Reynolds saying

25  anything while he was in the gym?

1          A.   No, I can't say that I do recall, it's

2    been so long.

3          Q.   What about Officer Craig, do you recall

4    Officer Craig saying anything?

5          A.   No.

6          Q.   What about Officer Dawdy?

7          A.   Dawdy was calling us names.  He always

8    called the women names.

9          Q.   What -- what kinds of names was Officer

10   Dawdy calling you?

11         A.   Bitches.

12         Q.   Okay.  And you testified that you saw

13   Warden Hulett in the gym; is that correct?

14         A.   Yes, sir.

15         Q.   Okay.  Approximately how long to your

16   knowledge was Warden Hulett in the gym?

17         A.   Till it ended.  I'd say she stayed till

18   it ended.  I couldn't be swear of that, because I

19   can't --

20              MS. McNAUGHT:  Objection.  If she can't

21   swear to it, then she shouldn't testify to it.

22         A.   I just know she --

23              MS. McNAUGHT:  Objection, Your Honor.

24              THE COURT:  Sustained.

25         Q.   Okay.  So, you saw Warden Hulett there,

1    but you're not sure how long she was there; is that

2    correct?

3          A.   No.

4          Q.   Okay.  After you were strip-searched in

5    the bathroom, what happened?

6          A.   Can you -- I'm sorry.  Can you repeat

7    that?

8          Q.   Sure.  After they were done

9    strip-searching you in the bathroom, what happened

10   next?

11         A.   Oh, we were uncuffed and told to get

12   dressed and went to sit on the bleachers.

13         Q.   Okay.  And when you were sitting on the

14   bleachers, were you in handcuffs or not?

15         A.   No cuffs.

16         Q.   Okay.  And how long did you have to sit

17   on the bleachers that day?

18         A.   Couple hours, waiting for the other

19   inmates to be done.

20         Q.   Okay.  And when the other inmates got

21   done, what happened?

22         A.   We were told to go to the central

23   dining room to eat, but we were refused to let go

24   to the bathroom or wash our hands.

25         Q.   Okay.  I meant to ask you, during the

1 time that you were strip-searched in the bathroom,

2 were any of the women that were strip-searched with

3 you on their period?

4          A.   Yes, sir.

5          Q.   Okay.   And were -- how many of the

6 women in the bathroom with you were on their

7 period?

8          A.   I don't know how many people when I was

9 in there.   There was already blood on the floor

10 when I entered the bathroom.

11         Q.   Okay.   But was there a woman who was

12 being strip-searched at the same time as you who

13 was on her period?

14         A.   Yes.

15         Q.   Okay.   And was she asked to remove her

16 sanitary product?

17         A.   Yes.

18         Q.   Okay.   What was she asked to do with

19 it?

20         A.   The cadet said, "Are you allowed to

21 have a tampon?"   She said, "Yes, I am.   We buy them

22 off commissary."   She said, "Take it out.   Take off

23 your pads.   Throw them in the garbage."   The women

24 would ask, "Can I have another pad?"   They said,

25 "No.   Go sit down."

1          Officer -- Warden Hulett came in and
2    gave the women sanitary pads.
3          Q.   Okay.  And when was -- when --
4    approximately what time during the search did
5    Warden Hulett come in to do that?
6          A.   It had been going on for a while before
7    she came in.  But when they asked, she gave them to
8    them.
9          Q.   Okay.
10         A.   I'm pretty sure it was Mrs. Willette
11   asked her for some sanitary napkins, and she went
12   and got us some.
13         Q.   Okay.  You said you were marched to the
14   central dining hall after the women were
15   strip-searched.
16         A.   Yes, sir.
17         Q.   Did you ask to wash your hands
18   before --
19         A.   Yes, sir.
20         Q.   Okay.  And were you allowed to do so?
21         A.   No, sir.
22         Q.   Did you eat lunch at the central dining
23   hall that day?
24         A.   No, sir.
25         Q.   Just again going back to the strip

search in the bathroom, was there enough room in

the bathroom for -- well, let me ask you this:

Were all the women asked to squat and cough at the

same time?

A.   Yes.

Q.   Okay.  And was there enough room in the

bathroom for that number of women --

A.   No.

Q.   -- to squat and cough?

A.   No.

Q.   And were your bodies touching when you

would squat and cough?

A.   Yes, bodies were touching.

Q.   Okay.

A.   Or, I know my body got touched by

another woman.

Q.   When you got back to your unit that

day, what was the state of your unit?

A.   They had searched all of our stuff.

MS. McNAUGHT:  Objection, Your Honor.

THE COURT:  Beg pardon?

MS. McNAUGHT:  Objection.  The -- what

happened in the dorm is not part of this.  The only

thing at issue in this case is the strip search.

THE COURT:  In the bathroom, is that

1  right?

2          MS. McNAUGHT:  Yes.  But he asked about

3  when they got back to their dorm.

4          THE COURT:  Yes.

5          MR. FIELD:  Well, Your Honor, the case

6  is about both the shake -- I mean, defendants

7  brought it up in their own opening statement.  It's

8  about the shakedown and the --

9          MS. McNAUGHT:  Your Honor, I --

10          THE COURT:  Wait a minute, people.  One

11  at a time.

12          MS. McNAUGHT:  I --

13          THE COURT:  No, no, wait just a minute,

14  Ms. McNaught.

15          You finish, Mr. Field.

16          MR. FIELD:  Thank you, Your Honor.

17          The case is about both the shakedown

18  and the strip search.  Those two things occurred

19  together.  The shakedown was of the unit.  The

20  strip search took place while the shakedown was

21  occurring in the gymnasium.

22          THE COURT:  Now, Ms. McNaught.

23          MS. McNAUGHT:  Your Honor, I think that

24  this might be better done outside the presence of

25  the jury.

1    THE COURT:  Well, we're not going to

2  take the time to do that right now.  This is all

3  part of the background.  And if it isn't

4  specifically at issue in the case, I'll iron all

5  that out with my instructions to the jury at the

6  end.  But as far as the perimeter here is

7  concerned, it's all part and parcel of the

8  background.  So, I'm going to -- I'm going to let

9  this go in.

10    All right.  Now, go ahead, Mr. Field.

11    MR. FIELD:  Thank you, Your Honor.

12    Q.  When you got back to Unit 2B, what was

13  the state of the unit?

14    A.  The dorms were in disarray because they

15  all got searched.  It was a normal process, you

16  know, just stuff was gone through, looking for

17  contraband.  And it was completely understandable.

18  Nothing out of the ordinary that I know.

19    Q.  Okay.

20    THE COURT:  Well, now, the point was,

21  you asked about -- about the context.  Didn't you?

22  This is about the context.  But what happened?  Did

23  anything happen?

24    A.  Just it was in disarray.  All of our

25  stuff was taken out of boxes but in disarray.  We

1  were searched.

2          THE COURT:  Well, Ms. McNaught is

3  right.  This isn't part of the case.

4          MR. FIELD:  Corrections officers

5  including -- and, you know, if Counsel wants us to

6  do this at a sidebar, we can.  But corrections

7  officers went through their unit while they were

8  being strip-searched.  It was -- it was one

9  exercise.

10          THE COURT:  Oh.  Is this a surprise?

11          MR. FIELD:  No, it's not.  I mean --

12          THE COURT:  It's not a surprise.

13          MR. FIELD:  -- what occurs as the

14  shakedown --

15          THE COURT:  Let's go on.  Let's go on

16  with the rest of this.

17          MR. FIELD:  Okay.

18          THE COURT:  We'll never finish the case

19  if we don't move on.

20          MR. FIELD:  Sure.

21      Q.  At some point after the strip search,

22  did you file a grievance, Ms. Henry?

23      A.  Yes.

24      Q.  Okay.  And when did you file a

25  grievance?

1    A.   The same day.  Me and every -- almost

2    every woman from the unit got grievances and filled

3    them out.

4    Q.   Okay.  And so I want to kind of go

5    through the grievance process with you a little bit

6    so that the jury understands what it is.

7         When you say you filled out a

8    grievance, is there an official form that you fill

9    out?

10   A.   Yes.

11   Q.   Okay.  And once you filled out that

12   official form -- well, actually, let me ask you

13   this:  What kinds of information did you put into

14   that form?

15   A.   You put in there how you feel you were

16   mistreated and you want an answer to why this

17   happened to you.

18   Q.   Okay.

19   A.   It's like a formal complaint.

20   Q.   Okay.  And once you have filled out

21   that form, what do you do with it?

22   A.   You put it in the grievance box that's

23   in the hallway where the officers sit.

24   Q.   Okay.  And once you have put the

25   grievance in the grievance box, what is the next

step for the inmate?

A.   The counselor or the grievance committee comes and picks up the things.  They read them.  They go over them and they send them back to you with an answer.

Q.   Okay.  And did you ever receive an answer to your grievance?

A.   Nobody ever got a grievance back.

Q.   You never got a response back --

A.   No.

Q.   -- to your grievance?

Okay.  Did you file any other grievances in relation to the strip search?

A.   Yes.

Q.   Okay.  What was that grievance?

A.   I filed a grievance on -- I grieved the fact that I didn't get my grievance.

Q.   You didn't get your response?

A.   Yeah.

Q.   Okay.  And did you get a response to that second grievance?

A.   No.

Q.   Okay.  Did you talk to Warden Hulett about the grievance that you filed?

A.   I talked to the counselor.  The box was

1  overwhelming.  It was -- the -- the -- it was so

2  full, they were falling out the top of the box.

3          Q.   Okay.

4          A.   So, we asked the counselor are they

5  ever going to pick up these grievance --

6          MS. McNAUGHT:  Objection, Your Honor,

7  to hearsay.

8          THE COURT:  Sustained.  Who's we?

9          A.   Me and --

10          THE COURT:  Just a moment, ma'am.  Now,

11  you wait, wait just a second.

12          MR. FIELD:  Thank you, Your Honor.

13          THE COURT:  Don't answer until Counsel

14  asks you a question.

15          THE WITNESS:  Okay.  Yes, sir.

16          THE COURT:  All right.

17          Q.   So, I'm going to -- I'll just ask you

18  what you specifically said to the counselor.  Okay?

19          THE COURT:  That's right.  That's

20  exactly right.

21          A.   I asked why we didn't get our

22  grievances back.  She said that -- no, first, I

23  asked her when was someone going to pick up the

24  grievances.  And she said, "I'm going to take

25  them."

1          MS. McNAUGHT:  Objection, Your Honor --

2          THE COURT:  Yes.

3          MS. McNAUGHT:  -- to the hearsay

4     statement.  There are no counselors who are

5     defendants in this case.

6          THE COURT:  I understand completely.  I

7     understand that.  But I'm going to let -- it's part

8     of the background here and I'm going to let it in.

9     We have to -- we all have to understand what this

10    process is.  There's not a member of the jury, nor

11    -- nor do I have experienced a complaint at Lincoln

12    correctional institution.  So, we've got to get

13    this out of how this works and what the norm is.

14    So, I'm going to allow this.  So, let's let it come

15    in.

16         Now, Mr. Field, we're getting this from

17    the standpoint of a correctional inmate.

18         MR. FIELD:  Correct.

19         THE COURT:  Right?  Then when we get to

20    the defendants' case, I'm going to allow further

21    discussion on this so that we all know how this

22    operation works.  Now, we can't talk about just the

23    defendants, because there are counselors, there are

24    guards, there are correctional officers, all

25    surrounding here in the process.  So, this is a

1    bigger scene than what we're just talking.  We've

2    got to understand about it, both the jury and I do.

3              So, I'm going to have some leeway here,

4    Ms. McNaught.  And I understand you're making some

5    very valid, specific, legal objections.  But we've

6    got to understand what the context is here.

7              MS. McNAUGHT:  And, Your Honor, I

8    understand your ruling.  Although, are you -- I'd

9    like to understand a little bit better.

10             THE COURT:  All right.

11             MS. McNAUGHT:  Are you saying in the

12   general process she can testify but -- my concern

13   is that any hearsay statements that she may make

14   about counselors in this particular instance who

15   are not represented here.

16             THE COURT:  Well, that's -- that's

17   absolutely true.  And when we get down to the

18   bottom line, I'll sift all that out and make sure

19   that we're talking only about named defendants.

20             MS. McNAUGHT:  I understand now.  Thank

21   you, Your Honor.

22             THE COURT:  You bet.

23             Okay, now, Mr. Field, have we kind of

24   clarified the situation?

25             MR. FIELD:  Just one -- one question,

1    Your Honor.

2                THE COURT:  Yeah.

3                MR. FIELD:  Because, you know, this

4    type of testimony may come in as sort of the effect

5    on the listener rather than as, you know, it being

6    direct evidence of what some additional -- some

7    other person said beyond Ms. Henry.  And so I'm

8    wondering if she -- just like when we talked about

9    what she heard in the gym and what she heard in the

10   dayroom, as long as she can at least identify the

11   person by position or if she knows the name, is she

12   able to testify as to what that individual told her

13   specifically?

14               THE COURT:  I'm going to be as lenient

15   as I can, but it's got to be understood that we

16   have only a certain number of defendants in this

17   case --

18               MR. FIELD:  Sure.

19               THE COURT:  -- that are called.  But

20   there are other witnesses perhaps to what went on

21   during this strip-search situation, and many people

22   will not know the names of who did what to whom or

23   when or where.  It's just part of the backdrop.

24   But we all have to understand this and we have to

25   know what's going on in order to get a good

1    perspective and handle on what the true facts were.

2    Now, I'll sift all this through at the end, believe

3    me.

4              So, ladies and gentlemen, you're going

5    to be hearing some backdrop type of information so

6    that it gives you an idea of what this institution

7    is like.  But we'll clarify it all when I get to

8    the end of the case.  Okay?

9              Very good.

10             MR. FIELD:  And I'll do my best to keep

11   it as general as possible.

12             THE COURT:  Well, keep it general but

13   be specific.  If you've got names --

14             MR. FIELD:  Sure.

15             THE COURT:  -- we want to hear them.

16             MR. FIELD:  Absolutely.

17             THE COURT:  Now, Ms. McNaught, is that

18   adequate for the moment?

19             MS. McNAUGHT:  Absolutely, Your Honor.

20             THE COURT:  Excellent.

21             Now, let's go ahead.

22             MR. FIELD:  Thank you, Your Honor.

23             THE COURT:  Because you've got five

24   minutes till noon.

25             MR. FIELD:  Okay.

1        Q.   (by Mr. Field) You testified that you

2    never received a response to your grievance;

3    correct?

4        A.   Yes, sir.

5        Q.   Okay.  What would be -- what's the

6    normal process if you have not -- if you're waiting

7    for a response, what would be your normal process

8    for finding out what's going on?

9        A.   To go talk to them or to grieve the

10   fact you never got your grievance back.

11       Q.   When you say go talk to -- go talk to

12   them, who do you mean?

13       A.   The grievance committee, grievance

14   counselor.

15       Q.   And did you go and talk to the

16   grievance counselor?

17       A.   He was on the unit.

18       Q.   Did you speak with the grievance

19   counselor?

20       A.   Yes, I did.

21       Q.   About the grievance related to the

22   strip search?

23       A.   Yes, I did.

24       Q.   Okay.  And did you -- after you did

25   that, did you ever get a response to your

1   grievance?

2        A.   The counselor from the unit is the one

3   that told us she gave them to him.

4             MS. McNAUGHT:  Objection to what --

5             THE COURT:  Wait a minute.  Go ahead.

6             MS. McNAUGHT:  Objection to what this

7   particular counselor said to this particular

8   grievant.  I thought we were supposed to talk about

9   grievances in general, the process in general, not

10  particulars.

11            THE COURT:  What do you say, Mr. Field?

12            MR. FIELD:  You said there would be

13  some leeway.  I understand the objection.  I'm

14  trying to keep it general if I don't know the

15  specific name of the counselor, but she has

16  identified it's an individual from the grievance

17  office.

18            THE COURT:  I think that's adequate.  I

19  think it's adequate.  We'll allow it.  Go ahead.

20       Q.   What did the grievance officer say to

21  you?

22       A.   First, the counselor from the Unit 2B

23  told us she was going to take them and give them to

24  the grievance committee.  When the grievance

25  committee guy came a couple days later, he told me

1    that he never received them, he don't know what

2    happened to them, and he has no answer for me.  He

3    just didn't know.

4                 THE COURT:  Now, who is he?

5         A.   The grievance officer.  The one that

6    handles the -- the office -- the man that's hired

7    to answer grievances.  He reads them and answers

8    them.

9                 MR. FIELD:  So, she's identified two

10   individuals, Your Honor, the counselor and the

11   separate grievance officer.

12                THE COURT:  But who was the grievance

13   committee?  Who is that made up of?

14        A.   It was just one -- one -- one man that

15   came to the unit and when -- because we were told

16   he had them.  So, when we discovered who he was, we

17   asked him, "When are we getting an answer?"  All I

18   just know he was a grievance -- the grievance

19   counselor.

20                THE COURT:  Do you know his name?

21        A.   No, sir, I do not remember.  He was the

22   grievance counselor while I was there.

23                THE COURT:  Did he have a name tag on?

24        A.   No.  No.  But I'm sure it's in record

25   somewhere who the grievance counselor was that year

1    -- that time -- at that time.

2                THE COURT:  All right.  That's

3    adequate.  Grievance counselor.  Go ahead.

4                MR. FIELD:  Okay.  I'm going to move on

5    from the grievance process anyway, Your Honor.

6                THE COURT:  Uh-huh.

7         Q.   You testified earlier that at the time

8    of the strip search you were working -- you had a

9    job within the prison; correct?

10        A.   Two jobs inside the prison, road crew

11   and industry.

12        Q.   Okay.  And when you worked on road

13   crew, did it require you to be strip-searched?

14        A.   Yes, sir.

15        Q.   Okay.  And were you strip-searched when

16   you went out to work on road crew?

17        A.   End of work, when you come back in.

18        Q.   Both when you went out and came back in

19   or only when you came back in?

20        A.   To my best recollection, it was when we

21   came back in.

22        Q.   Okay.  And it was every time that you

23   would go on road crew when you came back in, to

24   your recollection, you'd be strip-searched?

25        A.   Yes, sir.

1          Q.   What about for your industry job, are

2    you strip-searched for that as well?

3          A.   Just coming back from industry.

4          Q.   Okay.  And what about for visitation,

5    were you strip-searched?

6          A.   Yes, sir.

7          Q.   Okay.  So, fair to say that you were

8    strip-searched in the prison on a fairly regular

9    basis?

10          A.   Yes, sir.

11          Q.   And were those strip searches that

12    you've just described as part of visitation and as

13    part of your job, were those similar to the strip

14    search that occurred on March 31st, 2011?

15          A.   No.

16          Q.   How was the strip search that occurred

17    on March 31st, 2011, different from the ones that

18    you were -- that you went through on a regular

19    basis?

20          A.   It's just because of the way we were

21    treated, the way we were talked to.  It was

22    degrading, humiliating, filthy.  And I just felt

23    like I was being re-arrested again.

24               THE COURT:  Well, you -- wait a minute,

25    Mr. Field.  We're getting -- we're getting -- she's

1  not answering your question.  You want to know

2  specifically and we want to know, not just this

3  ramble.

4        So, let's take our luncheon break at

5  this time and then we'll get back to this.  And

6  let's get an understanding right now that we're not

7  going to go off on side shoots here.

8        MR. FIELD:  Sure.

9        THE COURT:  Let's stay right down the

10  middle of the courtroom and give it to us so that

11  we know specifically what we're talking about.  And

12  you'll have the opportunity of our lunch hour to

13  talk to your witness about this.

14        MR. FIELD:  Thank you, Your Honor.

15        THE COURT:  All right.  Ladies and

16  gentlemen, it's going to be 1:30.  But I do want to

17  remind you that we are about to take our first

18  break during the trial, so the instruction that I

19  gave you earlier I want to reiterate.

20        Until the trial is over, you are not to

21  discuss this case with anyone, including your

22  fellow jurors, members of your family, people

23  involved in the trial, or anyone else.  If anyone

24  approaches you and tries to talk to you about the

25  case, do not tell your fellow jurors, but advise me

1   about it immediately.

2            Do not read or listen to any news

3   reports of the trial.

4            And finally, remember to keep an open

5   mind until the evidence has been received and

6   you've heard the views of your fellow jurors.

7            Now, I may not repeat these things to

8   you before every break that we take from now on.

9   In fact, I will not.  But I will always ask you to

10  keep them in mind and recall my admonitions.  Okay?

11           Good.  So, enjoy your lunch and we will

12  be back here at 1:30 on the nose.

13           Court will stand in recess until 1:30.

14               (Court was then in recess.)

15               (The jury entered the courtroom.)

16           THE COURT:  Thank you, everyone.  All

17  right.  We're all in place.

18           Mr. Field.

19           MR. FIELD:  Thank you, Your Honor.  I

20  don't have any further questions for this witness

21  at this time.

22           THE COURT:  All right.  Then, Ms.

23  McNaught, you may cross.

24           MS. McNAUGHT:  Thank you, Your Honor.

25               CROSS-EXAMINATION

1    QUESTIONS BY MS. McNAUGHT:

2           Q.   Good afternoon.

3           A.   Hi.

4           Q.   Did you testify this morning that your

5    date of release was December of 2010?

6           A.   I might have, but --

7           Q.   Okay.

8           A.   To my recollection, I don't -- I don't

9    remember.

10          Q.   Okay.  Now, do you remember you

11    identified a correctional officer whose name was

12    Crup?

13          A.   Curup, yeah.

14          Q.   And did you know her from the facility?

15          A.   Yes, ma'am.

16          Q.   You'd seen her before?

17          A.   Yes, ma'am.

18          Q.   Would you describe her for the ladies

19    and gentlemen of the jury, please?

20          A.   Kind of short, little on the heavy

21    side.

22          Q.   A white lady?

23          A.   No, an African-American lady.

24          Q.   Okay.  Glasses?

25          A.   Can't remember.  When she came out, she

1    had the band on, so I don't remember if she had

2    glasses.

3        Q.    And she was on the tac team.  Is that

4    what you said?

5        A.    I think she was an officer.

6        Q.    Oh, she was one of the correctional

7    officers?

8        A.    Yeah.

9        Q.    And she was in the bathroom with you;

10   is that right?

11       A.    She was in the bathroom, yes.

12       Q.    And she stayed at the bathroom door all

13   during the search?

14       A.    No.  Some would come in; some would go

15   out.  They were coming in and out, taking turns.

16       Q.    All right.  And when -- when she left,

17   where did she go?

18       A.    She walked out into the gym with

19   another correctional officer.

20       Q.    Okay.  And then she would come back in

21   the gym to the gym bathroom.  Is that your

22   testimony?

23       A.    All I -- all I can testify that I can

24   remember is she was in the bathroom when I was

25   there and I seen her come out with a thing on her

1    face.

2            Q.    With a mask on her face?

3            A.    It was a -- it was a -- a headband like

4    they wear in the winter, like ear muff things.

5            Q.    And her face was covered with a mask?

6            A.    Just the nose and mouth area.  Because

7    it was only about that wide.

8            Q.    And then she came back -- once she left

9    the gym, then she came back in and she was at the

10   bathroom area.  Is that your testimony?

11           A.    I just know she was in the bathroom

12   area before I went in and while I was in.

13           Q.    And you were among the first of people

14   to be searched in the gym; is that correct?

15           A.    I'd say the first half of the people,

16   yes.

17           Q.    In fact, you said the first 20 percent;

18   isn't that correct?

19           A.    Of -- of our unit, yeah.  I'd say yeah.

20   Yes, ma'am.

21           Q.    You also testified earlier this morning

22   that when Warden Hulett came in she made sure that

23   all of the women who needed sanitary products had

24   them; is that correct?

25                 MR. FIELD:  Objection, Your Honor.

1    That misstates her previous testimony.

2              MS. McNAUGHT:  Well, Your Honor, this

3    is cross-examination.

4              THE COURT:  This is cross.  No.  I

5    think I'll allow it.  Go ahead.

6         A.   What was the question again, ma'am?

7         Q.   When Warden Hulett -- by the time that

8    Warden Hulett left the gymnasium, she made sure

9    that all of the women who needed sanitary products

10   had them.  Wasn't that your testimony this morning?

11        A.   Yes, ma'am.

12        Q.   You also testified this morning that

13   you had to stand in bodily fluids of other inmates.

14   Is that correct?

15        A.   Yes, ma'am.

16        Q.   And the officers who were searching

17   also had to stand in those bodily fluids; isn't

18   that correct?

19        A.   Yes, ma'am, but they had shoes on.

20        Q.   Now, you know what a strip search is

21   like; don't you?

22        A.   Yes, ma'am.

23        Q.   And the first thing that you do is take

24   off all your clothes; is that correct?

25        A.   Yes, ma'am.

1      Q.   And that's at the direction of a

2   correctional officer?

3      A.   Yes, ma'am.

4      Q.   Is that correct?

5      A.   Yes, ma'am.

6      Q.   And you were searched by correctional

7   officers or correctional cadets?

8      A.   There was cadets and correctional

9   officers in there.

10      Q.   So, both at the same time; is that

11   right?

12      A.   Yes, ma'am.

13      Q.   And how many -- how many cadets were

14   there?

15      A.   Two to -- two to three cadets, two to

16   three officers.

17      Q.   And how many correctional officers were

18   there?

19      A.   I'd say there was probably a couple of

20   each to my recollection.

21      Q.   And there was one correctional officer

22   or one cadet to every inmate; is that correct?

23      A.   I can't say that.

24      Q.   Well, the search was one-on-one;

25   correct?

1        A.   Sometimes there was three to four women

2  in there and only two officers and one cadet or

3  something.  It wasn't really one-on-one.

4        Q.   So, in some instances, there were fewer

5  correctional officers than there were inmates in

6  the bathroom.  That's your testimony?

7        A.   Yes.

8        Q.   So, after you take off your clothes,

9  the first thing you do is shake out your hair;

10  right?

11        A.   Uh-huh.

12        Q.   And that takes about five seconds to

13  shake out your hair; right?

14        A.   Yes, ma'am.

15        Q.   And then the next thing you do is you

16  hold out your hands and you show them your palms

17  and the backs of your hands; right?

18        A.   Yes, ma'am.

19        Q.   That takes about five seconds; right?

20        A.   Yeah.

21        Q.   Okay.

22        A.   Yes, ma'am.

23        Q.   And then you open your mouth and you

24  show them your mouth and your tongue; right?

25        A.   Yes, ma'am.

1         Q.   And that takes about five seconds;

2   right?

3         A.   Yes, ma'am.

4         Q.   Let's see.  Oh, and you show them the

5   backs of your ears; right?

6         A.   Yes, ma'am.

7         Q.   And that takes about five seconds;

8   right?

9         A.   Yes, ma'am.

10        Q.   And then you show them the bottom of

11  your feet; is that right?

12        A.   Yes, ma'am.

13        Q.   And that takes about five seconds;

14  right?

15        A.   Yes, ma'am.

16        Q.   And then you may have to lift your

17  breasts; correct?

18        A.   Yes, ma'am.

19        Q.   That takes about five seconds; right?

20        A.   Yes, ma'am.

21        Q.   And then if you have any other rolls on

22  your -- on your body, you have to lift those rolls;

23  is that right?

24        A.   Yes, ma'am.

25        Q.   And that takes about five seconds;

1  right?

2  　　　　A.　Average, yes.

3  　　　　Q.　Let's see.  And then you have to bend

4  over; correct?

5  　　　　A.　Yes, ma'am.

6  　　　　Q.　Squat?

7  　　　　A.　Yes, ma'am.

8  　　　　Q.　And spread your cheeks; right?

9  　　　　A.　Yes, ma'am.

10  　　　　Q.　And cough?

11  　　　　A.　Yes, ma'am.

12  　　　　Q.　And that takes 10 seconds?

13  　　　　A.　Yeah, around average, 10, 15 seconds.

14  　　　　Q.　And then you get back -- you get

15  dressed again; right?

16  　　　　A.　Unless you were told to do it again.

17  　　　　Q.　Okay.  And it takes you about 60

18  seconds, a minute or so, to -- to get dressed and

19  undressed; right?

20  　　　　A.　Little more than that.

21  　　　　Q.　Two minutes to get dressed and two

22  minutes to get undressed?

23  　　　　A.　I'd say, yes, ma'am.

24  　　　　Q.　Okay.  And what were you wearing that

25  day?

1        A.   I can't be positive, but probably a

2  gray sweatshirt and gray sweatpants.

3        Q.   And underwear?

4        A.   Yes.

5        Q.   A bra?

6        A.   Yes.

7        Q.   And socks?

8        A.   Yes, ma'am.

9        Q.   And shoes?

10       A.   Yes, ma'am.

11       Q.   Okay.  And your testimony is it took

12  you a couple of minutes to get all of those

13  articles of clothing off; correct?

14       A.   Yes, ma'am.

15       Q.   And then it took two minutes to get all

16  of those articles of clothing back on; is that

17  right?

18       A.   I'd say around that, yeah.  Yes, ma'am,

19  I mean.

20       Q.   Now, when you went back -- after you

21  were searched in the bathroom, you went back to the

22  gym; correct?

23       A.   Yes, ma'am.

24       Q.   And you sat down on the -- on the

25  bleachers; right?

1        A.   Yes, ma'am.

2        Q.   Okay.  And at that point, after you had

3  gotten your clothes back on, nobody put handcuffs

4  on you; did they?

5        A.   No, ma'am.  Not that I recall, but I

6  don't think so.

7        Q.   Did you sign a declaration in this

8  case?  A sworn statement?  A statement under oath?

9        A.   I don't understand.  What's that mean?

10       Q.   Did you sign a piece of paper that said

11  that you were telling the truth on that piece of

12  paper?

13       A.   On my grievance you're --

14       Q.   No.

15       A.   -- you're speaking of?

16       Q.   No.  I'm talking about a sworn

17  declaration that you prepared or that someone

18  prepared on your behalf for purposes of this

19  lawsuit.

20          THE COURT:  Ms. Thompson, do we have

21  one?  Is there one on her or not?

22          MS. McNAUGHT:  Your Honor, I'm more

23  than happy to show her to refresh her recollection.

24          THE COURT:  Well, that's fine.  Let's

25  get moving.  She can either say yes or no and then

1    Counsel can clarify it if there's a question.  But

2    let's move it.  Sure.

3              MS. McNAUGHT:  May I approach the

4    witness, Your Honor?

5              THE COURT:  Absolutely.  If you've got

6    one, let's get moving.

7         Q.   Ms. Henry, I'm showing you what's been

8    marked as Defendant's Exhibit 26.  Do you see that?

9         A.   Yes, ma'am.

10        Q.   Is that your signature?

11        A.   Yes, ma'am.

12        Q.   And you signed it on February 28th of

13   2012?

14        A.   Yes, ma'am.

15        Q.   And it's entitled Declaration of

16   Delores Henry?

17        A.   Yes, ma'am.

18        Q.   At Paragraph 5 -- did you write this or

19   did your lawyers write this for you?

20        A.   It's my signature.  I guess I did.

21        Q.   Okay.  And when you wrote this, you

22   swore to the things that were in it to be true; is

23   that correct?

24        A.   To the best of my knowledge, yes.

25        Q.   And did you say, "After the strip

1  search was over, those women were not given

2  replacement tampons or sanitary napkins."?

3         A.   They weren't.  The first -- probably at

4  least 20 percent of our unit wasn't given no

5  sanitary or pads until after the search warrant --

6  the search was almost -- was halfway over.  We

7  weren't given none.  Or, the women I was searched

8  with didn't -- weren't given them.

9         Q.   You said all of the women in this

10 declaration; didn't you?

11        A.   Mistake on my half because she did come

12 in and give them pads.

13        Q.   And you also said at Paragraph 9, "Back

14 in the gym, we were handcuffed again and forced to

15 wait until all of the other women had been

16 strip-searched."  You said that; didn't you?

17        A.   And that could have happened and I

18 don't remember.

19        Q.   But you previously testified that you

20 weren't handcuffed; didn't you?

21        A.   Yes, I did.

22             MS. McNAUGHT:  Nothing further.

23             THE COURT:  Redirect.

24                     REDIRECT EXAMINATION

25 QUESTIONS BY MR. FIELD:

1      Q.   Ms. Henry, you were asked a bunch of

2  questions about how many seconds it takes to do

3  various components of a strip search.  When you

4  were in the bathroom being strip-searched, did you

5  have to wait naked while other women were being

6  strip-searched by the officers?

7      A.   Yeah.  You had to all stand there

8  together.

9      Q.   And you testified that there were, you

10  know, a couple of corrections officers and a couple

11  of cadets.  Were they sort of going down the line

12  checking each woman as they went?

13      A.   Yes, sir.

14      Q.   So, when you testified that you thought

15  you were naked for about 15 minutes, it wasn't that

16  the strip search on you personally took 15 minutes,

17  it was that --

18          MS. McNAUGHT:  Objection, leading.

19      Q.   -- you were waiting --

20          THE COURT:  No, wait, wait.

21      Q.   -- that you were waiting --

22          THE COURT:  Wait a minute.  There's an

23  objection.

24          MR. FIELD:  Sure.

25          MS. McNAUGHT:  Leading.

1          THE COURT:  It is.  Sustained.

2          Q.   When you were in the bathroom being

3    strip-searched, you waited in that bathroom for 15

4    minutes while you were naked; is that correct?

5          MS. McNAUGHT:  Objection, leading.

6          THE COURT:  It is.  It is.

7          Q.   How many minutes did you wait in the

8    bathroom --

9          THE COURT:  There we are.

10         Q.   -- with your clothes off?

11         A.   Fifteen, 20 -- 15 minutes probably.

12         Q.   Okay.

13         A.   Around 15 minutes.

14         Q.   And during that entire time you were

15   not personally being strip-searched; correct?

16         A.   Part of -- one of the women being

17   strip-searched.

18         Q.   Right.  So, it took 15 -- about 15

19   minutes to strip-search all of the women?

20         A.   All of the women, yes, sir.

21         Q.   Okay.  You were asked some questions

22   about your declaration in this matter.  When you

23   signed that, you signed to the best of your

24   knowledge at the time; is that correct?

25         A.   It's now that I don't remember.

1      Q.   Okay.  And why is that?

2      A.   Because brain's nuts.

3      Q.   You're referring to your cancer?

4      A.   (Nodded head up and down.)

5      Q.   Okay.  And you're taking medication for

6  that?

7      A.   (Nodded head up and down.)

8      Q.   And you're receiving treatment for

9  that?

10      A.   (Nodded head up and down.)

11      Q.   Is that weekly treatment?

12      A.   (Nodded head up and down.)

13      Q.   Okay.  And you have problems -- some

14  problems with memory; is that right?

15          THE COURT:  Now, wait a minute.  You're

16  testifying for her.

17      A.   Yeah, I do have problems with memory

18  sometimes, yes, long-term.  Short-term I remember.

19  Long-term I don't.

20      Q.   Okay.  And do you receive treatment for

21  that?

22      A.   Yeah.  I've had five Gamma Knifes to

23  the brain.

24      Q.   How often do you receive treatment?

25      A.   Every week.

1      Q.   Okay.  And you were asked some

2    questions about Warden Hulett and sanitary napkins.

3    At what point during the strip search, you know,

4    the whole thing, did Warden Hulett come into the

5    gym?

6      A.   After I'd say it had been going on,

7    probably 20 percent of Unit B, the unit I was on,

8    2B, was into the process, probably a third of the

9    way she came in.  I can remember Ms. Willette

10    telling her that women needed sanitary pads.  She

11    went and got them some.  She got them or LTS got

12    them.  I just know they asked her for some.

13      Q.   Okay.  And did Warden Hulett come in

14    after you had been strip-searched?

15      A.   Yes.

16      Q.   Okay.  Did you -- did you overhear

17    Warden Hulett asking I think you said it was

18    Ms. Willette to get the sanitary napkins?

19      A.   I overheard Ms. Willette ask --

20      Q.   Okay.

21      A.   -- for sanitary napkins.

22      Q.   And who went to get the sanitary

23    napkins?

24      A.   To my best recollection, it was a LTS

25    girl.  I couldn't say who went and got the pads,

1    but I know they did get them.

2         Q.   Okay.  Do you know where they got them

3    from?

4         A.   No, sir.

5         Q.   Okay.  And do you know who they were

6    handed out to specifically?

7         A.   No, sir.

8              MR. FIELD:  Okay.  No further

9    questions, Your Honor.

10             THE COURT:  Thank you.

11             Recross?

12             MS. McNAUGHT:  Nothing, Your Honor.

13             THE COURT:  Very good.  Thank you.

14             Very well, ma'am, you may step down.

15                  (Witness excused)

16             THE COURT:  And plaintiff may call its

17   next witness.

18             MS. THOMPSON:  Your Honor, we call

19   Ieshia Brown.

20             THE COURT:  You'll stand and be sworn

21   first, ma'am.

22             THE WITNESS:  Right here?

23             THE COURT:  Yes.  Thank you.

24                  IESHA BROWN,

25   of lawful age, produced, sworn, and examined on

1  behalf of the Plaintiffs, testifies and says:

2                    DIRECT EXAMINATION

3  QUESTIONS BY MS. THOMPSON:

4        Q.   Good afternoon, Ms. Brown.

5        A.   Good afternoon.

6        Q.   Can you please introduce yourself to

7  the jury and spell your first name for the court

8  reporter?

9        A.   My name is Ieshia Brown.  Ieshia Brown,

10  I-e-s-h-i-a.

11        Q.   Thank you, Ms. Brown.  How old are you?

12        A.   Sixty-one.

13        Q.   Are you currently in prison, Ms. Brown?

14        A.   Yes.

15        Q.   In 2006, were you convicted of

16  residential burglary?

17        A.   Yes.

18        Q.   That is a felony?

19        A.   Yes.

20        Q.   And were you incarcerated in 2011?

21        A.   Yes.

22        Q.   Where were you incarcerated in March of

23  2011?

24        A.   In Lincoln Correctional Center on 2B.

25        Q.   Now, you've sat here and heard some

1    testimony from Ms. Henry about a mass strip search

2    on March 31st of 2011?

3        A.  Uh-huh.

4        Q.  Were you part of that strip search?

5        A.  Yes, I was.

6        Q.  All right.  I want to ask you some

7    questions about that.

8            Now, you said that in March of 2011 you

9    were on housing Unit 2B?

10       A.  Yes.

11       Q.  Was there a housing Unit 2A as well?

12       A.  Yes.

13       Q.  Where was housing Unit 2A located?

14       A.  In the same unit -- in the same

15   building but across the hall.  When you come

16   inside, across the hall.  Like they was like at 2A,

17   2B, like that.

18       Q.  In your interactions in the prison, did

19   you have -- did you interact with people from 2A?

20       A.  Yes.

21       Q.  Did you share a -- did 2B share a

22   dayroom with 2A --

23       A.  No.

24       Q.  -- in 2011?

25       A.  No.

```
 1          Q.   Now, in 2011, did Lincoln Correctional
 2    Center have a warden named Warden Reynolds?
 3          A.   Yes.
 4          Q.   And did you see --
 5               THE COURT:  Excuse me.  What was that?
 6    Did it have a what?
 7               MS. THOMPSON:  A warden named Warden
 8    Reynolds, Your Honor.
 9               THE COURT:  Oh, thank you.
10          Q.   Do you see Warden Reynolds in the
11    courtroom today?
12          A.   Yeah.
13          Q.   And I'm going to ask you to identify
14    Warden Reynolds by his clothing.
15          A.   He got on a -- I guess that's some type
16    of green suit or olive type of suit, blue and cream
17    tie, hair back.  I mean --
18               THE COURT:  Warden, would you mind
19    standing, please.
20               MS. THOMPSON:  Thank you, Your Honor.
21               THE COURT:  Thank you very much.
22          A.   He has a high receding line.
23               THE COURT:  Is that him?
24          A.   Yes, sir.
25               THE COURT:  Thank you.
```

1    A.   Right there.

2         MS. THOMPSON:  And, Your Honor, I would

3    ask the record to reflect the identification of

4    Warden Reynolds in court.

5         THE COURT:  It shall.

6         MS. THOMPSON:  Thank you, Your Honor.

7    Q.   Now, were there other wardens at

8    Lincoln Correctional Center in March of 2011?

9    A.   Yes.

10   Q.   Was Warden Hulett one of those wardens?

11   A.   Yes.

12   Q.   And can you identify -- well, let me

13   ask you this:  Is Warden Hulett in the courtroom

14   today?

15   A.   Yes.

16   Q.   Can you identify her --

17   A.   Yes.

18   Q.   -- by something she's also wearing?

19   A.   Yeah.  She's got on a green sweater or

20   blouse, coat or something, and orange and green

21   scarf.

22        THE COURT:  We'll ask her to stand also

23   if she would.  Thank you very much, Warden.

24   A.   Okay.  She has on a green jacket and

25   orange and green scarf and braids in her hair.

1          THE COURT:  That's fine.

2          MS. THOMPSON:  I'd ask, Your Honor,

3   that the record reflect an identification of Warden

4   Hulett.

5          THE COURT:  It shall.

6          MS. THOMPSON:   Thank you.

7          Q.   Now, to your understanding, was one of

8   these people, Warden Hulett or Warden Reynolds, the

9   other person's boss?

10         A.   Yes.

11         Q.   Who was whose boss, Ms. Brown?

12         A.   Warden Hulett was the head warden.  She

13  was in charge of operation, the operation warden,

14  and the -- Warden Reynolds, assistant warden.

15         Q.   In the week before March 31st of 2011,

16  did you see Warden Reynolds in the housing Unit 2B?

17         A.   Yes, I did.

18         Q.   When you see him in the unit?

19         A.   When I came out in the dayroom

20  handcuffed.

21         Q.   And I'm asking you before March 31st of

22  2011, in that period, did you see Warden Reynolds

23  in Unit 2B?

24         A.   Oh, yeah.  He came over the day before.

25  If I'm sure, he came either the day before or the

1  two days before and made a statement about us --

2  our unit being -- acting up and he was tired of it,

3  and if he have to, he'll bring Orange Crush in, and

4  he's sick of getting remarks, us dis -- dis --

5  disobeying and disrespecting the officers, and he

6  said he was sick of that shit.  Excuse my language,

7  but that's what he said.

8        Q.   Now, I want to make sure it's clear.

9  What day was it that Warden Reynolds came and had

10  this talk with -- on Unit 2B relative to March 31st

11  of 2011?

12        A.   It was either the 10th or the 9th.  It

13  was one of them days.  Because we had the strip

14  search, the shakedown and all that the next two

15  days later I know, something like that, around

16  then.

17        Q.   And who was present when Warden

18  Reynolds came to the unit and made those

19  statements?

20        A.   An officer was there that day running

21  the unit.  And I don't recall, not right off the

22  top of my head, who came with him.  But usually

23  when a warden comes, sometimes they come by

24  themself but sometimes somebody come with them, a

25  white shirt or officer or something like that.  But

1    I don't remember that part.  But I do remember him

2    saying that.

3         Q.   You, Ms. Brown, were there for those

4    statements?

5         A.   I remember hearing him saying it.  I

6    was looking dead at him.

7         Q.   Were there any other inmates, women

8    that were there for those statements?

9         A.   He said it to everybody that was on the

10   unit that was acting up.  He called us out in the

11   dayroom and made sure we all stood up in the middle

12   of the floor.  He made an announcement that he was

13   tired of what was going on on 2B.  He's tired of

14   getting reports about it.  He's sick of inmates

15   disrespecting his staff and talking back to them,

16   and he said he wasn't putting up with that shit.

17        Q.   I want to take your attention then to

18   March 31st of 2011, Ms. Brown.  What time did you

19   wake up on March 31st?

20        A.   Approximately around between 7:15 or

21   7:20.

22        Q.   And --

23        A.   a.m.

24        Q.   I'm sorry.  You said in the morning?

25        A.   a.m.

1          Q.   Thank you, Ms. Brown.  What is the

2     first thing that happened when you woke up?

3          A.   I heard a bunch of noise and -- I heard

4     a bunch of noise and I opened up my eyes and I

5     heard Orange Crush coming -- coming down the

6     hallway making a lot of noise, telling us to get up

7     out of our bed, get dressed, come to the door,

8     don't bring nothing, don't touch nothing, don't

9     bring nothing, come to the door.  And when I got in

10    two -- we got in twos and they cuffed us and walked

11    us down the hallway.

12         Q.   Let me take you back for a minute.  You

13    said, when you woke up, you heard Orange Crush.

14    How did you know that it was Orange Crush that was

15    making that noise?

16         A.   Because Officer Slater was standing at

17    my door and Officer Crudup and they was telling us

18    get up, those that were asleep, you know, get up,

19    get dressed, put on some clothes, and line up in

20    twos at the door.

21         Q.   Those officers that you just named,

22    were those members of Orange Crush?

23         A.   Yes.

24         Q.   And when those officers told you that,

25    were there any other IDOC employees that were there

1  when they said that?

2       A.   No.

3       Q.   Now, do you have medication that you

4  take in the -- let me actually strike that, Your

5  Honor, and ask a better question.

6            On March 31st of 2011, did you have

7  medication that you took in the mornings?

8       A.   Yeah.  I just take vitamins and pain

9  pills for my cancer I have in my blood, and it's

10 just to keep me from hurting when I'm sore.  And

11 the vitamins I was just given by the doctor to take

12 Vitamin E's and multivitamins and Vitamin D's and

13 iron pills, stuff like that.

14      Q.   Did you take the pain medication and

15 the vitamins on March 31st of 2011?

16      A.   I didn't get a chance to.  We couldn't

17 touch nothing.

18      Q.   So, after the officers that you

19 described came in and had you get up, what did you

20 do next?

21      A.   Okay.  They marched -- I got

22 handcuffed.  They put me in some handcuffs, which

23 was orange, some type of orange -- reddish-orange

24 type of handcuffs, something I ain't never seen

25 since I been locked up, and they marched me down

1  the hallway through a bunch of chaotic noise and

2  fussing and all that to the dayroom.

3      Q.   Now, can you describe how it is that

4  you were handcuffed?

5      A.   I was handcuffed so tight I didn't -- I

6  couldn't believe.  I was telling that lady these

7  handcuffs -- I was telling Officer Slater my

8  handcuffs was too tight, could she please loosen

9  them.  Well, she told me that that was too bad, go

10  to the dayroom, we'll deal with that later.

11      Q.   And were there any other IDOC employees

12  that were there when Officer Slater made those

13  comments to you about your handcuffs?

14      A.   One of them was standing there when she

15  made that statement.  But the inmate that was

16  standing next to me, getting ready to get

17  handcuffed next after me and Officer Crudit --

18  Crudit -- Crudup, whatever her name is.

19      Q.   Were your hands handcuffed in front of

20  your body or behind your body?

21      A.   Behind my back.

22      Q.   Was there anything different about the

23  handcuffs that you -- you said you had never seen

24  those handcuffs before.  Had you been handcuffed

25  before in your time in IDOC before March 31st?

1       A.   Yes, I had.

2       Q.   And do you -- were these handcuffs

3  different than the handcuffs you had had used

4  before?

5       A.   Yes, ma'am.

6       Q.   How were they different?

7       A.   These were like a red-orange type of

8  color, orange-reddish type of color, and the other

9  ones that I had on that -- the silver ones that

10 they carry in the back of their pouch on their

11 clothes, their pants, those is totally different

12 from the ones I had on.  Because these hurt so bad

13 I -- my arm was hurting so bad, I couldn't even

14 describe the pain I went through with them

15 handcuffs.  Yeah, it was a big difference.

16      Q.   In your experience with handcuffs prior

17 to March 31st of 2011, was there anything that the

18 officers did when handcuffing you to check the

19 handcuffs?

20      A.   No, they didn't check nothing.  They

21 just told me stand on that wall, stand there and

22 face the wall and don't turn around.  And I kept

23 telling them my arm was hurting, it was going to

24 sleep.  So, I was kind of holding my arms up as

25 much as I could to keep them from hurting.  But

1  nobody wouldn't do nothing, so I just looked at the
2  wall.
3         Q.   So, it's your testimony that on March
4  31st there wasn't anything done to check your
5  handcuffs?
6         A.   No.
7         Q.   Had you had other experiences before
8  March 31st of 2011 where when you were handcuffed
9  the handcuffs were checked?
10        A.   Yeah.
11        Q.   And can you describe to the jury in
12  your prior experiences how the handcuffs were
13  checked?
14        A.   When I would go to the Decatur
15  counseling center in Decatur, Illinois, they had me
16  in the little shackle thing where the handcuffs be
17  like right here.  And if I tell them they're too
18  tight, they'll check it out, and sometimes they'll
19  loosen it up.  But they always stick their finger
20  in and make sure it's not too tight.  But then you
21  got some they just don't care, so ...
22        Q.   So, after you were handcuffed and taken
23  to the dayroom, what happened next?
24        A.   I stood there, waiting on them to do --
25  handcuff everybody else and bring them to the

1  dayroom and waited on them to call all the inmates

2  back from their assignments that was on their

3  assignments.  Everybody had to come back.  Until

4  everybody came back and they got searched, and then

5  when they got done with all that, then they -- I'll

6  say about -- I'm going to say about at least 45

7  minutes we stood in that dayroom, maybe a little

8  less, but I won't go past 35.

9       Q.   Did you see people being --

10      A.   Under 35, I mean.

11      Q.   Thank you, Ms. Brown.

12           Did you see people being searched in

13  any way while you were in the dayroom?

14      A.   No, ma'am.

15      Q.   In the dayroom what were -- what were

16  you doing?

17      A.    I was trying to look around to see what

18  was going on around me because I was supposed to be

19  facing the wall, but I still peeped around to see

20  what was going on, and I was just watching them

21  handcuffing inmates and walking them out the door.

22  And some of them was hollering and screaming.  Like

23  Dawdy, he was always hollering.  He was hollering

24  and telling people to shut up.  And then they was

25  trying to get people organized so they could take

1  them out and on the road and line us up outside.

2  So, people was asking a lot of questions.  It was

3  real chaotic.

4          Q.   Did you see anybody else that were IDOC

5  employees in the dayroom besides Dawdy?

6          A.   I seen Greg -- Craig -- Lieutenant

7  Craig, Bigger -- Officer Bigger, Officer Slater,

8  Officer Crudup.  I seen Lieutenant Dawdy.  I seen

9  -- and Warden Reynolds.  Them was the people that I

10  seen that I'm -- that I seen.

11          Q.   Do you remember Lieutenant Dawdy saying

12  anything besides the testimony that you've just

13  given?

14          A.   I just -- I just kept hearing him

15  telling people to shut up, "What part of shut up

16  you don't understand?"  He was like, "Be quiet or

17  you going to seg."  You know, shut up or you going

18  to -- they don't never say be quiet.  They say shut

19  up.  He said, "Shut up or you going to seg."  He

20  going to put you in seg if you didn't, you know,

21  stop talking.  "Keep facing that wall and don't

22  turn your head back around no more."  That's what

23  he would say, stuff like that.

24          Q.   Now, you said that you saw Warden

25  Reynolds in the dayroom as well?

1    A.    Yeah.

2    Q.    And what did you see him doing?

3    A.    Running around giving orders.

4    Q.    What orders was he giving them?

5    A.    Telling them to get people together --

6  I guess he was letting everybody know -- I mean, he

7  was basically doing his -- saying -- he didn't want

8  to answer no questions.  People was asking him

9  questions.  He wouldn't answer them.  He was just

10  getting smart with everybody, like shut up.

11  Because I was one of them told him I was going to

12  talk to -- I was going to call a lawyer about the

13  way they was treating us, and he told -- he told me

14  he didn't give a damn, he didn't care.  He told me

15  he didn't care.

16    Q.    And that's --

17    A.    Told me he don't -- what he told me was

18  -- I said -- I said, "Look, I need you to uncuff --

19  take these cuffs off.  They hurting my arms real

20  bad.  Take them loose."  And he told me -- I told

21  him, "I'm going to call a lawyer if you don't."

22  And he told me he didn't care, call a lawyer.

23    Q.    And that's a conversation you had with

24  him in the dayroom?

25    A.    Going toward the gym.  Not in the

1    dayroom but this was going toward the gym.

2          Q.   So, at some point you left the dayroom

3    and went to the gym?

4          A.   Yeah.  They lined us up and took -- and

5    marched us out -- took us outside and marched us

6    down the road.  Not marched us but walked us.

7          Q.   And you mentioned Warden Reynolds went

8    with you?

9          A.   He was ahead of us.  He was on the side

10   of us too, walking on the side too.

11         Q.   Where did you go when you left the

12   dayroom?

13         A.   Outside -- I went outside and lined up

14   in twos.  Then they marched us out the gate, down

15   the road to the gym.  They walked us.  They

16   marched.

17              MS. THOMPSON:  May I approach the

18   witness, Your Honor?

19              THE COURT:  Of course you may.

20              MS. THOMPSON:  Your Honor, I've shown

21   the witness what's been previously marked as

22   Plaintiffs' Exhibit 201.

23         Q.   Ms. Brown, would looking at Exhibit 201

24   assist you in describing your testimony to the

25   jury?

1          A.    Okay.

2          Q.    Would it assist you in your testimony,

3    Ms. Brown?

4          A.    Yeah.  I mean, I know what this -- what

5    the paper is saying.  I know exactly where

6    everything at in this gym.

7               MS. THOMPSON:  Your Honor, may I again

8    publish Exhibit 201 to the jury?

9               THE COURT:  Sure.  And anything that

10   has been admitted you don't have to ask if you can

11   publish.  You may publish.

12              MS. THOMPSON:  I appreciate that, Your

13   Honor.

14              THE COURT:  At all times.

15              MS. THOMPSON:  Thank you.

16         Q.    Ms. Brown, we looked at Plaintiffs'

17   Exhibit 201 a little bit earlier.

18         A.    You're going to have to turn it around.

19         Q.    Thank you.

20         A.    Thank you.

21         Q.    Now, before we talk about what happened

22   when you got into the gym, can you explain to the

23   jury what the layout of the gym was?

24         A.    The gym, when you come inside the door,

25   you have a little stand right there where the

1  officers stand right there and they kind of like

2  count you in.  When you come past -- in, you

3  walking past the staff washroom.  Then you going to

4  go past the big bathroom with the door with no --

5  nothing on it, our bathroom, inmates' bathroom.

6  Then you got the LTS office where the LT officer

7  work at, Mr. Greer -- Officer Greer.  And then you

8  have another like room next door to that, a utility

9  room, and it's where they keep like your

10 volleyballs, the baseballs, pool sticks and pool

11 balls, and weights and stuff like that, weights for

12 your legs.  It's in there.  And then right when you

13 like come -- so, once you come across past all

14 that, you're going to come to where all the

15 exercising equipment is at, like bikes you ride and

16 things you lay down and pick up weights and stuff

17 like that on.

18        Q.   Let me stop you there, Ms. Brown.  So,

19 you said that you first came in through the doors.

20 Is the area that I'm indicating on the map the

21 doors of the gym?

22        A.   Yeah, it's like right here.

23        Q.   Then can you identify by touching the

24 screen the staff bathroom that you testified about?

25        A.   The staff room?

1        Q.    The staff bathroom.

2        A.    The staff bathroom is right here, right

3   there.

4        Q.    And then where -- can you point to

5   where the inmate bathroom is?

6        A.    Right here.

7        Q.    Can you point to where the office for

8   the gym person is?

9        A.    For LTS?

10       Q.    The LTS officer.  What does LTS stand

11   for, Ms. Brown?

12       A.    I don't exactly know what it stand for,

13   but I know it have a lot to do with us, giving us

14   -- providing activities for us to do, you know,

15   games.  We can check out games, cards, and stuff

16   like that.  And he give like bingo.  He's our

17   activity officer, so he provide activities for us

18   to do.

19       Q.    That's the LTS officer you're

20   describing?

21       A.    Yes, ma'am.

22       Q.    And the last arrow you made, that was

23   that person's office?

24       A.    Yes.

25       Q.    Then what is the -- what is the room

1   that's just above the LTS office?

2          A.   Above?  This is the utility room where

3   they keep all the weights and stuff like that are

4   right here.

5          Q.   So, the middle of the gym that's marked

6   as a basketball court is obviously a basketball

7   court.  What was the area used for that is just

8   above the basketball court?

9          A.   That's where all the weights at where

10  you want -- if you want to like ride a bike, the

11  weight bike, or lift weights, different types of

12  weights is there, and you got big balls and like

13  them big balls you lay back on, those big old balls

14  that you like do crutches -- scrunches, I mean.  I

15  guess you do for your stomach.  It's some balls you

16  lay on.  That's the area we do everything right up

17  in here.

18         Q.   Now, just to the top left of where you

19  were just indicating on the drawing I'm going to

20  show you, what is where I'm pointing right now?

21         A.   What is that?  I guess it's the bottom

22  part of the stairs going up the stairs to the L --

23  to the -- the room where we go upstairs for church.

24  I'm thinking thems stairs.  It might -- I think

25  it's a multipurpose -- multipurpose room, something

1   like that.

2           MS. THOMPSON:  Your Honor, I don't

3   recall if we've shown Plaintiffs' 236, but I'm

4   going to show the witness Plaintiffs' 236.

5           May I approach, Your Honor?

6           THE COURT:  You may.

7           Listen, Counsel, whenever I've given

8   you permission to approach a witness once, the

9   first time --

10          MS. THOMPSON:  Thank you, Your Honor.

11          THE COURT:  -- from then on, do it

12  without asking.

13          A.   Okay.  I see what you're saying.  Right

14  here?

15          Q.   Let me take this for a minute.

16          A.   Yeah.  That is part of the stairs going

17  up to the multipurpose building.

18          Q.   Does Plaintiffs' Exhibit 236 reflect

19  the gym area at Lincoln Correctional Center?

20          A.   Explain it?

21          Q.   Well, does it show the gym area of

22  Lincoln Correctional Center?

23          A.   Yes, it do.

24          Q.   The picture I just showed you?

25          A.   Yes.

1          MS. THOMPSON:  Your Honor, may I

2   publish Plaintiffs' 236 to the jury?

3          THE COURT:  Of course you may.  It's

4   already been published before.

5          MS. McNAUGHT:  No.

6          THE COURT:  Hasn't it?

7          MS. THOMPSON:  I don't think this one

8   was, Your Honor.

9          THE COURT:  Hasn't it?  It has not?  I

10  thought it was with the bathroom.

11         MS. THOMPSON:  It's a similar photo but

12  slightly different.

13         MS. McNAUGHT:  Different photo, Your

14  Honor.

15         THE COURT:  Thank you for clarifying

16  that for me.

17      Q.  So, do you see --

18         MS. THOMPSON:  I'm sorry, Your Honor.

19         THE COURT:  No.  I was just going to

20  say that if I can be confused, so can members of

21  the jury and any others.  But absolutely, go right

22  ahead, please.

23         MS. THOMPSON:  Thank you, Your Honor.

24      Q.  These are the weights that you were

25  just testifying about?

1          A.    Yeah.

2          Q.    And then can you show where on this

3     photograph the multipurpose room is?

4          A.    Up here.  Right there.

5          Q.    And the windows that are on the

6     multipurpose room up there, are those -- what is

7     the level of tinting on -- or, what was the level

8     of tinting on those windows on March 31st of 2011?

9          A.    Clear.  You can see straight through

10    them.

11               It's upside down.

12         Q.    So, showing you Plaintiffs' Exhibit 201

13    again on the monitor, Ms. Brown, the room that's

14    marked industry, what was that used for?

15         A.    For the ladies that sewed clothes, like

16    our pants, our pajamas, our robes.  They did robes

17    for the different penitentiaries for the men.  Like

18    they white robes, stuff like that.  This was our

19    sewing room.  So, they got paid to do that for us,

20    to make our clothes, then it go to the clothing

21    room for us to get.

22         Q.    And then this room that's marked beauty

23    parlor, that was a beauty parlor?

24         A.    Yes.

25         Q.    And where -- do you see where there's

1   this indication on the drawing where I'm pointing

2   my finger?  What is that?

3         A.   That's the front part where you can --

4   if you come to the gym, you come down this way

5   right here and then you can come in this way and

6   it'll bring you straight in the front of the beauty

7   parlor.

8         Q.   That's a door?

9         A.   Yeah.  But if you're coming from the

10  gym in, you'll come straight across the floor,

11  right in here.  That's it right there.

12        Q.   So, Ms. Brown, taking you back to when

13  you came in the gym, can you show the jury where it

14  is that you went on Exhibit 201 when you came into

15  the gym?

16        A.   Okay.  We came -- I came in and they

17  stood us up like this, like lined us up like this

18  behind each other and some was in front of me too.

19        Q.   Where in the lines that you've just

20  indicated on the drawing were you?

21        A.   I was right up in here, the third line.

22        Q.   So --

23             THE COURT:  Whereabouts?

24        A.   Right here in the back behind -- there

25  was two groups of people ahead of me.  I was right

1    here.  Right here in that line right there.

2          Q.  I'm sorry.  Just so the record is

3    clear, can you show where on the -- where in the

4    gym you were?

5          A.  I was up in here and there was a line

6    behind me and then it was a line before me.  That's

7    how it was, just like that.  Because I remember

8    there was a lot of people in front of me.

9          Q.  So, can you point to the spot in the

10    gym where you were standing when you came into the

11    gym?

12          A.  Like right here, up in here.  I was

13    like number -- coming back this a way, I was like

14    the fourth person in line.

15          Q.  So, what happened when you came into

16    the gym and stood in the spot that you've just

17    indicated on the exhibit?

18          A.  I stood there for a while until they

19    start taking handcuffs off of people.  Now, before

20    they got to me, I seen -- okay, before they got

21    to --

22          MS. BARNES:  Your Honor, I object.

23    There's no question pending.

24          THE COURT:  Yeah.

25          MS. THOMPSON:  I'll ask the witness a

1   question, Your Honor.

2           Q.   Ms. Brown, how much time passed between

3   when you got into the gym and when they started

4   doing searches?

5           A.   I'd say about an hour before I got in

6   there.  Yeah.

7           Q.   And during that hour what were you

8   doing?

9           A.   Just standing there handcuffed with my

10  hands back behind my back like this, bouncing from

11  one knee to the -- one leg to the next, trying to

12  keep my leg from going to sleep and stuff on me.

13          Q.   And the other women that you described

14  coming in and lining up, what were those women

15  doing?

16          A.   They had started on the first row and

17  taken them -- the cuffs off of them, taking them to

18  the bathroom and that room to strip-search them.

19          Q.   The women that weren't being taken for

20  strip searches, during that hour what were they

21  doing?

22          A.   The womens that was waiting or the

23  womens that was there?

24          Q.   The women that were waiting.

25          A.   Oh, we were just standing there

1    waiting.  The ones that they took in there, they

2    took them all in at one time.  And I'm saying it's

3    like -- it's got -- it was at least between five or

4    seven people together in that bathroom.  There was

5    a lot of people in that bathroom crowded up on each

6    other, so ...

7         Q.  While you were standing in the gym for

8    this hour that we've been describing, did you see

9    any IDOC employees in the gym?

10        A.  Yeah.  Only person I seen was Warden

11   Reynolds running around the whole gym.  He was

12   everywhere.  And I seen Leonetti.  I seen Craig.  I

13   seen Ms. Edmonson.  I seen Ms. Johnson -- Officer

14   Johnson.  And I seen Ms. Slater -- not Ms. Slater

15   -- Ms. Crudup.  I seen her.  She was right there in

16   the front with the cadets over in that front area,

17   right in the front of the bathroom area outside,

18   right there talking with them.

19        Q.  Other than -- so, the cadets you're

20   referring to are cadets from the training academy?

21        A.  Yeah.  Oh, and I seen Officer Anderson.

22        Q.  Okay.  And then you mentioned that you

23   saw Warden Reynolds?

24        A.  Yeah.

25        Q.  The other officers that you named, were

1  those people correctional officers or members of

2  Orange Crush or some -- do you know what their

3  assignment was?

4        A.   Yeah.   I seen Officer Leonetti too.

5  They was all basically keeping an eye on everybody,

6  making sure that people wasn't talking and asking

7  all them questions and, you know, getting smart in

8  every way they possibly can, you know.   That's the

9  kind of stuff they was doing in there, like telling

10  people be quiet, shut up, you know, stuff like

11  that.   They use shut up a lot.

12        Q.   Those officers that you named, were

13  those Orange Crush officers?

14        A.   Yeah, all them was Orange Crush except

15  for Warden Reynolds.

16        Q.   What was Warden Reynolds --

17        A.   And Officer Crudup.   She wasn't Orange

18  Crush.

19        Q.   What was Warden Reynolds doing as he --

20  you said he was running around the gym.   What was

21  he doing as he was -- what, if anything, was he

22  doing as he was running around the gym?

23        A.   He was walking around talking, just

24  talking, just running his mouth.   He just kept on

25  talking, just -- I don't know who he was talking

1    to.  He was just talking, making sure that people

2    wasn't talking and I guess doing what they was

3    supposed to do or was told, you know.

4              Q.   Now, at some point were you yourself

5    strip-searched?

6              A.   Yes.

7              Q.   And where were you strip-searched?

8              A.   In the bathroom, without a sheet on

9    there or cover on it.

10             Q.   And let me -- let me get to -- let me

11   ask you this question:  When you were taken into

12   the bathroom, did anybody go into the bathroom with

13   you?

14             A.   Yes.  I was in there with between five

15   and -- if I'm right -- I'm not quite sure, but I

16   knew there was a lot of us in there because I was

17   like in the middle part right here.  Denise

18   Stanfield was on the corner right here and --

19   what's that lady's name?  She was standing right

20   next to me.  Okay.  I can't remember her name.  But

21   it was like -- I was like here, here, here, here,

22   and here.  It was five.  It was really five.  I

23   said between five and seven.  It was a lot of

24   people in that bathroom.  We was touching each

25   other.  And I was scared because they had blood

1  everywhere.  I was tripping.

2          Q.   Let me ask you this:  Before you went

3  into the bathroom to be searched, you testified

4  that you saw other women going into the bathroom?

5          A.   Yeah, before me.

6          Q.   Did you see what -- I'm sorry.  I

7  didn't mean to interrupt you.

8          A.   Before me, yes.

9          Q.   Did you -- did you see what, if

10  anything, was happening to those women in the

11  bathroom?

12          A.   No, I didn't see them because they

13  still had me lined up.  My back was facing the --

14  my back was facing the bathroom because they had us

15  walking like this right here.  Whenever they got

16  through with somebody, somebody else just turned

17  around and start walking, they'll say give me some

18  more or give me -- you know, they'll say give me

19  some more, and they just started walking.  We was

20  facing the wall.

21          Q.   So, Ms. Brown, I'm showing you what's

22  been marked as Plaintiffs' Exhibit 237.  This is

23  the inmate bathroom in the gym?

24          A.   Uh-huh.

25          Q.   And is this the area that you went in

1  to be strip-searched?

2          A.    Yeah.

3          Q.    Can you show us on this photograph

4  where it is that you stood when you went into the

5  bathroom?

6          A.    Right here.  Right here where this

7  little mark at.  I'm talking about right here.  Can

8  you erase that a little bit so I can put it on here

9  right?  I was like right here.  And Denise was

10  right here.  Another lady was right here and

11  another lady.  It was five of us.  Because one was

12  by the garbage can, standing by the garbage can.

13          Q.    There isn't a garbage can depicted in

14  this photograph; right?

15          A.    There was one right here in this corner

16  right here.  Because they was telling -- the girls

17  was trying to pass they sanitary napkins down

18  and --

19              MS. BARNES:  Your Honor, this is kind

20  of a narrative at this point.

21          Q.    Let me ask you this question:  You

22  indicated that the --

23              MS. THOMPSON:  Oh, I'm sorry, Your

24  Honor.

25              THE COURT:  Go ahead, please.

1        Q.   You indicated on this map that there
2    was a garbage can right where my finger is
3    pointing?
4        A.   A red and gray garbage can.  The bottom
5    is red and the top is gray.  It was right here in
6    this corner.
7        Q.   Ms. Brown, let me ask you this:  When
8    you came into the bathroom with the other women,
9    were there any IDOC employees that were in the
10   bathroom too?
11       A.   Yes.  Ms. Crudup was in there and two
12   cadets.  You could tell they was new.  They was
13   being trained.  And the lady right there, she was
14   right there.  I don't know her name, but the lady
15   right there.
16       Q.   Can you indicate the clothing that the
17   person is wearing that you're indicating?
18       A.   She's got a blue-colored suit and white
19   shirt.
20            THE COURT:  Thank you.  She's standing.
21   She has been identified.  Thank you very much.
22            MS. THOMPSON:  And, Your Honor, I'd ask
23   the record to reflect an identification of
24   Ms. Hatfield.
25            THE COURT:  Yes.

1    Q.   You don't know Ms. -- you did not know

2    Ms. Hatfield's name at the time that you were in

3    the bathroom?

4    A.   I just know her face.  I never did know

5    her name.  Somebody had to give me her name.

6    Q.   So I understand, how many cadets were

7    in the bathroom when you went in?

8    A.   It was five -- you mean cadets?

9    Q.   Cadets, yes, ma'am.

10    A.   It was like three of them standing

11    right around.  One was standing up in here, one was

12    standing like up in here, and Ms. Crudup was

13    standing like right here, and there was one

14    standing right here, and one standing like behind

15    her, like, you know, behind this one.

16    Q.   Now, when you went into the bathroom,

17    were you still wearing handcuffs?

18    A.   No, ma'am.

19    Q.   When were your handcuffs taken off?

20    A.   They took your handcuffs off -- as they

21    went down the row taking people's handcuffs off,

22    those were the ones that had to go in the bathrooms

23    and get searched.

24    Q.   And yours were removed before you went

25    in to be searched?

1       A.   Yeah.   It also was a thing right here

2   on this wall right here that you press and you dry

3   your hands with.   It ain't on there, I see that.

4       Q.   Were there any other objects that were

5   in the bathroom when you went in there to be

6   searched besides the hand dryer you just identified

7   and the garbage can?

8       A.   Well, the only thing I remember is just

9   the garbage can and the thing on the wall that you

10  press and dry your hands with after you wash your

11  hands.   But I don't know -- there was a closet

12  right over here, but I can't see all the way in the

13  corner.   I don't know if it's still there.   I think

14  they took it down, though, since the men moved

15  over.

16      Q.   You've indicated on Plaintiffs' Exhibit

17  237 where you and the other women were standing

18  when you went into the gym.

19      A.   Yeah.

20      Q.   How close were you to the women next to

21  you?

22      A.   I was real close to her and Denise

23  Stanfield.   And these was the two ladies that was

24  on their period.   And they was trying to pass me --

25  they passed stuff down to put in the garbage.

1          Q.    Let me ask you this, Ms. Brown:    At

2     what point when you were in the bathroom did

3     someone pass you a pad to put in the garbage?

4          A.    How long I was in there?

5          Q.    Well, let me ask you a better question,

6     which is:    When you came into the bathroom, you

7     were in the bathroom with these other women, what

8     happened?

9          A.    They made us strip, all us strip.    And

10    I got -- like two of us was out of our clothes

11    before the other two was out -- three was out.

12    They finally got out they clothes and they was

13    complaining about they was --

14          MS. BARNES:    I object to what they were

15    saying as hearsay.

16          A.    Well, listen, Denise Stanfield was

17    complaining --

18          MS. BARNES:    I object.

19          THE COURT:    What?

20          MS. THOMPSON:    I think there was an

21    objection, Your Honor.    I can pose a different

22    question to the witness to lay some foundation for

23    these statements.

24          THE COURT:    Well, I'm having a very

25    difficult time understanding the witness, so --

1  well, let's be as specific as we can and shorten

2  the answers as best we can too.  I don't know if

3  everybody -- anybody having difficulty

4  understanding the witness?

5                    (No positive responses)

6            THE COURT:  Coming through?  Okay.

7  Good.  Good.

8        Q.   (by Ms. Thompson) And let me ask you,

9  Ms. Brown, if possible, if you could speak a little

10  bit more into the microphone --

11            THE COURT:  Yes.

12       Q.   -- to give your answers.

13            THE COURT:  Yes, I think that will

14  help.

15            MS. THOMPSON:  I'm sorry, Your Honor.

16       A.   All right.  Okay.

17       Q.   Ms. Brown, you said that when you came

18  into the bathroom the women removed their clothes?

19       A.   Yeah.

20       Q.   Why did they remove their clothes?

21       A.   Because we was told to get -- take off

22  all our clothes and drop them on the floor.

23       Q.   Who told you to drop your clothes on

24  the floor?

25       A.   The cadets.

1        Q.    When you came into the bathroom, did

2    you look at the floor?

3        A.    Yeah.  Yes, ma'am.

4        Q.    What did the floor look like when you

5    came in?

6        A.    It had tampons and sanitary napkins

7    laying around on it and blood, you know, spots of

8    blood, drips different places, you know, stuff like

9    that.

10        Q.    I don't mean to be in -- I just have to

11    ask you this question:  The tampons and the pads

12    that you saw on the floor, were those clean

13    items or --

14        A.    No.

15        Q.    -- used items?

16        A.    No, ma'am.  No, ma'am.  No, they

17    wasn't.

18        Q.    When you were in the bathroom, did you

19    see any clean tampons or clean pads in the

20    bathroom?

21        A.    No, I didn't.  The ladies were not

22    allowed to take it and drop it in the garbage, so

23    they told them to put it on the floor.

24        Q.    Who told the ladies to put the pads on

25    the floor?

1    A.   The cadets.   The cadets.   Them training

2    the cadets told us to put it on the floor -- told

3    them to put it on the floor.

4    Q.   And was that when Ms. Hatfield was in

5    the bathroom with you?

6    A.   Ms. Hatfield was standing behind them,

7    her cadets, behind them.  I guess she was watching

8    them, I guess seeing if they was doing what they

9    was supposed to do.  But she was standing behind

10   them and they was doing I guess what they was told

11   to do.  But they didn't do a good job.

12   Q.   So, when you -- after you had removed

13   your clothes, what happened?

14   A.   I stood there for about a couple of

15   seconds or something waiting on them -- everybody

16   to take off -- the other people to take off their

17   stuff so we all can start going through our hair

18   and squatting and pulling our cheeks open and stuff

19   like that.  I couldn't do nothing till everybody

20   else got out their clothes, so I was waiting.

21   Q.   So, was there a point where all of the

22   women in the bathroom all had their -- were all

23   naked --

24   A.   Yeah.

25   Q.   -- at the same time?

1          A.    We was -- they did us all at one time.

2          Q.    And what happened after all the women

3    in the room were naked?

4          A.    After they got naked, they told us to

5    pull our ears back, pull back our ears, open our

6    mouth, hold our tongue up, move our hair around,

7    make sure there nothing in it.  Then they told us

8    to turn around -- or, hold our breasts up and then

9    told us to turn around and squat three times and

10   cough and open our butt cheeks open and stuff like

11   that.

12         Q.    You -- I want to make sure I understand

13   your testimony.  You testified a minute ago about

14   someone trying to pass sanitary materials to you.

15         A.    Yes.

16         Q.    At what point in the search did that

17   happen?

18         A.    When they first took off all their

19   clothes, the lady was going to walk past down there

20   to throw them away, and the guy was standing --

21   they just took off walking and walking this way,

22   and the lady told them go back, don't move, stand

23   where they at.  And they told her they was trying

24   to move -- I mean, go down there and throw away

25   they pads and stuff and they tampons, and the lady

told her just leave -- put it on the floor and

don't move.  That's what she told her.

Q.  Now, at some point you were able to put

your clothes on again?

A.  Huh?

Q.  At some point you were able to put your

clothes back on?

A.  Yeah.

Q.  How long were you in the bathroom

without any clothes on?

A.  About -- I'm going to say about 25

minutes.  Because I had to wait on everybody else

to get dressed.

Q.  Were any of the women in the bathroom

with you given sanitary materials?

A.  No, ma'am.  No.

Q.  While you were in the bathroom, did any

of the cadets or the IDOC employees or Ms. Hatfield

say anything?

A.  The cadet -- Ms. Crudup, she had a

bandanna, that's what -- them things you wear on

your hair.  It's a scarf.  And it was like either

blue and black, blue and gray, or black and white.

But it was brand new.  And she pulled it out her

pocket and I'm standing there watching this lady

1  tie it across her eyes like right here and she tied

2  it in the back of her head like that.  So, I said,

3  "Whoa, that was real deep, man."  She said, "Ooh,

4  these bitches stink."  She said, "You see that one

5  right there?  Oh, my God."  You know, stuff like

6  that.  She said, "Hurry up and get these bitches

7  out of here."  And they started laughing like it

8  was funny.  And I felt so embarrassed.

9       Q.   Let me -- Ms. Brown, let me ask you

10 this question:  When Ms. Crudup made those

11 comments, was Ms. Hatfield in the bathroom?

12      A.   She was right there behind them.  She

13 know what them people said.  Yeah, she was behind

14 them.

15      Q.   Well, let me ask you this:  Was there

16 anything Ms. Hatfield said or did in response to

17 those comments?

18      A.   All of them started laughing.  She did

19 too.  And I thought that was very disrespectful to

20 do us like that and then laugh about it.

21      Q.   Ms. Brown, I'm going to show you -- I'm

22 going to show you Plaintiffs' 238, which is one of

23 the photos we've seen already.  While you were --

24 can you indicate on Plaintiffs' 238 specifically

25 where you were in the bathroom?

1        A.   Right here in the front.  Right here in
2   the front.
3        Q.   Ms. Brown, during the time that you
4   were in the bathroom and you were naked, was there
5   anything covering this door area that's indicated
6   in this photograph?
7        A.   No, ma'am.
8        Q.   Did you see any IDOC employees outside
9   of the bathroom while you were inside the bathroom
10  naked?
11       A.   Yeah.  Yes, ma'am.  I seen Leonetti --
12  Officer Leonetti.  I seen Lieutenant Craig.  I seen
13  Lieutenant Dawdy.  And I seen Warden Reynolds.  And
14  I seen Officer Anderson.  He's a male officer too.
15  He --
16       Q.   And you -- I'm sorry.
17       A.   He was standing at the thing where we
18  come in where the officers check us in at, but
19  somehow he managed to walk around the gym, and I
20  seen him from just standing right there in the
21  middle of the floor.
22       Q.   And you testified that you saw an
23  Officer Leonetti?
24       A.   I seen all of them, yes, ma'am.
25       Q.   Is Officer Leonetti a man or a woman?

1          A.   He's a man.

2          Q.   And you saw Officer Leonetti, Officer

3    Anderson --

4          A.   Lieutenant Craig.

5          Q.   -- Lieutenant Craig?

6          A.   Lieutenant Dawdy -- Dawdy and Officer

7    -- Mr. Reynolds -- Warden Reynolds.

8          Q.   Those are -- to make sure I understand

9    your testimony, those are all men that you saw when

10   you looked outside the bathroom door --

11         A.   Yeah.  I could --

12         Q.   -- as you were inside the bathroom?

13         A.   -- see them from standing right here in

14   this -- in the middle of the floor.  They kept

15   moving around the cadets, so they was like right

16   there in my face.

17         Q.   So, let me ask you this:  When you were

18   inside the bathroom and you looked out and saw

19   Warden Reynolds, what was Warden Reynolds doing?

20         A.   Walking through the gym, just standing

21   in the middle of the gym, looking that way toward

22   where we was at.

23         Q.   When you were in the bathroom and you

24   looked out and saw Lieutenant Craig, what was

25   Lieutenant Craig doing?

1    A.    Standing in the background back in the

2    back with his Orange Crush outfit on.  He was just

3    standing back there back in the back.  It's like

4    where they was standing -- where they was standing

5    is like they could see straight to that bathroom

6    where they was standing back there in the back.

7    They was our own guard or something, I don't know,

8    just standing there.

9        Q.    When you were in the bathroom and you

10   looked out and you saw Lieutenant Dawdy, what was

11   Lieutenant Dawdy doing?

12       A.    He was talking to -- he was talking to

13   the -- the -- Ms. Edmonson and them -- Officer

14   Edmonson and Ms. Johnson, they with was like right

15   by each other.  He was talking to them, but I could

16   still see him right there in my presence.

17       Q.    When you were in the bathroom and you

18   looked out and you saw Leonetti, what was Leonetti

19   doing?

20       A.    Standing back there next to Craig -- by

21   Craig -- Lieutenant Craig with his -- that stick in

22   his hand, just standing there looking ahead of him,

23   like in front of him.  In front of him, I mean.

24       Q.    When you were in that bathroom and you

25   looked out and you saw Officer Anderson, what was

1   Officer Anderson doing?

2          A.   Just walking around, looking around.

3   He was just looking like his head turn -- his head

4   was turned face -- he was over there by Lieutenant

5   Craig and them where they was standing like around

6   in that area and Ms. Johnson and them, Officer

7   Johnson, he was like right up in that area.  And I

8   looked and I seen him standing, and I'm like, what

9   is he standing there for?  He's supposed to be on

10  that little thing up there at the door.  That's

11  where they had him at -- assigned or whatever.

12         Q.   Ms. Brown, is Plaintiffs' 233 another

13  view of the gym at Lincoln Correctional Center?

14  That's the photograph I just showed you.

15         A.   Is that another part of it?

16         Q.   Is it another view of the gym?  Yes.

17         A.   You can get a view from the gym from --

18         Q.   And I'm sorry.  I want to make sure you

19  understand my question.  Is Plaintiffs' 233, the

20  photograph I just showed you, a view of the gym at

21  Lincoln Correctional Center?

22         A.   Yes, it is.

23              MS. THOMPSON:  Your Honor, may I

24  publish Plaintiffs' Exhibit 233 to the jury?

25              THE COURT:  Yes, you may.

1    Q.   Ms. Brown, during the time that you

2   were standing in the bathroom, you just told us

3   about various male IDOC employees that you saw in

4   the gym.

5    A.   Yeah.  Yes.

6    Q.   Can you identify on Plaintiffs' Exhibit

7   233 any of the places where you -- where those men

8   were standing when you looked out of the bathroom

9   and saw -- and saw the men?

10    A.   They was walking -- they was like

11   standing like right here and like -- like, you

12   know, they was standing across the thing like this

13   here.  So, they had to keep an eye on -- well, it

14   went all the way down because they was looking at

15   everybody.  They had to watch everybody, I guess.

16    Q.   I previously showed you Plaintiffs'

17   236.

18    A.   Uh-huh.

19    Q.   At any point when you were in the gym

20   that day, not just in the bathroom but anywhere

21   that you were, did you ever see anyone in the

22   multipurpose room that we pre -- that we talked

23   about a minute ago?

24    A.   No.

25    THE COURT:  Now, wait a minute.

1   Where's the -- the multipurpose room, isn't that up

2   on the second floor?

3         A.   Yes, sir.  It's up here.

4              THE COURT:  Right.

5              MS. THOMPSON:  I believe Ms. Brown

6   indicated these windows were the multipurpose room.

7              THE COURT:  Right, okay.

8         A.   Yeah.

9         Q.   Let me ask you a question, Ms. Brown.

10             THE COURT:  Well --

11             MS. THOMPSON:  I'm sorry, Your Honor?

12             THE COURT:  Are you going use that?

13             MS. THOMPSON:  I just asked the witness

14  a question about it.  I don't have another question

15  to pose to the witness.

16             THE COURT:  Oh, okay, fine.

17             MS. THOMPSON:  Thank you, Judge.

18        Q.   Ms. Brown, I've just shown you

19  Plaintiffs' Exhibit 250.  Is that another view of

20  the gym at Lincoln Correctional Center?

21        A.   Another view?

22        Q.   An area in the gym?

23        A.   Yeah, that's another area in the --

24  yes, that's another area.

25             MS. THOMPSON:  All right.  Your Honor,

1    may I publish --

2               THE COURT:  Please.

3               MS. THOMPSON:  -- Plaintiffs' Exhibit

4    250 to the jury?

5          Q.   All right.  Now, Ms. Brown, in

6    Plaintiffs' Exhibit 250 do you see a curtain?

7          A.   Yes.

8          Q.   Now, what area of the gym is the

9    curtain in this picture covering?

10         A.   The bathroom where we -- I was stripped

11   in.

12         Q.   Ms. Brown, when you were in the

13   bathroom being searched, was there a curtain of the

14   type depicted in Exhibit 250 over the door?

15         A.   No.

16         Q.   At any point before you went in to be

17   searched did you see any curtain in front of the

18   bathroom door opening?

19         A.   No.

20         Q.   At any point when you were in the gym

21   that day did you see a curtain over the door?

22         A.   No.

23              Can I say something?

24         Q.   Let me ask you a question, Ms. Brown.

25         A.   Okay.

1      Q.   When you finished being searched, what

2  happened next?

3      A.   They told us go out there and -- go sit

4  out there on the benches.  But there wasn't no room

5  when I got out there, so I had to sit on the floor.

6      Q.   And were there any other women around

7  you in the area that you went to sit?

8      A.   Yeah.  They were sitting on the

9  benches.  They was complaining that they was --

10  they was soaking wet --

11      MS. BARNES:  I object to what other

12  inmates --

13      A.   Yeah, there was other womens out there,

14  yeah.

15      THE COURT:  Just a moment.  Just a

16  moment.  When there's an objection, we've got to

17  take it.

18      MS. BARNES:  It's a hearsay objection.

19  I object to what other inmates were saying.

20      THE COURT:  That's sustained.

21      MS. THOMPSON:  Thank you, Your Honor.

22      Q.   Ms. Brown, when you went back and sat

23  on the floor, were there any IDOC officers in the

24  area where you were sitting?

25      A.   Yes, Officer Johnson and Edmonson --

1    Officer Edmonson and Officer Johnson, they was out

2    there standing close to us on the benches -- well,

3    by me, talking to the inmates, telling them to shut

4    up and be quiet and don't let me have to tell you

5    again the same thing.

6              MS. BARNES:  Your Honor, I object to

7    this witness talking about what anyone -- any

8    correctional officer said except these defendants.

9    She's --

10             THE COURT:  Well, I think that we can

11   -- unless they're defendants or not, I don't think

12   that that makes any difference.  I think we're

13   getting here not necessarily facts that are

14   directed toward individual defendants.  We're

15   talking about background and what is going on here.

16             Now, we've got a lot of people involved

17   here and they're not all named defendants, but

18   they're part of the backdrop.  They're part of the

19   whole scene.  And I think that the jury's entitled

20   to hear just what went on there at that time.  It's

21   very crucial.  It will be in the -- at the end of

22   the day.  So, I think that it's -- and frankly, I

23   would like to also see the big picture here of

24   what's going on and being transacted.

25             It seems to me that this is perfectly

1   acceptable and I'm going to allow it.  Overruled.

2            You may proceed.

3            MS. THOMPSON:  Thank you, Your Honor.

4       Q.  Ms. Brown, when you came out of the

5   bathroom, did you see -- did -- let me ask you a

6   better question.

7            At any point when you were in the gym

8   that day did you see Warden Hulett in the gym?

9       A.  Yes, I did.

10      Q.  At what point did you see Warden Hulett

11  in the gym?

12      A.  She came in at the last minute with

13  Warden -- with Deputy Denning.

14      Q.  And let me ask you this:  When you say

15  she came in at the last minute, when -- when did

16  she come in?

17      A.  We was very close to, you know, being

18  done with the strip search when she came in.  It

19  was still some people left to be searched, but she

20  came in with Deputy Denning, the deputy sheriff

21  from Springfield.

22      Q.  And let me ask you this:  How much time

23  passed between when you came into the gym and when

24  you saw Warden Hulett in the gym?

25      A.  I'd say about three hours.  Three

1  hours, something like that.

2      Q.   When you saw Warden Hulett in the gym,

3  did she say anything?

4      A.   Yes.  We were -- well, certain inmates

5  that was standing next to me and some of the other

6  inmates was asking her -- telling her about their

7  handcuffs was too tight and -- because I guess they

8  wanted her to take them off of them.  We was

9  complaining about our handcuffs.  I didn't say

10  nothing, but I was going to, but they did it for

11  me.  And she said, "It won't be much longer."

12      MS. BARNES:  Your Honor, I object.

13      THE COURT:  Yes, I'll sustain that

14  objection.

15      MS. THOMPSON:  As to what -- I'm sorry.

16  Because I want make sure I don't ask an improper

17  question.

18      THE COURT:  Yeah.

19      MS. THOMPSON:  It's sustained as to

20  what Warden Hulett said?

21      THE COURT:  No.  But you haven't asked

22  the question.

23      MS. THOMPSON:  Let me ask --

24      THE COURT:  This is a rambling type of

25  answer.

1          MS. THOMPSON:  I under -- I appreciate

2     the objection and I understand, Your Honor.

3          THE COURT:  You've got to come across.

4          MS. THOMPSON:  I appreciate that.

5     Thank you.

6          Q.  What, if anything, did you hear Warden

7     Hulett say when you saw her in the gym?

8          A.  That it won't be very much longer,

9     we'll be -- it'll all be over with.  And then I

10    heard the deputy sheriff say something about find

11    something to go over --

12         MS. BARNES:  I object to what the

13    deputy sheriff said, Your Honor.

14         THE COURT:  I'll sustain, sustain the

15    objection.

16         Now, ma'am, you mustn't go ahead and

17    ramble.

18         A.  Okay.

19         THE COURT:  You've got to just answer

20    specifically the question that is posed.

21         A.  Okay.

22         THE COURT:  Okay?

23         A.  All right.

24         THE COURT:  Good.

25         A.  She said --

1      Q.   I'm sorry.  Let me ask you a different

2  question, Ms. Brown.

3           THE COURT:  Go ahead.

4      Q.   Let me ask you a different question,

5  Ms. Brown.  At the time that you saw Warden Hulett

6  in the gym where were you?

7      A.   I was standing -- I was sitting down on

8  the floor when she came in.

9      Q.   All right.  And you said that there

10  were women who were talking to Warden Hulett about

11  handcuffs?

12      A.   Yeah.

13      Q.   You were not in handcuffs at that time?

14      A.   No.

15      Q.   Is there anything else that you heard

16  Warden Hulett say besides telling those women that

17  there -- it wouldn't be much longer?

18      A.   I heard her say something about go back

19  there and look in the industry room and see is

20  there any kind of -- some type material like a

21  sheet or something they can get to cover the door

22  with.

23      Q.   Did you ever see anybody come out with

24  a sheet or something?

25      A.   Yeah, they came out with something.  It

1 was a sheet, but they put it up there with some

2 tape, some -- some of that beige, cream-colored

3 tape. They put it up there with that. That's why

4 I'm trying to figure out where that come from right

5 here.

6       Q.   So, I'm going to show you Plaintiffs'

7 Exhibit 250 again. At some point did you see the

8 door to this bathroom covered?

9       A.   Yeah. Yes, I did.

10      Q.   Was it covered with the curtain that's

11 depicted in this photo?

12      A.   No. It wasn't on this at all. It was

13 just going -- some tape going across the top of it

14 right up there.

15      Q.   Are you describing a sheet that was

16 over the door?

17      A.   Yeah. And these little poles, they

18 wasn't on it.

19      Q.   At what point did a sheet -- did you

20 see a sheet go up over this door?

21      A.   I seen some material come out of the

22 industry room and they put it up over that door

23 with some tape. I don't -- I believe it was white

24 material that they put up there.

25      Q.   Other than having a conversation with

1    -- or, other than seeing Warden Hulett with Deputy

2    Denning, did you see Warden Hulett with any other

3    IDOC officers in the gym?

4         A.   No, I didn't.

5         Q.   And did you see Warden Hulett and

6    Warden Reynolds have any conversations in the gym?

7         A.   Yeah, I seen them talking.

8         Q.   Do you know what they were talking

9    about?

10        A.   No, ma'am.

11        Q.   Ms. Brown, how much time passed between

12   when you saw a curtain go up over the bathroom and

13   when you left the gym?

14        A.   How much time passed?

15        Q.   Yes, ma'am.

16        A.   Oh, I'd say another -- like another

17   good 30 minutes or 35 minutes, something like that.

18   Because they still had some people to search.

19        Q.   So, in that 30 minutes were there other

20   women that got searched?

21        A.   Yeah.  I remember Warden Hulett saying

22   something about that bathroom.  I think she once

23   said, "And use that bathroom right there too."

24   Which was the staff bathroom in the gym.  I

25   remember somebody saying that.  I don't know -- I

1    think it was her that said that.  Because they

2    started using the bathroom too because it had a

3    door that you can close.

4         Q.  I'm going to show you Plaintiffs'

5    Exhibit 233 again.

6         A.  Okay.

7         Q.  Is the door to the bathroom that you

8    were just describing depicted in Plaintiffs'

9    Exhibit 233?

10        A.  Just explain it?

11        Q.  Do you see the door to the bathroom on

12   Plaintiffs' Exhibit 233?

13        A.  Huh-uh.

14        Q.  Do you see the staff bathroom on

15   Plaintiffs' Exhibit 233?

16        A.  Yes, I do.

17        Q.  Can you point it out to the jury?

18        A.  Right here.  Right here.  Yeah.

19        Q.  So, at some point when you were in the

20   gym, did you see women going out of -- in and out

21   of the staff bathroom that you just identified?

22        A.  Yes, I did.

23        Q.  And when did you first see women going

24   into the staff bathroom to be searched?

25        A.  After Warden Hulett came in and told

1  them to put something over that door.

2      Q.  Now, you told us earlier that there is

3  a beauty shop in that gym as well.  While you were

4  in the gym, did you see women going in and out of

5  the beauty shop?

6      A.  Yes, I did.

7      Q.  And from where you were sitting, could

8  you see inside the beauty shop?

9      A.  No, I couldn't see inside because I was

10  sitting on the floor.  But the benches I was

11  sitting on, yeah, it was facing that.  The benches

12  they was sitting on, I mean.  I was sitting on the

13  floor.

14      Q.  Ms. Brown, did you ever see Warden

15  Hulett giving anybody sanitary materials in the

16  gym?

17      A.  No, ma'am, I didn't see that.

18      Q.  Did you see Warden Hulett leave the gym

19  at some point?

20      A.  Yes, I did.

21      Q.  How much time passed between when you

22  saw Warden Hulett in the gym with Deputy Denning

23  and when you saw Warden Hulett leave?

24      A.  After she got done talking to Warden

25  Reynolds -- Assistant Warden Reynolds, that's when

1  she left.

2          Q.   How much time was she in the gym for?

3          A.   About ten minutes.  Ten minutes at the

4  most, something like that.

5          Q.   While you were in the gym, did you hear

6  IDOC officers giving orders to yourself or other

7  women?

8          A.   Giving orders in what way?

9          Q.   Telling yourself or telling other

10  inmates to do something.

11          A.   Telling us to do something?

12          Q.   Yes.

13          A.   Oh, they was telling us to shut up a

14  lot and sit down and told us that if we don't shut

15  up they was going to write us a ticket and put us

16  in seg.  And mostly, they just kind of like

17  threatened and intimidated us in every way they

18  could, really.

19          Q.   Did you see any women that were

20  refusing to do things that they were asked to do?

21          A.   No, I didn't.

22          Q.   Did you see any inmates screaming at

23  IDOC officers?

24          A.   No.

25          Q.   Did you see anybody that was trying to

1   leave the gym?

2         A.   No, ma'am.

3         Q.   Did you see anyone trying to walk away

4   from the place where they were standing?

5         A.   No, ma'am.

6         Q.   So, Ms. Brown, did there come a time

7   that you left the gym?

8         A.   Yeah.  We left after everybody was

9   strip-searched.

10        Q.   And do you know how long you were in

11  the gym for from when you came in to when you left

12  after everyone was strip-searched?

13        A.   When we left, it was 12, at least

14  12:00.  Yeah.  Because the chow hall -- they had

15  ate already.  They took us straight to the chow

16  hall.  And when we got there, wasn't nobody in the

17  chow hall.  It was -- lunch was over with.  We was

18  the only one in there.

19        Q.   Did you get to eat lunch that day?

20        A.   They offered us lunch.  A lot of us

21  didn't eat it, though.

22        Q.   I want to ask you this question too:

23  When you were leaving the gym, you went out with

24  all -- you said that you went out with all of the

25  women --

1        A.   Yeah.

2        Q.   -- the inmates that were in there?

3        A.   Yeah, we walked out together and came

4  together.

5        Q.   When you walked out of the gym, did you

6  notice any women that were having any sanitary

7  problems?

8        A.   Yes.  Stacy Benton, Michelle Clopton,

9  Denise Stanfield.  There was quite a few of them.

10  They had problems.  They didn't even have no --

11  they was -- they didn't have nothing on.  They was

12  walking back without sanitary napkins on.

13        Q.   Can you describe how you knew that

14  those women was walking back without sanitary

15  napkins?

16        A.   Because they was angry and talking

17  about it going all the way over to the -- we walked

18  out the gym to the dining room, chow hall, and then

19  they was talking about going back to the unit.

20        MS. BARNES:  Your Honor, this is

21  hearsay and I object to it.

22        THE COURT:  I'll sustain.

23        Q.   Let me ask you a different question.

24  When you left the gym, did you see any women that

25  had blood on their clothes?

1       A.  Yes, I did.

2       Q.  How many women did you see that had

3  blood on their clothes?

4       A.  I seen Stacy Benton and I seen Denise

5  Stanfield.

6       Q.  Where on Ms. Stanfield's body was --

7       A.  On the back of they shorts, they

8  jogging pants.

9       Q.  On the bottom of their pants?

10      A.  Yeah, the back of it.

11      Q.  Did you ever file a grievance about

12  what happened on March 31st of 2011?

13      A.  Yes, I did.

14      Q.  And how did you fill out -- what is the

15  process you used to fill out that grievance?

16      A.  I wrote -- I mean, I did -- I wrote

17  about -- I mean, I -- I filled out a grievance

18  about them being -- a strip search.  My reason was

19  strip search.  That was the reason I put down,

20  strip search.  And then I wrote it out what time it

21  started and how they violated me, my rights, and I

22  feel like my body was exposed to a lot of things in

23  there and I wanted -- I wrote it out.  I got a copy

24  of one of my grievances, but they ain't from

25  Lincoln.

1          Q.   Let me ask you this, Ms. Brown:  Had

2     you ever filled out a grievance before --

3          A.   Yes.

4          Q.   -- March 31st of 2011?

5          A.   Yes.

6          Q.   There's an official form for

7     grievances?

8          A.   Yes, ma'am.

9          Q.   Is that the form you used to fill out

10    your grievance?

11         A.   Yep.

12         Q.   What did you do when you were done

13    writing the grievance out?

14         A.   I took it out in the hall, asked the

15    officer can I bring it out in the foyer where they

16    sit at and put it in the grievance box.

17         Q.   When you put your grievance in the

18    grievance box, was there anything else in the

19    grievance box?

20         A.   Yeah, they was some already in there.

21    About 30 was already in there.

22         Q.   Other grievances?

23         A.   Yes, ma'am.  Yes, ma'am.

24         Q.   When you were filling out your

25    grievance, did you see any other women also filling

1   out a grievance?

2          A.   Yes, ma'am.

3          Q.   How many other women?

4          A.   The whole unit.  We was sitting in the

5   dayroom doing it.

6          Q.   When did you fill out your grievances

7   in the dayroom?

8          A.   As soon as we got back in and got

9   situated, put our clothes and stuff -- they had

10  tore up our stuff -- put everything away and

11  organized, we went out in the dayroom and we went

12  and got a big pad of grievances from the officers

13  and they gave them to us and we sit in the dayroom

14  and wrote it.

15         Q.   Why did you fill out a grievance?

16         A.   Because I felt like they was -- they

17  embarrassed me and they was very disrespectful with

18  the strip search or shakedown or I don't --

19  whatever it was, they was very disrespectful, and I

20  didn't like the way they did that.

21         Q.   Was there something that you expected

22  to come from the grievance process, Ms. Brown?

23         A.   Yes, ma'am.  I was -- I'm thinking that

24  if a -- all the men that was in that gym, they knew

25  women was in there naked, I didn't understand why

1    would they be anywhere in our presence where we

2    could see them.  So, yes, I had to write that up.

3         Q.  But did you -- my question for you is:

4    What did you think would happen after you filed

5    your grievance?

6         A.  I figured that --

7         MS. BARNES:  Your Honor, I'm not sure

8    this is relevant to any issue in the case.

9         THE COURT:  Well --

10        MS. BARNES:  So I object.

11        THE COURT:  I'm not either at this

12   stage, but I'm going to err to let it in rather

13   than keep it out.

14        You know, we've got here, folks, we've

15   got an umbrella of everything that happened during

16   this whole thing, and we can nitpick till the cows

17   come home on individual little pieces.  But I think

18   that it's necessary for us, for the jury and for

19   everybody involved, to get the big picture of this

20   thing.  And then we can get down into the

21   nitty-gritty as we go along with the witnesses.

22   But I'm going to err to let it in rather than keep

23   it out.  So, we're going to keep it in.

24        MS. THOMPSON:  Thank you, Your Honor.

25        THE COURT:  Yeah.

1      Q.   Do you remember the question, Ms.

2 Brown?

3      A.   Huh?

4      Q.   I think the question I asked you was:

5 Why did you file a grievance?

6      A.   I felt like it needed to be wrote down

7 and it needed to go in front of the committee, the

8 grievance committee, so the grievance officer can

9 see what type of procedures we went through and how

10 bad they were, and I wanted them to make a decision

11 on the grievance.  Before I even go any further

12 with it, I needed to get my results from that.

13      Q.   Ms. Brown, did you ever see the

14 grievance that you filled out again?

15      A.   No, ma'am.

16      Q.   Did you ever see any of the grievances

17 that you saw other women submit again?

18      A.   No, ma'am.

19      Q.   After March 31st of 2011 did you ever

20 talk about this strip search with Warden Hulett?

21      A.   Yeah, I have.  I asked Warden Hulett

22 and Warden Reynolds, really both of them.

23      Q.   Well, first as to Warden Hulett, did

24 you ever discuss March 31st, 2011, with Warden

25 Hulett?

1    A.    Yeah.   I asked her about the grievance,

2    can she tell us where the grievance -- did she get

3    the grievance.   Because I was told from my

4    counselor on Unit 2 that she was -- got a phone

5    call saying that she had to bring the grievances up

6    top.   So, up top to me meant to the warden.

7    Q.    When did you have that conversation

8    with Warden Hulett?

9    A.    Sitting on the -- sitting on the row

10   one day, talked -- stopped her and asked did she

11   get our grievances that we wrote because the

12   counselor said they had went up top.   She didn't

13   know nothing about it, though.

14   Q.    How long after March 31st did you have

15   that conversation with Warden Hulett?

16   A.    About five days later.   Because we

17   didn't -- we went out there to check on the

18   grievances in the grievance box and they was all

19   gone, so we wanted to know did they -- did the

20   counselor get them and was she going to hear our

21   grievances.

22   Q.    And during that conversation with

23   Warden Hulett, did she ask you any other questions

24   about your grievances?

25   A.    No, she didn't say anything.   She just

1  said that she didn't get them.  She said she don't

2  know nothing about it, she didn't get it.

3      Q.  After March 31st of 2011, while you

4  were at Lincoln Correctional Center, did you ever

5  discuss the events of March 31st with Warden

6  Reynolds?

7      A.  I talked to him one day on the unit and

8  I was asking him about what do they mean when they

9  say your grievance went up top.  I just wanted to

10  know what that meant.  But nobody really gave me a

11  really, you know, direct answer about what that

12  meant.  Because I'm under the impression when they

13  say up top it went to one of the wardens or

14  Springfield.

15      Q.  Let me ask you this:  When you had that

16  conversation with Warden Reynolds, how long after

17  March 31st was that?

18      A.  Oh, I'd say about two weeks I seen him.

19  Because I'd already talked to Warden Hulett.  I

20  wanted to hear his side, see what he thought,

21  that's all.

22      Q.  And what, if anything, did Warden

23  Reynolds say to you when you saw him at the unit

24  about two weeks after March 31st?

25      A.  He said he didn't know what I was

1   talking about.

2       Q.  Did he ask you any other questions

3   about your grievance?

4       A.  No, ma'am.

5       Q.  Was March 31st, Ms. Brown, the first

6   time that you'd been strip-searched in the Illinois

7   Department of Corrections?

8       A.  Like that, yes.

9       Q.  Had you had to submit to a strip search

10   on other occasions prior to March 31st?

11       A.  Yeah, but it wasn't here.  It was in

12   Cook County.

13       Q.  But in -- in Lincoln Correctional

14   Center specifically, prior to March 31st had you

15   ever been strip-searched?

16       A.  Oh, when you first come in, back in

17   like 2000, they had us in the gym strip-searching

18   us, but it was all in a group then.  We come in on

19   a new, everybody come in from Dwight on a new.

20   They can strip-search then.

21       Q.  When you transferred in from another

22   institution?

23       A.  Yes, ma'am, from Dwight to Lincoln.

24       Q.  When you had that strip search, were

25   there men present?

1          A.   No, ma'am.

2          Q.   How long did that strip search take,

3     the one you just described when you came into the

4     institution?

5          A.   It didn't take that long because they

6     just be -- they just be making sure that you ain't

7     brought nothing from the -- the quarantine -- I

8     mean the X house, wherever you was in Dwight, with

9     you.  And if you ain't -- it don't take that long.

10    Then they take you straight to the clothing room.

11              MS. THOMPSON:  May I have just one

12    moment, Your Honor?

13              THE COURT:  You may.

14              MS. THOMPSON:  Thank you, Your Honor.

15    I have no more questions.

16              THE COURT:  You may cross.

17                   CROSS-EXAMINATION

18    QUESTIONS BY MS. BARNES:

19         Q.   Good afternoon, Ms. Brown.

20         A.   Hello.  How you doing?

21         Q.   Fine.  I believe you testified earlier

22    that you walked into the bathroom and there were

23    sanitary pads and napkins -- and tampons all over

24    the floor.

25         A.   Yes, ma'am.

1       Q.   Do you remember that testimony?

2       A.   Yes, ma'am, I did.

3       Q.   That's not quite how you described it

4  in your attestation -- your declaration.  Do you

5  remember giving a declaration in this case?

6       A.   Yes, ma'am, I did.

7       Q.   Okay.  Now, I just -- let me pose the

8  question here.

9       A.   Uh-huh.

10      Q.   I'm going to show you what we've marked

11 as Defendants' Exhibit Number 11 and I want you to

12 take a look at it.

13      A.   Okay.

14      MS. BARNES:  May I approach the

15 witness, Your Honor?

16      THE COURT:  Yes, please.

17      Q.   Take a look at Paragraph 5.

18      A.   Yes, ma'am.  I remember -- I remember

19 this.  Yes, ma'am.

20      Q.   Okay.

21      A.   And I can tell you why it's like that

22 too.

23      Q.   Hang on a second here.

24      Now, in this document you testified

25 that the women were able to throw their sanitary

1 napkins in a garbage can; isn't that right?

2         A.   The ladies that were with me --

3         Q.   Now, wait a minute.  Just answer my

4 question.  In this --

5         A.   Yes, yes.

6         Q.   Paragraph 5 of this --

7         A.   Okay.

8         Q.   -- you said they were able to throw it

9 in a garbage can.

10         A.   Uh-huh.

11         Q.   You testified also earlier that Warden

12 Reynolds talked to you a couple -- talked to you as

13 a -- I guess your housing unit a couple of weeks

14 before?

15         A.   Yes, ma'am.

16         Q.   And I think your testimony was that he

17 said, "I'm getting tired of this."  Essentially, is

18 it fair to say he sort of lectured you about your

19 behavior?

20         MS. THOMPSON:  Your Honor, I --

21         A.   Yes, ma'am.

22         MS. THOMPSON:  Your Honor.

23         A.   Yes, ma'am.  That's what I said when --

24         THE COURT:  Wait a minute.

25         A.   When she asked me, I --

 1          MS. THOMPSON:  Ms. Brown.

 2          THE COURT:  Wait a minute, folks.

 3          Now, when we've got an objection, just

 4   stop.  Okay?

 5          Now make it.

 6          MS. THOMPSON:  Your Honor, I object in

 7   that it misstates her testimony about the timing of

 8   her conversation with Warden Reynolds.

 9          THE COURT:  Is the timing on the

10   declaration?

11          MS. BARNES:  Actually, it was in her

12   testimony.  And I'm happy to ask her exactly when

13   Warden Reynolds talked to them right before the

14   search.

15          THE COURT:  Fine.  Why don't we go

16   ahead and do that.

17          MS. BARNES:  Okay.

18      Q.  When was it that Warden Reynolds came

19   in and talked to you about --

20      A.  Ma'am, I said it was either on the 9th

21   or the 10th.  Because we had the strip search on

22   the 11th.  I said I know he came through there one

23   of those days.  I wasn't for sure, I said.  I said

24   but he came through and made that announcement that

25   was he was sick of what's going on on that unit and

1   that he was going to -- if he have to bring Orange

2   Crush over here every day, he would do that.  And

3   he said that he was tired of people talking back to

4   the officers and getting bad reports about our

5   unit.  Yeah.  I've said all that.

6          Q.   Oh, Okay.  So, it's fair to say that

7   Warden Reynolds had penological concerns about

8   discipline in the prison; isn't that fair to say?

9          MS. THOMPSON:  Objection, Your Honor.

10          THE COURT:  No.  Well, wait a minute.

11   Wait a minute.  What's the objection?

12          MS. THOMPSON:  As to how she would know

13   whether those were penological concerns.

14          MS. BARNES:  I'll rephrase it.

15          THE COURT:  Yeah.  All right.  Try it.

16   Give it a stab.  Rephrase.

17          Q.   Ms. Brown, after having listened to

18   Warden Reynolds warn your unit about behaving --

19          A.   Yes, ma'am.

20          Q.   -- would you say that it would be fair

21   to say that he had concerns about discipline in the

22   prison?

23          A.   I'll say that -- no, ma'am, I won't say

24   that.  Nope.  I don't think that he had concerns.

25   I think he was being awful mean and I felt like he

1    was giving us -- it was like some revenge stuff

2    that he was on.  And no, I won't say that.  Nope.

3    No, ma'am.

4           Q.   Revenge?

5           A.   That's how I felt.  Yes, ma'am.

6           Q.   Your earlier testimony about the men,

7    they were way across on the other side of the gym;

8    weren't they?

9           A.   Not all of them.

10          Q.   I think you -- when you drew the lines

11   for the -- for the jury to see, all of those lines

12   were right -- right -- way over on the other side

13   of the gym; weren't they?

14          A.   Yes, ma'am, but when --

15          Q.   That's the only question --

16          A.   Okay.

17          Q.   -- pending.

18          A.   Yes, ma'am.

19          Q.   Okay.

20          A.   Uh-huh.

21          Q.   And how long had you been in the

22   institution when you went through this?

23          A.   Ever since October the 7th of '07.

24          Q.   Okay.  I think you mentioned when you

25   first got to the facility there was a group search.

1    A.   That was in 2000.  They don't do that
2  no more.  That was in 2000.

3    Q.   Okay.  But you had been through a group
4  search before; is that right?

5    A.   Yeah.  But wasn't nobody there but just
6  the officers that came in, the female officers.

7    Q.   Okay.

8    A.   That's it.

9    Q.   And I think you said it was done in the
10  gym; isn't that right?

11    A.   Yes, ma'am.  No.  Yeah.  Wait a minute.
12  No.  Where were we at?  Yes, ma'am, it was in the
13  gym.

14    Q.   Okay.

15    A.   Yes.

16    Q.   So, a group search is not something
17  that was not familiar to you because you'd been
18  through it before; isn't that fair to say?

19    A.   Yes, ma'am, but not with no mens in the
20  -- on the scene.

21    Q.   Okay.  I understand your -- what you're
22  saying here, but ...

23        Didn't you -- was Officer Crudup
24  standing at the bathroom door?

25    A.   Yes, ma'am, she was.

1          Q.   Okay.

2          A.   She was then inside too.

3          Q.   And how long total did the actual strip

4     search take?

5          A.   It took about 15, 20 minutes, something

6     like that.  About, you know, 15, 20 minutes, then

7     we was dressed and out of there.  Then we was

8     dressed and out of there.

9          Q.   That included getting dressed?

10         A.   Undressed.

11         Q.   I'm sorry.  Getting undressed?

12         A.   Yes, ma'am.

13         Q.   And then they asked you to do the hair

14    and your ears?

15         A.   Yes, ma'am.

16         Q.   And then you put your clothes back on?

17         A.   Dressed back and then out, yes.

18         Q.   And they let you go back and sit in the

19    gym without handcuffs?

20         A.   Yes, ma'am.

21              MS. BARNES:  Okay.  Could I have just a

22    second, Your Honor?

23              THE COURT:  Sure.

24              MS. BARNES:  Thank you.

25              THE COURT:  Thank you.  All right.

1    Redirect?

2    MS. THOMPSON:  Briefly, Your Honor.

3    REDIRECT EXAMINATION

4  QUESTIONS BY MS. THOMPSON:

5    Q.  Ms. Brown, how many days before this

6  search did Warden Reynolds have the -- make the

7  statements in the dayroom that you've testified

8  about?

9    A.  I'm thinking it was two days before it.

10  Because we had this -- as soon as he made that

11  statement, right away we had a -- right away we had

12  a -- they came through -- Orange Crush -- right

13  after he made that statement "I'll have Orange

14  Crush coming through here every day if I have to,"

15  then we seen Orange Crush waking us up out of our

16  sleep, making noise.

17    Q.  That wasn't two weeks before this

18  search happened?

19    A.  No.

20    Q.  Okay.  Now, you were shown a copy of a

21  declaration that you signed in this case,

22  Defendants' 11.  Did you just look at that a moment

23  ago?

24    A.  Yes, I did.

25    Q.  And that declaration -- in that

1  declaration you indicate that women had to -- you

2  saw women have to throw their sanitary napkins in

3  the garbage in front of you and others; right?

4       A.  No.  Well, this is what happened:  The

5  ladies tried to throw the things in the garbage,

6  the pads and the sanitary napkins, and the cadets

7  wouldn't let them.  They walked past me, got --

8  they got like right in front of me and tried to

9  throw it -- put it in there theirself.  That's how

10  I came involved when they tried to give it to me to

11  throw it in there.  Because they told them to go

12  back and put it on the floor.  And then they tried

13  to pass it to me to pass and I wouldn't do it.

14       Q.  All right.  Ms. Brown, I've just shown

15  you Plaintiffs' Exhibit 235.  Is that another view

16  of the Lincoln Correctional Center gym?

17       A.  Yes.

18       MS. THOMPSON:  And, Your Honor, may I

19  publish Plaintiffs' Exhibit 235?

20       THE COURT:  Of course.

21       MS. THOMPSON:  Thank you.

22       Q.  Now, Ms. Brown, on the right side of

23  Plaintiffs' Exhibit 235, is that the side of the

24  gym where the inmate bathroom was?

25       A.  Yes, it is.

1    Q.   And can you indicate on Plaintiffs'
2  Exhibit 235 where, as you were in that inmate
3  bathroom being searched, you saw male IDOC
4  employees?  And by that I mean can you mark on the
5  diagram where the male employees were that you saw
6  when you were in the bathroom?
7    A.   They was back in -- back here in the
8  back right -- right up in here, like right across
9  up in here.  That's where they like -- this is --
10  can you take this first -- these first two lines
11  out?  Okay.  They was like right here where you can
12  see like -- yeah, they was like right there.
13    Q.   So, are you indicating about at half
14  court of the basketball court?
15    A.   Yeah, that's where they was standing
16  at, right there.
17    Q.   Is that in the middle of the gym?
18    A.   Nope, it ain't in the middle.  It's
19  behind that court line where they play volleyball.
20  So, it's really behind the volleyball thing where
21  they put the little -- where they put the poles in
22  there and screw them down where the volleyball can
23  -- you can put the net on it, you know, some type
24  of little poles.  It's like right where the poles
25  go.

1          Q.   So, they would be where, if you were

2     putting a volleyball court in, where the volleyball

3     net would be?

4          A.   Yeah.  And I could see them real good.

5     They was right there in my face.

6               MS. THOMPSON:  Okay.  I have no more

7     questions.

8               Thank you, Your Honor.

9               THE WITNESS:  Yes, ma'am.

10              THE COURT:  All right.  Recross?

11              MS. BARNES:  Nothing more, Your Honor.

12              THE COURT:  Very well.  Thank you.

13              All right, ma'am, you may step down.

14              THE WITNESS:  Okay.  Thanks.

15                   (Witness excused)

16              THE COURT:  And we are all going to

17     take our break in the middle of the afternoon at

18     this time.  It is 20 after and we will stand in

19     recess until 3:30.

20              So, please recall my admonition, ladies

21     and gentlemen.  Don't discuss this case at all

22     until time for a verdict.

23              All right.  We'll stand in recess.

24                   (Court was then in recess.)

25                   (The jury entered the courtroom.)

1          THE COURT:  Thank you, Madam Clerk.

2          CLERK:  You're welcome, Judge.

3          THE COURT:  Thank you, everyone.

4          All right.  We're all in place and I

5     believe we're ready for the next witness.

6          MS. THOMPSON:  Thank you, Your Honor.

7     We call Jacqueline Hegwood.

8          THE COURT:  Thank you.

9               JACQUELINE HEGWOOD,

10    of lawful age, produced, sworn, and examined on

11    behalf of the Plaintiffs, testifies and says:

12         THE COURT:  Right up here, please.

13              DIRECT EXAMINATION

14    QUESTIONS BY MS. THOMPSON:

15         Q.   Good afternoon, Ms. Hegwood.  Could you

16    please spell your name for the court reporter?

17         A.   Jacqueline Hegwood.  Jacqueline,

18    J-a-c-q-u-e-l-i-n-e.

19         Q.   Ms. Hegwood, how old are you?

20         A.   I'm 52.

21         Q.   All right.  And where do you currently

22    live?

23         A.   Chicago, Illinois.

24         Q.   Do you have a job?

25         A.   Yes.

1         Q.   Where are you working?

2         A.   At Jimmy G's Soul Food and Diner and

3    also Joe's in Elgin.

4         Q.   And what do you do at Joe's and at

5    Jimmy G's?

6         A.   I'm a cook/cashier.  I'm a cashier at

7    Joe's.

8         Q.   All right.  Now, Ms. Hegwood, in 2010,

9    were you convicted of possession of a controlled

10   substance?

11        A.   Yes, ma'am.

12        Q.   And that's a felony?

13        A.   Ma'am?

14        Q.   That is a felony?

15        A.   Yes.

16        Q.   Did you go to prison for that?

17        A.   Yes.

18        Q.   Were you in prison in March of 2011?

19        A.   Yes, I was.

20        Q.   Were you at Lincoln Correctional Center

21   at that time?

22        A.   That's correct.

23        Q.   Ms. Hegwood, in March of 2011, what

24   housing unit were you at at Lincoln Correctional

25   Center?

1        A.   2B.

2        Q.   All right.  And some of the other women

3   who've testified today they were in 2B, were those

4   people that you knew at Lincoln Correctional

5   Center?

6        A.   Yes, ma'am.

7        Q.   Were any of those -- any of the people

8   who've testified today people that you shared a

9   dorm with?

10       A.   Yes, ma'am.

11       Q.   When you were at Lincoln Correctional

12  Center, were you friends with any of the women that

13  have testified today?

14       A.   I can't say friends, but we was okay.

15       Q.   You knew each other?

16       A.   Yes.

17       Q.   Now, Ms. Hegwood, I want to draw your

18  attention to March 31st of 2011.  What time did you

19  wake up that day?

20       A.   Right after count.  Well, when they

21  came in.

22       Q.   You said -- who is they?  Who's the

23  they that came in?

24       A.   The Orange Crush.

25       Q.   And can you describe how it is that

1    they came in?

2           A.   Loud and obnoxious, beating on things,

3    yelling, hollering, telling us to get up, get out

4    of bed, get dressed.

5           Q.   Was there anyone that came into the

6    housing unit with Orange Crush?

7           A.   Meaning staff members?

8           Q.   That's a good clarification, so thank

9    you.  Any other staff members that came in with

10   Orange Crush?

11          A.   Yes.

12          Q.   Who else came in with Orange Crush?

13          A.   It was -- I believe it was Warden

14   Reynolds.  Well, some of them that was staff was

15   Orange Crush.  That was Ms. Johnson, which is

16   Orange Crush too, Leonetti and a few others.  I

17   can't recall everybody's name.

18          Q.   Okay.  And you said that when Orange

19   Crush came in they were yelling.  What -- could you

20   hear what they were yelling?

21          A.   Yeah.  They was yelling at us to get

22   up.

23          Q.   All right.  So, what happened after

24   Orange Crush came in?

25          A.   Well, when they entered the building,

1 they came to our dorm and told us to get up, so --

2 I laughed at Ms. Johnson and I guess she got angry.

3 But meanwhile, they told me to line up. I lined

4 up. Then they told me to turn around and be

5 handcuffed. I couldn't be handcuffed in the back.

6      Q. Let me ask you a question. Did you say

7 that you -- you say that you laughed at

8 Ms. Johnson?

9      A. Because she -- she used to play with

10 me. And when I seen her in Orange Crush, I never

11 seen her in the orange suit before, so I laughed.

12      Q. And what was her reaction to you

13 laughing?

14      A. I guess she got angry.

15      Q. You've said that when people came in

16 they were yelling at you to get up. And I know

17 this seems a little strange in a courtroom, but can

18 you demonstrate how loud they were saying get up?

19      A. "Get up. Everybody up."

20      Q. Now, you said that you couldn't be

21 handcuffed.

22      A. No, ma'am.

23      Q. Why is that?

24      A. Because my arm was -- when I played

25 volleyball, I kind of fractured it a little. And

1    they wouldn't let me -- they wouldn't handcuff me

2    -- let me be handcuffed in the back, the health

3    care unit.  So, I tried to explain to the officers

4    and they told me I was lying.  So, they handcuffed

5    me to the back.  I started screaming and hollering

6    because it was hurting my arm.  Then my rotator

7    came out of place.

8         Q.   How long did it take after you were

9    handcuffed for your rotator to come out of place?

10        A.   Immediately.

11        Q.   Now, what were -- can you describe the

12   handcuffs that were used to handcuff you?

13        A.   It was like a burnt orange or orange,

14   kind of matched their uniforms.

15        Q.   Prior to March of 2011, had you seen

16   those handcuffs --

17        A.   No.

18        Q.   -- before?

19        A.   No.

20        Q.   Had you ever had those handcuffs

21   applied to you before?

22        A.   No.

23        Q.   Did they feel differently -- and let me

24   ask you this question:  Prior to March of 2011, had

25   you been handcuffed at Lincoln Correctional Center?

1          A.   No.

2          Q.   Was this the first time since you had

3   come to IDOC after 2006 that you had been

4   handcuffed?

5          A.   Yes.

6          Q.   Did these handcuffs feel differently

7   than other times in your life when you've been

8   handcuffed?

9          A.   Yes.

10         Q.   How did they feel different?

11         A.   They felt heavier, tighter.  They just

12  didn't feel the same as the silver.

13         Q.   Who is it that handcuffed you,

14  Ms. Hegwood?

15         A.   I can't recall.  It was Orange Crush.

16  No, I'm -- strike that.  It was -- what you call

17  them other peoples?  Cadets.

18         Q.   It was cadets?

19         A.   Uh-huh.

20         Q.   Did you know -- had you ever seen that

21  cadet before that handcuffed you?

22         A.   No.

23         Q.   Now, Ms. Hegwood, when -- when you put

24  a handcuff on your wrist, it can be tighter or

25  looser; right?

1          A.    Uh-huh.

2          Q.    When the handcuffs were applied to your

3   wrist, how tight were they?

4          A.    It was very tight.

5          Q.    What do you mean by very tight?

6          A.    I mean tight where I couldn't move or

7   anything.  The other handcuffs, the silver

8   handcuffs you got a -- you know, a length in them.

9   But these was like it was -- my hands was close

10  together.

11         Q.    So, in a typical set of handcuffs

12  there's a chain or a box in between the two links;

13  is that right?

14         A.    Uh-huh, yes.

15         Q.    Was there a chain or a box between

16  these?

17         A.    A box.

18         Q.    I'm sorry?

19         A.    A box.

20         Q.    How big was the box?

21         A.    About like that.

22         Q.    So, your hands were right together

23  behind your back?

24         A.    Uh-huh.

25         Q.    What happened after you were handcuffed

1 and after your rotator came out?

2    A. Warden Hulett -- I believe it was

3 Lieutenant Dawdy took me to the front and still

4 handcuffed, and I was crying, and Warden Hulett

5 asked me what was wrong with me, and he told her.

6 And she told them to call health care to see was I

7 lying or telling the truth.  And he stated if I was

8 lying, I was going to segregation.  And I told him

9 I wasn't worried about it because I'm not lying.

10 So, he called health care and they told him, "No,

11 she can't be handcuffed to the back.  She have to

12 be handcuffed to the front."  So, he immediately

13 came over and took the handcuffs off of me.

14    Q. What happened after he took the

15 handcuffs off of you?

16    A. I still -- they made me face the wall.

17    Q. Did you have -- so, after those

18 handcuffs were taken off, were you handcuffed

19 again?

20    A. Yes.

21    Q. And how were you handcuffed when you

22 were rehandcuffed?

23    A. In the front.

24    Q. How tight or loose were your handcuffs

25 when they were put in the front?

1    A.   They was kind of loose then because it
2  was the other ones.

3    Q.   Did your -- did the handcuffs hurt
4  anymore after you were rehandcuffed?

5    A.   No, they didn't.  No.

6    Q.   What happened to -- and you said that
7  your rotator came out.  Do you mean that your
8  shoulder actually --

9    A.   Yes.

10   Q.   -- pulled out?

11   A.   Yes.  My arm was in a sling afterwards.

12   Q.   What do you mean your arm was in a
13  sling afterward?

14   A.   It was in one of those slings, the arm
15  slings that they give you when your arm is messed
16  up.  I went to health care and they put my arm in a
17  sling because I couldn't use it for a while.

18   Q.   At some point were you able to put your
19  shoulder back in place?

20   A.   Yes.

21   Q.   When was that?

22   A.   When I went to health care.  It wasn't
23  healed.  They just -- I guess when they was pushing
24  on it.

25   Q.   Did your shoulder hurt after it was

1  pulled out?

2        A.   Yes.

3        Q.   For how long?

4        A.   Weeks.  I had to -- probably months

5  because I had to take my arm -- I fell out the bed

6  once because I was trying to get up and couldn't

7  get up.  I had to take my arm and press it against

8  the wall when it started hurting.  I was in real

9  severe pain.

10       Q.   And is that something that you did on

11 that day, put your arm against the wall?

12       A.   Yes.

13       Q.   All right.  So, after you were

14 handcuffed, you were taken to the front.  Your

15 handcuffs were reapplied to the front.

16       A.   Uh-huh.

17       Q.   What happened after that?

18       A.   They -- well, the Orange Crush took me

19 over to the gym -- took us over to the gym.

20       Q.   When you say us, who is us?

21       A.   Me and the other inmates that was on my

22 dorm, in my Unit 2B.

23       Q.   And, Ms. Hegwood, I want to make sure I

24 understand one thing.  Before the handcuffs were

25 put you on the first time, not when you were

1 rehandcuffed but the first time, did you tell

2 anyone before you were handcuffed the first time

3 that you shouldn't be handcuffed in the back?

4      A.   Yes.  It's all in my file.  I mean, the

5 officers knew.  I wasn't handcuffed until that

6 happened.

7      Q.   When you were in the dayroom, you

8 described a conversation that you had with Dawdy.

9 Did you hear Dawdy saying anything else besides the

10 discussion you had with him about your handcuffing

11 situation?

12      A.   He was telling us to shut up.

13      Q.   And again, and I don't mean to be rude

14 in this room, but what was the volume of his voice

15 when he was telling you to shut up?

16      A.   What was who?

17      Q.   What was the volume of his voice when

18 he was telling you to shut up?

19      THE COURT:  How loud was he?

20      A.   He was loud loud.

21      Q.   Can you demonstrate?

22      A.   Shut up.

23      Q.   How many times did he say shut up?

24      A.   Quite a few times.

25      Q.   Was there anyone else talking in the

1 dayroom besides Dawdy?

2      A.   Warden Hulett.

3      Q.   And anyone else besides Mr. Dawdy and

4 Warden Hulett?

5      A.   It was some more officers, but I don't

6 know their names.

7      Q.   The times that Mr. Dawdy was yelling,

8 what were the women in the dayroom doing?

9      A.   Asking them what's going on, why is

10 they doing this.

11      Q.   And was there any response that you

12 heard anyone give the women?

13      A.   No.

14      Q.   How long were you in the dayroom that

15 morning before you went -- before you left?

16      A.   Maybe an hour.

17      Q.   Okay.  And where did you go after you

18 left the dayroom?

19      A.   To the gym.

20      Q.   You walked over to the gym?

21      A.   Yes.

22      Q.   Did anyone walk over with you?

23      A.   Yes, the other inmates that was on my

24 unit, some more cadets, and some Orange Crush.

25      Q.   All right.  Ms. Hegwood, I'm showing

1    you what I think you've probably seen earlier

2    today.  This is Plaintiffs' 201.  Do you recognize

3    this as a diagram of the gym at Lincoln

4    Correctional Center?

5         A.  Yes.

6         Q.  Okay.  And I'm going to ask you -- you

7    can just touch your finger to the display in front

8    of you.  Can you show us where in the gym you went

9    when you came into the gym?

10        A.  We came in here, crossed over here, and

11   that's where we was lined up at.

12        Q.  Okay.  And can you just make a mark on

13   the diagram where it is that you stopped and stood

14   in the gym when you came in?

15        A.  Right here.  I was like the last line.

16        Q.  So, was there -- were there any women

17   between you and this bottom wall of the gym when

18   you came in?

19        A.  Yes.

20        Q.  So, you say you were the last line.

21   Was there no women on this side of you in the gym?

22        A.  No.

23        Q.  Okay.  When you got into the gym, what

24   did you see in there?

25        A.  I saw some officers, some cadets.

1      Q.   And what were the officers doing that

2 you saw?

3      A.   Talking among each other.

4      Q.   What were the cadets doing that you

5 saw?

6      A.   Watching us coming in, telling us where

7 to line up at.

8      Q.   So, what happened after you came into

9 the gym and lined up?

10     A.   After we came in the gym and lined up,

11 then Warden Hulett and Warden Reynolds came in.

12     Q.   And when -- how much time had passed

13 between when you got to the gym and when Warden

14 Hulett and Warden Reynolds came in?

15     A.   Maybe 30 minutes.

16          THE COURT:   What was that?

17          MS. THOMPSON:   The question was:   How

18 much time passed?

19          THE COURT:   No, I heard the question.

20 What was the answer?

21          MS. THOMPSON:   I believe she said about

22 30 minutes.

23     A.   Yes.

24     Q.   Is that right?

25     A.   Yes.

1          THE COURT:  Thank you.

2          Q.   What, if anything, happened between

3    when you got to the gym and -- when you got into

4    the gym and when you saw Warden Hulett and Warden

5    Reynolds?

6          A.   You say what happened?

7          Q.   Yeah.  If anything happened.  What --

8    what did you do during that time?

9          A.   Nothing.  Just stood there, still

10   handcuffed.

11         Q.   All right.  And I want to ask you about

12   Warden Hulett in a minute, but at some point when

13   you were in the gym were you searched?

14         A.   Yes.

15         Q.   Where in the gym -- or, where in this

16   area were you searched?

17         A.   I believe right here.

18         Q.   And is that area the staff bathroom?

19         A.   Yes.

20         Q.   How long did you wait when you came

21   into the gym before you were taken into the staff

22   bathroom?

23         A.   About two hours.

24         Q.   And describe to us -- describe for the

25   jury what happened when you went into the staff

1  bathroom.

2      A.   Well, they told us to come in.  As they

3  unhandcuffed us -- when it came our turn, they

4  unhandcuffed us.  We went to the bathroom and the

5  cadets, like I say, was being trained, so -- and I

6  made the statement they don't even know what

7  they're doing.  And they just had us standing there

8  for a minute with the door open.  So, Crudup came

9  past and asked them -- told them they can start

10  stripping us.

11      Q.   Did you know any of the women that you

12  went into the bathroom with?

13      A.   The inmates?

14      Q.   Yeah.

15      A.   Yes.

16      Q.   How many other women went into the

17  bathroom with you?

18      A.   About five, six.

19      Q.   Okay.  Now, Ms. Hegwood, I'm showing

20  you what was previously marked as Plaintiffs' 237.

21  Now, this is not the bathroom where you were

22  strip-searched; right?

23      A.   No.

24      Q.   What was the size of the bathroom that

25  you were searched relative to -- that you were

1  searched in relative to what you see here?  And by

2  that I mean is it bigger or smaller?

3      A.  Smaller.

4      Q.  Was where you were searched bigger or

5  smaller?

6      A.  This part.

7      Q.  Are you indicating this area?

8      A.  Yes.

9      Q.  Okay.  What was in the bathroom where

10  you were searched?

11      A.  A toilet and a sink.

12      Q.  And besides you and the inmates that

13  you went in with, how many other people were in the

14  bathroom when you went in there?

15      A.  As of inmates, about four of us was in

16  there.  They went -- it was like two in there in

17  front of me.  I was like the third one.

18      Q.  You said you came into the bathroom and

19  there was a point where somebody said to start the

20  searches.  And I don't want to misstate your

21  testimony.  Is that what you testified to?

22      A.  Yes.

23      Q.  How long did that take between when you

24  got in and somebody said start the searches?

25      A.  Like maybe ten minutes.

1    Q.    And during that time what were you

2  doing?

3    A.    Just standing there.

4    Q.    Okay.  Can you describe for the jury

5  how you were strip-searched?

6    A.    Shirts off first, pants off, bras,

7  panties, socks, take your hair -- take your fingers

8  through your hair, wiggle your ears, spread your

9  palms, take -- well, take your socks off, your

10  shoes, and then you had to turn around, spread your

11  cheeks, squat and cough.

12    Q.    At the time that you were being

13  strip-searched what were the other inmates in the

14  bathroom with you doing?

15    A.    We was all doing it.

16    Q.    So, they were being strip-searched at

17  the same time as you?

18    A.    Uh-huh.

19    Q.    And when you were being strip-searched,

20  was the bathroom door open or closed?

21    A.    When we started taking off our clothes,

22  it was open.

23    Q.    At some point did it -- was it closed?

24    A.    Yes.

25    Q.    Who shut it?

1    A.   I think Crudup, when she made her

2    statement.

3         Q.   Now, when you were strip-searched, were

4    there any men in the bathroom?

5         A.   Not in the bathroom.

6              THE COURT:  What's that?  I didn't hear

7    the answer.

8         A.   Not in the bathroom.

9         Q.   When you went into the bathroom and

10   then when the door closed, were there men outside

11   the bathroom?

12        A.   Yes.

13        Q.   And do you -- did you recognize those

14   men?

15        A.   Yes.

16        Q.   Who were they?

17        A.   Warden Reynolds, Officer Craig -- or,

18   Lieutenant Craig, Lieutenant Dawdy, Leonetti,

19   Officer Anderson, and some cadets, male cadets.

20        Q.   Before you went into the bathroom, did

21   you see any other -- any other women going in

22   there?  And I'm talking about the staff bathroom,

23   not the -- not the inmate bathroom.

24        A.   I can't recall, so I don't want to say

25   yes or no.

1          Q.   And before you went into the staff

2     bathroom, did you see any women going into the

3     inmate bathroom?

4          A.   Yes.

5          Q.   How many women did you see going into

6     the inmate bathroom before you went into the staff

7     bathroom?

8          A.   Quite a few of them.

9          Q.   Do you know how many quite a few is?

10          A.   At least a hundred or more.

11          Q.   And were those women going into that

12     bathroom alone or in what numbers?

13          A.   As a group.

14          Q.   In what size of groups?

15          A.   Maybe five, four.  Four to five.

16          Q.   When you went into the staff bathroom,

17     what was the condition of it?

18          A.   It was -- it was smelly already.

19     That's about it.

20          Q.   Were any of the women that went into

21     the bathroom with you on their periods?

22          A.   Yes.

23          Q.   And can you describe what you saw

24     relative to those women being on their periods?

25          A.   Yes.

1    Q.    What did -- how did you know they were
2  on their periods?
3    A.    Because I saw when they pulled off
4  their tampon, some pull off -- pulled their pads
5  off.  And when they squat and coughed, the blood
6  just was splashing from some inmates.
7    Q.    And when you saw it was splashing,
8  where was it going?
9    A.    Some of it went on my foot.
10    Q.    And was that from the woman next to
11  you?
12    A.    Yes.
13    Q.    How close was that woman standing to
14  you when that happened?
15    A.    Right here.  About a half an inch, inch
16  maybe.
17    Q.    From your body?
18    A.    Yes.
19    Q.    How many of the women that were in the
20  group that went into the staff bathroom with you
21  were on their periods?
22    A.    At least three of them.
23    Q.    Okay.  Did you see what they did with
24  -- well, let me ask you this:  Of those three, were
25  they wearing pads or tampons?

1      A.   Tina had on a tampon because that's who
2 bodily fluid hit my foot.
3      Q.   And did you see what she did with the
4 tampon when she had to remove it as part of the
5 search?
6      A.   They told her to drop it on the floor.
7      Q.   Was there any paper down on the floor
8 in the staff bathroom?
9      A.   No.
10     Q.   At some point after the search were you
11 able to get dressed again?
12     A.   Yes.
13     Q.   And how long -- how long were you naked
14 in the bathroom?
15     A.   At least 15 to 20 minutes.
16     Q.   And were the other women in the
17 bathroom naked with you about that same amount of
18 time?
19     A.   Yes.
20     Q.   During the time that you were in the
21 bathroom, were any of the staff or the cadets in
22 there saying anything?
23     A.   Yes.  They said, "You bitches stay."
24 Someone asked a question and they told them to shut
25 the F up.

1          MS. BAUTISTA:  Objection, Your Honor.

2          THE COURT:  Sustained.

3     A.  A cadet.

4          THE COURT:  Sustained.

5     Q.  Jacqueline, let me ask you this

6  question:  The women that were in the bathroom that

7  were on their periods, did you see any of them get

8  replacement sanitary materials --

9     A.  No, ma'am.

10    Q.  -- while you were in the bathroom?

11    A.  No.

12    Q.  After you were done with the search,

13 did you go back out in the gym?

14    A.  Yes.

15    Q.  Where in the gym did you go?

16    A.  On the bleachers.

17    Q.  Where did the women that had been in

18 the bathroom with you go when you came out of the

19 bathroom?

20    A.  We all had to go towards the bleachers.

21 Some sat on the floor.  Some if it was room -- if

22 they didn't make more room, they had to sit on the

23 floor.

24    Q.  Did you see any of the women that were

25 in the bathroom with you get replacement sanitary

1    materials --

2         A.   No.

3         Q.   -- when they came out into the gym?

4         A.   No, ma'am.

5         Q.   Okay.  You said that you saw Warden

6    Hulett come into the gym at some point.

7         A.   Yeah.

8         Q.   I want to make sure I understand.  Was

9    that before or after you went into the staff

10   bathroom to be searched?

11        A.   Before I went in.

12        Q.   How much -- how much before you went

13   into the bathroom did that happen?

14        A.   Maybe an hour.

15        Q.   Did you see what happened when Warden

16   Hulett came into the gym?

17        A.   She went towards the exercise equipment

18   and was standing there.  She was talking to Warden

19   Reynolds, and then Ms. Debbie Dennis came and she

20   was talking to her.  Then at a point she asked the

21   staff did they have anything to hang up at the

22   washroom.

23        Q.   So, let me show you -- I'm going to

24   show you Plaintiffs' 239.  So, Plaintiffs' 239

25   shows that inmate bathroom door we've been talking

1    about; right?

2            A.    Yes.

3            Q.    And the door that's next to it, what

4    door is that?

5            A.    That's the staff bathroom.

6            Q.    Okay.

7                  THE COURT:   It's what?

8            A.    The staff bathroom.

9                  THE COURT:   Thank you.

10           A.    You're welcome.

11           Q.    When you were in the gym, you said that

12   you saw women going into the inmate bathroom.

13           A.    Yes.

14           Q.    Did you see women going into this

15   bathroom when there was no covering on the door?

16           A.    Yes.

17           Q.    At what point -- was there some point

18   at which it was covered?

19           A.    Almost to the end of the search.

20           Q.    Was it covered at some point after

21   Warden Hulett came in?

22           A.    Yeah, she was in already.

23           Q.    How much after you saw Warden Hulett

24   did you see this door get covered?

25           A.    Maybe 40 minutes till the time we left.

1          Q.   And did you see women going into this

2     bathroom between when you saw Warden Hulett come in

3     and when the gym -- and when this bathroom door was

4     covered?

5          A.   Repeat that, please.

6          Q.   Let me ask you that question in a

7     better way.  I'm sorry.

8               You said Warden Hulett came into the

9     gym?

10         A.   Yes.

11         Q.   And then later this door was covered?

12         A.   Yes.

13         Q.   Is that right?

14         A.   Yes.

15         Q.   In between when Warden Hulett came in

16     and when this door was covered did you see women

17     going into that bathroom?

18         A.   Yes.

19         Q.   When you were in the gym, did you

20     actually see women in this bathroom being searched?

21         A.   Yes.

22         Q.   So, after you were done being searched,

23     you came out into the gym, onto the bleachers.

24     What happened next?

25         A.   The other ladies -- the rest of the

1  inmates was being searched -- strip-searched.

2  After we was done, they lined us up, back up in

3  twos, and they took us to the CDR.

4       Q.  I want to go back a minute to -- let me

5  show you --

6            THE COURT:  Excuse me.  What is the

7  CDR?

8            MS. THOMPSON:  Thank you, Judge.

9  That's a good question.

10      Q.  What is the CDR?

11      A.  The chow hall where we go -- the dining

12 room where inmates eat at.

13           MS. THOMPSON:  Thank you, Your Honor.

14      Q.  I'm going to show you -- this is

15 Plaintiffs' 201 again.  Can you show us where on

16 this diagram you went when you came out of the

17 bathroom?

18      A.  Can you move it down some?

19      Q.  Yeah.  Thanks.  Let me fix that.

20      A.  We came out -- this is where the

21 bleachers is at.

22      Q.  All right.  And did you see women going

23 -- let me ask you this:  When you came out of the

24 staff bathroom, was the inmate bathroom door

25 covered?

1        A.   Yes.

2        Q.   But before -- at what point did you see

3  it get covered?

4        A.   I didn't --

5        Q.   Let me ask you a better question.  Was

6  it covered before you went into the staff bathroom?

7        A.   No.

8        Q.   Okay.  And can you show the jury one

9  more time -- I know we marked this already, but can

10  you show the jury one more time where you were

11  standing before you went into the staff bathroom?

12        A.   Over here.

13        Q.   Okay.  Now, when you were standing

14  here, the place that you just marked on this

15  diagram, did you see male IDOC employees in the

16  gym?

17        A.   Yes.

18        Q.   And can you mark on the map where it is

19  that you saw male -- where you saw those male IDOC

20  employees standing?

21        A.   They came in here, came across and

22  crossed over to about there, where the warden was

23  at.

24        Q.   You said where the warden was at?

25        A.   Uh-huh.

1       Q.    What warden are you talking about?

2       A.    Warden Hulett.

3       Q.    Okay.  And did you see men standing

4  with Warden Hulett there?

5       A.    Yes.

6       Q.    Warden Reynolds?

7       A.    Yes.

8       Q.    Did you see male IDOC employees

9  anywhere else in the gym besides the place you just

10  marked Warden Reynolds having been?

11       A.    Yes.  They was all over.

12       Q.    Was there some point where you saw male

13  IDOC employees leave the gym?

14       A.    Yes.

15       Q.    When was that?

16       A.    When they was getting ready to send us

17  to the chow -- to the CDR.

18       Q.    Now, Ms. Hegwood, after you went to the

19  chow hall, to CDR, what did you do next?

20       A.    Well, we were asking -- well, I asked,

21  "Can I wash my hands?"  And they told me no.

22            MS. BAUTISTA:  Objection, Your Honor.

23  I object to the hearsay response.  We don't know

24  who they is or what's going on here.

25            THE COURT:  Well, you're right.  You're

1  absolutely right.  But this is rather unusual.

2  We've got a whole bunch of people here.  And I

3  think we can identify perhaps a little more

4  specifically, Counsel, but not necessarily names,

5  but they can be identified as correctional officers

6  or employees or something or the Orange Crush or

7  whatever the case may be, maybe a little better

8  idea of who we're talking about.

9       MS. THOMPSON:  I'll address that, Your

10 Honor.

11      THE COURT:  Without the specific

12 identification of a person by name.

13      Q.  Ms. Hegwood, you said that after you --

14 at some point you asked somebody if you could wash

15 your hands?

16      A.  Yes.

17      Q.  Who did you ask if you could wash your

18 hands?

19      A.  The officers.

20      Q.  Do you know which officer that was?

21      A.  The officers in the Orange Crush.  I

22 asked Dawdy.

23      Q.  And did you get a response?

24      A.  No.

25      Q.  Were there -- at any point when you

1    were in the gym did you talk to Warden Reynolds?

2        A.   No.

3        Q.   Now, Ms. Hegwood, at any point did you

4    file a grievance about what happened on March 31st?

5        A.   Yes.

6        Q.   When did you file that grievance?

7        A.   The same day, March 31st.

8        Q.   Okay.   And what -- did you use the

9    official grievance form to fill out your grievance?

10        A.   Yes, ma'am.

11        Q.   Did you submit that grievance?

12        A.   Yes, ma'am.

13        Q.   When did you submit it?

14        A.   The same day.

15        Q.   How did you submit the grievance?

16        A.   Is submitting putting it in?

17        Q.   Yeah.   Where did you put it?

18        A.   I put it in the grievance box.

19        Q.   After you put your grievance in the

20    grievance box, did you ever see it again?

21        A.   No, ma'am.

22        Q.   Was it ever returned to you?

23        A.   No, ma'am.

24        Q.   Did anyone ever talk to you about your

25    grievance --

1          A.   No, ma'am.

2          Q.   -- from the institution?

3          A.   No, ma'am.

4          Q.   Now, Ms. Hegwood, in terms of what

5     happened on March 31st, was this the first time

6     when you were in the Illinois Department of

7     Corrections after your 2006 conviction that you had

8     to undress in front of IDOC staff?

9          A.   Repeat that.

10         Q.   Sure.  What happened on March 31st,

11    2011, this was an incident in which you had to take

12    off your clothes in front of IDOC staff; right?

13         A.   Yes.

14         Q.   Is that something that you'd had to do

15    prior to March 31st since your 2006 conviction?

16         A.   No, not like that.

17         Q.   Had you been strip-searched at --

18         A.   Yes, I have.

19         Q.   -- Lincoln Correctional Center before

20    March 31st of 2011?

21         A.   At Lincoln?  No.

22         Q.   At Lincoln, yes.

23         MS. THOMPSON:  All right.  May I just

24    have one moment, Your Honor?

25              THE COURT:  Of course.

1          MS. THOMPSON:  I have no more questions

2    at this time, Your Honor.

3          THE COURT:  Thank you.

4          You may cross.  You may proceed,

5    Ms. Bautista.

6          MS. BAUTISTA:  Thank you, Your Honor.

7          THE COURT:  Surely.

8                    CROSS-EXAMINATION

9    QUESTIONS BY MS. BAUTISTA:

10         Q.   Ms. Hegwood, do you recall your inmate

11   number?

12         A.   Yes.

13         Q.   What is it?

14         A.   V48019.

15         Q.   Now, you have some convictions from

16   August of 2010; isn't that correct?

17         A.   Yes.

18         Q.   And those are different than the 2006

19   conviction that you already testified to; correct?

20   You have a conviction from August 3rd, 2010, of

21   escape, violating electronic monitoring; is that

22   correct?

23         A.   Yes.  That's all the same case.

24         Q.   And you have a conviction of theft from

25   August 3rd, 2010; is that correct?

1        A.   Theft?

2        Q.   Yes.

3        A.   That's the house arrest.

4        Q.   And you have a conviction of

5    manufacture/delivery of 10 to 15 grams of heroin

6    from August 3rd, 2010; is that correct?

7        A.   That's correct.

8        Q.   So, let's talk a little bit about March

9    31st, 2011.  You didn't know there was going to be

10   a strip search that day; is that correct?

11       A.   I didn't know it was going to be that

12   day, that particular day, but Warden Reynolds had

13   came and called us all out in the dayroom and told

14   us that --

15       Q.   Okay.

16       A.   -- he was going to do that.

17       Q.   Let me ask another question.

18            MS. THOMPSON:  Your Honor?

19            THE COURT:  What?

20            MS. THOMPSON:  The witness was

21   responding to the question.

22            THE COURT:  Yeah.  Well, let's get it

23   all out before we jump in with another question.

24            Go ahead.  Finish out what you were

25   answering on that first question.

1          A.   Me?

2               THE COURT:  Yes.  The witness.  Yes,

3     please.

4          A.   Reynolds -- Warden Reynolds had called

5     us all out prior to the strip search that he was

6     tired of something going on and going to be -- and

7     that he was going to put a stop to it.  Every day

8     if he had to he was going to have the Orange Crush

9     come.

10              THE COURT:  All right.

11         Q.   Now, you testified that when the

12    inmates that you were searched with had to squat

13    and cough that blood splashed on your foot as a

14    result of that; is that correct?

15         A.   Yes.

16         Q.   Okay.  Now, you completed a declaration

17    in this case like the other plaintiffs did.

18         A.   Yes.

19         Q.   Is that correct?

20              I'm going to show it to you.  It's

21    Defendants' 25.

22              MS. BAUTISTA:  May I approach, Your

23    Honor?

24              THE COURT:  Please.

25         A.   I can't see nothing.

```
1         Q.   What I just showed you was your
2    declaration; is that correct?
3         A.   Yes.
4         Q.   And you signed it on the second page?
5         A.   Yes.
6         Q.   And it's dated February 25th of 2013;
7    is that correct?
8         A.   Yes.
9         Q.   And you signed it under penalty of
10   perjury; is that correct?  You swore to tell the
11   truth?
12        A.   Yes.
13        Q.   Tell the truth in your statements?
14        A.   Yes.
15        Q.   And in this you made statements
16   regarding the strip search on March 31st, 2011; is
17   that correct?
18        A.   Yes.
19        Q.   And you didn't say anything in this
20   declaration about blood splashing on your foot; did
21   you?
22        A.   No.
23        Q.   And you testified today that the women
24   on their periods just had to drop their tampons on
25   the floor; is that correct?
```

1          A.   Yes.

2          Q.   But, in fact, in this declaration that

3     we just asked you about you said that the women had

4     to throw them in a garbage can.  Is that correct?

5     That's the statement that you testified to in your

6     declaration?

7          A.   If I did, they asked to throw them in

8     into the garbage can.  There wasn't no garbage can

9     in that bathroom.

10          Q.   You said the women on their period were

11     forced to remove their tampons --

12          A.   Yes.

13          Q.   -- and sanitary napkins in front of

14     everyone --

15          A.   Yes.

16          Q.   -- and throw them in a garbage can.

17     Isn't that what you testified to in your

18     declaration?

19          A.   I might have said that.  I don't know.

20     I don't recall.

21          Q.   The inmates that you were searched with

22     in the staff bathroom, you all had to take your

23     clothes off at the same time; is that correct?

24          A.   I believe so.

25          Q.   And you were given the instructions for

1 the strip search at the same time; is that correct?

2    A. Some of us, yes.

3    Q. And you were instructed to shake out

4 your hair; is that right?

5    A. Yes.

6    Q. And you did in fact shake out your

7 hair?

8    A. I didn't have any.

9    Q. You didn't have any hair at that time?

10    A. No.

11    Q. Okay.  So, you didn't need to follow

12 that step of the instructions; is that right?

13    A. I mean, I just rubbed my head.

14    Q. Okay.  And did you have to show your

15 ears --

16    A. Yes.

17    Q. -- to the correctional officer?

18    And that's to show the officer if

19 anything is being hidden behind your ears; is that

20 right?

21    A. Yes.

22    Q. And did you have to open your mouth as

23 well?

24    A. Yes.

25    Q. And that's to reveal if anything's

1    being hidden inside your mouth; is that right?

2         A.  Yes.

3         Q.  And you have to bend over and spread

4    your buttocks; is that correct?

5         A.  Yes.

6         Q.  Is that at the same time as squatting

7    and coughing?

8         A.  No.  You spread your cheeks -- bend

9    over and spread your cheeks, then you squat and

10   cough.

11        Q.  Okay.  And both bending over and

12   spreading your cheeks and squatting and coughing,

13   that's to reveal any contraband that might be

14   hidden; is that right?

15        A.  Yes.

16        Q.  Now, you testified that you dislocated

17   your shoulder during this -- on the unit; is that

18   right?

19        A.  No, I didn't say I dislocated my

20   shoulder on the unit.

21        Q.  Okay.  Now, you -- you testified that

22   you live on Unit 2B; is that right?

23        A.  Yes.

24        Q.  And that's with the other women that

25   have testified so far today, right, both --

 1          A.   Yes.

 2          Q.   And you didn't see anybody from Unit 4B

 3    while you were being strip-searched; is that right?

 4          A.   Not to my recollection.

 5          MS. BAUTISTA:   If I could just have a

 6    moment, Your Honor.

 7          THE COURT:   Of course.

 8          MS. BAUTISTA:   Nothing further.

 9          THE COURT:   Thank you, Ms. Bautista.

10          Redirect?

11          MS. THOMPSON:   Thank you, Your Honor.

12                    REDIRECT EXAMINATION

13    QUESTIONS BY MS. THOMPSON:

14          Q.   Before you were taken to the gym on

15    March 31st, did something happen to your shoulder

16    on the unit?

17          A.   Yes.

18          Q.   What -- I think Counsel asked you a

19    question about whether your shoulder was

20    dislocated.

21          A.   Yes.

22          Q.   Was it dislocated?

23          A.   My rotator, yes.

24          Q.   What exactly happened to your rotator?

25          A.   When they went to handcuff me, I told

1    them I couldn't be handcuffed in the back.  They

2    thought I was lying.  They asked me did I have

3    paperwork to prove it.  I said, "Health care have

4    it."

5         Q.    Well, and I'm sorry, the question I

6    meant is:  What physically happened to your

7    shoulder?

8         A.    When they twist my arm to handcuff me

9    to the back, they thought I was I guess resisting.

10   But I was in pain and I was hollering and crying.

11   And when they twisted my arm, it wouldn't go back.

12   They forced my arm back.

13        Q.    Now, you were asked some questions by

14   Counsel about the reason that various things

15   happened while you were in the bathroom.

16        A.    Uh-huh.

17        Q.    When you were in the staff bathroom

18   being searched, was anybody saying anything?

19        A.    As of staff?

20        Q.    Yeah.

21        A.    Yes, they was talking in there.

22        Q.    What were they saying?

23        A.    These bitches stink.  Shut the F up.

24        Q.    Do you know what the reason for that

25   language was?

1          A.   Asking them questions.

2               MS. THOMPSON:  All right.  I have no

3     further --

4          A.   And I guess because of the feces, the

5     blood or whatever, they said we stunk.

6               MS. THOMPSON:  All right.  I have no

7     further questions, Your Honor.

8               THE COURT:  All right.  Back for

9     recross.

10              MS. BAUTISTA:  No, Your Honor.

11              THE COURT:  Very good.  All done.

12              Thank you.  You may step down,

13    Ms. Hegwood.

14              THE WITNESS:  Thank you, Your Honor.

15                   (Witness excused)

16              THE COURT:  And you may call your next.

17              MS. THOMPSON:  Your Honor, we have one

18    brief issue we wanted to address with the Court.

19              THE COURT:  You have what?

20              MS. THOMPSON:  We have one brief issue

21    we wanted to address with the Court if we could

22    just approach.

23              THE COURT:  Why, sure.  Does this have

24    to do with the next witness?  Is that what you're

25    telling me?

1        MS. THOMPSON:  Potentially, yes, Your

2   Honor.

3        THE COURT:  All right.  Come on up.

4                 (The following proceedings were

5                 held at the bench, out of the

6                 hearing of the jury.)

7        MS. THOMPSON:  We have another witness

8   that we can start on.  I know that the defense has

9   some issues with respect to our expert that they

10  may want to take up with the Court, which we can do

11  you know, after the -- I don't know if the judge

12  wants to do that at 5 after the jury leaves or how

13  the Court wants to proceed, but we need to do that

14  I think this afternoon.  So, I don't know if the

15  Court wants us to put on a witness or address those

16  issues or how we should proceed.

17       THE COURT:  I don't know what -- I have

18  no idea what you're talking about.  Do we have some

19  motions in limine or something that we --

20       MS. McNAUGHT:  Yes, Your Honor.  We did

21  have a motion in limine.  You said that if we had

22  problems with the expert witness we were -- we

23  could do an offer of proof and we're going to ask

24  to do that offer of proof.

25       THE COURT:  Well --

1    MS. McNAUGHT:  I would think tomorrow

2    would be the better time to do that.

3           THE COURT:  Does this have to do with

4    the next witness?

5           MS. THOMPSON:  If we were -- if we're

6    going to take this issue up after -- my question

7    was just if we'd have time to talk about that with

8    the Court after 5:00.  If we do, then we can start

9    our next witness.  I just wanted to make sure we --

10          THE COURT:  How much time is it going

11   to take?

12          MS. THOMPSON:  The next witness will

13   not be done by 5:00.  But I don't know how long

14   it's going to take to address their issue.

15          THE COURT:  Well, we never do.  That's

16   the throw of the dice in trial.  It's always this

17   way.

18          MS. THOMPSON:  I just wanted to make

19   sure we had time to talk with the Court about this

20   issue today.  So, we can start with our witness.

21          THE COURT:  Today?

22          MS. THOMPSON:  Just determine how to

23   proceed on this issue today.  So, if we can do that

24   after 5 when the jury leaves, then we'll start our

25   next witness, Judge.

1          THE COURT:  Okay.  We're not going to

2    break in right now.

3          MS. THOMPSON:  I understand.

4          THE COURT:  That's for sure.

5          MS. THOMPSON:  All right.

6          THE COURT:  Okay.  So, let's -- let's

7    go ahead till 5 and then we'll bring it up out of

8    the presence of the jury when they're gone and see

9    where we stand.

10         MS. McNAUGHT:  Okay, great.

11         MS. THOMPSON:  Thank you, Your Honor.

12         THE COURT:  Yeah.

13              (Which concluded the proceedings

14                  at the bench.)

15         THE COURT:  All right.  You may call

16   your next, Mr. Field.

17         MR. FIELD:  Thank you, Your Honor.  The

18   plaintiffs call Patricia Phillips.

19              PATRICIA PHILLIPS,

20   of lawful age, produced, sworn, and examined on

21   behalf of the Plaintiffs, testifies and says:

22              DIRECT EXAMINATION

23   QUESTIONS BY MR. FIELD:

24         Q.  Good afternoon, Ms. Phillips.

25         A.  Hi.

1       Q.   Could you introduce yourself to the
2   jury and spell your name for the court reporter?
3       A.   I'm Patricia Phillips.  My name
4   P-a-t-r-i-c-i-a.
5       Q.   And you're one of the class
6   representatives in this case?
7       A.   Yes.
8       Q.   Okay.  Where do you currently live?
9       A.   I live in Washington, Illinois.
10      Q.   Okay.  Have you always lived in
11  Washington, Illinois?
12      A.   Yes.
13      Q.   Okay.  And do you currently work?
14      A.   Yes.
15      Q.   And where do you currently work?
16      A.   I work at a Huck's gas station and
17  Godfather's Pizza.  I'm a cook.
18      Q.   Okay.  What do you do at the gas
19  station?
20      A.   I'm a cook.
21      Q.   Okay.  They're the same?
22      A.   Yeah, they're the same place.
23      Q.   Okay.  And how old are you currently?
24      A.   I'm 39.  I'm 49.  49.  Sorry.
25      Q.   How old were you at the time on March

1  31st, 2011?

2          A.   About 44 I think.

3          Q.   44.  And in March 2011 were you

4  incarcerated?

5          A.   Yes.

6          Q.   Where were you incarcerated at that

7  time?

8          A.   Lincoln Correctional Center.

9          Q.   Okay.  And what were you incarcerated

10  for?

11          A.   Prostitution.

12          Q.   Okay.  And when were you released from

13  Lincoln Correctional Center?

14          A.   2012.

15          Q.   Okay.  And since being released from

16  Lincoln Correctional Center in 2012, have you been

17  incarcerated for any reason whatsoever?

18          A.   No.

19          Q.   Okay.  In March 2011, how long had you

20  been at Lincoln Correctional Center?

21          A.   A year.

22          Q.   A year.  And what housing unit were you

23  in at Lincoln Correctional Center in March 2011?

24          A.   2B.

25          Q.   Okay.  Do you recall what dorm you were

1    in?

2              A.    I was in Dorm 8.

3              Q.    Dorm 8.  How many women were housed in

4    each of the dorms?

5              A.    Twenty.

6              Q.    Okay.  In March 2011, did you have a

7    job within the prison?

8              A.    Yes.

9              Q.    What job did you have within the prison

10   at that time?

11             A.    I had an outside grounds job, but I'm

12   not sure if I -- and a kitchen.  I don't know if I

13   was working in the kitchen or that outside of the

14   gate.

15             Q.    Okay.  So --

16             A.    Maintenance.

17             Q.    -- it's fair to say that you held a

18   couple of different jobs while you were at Lincoln

19   Correctional Center?

20             A.    Yes.

21             Q.    At one point you worked as a sort of

22   maintenance --

23             A.    Uh-huh.

24             Q.    -- outside maintenance person?

25             A.    Uh-huh.

1    Q.   And at another point you worked in the

2  kitchen?

3    A.   Yes.

4    Q.   Okay.  Now, you've heard various class

5  members today discuss the mass strip search that

6  occurred in March 2011.  Were you strip-searched

7  during that same mass strip search?

8    A.   Yes.

9    Q.   Okay.  On March 31st, 2011, what time

10  did you wake up that day?

11    A.   When they came in screaming right --

12  right after count, about 7:30 or so.

13    Q.   Okay.

14    A.   7, 7 -- they came in to count 7.  7:15,

15  something like that.

16    Q.   Something like 7:30, 7:15?

17    A.   Yeah, something like that.

18    Q.   Okay.  Well, what time was count?

19    A.   Count was at 7 a.m.

20    Q.   7 a.m.  And that was every day?

21    A.   Yes.

22    Q.   And it was at 7 a.m. every day?

23    A.   Yes.

24    Q.   So, when you say they came in, who do

25  you mean?

1      A.   The Orange Crush and Warden Reynolds

2  and Dawdy.  He was in Orange Crush.  And that's all

3  I remember.

4      Q.   Do you remember the names of any of the

5  other individuals that came in at that time?

6      A.   Craig.  I can't remember all the other

7  names.

8      Q.   Okay.  Was Officer Craig a member of

9  the Orange Crush?

10     A.   Yes.

11     Q.   Okay.  And what did the Orange Crush do

12  as they came into the unit?

13     A.   They came in yelling, yelling and

14  screaming, told us to get -- stand at our bunks.

15  Then they told us to get in twos like the animals

16  you are.  And then they hand -- they brung us out

17  of the dorm and handcuffed us.  They had two

18  officers standing -- Orange Crush or an officer at

19  the end of the dorm, and they came out and

20  handcuffed us and put us in the dayroom standing

21  towards the wall.

22     Q.   Okay.

23     A.   And do not turn around or talk.

24     Q.   You -- going back to the Orange Crush

25  coming in and yelling at the women in your -- in

1   your unit, you heard Ms. Hegwood testify earlier

2   about the volume of that screaming.  Do you agree

3   with that -- with her?

4           A.   Yes.

5           Q.   It was that loud?

6           A.   Yes.

7           MS. McNAUGHT:  Objection, Your Honor,

8   to the extent that he's asking her to confirm

9   somebody else's testimony and bolster any

10  credibility.

11          THE COURT:  Sustained.  Just ask her

12  what she heard, what she saw.

13          MR. FIELD:  Sure.

14          Q.   When the Orange Crush -- when they

15  came, they were yelling at you?

16          A.   Yes.

17          Q.   And was the yelling loud?

18          A.   Yes, very loud.

19          Q.   Okay.  Can you estimate the number of

20  Orange Crush members that came in to the unit that

21  morning?

22          A.   Eight maybe, eight to ten.  I don't --

23  I'm not sure.

24          Q.   Okay.  Were there other correctional

25  officers or --

1   A. Yes.

2   Q. -- IDOC staff with them?

3   A. Yes.

4   Q. Who else was there?

5   A. Warden Reynolds, our officer that was

6 on the unit.  I can't remember the name.

7   Q. Well, were there regular corrections

8 officers that were not Orange Crush?

9   A. Yeah, there was a couple, yeah.

10   Q. And were there cadets as well?

11   A. Yes.

12   Q. Now, you said that they asked you to

13 line up two by two.

14   A. Yes.

15   Q. Where did you -- when you were asked to

16 line up two by two, where did you line up?

17   A. We lined up in the dorm.

18   Q. Okay.  Where exactly in the dorm did

19 you --

20   A. Right by our beds we -- we had to get

21 in -- you know, just in twos lined up in the middle

22 of the dorm in the hall -- there's a row of bunk

23 beds and a row of bunk beds, and we were in the

24 middle of the dorm.

25   Q. So, just so I'm clear, the dorm had

1 bunk beds on both sides and sort of like a hallway

2 or --

3    A. Yes.

4    Q. -- space down the middle?

5    A. Yes.

6    Q. And you were asked to line up in that

7 space down the middle?

8    A. Yes.

9    Q. And that space led out to the sort of

10 entrance or exit into your dorm?

11    A. Yes.

12    Q. Okay.  And where were the individuals

13 who were doing the handcuffing?  Where were they

14 standing?

15    A. They were outside the dorm.  We stepped

16 out.  There's a doorway, you know, just to the

17 dorm, and we stepped out and they handcuffed us.

18    Q. Okay.  And so were the -- was it --

19    THE COURT:  Do we have a picture or an

20 exhibit that shows the dorm?  How simple it would

21 be to put it up here if we have it.

22    MR. FIELD:  We don't.

23    THE COURT:  You don't have it?

24    MR. FIELD:  We don't have one, Your

25 Honor.

1          THE COURT:  Okay.  All right.  Well,
2    then we'll have to describe it as such.
3          MR. FIELD:  Okay.
4          THE COURT:  All right.
5          MR. FIELD:  We'll do our best.
6          THE COURT:  Sorry for asking, but I
7    thought that was a nice one that you've got of the
8    gym.  But we don't have one of the dorm.
9          MR. FIELD:  Well --
10          THE COURT:  Okay.
11      Q.  Ms. Phillips, do you think you could
12    maybe sketch on the screen what the dorm looks
13    like?
14          THE COURT:  Sure.  That's a way to do
15    it.
16      A.  Okay.  There's a doorway right -- okay.
17    There's a doorway to the dorm.  There's bunk beds
18    on this side, bunk beds on this side, and then they
19    -- we were lined up right here and we walked out
20    the doorway, and the officers were standing right
21    here, two of them, and they handcuffed each of us.
22      Q.  Okay.  And this -- this middle line
23    here, this is where the women in your dorm were
24    standing?
25      A.  Yes.

1    Q.    And these other outside lines are where

2    the --

3    A.    Bunk beds were.  These are the beds.

4    Q.    And the beds kind of went this way?

5    A.    They went this way, this way, this way,

6    this way.  They had five on each side or four.

7    Four or five on each -- five on each side I think.

8    Q.    Okay.  And where were you standing --

9    so, which one of these bunk beds were yours?

10    A.    I was the second to the last.

11    Q.    Okay.

12    A.    To the last one to the back of the

13    dorm.

14    Q.    So, how long would you estimate you

15    were standing by -- in that line waiting to be

16    handcuffed?

17    A.    Oh, probably about maybe 10, 15

18    minutes.

19    Q.    Okay.  And when you got to the -- this

20    front area right here where they did the

21    handcuffing, were they handcuffing one woman at a

22    time or two women at a time?

23    A.    Two.  They had two officers standing

24    out here.

25    Q.    Okay.  And how long did it take for

1    them to do the handcuffing?

2           A.    Three or four minutes.

3           Q.    Okay.  Did they do a pat-down search

4    while they were doing that handcuffing?

5           A.    No.

6           Q.    Okay.  Did they ask you to take your

7    shoes off or anything like that when they were

8    doing the handcuffing?

9           A.    No.

10          Q.    Okay.  And so once they handcuffed you,

11   what happened?

12          A.    They sent us into the dayroom.

13          Q.    Okay.  When you say they sent you into

14   the dayroom, how did you --

15          A.    They walked us into the dayroom and

16   stood us up facing the wall.

17          Q.    Okay.  Who -- and who walked you to the

18   dayroom?  Was it an Orange Crush member?  Was it a

19   cadet?  Was it a correctional officer?

20          A.    I believe it was an Orange Crush.

21          Q.    Okay.  And were they saying anything --

22   were any of the Orange Crush members or any of the

23   individuals doing the handcuffing, did they say

24   anything to you while they were handcuffing you?

25          A.    They just kept telling us shut up.

1 That's pretty much what they told us.  Shut up.

2      Q.   Okay.  And did you say anything to them

3 while they were handcuffing you?

4      A.   No, I didn't.

5      Q.   Okay.  And did you say anything to the

6 Orange Crush member that you believe walked you to

7 the dayroom?

8      A.   Just that my handcuffs were too tight

9 on me.

10      Q.   Okay.  And you were handcuffed be --

11 were you --

12      A.   Behind my back.

13      Q.   -- handcuffed in the front or behind

14 your back?

15      A.   Behind.

16      Q.   Okay.  And when you told them that your

17 handcuffs were too tight, what did that individual

18 say?

19      A.   Nothing.  They said, "Just shut up and

20 get in the dayroom."

21      Q.   Okay.  And then once they brought you

22 into the dayroom, what happened next?

23      A.   We stood there until they got everybody

24 cuffed, all five dorms, and then they marched --

25 they walked us out to the gym.

1        Q.   Okay.  Do you want to do a quick sketch

2   of the dayroom and show us where you were standing

3   in the dayroom?

4        A.   Okay.  This is the dayroom.  Okay?  And

5   we were -- I was standing along this wall right

6   about there.

7        Q.   Okay.  And where's the entrance into

8   the dayroom?

9        A.   The entrance to the dayroom is right

10  here.

11       Q.   Okay.

12       A.   Well, that's from the hallway to going

13  outside.

14       Q.   Okay.  And so, were you asked to stand

15  facing the wall in the dayroom?

16       A.   Yes.

17       Q.   Okay.  And how long would you estimate

18  you stood there while they were bringing other

19  women in from the unit?

20       A.   I would say 45 minutes to an hour.

21       Q.   Okay.  And were you allowed to sit down

22  at all during that period?

23       A.   No.

24       Q.   Okay.  And were you allowed to talk at

25  all during that period?

1      A.   No.

2      Q.   Okay.  Were there any women who were in

3   the dayroom with you who were talking during that

4   period?

5      A.   They were trying to ask what was going

6   on and stuff.  They just said, "Shut up and turn

7   and face the wall."

8      Q.   Okay.  And so, after they brought the

9   rest of the women into the dayroom, what happened

10  next?

11     A.   They -- they took us out and walked us

12  to the gym.

13     Q.   Okay.  And who -- do you recall the

14  names of any of the individuals who walked the unit

15  to the gym?

16     A.   Warden Reynolds was in front of the

17  line and Dawdy was on the side and Craig was on one

18  side.

19     Q.   Okay.  And do you recall any of those

20  individuals saying anything to you as you were

21  walking?

22     A.   Yep.  Dawdy was calling us bitches.

23     Q.   Anything else?

24     A.   "Shut up, you bitches."

25     Q.   Okay.

1        A.    They threatened to take us to seg.

2        Q.    Okay.

3        A.    He threatened.

4        Q.    And that was -- that was Lieutenant

5    Dawdy?

6        A.    Yes.

7        Q.    He was an Orange Crush member?

8        A.    Yes.

9        Q.    Okay.   What about Assistant Warden

10   Reynolds?  Did he say anything?

11       A.    He just kept telling us to shut up.

12       Q.    Okay.   And that was on the way to the

13   gym?

14       A.    Yes.

15       Q.    Okay.   And what about Officer Craig,

16   did he say anything as you were walking over to the

17   gym?

18       A.    I didn't hear Officer Craig say

19   anything.

20       Q.    Okay.   Now, I'm going to show you

21   what's marked as Plaintiffs' Exhibit 201.  Do you

22   prefer to have it this way around or do you want me

23   to flip it?

24       A.    No.

25       Q.    This is good like this?

1          A.   Yeah.

2          Q.   Okay.  All right.  Can you indicate on

3    this floor plan where you were brought into the gym

4    and -- yeah.  We'll start with that.  Where --

5          A.   Right here.

6          Q.   Okay.

7          A.   Right here.

8          Q.   And when you were brought into the gym,

9    where were you -- where did they bring you once

10   they brought you into the gym?

11         A.   Well, I was like in a -- there was a

12   line here, and I was like in the second line and

13   then there was a line behind me.

14         Q.   Okay.  And which way were you facing in

15   those lines?

16         A.   Towards the wall.

17         Q.   So, which wall?

18         A.   This wall right here.

19         Q.   Okay.  Can you indicate exactly where

20   on this floor plan you were standing while you were

21   in the gym?

22         A.   I was standing about right over here

23   somewhere.  Right there.

24         Q.   Okay.  Now, you heard some testimony --

25   well -- yes, you heard some testimony about women

1  being strip-searched in the gym bathroom this

2  morning; correct?

3     A.  Yes.

4     Q.  Okay.  And while you were standing in

5  that line, could you see women being strip-searched

6  in that bathroom?

7         MS. McNAUGHT:  Objection as to the

8  leading nature, Your Honor.

9         THE COURT:  Sustained.

10    Q.  When you were standing in the line,

11  could you see women being --

12    A.  Yeah.

13        MS. McNAUGHT:  Objection, Your Honor.

14        THE COURT:  What did she see?

15    Q.  When -- when you were standing in the

16  line, could you see the bathroom?

17    A.  Yes, I could.

18    Q.  Okay.  And were there women being

19  strip-searched in the bathroom?

20    A.  Yes.

21        MS. McNAUGHT:  Objection, Your Honor,

22  as to the leading.

23        THE COURT:  I'll sustain.

24        Just ask her what she saw.

25    Q.  When you were standing in that line,

1    what did you see?

2         A.   I saw women being taken in the bathroom

3    and being stripped.

4         Q.   Okay.  And was there a curtain in front

5    of that door?

6         A.   No, there wasn't.

7         Q.   Okay.  Now, how long were you -- were

8    you strip-searched in the bathroom?

9         A.   No, I wasn't.

10        Q.   Where on this -- well, where were you

11   strip-searched?

12        A.   I was strip-searched in the beauty

13   shop.

14        Q.   Okay.  How long would you estimate that

15   you were standing in the line in the gym before you

16   were strip-searched in the beauty shop?

17        A.   I would say an hour and a half to two

18   hours.

19        Q.   Okay.

20        A.   A long time.

21        Q.   The beauty shop, did it have a door

22   going into the gym?

23        A.   Yes.

24        Q.   Okay.  And did that door -- was that a

25   solid door or did it have a window in it?

1          A.   It was a solid door, I believe.

2          Q.   Okay.  And what about inside the beauty

3     shop, was there a door inside the beauty shop?

4          A.   Yes, there was a --

5          MS. McNAUGHT:  Objection, Your Honor,

6     as to the leading.

7          THE COURT:  Sustained.  Sustained.

8          Q.   Did the beauty shop have --

9          THE COURT:  Have her point right on

10    here --

11         MR. FIELD:  Sure.

12         THE COURT:  -- wherever -- where the

13    door is and so forth.  It's rather obvious.

14         A.   There's a door right here, right around

15    here.  Right there.

16         Q.   Was that a solid door?

17         A.   No, it had a window.

18         Q.   Okay.  And was there -- were there any

19    windows in the room?

20         A.   No.

21         Q.   Besides the one in the door?

22         A.   Besides one in the door.

23         Q.   Okay.  I'm going to show you what's

24    marked as Plaintiffs' 226.  Will this aid you in

25    providing testimony?

1          MR. FIELD:  Permission to publish, Your

2    Honor?

3          THE COURT:  Yes.

4          Q.  Is this a photo of the interior of what

5    you referred to as the beauty shop?

6          A.  Yes.

7          Q.  Okay.  And is that that door that

8    you've referred to?

9          A.  Yes, that's the door.

10         Q.  Okay.  Do you know where that door

11   leads to?

12         A.  The outside.

13         Q.  Okay.  And what is -- when you say the

14   outside, what --

15         A.  Outside.  It leads to outside.

16   Outdoors.

17         Q.  Well, if you were going to the -- going

18   to the beauty shop, for example, for an

19   appointment, would you go in through the gym door

20   or would you go in through that outside door?

21         MS. McNAUGHT:  Objection, Your Honor.

22         A.  You would go in through the outside

23   door.

24         THE COURT:  Wait a minute.  Wait a

25   minute.  Hold it.  Can't have three voices at once.

1        MS. McNAUGHT:  This is still leading.

2        THE COURT:  It is.  It is leading.  It

3   is leading.  But having said that, it will take us

4   from now until Christmas if we keep doing this.

5        Now, this is called a beauty shop, is

6   that right?  That we have on the -- which is 226.

7        MR. FIELD:  Yes, Your Honor.

8        THE COURT:  Plaintiffs' 226 is on the

9   view plate right now.  And that's called a beauty

10  shop.  It's obviously not a beauty shop.  But it is

11  called a beauty shop; is that right?

12       MR. FIELD:  Right.

13       THE COURT:  Okay.

14       MR. FIELD:  Well --

15       THE COURT:  Now, that is the door -- is

16  that not the door that she has testified to coming

17  in from wherever?  That's the door coming in and

18  there's one window.

19       MR. FIELD:  That's --

20       THE COURT:  Is that right?

21       MR. FIELD:  Yes, Your Honor.

22       THE COURT:  Okay.  Now, why are we

23  arguing over this?  That's the beauty shop.  That's

24  what they call the beauty shop.  And that's the

25  name on one of the view graphs or one of the

1    exhibits.  So, let's move along.  Let's move along.

2          Q.   (by Mr. Field) I'm going to show you

3    what's marked as Exhibit 243.  Will this aid in

4    providing your testimony today?

5          A.   Yes.

6               MR. FIELD:  Permission to publish, Your

7    Honor?

8               THE COURT:  Yeah, go ahead.

9          Q.   Is this a view towards the beauty shop

10   from inside the gym?

11         A.   Yes.

12         Q.   Okay.  When you were brought into the

13   beauty shop -- well, how long had you been waiting

14   in line before you were brought into the beauty

15   shop to be strip-searched?

16         A.   At least two hours.

17         Q.   Okay.  And were other inmates brought

18   into the beauty shop with you?

19         A.   Yes.

20         Q.   And how many other inmates were brought

21   into the beauty shop with you?

22         A.   Six to eight I think.

23         Q.   Okay.  If I show you Exhibit 201 again,

24   can you -- and I will zoom in on the beauty shop.

25         A.   Okay.

1          Q.   Can you point out where in the beauty

2    shop you were asked to stand?

3          A.   Right here.

4          Q.   Okay.  And where were the other inmates

5    that entered the beauty shop with you?

6          A.   One was here.  One was here.  I think

7    there were four in one line, four -- there was

8    eight.  Eight of us.

9          Q.   Okay.  Were there any mirrors in the

10   beauty shop --

11         A.   Yes, there was.

12         Q.   -- in March 2011?

13         A.   Yes.

14         Q.   Where were those mirrors?

15         A.   They were up by where the -- you know,

16   where the -- where they do the hair at.  They were

17   all along this wall and there was some along this

18   wall.  That I can recall.

19         Q.   Okay.  And how many -- well, were there

20   any Orange Crush members in the beauty shop with

21   you during the --

22         A.   No.

23         Q.   -- time that you were brought in there?

24         A.   No.

25         Q.   Were there cadets in there at that

1  time?

2        A.   Yes, there was cadets.

3        Q.   And were there corrections officers who

4  were not Orange Crush?

5        A.   Yes.

6        Q.   Okay.  Do you recall the names of any

7  of those corrections officers?

8        A.   I don't.

9        Q.   Okay.  Can you describe how you were

10  strip-searched?

11       A.   They told us to take all our clothes

12  off.  They made us squat -- bend over and spread

13  our cheeks -- well, go through our hair, our ears,

14  our mouth, then bend over and spread our cheeks,

15  and then squat and cough.

16       Q.   Okay.  And how many -- did they ask you

17  to squat and cough -- or, how many times did they

18  ask you to squat and cough?

19       A.   Two times.

20       Q.   Okay.  Now, you testified that you

21  thought there were two rows of four inmates in the

22  beauty shop while you were in there?

23       A.   Yes.

24       Q.   Okay.  Did they strip search each of

25  those inmates at the same time or did they do it

1    one at a time?

2         A.   We all got naked at the same time.

3         Q.   Okay.  And what about the squatting and

4    coughing, was that all at --

5         A.   That's all at the same time.

6         Q.   What about checking your --

7         A.   Yes.

8         Q.   -- you know, other parts of your body?

9         A.   Yes.

10        Q.   All at the same time?

11        A.   Because there was C/Os and cadets

12   standing in front of us and in back of us.  Yes.

13        Q.   Okay.  Can you estimate approximately

14   how long you were standing in the beauty shop

15   naked?

16        A.   I would say 10 minutes, 15 minutes,

17   something like that.

18        Q.   Okay.  Now, when you -- from where you

19   were standing in the beauty shop, could you see

20   outside the -- from that window in the door?

21        A.   Yes.

22        Q.   Okay.  And was there anybody standing

23   outside that door?

24        A.   No.

25        Q.   Okay.  What about could you see outside

1    that -- the window that we saw in this photo here?

2         A.   I don't recall a window.  I didn't -- I

3    can't recall a window being there.

4         Q.   Okay.  And you -- I'm sorry.  I know I

5    asked you this, but how long did you say you

6    estimated you were in the beauty shop naked?

7         A.   About 10, 15 minutes.

8         Q.   Okay.  Had other women been

9    strip-searched in the beauty shop previous to you?

10        A.   Yes.

11        Q.   Okay.  And when you were brought out of

12   the beauty shop, where did you go?

13        A.   To the -- back in the gym.

14        Q.   Okay.  And where in the gym did you go?

15        A.   I was sat on the floor.

16        Q.   Okay.  And can you indicate on this

17   floor plan where it is that you were sitting?

18        A.   I was sitting right about there.

19        Q.   Okay.  And were there other women

20   sitting there as well?

21        A.   Yes, there were women on the floor.

22        Q.   Okay.  And were there women sitting in

23   the bleachers?

24        A.   Yes.

25        Q.   During the period of time that you were

1  strip-searched in the bathroom, was any of the

2  women that you were strip-searched with on their

3  period?

4       A.  Not that I can recall.  Not when I was

5  in there.

6       Q.  Well, what condition was the beauty

7  shop floor in when you got into the beauty shop?

8       A.  I just -- I saw something wet on there.

9  I don't know what it was.

10      Q.  Okay.  And when you took your clothes

11  off for the strip search, where did you put them?

12      A.  On the floor.

13      Q.  Okay.  How long would you say you were

14  -- well, what happened after you were asked to sit

15  on the floor in the gym after you were

16  strip-searched?

17      A.  I had to wait for everybody else to get

18  searched.

19      Q.  Okay.  And how long would you estimate

20  you were sitting there on the gym floor?

21      A.  Hour.

22      Q.  Okay.  And during the period of time

23  that you were sitting there on the gym floor, did

24  you -- well, did you see Assistant Warden Reynolds

25  at all?

1       A.   Yes.

2       Q.   And did assistant -- did you hear

3  Assistant Warden Reynolds say anything to anyone?

4       A.   Just shut up, be quiet, face the wall.

5  No, when I was sitting, they were telling the other

6  girls to face the wall.

7       Q.   And do you recall seeing anybody else

8  that you can identify by name while you were

9  sitting on the floor?

10      A.   Dawdy, Craig was in the gym, Arm -- was

11  it Armstrong or -- Anderson, Anderson, Mr. Anderson

12  was in there.

13      Q.   Well, can you indicate where -- while

14  you were sitting on the floor -- let's start with

15  Assistant Warden Reynolds.  Where was Assistant

16  Warden Reynolds when you were sitting on the floor?

17      A.   Well, she had just came in -- she had

18  just came in and said, "Get a curtain."  She said,

19  "Who authorized this?"  I heard her say that.

20      Q.   Is that Warden Hulett?

21      A.   Yes.

22      Q.   Okay.  And that occurred while you were

23  sitting on the floor?

24      A.   Yes.

25      Q.   Okay.  You testified a minute ago that

1   you overheard -- you also overheard Assistant

2   Warden Reynolds.  I'm asking where Warden Reynolds

3   was in the gym when you heard that?

4          A.   He was standing back over in here

5   somewhere.

6          Q.   And what about Lieutenant Dawdy, where

7   was he?

8          A.   They were standing and talking, all of

9   the officers.

10         Q.   Okay.  When Warden Hulett came in and

11  you overheard her say get a curtain for the

12  bathroom entrance, was that after you had been

13  searched?

14         A.   I think -- I think it was before I went

15  into the beauty shop.

16         Q.   Okay.  Well, were you sitting on the

17  floor when you overheard that?

18         A.   No.

19         Q.   Or were you still standing in the line?

20         A.   I was still standing in the line when I

21  heard -- when she came in.

22         Q.   Okay.  And can you indicate where in

23  the gym you were standing when you overheard that?

24         A.   Right in -- there was a line there and

25  there was a line there, and I was standing right in

1    here somewhere.

2              Q.   Okay.

3              A.   In the middle.

4              Q.   And assistant -- sorry.  Warden Hulett

5    came in through the door here?

6              A.   Yes.

7              Q.   And where was she when you overheard

8    her say get a curtain for that?

9              A.   She was walking and said, "Where's the

10   -- get a curtain for that bathroom.  Who authorized

11   this?"  I heard her say that.

12             Q.   Okay.  Previous to Warden Hulett coming

13   into the gym, had women -- were they

14   strip-searching women in the beauty shop?

15             A.   I don't recall.  I can't remember.

16             Q.   Okay.  What about -- well, previous to

17   Warden Hulett coming in the gym, had they been

18   strip-searching women in the bathroom?

19             A.   Yes.

20             Q.   Okay.  What about in the staff

21   bathroom, had they started strip-searching women in

22   the staff bathroom?

23             A.   I think they started that afterward,

24   after she came in.

25             Q.   Okay.  Okay.  And how long would you

1    estimate that -- after Warden Hulett came in, how

2    long would you estimate that she was in the gym?

3         A.   Probably 10, 15 minutes, if that.

4         Q.   Okay.  And did you see her talking to

5    anybody while she was in the gym?

6         A.   Warden Reynolds.

7         Q.   Anybody else?

8         A.   Huh-uh.

9         Q.   Okay.  And did you overhear what she

10   said to Warden Reynolds?

11        A.   No, I didn't.

12        Q.   Okay.  Where was Warden Reynolds

13   standing when Warden Hulett talked to him?

14        A.   Well, she walked in and they -- like

15   right around in here somewhere, back down here

16   somewhere.  She walked in and he was walking

17   towards her and they -- right about there.

18             I made a mess of that but ...

19        Q.   Going back to when you were in the

20   beauty shop, did any of the corrections officers or

21   cadets in the beauty shop make any comments to any

22   of the women?

23        A.   No, but they -- they did when I was out

24   in the gym.  I heard them.

25        Q.   Who -- well, where were you in the gym

1    when you overheard that?

2          A.   I was standing right in the line facing

3    the wall and I -- and then I turned around and

4    Crudup had that bandanna over her nose and face

5    talking about these bitches are stinking.  And they

6    all were talking about them stinking and stuff.

7          Q.   Okay.  That was Officer Crudup you

8    think?

9          A.   Yes.  Crudup and there was other

10   officers saying that.  I don't remember -- recall

11   who they were.

12         Q.   Okay.  After sitting on the gym floor

13   waiting for the rest of the women to be

14   strip-searched, where were you taken?

15         A.   After everybody got strip-searched, we

16   were lined up in twos and walked to the dining

17   room.

18         Q.   Okay.  And do you have a -- do you have

19   any recollection of what time that was when you

20   were walked to the dining room?

21         A.   I would -- I have -- I'm thinking about

22   12 or 1:00, maybe even 2.  I'm not sure.

23         Q.   Okay.  How long did it take to walk you

24   over to the dining hall?

25         A.   Five minutes, if that.

1          Q.   And were you walked over to the dining

2    hall in handcuffs?

3          A.   No.

4          Q.   Okay.  And when you were sitting on the

5    floor, did you have handcuffs on?

6          A.   No.

7          Q.   Okay.  Did you eat lunch that day in

8    the dining hall?

9          A.   No, I didn't.

10         Q.   Okay.  Did you -- well, while you were

11   walking over or being walked over to the dining

12   hall, did you see any women who were having any

13   sanitary issues?

14         A.   I didn't myself, no.

15         Q.   Okay.  But you didn't have lunch that

16   day?

17         A.   No, I didn't eat.

18         Q.   Did you overhear any women on that

19   march over to the dining hall saying anything to

20   the corrections officers?

21         A.   Yes.  "Can we wash our hands?"

22              MS. McNAUGHT:  Objection, Your Honor.

23              THE COURT:  Wait a minute.  Wait a

24   minute.

25         A.   They asked if they could wash --

1          THE COURT:  Wait just a moment, please.

2          MR. FIELD:  You have to wait.

3          THE COURT:  Don't answer.

4          MS. McNAUGHT:  This is a hearsay

5     statement offered for the truth of the matter

6     asserted and it's -- she's going to testify about

7     something that another inmate said.

8          THE COURT:  Yes.  And if that is the

9     case, the objection is sustained.

10          MR. FIELD:  Okay.  Thank you, Your

11    Honor.

12          THE COURT:  Now, is this a good time to

13    stop?

14          MR. FIELD:  I was just going to say I

15    was about to get to a different topic, so we --

16          THE COURT:  Excellent.  See, I

17    anticipated you.  I just knew it was going to be

18    about the right time that all of us were thinking,

19    well, we can hardly wait to get out of here.  Okay.

20    Very good.

21          And you will be back on the stand

22    tomorrow morning.  Do you understand that, ma'am?

23      A.   Yes, sir.

24          THE COURT:  All right, fine.  And we're

25    going to recess for the night at this time.  And,

1  ladies and gentlemen, please recall my admonitions,

2  no discussion about this with family, anyplace at

3  all, no cell phones, nothing, nothing.  Okay?

4          Great.  See you tomorrow morning.

5  You're recessed until 10:00.

6          CLERK:  All rise.

7          THE COURT:  That's fine.  You just go

8  right ahead and leave.  I want to talk to counsel

9  here a minute.

10          (The jury left the courtroom.)

11          THE COURT:  All right.  The record may

12  show that the jury has left the courtroom and

13  they're recessed for the evening.

14          Be seated, everybody.  And let's take

15  up the matter that we had a sidebar -- a brief

16  sidebar about.  So, let 'er rip.  What is it?

17  Let's get at it.

18          MS. THOMPSON:  My understanding, Your

19  Honor -- we have a corrections expert who intends

20  to testify.  We're going to put her on the stand on

21  Wednesday.  Her name is Wendy Still.  This was the

22  subject of a motion in limine.  The defendants

23  filed a motion in limine asking to bar certain

24  aspects of her testimony.  We responded.

25          It is our intention to present from --

1   from Ms. Still, as you would from any expert, her

2   opinions about what occurred in this case.  She

3   will testify about nationally accepted correctional

4   standards.  And she will testify that based on the

5   assumptions that she has in this case, which come

6   from materials that she was provided, that, you

7   know, here are her -- here are her opinions about

8   various aspects of what happened.

9           She won't testify that she knows what

10   happened.  She'll testify and acknowledge that she

11   is basing her opinions on assumptions based on

12   materials she was provided.

13           And as we said in our motion in limine,

14   there is plenty of case law to indicate that that

15   is appropriate for an expert to do.

16           My -- the Court ruled on the motion in

17   limine and, as I understood the Court's ruling,

18   indicated that that testimony was appropriate.

19           My understanding now is that the

20   defendants would like the plaintiffs to make an

21   offer of proof about Ms. Still.  I don't believe

22   that is necessary given the Court's motion in

23   limine ruling.  But if the Court wants us to make

24   an offer of proof, I just wanted to work that out

25   so that we could determine, you know, in the

1   schedule where to make time for that so that we

2   would be prepared.

3          We were only going to have Ms. Still,

4   who is an out-of-town expert, be present on

5   Wednesday.  So, we don't believe an offer of proof

6   is necessary, but if the Court wants us to make

7   one, we would suggest doing so on Wednesday morning

8   and then having her testify later on Wednesday.

9   But that's the issue as I see it, Your Honor.

10          THE COURT:  All right.

11          MS. McNAUGHT:  And, Your Honor, based

12   upon --

13          THE COURT:  Why don't you come up here?

14   You look like you're very uncomfortable leaning

15   over the table.  So, if you can get to a mic for

16   stand-up, it would be helpful.  Thank you, Ms.

17   McNaught.

18          MS. McNAUGHT:  We understood your

19   ruling on the motion in limine was that Ms. Still

20   could testify to correctional standards, but we

21   don't believe that it's appropriate for her to

22   testify about what she believes and then say that

23   those standards were violated.  We believe that

24   you've already addressed that in your ruling on the

25   motion in limine.

1    And so, based upon the information that

2    -- or, what Counsel has just said she plans to

3    elicit, we think that in fact an offer of proof is

4    required or is necessary so that you can let the

5    parties know what is appropriate in your mind and

6    what is not.  And so, for that reason, we ask that

7    the offer of proof be done prior to her actually

8    being able to testify in front of the jury.

9    THE COURT:  All right.  I think -- what

10   do you think?

11   MS. THOMPSON:  Well, this is the issue,

12   Your Honor, as I see it:  We understand that -- and

13   what I understood the Court's ruling in summary

14   judgment, which was very clear, was that Ms. Still

15   cannot testify about any of the ultimate issues in

16   this case.  She can't say -- and there were

17   statements in her opinions, which we agree should

18   not come before this jury, that in her opinion, you

19   know, there were issues -- there were things that

20   indicated deliberate indifference, in her opinion

21   there were things that went to ultimate issues.

22   She talked some about damages in her report.  And

23   we agree those issues don't come in and we don't

24   intend to offer them.

25   What we intend to do with Ms. Still is

1    what experts do all of the time, which is to say

2    here's the materials I was provided, and based on

3    these materials and given my knowledge of national

4    correctional standards, which I will explain, you

5    know, what those standards are, here is the way

6    that defendants' conduct violated national

7    standards, here is the way that defendants' conduct

8    in her view doesn't -- you know, here, based on

9    national standards, it's her view as to why this

10    conduct isn't necessary for some -- something that

11    correctional officers need to do.

12            I think the defendants are free to

13    cross-examine her and say, well, you're relying on

14    X, and X isn't true, or you're assuming X is true.

15    That is standard cross-examination that experts

16    always face, and that cross-examination is

17    appropriate.

18            But there's plenty of law to say that

19    it's not inappropriate for her to say my opinions

20    are based on these assumptions. And if defendants

21    want to challenge those assumptions, they may do

22    so.

23            She won't testify to the ultimate

24    issues, but that's the testimony we intend to

25    offer.

1    And what I fear, Judge, is that what

2    this will really mean is that we will spend a lot

3    of time where she will give her full testimony in

4    front of this Court and then she'll just give that

5    testimony again.  And I think that may be a waste

6    of time.

7    Obviously, we would offer her on issues

8    that the Court would object to at our peril because

9    I assume the Court would sustain any objections

10   about improper testimony.  It would probably be

11   unhappy with us, and fairly so if we do something

12   that's unfair.  And that would be at our peril in

13   front of the jury.  But to have her testify twice,

14   it seems to us, isn't the best use of our time

15   here.

16   THE COURT:  Well, I can agree with

17   that.  I think we'll all agree with that.  We don't

18   want her to testify twice.  Believe me, I don't.

19   Now, Ms. McNaught, give me your bottom

20   line.

21   MS. McNAUGHT:  Your Honor, based upon

22   the information that plaintiffs stated -- well,

23   first of all, the expert report is of no use to

24   anybody because it opines on a lot of things that

25   she absolutely cannot get into.

1          THE COURT:  Definitely.

2          MS. McNAUGHT:  So, we're at the

3   plaintiffs' mercy in telling us what it is that

4   they plan to have -- to elicit from her.  And when

5   they responded to the motion in limine, they

6   introduced a lot of things that we believe the

7   Court has said are not fair game for her to testify

8   to.  And so that's why we believe that it's

9   appropriate outside the presence of the jury to do

10  an offer of proof so that you can let us all know

11  what it is that she can get into in front of the

12  jury and what she can't get into in front of the

13  jury.  And if we wait until plaintiff makes a

14  mistake, the cat's out of the bag.

15         THE COURT:  Oh, of course.  Of course.

16  The damage is done.  So, that is always the problem

17  with this kind of -- with this kind of evidence and

18  this kind of testimony.  But I don't know of any

19  other way we can do it.  We simply have got to have

20  the offer of proof.  And my rulings heretofore have

21  been for the basis of getting this thing narrowed

22  down and getting us closer to the meat and potatoes

23  so that we don't have to have the jury waiting and

24  spinning wheels on something that they can't do.

25         I don't know how we can avoid the offer

1    of proof.  I think that it's going to have to be.

2    Now, we're going to run it tight as a tick.  So,

3    you give me what you think we can do by way of

4    timing, but we're going to have to do it.  We're

5    going to have to have an offer of proof.

6            Now, when is she going to be here?

7            MS. THOMPSON:  She's going to be here

8    on Wednesday, Your Honor.

9            THE COURT:  On Wednesday.  All right.

10   Well, we're going to have to carve out about how

11   much time you're going to take.  How much do you

12   think we're going to need?  I'm not -- it's going

13   to be outside the presence of the jury and so I'm

14   going to allow all of the leading questions that

15   you need to have and then we'll chop out whatever

16   has to be chopped out.

17           MS. THOMPSON:  My suggestion would be

18   this, Your Honor:  Tomorrow -- and we've already

19   made, candidly, better progress today than we

20   expected.  We got through more witnesses than we

21   were thinking we would.  I think we're making good

22   progress.  I think we'll make more progress

23   tomorrow than we were planning on.

24           THE COURT:  Good.

25           MS. THOMPSON:  And that we start on

1   whatever time on Wednesday morning the Court

2   directs.  We'll do whatever we need to do by way of

3   an offer of proof.  We can put Ms. Still on

4   immediately thereafter and we'll move forward from

5   there.

6              THE COURT:  All right.  Now, how about

7   this?  How much time do you think you're going to

8   -- we're going to take on her?

9              MS. THOMPSON:  I will be honest that I

10  have not done an offer of proof in this way before.

11  I think leading will speed it up.  I mean, she

12  would be a longer witness and we believe the topics

13  we've offered her for are all appropriate, so her

14  testimony at trial might be somewhat long.  But we

15  think the -- I think the offer of proof could be

16  shorter.  I don't know what the defendants intend

17  to do in terms of, you know, crossing her or making

18  argument.  And I appreciate that they may feel like

19  they won't know until they hear from her.  But I

20  think we can make our presentation relatively

21  brief, and we can see where we're at from there,

22  Judge.

23             THE COURT:  Well, why don't we do this?

24  Why don't we -- what time is she going to be here?

25  Is she going to be here first thing in the morning?

1          MS. THOMPSON:  Yes, Your Honor.

2          THE COURT:  All right.  Well, why don't

3    we do this?  Let's put her on at 9:30, put her on

4    at 9:30 and try to get this done as quickly as

5    possible.  You can -- you can lead, you can

6    preface, you can ballpark, do whatever the two of

7    you want to do in order to get us right down to the

8    nitty-gritty what I'm going to permit her to

9    testify to.  And hopefully, we can get that done in

10   a half an hour and then move right into the jury.

11          Now, folks, understand, these eight

12   people over here are giving up their time from

13   their families, their work, everything.  So, we

14   don't want to abuse them.  And I will refuse to

15   allow that if we can avoid it.

16          So, I want to -- I want you to use

17   leading questions, get this stuff to the -- because

18   the jury is not going to be here.  So, let's get

19   down right to the meat and potatoes.  I'm quite

20   serious about this.  And I'm sure you understand

21   that I am.

22          And it's the same thing with all of the

23   defendants here and the plaintiffs.  They don't

24   want to be sitting around here forever and a day.

25   And I don't, either.  None of us do.  I've got

1    plenty of work coming up the pike and you do too.

2    So, let's understand what we're doing.  Okay?

3              Now, plan on it that way.  And you've

4    got 30 minutes.  Okay?

5              MS. McNAUGHT:  Thank you, Your Honor.

6              THE COURT:  Good show.

7              MS. McNAUGHT:  Thank you.

8              THE COURT:  Now, anything else tonight?

9              MS. THOMPSON:  I don't believe so, Your

10   Honor.  Thank you.

11             THE COURT:  Okay.  See you all at 10:00

12   in the morning.  Court stands in recess, everyone.

13                   (Court recessed at 5:10 p.m.)

14

15   I, DOROTHY J. HART, CSR, RPR, Freelance Court

16   Reporter, certify that the foregoing is a correct

17   transcript from the record of proceedings in the

18   above-entitled matter.

19

20                      /s/ Dorothy J. Hart
                     _____
21                     CSR License No. 084-001390

22

23

24

25