1     UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF ILLINOIS

3      SPRINGFIELD DIVISION

4

5 BEVERLY THROGMORTON, et al., )
             )

6       Plaintiffs, )
             )

7    -vs-     ) NO. 12-3087
             )

8 FORMER ASSISTANT WARDEN  ) JURY TRIAL
 REYNOLDS, et al.,    )

9           )
       Defendants. )

10

11     TRANSCRIPT OF PROCEEDINGS

12   BEFORE THE HONORABLE RICHARD MILLS

13     U.S. DISTRICT JUDGE

14

15 NOVEMBER 18, 2016

16 A P P E A R A N C E S:

17 FOR PLAINTIFFS:   Ms. Ruth Z. Brown
          Ms. Tara Elizabeth Thompson

18         Mr. Vincenzo Field
         311 N. Aberdeen St.

19         3rd Floor
         Chicago, IL 60607

20

  FOR DEFENDANTS:   Ms. Karen L. McNaught

21         Ms. Deborah L. Barnes
         Ms. Laura K. Bautista

22         500 S. Second St.
         Springfield, IL 62706

23

24 COURT REPORTER:   Ms. Dorothy J. Hart, CSR, RPR
         Illinois CSR No. 084-001390

25

INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Peter Leonetti | 18-3 | 18-11 | | |
| Abrham Anderson | 18-18 | 18-24 | 18-29 | |
| Monica Slater | 18-32 | 18-54 | 18-67 18-76 | 18-73 |
| Carlita Edmonson | 18-77 | 18-89 | 18-99 | 18-102 |
| Kimberly Johnson | 18-104 | 18-113 | 18-124 | 18-126 |
| Dominique Crudup | 18-127 | 18-135 | 18-145 | |
| Courtney Krull | 18-147 | 18-152 | | |
| Russell Reynolds | 18-157 | 18-185 | 18-209 | |
| Alan Pasley | 18-212 | 18-278 | | |

| EXHIBITS | IDENTIFIED | ADMITTED |
|---|---|---|
| Plaintiffs' Exhibit 35 | 18-204 | |
| Plaintiffs' Exhibit 35-1 | 18-205 | 18-206 |
| Plaintiffs' Exhibit 36 | 18-230 | 18-230 |
| Plaintiffs' Exhibit 37 | 18-235 | 18-235 |
| Plaintiffs' Exhibit 38 | 18-219 | 18-220 |
| Plaintiffs' Exhibit 47 | 18-189 | |
| Defendants' Exhibit 83 | 18-44 | 18-45 |
| Defendants' Exhibit 86 | 18-47 | 18-47 |
| Defendants' Exhibit 88 | 18-46 | 18-46 |
| Defendant's Exhibit 90 | 18-253 | 18-254 |

P R O C E E D I N G S

(The jury entered the courtroom.)

THE COURT:  Thank you, Madam Clerk.

Good morning, everyone.  Well, it's not quite as nice a day today as it was yesterday, but then we're all inside and there's no heavy lifting.

So, we're ready to proceed.  Everyone is in place.  The jury is in the box.  And I believe that we are ready for another witness.

MS. BARNES:  Defendants are calling Peter Leonetti.

THE COURT:  Thank you.

PETER LEONETTI, of lawful age, produced, sworn, and examined on behalf of the Defendants, testifies and says:

THE COURT:  Right up here, please.

DIRECT EXAMINATION

QUESTIONS BY MS. BARNES:

Q.  Good morning.  Could you spell your name for the court reporter, please?

A.  P-e-t-e-r L-e-o-n-e-t-t-i.

Q.  Peter Leonetti?

A.  Yes, ma'am.

Q.  What is -- what do you do for a living?

A.  I'm a correctional sergeant.

1        Q.   Where?

2        A.   Lincoln Correctional Center.

3        Q.   How long have you been there?

4        A.   About 17 and a half years.

5        Q.   Now, you are aware that this trial is

6 about events that occurred at Lincoln Correctional

7 Center on March the 31st, 2011; isn't that right?

8        A.   Yes, ma'am.

9        Q.   What was your role that day?

10       A.   I was an officer at the time and I was

11 also a member of the tactical team, so my role was

12 to conduct operations with the cadets.

13       Q.   Were you in tactical gear at that time?

14       A.   Yes, ma'am.

15       Q.   Okay.  And how did you start your day

16 out?

17       A.   We stood roll call.  I believe we went

18 down and got dressed out and waited for the cadets

19 to show up.

20       Q.   Where?

21       A.   At Lincoln.

22       Q.   Okay.  And when the cadets showed up,

23 what happened after that?

24       A.   We got them all off the bus, got them

25 organized.  Some of the -- some of the bosses gave

1  speeches about what they expected, what they wanted
2  us to do, and we started our day from there.
3       Q.   And where did you go first?
4       A.   I believe we went to 2B, Housing Unit
5  2B.
6       Q.   Just briefly, because we've heard a lot
7  of testimony about it, just quickly tell the jury
8  how -- what you did as you organized the women to
9  be transported to the gym.
10      A.   Well, I was -- I was stationed in the
11 hallway of the housing unit.  The cadets were the
12 ones, you know, giving the orders and, you know, we
13 were obviously assisting them because they're --
14 they're going through the academy.  We just made
15 sure that everything was done in a safe and secure
16 manner.  We got them all lined up, got them cuffed
17 up.  And when we took them off the housing unit, we
18 paired them up, walked them over to the gym, and
19 then I returned to the housing unit to start the
20 shakedowns.
21      Q.   Okay.  Let's back up a little bit.
22 When you were walking them over to the gym, did you
23 hear any cadets say anything to the inmates?
24      A.   No, ma'am.  No.
25      Q.   Well, was it complete silence?

1      A.  I wouldn't say complete silence, but

2  there -- there wasn't a whole lot of talking.  It's

3  a pretty simple walk from the housing unit to the

4  gym and inmates pretty much know where they're

5  going, so they don't have to be given directions on

6  which way to go.  I wouldn't say it was silent, but

7  there wasn't a whole lot of talking.  There was

8  probably a few "Stay paired up.  Don't put gaps in

9  the line," because some people walk slower than

10  others, and that would be really about it.

11      Q.  What about the tactical officers, were

12  they saying anything to the inmates?

13      A.  It would be about the same.  It would

14  be about the same.  "Stay paired up.  Keep with the

15  line.  Don't put gaps in the line."  That would be

16  really about it.

17      Q.  At any --

18      A.  "Keep your head forward."

19      Q.  At any time during that walk from the

20  housing unit to the gym did you ever hear degrading

21  language, anybody tell the inmates to shut the fuck

22  up, call them bitches?  Did you hear anything like

23  that?

24      A.  No, ma'am.  No.

25      Q.  If you had heard that, what, if

1  anything, would you have done?

2      A.   If I heard a cadet or a fellow tactical

3  officer say that?

4      Q.   Either one.

5      A.   Well, if I had heard it, which I never

6  did, especially with a cadet, I would have

7  corrected them.  Because we don't -- we don't talk

8  to the offenders like that.  We don't do that.  So,

9  the whole point of them being there was to learn

10  how to conduct these operations, to learn how to

11  conduct themselves around inmates, and we would

12  have -- we would have corrected them pretty quick.

13  Like, "Hey, that's -- that's no-go.  That's a

14  no-go."

15      Q.   Okay.  There's been some testimony that

16  you were in the gym.  Is that correct?

17      A.   I -- I -- maybe I was in the doorway

18  for just a moment as the line that we ran over to

19  the housing unit was finishing up getting into the

20  gym.  But as soon as the last inmates entered the

21  gym, I was headed back over to the housing unit

22  because my responsibility was to make sure that the

23  cadets were searching properly.

24      Q.   Okay.  And so, it's fair to say that

25  you spent most of your time that day in the housing

1  unit doing the shakedowns?

2     A.  Yes, ma'am, the vast majority of my

3  time.  If I wasn't running a line or going to get

4  supplies, say shakedown slips or trash bags or

5  something along those lines, I was on the housing

6  unit, unless the inmates were moving.

7     MS. BARNES:  Okay.  Just a second, Your

8  Honor.

9     THE COURT:  Okay.

10    Q.  Thank you, Mr. Leonetti.  Oh, you know

11  what, I did forget to ask you:  Did you have --

12  what does the inside grounds officer do?

13    A.  The inside grounds officer --

14    Q.  And let me back you up.  Who had that

15  position on March 31st, 2011?

16    A.  That day?  I'm not sure who had it that

17  day because I was with the tac team, so I don't

18  know who was assigned to it.

19    Q.  Have you ever been assigned an inside

20  grounds officer?

21    A.  Yes, ma'am.  We're assigned 90-day

22  assignments.  For a 90-day assignment we basically

23  get the same post.  And for quite some time, I was

24  the tool room officer right around that same time.

25  Obviously, it would have been someone else that day

1   because I was with the tac team.  But the tool room

2   officer is responsible for basically the

3   maintenance, just basic maintenance, you know, not

4   craftsman-style maintenance but general

5   maintenance, floor maintenance and mowing the grass

6   inside the facility, inside the four walls, and

7   that's dealing with giving out our toxic

8   substances, which is bleach and industrial cleaner,

9   making sure that the porters have the stuff that

10   they need to keep our institution clean.

11        Q.   Okay.  And what about supply closets?

12   And specifically, I'm asking about the supplies of

13   sanitary pads, who was responsible for that?

14        A.   That would have been the tool room

15   officer, the inside grounds officer.  We were

16   responsible for ordering and stockpiling toilet

17   paper and sanitary napkins, sanitary pads, and we

18   were the -- we were the one that would distribute

19   those out to the housing units at the appropriate

20   time of the month so they could be then given out

21   to the inmates.  And we also -- well, frankly, you

22   never wanted to run out of those, so we stockpiled

23   them everywhere we possibly could.

24        Q.   What about the gym, were they in the

25   gym?

1    A.  We always kept them in the gym.  There

2  was -- there was a few cases -- at minimum, a few

3  cases always kept in the closet right next to the

4  bathroom.  Because we -- at our institution we had

5  things like Mom and Me Camp that were for the

6  offenders so they could, you know, be with their

7  kids.  And there was a lot of inmates that got to

8  attend those.  So, when they came over, they would

9  have to be strip-searched in and then

10  strip-searched back out.  And we always kept cases

11  of pads in those areas because they frequently

12  needed those a lot and they weren't allowed to

13  bring whole bags of pads from the housing unit.  We

14  always had them there for them.

15    I would keep them in -- in say like the

16  mechanical rooms on the backs of the housing units

17  just in case we needed an extra case here or an

18  extra pack there, so -- we also had -- in the

19  gymnasium, there was a -- I guess it was like a

20  brown, locked shelf, if you will.  It should have

21  been probably hanging on the wall, but it was

22  always sitting there.  And it was full of toilet

23  paper and pads just because.

24    MS. BARNES:  Okay.  Thank you.

25    THE WITNESS:  You're welcome.

1          THE COURT:  Any cross?

2          MR. FIELD:  Thank you, Your Honor.

3              CROSS-EXAMINATION

4    QUESTIONS BY MR. FIELD:

5          Q.   Good morning, Sergeant Leonetti.

6          A.   Good morning, sir.

7          Q.   You were asked some questions about

8    when the tactical team entered Housing Unit 2B.  Do

9    you remember those questions?

10         A.   When we entered?

11         Q.   Yeah.  Just a minute ago.

12         A.   Sure.

13         Q.   You entered the housing unit with the

14   cadets; correct?

15         A.   Correct.

16         Q.   I believe you said -- and I just want

17   to make sure that it wasn't a misstatement.  Did

18   you say that the cadets were giving orders as you

19   entered the housing unit?

20         A.   Not as we entered.

21         Q.   Okay.

22         A.   Not as we entered.  Once we got down

23   the hallway, they were -- they were put at the

24   doorways and helping give orders, as we were giving

25   orders.

1    Q.   Okay.  Well, so -- Lieutenant Dawdy is

2  the tactical team commander; correct?

3    A.   Yes.

4    Q.   And his testimony was that tactical

5  team members were put in the doorways of the dorms

6  in order to give those orders.  So, is your

7  testimony that it was cadets or tactical team

8  members?

9    A.   It was most likely both.

10   Q.   Most likely.  As you sit here today, do

11  you know whether it was cadets or tactical team

12  members?

13   A.   I can't recall a specific instance of

14  -- of at this doorway it was a cadet and this

15  doorway was a tac -- we were all -- we were all in

16  the hallway together and it's not a humongous

17  hallway, so ...

18   Q.   Sure.  You don't know who was standing

19  where; is that correct?

20   A.   Correct.

21   Q.   And your testimony is that, in the

22  presence of tactical team officers, the cadets were

23  giving orders to the inmates?

24   A.   They were giving orders to the inmates

25  and the tactical officers were also giving orders

1  to the inmates.

2       Q.   And that was all occurring at the same

3  time?

4       A.   Yes.

5       Q.   Okay.  And they were giving those

6  orders -- they were yelling those orders; correct?

7       A.   They were stating them loudly, yes.

8       Q.   What's the difference between stating

9  something loudly and yelling?  Nothing?

10      A.   I don't know what you would define as

11 yelling and stating something loudly.

12      Q.   Well, what is your -- I'm trying to

13 figure out what your understanding of stating

14 something loudly is.  Is it the same thing as --

15      A.   In a clear --

16      Q.   Loud voice?

17      A.   -- loud voice.  Not --

18      Q.   And yelling is saying something in a

19 clear, loud voice too; right?

20      A.   Yes.

21      Q.   Okay.

22           THE COURT:  Mr. Field, let's go ahead.

23           MR. FIELD:  Sure.

24      Q.   You said that it was a pretty simple

25 walk -- once you had the inmates cuffed and ready

1  to go over to the gym, it was a pretty simple walk

2  over to the gym; correct?

3       A.   Yes.

4       Q.   Okay.  So, any reason why the tactical

5  team in riot gear was necessary to take this pretty

6  simple stroll over to the gym?

7       A.   Because that was a lot of inmates

8  moving all at one time.

9       Q.   Okay.  But again, you said it was a

10  simple walk.  Inmates knew the way to go?

11       A.   Simple as in directional wise.

12       Q.   Tactical team necessary to walk over

13  those inmates over there or could regular

14  corrections officers --

15       A.   To ensure the safety and security of

16  the institution, yes.

17       Q.   But those inmates were cuffed behind

18  their back; correct?

19       A.   Correct.

20       Q.   Okay.  Now, you were asked some

21  questions about whether or not on that walk over to

22  the gym you overheard any cussing, swearing, or

23  anything like that.  Do you remember those

24  questions?

25       A.   Yes.

1    Q.   And you said that you definitely did
2    not overhear anything like that; correct?
3    A.   I don't believe I said definitely.  I
4    didn't -- I didn't recall hearing anything like
5    that.
6    Q.   Okay.
7    A.   I didn't hear any -- any of that.
8    Q.   Okay.  But you said you definitely
9    would have corrected somebody had you overheard
10   that; right?
11   A.   If I had heard a cadet, yes.
12   Q.   Okay.  You said especially with the
13   cadets you would have corrected it?
14   A.   Correct.
15   Q.   What about if it was one of your
16   superior officers, would you have corrected them if
17   they had spoken like that?
18   A.   Yes.
19   Q.   It would have been your place as a
20   tactical team member to correct Lieutenant Dawdy?
21   A.   What do you mean by my place?
22   Q.   Well, he's your commander; correct?
23   A.   Correct.
24   Q.   Okay.  So, are you in the sort of
25   business of correcting the things that he says or

1  does while you're on a detail?

2       A.   If he was doing something improper --

3            COURT REPORTER:  One at a time, please.

4            THE COURT:  Yeah.  One at a time.

5       A.   I'm sorry.  I'm sorry.  I apologize.

6       Q.   No.  I apologize.  Go ahead, sir.

7       A.   If he was doing something that

8  improper, yes, I would correct him.

9       Q.   Have you ever had any opportunity to

10 correct Lieutenant Dawdy in any detail as --

11      A.   Not -- not in that fashion.

12      Q.   What about Assistant Commander Craig,

13 any -- ever have to correct him or speak on his

14 behalf because he wasn't doing something you

15 thought was proper?

16      A.   No, sir.

17      Q.   You had some -- you testified about the

18 cases and cases of sanitary napkins that were kept

19 in the gym?

20      A.   Yes, sir.

21      Q.   But you never went in the gym that day;

22 correct?

23      A.   No, sir.

24      Q.   That's your testimony?

25      A.   No, sir.  Yes, sir, that is my

1 testimony.  No, sir, I did not go into the gym.

2      Q.  You were never in the gym?

3      A.  No, sir.

4      Q.  So, that closet in the bathroom that

5 you testified could have had boxes and boxes full

6 of pads but not a single one of them was given out

7 as far as you know?

8      A.  That is a possibility, sir.

9      Q.  I just want to get a clarification on

10 something.  I think you said that those boxes of

11 sanitary napkins were kept in the gym because women

12 were not allowed to bring them over from the

13 housing unit; is that correct?

14      A.  On specific -- like when we had

15 specific programs.

16      Q.  What about during a shakedown?  Is that

17 something they would have been allowed to bring

18 over to the gym?

19      A.  No.

20      MR. FIELD:  Okay.  No further

21 questions, Your Honor.

22      THE COURT:  Thank you.

23      MS. BARNES:  Nothing, Your Honor.

24      THE COURT:  Okay.  All right.  Thank

25 you, Sergeant.  You may step down.

1        THE WITNESS:  Thank you, sir.

2            (Witness excused)

3        THE COURT:  You may call your next.

4        MS. BARNES:  Defendants call Abe

5  Anderson.

6        THE COURT:  Right up here,

7  Mr. Anderson.  Please raise your right hand and be

8  sworn by the clerk.

9            ABRHAM ANDERSON,

10  of lawful age, produced, sworn, and examined on

11  behalf of the Defendants, testifies and says:

12        THE COURT:  Right up here, please, in

13  this seat.  And if you would lean right into the

14  microphone, that would be a big help.

15        Ms. Barnes.

16            DIRECT EXAMINATION

17  QUESTIONS BY MS. BARNES:

18        Q.   Good morning.

19        A.   Good morning.

20        Q.   Would you state your name and please

21  spell it for the court reporter?

22        A.   Abrham Anderson, A-b-r-h-a-m

23  A-n-d-e-r-s-o-n.

24        Q.   Mr. Anderson, what do you do for a

25  living?

1          A.   I'm a retired correctional officer.

2          Q.   And when you were a correctional

3     officer, where did you work?

4          A.   Lincoln Correctional Center.

5          Q.   How long did you work there?

6          A.   When I retired, 25 years.

7          Q.   This trial is about events that

8     occurred on March 31st, 2011.  And do you remember

9     that day doing a shakedown and strip search?

10          A.   I do.

11          Q.   All right.  Would you tell the members

12     of the -- well, let me ask you this:  When you were

13     at Lincoln Correctional Center, what house were you

14     assigned to?

15          A.   I -- it --

16          Q.   On that day.  I'm sorry.

17          A.   On that day, I was assigned to Housing

18     Unit 2B.

19          Q.   All right.  And that day, what, if

20     anything, were you advised about events of that

21     day?  I mean, what was going to happen.

22          A.   That the -- well, actually, we wasn't

23     advised of anything until the last minute, and then

24     the tac team came in and said that they was going

25     to do a shakedown, and they proceeded to clear the

1  housing unit.

2      Q.   Okay.  Now, you were assigned to 2B?

3      A.   Yes.

4      Q.   As the assigned correctional officer

5  for 2B, could you tell the jury just generally what

6  your duties were with respect to the women who

7  lived on that unit?

8      A.   The security and well-being of all the

9  hundred inmates that was on that housing unit.

10     Q.   And did you walk through that house

11 occasionally?

12     A.   Had to every half-hour.  Had to go back

13 and sign a logbook in the back of the building.

14     Q.   Were you familiar then with the shower

15 facilities?

16     A.   Yes.

17     Q.   Just to describe for the jury how the

18 women lived day-to-day, what did the shower look

19 like?

20     A.   It was an area that was probably about

21 -- probably about 8 by 15 feet and it had five

22 showerheads.  It had like a swinging door on the

23 outside of it that they had to go into and on the

24 outside of that was a big shower curtain to block

25 the view.

1    Q.   Now, when the women showered, the

2  showerheads were open, there were no curtains

3  around them; right?

4    A.   No, no.  It was one room that had five

5  showerheads in it.

6    Q.   Okay.  And the curtain that you talked

7  about, were you ever able to go behind that or

8  permitted to go behind that when the women were

9  showering?

10    A.   Not while they were showering, no.

11    Q.   Okay.  How long were you -- would it be

12  fair to say that the women on 2B knew you?

13    A.   Oh, absolutely.

14    Q.   Okay.  Now, that day when the women

15  were taken from the housing unit over to the gym,

16  what did you do?

17    A.   Well, to begin with, while the tac team

18  was getting them prepared to move, I basically was

19  in the front foyer waiting for them to get them

20  completed and cuffed up and out of their room.  And

21  then once they got everybody cuffed up and -- then

22  we formed them up in a group on the outside of the

23  building and then I marched them over to the gym.

24    Q.   When you got to the gym, what did you

25  do?

1       A.  I was told to make sure they was kept

2  quiet and did not come in contact with the other

3  inmates that was -- after they had been shook down,

4  basically keeping them separate from each other.

5       Q.  Okay.  Now, did you -- how long were

6  you inside the gym?

7       A.  I'm not a hundred percent sure, but I

8  think we got over to the gym probably about 9:00.

9  I think it was like 11:00 or something like that

10  when we went over for lunch.  We marched all the

11  inmates over for lunch and then back to the housing

12  unit.  And I think we got -- they got done with the

13  housing unit probably somewhere around 1:00.

14       Q.  Okay.  While you were in the gym, what

15  were you doing?

16       A.  Going around making sure everybody was

17  staying in compliance with what we was told to do

18  as far as staying in the areas that they was

19  assigned to.  Like they was standing in the middle

20  of the gym waiting for their turn to be shook down.

21  And once they got shook down, then they was told to

22  go sit on these bleachers.

23       Q.  Were they cuffed or uncuffed?

24       A.  Part of the time they were cuffed and,

25  once they got to the bleachers, they was uncuffed

1    by then.  It took a while for us to get all 100

2    people uncuffed.

3         Q.  Oh, did you do -- I mean, were all 100

4    uncuffed?

5         A.  Eventually, yes.

6         Q.  Well, because they had to be taken to

7    the bathroom; right?

8         A.  Yes.

9         Q.  Okay.  So, you were present during the

10   strip searches?

11        A.  Yes.

12        Q.  Could you see inside the bathroom?

13        A.  No, ma'am.

14        Q.  Why?

15        A.  They had a big curtain up.

16        Q.  Okay.  And then once 2B was done, what

17   did you do?

18        A.  Once 2B got -- well, once they got done

19   with the housing unit, then we all went back to the

20   housing unit, and then I resumed my duties of the

21   housing unit.

22             MS. BARNES:  Okay.  Thank you.

23             THE COURT:  Cross?

24             MR. FIELD:  Thank you, Your Honor.

25                  CROSS-EXAMINATION

1    QUESTIONS BY MR. FIELD:

2        Q.   Good morning, Mr. Anderson.

3        A.   Good morning.

4        Q.   You said you were assigned to Unit 2B

5    that day; correct?

6        A.   Yes.

7        Q.   And that you found out at the last

8    moment that a shakedown was going to occur?

9        A.   Yes.

10       Q.   Okay.  Were you the regular officer

11   assigned to Unit 2B?

12       A.   For that 90-day period, yes.

13       Q.   Okay.  And had you heard anything about

14   the shakedown previous to you learning about it

15   that day?

16       A.   No.

17       Q.   Okay.  Nobody came to you to say that

18   because of excessive contraband or violence the

19   unit was going to be shook down?

20       A.   No.

21       Q.   You said that you marched the women

22   over to the gym once they got them arranged in a

23   line and all cuffed up; correct?

24       A.   Yes.

25       Q.   Okay.  Who ordered you to march the

women over to the gym?

A.   That I don't remember who actually was -- give the command for that.  I don't recall.

Q.   But you would have had to been given a command to do that, correct, because your assignment was in 2B?

A.   Yes.

Q.   Okay.  Now, you said the women, once they were done with the strip searches, they were allowed to sit on the bleachers; correct?

A.   Yes.

Q.   And once they were sitting on the bleachers, their cuffs had been removed; correct?

A.   Yes.

Q.   And their cuffs were removed once they had been brought into the bathroom to be strip-searched; correct?

A.   I think they was taken off even before they got to the bathroom.

Q.   Just before they were going to go into the bathroom?  In terms of the next group that was going to be brought in, they would have their cuffs removed?

A.   No.  They were taken off shortly after we got there.  But, like I said, it took a while to

1  do it because there was so many of them.

2        Q.   Well, how long is a while?

3        A.   I don't recall.

4        Q.   Okay.  So, whatever period a while is,

5  they were standing there at the very least for that

6  amount of time with their hands cuffed behind their

7  backs?

8        A.   Yes.

9        Q.   Okay.  And were you one of the officers

10 responsible for removing the cuffs or was somebody

11 else responsible for that?

12       A.   There was several of us that had keys

13 that was going around undoing the cuffs.

14       Q.   Okay.  And do you recall who the other

15 officers were?

16       A.   Not -- not per se, no, I do not.

17       Q.   Okay.  You said that one of your duties

18 when you were assigned to the gym was to keep the

19 women from Unit 2B separated from the other

20 inmates; correct?

21       A.   Not necessarily from Unit 2B.  They all

22 was from 2B.  I was keeping the ones separate that

23 had been shook down from the ones that had not been

24 shook down.

25       Q.   So, the ones that went to sit on the

1  bleachers you needed to keep them separate from the

2  ones that were standing in the gym waiting to be

3  strip-searched?

4          A.   Yes.

5          Q.   Okay.  Now, you said something about

6  there was a period of time where you -- I wasn't

7  sure if it was just you, but how did this work, the

8  lunch, the 11:00 lunch or something like that?  Can

9  you -- what was the testimony on the 11:00 lunch

10  thing?

11          A.   I don't understand the question.

12          Q.   Well, were the women brought to lunch

13  at 11:00?  Is that your testimony?

14          A.   I'm pretty sure they were, if I'm not

15  mistaken, yes.

16          Q.   So, even though you were supposed to

17  keep the women who had been shook down separate

18  from the women who were still waiting to be

19  strip-searched --

20          A.   By that time we was done with the

21  shakedown as far as the strip searches.

22          Q.   So, you got the women to the gym at

23  what time?

24          A.   I honestly don't remember.  Like I

25  said, I think it was about 9:00.

1    Q.   And so, your testimony is that it --

2    from getting the women there at 9:00, by 11:00

3    everyone was done being strip-searched and you were

4    able to take them to lunch?

5    A.   I believe that to be correct.

6    Q.   Okay.  You didn't hear any of the other

7    testimony in this case; is that correct?

8    A.   I don't understand the question.

9    Q.   Well, I'm trying to figure out why your

10   timing is completely different than everybody

11   else's in this case, so --

12        MS. BARNES:  Your Honor, I object.  I

13   think he's arguing.

14        THE COURT:  I agree.  What he's saying,

15   Mr. Anderson -- well, now I've lost the train of

16   thought.  What were talking about?

17        MR. FIELD:  The amount of time it took

18   to get everyone in the gym and strip-searched, Your

19   Honor.  But I can retract the question.

20        THE COURT:  Well, let's do.  And let's

21   get this cleared up because I think that you're

22   talking about two different things.  Yeah, go

23   ahead.

24        MR. FIELD:  Okay.

25   Q.   Just so it's clear, what time, as you

1  sit here today, do you recall bringing the women

2  into the gym from Unit 2B?

3       A.  Yes.

4       Q.  What time was it?

5       A.  I don't recall that.

6       Q.  Okay.  So, it could have been 9:00,

7  could have been 9:30, could have been 8:30.  You

8  don't know?

9       A.  I do not remember.  Correct.

10      Q.  Okay.  And do you recall when you left

11 the gym with the women after they had all been

12 strip-searched?

13      A.  Yes.

14      Q.  Okay.  Do you recall what time it was

15 when that occurred?

16      A.  Not -- not -- it was towards the end of

17 the day I know, but I can't recall exactly what

18 time it was.  That's been several years ago.

19           MR. FIELD:  Okay.  No further

20 questions, Your Honor.

21           THE COURT:  Very well.  Redirect?

22                REDIRECT EXAMINATION

23 QUESTIONS BY MS. BARNES:

24      Q.  Mr. Anderson, you just testified that

25 it was towards the end of the day that people --

1  now I'm confused.  How long did it take 2B to go

2  through the strip search?

3      A.  The strip search is one thing, but they

4  was shaking down the housing unit.

5      Q.  Okay.

6      A.  And that's what we was waiting for.  We

7  was -- we couldn't go back to the housing unit

8  until they got done searching the housing unit.

9      Q.  Okay.

10     A.  So, we all stayed in the gym until they

11 got the housing unit done.

12     Q.  Okay.  Did the offenders have to stand

13 for hours in handcuffs?

14     A.  No.

15     Q.  Okay.  Then I want to clear up another

16 thing.  When you -- I think you testified you

17 couldn't see inside the bathroom.

18     A.  Correct.

19     Q.  And I can't remember if you said why

20 you couldn't see inside the bathroom.

21     A.  I said there was a curtain up.

22         MS. BARNES:  Yeah, okay, that's what I

23 thought.  Thank you.  All right.

24         MR. FIELD:  No further questions for

25 this witness, Your Honor.

1          THE COURT:  Okay.  Just a second.

2          Well, I'm not quite certain as to when

3     everybody was fed.  You said it took -- you've got

4     a hundred inmates and it took a long time to shake

5     down the housing units.  Now, somebody was -- they

6     were fed during that period; is that right?

7          A.   Yes.

8          THE COURT:  And how were they fed?

9     Were they taken to someplace or what?

10         A.   They was taken over to the dietary.

11         THE COURT:  In groups or what?

12         A.   The whole housing unit.

13         THE COURT:  Ah.  At one fell swoop?

14         A.   Yes.

15         THE COURT:  Oh, okay.

16         A.   That was after everybody had been

17    strip-searched, but they was still working on the

18    house.

19         THE COURT:  I understand.  And you said

20    it took a long time to do that?

21         A.   For the house, yes.

22         THE COURT:  Yes.  Okay.  Now, I'm

23    pretty clear now.

24         Does that entail any further questions

25    from you, Mr. Field?

1          MR. FIELD:  No, Your Honor.  That's

2     fine.  Thank you.

3          THE COURT:  Or Ms. Barnes?

4          MS. BARNES:  No.

5          THE COURT:  No?  Everything -- okay.

6          Thank you very much, Mr. Anderson.  You

7     may step down.

8          THE COURT:  And is Mr. Anderson

9     excused?

10         MS. BARNES:  Yes.

11         MR. FIELD:  Yes, Your Honor.

12         THE COURT:  Very well.  All parties.

13    Thank you very much.

14              (Witness excused)

15         THE COURT:  You may call your next, Ms.

16    McNaught.

17         MS. McNAUGHT:  Monica Slater.

18         THE COURT:  Come right up here,

19    Mrs. Slater, and be sworn by Madam Clerk.

20              MONICA SLATER,

21    of lawful age, produced, sworn, and examined on

22    behalf of the Defendants, testifies and says:

23         THE COURT:  Right up here at this

24    stand.

25              DIRECT EXAMINATION

1    QUESTIONS BY MS. McNAUGHT:

2         Q.   Good morning.

3         A.   Good morning.

4         Q.   Sit up towards the microphone --

5         A.   Yes.

6         Q.   -- or pull it towards you.

7         A.   Okay.  Is that good?

8         Q.   Would you please state your name?

9         A.   Monica Slater.

10        Q.   And spell your name for the court

11   reporter, please.

12        A.   Monica, M-o-n-i-c-a, Slater,

13   S-l-a-t-e-r.

14        Q.   Are you employed?

15        A.   Yes.

16        Q.   How are you employed?

17        A.   Through Department of Corrections.

18        Q.   How long have you been employed by the

19   Illinois Department of Corrections?

20        A.   Sixteen years.

21        Q.   Where do you currently work?

22        A.   In Lincoln Correctional Center.

23        Q.   And where did you work on March 31st of

24   2011?

25        A.   Lincoln Correctional Center.

1        Q.   Are you a member of the tac team at

2  Lincoln Correctional Center?

3        A.   Yes.

4        Q.   And were you a member of the tac team

5  on March 31st of 2011?

6        A.   Yes.

7        Q.   Do you recall being present at Lincoln

8  Correctional Center on March 31st of 2011?

9        A.   Yes.

10       Q.   And what's the first thing that you

11  recall about being at work?

12       A.   We were told after roll call that we

13  needed to report down to the tac room.

14       Q.   And what time was roll call?

15       A.   At 6:45.

16       Q.   And you were told that you needed to

17  report somewhere?

18       A.   Yes, down to the tac room by our

19  commander.

20       Q.   And did you do that?

21       A.   Yes.

22       Q.   Do you know approximately what time you

23  reported?

24       A.   Anywhere between 7:30, 8:00 we were

25  down there.

1    Q.   And who else was on the tac team that

2    you recall?

3    A.   It was Dawdy, Craig, Johnson, Edmonson,

4    myself, Krull, and Varble.  There's several other

5    -- gosh, I don't remember everybody on there.

6    Q.   Okay.  Approximately how many were on

7    the tac team that were involved in the events on

8    March 31st of 2011?

9    A.   I would say anywhere from eight to ten

10   possibly that were all there.

11   Q.   And when you gathered, were you given

12   any kind of a briefing?

13   A.   They just told us that the cadets were

14   coming in and we're just going to be there to

15   assist them to see that they do the proper

16   shakedown and the cuffs are put on properly and

17   that they were going to assist in doing the strip

18   searches.

19   Q.   Did they tell you what housing units

20   were going to be involved?

21   A.   They told us B House 2 and then House

22   4.

23   Q.   Did they tell you where cadets were

24   going to be -- I'm sorry -- where inmates were

25   going to be taken while the procedure was going to

1    be conducted?

2         A.   Yes.  We were going to be over in the

3    gym, escort them to the gym.

4         Q.   Now, had you trained on the tac team

5    prior to March the 31st of 2011?

6         A.   Yes.

7         Q.   So, did you understand what the

8    procedure was to escort from the housing unit to

9    the gym?

10        A.   Yes.

11        Q.   Did you understand or had you trained

12   on how to do a mass shakedown in a housing unit

13   prior to March 31st of 2011?

14        A.   Yes.

15        Q.   And had you been involved in other mass

16   strip searches prior to that?

17        A.   Yes.

18        Q.   And would that be as both an officer

19   and a member of the tac team or just one or the

20   other?

21        A.   Both.

22        Q.   After you were given this briefing --

23   well, who was the briefing given by?

24        A.   Dawdy.  Lieutenant Dawdy.

25             THE COURT:  Who?

1          A.   I'm sorry.  Commander Dawdy.

2              THE COURT:  Yeah, lean into that

3     microphone, please.

4          A.   Commander Dawdy.

5              THE COURT:  Thank you.

6          Q.   And what was he the commander of?

7          A.   The tac team.

8          Q.   After you were given that briefing,

9     were you dressed in tactical gear?

10         A.   Yes.

11         Q.   What did the tactical gear consist of?

12         A.   We had on our orange jumpsuits and our

13    vest and our batons and our gas masks.  It's a

14    standard that we put on whenever we get dressed

15    out.

16         Q.   Boots?

17         A.   Yes.

18         Q.   And the gas masks, did you actually

19    have the gas masks on?

20         A.   No.

21         Q.   Did you have some kind of -- something

22    on your head?

23         A.   Our helmets.

24         Q.   And does that have a shield on it so

25    that it covers your face?

1          A.   Yes.

2          Q.   And was the shield closed so that

3     people couldn't see your face?

4          A.   No.

5          Q.   So, people could see your face?

6          A.   Yes.

7          Q.   The shield has a window that opens up?

8          A.   Yes.  It flips up and down.

9          Q.   After -- well, where did you go after

10    you were dressed and you had been given your

11    briefing?

12         A.   We had went to House 2 first.

13         Q.   Okay.  And how did you get there?

14         A.   We drove up in a van to the sally port

15    and then we marched in from the sally port into

16    House 2.

17         Q.   I want to show you what's been

18    previously marked as Plaintiffs' Exhibit 202.  Do

19    you recognize that?

20         A.   Yes.

21         Q.   What is it?

22         A.   It's the aerial shot of our

23    institution.

24         Q.   And do you see the sally port --

25         A.   Yes.

1       Q.  -- on that exhibit?

2       A.  Yes.

3       Q.  If you touch the screen, can you show

4 the ladies and gentlemen of the jury where the

5 sally port is?

6       A.  Yes, it's right here.

7       Q.  And where is it that you gathered as a

8 group once you took the van and went in through the

9 sally port?

10      A.  Once we came in through the sally port,

11 then we went down to House 2, which is located

12 right there.

13      Q.  And how did you get to House 2 --

14      A.  We --

15      Q.  -- from the sally port?

16      A.  We marched in.

17      Q.  And how do you march?  In one line or

18 in two lines or in multiple lines?

19      A.  Usually it's in two lines, side by

20 side.

21      Q.  And what did you do when you got to

22 Housing Unit 2?

23      A.  We went in there and told them all to

24 get back to their dorms.  And then once they all

25 got back there, then we did a shakedown dorm by

1  dorm.  Or, not -- we basically patted them down.

2       Q.   Let's go back.  So, you said that you

3  came into the housing unit and you told them all to

4  get back into their dorms.

5       A.   Yes.

6       Q.   Where were -- where were they -- where

7  were they?

8       A.   Some of them were in the dayroom

9  watching TV, playing cards, and then some may have

10  been in the shower or in the bathrooms.  And then

11  once we went in there and told them all to get back

12  to the dorms, then we waited for all of them to get

13  in their dorms.

14       Q.   Okay.  Now, the dayroom is how big?

15       A.   Gosh, I'm not sure.  It's two TVs in

16  there.  There's several tables in there for them to

17  sit and play cards and -- it's a -- I mean, it's a

18  fairly big spot, big place for them to -- where the

19  majority of them would hang out at.

20       Q.   When you walk into the house -- when

21  you walk into dorm -- I'm sorry -- into Housing

22  Unit 2, do you walk in the middle of the housing

23  unit?

24       A.   You walk into a control area.

25       Q.   Okay.  And what's off to the left?

1     A.   Is the B side.  And then you walk off

2  -- and then on the other side is the A side.  You

3  have the A and the B side.

4     Q.   So, where is the -- where is the

5  dayroom from the control side?

6     A.   When you walk in through control and

7  you go to 2B, it's on the right-hand side when you

8  walk in, and the dayroom -- when you walk in

9  through that door to go in that wing, the dayroom's

10 on the left.

11    Q.   And where are the showers and the

12 toilets?

13    A.   They're all on the -- located on the

14 right-hand side.

15    Q.   And then where are the dorms?

16    A.   Straight ahead in the back.

17    Q.   So, you said that you came in and told

18 them to -- to what?

19    A.   To all go back to the dorms.

20    Q.   And did they do that?

21    A.   Yes.

22    Q.   And then what happened?

23    A.   And then once they were all in the

24 dorms, they're advised to make sure they had their

25 shoes, whether it be shower shoes or tennis shoes

1    or state shoes on, and then not to worry about

2    grabbing anything else unless they needed their

3    meds for emergency purposes, if they had heart

4    issues or asthma.  And then they were told to leave

5    everything else there in their bed area and make

6    sure they had their IDs.

7              Q.   And then what happened?

8              A.   And as they were coming out of the

9    dorm, we patted them down.

10             Q.   Who's the we?

11             A.   The cadets.  And we watched them to

12   make sure that they patted them down correctly.

13             Q.   You said, "We made sure that they

14   patted them down."  Who is the "we" and who is the

15   "they"?

16             A.   The cadets were there and then us as

17   some of the tac members, the female tac members, we

18   were there to make sure that the pat-downs -- the

19   pat searches were conducted properly.

20             Q.   By who?

21             A.   By the cadets.

22             Q.   The cadets that conducted the pat-down

23   searches, were they male, female, or both?

24             A.   They were all female.

25             Q.   Okay.  And eventually were all hundred

1   inmates patted down?

2          A.   Yes.

3          Q.   And then what did you do?

4          A.   Then once they were all patted down,

5   then they were cuffed up, and then once they got a

6   group of them, then they were escorted from the

7   house over to the gym.

8          Q.   While they were being cuffed, where

9   were they located?

10         A.   After they were being cuffed, then they

11  were placed into the dayroom.

12              THE COURT:  Could you lean in just a

13  little more to that microphone, please?

14         A.   Yes.

15              THE COURT:  Thank you.

16         Q.   And then were they escorted from the

17  dayroom over to the -- to the outside to go to the

18  gym?

19         A.   Yes.

20         Q.   And then who escorted the inmates from

21  the outside of Unit 2B to the gym?

22         A.   There was I believe -- and I'm not

23  positive.  I know -- I believe there may have been

24  a couple of cadets and then there was one tac

25  member.

1    Q.   And show the ladies and gentlemen of

2  the jury how it was that the inmates were escorted

3  from 2B to the gym.

4    A.   Okay.

5    Q.   When you got to the gym, what did you

6  do?

7    A.   Then they were dropped off there.

8    Q.   What did you do?

9    A.   I was not there.  I didn't escort.

10    Q.   Okay.  Where were you?

11    A.   I was on the housing unit.

12    Q.   Did you eventually go to the gym?

13    A.   Yes.

14    Q.   Okay.  When did you go to the gym?

15    A.   I'm not positive exactly when.  I was

16  called over there because they needed more help

17  with the females to strip them out.  And then when

18  I got there, I took them into the beauty shop.

19    Q.   I want to show you what's been marked

20  as Exhibit 83.

21       MS. McNAUGHT:  Madam Clerk, has this

22  been entered?  83?

23       CLERK:  Is it defendants'?

24       MS. McNAUGHT:  Uh-huh.

25       CLERK:  No, it has not.

1          Q.   Do you recognize Exhibit 83?

2          A.   Yes.

3          Q.   Is it a true and accurate

4    representation of the beauty shop door --

5          A.   Yes.

6          Q.   -- on March 31st of 2011?

7          A.   Yes.

8          MS. McNAUGHT:  Your Honor, I'd move for

9    the admission of Defendant's Exhibit 83.

10         THE COURT:  Which is that one?  Is this

11   a new one?

12         MS. McNAUGHT:  It's a new one.

13         THE COURT:  Put it on there, yep.

14         MS. McNAUGHT:  Well --

15         THE COURT:  Yeah, it's admitted.

16              (Defendants' Exhibit Number 83

17              admitted.)

18         Q.   Can you tell the ladies and gentlemen

19   of the jury what Defendants' Exhibit 83 is, please?

20         A.   That's the side entrance into the

21   beauty shop from the gym.

22         Q.   And will you show the ladies and

23   gentlemen of the jury what the side entrance is?

24         A.   This one.

25         Q.   And is that a solid door?

1       A.  Yes.

2       Q.  And then I'll show you what's been

3 marked as Defendants' Exhibit 88.  Do you recognize

4 that?

5       A.  Yes.

6       Q.  What is it?

7       A.  That's what's on the opposite side of

8 that door.  That's the door on the other side.

9       MS. McNAUGHT:  Your Honor, I move for

10 the admission of Defendants' Exhibit 88.

11       THE COURT:  Any objection?

12       MR. FIELD:  No, Your Honor.

13       THE COURT:  It's admitted.

14         (Defendants' Exhibit Number 88

15         admitted.)

16       Q.  And would you point out to the ladies

17 and gentlemen of the jury -- it's on the screen --

18 what the other side of that door to the gymnasium

19 is?

20       A.  Okay.  On the -- that is -- when you

21 come in from that door, that door to the -- that

22 says exit above it is the door into the -- at the

23 time was the industries room.  And then that other

24 door next to it is the -- like a closet, a storage

25 closet.

1      Q.   So, the door that shows exit is not the

2 door to the gym?

3      A.   No.   That's the industries door.

4           THE COURT:   Where does it go?

5      A.   It goes into the industries.

6           THE COURT:   Thank you.

7      Q.   And I'll show you what's been marked as

8 exhibit -- Defendants' Exhibit 86.  Do you

9 recognize that?

10      A.   Yes.

11      Q.   What is it?

12      A.   That's the door that goes into the gym.

13           MS. McNAUGHT:   Your Honor, I move for

14 its admission.

15           THE COURT:   Any objection?

16           MR. FIELD:   No objection.

17           THE COURT:   Well, say it, please.

18           It's admitted.

19                (Defendants' Exhibit Number 86

20                admitted.)

21      Q.   And will you point to the door that is

22 the other side of the beauty shop?  Thank you.

23           I'm also going to show you what's been

24 previously admitted as Plaintiffs' Exhibit 201.  Do

25 you recognize that?

1      A.   Yes.

2      Q.   Can you show the ladies and gentlemen

3  of the jury where the gym entrance is that the

4  cadets were marched through?

5      A.   Right there.

6      Q.   I'm sorry.  The cadets and the inmates.

7      A.   There.

8      Q.   And where is the inmate bathroom?

9      A.   Right there.

10     Q.   Did you conduct searches in the inmate

11 bathroom?

12     A.   No.

13     Q.   Were you able to observe any coverings

14 on the bathroom entranceway?

15     A.   Yes.  There was -- they had a big sheet

16 that we always leave that we have up there.

17     Q.   And when you entered the gym, where

18 were -- where did you see inmates standing?

19     A.   The inmates were predominantly over in

20 this area.

21     Q.   And were those the -- which set of

22 inmates were those?

23     A.   The ones from 2B that were waiting to

24 be or had been stripped.  Some of them were on the

25 bleachers and some were standing.

1        Q.   Where is the beauty shop?

2        A.   Right here.

3        Q.   And is that where you were involved in

4 strip searches?

5        A.   Yes.

6        Q.   Okay.  Tell the ladies and gentlemen of

7 the jury how you were involved in those strip

8 searches.

9        A.   I was involved -- I took a couple of

10 the cadets over into the beauty shop and we went in

11 there and we had a couple of the inmates.  We took

12 two to three at a time and we stripped them out in

13 there.

14        Q.   At any time did you see menstrual blood

15 on the floor?

16        A.   No.

17        Q.   At any time did you see feces on the

18 floor?

19        A.   No.

20        Q.   At any time did you see urine on the

21 floor?

22        A.   No.

23        Q.   Did any inmates ever ask for sanitary

24 napkins and were refused in your presence?

25        A.   No.

1    Q.   Was there a trash can in the beauty

2  shop?

3    A.   Yes.

4    Q.   And could inmates put their waste in

5  the beauty shop wastebasket?

6    A.   Yes.

7    Q.   Were you in the bathroom with anyone

8  else -- any other staff members from Lincoln

9  Correctional Center?

10    A.   I wasn't in the bathroom.

11    Q.   I'm sorry.  In the beauty shop.

12    A.   In the beauty shop there may have been.

13  I don't recall who -- if there was another officer

14  in there, I don't recall.

15    Q.   Did you ever laugh at any inmates while

16  they were being strip-searched?

17    A.   No.

18    Q.   Do you recall any other staff laughing

19  at the inmates while they were being strip-searched

20  in the beauty shop?

21    A.   No.

22    Q.   Do you remember any staff member

23  saying, "Get these bitches out of here."?

24    A.   No.

25    Q.   Do you remember any staff ever covering

1  their face with a bandanna or mask?

2          A.   No.

3          Q.   Are bandannas or masks allowed --

4          A.   No.

5          Q.   -- in the institution for staff?

6          A.   No.

7          Q.   When a line moves, is there supposed to

8  be talking by the inmates?

9          A.   No.

10          Q.   Why not?

11          A.   Because they're supposed to be quiet

12  and --

13               THE COURT:   Lean into that mic, please.

14          A.   They're supposed to remain quiet.

15  That's --

16          Q.   Do you know why?

17          A.   That's just something we've always

18  commanded so it doesn't -- depending on what

19  they're saying, it doesn't stir and cause everyone

20  to talk, and then they can't hear us talking to

21  them and telling them what to do, where to go.

22          Q.   I'm going to show you a set of

23  handcuffs.  Do you recognize these?

24          A.   Yes.

25          Q.   What are they?

1      A.   They're handcuffs.

2      Q.   Is there anything special about them?

3      A.   No.

4      Q.   The fact that they're orange, does that

5  mean anything to you?

6      A.   No.

7      Q.   Are they used by a certain group of

8  persons within the Illinois Department of

9  Corrections?

10     A.   They use them at the academy and then

11 we also have orange ones that are used also for

12 tac.

13     Q.   And these are used at Lincoln

14 Correctional Center?

15     A.   No.  We don't have -- on the -- those

16 cuffs there, they're used and they bring them in in

17 the crates, and those are used just when we're

18 doing mass shakedowns.  They'll bring them and

19 they'll have them there for us to use.  But those

20 are what they use at the academy and they have

21 those there.

22     Q.   Are there any differences in the orange

23 cuffs that you use -- that you used during the mass

24 strip search on March 31st of 2011 and the cuffs

25 that you regularly use day-to-day at Lincoln

1　　Correctional Center?

2　　　　　A.　No.　They're the same.

3　　　　　　　THE COURT:　Do you use the orange cuffs

4　　just like you would the regular cuffs?

5　　　　　A.　Yes.　That's to help differentiate so

6　　we don't get their handcuffs mixed up with any of

7　　our handcuffs.

8　　　　　　　THE COURT:　Oh, you mean the orange

9　　ones are for who?

10　　　　　A.　They use them whenever they bring in

11　　the cadets and they have them all together and

12　　they're all accounted for and they use those

13　　whenever they come in for shakedowns for training

14　　for cadets.

15　　　　　　　THE COURT:　But normally at Lincoln or

16　　at, if you know, any other penal facility, do they

17　　normally have just the silver ones?

18　　　　　A.　Yes.

19　　　　　　　THE COURT:　Good.　Thank you.

20　　　　　　　Does that trigger any further

21　　questions?

22　　　　　　　MS. McNAUGHT:　No.　But I still have

23　　one more.

24　　　　　　　THE COURT:　Good.　You go right ahead.

25　　　　　Q.　Can you explain to the ladies and

1   gentlemen of the jury why bandannas or masks are

2   not allowed to be worn by correctional staff?

3        A.   Because it conceals their identity.

4   We're not supposed to have anything in -- us or the

5   inmates can't wear anything to conceal their

6   identity.

7             MS. McNAUGHT:  Nothing further.

8             THE COURT:  Fine.  You may cross.  And,

9   Mr. Field, if any question I had about the -- I

10  just didn't quite understand about the handcuffs.

11  If you have any other questions, you just go right

12  ahead and clarify it.

13            MR. FIELD:  Thank you, your Honor.

14            THE COURT:  Surely.

15                 CROSS-EXAMINATION

16  QUESTIONS BY MR. FIELD:

17       Q.   Good morning, Officer Slater.

18       A.   Good morning.

19       Q.   I'm sorry, I didn't hear you get asked.

20  It's officer; correct?  I wasn't --

21       A.   Yeah.

22       Q.   Okay.  And you've worked for Illinois

23  Department of Corrections for how long?

24       A.   Sixteen years.

25       Q.   And always at Lincoln, was that your

1  testimony?

2       A.   Yes.

3       Q.   Since we're on the issue of handcuffs,

4  I'll just get -- we'll go through that.  You said

5  that the orange handcuffs that are used by cadets

6  are no different than the ones that corrections

7  officers use on a regular basis; correct?

8       A.   Correct.

9       Q.   Okay.  But you also said that the

10 tactical team has orange cuffs; is that correct?

11      A.   Sometimes when we go and do mass

12 shakedowns, then they will have a big crate there,

13 again, of handcuffs, and sometimes they are the

14 orange ones also.

15      Q.   Okay.  So, I just want to make sure

16 we're talking about the -- the orange cuffs that

17 the tactical team uses are not -- are they in any

18 way different than the orange cuffs that the cadets

19 use?

20      A.   No.  They're the same.

21      Q.   The same ones.  And those cuffs that

22 are kept in the crates, whose responsibility are

23 they to maintain those cuffs?

24      A.   Usually they will put somebody in

25 charge of making sure they're all accounted for.

1        Q.  Okay.  And what about making sure that,

2  you know, they're all in proper working order and

3  that kind of thing?  Who maintains those cuffs in

4  that way?

5        A.  I'm not sure.

6        Q.  Okay.  And what about the personal

7  cuffs that you use, are you responsible for

8  maintaining them in the way that I described?

9        A.  We don't have personal cuffs.  They're

10  kept in our armory.

11        Q.  Okay.  And so who would be responsible

12  for maintaining the cuffs in the armory?

13        A.  Whoever's in charge of the armory

14  coordinator.

15        Q.  Okay.  You testified that you -- you

16  were not one of the tactical team members who

17  marched the women over to the gym; correct?

18        A.  Correct.

19        Q.  You stayed in the housing unit for the

20  shakedown?

21        A.  I was there for part of it and then

22  they asked me to come over to the gym.

23        Q.  Okay.  And do you recall approximately

24  what time it was when they asked you to come over

25  to the gym?

1      A.   No, I do not.

2      Q.   Okay.  And they asked you to come over

3  to the gym to help with the strip searches;

4  correct?

5      A.   Yes.

6      Q.   Okay.  And was that because they wanted

7  the -- you know, the strip searches were going too

8  slowly and they needed additional help?

9      A.   Yes.

10     Q.   Okay.  You've been at Lincoln

11  Correctional Center for a long time.  Are you aware

12  of an Officer Crudup?  Is that how it's pronounced?

13     A.   Yes.

14     Q.   And is Officer Crudup somebody that

15  you've worked with before?

16     A.   Yes.

17     Q.   Okay.  She's not a member of the

18  tactical team though; correct?

19     A.   No.

20     Q.   Okay.  Do you recall where Officer

21  Crudup was detailed on March 31st, 2011?

22     A.   No.

23     Q.   Okay.  Did you see her in the gym that

24  day, to your knowledge?

25     A.   Yes.  She was asked to come and help.

1          Q.   Okay.  And she was strip-searching

2    women in the bathroom?

3          A.   I'm not -- I don't recall where she was

4    strip-searching at.

5          Q.   But she was involved in the strip

6    searches?

7          A.   I believe so.

8          Q.   Okay.  And you saw her in the gym that

9    day?

10         A.   I could have.  I know I seen her that

11   day in passing.

12         Q.   Okay.  But you don't recall if it was

13   in the gym?

14         A.   Correct.  It may have --

15         Q.   But you do know that she was involved

16   in strip searches?

17         A.   Right.

18         Q.   Okay.  Do you recall who else was in

19   the gym that day in terms of officers, whether

20   tactical team members or regular corrections

21   officers?

22         A.   No, I do not.

23         Q.   Okay.  And you testified that there was

24   a curtain up in front of the bathroom, the gym

25   bathroom entrance when you came to the gym that

1  day; is that correct?

2          A.   Yes.

3          Q.   But again, your testimony is that you

4  came to the gym later in the day because the strip

5  searches at that point had been going too slowly

6  and they needed extra help; correct?

7          A.   Correct.

8          Q.   So, you don't know if that curtain was

9  up earlier in the day?

10         A.   I cannot positively say that, no.  But

11  I'm sure it probably was because anytime we do

12  strip searches that's the first thing we always do

13  is put a curtain up.

14         Q.   But you weren't in the gym, so you

15  don't know if it was up; correct?

16         A.   Correct.  I wasn't there when they

17  initially started the strip searches.

18         Q.   Okay.  Now, you were asked a bunch of

19  questions about whether or not you recall anyone in

20  the beauty shop using -- you know, cussing or using

21  degrading language or anything like that.  Do you

22  recall those questions?

23         A.   Yes.

24         Q.   Okay.  What about in the gym, did you

25  overhear anyone using that kind of language in the

1   gym?

2       A.   No.

3       Q.   What about in the housing units, did

4   you overhear anyone using that kind of language in

5   the housing units?

6       A.   No.

7       Q.   At any time that day did you overhear

8   anyone using that kind of language?

9       A.   No.

10      Q.   Okay.  The beauty shop has a civilian

11  employee; correct?

12      A.   Yes.

13      Q.   Okay.  Do you recall if that civilian

14  employee was in the beauty shop that day when you

15  were doing strip searches in there?

16      A.   She may have been in there.  I do not

17  recall.

18      Q.   Okay.  But if she was in there, IDOC

19  policy is that individuals not involved in strip

20  searches are not supposed to be present during a

21  strip search; isn't that correct?

22      A.   Correct.  But I think she may have a

23  correctional title.  I'm not positive.  I'm not

24  sure.

25      Q.   She's not a corrections officer?

1          THE COURT:  You've got to lean into

2     that mic, please.

3          A.   Yes.

4          Q.   She is not a corrections officer;

5     correct?

6          A.   No, she is not, but she can also pat

7     them down.

8          Q.   But she wasn't involved in the strip

9     searches that day?

10         A.   Correct.

11         Q.   Okay.  You testified that when you

12    started doing strip searches -- well, let me ask

13    you this first:  Who ordered you to start doing the

14    strip searches in the beauty shop?

15         A.   I don't recall exactly who ordered

16    them.  I know it was brought up to -- for us to go

17    ahead and use the beauty shop because it was taking

18    a while --

19         Q.   Sure.

20         A.   -- to strip them in -- or, to get the

21    strip searches done, so then I went ahead and we

22    went into the beauty shop.  As far as who ordered

23    that, I do not recall who ordered that.

24         Q.   Okay.  And your testimony is that you

25    would bring two to three women into the beauty shop

1    to be strip-searched at one time; is that correct?

2        A.    Yes.

3        Q.    Okay.  Now, the beauty shop has a

4    bathroom in it; correct?

5        A.    Yes.

6        Q.    And that bathroom has a solid door?

7        A.    Yes.

8        Q.    And the beauty shop also has a door to

9    the outside that has a window; correct?

10       A.    Yes.  And it was on the other side of

11   the room.

12       Q.    Sure.  But I'm wondering, if you only

13   brought two to three women into the beauty shop at

14   a time and there's a door with a window and a

15   civilian employee, why didn't you just go ahead and

16   strip-search them --

17            MS. McNAUGHT:  Objection.

18       Q.    -- in the bathroom?

19            MS. McNAUGHT:  There is no --

20            THE COURT:  Wait.

21            MS. McNAUGHT:  It assumes facts that

22   are not into evidence.

23            THE COURT:  I'll sustain.

24            MR. FIELD:  Thank you, Your Honor.

25       Q.    Why didn't you use the bathroom in the

1   beauty shop to strip-search the women that you were

2   bringing in there that day?

3       A.  That bathroom is not big enough for

4   myself and a cadet and an inmate to be in there to

5   strip them.

6       Q.  Okay.  And it's not big enough to do

7   three inmates at the same time; is that correct?

8       A.  No.  That bathroom is very small.

9       Q.  Okay.  And your testimony is you're not

10   sure if there was another officer in the beauty

11   shop with you when you were doing the strip

12   searches; correct?

13       A.  I believe there was one that came in

14   and I don't recall who exactly it was --

15       Q.  Okay.

16       A.  -- that came in there with me.

17       Q.  Sure.  And was there more than one

18   cadet in there with you?

19       A.  Yes.

20       Q.  How many cadets were in there?

21       A.  I'd say probably at least two to three.

22       Q.  Okay.  Maybe more?  Possibly more than

23   that?

24       A.  Well, there was one cadet for each

25   inmate.

1      Q.   Okay.

2      A.   So, there was usually probably right

3  around two or three.

4      Q.   Okay.

5      A.   I believe.

6      Q.   I'm sorry.  I didn't mean to cut you

7  off.

8      A.   No, that's okay.

9      Q.   There was some testimony yesterday

10  about a grievance that was filed about a strip

11  search that occurred in dietary within about a

12  month of the mass shakedown and strip search at

13  Lincoln Correctional Center.  Do you recall if

14  there was any -- do you recall any kind of training

15  on strip searches or shakedowns in the month or so

16  previous to the March 31st, 2011, shakedown?

17      A.   No.

18      Q.   Do you recall receiving a memo of any

19  kind that said that collective or group -- strip

20  searches in collective groups are against the

21  facility's policy?

22      A.   No.

23      Q.   You didn't receive anything like that

24  previous to March 31st, 2011?

25      A.   No.

1    Q.   You were asked some questions about

2    whether there was blood on the floor, that kind of

3    thing.  You were originally detailed to the housing

4    unit; correct?

5    A.   No.

6    Q.   For March 31st, 2011, you were supposed

7    to do the shakedowns in the housing unit?

8    A.   I was over there assisting.

9    Q.   Okay.  And then you went over to the

10   gym later?

11   A.   Yes.

12   Q.   So, when you were in the beauty shop

13   doing the strip searches, did you have a supply of

14   sanitary napkins or pads that you could provide

15   inmates if they needed them?

16   A.   Yes.

17   Q.   They were in the beauty shop?

18   A.   Yes.

19   Q.   Okay.  Where in the beauty shop were

20   they?

21   A.   Usually whenever I came in, I -- out of

22   habit from doing strip searches, I always grabbed a

23   bag of pads and toilet paper and put those in

24   there.

25   Q.   And did you do that that day?

1    A.   Yes.

2    Q.   Okay.  When exactly did you do that?

3    A.   As far as exactly -- it would have been

4  before I even took anyone in there.

5    Q.   You're saying -- I'm trying to figure

6  out what you recall actually doing that day.  So,

7  do you have a memory as you sit here today of

8  actually getting sanitary napkins and toilet paper

9  and --

10    A.   Yes.

11    Q.   -- bringing it into the beauty shop?

12    A.   Yes.

13    Q.   Okay.  But your testimony is that

14  nobody asked you for those items?

15    A.   If they needed them, then they were

16  there.

17    Q.   But I'm asking you if anyone asked you

18  for those items.

19    A.   I don't recall if anyone asked

20  specifically.  But whenever I do strip searches,

21  when we do mass strip searches like that for any

22  programs or in the shakedown like what we did for

23  that when the cadets came in, we grab the bag of

24  pads and the toilet paper.  And that's automatic

25  before I even get started.

1   Q. Previous to you arriving in the gym, do

2 you know if strip searches had already started in

3 the beauty shop?

4   A. No.  I was the first one.

5   Q. You were the first one.  Okay.  And

6 when you're doing strip searches, are you wearing

7 gloves?

8   A. Yes.

9   Q. Okay.  And why is that?

10   A. Because when we check their clothes, we

11 -- when they take off their clothes, then we hold

12 onto those or they'll set them down but we always

13 check their clothes, and then when they're done

14 with their strip searches, then we hand them back

15 one item at a time to give them their stuff for

16 them to get dressed.

17   MR. FIELD:  All right.  No further

18 questions, Your Honor.

19   THE COURT:  Thank you, Mr. Field.

20   Ms. McNaught, redirect.

21   MS. McNAUGHT:  Thank you, Your Honor.

22     REDIRECT EXAMINATION

23 QUESTIONS BY MS. McNAUGHT:

24   Q. You said that you've done other mass

25 strip searches for programmatic events; is that

correct?

A. Yes.

Q. What other kinds of programmatic events have you done strip searches for?

A. For the Mom and Me Camps and the Sister Pat visits that would come.

Q. Explain to the ladies and gentlemen of the jury what Mom and Me Camp is.

A. Mom and Me is where the inmates would have a day to spend with their kids. And the parent or -- and the other parent or a guardian would bring the kids in of the inmates. They would bring in the inmates' kids, and they would get to spend that whole day with them, and they would play, play games, eat lunch with them, and then by 2:00 they would leave.

Q. And the inmates are strip-searched en masse?

A. Yes. They're strip-searched two to three at a time. And there's usually one female officer or either -- there's times where I've been in there by myself stripping them, so it would be two inmates at a time. And if there's two officers, then we may have four inmates in there. So, anywhere between two to four inmates would be

1    in there at a time being stripped.

2         Q.   And where is it that you do those mass

3    strip searches?

4         A.   In the bathroom in the gym.

5         Q.   And is it your habit to get sanitary

6    napkins and toilet paper prior to that strip

7    search?

8         A.   Yes.  It's automatic.

9         Q.   And why is it that you do?

10        A.   Just so that we don't have to leave the

11   area while they're being strip-searched and stop in

12   the middle of it.  So, I always make sure that --

13   we always double-check and make sure that there's

14   the toilet paper and we have pads in there.

15        Q.   And then you mentioned that there was a

16   Sister Pat Program.  Tell the ladies and gentlemen

17   of the jury what that is.

18        A.   Sister Pat is a program through one of

19   the Chicago Lutheran Services that they have up

20   there, and they would bring down, there again, the

21   -- a parent or a guardian and they would have the

22   kids and they would come in for the day and get to

23   spend the whole day with the mom, and it would be

24   once a month.

25        Q.   And where is that located, that event?

1          A.   In the gym.  They're both located in

2     the gym.

3          Q.   And inmates for both Mommy and Me and

4     Sister Pat have to be strip-searched prior to the

5     children coming in?

6          A.   Yes.

7          Q.   And then they have to be strip-searched

8     after?

9          A.   Yes.

10          Q.   Besides Mommy and Me and Sister Pat,

11     have you done -- and this event on March the 31st

12     of 2011, have you had to do other strip searches --

13          A.   Yes.

14          Q.   -- en masse?

15          A.   Yes.

16          Q.   And when do you have to do those?

17          A.   We've done other strip searches in -- I

18     would say when we've done tac details.  We -- I did

19     one when we went to Logan -- I went to Logan.  I've

20     done one when we've had the cadets in.  So, it's --

21          Q.   Do you do them when you bring inmates

22     in and out of dietary?

23          A.   Yes.

24          Q.   Okay.  Explain to the ladies and

25     gentlemen of the jury how that happens.

1          A.   On that, we would -- you have to strip

2     out five.  So, we would take two or three there

3     again and strip them out in the laundry room area.

4     That was a closed off area.

5          Q.   And how do you choose which two or

6     three you're going to strip search?

7          A.   Well, we have to do five at a -- we had

8     to do five shakes and five -- five shakes, five

9     strips out of dietary.  Everyone got --

10         Q.   Every day?

11         A.   Every day we had to --

12         Q.   Every shift?

13         A.   Yes.  They all -- we had to do five

14    strips out of dietary.  So, everyone had to be

15    stripped.  And there were some days where all of

16    dietary got stripped.  So -- but we had to do at

17    least a minimum of five out of dietary.  And we

18    would take them in and do them, again, anywhere --

19    sometimes all five of them would get stripped at

20    the same time and other times it would just be two

21    to three.  But usually the officer or the food sup

22    would just give us --

23         Q.   The food sup?  What is that?

24         A.   The food supervisor.  I'm sorry.  And

25    they would give us a list of names of ones that,

1  you know, would need to be searched.  And every day

2  it was different.  Some days they may have been the

3  same ones, but we just -- they give us the names,

4  and then we would take them in the back and do

5  that.

6  Q.  Now, during the mass strip search on

7  March the 31st of 2011, explain to the ladies and

8  gentlemen of the jury how the operation worked with

9  cadets and inmates as far as who came into the

10 beauty shop and who left.

11 A.  The only ones that were in the beauty

12 -- that would come into the beauty shop was the

13 ones --

14 Q.  No.  You don't understand my question,

15 so let me -- let me take another stab at it.

16 A.  Okay.

17 Q.  Were the same two or three cadets in

18 the beauty shop searching all of the inmates or did

19 they rotate?

20 A.  They were the same.

21 Q.  And so, you would finish two or three

22 inmates with two or three cadets.  The inmates

23 would leave and then another set of inmates would

24 come in but the cadets would never leave?

25 A.  Right.

1    Q.   Okay.  And you were supervising the

2  cadets in the beauty shop?

3    A.   Yes.

4    Q.   If they did it wrong, would you correct

5  them?

6    A.   Yes.

7    Q.   And did you ever see any cadets doing

8  it incorrectly?

9    A.   No.

10   Q.   Have you ever had cuffs fail?

11   A.   Yes.

12   Q.   And what do you do when a cuff fails?

13   A.   Grab another set.

14        MS. McNAUGHT:  Nothing further.

15        THE COURT:  Mr. Field.

16        MR. FIELD:  Thank you, Your Honor.

17        THE COURT:  Surely.

18             RECROSS-EXAMINATION

19  QUESTIONS BY MR. FIELD:

20   Q.   Officer Slater, you were asked about

21  the -- I think it's called Mom and Me Program?

22   A.   Yes.

23   Q.   That's a voluntary program; correct?

24   A.   Yes.

25   Q.   So, inmates who voluntarily want to go

1    to the program, they understand that if they

2    volunteer they're going to be strip-searched before

3    they can start the program; correct?

4        A.  Yes.

5        Q.  Okay.  And I think the other program

6    was called the Sister Pat Program?

7        A.  Uh-huh.

8        Q.  Also a voluntary program?

9        A.  Yes.

10        Q.  Okay.  And so, the inmates who

11    volunteered for that program would know that if

12    they volunteered for it, if they wanted to take

13    part, they were going to be strip-searched;

14    correct?

15        A.  Correct.

16        Q.  Okay.  Now, the dietary strip searches

17    that you're talking about, were those of the

18    workers in dietary?

19        A.  Yes.

20        Q.  Okay.  And the working program is also

21    volunteer; is that correct?

22        A.  Yes.

23        Q.  Okay.  So, those inmates as well knew

24    that if they wanted a job in the prison, they would

25    be strip-searched?

1          A.   Yes.

2          Q.   Okay.  You testified that there -- the

3    strip searches that would occur in the dietary

4    would take place in the laundry room; is that

5    correct?

6          A.   Yes.

7          Q.   Is there a bathroom in the laundry room

8    -- or, in the dietary?

9          A.   Yes.

10         Q.   Were strip searches ever conducted in

11   that bathroom?

12         A.   Yes.

13         Q.   Okay.  How large is the bathroom in

14   dietary?

15         A.   How large?

16         Q.   Yeah.  How large is it?

17         A.   It's big enough for me and two others

18   in there, because I would take two in there.

19         Q.   Okay.  Is it the same size as the

20   bathroom in the beauty shop?

21         A.   No.

22         Q.   Slightly bigger?  Much bigger?  What's

23   the difference?

24         A.   It's -- the one in the bathroom is

25   wider.  The one in the beauty shop is very narrow.

1          MR. FIELD:  Okay.  No further

2     questions, Your Honor.

3          THE COURT:  Thank you.

4          Ms. McNaught?

5          REDIRECT EXAMINATION

6     QUESTIONS BY MS. McNAUGHT:

7          Q.   When you've done the mass strip

8     searches for Mommy and Me and Sister Pat and in the

9     dietary, have those inmates been cuffed prior to

10    the searches?

11         A.   No.

12         Q.   But on the March 31st, 2011, event, the

13    inmates were cuffed between the housing unit and

14    the gym?

15         A.   Yes.

16         Q.   And then in the gym for a period of

17    time?

18         A.   Yes.

19         MS. McNAUGHT:  Nothing further.

20         MR. FIELD:  No further questions, Your

21    Honor.

22         THE COURT:  Thank you.

23         Thank you very much, you may step down,

24    Ms. Slater.

25         Now, is Ms. Slater excused?

1          MR. FIELD:  Yes, Your Honor.

2          MS. McNAUGHT:  Carlita Edmonson.

3          THE COURT:  Is she excused?

4          MS. McNAUGHT:  Yes.  I'm sorry.  She is

5    excused.

6          THE COURT:  Very well.  Thank you,

7    Ms. Slater, you're excused.

8                    (Witness excused)

9          THE COURT:  You may call your next.

10          MS. McNAUGHT:  Carlita Edmonson.

11          MS. BAUTISTA:  It's going to be just a

12    second on that.

13          THE COURT:  Beg your pardon?

14          MS. BAUTISTA:  Just one minute for

15    Ms. Edmonson.

16          THE COURT:  Surely.

17                  CARLITA EDMONSON,

18    of lawful age, produced, sworn, and examined on

19    behalf of the Defendants, testifies and says:

20          THE COURT:  Come right up here, please,

21    and have a seat.  And please lean right into that

22    microphone, if you would.  Thank you.

23                  DIRECT EXAMINATION

24    QUESTIONS BY MS. McNAUGHT:

25          Q.   Good morning.

1      A.   Good morning.

2      Q.   For the record, would you please state

3  your full name and spell it for the court reporter?

4      A.   Carlita Edmonson, C-a-r-l-i-t-a

5  E-d-m-o-n-s-o-n.

6      Q.   Are you currently employed?

7      A.   Yes.

8      Q.   How are you employed?

9      A.   I'm a correctional officer.

10     Q.   And how long have you been a

11  correctional officer?

12     A.   Since August of 2000.

13     Q.   Are you -- where do you currently work?

14     A.   Lincoln Correctional Center.

15     Q.   And have you always worked at Lincoln

16  Correctional Center since you have been a

17  correctional officer?

18     A.   Yes.

19     Q.   And your rank is correctional officer?

20     A.   Yes.

21     Q.   Are you also or were you also a member

22  of the tactical unit on March 31st of 2011?

23     A.   Yes.

24     Q.   Do you recall being called as a

25  tactical unit for an event that occurred on March

31st of 2011?

    A.   Yes.

    Q.   How were you called and by whom?

    A.   By the tac commander.  We were told that we were going to have some cadets in and that we were to monitor and make sure everything is okay.

    Q.   And do you recall approximately when it is that you met in your tactical group?

    A.   I think we had to be down in the tac room about maybe 8, 8:15.  I'm not sure.

    Q.   And then where did you go from there?

    A.   When we got done, got dressed, we marched up to the sally port and we came in.

    Q.   Came in where?

    A.   The facility.

    Q.   And where did you go when you -- well, were you given any instruction by your tactical commander about what you were supposed to do?

    A.   Yes.

    Q.   Okay.  And who was your tactical commander?

    A.   Troy Dawdy.

    Q.   When you got into the institution, were the cadets there?

1    A.   I believe so.   They were there.   I

2   believe so, yeah.

3    Q.   And after the gathering, where did you

4   go?

5    A.   We marched to Housing Unit 2.   I

6   believe we went in first Housing Unit 2.

7    Q.   What did you do in Housing Unit 2?

8    A.   Once we got into the Housing Unit 2, we

9   told the ladies the dayroom was closed and we told

10  them to go back to their dorms and have their

11  medication and get ready to come out.

12   Q.   At some point did the ladies start

13  coming out?

14   A.   They came out dorm by dorm.

15   Q.   And where did they go?

16   A.   They came out, they were pat-searched,

17  and then they were taken into the dayroom and

18  cuffed up, and then they were taken over to the

19  gym.

20   Q.   Did you escort them to the gym?

21   A.   Some lines, yes.

22   Q.   What was your assignment on the

23  tactical unit as far as the cadets on March 31st of

24  2011 after you marched them -- some of the lines to

25  the gym?

1     A.  We were to monitor them to make sure

2  they were cuffing the ladies right and making sure

3  that they did the strip searches right.

4     Q.  Okay.  That was at the housing unit?

5     A.  That was once we got to the gym.  On

6  the housing unit we were making sure they were

7  cuffed and brought out to the dayroom and was told

8  -- and they were lined up in the dayroom, and that

9  was what we monitored.

10     Q.  And what did you do after you got to

11  the gym?

12     A.  After we got them to the gym, they were

13  told to line up on the wall by the beauty shop.

14     Q.  Okay.  I'm going to show you what's

15  been previously admitted into evidence as

16  Plaintiffs' Exhibit 201.  Do you see the entrance

17  to the gym?  And if you'll tap on that screen as to

18  where the entrance of the gym is.

19     A.  I believe it's right there.

20     Q.  Okay.  And where is it that -- when the

21  ladies were marched over and initially placed into

22  the gym, what wall were they placed on?

23     A.  This wall over here.

24     Q.  Now, was there somebody at the entrance

25  of the door to the gym?

1          A.   At this door right here?

2          Q.   Yes.

3          A.   I'm not sure.  I don't recall.  Because

4     I was on the inside.

5          Q.   And how were the ladies lined up on

6     that wall in the gym?

7          A.   They were lined up in rows.

8          Q.   Okay.  Can you show the ladies and

9     gentlemen how it was that they were lined up?

10         A.   They was lined up against this row --

11    this wall.

12         Q.   And is there any tactical reason why

13    they would be lined up there?

14         A.   So when we bring the ladies in and we

15    get ready to strip in the bathroom, they couldn't

16    look that way.  They had to look the other way.

17         Q.   Okay.  So, the ladies that were on --

18    well, do you know which -- which wall to the gym?

19         A.   They were on this wall.

20         Q.   Okay.  Do you know which direction that

21    is?

22         A.   I'm bad with direction, but they was on

23    that wall.

24         Q.   Okay.  But they were lined up from the

25    beauty shop to the industries on the end line of

1   the basketball court?

2   　　　A.　Yes.

3   　　　Q.　And they were facing which way?

4   　　　A.　The beauty shop.

5   　　　Q.　The wall towards the beauty shop and

6   industries?

7   　　　A.　Yes.

8   　　　Q.　And were you involved in any of the

9   strip searches?

10   　　　A.　Yes, I was.

11   　　　Q.　Where were you located?

12   　　　A.　I was located in the restroom.

13   　　　Q.　The inmate restroom?

14   　　　A.　Yes.

15   　　　Q.　I want to show you what's been

16   previously marked as Plaintiffs' Exhibit 250.  Do

17   you recognize that?

18   　　　A.　Yes.

19   　　　Q.　What is it?

20   　　　A.　That's the women's restroom.

21   　　　Q.　Okay.  And does it have a curtain over

22   it?

23   　　　A.　Yes, it does.

24   　　　Q.　And is that curtain over the opening of

25   the inmate restroom -- does that fairly depict the

way that it looked on March the 31st of 2011 when
you were in the bathroom?

    A.   Yes.

    Q.   So, tell us how the strip search in the
bathroom worked.

    A.   We would take maybe three to four, I
believe it was, inmates in and there was three to
four staffs with them, and they were told to do the
strip search.  They were told to take their clothes
off.  We examine their clothes.  And then we tell
them to open their mouth.  They open their mouth.
Run their hands through their hair, show us behind
their ears, turn around, the bottom of your feet,
and then cough and squat three times.

    Q.   Were sanitary napkins available for any
menstruating women?

    A.   Yes, there was.

    Q.   Were the -- was there a wastebasket in
the bathroom?

    A.   Yes, there was.

    Q.   Were ladies allowed to place their used
sanitary products in the wastebasket?

    A.   Yes, they was.

    Q.   If they needed to use the restroom,
could they do so?

1    A.   Yes, they could.

2    Q.   Or the toilet?

3    A.   Yes.

4    Q.   Did you see blood, urine, or feces on

5    the floor of the inmate bathroom at any time on

6    March 31st of 2011?

7    A.   No.

8    Q.   And were sanitary products available to

9    women who needed them?

10   A.   Yes.

11   Q.   Do you recall -- or, no, let me ask

12   another question.

13        Was the officer restroom in the gym

14   ever used during the March 31st, 2011, search?

15   A.   No.  Not as I recall, no.

16   Q.   And can you point out to the ladies and

17   gentlemen of the jury where the officer bathroom

18   is?

19   A.   It's like maybe right there.  I know

20   it's like not too far from theirs.  But it's like

21   on the wall.  I think it's like right there.

22   Q.   Were you in and out of the inmate

23   bathroom in the gym on March 31st of 2011?

24   A.   Yes.

25   Q.   And so you would have known if the

1    officer bathroom was being used; wouldn't you?

2         A.   Yes.  It was locked and secure.

3         Q.   Approximately how long were you in the

4    gym for the strip search of Unit 2B?

5         A.   I'm not sure.  I was there.  I'm not

6    sure how long it was.

7         Q.   And was Unit 2B finished and then Unit

8    4B came in?

9         A.   Yes.

10        Q.   And 2B was done in the morning?

11        A.   I think so.

12        Q.   And 4B was done in the afternoon?

13        A.   Yes.

14        Q.   Did you ever hear any disparaging

15   comments made to any inmates who were being

16   strip-searched on March 31st of 2011?

17        A.   No.

18        Q.   Did you ever hear any profanity being

19   used towards inmates during the strip search on

20   March 31st of 2011?

21        A.   No.

22        Q.   Did you ever see any correctional

23   officers put bandannas over their faces on March

24   31st of 2011?

25        A.   No.

1        Q.   Did you ever hear any correctional

2   officers or cadets complain about the smell of any

3   inmate who was strip-searched on March 31st of

4   2011?

5        A.   No.

6        Q.   At any time did you stand in blood?

7        A.   No.

8        Q.   Did you stand in feces or urine on

9   March 31st of 2011?

10       A.   No.

11       Q.   Did you ever see any blood, urine, or

12  feces being tracked from the bathroom -- from the

13  inmate bathroom into the gym on March 31st of 2011?

14       A.   No.

15       Q.   Did any of the female inmates after or

16  during the strip search on March 31st, 2011,

17  complain?

18       A.   Yes.

19       Q.   What kinds of complaints did you hear?

20       A.   That it's not right.  They complained

21  about a lot, though.  I heard a lot of complaints.

22            THE COURT:  Say that again.

23       A.   They complained about a lot of things.

24       Q.   Is that when they were in the gym?

25       A.   No.

1    Q.   It was after they --

2    A.   Afterwards.

3    Q.   Did you hear complaints in the gym?

4    A.   No.

5    Q.   And so, the complaints that you heard,

6    where did you hear them and when did you hear them?

7    A.   I hear complaints all the time.  I'm a

8    female officer on the wings with them, so they're

9    always complaining about everything.

10         MS. McNAUGHT:  Nothing further.

11         MS. BAUTISTA:  Wait a minute.

12         MS. McNAUGHT:  Oh, hang on just a

13   minute.

14         THE COURT:  Surely.

15   Q.   Is there a different procedure for

16   women who are menstruating to do the squat and

17   cough?

18   A.   Yes.

19   Q.   Tell the ladies and gentlemen of the

20   jury what that procedure is.

21   A.   When they're on their monthly, they

22   stand over the toilet and they cough and squat, and

23   so if anything drip out, it drips in the toilet.

24   Q.   Did you make any disparaging comments

25   to any inmates on March 31st of 2011?

1       A.  No.

2       Q.  Did you use any profanity towards

3 inmates on March 31st of 2011?

4       A.  No.

5       Q.  Did you cover your face or make any

6 comments about the way that inmates smelled on

7 March 31st, 2011?

8       A.  No.

9       MS. McNAUGHT:  Nothing further.

10       THE COURT:  Mr. Field.

11           CROSS-EXAMINATION

12 QUESTIONS BY MR. FIELD:

13       Q.  Good morning, Officer Edmonson.

14       A.  Good morning.

15       Q.  You were asked some questions about

16 complaints.  Do you recall a grievance being filed

17 against you in March 2011 about a strip search in

18 dietary?

19       A.  Yes.

20       Q.  Okay.  And were you -- did anyone

21 follow up with you on that?

22       A.  No.

23       Q.  Okay.  So, how were you made aware of

24 the grievance?

25       A.  I think from talking to my lawyer.

1       Q.  Okay.  But nobody from the facility,

2  not Warden Hulett, not Warden Reynolds, followed up

3  with you about that grievance after it was filed?

4       A.  I don't recall.

5       Q.  Okay.  Do you recall receiving any

6  additional training on conducting strip searches

7  after that grievance was filed?

8       A.  No.

9       Q.  What about receiving any memos that

10  said that strip searches in collective groups are

11  not allowed per the facility's policy, did you

12  receive anything like that?

13       A.  I haven't, no.

14       Q.  Okay.  Your testimony was that the

15  women that were marched into the gym from Unit 2B

16  were lined up along this wall here; is that

17  correct?

18       A.  Yes.

19       Q.  And they were facing this wall?

20       A.  Yes.

21       Q.  Okay.  And that was so that they

22  couldn't see into the bathroom?

23       A.  Right.

24       Q.  Okay.  Now, was it also your testimony

25  that this sheet was covering the bathroom door?

1      A.   A curtain, yes.

2      Q.   So, how could the women see into the

3 bathroom if there was a sheet covering the door?

4      A.   They can't.  But they still -- the

5 procedure is for them to look the opposite way.

6      Q.   So, you were really concerned that they

7 couldn't see in there; correct?  That's why they

8 were faced against that opposite wall?

9      A.   You can't see through the curtain

10 anyway.

11      Q.   Okay.  So, it wouldn't make a

12 difference where they were lined up in the gym?

13 They wouldn't have been able to --

14      A.   Yeah, it makes a difference.

15      Q.   Why's that?

16      A.   Because they're supposed to stand on

17 that wall back there.

18           THE COURT:  Because they what?

19      A.   They have to stand on the back wall

20 where we line them up at.

21      Q.   So they could face the wall.  And your

22 testimony was that they couldn't see in the

23 bathroom; correct?

24      A.   Right.  And they couldn't see the other

25 inmates go in the bathroom.

1    Q.   Okay.  But your testimony also is that

2    there was a curtain there to prevent them from

3    seeing in?

4    A.   Right.

5    Q.   Okay.  Were there other individuals in

6    the gym that day?

7    A.   How do you mean?

8    Q.   Well, there were other officers in the

9    gym besides --

10   A.   Yes.

11   Q.   -- yourself; correct?

12   Who else was in the gym?  Who else do

13   you recall seeing?

14   A.   Other tactical members, other female

15   tactical members, female cadets, some of the upper

16   -- like the --

17   Q.   Assistant Warden Reynolds, was he in

18   the gym?

19   A.   He might have been there.  He was in

20   and out.

21   Q.   He was in and out of the gym that day?

22   A.   Right.

23   Q.   What about Warden Hulett, was she in

24   and out of the gym that day?

25   A.   Yes, she was in there.

1       Q.   What about Tac Commander Dawdy, was he

2  in the gym that day?

3       A.   He came in and then he left back out

4  because he was on the wings with the guys shaking

5  down.

6       Q.   What about Assistant Commander Craig,

7  was he in the gym that day?

8       A.   He was in and out also.

9       Q.   Okay.  What about Officer Anderson, was

10  he in the gym that day?

11       A.   Yes, he was one of the officers that

12  was on the house when they brought the house over.

13       Q.   Okay.  And Officer Anderson is a male

14  officer; correct?

15       A.   Yes.

16       Q.   And Lieutenant Dawdy is male; correct?

17       A.   Yes.

18       Q.   Same thing for Assistant Warden

19  Reynolds and Assistant Commander Craig; correct?

20       A.   Yes.

21       Q.   Any other male officers in the gym that

22  day?

23       A.   I'm not sure.

24       Q.   Okay.  What about male cadets?

25       A.   No.  They were on the housing units.

1          Q.   Okay.  What about --

2               THE COURT:  Wait a minute.  What was

3     that answer?

4          A.   They were on the housing units.

5               THE COURT:  They were in the housing

6     unit?

7          A.   Yeah, they were on the housing units

8     shaking down.

9               THE COURT:  Thank you.

10         Q.   What about Officer Leonetti, was he in

11    the gym that day?

12         A.   He was on the tac team.  He was in and

13    out.

14         Q.   He was in and out of the gym that day;

15    correct?

16         A.   Yeah.

17         Q.   Okay.  Now, there was testimony that

18    there was strip searches in the beauty shop that

19    day as well; correct?

20         A.   I believe so, yes.

21         Q.   So, the women facing that wall by the

22    beauty shop would have been looking directly in the

23    direction of that strip search; correct?

24         A.   No, because there's a door and it's

25    closed.

1        Q.   Okay.  But did anybody go in and out of

2  that door that day?

3        A.   I'm not sure.  I was in the restroom.

4        Q.   Okay.  Well, how did they bring inmates

5  into the beauty shop to get them strip-searched?

6        A.   They were all in the gym.  There's a

7  door right there that goes right into the beauty

8  shop.

9        Q.   Sure.

10       A.   Right there.

11       Q.   This door right here; correct?

12       A.   Yes.

13       Q.   Okay.  And your testimony is that they

14  were lined up right here; correct?

15       A.   Yes.

16       Q.   Okay.  And you need to open that door,

17  I'm assuming, to get into the beauty shop?

18       A.   When you open it, the ladies move to

19  the side.

20       Q.   The ladies that were standing in --

21       A.   If there was some standing there,

22  they'd move to the side so you can get through the

23  door.

24       Q.   I see.  So, why not just line them up

25  away from the door so they don't have to move to

the side?

A.   I don't know why they -- that's how it
-- that's the procedure.  That's how it's done.

Q.   Okay.  So, every time somebody needed
-- an inmate needed to be brought into the beauty
shop to be strip-searched, women that were lined up
against that wall needed to be moved out of the
way?

A.   If they were still there.

Q.   Okay.  And the women that were standing
against that wall, they were handcuffed; correct?

A.   No.

Q.   When were their handcuffs taken off?

A.   Their handcuffs was taken off when they
came in the gym.

Q.   Who took their handcuffs off?

A.   The cadets.

Q.   Female cadets?

A.   Yes.

Q.   Okay.  And when -- how long were they
in the gym with their handcuffs on?

A.   As quick as we can get them off.

Q.   Okay.  And do you have any memory as
you sit here today how long that took?

A.   Maybe -- I'm not sure.

1    Q.   You work with an Officer Crudup?

2    A.   Yes.

3    Q.   Okay.  And she was detailed to the gym

4  that day too?

5    A.   I'm not sure which officer was

6  detailed.  Like I said, I was on the tac team,

7  so ...

8    Q.   Okay.  Well, she was in the gym that

9  day?

10   A.   I believe so, yes.

11   Q.   And was she also in the bathroom with

12 you that day?

13   A.   I'm not sure if Crudup was in the

14 bathroom.  I can't recall.

15   Q.   But you recall seeing her in the gym?

16   A.   Yes.

17   Q.   Okay.  Can you describe Officer Crudup

18 for the jury?

19   A.   She's a female officer.

20   Q.   Okay.

21   A.   African-American.  And she was an

22 officer.

23   Q.   Is she tall?  Short?

24   A.   She's taller than me.  I'm short.

25   Q.   Okay.

1        A.  So everybody's tall to me.

2        Q.  Short hair?  Long hair?

3        A.  I think she had a ponytail.  I'm not

4 sure.  Her hair is pretty long.

5        Q.  You think it was long.  Okay.  And

6 heavyset?  Thin?

7        A.  Medium-set.  I don't like to call women

8 heavy, but she's medium-set.

9        Q.  Okay.  I understand.  I wasn't trying

10 to trap you.

11        Are you allowed to wear headbands at

12 work --

13        A.  No.

14        Q.  -- if you need one?

15        Any kind of -- anything to sort of hold

16 your hair back?  You said she was wearing a

17 ponytail.

18        A.  Well, you can wear a ponytail holder.

19        Q.  Okay.  Anything else like that?  I

20 mean, what could you use to hold your ponytail? is

21 what I'm, I guess, wondering about.

22        A.  Like a ponytail holder.  Like a little

23 -- it's like a little rubber band.

24        Q.  Okay.  That's the only thing you can

25 use or could you use like a -- you know, some other

1  thing to tie your hair back?

2         A.   Like what?  No, that's it.

3         Q.   Head scarf, something like that?

4         A.   No, that's not allowed.

5         Q.   Not allowed?

6         A.   No.

7         Q.   Nothing like that?

8         A.   No.

9         Q.   What about a bandanna?

10        A.   No.

11        Q.   Even on your uniform?

12        A.   No.

13             MR. FIELD:  Okay.  No further

14  questions, Your Honor.

15             THE COURT:  Thank you.

16             Ms. McNaught.

17                 REDIRECT EXAMINATION

18  QUESTIONS BY MS. McNAUGHT:

19        Q.   So, bandannas, can they be used as gang

20  symbols?

21        A.   Yes.

22        Q.   Is that why --

23        A.   Yes, that's why it's not allowed.

24        Q.   Do you continue to do collective strip

25  searches?

1    A. Not now because we have the males.

2    Q. Oh, right. Lincoln Correctional Center

3 is now a male institution?

4    A. Now a male institution.

5    Q. After March of 2011, when you still had

6 inmates -- female inmates at Lincoln, did you

7 continue to do collective strip searches?

8    A. Yes.

9    Q. And what happens if you have five

10 inmates such as in the dietary that you have to

11 strip-search but you only have one female officer?

12    A. At times we have stripped them like

13 that, but you monitor them all. But most likely

14 it's maybe one or two in at a time and the rest of

15 them stand outside the door, and the other officer

16 watch them, and then you bring those in after those

17 leave out.

18    Q. Now, you showed the ladies and

19 gentlemen of the jury where the female inmates were

20 when they first came in. After they were

21 strip-searched, show the ladies and gentlemen of

22 the jury where they -- where they gathered after

23 they were searched.

24    A. After they were searched, they were --

25 basically they can sit and just be quiet.

1    Q.   And how is it that you were able to

2    keep the inmates who had been strip-searched

3    separate from the ones who hadn't yet been

4    strip-searched?

5    A.   Because the ones that's been

6    strip-searched already, they were over on this

7    side.  And then once they all got stripped, then

8    they were able to come together.

9    Q.   You mentioned that Officer Hulett --

10   I'm sorry -- Warden Hulett, Assistant Warden

11   Reynolds, and Officers Leonetti, Dawdy, and

12   Anderson I think, were in and out of the gym.

13   A.   Yes.

14   Q.   Do you have a specific recollection of

15   the exact time of when it is that those personnel

16   were there?

17   A.   Our tac commander, he came in, you

18   know, to make sure everything is okay, and then

19   they left and then want back.  And because I think

20   Reynolds might have been the -- I'm not sure if he

21   was the warden at that time or the major, but he

22   was with the authority staff.

23   Q.   Okay.  And when you talk about

24   authority staff, are those folks from Springfield?

25   A.   Yes, the deputy director, the warden.

1    Q.   Well, the warden isn't from

2  Springfield.

3    A.   Well, she was with the director.

4    Q.   So, explain to the ladies and gentlemen

5  of the jury what it means by folks from

6  Springfield.

7    A.   Those are the big bosses.

8    Q.   The male officers that were in and out

9  of the gym during the strip search, they weren't

10  physically located in the areas where the strip

11  searches were being conducted; were they?

12    A.   No.

13    MS. McNAUGHT:  Nothing further.

14    THE COURT:  All right.  You may cross

15  -- or, recross.

16            RECROSS-EXAMINATION

17  QUESTIONS BY MR. FIELD:

18    Q.   The male corrections officers and

19  lieutenants and Assistant Warden Reynolds that you

20  testified were in the gym at various times during

21  the day, were they walking around the gym while

22  they were in there?

23    A.   No.  They'll come in and they'll ask a

24  question and they'll leave right back out.

25    Q.   Okay.  Well, when they came into the

1   gym, they had to walk into the gym; correct?

2        A.   Yes.

3        Q.   Okay.  So, they weren't just at the

4   door of the gym.  They were in the gym.

5        A.   They walked in the gym, in the door,

6   and sat, said what they had to say, they turned

7   around and they walked right back out.

8        Q.   Okay.  So, your testimony is that after

9   the women were strip-searched, they were asked to

10   sit in this area on the bleachers; is that correct?

11        A.   They were over in this area, yeah, in

12   the bleachers, yes.

13        Q.   Okay.

14        A.   But they all were dressed.

15        Q.   Right.  The women that were sitting in

16   the bleachers in this area here, they were facing

17   this way; correct?

18        A.   After they got strip-searched, yes.

19        Q.   Okay.  So, they could certainly see

20   into the bathroom.

21        A.   No, because there was a curtain up

22   there.

23        Q.   But they weren't facing the wall away

24   from the strip search?

25        A.   But you can't see through the curtain.

1       MR. FIELD:  Okay.  So -- that's all

2   right.  No further questions.

3       THE COURT:  Thank you.

4       MS. McNAUGHT:  Nothing further.

5       THE COURT:  Very well.  Thank you very

6   much, ma'am.  You may step down.

7       And are we finished with this witness?

8       MS. McNAUGHT:  Yes, Your Honor.

9       MR. FIELD:  Yes, Your Honor.

10      THE COURT:  Very well.  You're excused.

11  Thank you so much.

12              (Witness excused)

13      THE COURT:  And who is our next?

14      MS. BARNES:  Kim Johnson.

15      THE COURT:  Kim Johnson.

16          KIMBERLY ANN JOHNSON,

17  of lawful age, produced, sworn, and examined on

18  behalf of the Defendants, testifies and says:

19      THE COURT:  Right up here in this

20  chair.  And please lean into the microphone, if you

21  would.

22      THE WITNESS:  Yes, sir.

23          DIRECT EXAMINATION

24  QUESTIONS BY MS. BARNES:

25      Q.  Good morning, Ms. Johnson.

1      A.   Good morning.

2      Q.   Would you state your name and spell it

3 for the court reporter, please?

4      A.   Kimberly Ann Johnson, K-i-m-b-e-r-l-y

5 A-n-n J-o-h-n-s-o-n.

6      Q.   Ms. Johnson, are you employed?

7      A.   Yes, I am.

8      Q.   Where?

9      A.   At Logan Correctional Center.

10      Q.   What do you do?

11      A.   A women/family service counselor.

12      Q.   Were you ever employed at -- well, how

13 long have you been with the Department of

14 Corrections?

15      A.   Sixteen and a half years.

16      Q.   Were you ever employed at Lincoln?

17      A.   Yes, ma'am.

18      Q.   I'd like to draw your attention to

19 March the 31st, 2011, when a group -- mass

20 shakedown and strip search was conducted.  Do you

21 remember that day?

22      A.   Yes, ma'am.

23      Q.   Okay.  Would you tell the jury, please,

24 what you did in the morning that day?  What I want

25 to do is walk -- walk you through what was going on

1   with you that day.

2        A.   As much as I can recall.  I remember

3   that day being notified by my tac commander that

4   the cadets from the training academy would be

5   coming on grounds to actually get some training as

6   far as conducting shakedowns and strip searches.

7        Q.   Were you on the tac team?

8        A.   Yes, ma'am.

9        Q.   Okay.  And were you suited up in your

10  orange gear?

11       A.   Once I was notified by my tac

12  commander, yes, ma'am, I was suited.

13       Q.   Okay.  What -- well, just tell the jury

14  what you did first after you were suited up.

15       A.   I pretty much waited on instructions

16  from the tac commander.  I believe we waited until

17  they got on grounds.  And we left the tac room and

18  went to the sally port, where we met the cadets and

19  the instructors.

20       Q.   And what did you do after that?

21       A.   We actually headed to Housing Unit 2.

22       Q.   Okay.  And this ground has been plowed

23  many times, so I want you to skip to when you

24  escorted the members of the housing unit over to

25  the gym.  Did you participate in walking them from

the unit to the gym -- housing unit to the gym?

A.   Yes, ma'am.

Q.   During that escort did you hear any
cadet or fellow tactical team officer say anything
degrading to any of the inmates who were being
escorted?

A.   Absolutely not, no.

Q.   If you had heard such a thing, what, if
anything, would you have done?

A.   First and foremost, I would have
probably said something to my fellow staff,
especially a cadet.  Because, you know, being
around so many years, you understand that you can
just not -- you can't talk to people like that.
You know, you can get a lot more accomplished and,
you know, without frustration if you address
offenders as people.  And I would have said
something.  So, no, ma'am, I did not hear that.

Q.   Okay.  So, once you got to the gym,
what did you do?

A.   I believe we just stood around making
sure that the ladies were acting appropriately, not
being loud.  We had quite a few women in the gym at
that time, so we were just making sure that
everything was orderly.  We had the cadets there as

1  well.  So, we were just waiting to uncuff them and

2  conduct the strip searches.

3      Q.  Did you conduct strip searches?

4      A.  Yes, ma'am.

5      Q.  Where?

6      A.  In the restroom in the gym.

7      Q.  There's been a lot of testimony in this

8  -- or, not a lot of testimony, some testimony in

9  this case that men could see into the -- into the

10  bathroom.  What is your recollection of the

11  provisions made for the bathroom that day?

12      A.  Absolutely not.  Like we had done it

13  hundreds of times, we had a screen covering.  It

14  was a sheet and it was like a PVC plastic.  And we

15  had used that hundreds of times, like I said, when

16  we did strip searches in the gym.

17      Q.  Now, I want you to tell the jury about

18  doing the strip searches.  How many of you -- how

19  many women did you take into the bathroom?

20      A.  The way I remember it, it was like

21  maybe four staff members and we each had a -- we

22  had several cadets in there.  The women would come

23  into the restroom.  And I was actually giving the

24  orders as far as what to do when conducting the

25  strip.  I had my cadet there on the side of me,

1   showing her -- telling her what we're looking for,

2   why we do this.  And actually, I remember handing

3   the clothes that the women would remove to the

4   cadet so she could actually help out and search the

5   clothing that was part of a strip search.  You had

6   to search the clothing to make sure there was no

7   contraband or anything in there.

8       Q.  Okay.  Then there's also been some

9   testimony that women had to stand in blood, bodily

10   fluids, and had dirty pads around them.  What do

11   you remember about the condition of that bathroom?

12       A.  No, ma'am.  There was not urine, blood,

13   or feces on the floor.  That's not true.  No,

14   ma'am.  We had -- we actually had -- because right

15   next to the bathroom it was a closet and that's

16   where we had extra padding.  You had a -- it was a

17   toxic closet.  We called it a toxic closet.  And we

18   had actual disinfectant, bleach, different things

19   in there at all times, every shift.  So, if it

20   had've been something on the floor, we would have

21   had it cleaned up.  But, no, ma'am, there was

22   nothing on the floor.

23       Q.  Let's talk about blood on the floor.

24   Would -- I'm not sure how to phrase this.  Why if

25   -- why would that be a concern to you as a staff

member if there was blood all over the floor?

A.   First and foremost, I have a family outside of my job.  Blood -- we all know that blood is contagious, carries a lot of air, you know --

Q.   Pathogens?

A.   Yeah, pathogens.  So, no, I wouldn't be standing myself on a floor that had blood, feces, or urine, and I would not, definitely not have other people standing in that -- in that type of condition.  I just wouldn't do that.

Q.   The menstruating women, how did they handle the squat and cough thing?

A.   Usually they would squat over the toilet.  If they said, "Well, Ms. Johnson, I'm on my cycle," go over the toilet, squat and cough, and remove -- if they had a tampon on, it would have to be removed, of course.  And then they were given a pad or something to go back to the unit.

Q.   Okay.  Did you ever tell the women to shut up?

A.   No.  I -- I've probably told them to be quiet if they were talking.  But actually, by the time we got into the restroom for the strip search, nobody was talking.  Like I said, when we first entered into the gym, at that time I was standing

1  around and I was telling the ladies, "You be quiet,

2  stand here."  They complained about the cuffs.

3  "Ladies, this is routine.  We got to get through

4  this, then you'll get back to your housing units."

5  But, no, I can't recall saying shut up.

6      Q.  Do you remember -- there's been a lot

7  of testimony about how long the women were cuffed

8  or uncuffed or when they -- what do you remember

9  about the cuffing?

10      A.  I remember we had a lot of people that

11  were like medically -- had medical conditions.  I

12  remember we uncuffed them right away.  But they had

13  to remain cuffed until we got everybody, if I

14  recall right, in the gym.  And then as someone

15  removed the cuffs, that's when they were able to

16  come into the restroom to get strip-searched.

17      MS. BARNES:  Okay.

18      THE COURT:  Ms. Barnes, would this be a

19  good moment to recess?

20      MS. BARNES:  Actually, I'm almost -- I

21  think I am -- unless I -- Ms. McNaught has one

22  question for me and then we'll be done.

23      THE COURT:  Okay.  You go right ahead.

24      Q.  Were the inmates strip-searched in the

25  gym bathroom or the staff bathroom?

1          A.   Gym.

2          Q.   Okay.

3          A.   In their restroom.  They had a restroom

4    for staff and one for the offenders.  We were in

5    the offenders' bathroom.

6          Q.   Was that staff restroom used?

7          A.   No, ma'am.

8               MS. BARNES:  Okay.  Thank you.  I'm

9    done.

10              THE COURT:  All right, fine.

11              Well, then, Mr. Field or whoever is

12   going to cross, it will be right after lunch.  All

13   right?

14              It is 12 high, time for lunch.  Recall

15   the admonition.  And we'll see you back here at

16   1:30.

17              We'll stand in recess, Madam Clerk.

18                   (Court was then in recess.)

19                   (The jury entered the courtroom.)

20              THE COURT:  Thank you, everyone.

21              All right.  We're all in place and

22   ready to proceed.

23              Mr. Field.

24              MR. FIELD:  Thank you, Your Honor.

25              THE COURT:  You may cross for

1  Ms. Johnson.

2                    CROSS-EXAMINATION

3  QUESTIONS BY MR. FIELD:

4        Q.   Good afternoon, Officer Johnson.  You

5  testified this morning that you were on the

6  tactical team on March 31st, 2011; is that correct?

7        A.   Correct.

8        Q.   Were you a part of the briefing that

9  the tactical team received that morning?

10       A.   Yes.

11       Q.   Do you recall what that briefing was

12  about?

13       A.   That the cadets from the academy would

14  be on grounds to conduct shakedowns and we were to

15  assist.

16       Q.   Okay.  That the cadets were going to be

17  on the grounds for a training exercise?

18       A.   Yes, sir.

19       Q.   Were you informed at that briefing what

20  units you would be shaking down?

21       A.   I can't recall.

22       Q.   Okay.  Do you recall if there was

23  anything about Unit 2B or 4B that was said at all

24  during that briefing?

25       A.   I think maybe they said 2, we're going

1   to House 2.

2        Q.   Okay.  Nothing about excessive

3   contraband or violence in those units to make those

4   the two places that the cadets were going to be

5   taken for the training exercise?

6        A.   No.

7        Q.   Were you detailed to the gym that day?

8        A.   Well, I was detailed to the tactical

9   unit, which I went to Housing Unit 2 and then I was

10  actually escorting the offenders to the gym, and I

11  remained in the gym, yes.

12       Q.   Okay.  Who else was in the gym that day

13  in terms of corrections officers and other IDOC

14  staff that you recall?

15       A.   We had -- there was officers there.  We

16  had the director, Deb Denning, our director.  We

17  had wardens there, I believe.  We had --

18       Q.   Well, I want to know -- I want to know

19  who you recall actually seeing there that day.  Do

20  you recall Assistant Warden Reynolds being there in

21  the gym that day?

22       A.   Yes, I saw him walking around the gym,

23  yes.

24       Q.   Okay.

25       A.   Correct.

1    Q.   What about Officer Anderson, was he

2  there that day?

3    A.   I can't recall Anderson being there.

4    Q.   Okay.  What about Officer Dilly, was in

5  the gym that day?

6    A.   I don't remember, sir.  He's part of

7  the tac team, but I can't remember.

8    Q.   Okay.

9    A.   For the most part, the male tac members

10  were kind of like hanging out on the units

11  assisting the cadets with showing them how to do a

12  proper shakedown.

13    Q.   But some of the male tac team members

14  were also detailed to the gym as extra security;

15  isn't that right?

16    A.   I saw male tactical staff there as

17  well.  Yes, sir.

18    Q.   Okay.  And they were walking around the

19  gym as well, like Assistant Warden Reynolds?

20    A.   They were in and out per se, I think.

21  Kind of like in and out.  And I really can't

22  recall, because I was, like I said, in the bathroom

23  actually doing strip searches.

24    Q.   Right.  But you recall male tactical

25  officers being in the gym that day?

1          A.   They helped escort the line, yes, sir.

2          Q.   What about Officer Rickford, was he in

3     the gym that day?

4          A.   I can't recall Officer Rickford being

5     there.

6          Q.   Okay.  Did you see Warden Hulett there?

7          A.   I can't even recall Warden Hulett being

8     there.  Maybe she was.

9          Q.   Okay.  Now, you testified this morning

10    that once you escorted the inmates into the gym or

11    the line of inmates that you escorted in the gym,

12    you sort of stood around waiting for the remainder

13    of the inmates to be brought in; is that correct?

14         A.   Yes.

15         Q.   Okay.  And while you were waiting for

16    the remainder of the inmates to be brought in, the

17    inmates that were in the gym were left handcuffed;

18    correct?

19         A.   Yes.  They were handcuffed when they

20    went inside the gym, yes.

21         Q.   Sure.  And no inmates were handcuffed

22    from Unit 2B until all of the inmates were in the

23    gym; is that correct?

24         A.   You know what, I can't recall.

25    Seriously, I can't.  It's been five years.

1      Q.   Sure.  But when they were brought into

2  the gym, at the very least, they were in handcuffs;

3  correct?

4      A.   Yes, they were in handcuffs.

5      Q.   And they were lined up in handcuffs?

6      A.   Yes, yes, absolutely.

7      Q.   I believe your testimony was that when

8  you were doing strip searches in the gym bathroom

9  you had four staff members with you and several

10  cadets; is that correct?

11      A.   Yes.

12      Q.   Okay.  Do you recall the number of

13  cadets?

14      A.   I don't know if it was two, three.  I'm

15  not sure exactly the number of cadets.

16      Q.   Okay.  And the four staff members was

17  on top of you being there as well; is that correct?

18      A.   No, it was three and myself.

19      Q.   Okay.  So, four officers and at least

20  two or three cadets; correct?

21      A.   Yes.

22      Q.   Okay.  And how many inmates would have

23  been brought into the bathroom at a time?

24      A.   It would have been four.  Because we

25  brought -- each staff member brought an offender

1  in, and we had the cadets kind of standing by

2  watching the proper technique for a strip search.

3       Q.   So, there would have been at least four

4  inmates, four staff members, and two or three

5  cadets in the bathroom at any given time?

6       A.   Yes.

7       Q.   Okay.   There's been some testimony

8  about the closet that was in the gym bathroom.   I

9  believe you called it the toxic closet?

10      A.   Yes.

11      Q.   Is that right?

12      A.   Yes, sir.

13      Q.   Did you have the key to the toxic

14  closet that day?

15      A.   I did not have the key, no.

16      Q.   Do you recall who had the key to the

17  toxic --

18      A.   I cannot recall.   Well, first and

19  foremost, the key -- if we had like any

20  administrator there, they would have pulled keys,

21  so they would have had the access to that key.   If

22  it was a gym officer assigned to that unit, he or

23  her would also have the keys.

24      Q.   But you --

25      A.   But I didn't personally have the keys,

1  no.

2      Q.   And you don't recall who on that day

3  had the keys to that closet?

4      A.   No, sir.

5      Q.   Now, you testified that when you

6  brought the women into the gym and you were waiting

7  to take their handcuffs off, you immediately took

8  off the cuffs of those women who had medical

9  conditions; is that correct?

10      A.   As they complained.

11      Q.   Okay.  So, I just want to understand

12  what the process was.

13      A.   All right.

14      Q.   Were the cuffs removed as soon as they

15  complained?

16      A.   Pretty much so.  Within the next

17  probably five minutes they were complaining.  Like

18  I said, we had administration there.  We had the

19  actual tac commander there, statewide tac

20  commander, as well as my tac commander.  So, they

21  made the call to remove the cuffs for -- from the

22  women that were complaining.

23      Q.   Well, when you say your state tac

24  commander was there, do you mean he was in the gym

25  or was he somewhere on the grounds?

1      A.   He was somewhere on grounds.

2      Q.   Okay.

3      A.   Could have been in the gym.

4      Q.   And so, what -- I just want to figure

5 out who it is that you know that -- who it was that

6 was making the decisions based on medical necessity

7 to remove the cuffs.  What is the basis of your

8 knowledge for that?

9      A.   Could you please repeat that?

10      Q.   Sure.  How do you know that -- who was

11 making the decision to remove cuffs based on

12 medical necessity?

13      A.   Well, this is what I do know:  I do

14 know, being on the tac team, we have a chain of

15 command.  We have a tac commander.  They make the

16 decisions.  Whenever we're doing any type of

17 tactical detail, they make the decisions.  So, if

18 they -- if we went to them and said, you know,

19 Ms. So and So is complaining, says the cuffs, you

20 know, is hurting her bad arm, you know.  And they

21 were also informed when they -- when we brought

22 them over to the gym, if they had any type of

23 medical conditions, they needed to bring their

24 paperwork.  If they had like an asthma pump or

25 anything like that, they had to bring it.  So, for

the most part, the ones that had medical -- legit

medical issues, they had paperwork saying, you

know, this is a medical condition.

Q. Sure. But you as a tactical officer

could not make the decision to remove those cuffs;

correct?

A. No, absolutely not.

Q. You'd have to go to your commander;

correct?

A. Yes, sir.

Q. And your commander would have to go up

the chain of command as well; correct?

A. No.

Q. They could make the decision on their

own?

A. Yes, sir.

Q. Okay. And what about in terms of the

time -- timing when the handcuffs would be removed,

that would be a decision that was made by your

commander as well; correct?

A. Yes.

Q. And that's for all inmates, not just

the ones with medical necessities; correct?

A. Yes.

Q. You were detailed in your tactical gear

1  that day?

2       A.  Uh-huh, yes.

3       Q.  And you were involved in doing strip

4  searches?

5       A.  Yes.

6       Q.  Okay.  There's been a lot of testimony

7  about the tactical gear, but you had your baton

8  that day?

9       A.  Actually, the way the procedure went,

10  when you're going on a -- a detail, which is a

11  tactical detail, you actually have your baton and

12  your -- all your gear on.  But once we actually get

13  to the location, we actually remove our helmets as

14  well as our baton and our -- a lot of times we

15  would remove our vests.  Because when you're

16  actually working and, you know, it gets really warm

17  with all that stuff on.  So, we actually had

18  removed those three items and set it over in the

19  gym on the side, and we just kind of like had it

20  lined up on the side, sir.

21       Q.  So, those items would have been removed

22  when you got to the gym.  Is that your testimony?

23       A.  Yes.  Eventual -- by the time I got in

24  to do the strip searches, I no longer had that gear

25  on because I knew I was going to be in an enclosed

unit with four, five, six people.  And, you know,
people draw heat.  So, we always remove it.  Even
if we were doing like a shakedown on the unit, we
would always remove the helmet, the baton, as well
as the vest.

     Q.   So, there were batons and helmets that
were just sitting on the floor in the gym.  Is that
your testimony?

     A.   They were monitored on the side of the
gym by additional staff.

     Q.   Do you recall who the staff --

     A.   No, sir.

     Q.   -- member was?

     A.   I do not recall.

     Q.   But your testimony is there was
somebody that was placed on that gear to guard it
during the strip search?

     A.   Sir, I cannot say they were placed on
that gear, but it was a lot of staff there and
someone was actually there watching the gear.

     Q.   There was a lot of staff in the gym?

     A.   Yes, sir.

     Q.   So, there would have been a lot of
people?

     A.   Tons of staff, administration, yes,

1  sir.

2      Q.   Including male staff?

3      A.   In and out, yeah, male staff, yeah,

4  they were in and out.

5           MR. FIELD:  No further questions, Your

6  Honor.

7           THE COURT:  Thank you.

8           THE COURT:  Redirect?

9              REDIRECT EXAMINATION

10 QUESTIONS BY MS. BARNES:

11     Q.   Ms. Johnson, I just want to clear one

12 thing up.  Counsel asked you about your movements

13 that day and you said you went to 2B.  Right?

14     A.   We -- yes, we left from --

15     Q.   Okay.

16     A.   Yes, ma'am.

17     Q.   Were you in the dayroom?

18     A.   Usually when you come on a unit, you

19 were in the dayroom, maybe walking down the halls,

20 making sure everybody got ready to, you know, leave

21 the unit and be transported.

22     Q.   Yes.  There's been some testimony that

23 the inmates were staged there in the dayroom before

24 they went to the gym.

25     A.   Yes.

1          Q.   Do you remember that?

2          A.   Yes, ma'am.  Usually they're given an

3     order to come out of their cells or the dorms there

4     and to grab any important medications and paperwork

5     that they needed, and then they were all in the

6     dayroom until they got escorted over.

7          Q.   And while you were in the dayroom, did

8     you hear any officer, tac team member, or cadet

9     verbally abuse any inmate?

10         A.   No.

11              MS. BARNES:  Okay.  Thank you.  That's

12    all I have.  Oh, that's not all I have.

13         Q.   Part of your equipment is a radio?

14         A.   Yes.

15         Q.   And you are -- Counsel asked you about

16    how people knew what.  You were able to communicate

17    with that radio?

18         A.   Yes, ma'am.  Radios, as well as keys,

19    you keep on you at all times.

20         Q.   Okay.

21         A.   Yes.

22         Q.   And could you hear things on that radio

23    too?

24         A.   Yes, ma'am.

25         Q.   So that you knew what was going on and

the traffic going on?

A.   Yes, ma'am.

        MS. BARNES:  Okay.  Thank you.

        THE COURT:  Mr. Field?

                RECROSS-EXAMINATION

QUESTIONS BY MR. FIELD:

        Q.   During the shakedown of Unit 2B before
you brought the women over to the gym, you weren't
in the dayroom for the entire time that you were in
there; correct?

        A.   No, sir.

        Q.   Okay.  So, if there were comments made
in the dayroom to the women who were cuffed in
there and waiting to be transported to the gym, you
would not have overheard those comments?

        A.   It's possible I wouldn't, no, if I was
down the hall.

        MR. FIELD:  All right.  Thank you.

        THE COURT:  Ms. Barnes?

        MS. BARNES:  Nothing, Your Honor.

        THE COURT:  Very well.  Thank you very
much, Ms. Johnson.  You may step down.

        And is Ms. Johnson excused?

        MS. McNAUGHT:  Yes, Your Honor.

        MR. FIELD:  Yes, Your Honor.

1          THE COURT:  From both sides.  Very

2    well.  Thank you.

3                    (Witness excused)

4          THE COURT:  You may call your next.

5          MS. McNAUGHT:  Dominique Crudup.

6                    DOMINIQUE CRUDUP,

7    of lawful age, produced, sworn, and examined on

8    behalf of the Defendants, testifies and says:

9          THE COURT:  Right up here, please.

10   Have a seat, and lean into the microphone.

11                  DIRECT EXAMINATION

12   QUESTIONS BY MS. McNAUGHT:

13         Q.   Good afternoon.

14         A.   Good afternoon.

15         Q.   For the record, would you please state

16   your name and spell it for the court reporter?

17         A.   Dominique Crudup, D-o-m-i-n-i-q-u-e,

18   Crudup, C-r-u-d-u-p.

19         Q.   Are you currently employed?

20         A.   Yes.

21         Q.   And how are you employed?

22         A.   What do you mean?

23         Q.   What's your job?

24         A.   Department?

25         Q.   Where do you work?

1      A.   St. Charles, Department of Juvenile

2  Justice.

3      Q.   And how long have you worked for the

4  Department of Juvenile Justice?

5      A.   Little over three years.

6      Q.   And prior to being employed by the

7  Department of Juvenile Justice, where did you work?

8      A.   Lincoln Correctional Center.

9      Q.   In what capacity?

10     A.   I used to be a C/O.

11     Q.   Does that stand for correctional

12  officer?

13     A.   Yes, ma'am.

14     Q.   Were you a correctional officer at

15  Lincoln Correctional Center on March 31st of 2011?

16     A.   Yes, ma'am.

17     Q.   When you started your day on March 31st

18  of 2011, where were you at the correctional center?

19     A.   On a housing unit.

20     Q.   Do you remember which one?

21     A.   I believe House 3.

22     Q.   House 3?

23     A.   Yes.

24     Q.   And were you told to go someplace else

25  at some point?

1  A.  Yes, ma'am.

2  Q.  And where were you told to go?

3  A.  To House 2.

4  Q.  Did you go to House 2?

5  A.  Yes.

6  Q.  And where were you on House 2?

7  A.  In the vestibule area.

8  Q.  Did you see anything in House 2A when

9  you got there?

10  A.  The inmates on House 2A were throwing

11  away things, flushing things down the toilet,

12  because they thought that we were going to come

13  over there after we left 2B.

14  Q.  So, did you go to 2B then?

15  A.  Yes.

16  THE COURT:  Ms. Crudup, would you lean

17  right into that microphone, please?  Thank you.

18  Q.  At some point did you leave Housing

19  Unit 2B and go over to the gym?

20  A.  Yes.

21  Q.  And when you went over to the gym, what

22  was your assignment initially?

23  A.  To observe the cadets strip-searching

24  the female inmates.

25  Q.  In what area?

1      A.   The inmate bathroom.

2      Q.   And what, if anything, was in front of

3  the inmate bathroom?

4      A.   What do you mean?

5      Q.   Was there a curtain in front of the

6  inmate bathroom?

7      A.   Oh, yes.

8      Q.   About how many staff and -- were cadets

9  with you when you were in the inmate bathroom?

10     A.   Yes.

11     Q.   About how about staff and cadets were

12  in the inmate bathroom when you were in there?

13     A.   I can't recall the exact number.

14     Q.   Were you in multiples?  More than one

15  at a time?

16     A.   Yes.

17     Q.   And what was your job in the inmate

18  bathroom when the strip searches were going on?

19     A.   To show the cadets how to conduct a

20  strip search.

21     Q.   Did you hear any of the cadets or any

22  staff in the inmate bathroom make any kind of

23  derogatory statements towards any of the inmates?

24     A.   No.

25     Q.   Did you make any derogatory statements

towards any of the inmates that were being searched

in the inmate bathroom?

A.   No.

Q.   Did you -- were you wearing a bandanna,

a black and white bandanna that day?

A.   No.

Q.   And how do you know that you weren't

wearing one?

A.   Because it's against our uniform policy

code.  We're not allowed to wear bandannas or bring

them in the facility at all.

Q.   Now, at some point did you leave the

inmate bathroom and go to another part of the gym

where searches were being conducted?

A.   Yes.

Q.   Where was that?

A.   The beauty shop.

Q.   And were there other correctional staff

in the beauty shop along with you?

A.   There could have been.  I'm not sure.

There was a lot going on.  There could have been.

I don't know.

Q.   Were there cadets in the beauty shop

with you?

A.   Yes.

1       Q.   And what was your position?  What was

2    it that you did that day in the beauty shop?

3       A.   I stood at the door.

4       Q.   Would that be the door between --

5       A.   The gym.

6       Q.   -- the gym and the beauty shop?

7       A.   Yes.

8       Q.   And describe for the ladies and

9    gentlemen of the jury what that door looks like.

10      A.   It's a big steel or metal door with no

11   windows.

12      Q.   It's solid?

13      A.   Yes.

14      Q.   Did you hear any staff or cadets in the

15   beauty shop make any inappropriate comments to the

16   inmates being searched?

17      A.   No.

18      Q.   Did you make any inappropriate comments

19   to the inmates being searched in the beauty shop?

20      A.   No.

21      Q.   Did you hear any derogatory or profane

22   language being used by any staff in the beauty

23   shop?

24      A.   No.

25      Q.   Did you yourself make any kind of

1  derogatory or profane comments towards any of the

2  inmates being searched?

3      A.  No, ma'am.

4      Q.  Did you see any blood, urine, or feces

5  on the floor of the beauty shop where inmates were

6  being strip-searched on March 31st of 2011?

7      A.  No, ma'am.

8      Q.  Did you see any blood, feces, or urine

9  in the inmate bathroom while inmates were being

10 searched on March 31st of 2011?

11     A.  No, ma'am.

12     Q.  Did you see tampons being thrown on the

13 floor in either the beauty shop or the bathroom?

14     A.  No, ma'am.

15     Q.  Was the officer or the staff bathroom

16 used for searches of inmates on March 31st of 2011?

17     A.  I don't recall if it was used that day

18 for anything.

19     Q.  Did you ever tell inmates that they

20 couldn't use sanitary napkins after they had been

21 searched on February 31st of 2011?

22     A.  No.

23     Q.  Did you tell inmates that they couldn't

24 throw away sanitary napkins after they had been --

25 or, while they were being searched on March 31st of

1  2011?

2       A.   No.

3       Q.   If Delores Henry had said that you

4  asked a cadet if she was ready for this because

5  inmates smelled bad, would that be true?

6       A.   No.

7       Q.   If Delores Henry said that you said

8  inmates smelled bad, would that be true?

9       A.   No.

10      Q.   If Ieshia Brown said you had a black

11 and white bandanna on, would that be true?

12      A.   No.

13      Q.   If Ieshia Brown said that you said,

14 "Get these bitches out of here," would that be

15 true?

16      A.   No.

17      Q.   If Jacqueline Hegwood said that you

18 told cadets they could strip in the staff bathroom

19 before the door was closed, would that be true?

20      A.   No.

21      Q.   If Patricia Phillips said you had a

22 bandanna over your nose and were talking about

23 women stinking, would be that true?

24      A.   No.

25      Q.   If Millie Lee said, "I don't give a

fuck if men can see them," meaning the inmates,

would that be true?

      A.  No.

      MS. McNAUGHT:  Just a moment, Your

Honor.

      THE COURT:  Surely.

      MS. McNAUGHT:  Nothing further.

      THE COURT:  You may cross.

           CROSS-EXAMINATION

QUESTIONS BY MS. THOMPSON:

      Q.  Good afternoon, Ms. Crudup.

      A.  Hello.

      Q.  It's your testimony that you started on

House 3 the morning of March 31st as your

assignment?

      A.  Yes.

      Q.  And if you had stayed on House 3 that

day for your shift, what would have been your

responsibilities?

      A.  To run that housing unit.

      Q.  What do you mean by running that

housing unit?

      A.  If the inmates needed anything, get it

for them.  If they had to go somewhere -- they

probably wouldn't have been able to go, but just --

1    my job is to make sure that that unit is safe and

2    secure.

3          Q.   And do you do that job by sitting in

4    the controlled area of the unit?

5          A.   It depends.  You have to walk around,

6    do wing checks, make sure nothing is going on in

7    the dorms, the dayrooms.

8          Q.   Would you -- I'm sorry.  Go ahead.

9          A.   You just don't sit.

10         Q.   Is there a desk that you're stationed

11   at from where you would go do your job in that

12   unit?

13         A.   Yes.

14         Q.   Okay.  Now, you said that when you

15   walked into Housing Unit 2 that morning that you

16   were in the vestibule; is that right?

17         A.   Yes.

18         Q.   And is the vestibule the area between

19   2A and 2B?

20         A.   Yes.

21         Q.   And after you were in the vestibule,

22   did you end up going into the dayroom area of 2B?

23         A.   Yes.

24         Q.   And after going into the dayroom area

25   of 2B, did you leave Housing Unit 2 and go to the

gym?

A.   Yes.

Q.   So, from the vestibule area of Housing Unit 2 are you looking down a hall into 2A?

A.   No.

Q.   Well, what -- what parts of 2A can you see from the vestibule between 2A and 2B?

A.   You can see down the hall, you can see the dayroom, and you can see the water fountain and the garbage.

Q.   Okay.  Are there any other parts of 2A that you can see from the vestibule?

A.   The phones.

Q.   Okay.  And so, where were you seeing people throwing things away in 2A as you were standing in the vestibule?

A.   The garbage is right by the door, so ...

Q.   How close to you was the garbage when you saw people throwing things into it?

A.   It wasn't close.  It's about as far as that stand is.

Q.   You're referring to sort of the edge of the jury box there?

A.   Yes.

1    Q.   Okay.  And could you actually see the
2  people that were throwing things in the garbage?
3    A.   Yes.
4    Q.   Okay.  And how long were you in Housing
5  Unit 2 before you went to the gym?
6    A.   I can't say.
7    Q.   Okay.  Well, while you were in Housing
8  Unit 2, did you go report that there were people
9  throwing away contraband in 2A?
10    MS. McNAUGHT:  Objection.  She didn't
11  say contraband.  She just said things were being
12  thrown away.  So, it misstates the evidence.
13    THE COURT:  I believe that's correct.
14  Let's clean it up.
15    MS. THOMPSON:  Okay.
16    Q.   You said that people were throwing
17  things away because they thought you were coming
18  there next; right?
19    A.   Yes.
20    Q.   So, was it your suspicion they were
21  throwing away contraband?
22    A.   Could have been throwing away anything.
23    Q.   Okay.  Well, did you go report that you
24  had a suspicion that people might be throwing away
25  contraband?

1    A.  I didn't have a suspicion they were

2  throwing away contraband.  I just seen them

3  throwing away things.

4    Q.  But you -- you said that your concern

5  was you were going to go there next.  So, didn't

6  you have a suspicion?

7    A.  That was not my concern.  That was

8  their concern.

9    Q.  Let me restate what I said.  Let me

10  restate the question.

11    You said that it was your assumption

12  that they were throwing things away because they

13  were worried that you all were coming there next;

14  right?

15    A.  That's not what I said.

16    Q.  Okay.  Well, did you go check the

17  garbage can to see if what they'd thrown away was

18  contraband?

19    A.  No.

20    Q.  Were you at all worried that what you

21  saw was someone throwing away contraband?

22    A.  That unit had an officer there.

23    Q.  Did you tell that officer --

24    A.  That officer observed and did

25  everything they were supposed to do.  If that

officer seen them throwing away contraband, they

would have reported it.

Q.   Well, where --

A.   They were closer than I am.

Q.   Okay.  But did you tell that officer,

"Hey, did you see what just happened?"

A.   No.

Q.   Did you --

A.   Why would I?  That's not an unusual

thing for inmates to throw things in the garbage.

I wouldn't have reported that.

Q.   Okay.  So, there was really no reason

for you to think that that had anything to do with

suspicion about what you guys were doing there

then; right?

A.   I didn't say that's what I thought.  I

said that they thought that we were coming there

next and that's what was told to me from their

housing unit officer.

Q.   So, the throwing things away was really

not a suspicious act for you then; right?

A.   No.

Q.   Okay.  Now, did you help escort inmates

to the gym from Housing Unit 2?

A.   Yes.

1    Q.   Okay.  And when you got to the gym with

2    the inmates, how long was it before you started

3    searching women in the inmate bathroom?

4    A.   Almost immediately.

5    Q.   Can you give us an estimate of how long

6    that was?

7    A.   I cannot.

8    Q.   And when you got -- well, let me ask

9    you this:  How did you learn what it is that you

10   were going to be doing in the gym?  Who gave you

11   that assignment?

12   A.   I don't recall.

13   Q.   But did you know before you got to the

14   gym that you were going to be doing strip searches

15   there?

16   A.   Yes.

17   Q.   When you were standing at the door of

18   the beauty shop, is part of what you were doing

19   opening and closing that door so that people could

20   get in and out of the beauty shop?

21   A.   Yes.

22   Q.   Did you have a set of keys for the gym

23   that day?

24   A.   No.

25   Q.   Who had a set of keys for the gym?

1        A.   Lieutenant; the armory; if we have a

2  gym officer, the gym officer.

3        Q.   Who was the gym officer that day?

4        A.   I don't know.

5        Q.   But that person would have been in the

6  gym during this time?

7        A.   Probably not.

8        Q.   Are there parts of the gym officer's

9  job that are not in the gym?

10       A.   The gym officer is in the gym when

11  inmates are in the gym when we have gym lines.  If

12  we don't have gym lines, then they do other things

13  in the facility.

14       Q.   So, they might not have even been there

15  with the keys at that time that you were doing

16  these searches?

17       A.   (Nodded head up and down.)

18       Q.   Is that right?

19       A.   Yes.

20       Q.   Okay.  Were there members of the staff

21  that you saw using the staff bathroom in the gym

22  while you were there doing these searches?

23       A.   I don't recall that being used at all.

24       Q.   How long were you in the gym that day

25  doing these searches?

1      A.   I can't say.

2      Q.   After you finished with the strip

3  searches, was there anything else you did in the

4  gym?

5      A.   As far as?

6      Q.   Well, when you were done with the strip

7  searches, did you immediately leave the gym or did

8  you do anything else in the gym before you left?

9      A.   No.

10     Q.   Whose job was it to -- well, let me ask

11  you a better question.

12          Is there a particular position whose

13  job it is to clean the gym on some -- you know,

14  every so often or after some period of time?

15     A.   The gym porters.

16     Q.   Are those inmates?

17     A.   Yes.

18     Q.   And how often do porters clean the gym?

19     A.   Every day.

20     Q.   And at what times do porters clean the

21  gym?

22     A.   The morning and evening.

23     Q.   Okay.  And were you wearing gloves

24  while you were doing these searches?

25     A.   No.  Because I wasn't doing the

searches.

Q. Well, you were instructing -- you said that it was your job to show cadets how to conduct strip searches; right?

A. Yes.

Q. But you yourself were not doing the searches?

A. No.

Q. So, how were you showing cadets how to do the searches?

A. They would stand next to me. I would tell them what to do.

Q. And then they would be doing it?

A. Yes.

Q. Did you see an Officer Anderson in the gym at any point on this day?

A. No.

Q. What about an Officer Rickard?

A. No.

Q. What about Wendy Joiner?

A. No.

Q. Did you see an Officer Dilly in the gym that day?

A. No.

Q. How much of the time that you were in

the gym was spent in the bathroom versus standing

outside the beauty shop door?

        A.   I don't know.

        Q.   I mean, were you spending more time in

the bathroom than you were at the beauty shop or

more time at the beauty shop door than in the

bathroom?

        A.   I don't know.

        Q.   During the time that you were

instructing cadets about how to do strip searches

in the bathroom, did you take any breaks?

        A.   No, not that I recall.  During strip

searches?

        Q.   Yeah.  Did you --

        A.   Not that I recall.

        Q.   -- come out into the gym to take a

break and then go back inside the bathroom?

        A.   Not that I recall.

                MS. THOMPSON:  Just one moment, Your

Honor.

                THE COURT:  Surely.

                MS. THOMPSON:  No other questions, Your

Honor.

                THE COURT:  All right.  Redirect?

                        REDIRECT EXAMINATION

1   QUESTIONS BY MS. McNAUGHT:

2       Q.  When the searches were going on in the

3   beauty shop, were you standing on the inside or the

4   outside of the door?

5       A.  The inside.

6         MS. McNAUGHT:  Nothing further.

7         THE COURT:  Ms. Thompson?

8         MS. THOMPSON:  Nothing further, Your

9   Honor.

10        THE COURT:  Thank you very much.

11        All right, Officer, you may step down,

12   Ms. Crudup.  Thank you.

13        And is this witness excused, ladies and

14   gentlemen?

15        MS. McNAUGHT:  Yes, Your Honor.

16        MR. FIELD:  Yes, Your Honor.

17        THE COURT:  Very well.  You are

18   excused.

19           (Witness excused)

20        THE COURT:  Your next.

21        MS. McNAUGHT:  Kim Johnson.

22        MS. BARNES:  No, we just had Kim

23   Johnson.

24        MS. McNAUGHT:  Oh, I'm sorry.

25        MS. BARNES:  Courtney Krull.

1          THE COURT:  I'm sorry?

2          MS. BARNES:  Courtney Krull.

3          THE COURT:  Courtney Krull, all right.

4          Right up here, please.  Raise your

5    right hand and be sworn by Madam Clerk.

6                    COURTNEY KRULL,

7    of lawful age, produced, sworn, and examined on

8    behalf of the Defendants, testifies and says:

9          THE COURT:  Come right up here, please,

10   and have a seat.  And lean right into the

11   microphone, if you would.

12          Ms. Barnes.

13                 DIRECT EXAMINATION

14   QUESTIONS BY MS. BARNES:

15        Q.   Ms. Krull, could you state your name

16   and spell it for the court reporter, please?

17        A.   It's Courtney Krull, C-o-u-r-t-n-e-y

18   K-r-u-l-l.

19        Q.   Ms. Krull, are you employed?

20        A.   Yes.

21        Q.   Where?

22        A.   Lincoln Correctional Center.

23        Q.   What do you do there?

24        A.   I'm a correctional officer.

25        Q.   How long have you worked there?

1        A.   For -- it'll be seven years in January.

2        Q.   Did you work there in March of 2011?

3        A.   Yes, ma'am.

4        Q.   Did you participate in a mass -- well,

5 a group shakedown and strip search on that day?

6        A.   Yes.

7        Q.   Would you tell the jury, please, what

8 your role in that procedure was?

9        A.   I was a tac member at the time and I

10 was in the gym and I was showing the cadets how to

11 do a proper strip search.

12        Q.   Did you accompany the officers who went

13 to the actual housing unit to gather the women and

14 bring them over?

15        A.   Yes, ma'am.

16        Q.   And where did you go first?

17        A.   We went to -- we were in the sally port

18 first and then we went to House 2.

19        Q.   Okay.  Do you recall being -- staging

20 the women in the dayroom?

21        A.   Yes.

22        Q.   And who was present in the dayroom

23 besides the inmates?

24        A.   There was the tac -- the tac members

25 and then the cadets as well.

1    Q.   Did you ever hear any cadet or tac

2  member say anything degrading or derogatory to any

3  of the inmates?

4    A.   No, ma'am.

5    Q.   So, then did you accompany the inmates

6  to the gym?

7    A.   Yes.

8    Q.   On that journey, did you hear any

9  remarks, comments, degrading or derogatory names

10  directed to the inmates on that part of the

11  procedure?

12    A.   No.

13    Q.   Was it complete silence?

14    A.   There was maybe some small chat or

15  something along those lines, but, I mean, we were

16  -- it was pretty swift getting them over there.

17  Nobody was really out of pocket or out of line to

18  sit there and make a remark.

19    Q.   Once you got there, what did you do?

20  To the gym.

21    A.   We lined up all of the inmates and then

22  we started taking off their handcuffs.  Because we

23  didn't -- I don't think we had enough, to be exact.

24  I'm not sure.

25    Q.   Had enough what?

1      A.   Handcuffs.

2      Q.  Oh.  Anyway, so you started taking

3 handcuffs off?

4      A.   Yes.  And then we would take the

5 inmates -- there was a group of us.  There was

6 Ms. Johnson, Ms. Edmonson, and then myself in the

7 gym.  And we would take with a cadet into the

8 bathroom and then we would strip-search them and

9 then bring them back out.

10     Q.  Was this the first time -- you were

11 fairly new at the department at that time; right?

12     A.   It would have, yeah, been about a

13 little over a year, I believe.

14     Q.  Okay.  You had done strip searches

15 before?

16     A.  Yes, ma'am.

17     Q.  What, if anything, do you remember

18 about the bathroom with respect to maintaining

19 privacy of the women?

20     A.   There was a curtain up.  It would -- we

21 always have it up for certain events.  Whenever we

22 would strip-search the females over there for any

23 type of volunteer programs or anything like that,

24 there's always a curtain.

25     Q.  Okay.  Who was with you in the

1   bathroom?

2       A.  It was Ms. Johnson and Ms. Edmonson.

3       Q.  Okay.  How many cadets?

4       A.  We each had one.  So, there would be

5   three total.

6       Q.  What was the condition of the floor?

7       A.  The floors actually -- what I remember

8   is like normal.  It was clean.  We have porters

9   that come there every day and night that would

10   clean it.  So, there was nothing that I can think

11   out of ordinary.

12       Q.  Okay.  There's been some testimony that

13   some women were menstruating and that there was

14   blood on the floor.

15       A.  No.

16       Q.  Okay.  What do the menstruating women

17   do when you ask them to squat and cough?

18       A.  When you would strip-search somebody

19   that's say on their period, you would have them

20   usually go over the toilet.

21       Q.  Okay.

22       A.  So nothing would, I guess, come down or

23   fall and touch the ground.

24       Q.  Okay.  What about your supply of

25   sanitary napkins?

1      A.   There was probably a box if -- I'm not

2  quite sure.  But I know we have tons of sanitary

3  napkins and we always had them everywhere that we

4  were at whenever you do a strip search.

5      Q.   Okay.  Does the -- an inmate named

6  Adrian Maynor here testified that she talked to you

7  that day.  Do you remember -- do you remember -- do

8  you even know her?

9      A.   No, it doesn't sound familiar.

10     Q.   Okay.  Did you ever tell any inmate

11 that day to shut the fuck up?

12     A.   No.  I would probably get in trouble if

13 I did that.

14          MS. BARNES:  Okay.  Just a second, Your

15 Honor.

16          THE COURT:  Sure.

17          MS. BARNES:  Thank you.

18          THE COURT:  Cross.

19                 CROSS-EXAMINATION

20 QUESTIONS BY MR. FIELD:

21     Q.   Good afternoon, Officer Krull.

22     A.   Hello.

23     Q.   You testified that there was a curtain

24 up in front of the bathroom entrance; is that

25 correct?

1          A.   Yes.

2          Q.   Do you know who put that curtain up?

3          A.   I don't recall.

4          Q.   Do you know when the curtain went up?

5          A.   It was there before we got over there,

6     I know that.

7          Q.   Okay.  You said it was something that

8     normally went up.  Where was that curtain normally

9     kept?  Do you have any knowledge of that?

10         A.   No, not really.

11         Q.   And you don't know who put it up?

12         A.   No.

13         Q.   Do you know who gave the order for the

14    curtain to be put up?

15         A.   I don't.  I'm sorry.

16         Q.   Now, you said during the strip search

17    -- you talked about women who were menstruating and

18    you said you would usually let them go over the

19    toilet.  Is that your testimony?

20         A.   Yes.

21         Q.   When you say usually, in what

22    circumstances would you not let them go over the

23    toilet?

24         A.   I -- if they were menstruating, they

25    would go over the toilet.  I -- it was just --

1  unless they didn't say anything.

2      Q.   How likely is it that a woman who's

3  menstruating who is about to be strip-searched is

4  not going to say something about having her period?

5      A.   Probably almost never.

6      Q.   Okay.  There was a grievance filed in

7  March of 2011 about women getting strip-searched in

8  dietary.  Was that something that you had any

9  knowledge of before this strip search on March

10  31st, 2011?

11      A.   No, sir.

12      Q.   Okay.  Did you receive any memo about a

13  woman being forced to remove her sanitary napkin in

14  the middle of dietary for a strip search?

15      A.   No, sir.

16      Q.   No training on that, that that is not

17  -- that's a violation of policy, anything like

18  that?

19      MS. BARNES:  Your Honor, I object to

20  this.  It's --

21      THE COURT:  Well, yes, I think that

22  technically you're correct, Ms. Barnes.  But we've

23  had a lot of testimony about this and I'm going to

24  give Mr. Field some extra leeway.

25      Go ahead.

1    MR. FIELD:  Thank you, Your Honor.  I'm

2 moving on anyway.  That's --

3    THE COURT:  Well, that solves the

4 problem then; doesn't it?

5    MR. FIELD:  Absolutely.

6    THE COURT:  All right.  Go ahead.

7    Q.  You testified about having sanitary

8 napkins in the gym bathroom.  Do you recall that

9 testimony?

10   A.  Yes.

11   Q.  You said there probably would have been

12 a box; is that correct?

13   A.  Yes.

14   Q.  Okay.  You don't know for sure as you

15 sit here today that there were sanitary napkins in

16 the bathroom; correct?

17   A.  No.  I know there was.  I just -- I

18 can't give you a number.  I don't remember.  I know

19 that we have them because we have a trash can and

20 then we have like a little -- it was -- I can't

21 remember if -- I know that they were there.  I just

22 don't remember how many or how much of a supply was

23 actually there.

24   Q.  Okay.  So, your testimony is that they

25 were not in the bathroom closet.  They were

1    somewhere outside of that closet.  Is that your

2    testimony?

3            A.   They were probably right next to us or

4    on a -- I'm sorry.  I don't remember exactly.

5            Q.   So, you don't recall where the sanitary

6    napkins were in the bathroom; isn't that correct?

7            A.   Yes.

8            Q.   Okay.  So, they could have been in the

9    closet where they were normally stored; is that

10   correct?

11           A.   They could have been.  I don't -- I

12   don't remember.

13              MR. FIELD:  Okay.  Nothing further,

14   Your Honor.

15              THE COURT:  All right.  Back to you,

16   Ms. Barnes.

17              MS. BARNES:  Nothing further, Your

18   Honor.

19              THE COURT:  All right.  Thank you.

20              Thank you, Ms. Krull.  You may step

21   down.

22              And is Ms. Krull excused?

23              MS. BARNES:  Yes.

24              MR. FIELD:  Yes, Your Honor.

25              THE COURT:  Thank you.

1          You are excused.  Thank you, Ms. Krull.

2               (Witness excused)

3          THE COURT:  All right.  Next?

4          MS. McNAUGHT:  Russ Reynolds.

5          THE COURT:  Very good.  Mr. Reynolds,

6     you've already been sworn, I believe, and you've

7     been on the stand, so you just may take it again.

8          THE WITNESS:   Thank you, Your Honor.

9                    RUSSELL REYNOLDS,

10    of lawful age, produced, sworn, and examined on

11    behalf of the Defendants testifies and says:

12                    DIRECT EXAMINATION

13    QUESTIONS BY MS. McNAUGHT:

14         Q.   Good afternoon.

15         A.   Good afternoon.

16         Q.   Are you the same Russell Reynolds who

17    was previously sworn and testified in this matter?

18         A.   I think I am.

19         Q.   How was the search or the request for a

20    search of inmates at Logan Correction -- at Lincoln

21    Correctional Center initiated?

22         A.   Early in February, I believe February

23    8th, Warden Hulett called me to her office.  We had

24    a discussion.  In that discussion, it entailed

25    requested assistance from the training academy.

That discussion was very late in the afternoon, probably after business hours, after 4 or 5:00 in the evening.

The morning of the 9th, I sent the request to Commander Polley in Springfield stating, you know, Lincoln Correctional was requesting assistance from the cadets in shakedowns and strip searches.

Q.   Who is Commander Polley?

A.   He is our statewide tactical commander. He was also the assistant manager of the training academy at that time.

Q.   Well, why did you ask Commander Polley to have cadets assist in strip searches -- or, in an event?

A.   Because we were having disciplinary problems, contraband problems, and just excessive problems on certain units.

Q.   And what was Commander Polley's response?

A.   I got a response back from Commander Polley on the 11th after business hours.  I opened it on the morning of the 14th, February 14th.  It said, "This class is booked.  I will keep you in mind."

1    Q.   And what did you understand this class

2   is booked to mean?

3    A.   That the correctional cadets, the

4   academy cadets were already booked to go to another

5   facility for a shakedown for that class.

6    Q.   And so what happened then?

7    A.   I advised Warden Hulett via Outlook

8   that, you know, here's Commander Polley's response.

9   She Outlooked back, "Yes, I got it too."  And she

10  said, "Come to my -- please see me before you

11  leave."

12       So, that day I went to her office.  She

13  said, "Hey, we can't get them this class but please

14  keep in mind, mark your calendar, at a later date I

15  want to get these cadets in as soon as we can."

16       So, I waited until March 14th.  I sent

17  Commander Polley another message, another Outlook

18  message, saying, "Please, you know, be mindful

19  we're still having issues.  Could you -- if you'd

20  have cadet assistance, we would greatly appreciate

21  it."

22       He immediately texted back, "I have

23  Lincoln in mind.  I'll give you a date."

24    Q.   And were you given a date?

25    A.   Commander Polley sent an Outlook

1 message to Warden Dawson at Logan Correctional

2 Center as well as Warden Hulett at Lincoln

3 Correctional Center stating, "We're coming to

4 Lincoln.  You're getting ..." In our case we got 60

5 cadets.  But it was only forwarded to those two, to

6 the warden of each facility.

7        I was on vacation in Dallas.  When I

8 checked my Outlook sometime after the 14th, Warden

9 Hulett had sent to me a thing saying, "Get with

10 Commander Dawdy, let's combine the two March tac

11 practices to this date -- for that date.  So, bring

12 in our tac team, get with Dawdy, and make sure you

13 set up the operational aspects and the needs."

14       Q.  And was an operation eventually set up?

15       A.  Yes.  Commander Polley gave them a date

16 for the 31st on that March 14th Outlook.  Upon my

17 arrival to work the Monday before the operation --

18 the operation was actually on a Thursday.  I

19 originally thought it was Wednesday, but it was a

20 Thursday -- I got with Warden Hulett.  She'd had a

21 meeting the previous week while I was gone with the

22 Assistant Statewide Commander Rod Brady, Assistant

23 Warden Brad Hillman, Major Rose from the 7 to 3

24 shift, and herself to discuss issues of how they

25 wanted to do.

1    Upon my arrival back to work, she ran

2 it through me.  Everything seemed to be in place.

3 We had it set up.  I had some issues I had come in

4 for early that morning to ensure were done, but we

5 were set up and ready to go.

6    Q.   And how is it that you are able to

7 remember the dates and the information that you've

8 just testified to?

9    A.   Documentation that has been admitted

10 into evidence in this court, my Outlook messages,

11 Commander Polley's Outlook messages.

12         MS. THOMPSON:  Objection, Your Honor.

13         THE COURT:  Yep.

14         MS. THOMPSON:  There has been no such

15 evidence admitted into court.

16         THE COURT:  Well --

17         THE WITNESS:  Excuse me.  I may have

18 misspoke about admitted.

19         THE COURT:  But I'm confident that

20 discovery would have been done.

21         MS. THOMPSON:  Well, I simply want to

22 know what evidence before the court, Your Honor.

23         THE COURT:  Well, I appreciate that.

24 But I think that we're making a distinction between

25 evidence and discovery and materials.

1          So, we'll -- you clarify this up, Ms.

2   McNaught --

3          MS. McNAUGHT:  I will.

4          THE COURT:  -- if you would.

5      Q.   Did you -- were you able to look at

6   your e-mail or your Outlook messages in

7   anticipation of testifying in this case?

8      A.   Yes.

9      Q.   And is that how it is that you

10  remember?

11     A.   Yes.

12     Q.   Now, let's go to the events of March

13  31st of 2011.  Do you remember what time you got to

14  the institution that day?

15     A.   It would have been very early, 5:30,

16  6:00 in the morning.

17     Q.   And was that unusual for you?

18     A.   No.  Duty administrative staff come in

19  and out of the facility at all times of the day.

20  They like us to make unexpected inspections on all

21  three shifts.  So, our presence is always there.

22          But my intent coming that morning was

23  to make sure I had garbage bags, shakedown slips,

24  rubber gloves, all the issues.  I toured the gym

25  early, made sure the partition was there.  I didn't

put it across the door, but it was there.  I made
sure I had shakedown slips there, had rubber gloves
there.

Q.  Do you remember whether you were in
charge of trying to obtain the sanitary napkins?

A.  No, I was not in charge of it.  They --
we kept a forward stock supply in that gym
bathroom.  The main supply, which was, you know, a
big roomful of them, was back in the grounds
maintenance building, maintenance area.  But
Officer Leonetti would keep stashes all over the
facility.

Because it was not uncommon when I'd
do my daily rounds for a lady to say, "Hey, I know
you gave us pads but I'm out."  And I would call
Officer Leonetti and say, "Will you give me a call
at this extension?  Please go take care of this
offender and get her napkins."  I mean, that was
every couple of days.  I mean, it's not uncommon.

Q.  So, about what time did folks start
arriving that were either being used as the
tactical unit or the cadets?

A.  Commander Polley informed us that the
cadets would be leaving the academy at
approximately 8 a.m., no earlier than 8 a.m.

1      Q.   And the academy is in Springfield?

2      A.   Springfield, yes.  So, you got a

3  35-minute drive to Lincoln, give or take.  I think

4  the cadets actually arrived at about 8:40, 8:45

5  a.m.  The first thing Mr. Pasley said was, you

6  know, "A lot of my guys got to use -- or, ladies

7  have to use the restrooms before we start."

8            And we had a briefing scheduled for 9

9  a.m. in the dietary.  So, the cadets, the tac team

10  was coming in by that time.  They reported at 8:30

11  and were dressed and ready to go and in the dietary

12  by 9.  We provided basically milk, juice, restroom

13  facilities for the cadets.  We had a brief meeting

14  at about 9 a.m. and it was off to House 2B.

15      Q.   And where did you go?

16      A.   I -- during the briefing, Warden Hulett

17  got up, she spoke, you know, basically, "Hello.

18  This is Lincoln Correctional.  I'm Warden Hulett.

19  Thank you for coming.  If you have any issues,

20  please see my assistant warden.  He will give you

21  the details of the operation."

22            I basically told them, "We're going to

23  Housing Unit 2B.  We're looking for excessive

24  contraband, any contraband items."  I didn't give

25  them specific details what I'm looking for.  I

said, you know, "Major, minor contraband.  Please

be safe, be professional.  If you have questions, I

will be with the shakedown teams all day long.  See

me.  See Commander Dawdy."  I introduced him.

I asked Mr. Pasley if he had anything

to say.  He said, "No, my cadets are ready to go."

And about 9:15, 9:17 or so, we were off

to Housing Unit 2B.

Q.  Now, did you also inform the tac team

and the cadets that you would be shaking down Unit

4B?

A.  No, they were not given that

information.  Commander Dawdy may have had it.

Commander Craig -- Assistant Commander Craig might

have had it.  But, no, I had not told anybody where

we were going.  Nobody knew before the morning of.

Me and the wardens and Mr. Polley.

Q.  At the meeting where you told the

cadets and the tac team, did you -- that they were

going to go to 2B, did you tell them that you were

going to go to 4B?

A.  Wouldn't have told them.

Q.  Okay.  When would you have told folks

that they were going to go to 4B?

A.  When they had their lunch break mid-

1    afternoon, that's when it would have been.

2         Q.   And why didn't you tell anybody -- why

3    didn't you tell the whole group that as soon as

4    they got done with 2B they were going to go to 4B?

5         A.   Because then if -- that would have got

6    out.  It wasn't a big secret we were there anyway.

7    They could see the tac team coming in.  They could

8    see the cadets moving, the lines moving.  But

9    there's no sense in advising or telling a person

10   where we're going because it always seems to get

11   back to the offender population.

12        Q.   Now, were you in the gym at any time

13   prior to the ladies being strip-searched while the

14   ladies were in the gym?

15        A.   No.  I went to Housing Unit 2B with the

16   tac team.  The tac team and their commanders went

17   in first.  The cadets went in behind them.  Me and

18   Warden Hulett followed in behind them, watched the

19   -- watched the incident unfold, watched them get

20   patted down, get pat-down searched, cuffed, led to

21   the hallway.

22            While they were in the hallway, I gave

23   them basically the speech, "Hey, this is what we're

24   doing, Offenders.  This is -- you're going to be

25   gone for an extended period of time.  I can't tell

1  you if it's going to be an hour and a half or two

2  and a half hours, but you're going to be gone for a

3  while.  If you have a required medication, please

4  take it with you.  You're allowed to take your

5  wedding band with you or your wedding ring with

6  you.  Any other issues, concerns, medically,

7  otherwise, cuff concerns, please see me.  I'm right

8  here.  I'm not that hard to talk to.  Address your

9  issues and I'll make a decision."

10          Q.  And that was in the housing unit of 2B?

11          A.  In the dayroom as they came out in

12  restraints.

13          Q.  And then did you go to the gym?

14          A.  Nope.  I stepped outside of Housing

15  Unit 2B -- because we had cadets that were still on

16  2B.  So, I stepped out and they'd bring -- I

17  believe they'd bring the offenders out in small

18  groups, stage them on the walks.  When the tac team

19  took them to the gym, I just sat back and watched.

20  Because I'd never seen that line move at my

21  facility.  So, I just kind of sat back and

22  monitored it.

23          Once they got in the gym, the male tac

24  members and male cadets that were with them came

25  back to 2B and we searched it.

1    Q.   At any time on March 31 of 2011 did you

2  go to the gym?

3    A.   Yes, ma'am.

4    Q.   And when was that?

5    A.   I would guess somewhere between 2 and

6  2:15, 2:20 in the afternoon.

7    Q.   So, let's go back and talk about the

8  search -- the contraband search in the housing

9  unit.  Were you able to look at any documents to

10  help you figure out when you were in Housing Unit

11  2B?

12    A.   Yes.  I reviewed the shakedown slips

13  from that day in question.

14    Q.   And --

15    A.   From 2B and 4B.

16    Q.   Let's talk about 2B.

17    A.   Okay.

18    Q.   What times were the shakedown slips --

19  the earliest shakedown slips that you found?

20    A.   Somewhere between 9:40 -- starting

21  around about 9:40, 9:45 a.m.

22    Q.   And so what does that mean to you?

23    A.   That the inmates were done to the gym

24  and the cadets and the male tac members were back

25  in the housing unit by 9:45.

1    Q.   And what was the latest shakedown slip

2    that you were able to find for Housing Unit 2B?

3        A.   I think approximately 11:40 or so.

4        Q.   And so what does that mean to you?

5        A.   That means they were pretty much

6    finished.  They finished the strip searches in the

7    gym first.  We had finished our housing unit search

8    by approximately 11:45.  Because I sent the cadets

9    on break from like 11:45 to 12:15, 12:20.

10            Because I have to -- one of my

11   responsibilities is to make sure my tac team gets

12   fed, my staff gets fed, the cadets and the cadet

13   instructors get fed.  I mean, we wouldn't work

14   somebody, you know, that length of time without

15   giving them a proper lunch break.

16       Q.   So, approximately how long were folks

17   on the -- on Unit 2B shaking down?

18       A.   Two hours, two hours and five minutes,

19   ballpark figure.

20       Q.   And did the shakedowns take longer than

21   the strip searches for 2B?

22       A.   Yes.  And especially -- we were done

23   shaking down, but there were some cadets left of 2B

24   to finish writing IDRs, incident reports, tickets,

25   but the shakedown was complete.

1          Q.   Okay.  Explain what an IDR is.

2          A.   An IDR is an inmate disciplinary

3     report.

4          Q.   And what --

5          A.   The inmates refer to it as a ticket.

6          Q.   And what's the consequence of a ticket?

7          A.   It could be anything, depending on what

8     the contraband is and depending what the inmate's

9     disciplinary history is.  If she had -- say she had

10    outdated medication and she had had seven tickets

11    before for outdated medication, the consequences

12    could have been pretty serious.

13         Q.   So, after the cadets and the tactical

14    team had the opportunity to have lunch, how did you

15    relay to them that they were supposed to go back to

16    wherever they were supposed to go or they were

17    supposed to go wherever they were supposed to go

18    and Unit 4B would be shaken down?

19         A.   They were advised to meet back to the

20    dietary by 12:15 to 12:20.  At that time I advised

21    them that we were going to shake down another

22    housing unit and we were going to Housing Unit 4B

23    and that process began.

24         Q.   And were you able to look at any

25    documents to determine how long you were on Housing

Unit 4B?

A.   Yes.   The first one started -- first shakedown started ballpark 12:45.  So, that means it took from 12:20 to 12:45 to get over there, get them back to the bed areas, get them pat-searched, get them restrained, get them to the dayroom, and get them back to the gym.

Q.   And what was the latest shakedown slip that you recall?

A.   2:33 p.m., I believe.

Q.   Okay.  And what does that mean to you?

A.   They were -- we were done with the shakedowns, both the unit of 4B and the gym of 4B by 2:30, quarter to -- by 2:30, quarter till 3. The cadets were assigned to leave Lincoln Correctional Center absolutely, positively no later than 3 p.m.

Q.   And by whose command was that?

A.   Commander Polley, Deputy Director Denning, Warden Hulett.  I mean, they didn't want to -- nobody wanted to pay the cadet overtime.

Q.   I'm sorry.  No one wanted to pay a cadet --

A.   They didn't want to pay the cadet overtime.

1     Q.  When you went into the gym in the

2  afternoon, was that after the strip searches were

3  done?

4     A.  They were just -- I mean, they were

5  still finishing them, but they were almost

6  completed.

7     Q.  Were you able to see any females

8  actually being strip-searched?

9     A.  No.  I was with Warden Hulett and

10  Deputy Director Denning, and if that would have

11  happened, they would have crucified me.

12     Q.  Did you see any blood, bodily fluids,

13  feces on the gym floor?

14     A.  No, ma'am.

15     Q.  Prior to March 31st of 2011, did you

16  tour the various housing units?

17     A.  Every day.

18     Q.  And what kinds of things would you do

19  when you would tour the housing units?

20     A.  Ms. Denning was very adamant that her

21  administrative command staff, her wardens, her

22  assistant wardens make daily rounds.

23     Q.  And so what does that mean?

24     A.  It was --

25     Q.  Explain to the ladies and gentlemen of

1   the jury what it means to do rounds.

2           A.   The facility is broke down into

3   buildings.  We have what we call duty

4   administrative log.  Every 24 hours some building

5   has got to be inspected.  Every 48 hours some

6   building has got to be inspected.  That means

7   you've got to go in, check lights, make sure

8   security features are correct, make sure doors

9   lock.  And then you log in that duty administrative

10  book.

11          Beyond that, Warden Hulett, myself,

12  Mr. Hillman, one of us would always be out around

13  the facility.  I mean, I would take two or three

14  hours of my day going from seg, listening to inmate

15  concerns in segregation, health care unit, House 5,

16  House 4, House 3, House 2, House 1, the gym, the

17  yard, dietary, going in when they were feeding and

18  stand chow for a while.  The intent was to make her

19  administrative command staff accessible to the

20  inmate population.

21          Q.   And so, would inmates come up to you?

22          A.   Oh, constantly.

23          Q.   And what kinds of things would they

24  talk to you about?

25          A.   Pads.  "Can I get extra visitors on

this date?"  They were only allowed a certain

amount of visitors.  But if the family was coming

from out of state or could very rarely make it, one

of the administrative command staff could say,

"Okay, you can have three extra visitors on that

day.  You can still only get five hours but instead

of having five, you can have seven."  You know,

allowing visitation -- visiting room space

restraints.  It might be, "Hey, I need a pair of

socks."  Or "Officer So and So is being

disrespectful to me."  It could have been anything.

A lot of them issues -- we also had

inmate request slips.  It was a little square piece

of form they filled out.  They dropped it in the

box and they would be delivered to whoever that

request slip was assigned to.  Once a week, all

three wardens, both assistant wardens and the

warden, had an administrative call line.  So, if I

got 15 request slips for an inmate wanting to speak

to me, I would set a three or four-hour block of

time, set a schedule, I want to see this inmate at

9:15, this one at 9:30, this one at 9:45, this one

at 10:00, and they would be escorted to my office.

We would sit down and discuss their problem, and

I'd address their issues.

1          That was -- that was one of Ms.

2    Denning's major things is making sure her command

3    staff is available and listening to the offender

4    population.

5          Q.   Now, would there be any reason why you

6    would want one inmate to tell on another inmate?

7          A.   A lot of -- a lot of the internal

8    affairs intelligence, a lot of the intel unit's

9    information came from what is commonly referred to

10   as an informant or an inmate -- they call them

11   snitches.  But you may get an anonymous request

12   slip, "Hey, there's something hidden in this light

13   in this room."  Or all my IA officers, my IA

14   supervisors, and my intel officers all had

15   informants all over the housing units.

16         Q.   Okay.  You just used IA and --

17         A.   Internal affairs and intel unit.

18         Q.   Okay.  Explain the difference between

19   internal affairs and the intelligence unit.

20         A.   The intel unit is more coordinated for

21   gang and unauthorized activity from organizations.

22              Internal affairs investigation does all

23   invest -- they do all our internal investigations,

24   whether it be staff investigations, inmate

25   investigations.

1          Q.   Are there any safety concerns for

2     snitches?

3          A.   Oh, yeah.

4          Q.   Why?

5          A.   The phrase was snitches get stitches.

6     But, you know, you wouldn't -- you'd take

7     precautions to ensure that your informants weren't

8     known.  You wouldn't set them out.  You would slide

9     them in the middle of one of your call lines.  For

10    me it was.  I could slide mine in my call lines,

11    and if I'm seeing 20 offenders, nobody seems to

12    understand.

13         Q.   Do you encourage inmates to snitch on

14    each other?

15         A.   I would say my intel unit -- my

16    internal affairs unit use it very well.  But you

17    didn't have to -- most times you didn't have to go

18    to look for information.  It would usually come to

19    them.

20         Q.   I want to talk a little bit about the

21    housing units.  Do inmates have jobs?

22         A.   Every inmate inside a correctional

23    facility has an assignment, given medical

24    restrictions.

25         Q.   And by assignment, what does that mean?

1   A.   They have a job.  It could be anything

2   from a housing unit porter, dietary, maintenance,

3   grounds maintenance, LTS, anything.

4   Q.   Do they have to have a job?

5   A.   Yes.

6   Q.   Okay.  If they go to school, do they

7   also have to have a job?

8   A.   If you're full-time school, that is

9   your job.  But if you're like a part-time morning

10  student, you may have an afternoon porter's job.

11  Q.   Do inmates work all three shifts?

12  A.   All three shifts.

13  Q.   So, not every inmate works all three

14  shifts --

15  A.   No.

16  Q.   -- but all inmates work one of the

17  shifts?

18  A.   Yeah, they work different respective

19  shifts in the facility, yes.

20  Q.   And when they're not working, what

21  kinds of things can they do in the institution?

22  A.   We would try to run on a daily basis a

23  gym line, a yard line.

24  Q.   What's the difference between gym and

25  yard?

1    A.  Gym is the building that they've showed

2  so many photos of.  There's basketball.  There's

3  weights.  There's cardio equipment.  They play

4  volleyball.

5          The yard is an outside exercise yard.

6  It's on the other end of the facility.  It's got a

7  running track.  They play softball.  They play sand

8  volleyball.  They can play Frisbee.  They can take

9  a blanket out there and just lay in the yard if

10  they want.

11    Q.  Okay.  What other kinds of things

12  besides gym and yard can an inmate do?

13    A.  All kinds of various programs.  Like

14  they discussed Mom and Me Camp.  They discussed

15  Sister Pat.  There was always a volunteer social

16  program going on, church services, Alcoholics

17  Anonymous, Narcotics Anonymous.  We had a

18  fingernail painting class.  We had all kinds of

19  stuff.  It was -- there was various activities

20  going on.  And as long as you were in good

21  standings, you could go to any one in your

22  nonworking hours.

23    Q.  But a lot of those activities are not

24  run all three shifts; are they?

25    A.  No.  Most -- it's probably days and

afternoon shifts.  We would run evening activity.
We would run day shift activities.

Q.   And explain what the shifts are.

A.   Day shift in our facility minus roll
call was 7 a.m. to 3 p.m., 3 p.m. to 11, and 11
p.m. to 7 a.m.

Q.   And when do inmates normally -- when
does dietary normally fix breakfast or serve
breakfast?

A.   Dietary in a correctional facility is
early.  I think the first dietary lines start
feeding about 5:30, quarter to 6:00 in the morning
after count.

Q.   And when do they end?

A.   Oh, they're done before day shift comes
on at 7 a.m.

Q.   And when is lunch?

A.   Lunch is 11:00, after the 10:50 a.m.
count.

Q.   And when does it end?

A.   Lunch is usually done -- depends on
what it is.  I mean, most normal days 12, 12:15.
Fried chicken day or if we're having something --
they always seem to love sweets.  It might be
12:30.

1       Q.   And what about dinner?

2       A.   After I think it's the 3:45 p.m. count.

3  So, it would run from 4 to 5:30, quarter till 6.

4       Q.   If an inmate doesn't want to -- if an

5  inmate is finished with her job, doesn't want to

6  be involved in any programs, where does she hang

7  out?

8       A.   The dayroom.  In the housing unit

9  dayroom.

10      Q.   Do they have to hang out in the dayroom

11  or can they be in their -- in their dorm?

12      A.   Oh, they can most certainly be in their

13  dorm.  That's their private area.

14      Q.   What kinds of things do they do in the

15  dorm?

16      A.   They watch TV.  They have headphones.

17  They read books.  They play cards.  They play

18  dominoes.

19      Q.   And what kinds of things can they do in

20  the dayroom?

21      A.   The same thing.  They have a microwave

22  in the dayroom.  They have bigger TVs.  The inmate

23  -- offender pay phones are in the dayroom.  There's

24  two phones.  They can call home.  The bathroom and

25  the showers and the laundry facilities, or the

1  washer and the dryer, they're all in and off the

2  dayroom.

3      Q.  Now, there was some testimony by Millie

4  Lee and she said that she got to hang out in the

5  sewing room or the industry room while the inmates

6  from 2B were being shaken down and strip-searched.

7      MS. THOMPSON:  Objection, Your Honor.

8  That misstates her testimony.

9      THE COURT:  Say that again.

10     MS. THOMPSON:  That misstates her

11 testimony, Your Honor.

12     THE COURT:  Well --

13     MS. McNAUGHT:  Your Honor, I'll

14 rephrase.

15     THE COURT:  All right, fine.

16     Q.  At some point did movement stop on

17 March the 31st of 2011?

18     A.  Yes.  Movement stopped approximately 8,

19 8:10 a.m.

20     Q.  And what does that mean when we say

21 movement stopped?

22     A.  We initiated what we call a limited

23 facility lockdown.  We -- everybody who was -- I

24 didn't stop assignments from going prior to that 8

25 a.m. time because it would have gave my offender

1  population a clue that, hey, something's not right,

2  this is not normal.  So, we allowed all the

3  offenders to go to work like they normally would.

4       At 8 a.m., we notified the armory,

5  institute a facility lockdown, return all the

6  offenders to their housing units.  And from that

7  time on, there was what we call limited escorted

8  movement.

9       Q.  And what does that mean?

10       A.  Nobody was allowed outside their

11  housing unit, with the exception -- I think me and

12  the warden had decided we left dietary workers in

13  the dietary.  If they left that building, they

14  would be escorted -- staff-escorted to and from the

15  buildings.

16       Now, we did run required medication

17  lines.  I mean, if an offender in House 5 needed

18  9:00 medication, an officer would go there at 5

19  till 9, walk her to the health care, get her

20  medication, and walk her back.

21       There was -- with moving -- once you

22  get a tac team inside a facility, there is no

23  reason for regular movement.

24       Q.  And what about staff movement?

25       A.  Staff movement would have been pretty

1    much open.  But they wouldn't have been -- they

2    were pretty much all tied up.

3            Q.   And why was that?

4            A.   I used every person I could have to

5    assist in that shakedown.

6            Q.   So, let's talk about that a little bit.

7    You had extra outside staff in your housing units

8    when you were shaking them down.  Were there needs

9    that were unfulfilled in some of your other areas?

10           A.   No.  It takes a few extra staff members

11   to run that limited movement.  If I want to run --

12   if we want to run -- say day shift dietary ends at

13   1:00 in the afternoon.  Them ladies are done

14   working.  I want to get them back to their housing

15   unit.  I can't move a line of 40 or 45 staff -- I

16   mean inmates with one staff member.  And if I'm

17   running constant med lines or if we have -- we have

18   to have staff responsible to respond to medical

19   codes and medical emergencies.  I have to have

20   staff assigned to respond to fights and

21   disturbances.

22           I mean, I was -- if I would have had

23   enough staff to do it myself without using the

24   cadets, I would have.  But I didn't.

25           Q.   Ieshia Brown testified that you had

1  gone into the housing unit where she lived prior to

2  March the 31st and you made the comment, "I'm sick

3  of this shit."  Did you say that?

4         A.   No, not in them terms.  If Ms. Brown

5  had lived on 2B, I did have a discussion somewhere

6  prior to March 31st.  If I can remember right, I

7  had my tac team in in January of 2011 on House 2B

8  because I was having problems at that time.  That

9  didn't seem to correct the problem.

10        I did on occasion have meetings with

11 multiple -- I mean, numerous inmates.  It might not

12 have been 2B or 4B.  It could have been 5A or 3B.

13 I would -- routinely, if I had problems that didn't

14 seem to be getting better or weren't addressed, I

15 would bring all the offenders to the dayroom, and

16 we'd sit down and I'd sit in the middle, and say,

17 "Hey, ladies, this is the problem we're having.  We

18 won't tolerate it.  You have to correct the

19 behavior."  I mean -- and I'd listen to what their

20 concerns were and they'd listen to mine.  Sometimes

21 it helped; sometimes it didn't.

22        Q.   Did you threaten to send in the tac

23 team or the -- I'm sorry -- I believe the words

24 were "I'll send in Orange Crush."  Did you say

25 that?

1    A.   Nope.  I'd have never told them it was

2 coming.  Even if in my mind I knew it was coming,

3 they'd have never known.

4    Q.   Well, would you have threatened it,

5 maybe to try --

6    A.   No, ma'am.

7    Q.   -- and curb behavior?

8    A.   No, ma'am.

9    Q.   Did you ever threaten that you were

10 going to seek revenge?

11    A.   No.

12         MS. McNAUGHT:  I have nothing further

13 at this time.

14         THE COURT:  All right.  Ms. Thompson,

15 you may cross.

16         MS. THOMPSON:  Thank you, Your Honor.

17                 CROSS-EXAMINATION

18 QUESTIONS BY MS. THOMPSON:

19    Q.   Hello again, Assistant Warden Reynolds.

20    A.   Good afternoon, ma'am.

21    Q.   I want to make sure I understand the

22 time frame of everything.

23    A.   Okay.

24    Q.   So, we've talked about this before, so

25 I don't want to go through the whole thing in

1  detail, but after your meeting at the sally port

2  with the cadets and the tac team, you go to Unit

3  2B; right?

4          A.   No, ma'am.  We had -- the only thing we

5  did in the sally port was that's where they came in

6  at.

7          Q.   And let me correct because I'm wrong

8  and you're right.

9               After your meeting at dietary with the

10  cadets and the tac team, you go to Unit 2B; right?

11          A.   Yes, ma'am.  I followed behind them.

12          Q.   Okay.  And at 2B you -- the tac team,

13  the cadets get the women lined up, they get them

14  handcuffed, and those women then go to the gym;

15  right?

16          A.   They went to the dayroom and then were

17  staged on the walks to go to the gym.  That's

18  correct.

19          Q.   Right.  And it's your testimony that at

20  that point the shakedowns in Unit 2B began;

21  correct?

22          A.   No.  It actually was minutes later.

23  Because I -- I turned and went outside and watched

24  the line go from 2B to the gym.  At that time

25  Commander Dawdy, Commander Craig, and the male tac

1  members came back, and that's when the search

2  started.

3      Q.   And those shakedowns take place and the

4  people that are there working on those work on them

5  until they're done; right?

6      A.   Yes, ma'am.

7      Q.   Okay.  Now, at that point the cadets

8  have a lunch break; is that right?

9      A.   Well, they had a lunch break at

10 approximately 11:45, yes.

11     Q.   Okay.  And what is the tac team doing

12 at 11:45 while the cadets are taking a break?

13     A.   They're on their break too.

14     Q.   Okay.  So, nothing is going on over the

15 lunch hour?

16     A.   Nothing on 2B.

17     Q.   Right.

18     A.   That I know of, no.

19     Q.   Well, what about on 4B?

20     A.   No.

21     Q.   Did anything happen during the lunch

22 hour?

23     A.   No.  We didn't start 4B until about

24 12:20 in the afternoon.

25     Q.   Okay.

1      A.   Or maybe a little bit later.

2      Q.   Okay.  And then, as you said, you had

3  to finish by 3.  This wasn't something where you

4  could pay overtime --

5      A.   Right.

6      Q.   -- so you needed to get people out?

7      A.   Yeah.  The cadets had to be out -- I

8  mean, given appropriate restroom breaks, given

9  something to drink, get back on the bus, and be out

10  of my facility by 3.

11      Q.   Okay.  And is it your testimony that

12  the strip searches in the gym for the women from 2B

13  that those were done before the shakedowns were

14  done on 2B?

15      A.   I believe the strip searches were done

16  -- it was pretty close, but I think they were done

17  a little bit before.  If that's my -- that's what

18  my memory serves.

19      Q.   Okay.  Isn't it actually true,

20  Assistant Warden Reynolds, that you went to 4B as

21  quick as possible after going to 2B?

22      A.   After lunch break, yeah, I think.  It

23  was pretty -- it was pretty quick.  I mean, a

24  half-hour or so.

25      Q.   Isn't it true that you went to 2B and

1  then to 4B as close to being simultaneous as you

2  can?

3          A.   When I originally did my deposition --

4          Q.   Well, hold on.  Is it true that you

5  went to Unit 4B as close to being simultaneous as

6  you can?

7          A.   Yes, giving people time for breaks,

8  yes.

9          Q.   Okay.  And so you anticipate what I'm

10  going to say next.  You were deposed in this case;

11  right?

12          A.   Yes.  And I was mistaken.

13          Q.   Okay.  Well, let me explain how you

14  were mistaken.  You were disclosed -- you were

15  deposed on September 3rd of 2015; right?

16          A.   Yes, that is correct.

17          Q.   Okay.

18          MS. McNAUGHT:  Just tell me the page

19  and line.

20          Q.   In your deposition --

21          MS. THOMPSON:  And for the record, I'm

22  referring to Plaintiffs' Exhibit 47, Page 70.

23          Q.   -- were you asked this question and did

24  you give this answer:

25          "Q.   Okay.  And so, what did you do

1          after the briefing?

2          "A.  I took the cadets and my tac

3          team in the housing unit.  I think we

4          went to 2B first, 2B, and then

5          immediately to 4B as quickly -- I mean

6          as close to possible -- as close to

7          being simultaneous as you can."

8          Were you asked that question and did

9     you give that answer?

10          A.  Yes, that was my answer.  And I was

11     wrong.

12          Q.  What is the -- I want to go back to the

13     shakedowns to follow-up on one thing.  We -- as you

14     know, we looked at the shakedown slips earlier and

15     there was some testimony about the process by which

16     those are completed.

17          A.  Yes, ma'am.

18          Q.  And I want to make sure that everyone

19     understands.  When a cadet identifies that they --

20     and I'm talking about what actually occurred on

21     March 31st.  When a cadet would identify something

22     that they found that was contraband, would they

23     immediately take that contraband to someone and

24     start completing the slip on that contraband?

25          A.   Okay.  When they had finished their

1    shakedown and if they had discovered contraband,

2    that contraband would be taken, sealed in a clear

3    plastic bag, tied off.  The fifth copy, which I

4    believe goes to the offender, would have been left

5    in her bed area for her to find or to have when she

6    got back.  The rest of them would have been stapled

7    to that plastic bag.  And there would have been a

8    cart or a -- a roll-around like a laundry cart that

9    was outside in the dayroom.  They'd have took that

10   contraband, placed it in that cart, and at the end

11   of the completion of 2B, that cart would be rolled

12   over to the shift commander's office for him to

13   fill out -- to start the chain of command on the

14   other side of the form.

15        Q.   And is that something that you do as

16   you go, meaning an inmate finds something, they

17   immediately bag it, do the paperwork and put it on

18   the cart?

19             And I think I said -- I meant cadets.

20   I might have said inmate and I apologize.  I'm

21   talking about the cadets.

22        A.   I mean, when he finishes the -- he may

23   find a piece of contraband, he'll -- he could set

24   it on the bed; continue his search; finish his

25   search; make sure he fills the report out right;

1   lists all the contraband; take the contraband; put

2   it in the bag; seal it up; tie it off; and he would

3   either tape or staple that rest of the original

4   contraband thing to the outside of the bag; take it

5   out; put it in that -- put it in that cart, which

6   would then be rolled to the shift commander and the

7   contraband custodian.

8       Q.   Okay.  In your -- you obviously gave

9   some testimony earlier in this trial; right?

10      A.   Yes, ma'am.

11      Q.   And you're back and now you've looked

12  at the shakedown slips; right?

13      A.   I don't -- oh, I mean, I looked at the

14  shakedown slips recently.

15      Q.   Right.

16      A.   But I didn't look at them that day, I

17  don't think.

18      Q.   Right.  And so, I'm saying, you --

19  you're here today and you're able to give some

20  better clarity to the timing because you've looked

21  at those shakedown --

22      A.   Yes, ma'am.

23      Q.   -- slips; right?

24      A.   Yes, ma'am.

25      Q.   So, if cadets are looking in the

1  housing units and they're doing work on the

2  shakedowns but they don't find any contraband,

3  there's not going to be any slips; right?

4       A.  Even if -- okay.  If you do -- if

5  there's 20 beds in a dorm, if all 20 beds are no

6  contraband, you can leave one slip for the whole

7  room.

8       Q.  But if there is contraband in the room,

9  then there's going to just be a slip saying here's

10  what the contraband was?

11       A.  Yes.  But if -- it's -- if you leave

12  just one slip for that contraband, the other 19 got

13  to get a slip saying none.  You can only leave a

14  mass slip if the whole dorm would have been clean,

15  that whole 20-bed area.  Otherwise, the offender

16  should have got a -- the same thing, no contraband

17  found, signed by the officer, date and time of the

18  search and everything.

19       Q.  Okay.  Well, the contraband slips that

20  you reviewed in reminding yourself about the times,

21  none of those contraband slips are contraband slips

22  that say no contraband found; right?

23       A.  That is correct, ma'am.  I only had the

24  contraband found slips.

25       Q.  Right.  So -- and I'm -- I'm

1    referencing Plaintiffs' Exhibit 221.  Those are the

2    contraband slips --

3              A.   Yes, ma'am.

4              Q.   -- related to --

5              A.   Yes, ma'am.

6              Q.   And none of these are none found slips;

7    right?

8              A.   No, ma'am.  They're all contraband

9    found slips.

10             Q.   Okay.  So, these contraband slips don't

11   really tell you how long this happened; right?

12             A.   They would -- they gave me a pretty

13   close approximate time frame.  That wouldn't have

14   been -- all these times are approximate.  They

15   would not have been exact to the minute.

16             Q.   Sure.  Well, there's only -- and I

17   don't want to be wrong about this.  I think we said

18   there were 33 of these contraband slips; right?

19             A.   That's a pretty close approximation, I

20   would guess, yes.

21             Q.   Okay.  So, 33 slips for 200 beds;

22   right?

23             A.   Uh-huh, 33 pieces of contraband found.

24             Q.   For 200 beds, right?

25             A.   Yes, for approximately 200 offenders,

1   yes.

2           Q.   Okay.  So, does that mean that there

3   were 167 contraband slips saying no contraband

4   found?

5           A.   If there was only no contraband found

6   in the whole bed area, a whole dorm of 20, there

7   would have been one slip for them 20.  But there

8   would have been a lot of no contraband found slips,

9   yes.

10          Q.   Okay.  And so, that's also potential

11  additional time spent searching these areas that

12  wouldn't be reflected by these slips because these

13  slips don't have times for the -- for the time that

14  the cadets were spending searching for contraband,

15  finding none, and making a slip that said this is

16  -- you know, this the time I spent not finding

17  anything?

18          A.   Yes, there could be other slips that

19  indicate a minor variation in change in times.

20          Q.   Okay.  Can you see that, Assistant

21  Warden?

22          A.   Yeah, I can see the officer's side of

23  it, yes.

24          Q.   Okay.  So, I'm showing you one of the

25  shakedown slips from Plaintiffs' 221 and this has

1    got a Bates number on it of 3.  So, this is the

2    contraband slip that was found in the gym -- or,

3    the contraband slip for contraband that was found

4    in the gym during the strip searches in this case.

5    Right?

6          A.   Yes, it's from Offender Crisp, it looks

7    like, in the gym.

8          Q.   Okay.  And do you see the times on this

9    contraband slip?

10          A.   It says 11:55 a.m. to 12:03 p.m., I

11    believe.

12          Q.   Okay.  So, this con -- strip search

13    where this contraband was found happened between

14    11:45 and 1:00; right?

15          A.   It says 11:55 and 12:03.

16          Q.   So, this happened during lunch; right?

17          A.   It could have been before lunch.  I

18    mean, the inmates were not in the gym per se at

19    11:55 a.m.

20          Q.   Right.

21          A.   I don't know if Ms. Crisp was a 2B or a

22    4B offender.

23          Q.   Well, if I told you that Ms. Crisp was

24    a 4B offender --

25          A.   I'd say she was early.

1    Q.   That somehow she got into the gym --

2    A.   No, no, she was -- I think Ms. Crisp

3    would have been a 2B offender.

4    Q.   And so if there's testimony in this

5    case that Ms. Crisp was a 4B offender, then your

6    timeline doesn't work; right?

7    A.   I -- this slip would be -- I can't -- I

8    can't say why she would be in the gym at 11:55

9    because we hadn't brought them over yet.

10   Q.   Because by your testimony 4B was

11   definitely not in the gym before everyone took

12   lunch; right?

13   A.   They should have all been at lunch.

14   Q.   Right.  And so, if there's a 4B slip

15   from 11:55, then 4B was definitely in the gym by

16   11:55; right?

17   A.   Or the officer made a mistake.

18   Q.   Now --

19   THE COURT:  Wait a minute.  What was

20   that last -- what was your answer?

21   A.   Or the officer was mistaken on his

22   time.

23   Q.   Well, they would have been mistaken

24   twice; right?

25   A.   Yes, ma'am.  He said it started at

1  11:55 and ended at 12:03. That's what the slip

2  says.

3      Q. Right. So, the person would have had

4  to have been wrong about the time two -- on two

5  different occasions when filling this out; right?

6      A. Yes, ma'am.

7      Q. And one thing that your tac team was

8  doing in teaching cadets how to do shakedowns was

9  to teach them how to fill out shakedown slips;

10  right?

11      A. Yes, ma'am.

12      Q. And one of the things that cadets, as

13  well as any IDOC officer, would be taught would be

14  to be precise about these times; right?

15      A. Yes, ma'am.

16      Q. Because it's important. This is a

17  record. Someone could be charged with a crime

18  based on this shakedown slip in part; right?

19      A. Yes, ma'am.

20      Q. This is evidence of a crime?

21      A. Yes, ma'am.

22      Q. Potentially. If what this person has

23  is illegal; right?

24      A. Yes, ma'am.

25      Q. And so the times would be very

1　important?

2　　　A.　Yes, ma'am.

3　　　Q.　There was some testimony about

4　Commander Polley and Commander Brady.  And I think

5　you said that it was your understanding that Warden

6　Hulett had met with Commander Polley and Commander

7　Brady or at least spoken with them, maybe not in

8　person, but talked with them about these searches

9　before they took place; is that right?

10　　　A.　I got an Outlook message upon my return

11　to work and it was dated I think March 22nd or

12　24th, and it said, "Warden Reynolds, I had a

13　meeting today with Assistant Commander Rod Brady,

14　Assistant Warden Hillman, and Major Rose to discuss

15　the logistics and issues regarding the shakedown on

16　3/31/11."

17　　　Q.　Okay.  But it was your testimony and

18　remains your testimony that at the meeting you had

19　with Warden Hulett on either Monday or Tuesday

20　before these searches when you came back from

21　Dallas that that's when you and Warden Hulett

22　decided how this shakedown and strip search was

23　going to take place; right?

24　　　A.　Well, they had discussed it at that

25　meeting before.  But, yeah, me and the warden would

have made our final decisions there.

Q.   Okay.  Well, there was nothing in the e-mail saying Commander Polley and Commander Brady decided who was going to be strip-searched in this case; right?

A.   No, ma'am.  That would have been me and Warden Hulett.

Q.   They didn't decide where in the facility this was going to take place?

A.   No, ma'am.  It would be me and Warden Hulett.

Q.   They didn't request that some search be done of Lincoln Correctional Center; right?

A.   No, ma'am.  That would have been me and the warden.

Q.   So, Commander Polley and Commander Brady didn't tell you how to do this; right?

A.   No.  They may have given Ms. Hulett guidance on what they thought was an appropriate way to go, but the decision would have been hers and then mine -- or, mine and then hers.

Q.   Okay.  And you were talking earlier about Outlook messages that you'd reviewed that included requests by you for this -- to get cadets to do this; right?

1       A.   Yes, ma'am.

2       Q.   And when you made your request in

3  Outlook, you didn't tell Commander Polley that you

4  needed help with problems in Units 2B and 4B;

5  right?

6       A.   No, ma'am.  I would not have aired our

7  facility laundry over Outlook.

8       Q.   Right.  You didn't tell him, "I'm

9  having a problem with inmates not respecting us in

10  Units 2B and 4B."  Right?

11       A.   No, not via Outlook, I would not have.

12       Q.   All you said was, "We would like to

13  have the cadets come."

14       A.   We could use assistance in shakedowns,

15  and any help he could provide, we'd greatly

16  appreciate it.

17       Q.   Just a couple additional questions.

18       A.   Yes, ma'am.

19       Q.   You testified that when you were in the

20  dayroom -- and I'm taking you back to 2B.

21       A.   Okay.

22       Q.   When you were in the dayroom and all of

23  the women had come into the dayroom and they had

24  been handcuffed -- right?

25       A.   Yes, ma'am.

1      Q.  -- that you said you had a conversation

2  or you addressed the group and you said in part,

3  you know, here's what's going to happen, I'm not

4  that hard to talk to, so come see me if you have

5  any questions.  Right?

6      A.  Uh-huh.

7      Q.  And then your testimony is that you

8  immediately left the dayroom; right?

9      A.  I follow -- no.  They left.  I followed

10  them out.

11      Q.  Okay.  And did anyone come to talk to

12  you about questions after you said come see me and

13  then the women were marched out?

14      A.  If it was, it was, "How long is this

15  going to take?"  And I couldn't give them a time

16  frame.  I'd have told them an extended period of

17  time.

18      Q.  And then the women went to the gym;

19  right?

20      A.  Yep.  I gave them instructions, you

21  know, "Please take your -- you're allowed to take

22  your wedding band.  If you have asthma inhalers,

23  nitro, required medication, take it.  If you have

24  any medical concerns, personal concerns, see me.

25  I'm right here."

1    Q.   And then you, by your testimony,

2    weren't back in the gym until 2:15; right?

3    A.   About that time.  Between 2, 2:15, me

4    and Warden Hulett and Ms. Denning went over.

5    Q.   Okay.  So, there was no way that any

6    women could come to you with concerns between when

7    they left and 2:15; right?

8    A.   No.  I mean, I'm always available via

9    radio.  But, I mean, an inmate doesn't have a

10   radio.  If there had been a problem -- I'm trying

11   to relay, if there had been a problem in the gym, I

12   was easy to get ahold of.  It --

13   Q.   Because you were -- I'm sorry.  Go

14   ahead.

15   A.   My facility radio has the radio itself

16   and they're also built with cellphones inside of

17   them.  I mean, they had a dial pad.  So, if the

18   armory couldn't reach me via the radio, they could

19   call my cellphone.  So, I was not unattended or

20   unreachable for any period of time.

21   Q.   You testified that you stepped out or

22   at least watched the lines of women going to the

23   gym because you'd never seen that kind of line

24   movement in your facility?

25   A.   Well, not in Lincoln.  I mean, we've

1  had big lines move at Lincoln, big lines to the

2  gym, to the programs.  But as far as using the tac

3  team and that many cadets and that many offenders

4  on a walk, yeah, it was something I wanted to see.

5        Q.   Because it's something that you'd never

6  done before really; right?

7        A.   No, I've seen it thousands of times in

8  the men's facilities, but never in -- first of all,

9  never when I was a warden and never inside the

10  Lincoln Correctional Center the time frame that I

11  was there.

12        MS. THOMPSON:  Just one moment, Your

13  Honor.

14        Q.   I think you testified earlier,

15  Assistant Warden Reynolds, that you didn't know

16  the housing location for Ms. Crisp, so you weren't

17  sure --

18        A.   No, I have -- at this time I wouldn't

19  know where she lived at that time.

20        Q.   Okay.  Well, would looking at something

21  called a cell occupancy history inquiry help you to

22  know where she was at that time?

23        A.   If it's for Ms. Crisp, yes, ma'am, it

24  would.

25        MS. THOMPSON:  Your Honor, I'm going to

1    show the witness Plaintiffs' Exhibit 35.

2          THE COURT:  Thank you.

3          MS. THOMPSON:  And specifically Page

4    228.

5       A.  I should have brought my glasses.

6       Q.  Are they at the table?

7       A.  No, she's in 4B.  I can see it.  I just

8    couldn't see it very well.

9          MS. THOMPSON:  Your Honor, I'm going to

10   ask that Plaintiffs' --

11       Q.  Well, let me ask you this:  Plaintiffs'

12   Exhibit 35 is our cell occupancy history inquiries;

13   right?

14       A.  Yes, ma'am.

15       Q.  And if you want to look at the rest of

16   the exhibit -- you don't have to take my word for

17   it -- I can show you the rest.

18       A.  Oh, no, I see what it was.

19          MS. THOMPSON:  Your Honor, I'm asking

20   that Plaintiffs' Exhibit 35 be admitted into

21   evidence.

22          THE COURT:  Plaintiff's 35 what?  B?

23          MS. THOMPSON:  It's Plaintiff's Exhibit

24   35.  Counsel is right that there's just one page

25   we're interested in and I can potentially mark that

1    as 35-1 and just admit 35-1 into evidence, Your

2    Honor.

3              MS. McNAUGHT:  I would have no

4    objection to the one page.

5              THE COURT:  Very well.  The one page is

6    admitted as a single exhibit and it is marked

7    Plaintiffs' 35.  Is that right?

8              MS. THOMPSON:  It will be 35-1, Your

9    Honor.

10             THE COURT:  Dash 1.  Very good.

11                  (Plaintiffs' Exhibit Number 35-1

12                  admitted.)

13             MS. McNAUGHT:  No, Tara, just go ahead

14   and put the whole thing in.

15             MS. THOMPSON:  If you want to put the

16   rest in, you can.

17             MS. McNAUGHT:  Okay.

18             MS. THOMPSON:  Permission to publish to

19   the jury, Your Honor.

20             THE COURT:  Well, it's admitted, so you

21   may publish by putting it on the overdraft --

22             MS. THOMPSON:  Thank you.

23             THE COURT:  -- oversee.  Yeah.  That's

24   fine.

25        Q.  So, this shows that there is a Sheila

1  Crisp; right?

2      A.  Yes, ma'am.

3      Q.  And that shows that her housing unit

4  was 4B?

5      A.  4B-10-9.

6      Q.  Now --

7          THE COURT:  Why don't we leave that on

8  there.

9          MS. THOMPSON:  Sure.

10         THE COURT:  That was very quick.  I

11 didn't even --

12         MS. THOMPSON:  I'm sorry, Your Honor.

13         THE COURT:  Okay.  Now, let's move it

14 carefully so that all of the exhibit is shown.  It

15 isn't all quite there.  Back up just a little bit.

16 There we go.  Okay.  Now we've got it all on there.

17     Q.  So, where I was pointing, you can see

18 that that's Sheila Crisp; right?

19     A.  Yes, ma'am.

20     Q.  Okay.  And you can see that she's in

21 Housing Unit 4B; right?

22     A.  4B-10-9.

23     Q.  Okay.  Now, are there ever inaccuracies

24 in the housing records at Lincoln Correctional

25 Center?

1    A.   I would say it's a very accurate

2  document.

3    Q.   Okay.  Well, sometimes is it possible

4  that someone's housing -- someone's cell occupancy

5  doesn't get recorded correctly if they get moved?

6    A.   Yeah, for a short period of time, and

7  then it would -- the assignment office would --

8  after the move's completed, they would change it in

9  the computer.

10    Q.   Okay.  But this document indicates that

11  Ms. Crisp was in 4B on March 31st of 2011?

12    A.   Yes, that's what it indicates.

13    THE COURT:  Now, explain further what

14  4B-10-09 means.

15    Q.   Go ahead, sir.

16    A.   Your Honor, it's Housing Unit 4B --

17    THE COURT:  Say that again.

18    A.   She's in Housing Unit 4B, Room 10, Bed

19  9.

20    THE COURT:  Ah, Room 10, Bed 9.  Thank

21  you.

22    MS. THOMPSON:  I have no further

23  questions, Your Honor.

24    THE COURT:  All right.  Shall we leave

25  that up?

1          MS. McNAUGHT:  No.

2          THE COURT:  No.  All right.

3              REDIRECT EXAMINATION

4  QUESTIONS BY MS. McNAUGHT:

5          Q.  When you say that the inmate occupancy

6  -- cell occupancy can be -- sheet can be incorrect

7  for a short period of time, what's the maximum

8  amount of time that the cell occupancy history can

9  be wrong?

10        A.  It would be a very minute time frame.

11  When the offender's packing to move, once she steps

12  foot out of House 2, by the time she gets into 4,

13  the computer's been changed.

14        Q.  So, within a shift?

15        A.  Oh, no, within -- within minutes of a

16  shift.

17        Q.  Now, when you were deposed, what was

18  your employment history?

19        A.  I was retired.  I retired May 1st of

20  2012.

21        Q.  And did you have access to your e-mail

22  messages at that point?

23        A.  No.  No, ma'am, I did not have no

24  documentation, no -- nothing to review back to --

25        Q.  But your Outlook messages have since

1  been --

2        A.   Outlook messages, the shakedown slips

3  have, yeah, refreshed my memory, give me a pretty

4  good recollection of time frames.

5              MS. McNAUGHT:  Nothing further.

6              MS. THOMPSON:  I have nothing further,

7  Your Honor.

8              THE COURT:  Very good.  All right.

9  Thank you, Warden.

10              THE WITNESS:  Thank you, Your Honor.

11              THE COURT:  You may step down.

12                  (Witness excused)

13              THE COURT:  Okay.  And it's about time

14  for us to take a break.  Wouldn't you say?

15              Now, you'll be ready with another

16  witness as soon we come back?

17              MS. McNAUGHT:  Yes, Your Honor.

18              THE COURT:  Fine.  Let's take our

19  afternoon break, ladies and gentlemen, and we'll be

20  back here in 20 minutes at 3:30.  Very good.  Enjoy

21  your break.  Recall my admonition.

22              We stand in recess.

23              MS. McNAUGHT:  Judge, before you leave.

24              THE COURT:  Sure.

25                  (The jury left the courtroom.)

1          THE COURT:  All right.  The record may

2   show the jury has left the courtroom.

3          Go ahead.

4          MS. McNAUGHT:  We have one witness left

5   and then we'll be finished.  And I'm not sure if

6   plaintiffs have any rebuttal or not but --

7          MS. THOMPSON:  Is your last witness

8   Mr. Pasley?

9          MS. McNAUGHT:  Yes.

10          MS. THOMPSON:  I don't anticipate any

11   rebuttal.

12          MS. McNAUGHT:  And so my anticipation

13   is that we might finish before 5.  I assume that

14   you do not want to start in with closings right

15   away.

16          THE COURT:  Oh, no, absolutely not.

17          MS. McNAUGHT:  Okay.  Thank you.  So,

18   we might be able to leave a little bit early on

19   Friday?

20          THE COURT:  Who knows?  Who knows what

21   The Shadow knows?  Okay.

22          No, quite seriously, we've got the time

23   here.  And as soon as your testimony is finished

24   and if there's no rebuttal, then we will go

25   immediately, Counsel -- we'll excuse everybody.

1  We'll take up our jury instructions.

2         MS. McNAUGHT:  Okay.  Fair enough.

3  Thank you, Your Honor.

4         MS. THOMPSON:  Thank you, Your Honor.

5         THE COURT:  Sure.  So, we'll do that

6  tonight then.

7         Let's take our break.

8              (Court was then in recess.)

9              (The jury entered the courtroom.)

10        THE COURT:  Thank you, everyone.

11        All right.  We're all back in place.

12        MS. BAUTISTA:  Your Honor, at this time

13  we call Alan Pasley.

14            THE COURT:  Thank you very much.

15                 ALAN PASLEY,

16  of lawful age, produced, sworn, and examined on

17  behalf of the Defendants, testifies and says:

18               DIRECT EXAMINATION

19  QUESTIONS BY MS. BAUTISTA:

20        Q.   Can you state your name for the record,

21  please?

22        A.   It is Alan Pasley, A-l-a-n P-a-s-l-e-y.

23        Q.   You're employed by the Department of

24  Corrections?

25        A.   Yes, I am.

1     Q.   When did you start with the Department

2  of Corrections?

3     A.   I began my employment in July of 1994.

4     Q.   What was your position then?

5     A.   I began as a youth supervisor II at the

6  Illinois Youth Center at Valley View, which was a

7  medium security juvenile center.

8     Q.   And in the current day, the Department

9  of Juvenile Justice handles the youth centers.  Is

10  that fair to say?

11     A.   Correct.

12     Q.   But at that time that was under the

13  umbrella of the Department of Corrections?

14     A.   Yes, it was.

15     Q.   What's your current position with the

16  state?

17     A.   I'm the state's programs compliance

18  administrator.

19     Q.   What does that mean?

20     A.   I'm the State of Illinois Prison Rape

21  Elimination Act coordinator.

22     Q.   And that's the same act that we heard

23  Ms. Wendy Still testify about; right?

24     A.   Correct.

25     Q.   And can you describe for the ladies and

1   gentlemen of the jury your career path from a youth

2   specialist to your current position?

3         A.   Yes.  I worked at the Illinois Youth

4   Center Valley View from 1994 to 1996.  At that

5   time, I transferred to Jacksonville Correctional

6   Center, which was a minimum security male facility,

7   and I transferred as a correctional officer.  I

8   worked there from 1996 to 1998, at which time I was

9   promoted to a corrections residence counselor I at

10   Decatur Adult Transition Center, which essentially

11   is a security role for a co-ed work release center

12   working in the community.  I was there from 1998 to

13   2000.  In 2000, I promoted to correctional

14   counselor in the Women and Family Services Division

15   at Decatur Correctional Center.  In 2005, I

16   promoted to trainer or staff development specialist

17   at the training academy, and I was in that position

18   from 2005 to 2011 of June.  At that point, I was

19   promoted to manager of training from 2011 to 2013.

20   In 2013, I had made the move to Logan Correctional

21   Center as the superintendent of a maximum security

22   female facility.  And in September of this year, I

23   was promoted again to the programs compliance

24   administrator here in Springfield.

25         Q.  Now, I didn't hear in that history you

mentioning that you were ever on the tac team.

Were you ever a member of the tactical team?

    A.    No, I was not.

    Q.    You mentioned that you were a

correctional counselor.  What does that -- what did

you do in that role?

    A.    My role as a correctional counselor at

Decatur Correctional Center was I worked in the

Women and Family Services Section.  I worked in the

Inmate Reunification Unit in which we worked with

offenders closely in regards to bringing their

children in for visits, reestablishing that family

bond.  And then I also provided programming and

counseling to offenders through group therapy

sessions.

    Q.    Is this the same type of counselor that

we've heard that deals with grievances?

    A.    No, I did not deal with grievances.

    Q.    So, it's fair to say that you have had

experience working in both male and female

correctional institutions?

    A.    Yes.

    Q.    And in the male correctional

institutions you were a correctional officer; is

that fair?

1          A.   Yes, I was.

2          Q.   And you've worked directly with

3    inmates?

4          A.   Yes.

5          Q.   Your position in March of 2011, that

6    was at the training academy; is that right?

7          A.   Yes, it was.  I was a staff development

8    specialist at that time.

9          Q.   And what does that mean?

10         A.   As a staff development specialist, I

11   was charged with providing a variety of training

12   programs to all departmental staff.  I promoted --

13   I provided training in the areas of critical

14   incident command, hostage negotiation, employee

15   review hearing trainings, Departmental Rule 504,

16   the administration of discipline, especially the

17   ticket writing process.  I provided training to all

18   -- to staff in preservice orientation training,

19   which is the training that all new nonsecurity

20   staff members receive.  And then I provided

21   training for our preservice security training,

22   which is for our security staff.  And specifically

23   in that training, I provided training in the areas

24   of professional conduct, blood-borne pathogens,

25   report writing, personal search, cell area search,

1   and a variety of other topics.

2          Q.   So, is it fair to say that training at

3   the Department of Corrections continues after

4   cadets attend the academy?

5          A.   Yes.  Our training for our employees is

6   ongoing.

7          Q.   Now, is cadet the correct term for an

8   employee who's going through this six-week

9   training?  Is that the term the department uses?

10         A.   No.  The department uses the term

11  correctional officer trainee from the point in

12  which the officer is hired up until their six-month

13  probation completes.

14         Q.   So, an employee who has completed the

15  six weeks training is still considered a -- what

16  did you say -- correctional officer trainee?

17         A.   Yes.  They're a correctional officer

18  trainee.

19         Q.   Is there any difference between an

20  employee on the day before the end of that six

21  weeks of training versus the day after?

22         A.   No, not in regards to their authority.

23         Q.   We've heard the term sworn and unsworn.

24  Do you know what those terms refer to?

25         A.   Oftentime, when people refer to sworn

1   staff, they often relate it to police officers in

2   the street.  And, yes, our correctional officers

3   take an oath at their graduation to uphold the

4   Illinois Constitution and the United States

5   Constitution, but our authority is only within the

6   prison system.  We're not sworn officers per se in

7   operating in the streets.  Very similar to the

8   duties of a peace officer.

9        Q.  Does being --

10       A.  But --

11       Q.  I'm sorry.

12       A.  I was just going to say, but all

13   employees of the Department of Corrections also

14   have that same responsibility of ensuring that all

15   rules, regulations, and constitutional rights under

16   the U.S. Constitution and Illinois State

17   Constitution are enforced in regards to offenders.

18       Q.  Does unsworn mean that an employee

19   cannot be one-on-one with an inmate?

20       A.  No.  We often refer to them as

21   non-uniform staff, because we like to think that

22   all staff are security driven.  But daily, in all

23   of our prisons statewide, nurses, doctors,

24   counselors, dietary workers, teachers, librarians,

25   recreational workers, chaplains all deal with

1   offenders one-on-one in private settings.

2         Q.   Can cadets or correctional officer

3   trainees be alone with an inmate?

4         A.   Yes, they may.

5         Q.   Now, you're familiar with the

6   curriculum from the training academy in 2011; is

7   that correct?

8         A.   Yes, I am.

9         Q.   And you said that you have taught

10  cadets or correctional officer trainees regarding

11  professional conduct; is that right?

12        A.   Yes, I have.

13        Q.   And is there a curriculum for that?

14        A.   Yes, there is.

15        Q.   I'm going to show you what's marked as

16  Plaintiffs' Exhibit 38.  What do you recognize that

17  as?

18        A.   This is the curriculum that is actually

19  issued to all new correctional officer trainees

20  when they attend the training academy and this is

21  the curriculum involving professional conduct.

22        Q.   And that's the Department of

23  Corrections' curriculum?

24        A.   Yes, it is.

25             MS. BAUTISTA:  Your Honor, at this time

1  I move to admit Plaintiffs' Exhibit 38 into

2  evidence.

3            THE COURT:  Any objection?

4            MS. BROWN:  No, Your Honor.

5            THE COURT:  It's admitted.

6                 (Plaintiffs' Exhibit Number 38

7                 admitted.)

8            MS. BAUTISTA:  Can the screens be

9  turned on, please?

10           THE COURT:  What's the matter?  The mic

11 doesn't seem to be --

12           MS. BAUTISTA:  Your Honor, I was just

13 asking for the screens to be turned on.

14           THE COURT:  Oh, good.  Thank you.

15      Q.   So, we can't see the whole page at a

16 time, but we'll just start looking at it.  Does

17 this -- is this the curriculum regarding

18 professionalism?

19      A.   Yes, this would be the curriculum

20 involving professional conduct.

21      Q.   And what is -- without giving the jury

22 every blow by blow of what the cadets are trained

23 on, can you describe for the jury the beginning of

24 the curriculum regarding professionalism for

25 cadets?

1    A.   Yes.  All of our curriculums are

2    essentially written the same, a general outline,

3    like you see, including performance objectives and

4    then they would go into a series of topics.

5            In regards to professional conduct,

6    you'll see in the first section the criteria for --

7    for a profession.  And very generic in stance of

8    rules that would apply in professional job titles.

9    And from that point, we would build upon that to

10   more specific things involving correctional

11   officers, to include topics such as ethics,

12   morality, you know, the -- how we deal with

13   offenders one-on-one, the importance of

14   professional communication, to not be demeaning, to

15   not be condescending, to be a professional.

16   Q.   Is part of the curriculum informing

17   cadets the way that they should behave?

18   A.   Yes, it is.  As you see in that, you

19   see a variety of topics, such as displaying good

20   manners and speech.  And these would be not only

21   how an employee would address an offender but how

22   an employee would address a co-worker or the public

23   or the court, per se.  Not gloating over weaknesses

24   of others; analyzing their own speech and actions,

25   as well as the speech and actions of others; being

1   alert, quick to respond; adapting to change; the

2   basics of being a professional correctional

3   officer.

4           Q.   Does the curriculum address the

5   demeanor that a correctional officer should have?

6           A.   Yes, it would.  In this section, you

7   know, we see demeanor.  And I'll read from it.

8   "Demeanor refers to the way a person conducts

9   himself or herself or the manner in which he or she

10  behaves."

11          And then you see a series of topics.

12  The one that stands out to me is voice quality.  We

13  teach our officers to be calm, to speak in a

14  low-pitched voice, not yelling, not screaming, but

15  an authoritative, low-pitched voice, to not be

16  threatening, to not degrade, to be respectful.

17          You know, my experience has shown me

18  that when you're respectful to an individual, it's

19  much easier to get them to either gain compliance

20  or not only at that moment of that respect but I

21  may need that respect from that individual at any

22  point.  So, it's not something that we turn on or

23  off.  We teach our cadets that you always act with

24  the highest demeanor.

25          Q.   And what are cadets taught in regards

1   to the vocabulary they should use as a correctional

2   officer?

3        A.  In regards to vocabulary, you know, we

4   do teach them to speak on that person's level.  We

5   don't want them to utilize, you know, big words,

6   per se.  We want them to use understandable

7   language but to avoid profanity.  We want to set a

8   bar and we don't want to go underneath that bar, so

9   we avoid that profanity.  And it is taught in our

10   curriculum.

11        Q.  Does the curriculum address actions

12   regarding professionalism?

13        A.  Yes, it does.  When we discuss

14   professionalism, being the -- the standard that is

15   used often in training is the concept of firm,

16   fair, and consistent.  And you can see that noted

17   under Section 3 under Action.  And that is the

18   basis of our curriculum, to be firm, fair, and

19   consistent.

20           And I'll read once again straight from

21   it.  "It is important for offenders to understand

22   that you're consistent in your decision and not

23   swayed by your personal mood or the offender's

24   personality."

25           So, once again, we don't let the

1   offender dictate our behavior.  We dictate that

2   behavior.  We want them to be impartial.  We don't

3   want them to jump to conclusions.  But yet we want

4   them to stay within their authority that if -- you

5   know, the standard thing that is commonly taught is

6   if you don't know the answer to a question from an

7   offender, be honest, tell them you don't know.  But

8   if you're going to let them know that you're going

9   to get an answer for them, get an answer for them,

10  go back with that answer.  But you also have to be

11  firm enough to be able to state that if the answer

12  is no, the answer's no.  And that is essentially

13  being firm, fair, and consistent.

14      Q.   Now, what about training in regards to

15  situations that may arise, are cadets given

16  information regarding that?

17      A.   Yes.  In the curriculum itself we

18  actually provide them some very basic situations.

19  And of course, a trainer in class may also expound

20  upon that.  But in the curriculum itself you see

21  three situations that I find are very good

22  instructional tools to use with cadets.

23          The first one, the situation states

24  that you witness a staff member giving an offender

25  contraband.  The contraband in question is a

cigarette.  Well, we're trying to instruct -- or,
instruct our cadets and demonstrate to them that
regardless of rank or title, that when you see
something that is wrong, that's a violation of the
rules, you are to report it.  And that is
discussed.

And then I go back to situation 3 that
you see at the bottom of the page, you witness
excessive use of force by a senior staff.  They
remind you that they are -- that you are new here
and would have no idea what excessive force is.
And we emphasize to our cadets or our correctional
officer trainees to go with their gut feeling.  If
it doesn't seem right, report it, question things.

The important thing that we stress is
that at the end of the day we all go home safely.
But we also want to come back the next day for
work.  And by not reporting something serious like
excessive force by a senior staff, they could lose
their employment.  So, we stress that heavily
within our training.

Q.   What instruction is provided regarding
reporting senior staff engaging in misconduct?

A.   We are a paramilitary organization, so
we do have a chain of command.  But it's also

1   stressed to those correctional officer trainees

2   that they can go outside that chain of command.

3   And the example I'll use for this would be as a

4   correctional officer, I might have a sergeant who

5   is my direct chain of command who I see do

6   something wrong.  I have the authority that I can

7   go to a lieutenant, a major, or a shift supervisor,

8   an assistant warden, a warden, a deputy director,

9   all the way to the director's office.  I can step

10  outside the authority of that chain of command to

11  report misdeeds.

12       Q.   Are cadets trained regarding reasons

13  why a correctional officer might engage in

14  misconduct?

15       A.   Yes, they are.  Unfortunately, in all

16  professions, you know, misconduct does occur.  And

17  we do discuss, you know, the very common reasons

18  for misconduct.  And you can see them listed in the

19  curriculum.  It could be greed; it could be anger;

20  lust when we talk in regards to socialization and

21  sexual misconduct issues; and it could be peer

22  pressure, you know, the fact that peer influence

23  some decisions.  New staff may be influenced by

24  inappropriate responses and reactions by seasoned

25  staff.  It's not unrealistic to think that staff

1   could face peer pressure.  But we teach them not to

2   let peer pressure overcome them, that you want to

3   be firm, fair, consistent.

4        Q.   You mentioned socialization.  What did

5   you mean by that?

6        A.   Socialization essentially could be an

7   unprofessional relationship with an offender.  It

8   could be as simple as, you know, contacting their

9   family, bringing in minor contraband, all the way

10  to a criminal act, such as a sexual relationship

11  with an offender.

12       Q.   Does this module on professionalism

13  address consequences that a correctional officer

14  could have occur?

15       A.   Yes, it does.

16       Q.   Can you discuss that?

17       A.   You see the section clearly marked

18  Consequences, and I won't read it verbatim, but you

19  see the key four bullets, you know, the loss of

20  employment, which can cause financial problems;

21  loss of your home; loss of your car; loss of

22  employment opportunities; it could hinder your

23  future advancement; health risk; you know,

24  something that we stress heavily is that, you know,

25  with misconduct you can put your health at risk;

loss of integrity; loss of family, friends, respect in the community.  An additional subject that isn't listed there, but loss of the integrity of the institution that you work for, the Department of Corrections as a whole.

Q.   Now, I think you said at the beginning that the cadets are given this packet regarding professional conduct, the written material that we've been going over?

A.   Yes.  They receive the curriculum on their first day at the training academy.

Q.   And when -- is it also taught to them, this module on professional conduct?

A.   Yes, that is taught in week one.  And then at the completion of the week, they are also given a test in regards to this module.

Q.   We've been speaking in weeks.  How many hours each day are the cadets present?

A.   Essentially, Monday is a travel day for them, so they are not in the classroom until 12. So, they would be in the classroom for four hours on Monday.  And then Friday is also a travel day, so they would be on the road by noon.  So, they would work 8 to 4 Tuesday through Thursday, and then 12 to 4 on Monday, 8 to noon on Friday.

1    Q.   And you said the professionalism is
2  taught during week one?
3    A.   Correct.
4    Q.   How much time during week one is spent
5  on professional conduct?
6    A.   Essentially, a half day to a full day,
7  typically on that Tuesday, the second day of their
8  training.
9    Q.   What happens at the end of week one?
10   A.   They are given a written exam.
11   Q.   Is there an expectation in regards to
12  that exam?
13   A.   Yes.  A cadet, to pass the training
14  academy, must have a compiled score of greater than
15  70 percent.
16   Q.   So, that's -- there is an exam at the
17  end of each week?
18   A.   Correct.
19   Q.   And at the end of the academy they have
20  to have a score of 70 percent?
21   A.   Yes.
22   Q.   Is anything done if a cadet at the end
23  of week one does not have a 70 percent at that
24  time?
25   A.   Yes.  Typically, if a correctional

1    officer trainee would score below 70 percent, the

2    manager of training would assign either a class

3    counselor or a trainer to reaffirm that curriculum

4    with that cadet and in some cases would require

5    them to retake the test.  That our overall goal is

6    to make sure that that correctional officer trainee

7    fully understands the curriculum that's in front of

8    them.

9        Q.   Okay.  I'm going to show you what's

10   been marked as Plaintiffs' Exhibit 36.  Do you

11   recognize that?

12       A.   Yes, I do.

13       Q.   What do you recognize it as?

14       A.   It is the curriculum provided to

15   correctional officer trainees, or cadets, in the

16   areas of personal search.

17           MS. BAUTISTA:  Your Honor, I move to

18   admit Plaintiffs' Exhibit 36.

19           MS. BROWN:  No objection, Your Honor.

20           THE COURT:  It's admitted.

21               (Plaintiffs' Exhibit Number 36

22               admitted.)

23       Q.   Now, can you describe for the jury the

24   performance objectives of the personal search

25   section of the curriculum?

1          A.   Yes.  Once again, the standard

2    curriculum, they're all essentially formatted the

3    same.  The first area would be that of performance

4    objectives.  And what that basically is is, similar

5    to a syllabus that you might see in school, just a

6    general overview of what that individual is going

7    to receive during that training.  So, in this case,

8    we're going to discuss, you know, the name and two

9    purposes for a search; we're going to define

10   contraband; we're going to talk about the

11   categories of contraband; the types of searches; a

12   body search; the procedure for a strip search.

13   We're going to identify categories of people who

14   are subject to search.  We're going to define a

15   body search and identify the procedure for the

16   disposal of contraband.

17          Q.   The test at end of the week, does it

18   test the cadets regarding these performance

19   objectives?

20          A.   Typically, the test -- which I will

21   also include is a closed-book test, that they're

22   required to know the knowledge when they take it --

23   would not necessarily test them specifically to

24   what the performance objectives are, but the

25   questions typically are highlighted from those key

1  areas that we find important enough to make

2  performance objectives.

3      Q.  Does the curriculum discuss rules for

4  doing a personal search?

5      A.  Yes, it does.

6      Q.  And what are cadets taught regarding

7  rules for a personal search?

8      A.  We want them to be systematic,

9  thorough, and objective.

10      Q.  Can you describe briefly for the jury

11  what that means or what the cadets are taught in

12  regards to that?

13      A.  In regards to systematic, it's not so

14  much following steps in an order but doing things

15  the same way every single time.

16          In regards to being thorough, we want

17  them to take their time and to do just that, do a

18  thorough job.

19          In regards to objective, we want them

20  to be professional.  You know, we want them to

21  display that attitude.  You know, we want them to

22  be firm, fair, and consistent.

23      Q.  Is it fair to say that professionalism

24  is a part of the training, not just in the

25  professionalism module?

1 A. Absolutely. Professionalism is

2 throughout our training curriculum. Just as you

3 see for personal search, you know, part of being

4 objective is being a professional. In fact, I

5 would be hard-pressed to find a module within our

6 training that would not constitute areas of

7 professionalism because it's a part of being a

8 correctional officer in all of your duties.

9 Q. Does this curriculum teach cadets

10 regarding the reason for unclothed searches?

11 A. Yes, it does.

12 Q. Can you discuss that, please?

13 A. Yeah. You see the -- the beginning at

14 the very bottom of the page where it talks about

15 some situations that may call upon you to conduct a

16 search. And I'm assuming you mean unclothed search

17 for offenders.

18 Q. Well, before we get to that, who can be

19 subject to an unclothed personal search?

20 A. Essentially, anyone entering a facility

21 can be subject to an unclothed search. Obviously,

22 in the cases of visitors or employees, it takes a

23 higher authority to approve that. But all

24 individuals entering a facility are subject to

25 that.

1      Q.   And what are cadets taught in regards

2    to when an offender may be subjected to an

3    unclothed search?

4      A.   An offender can be subject to a -- to

5    an unclothed search for various reasons that have

6    been brought up, from entering and leaving a

7    visiting area; entering and leaving a special

8    program; a mass search such as this; when they

9    leave the facility for medical appointments; when

10   they leave the facilities for courtroom testimony

11   or courtroom appearances; if they leave the fence

12   area for an outside work detail or an area in which

13   they come and go from a work location, such as

14   dietary, industries, areas along that line.

15     Q.   Are all of those situations

16   specifically listed in the curriculum?

17     A.   No, they would not be.

18     Q.   Why is that?

19     A.   Because the areas in which an offender

20   can be searched, it's very broad.  It would be very

21   facility-based to facility.

22          To cite an example, when I worked at

23   Jacksonville Correctional Center, our correctional

24   center industry workers worked inside the fence.

25   It was required that we search them every single --

1     strip-search them every single day coming and going

2     from that work location because of sensitive

3     information that they had access to.  Where I --

4     when I worked at Decatur Correctional Center, our

5     correctional industry workers were not

6     strip-searched coming and going at the time that I

7     worked there.  So, it would vary based on facility.

8           Q.  Okay.  I'm going to show you what's

9     been marked as Plaintiffs' Exhibit 37.  Do you

10    recognize that?

11          A.  Yes, I do.

12          Q.  What do you recognize it as?

13          A.  It is a print-off of the PowerPoint

14    presentation that would be provided or demonstrated

15    to correctional officer trainees, or cadets, when

16    they would be attending personal search class.

17          MS. BAUTISTA:  Your Honor, at this time

18    I move to admit Plaintiffs' Exhibit 37.

19          THE COURT:  You're offering that into

20    evidence?

21          MS. BAUTISTA:  Yes.

22          THE COURT:  Any objection?

23          MS. BROWN:  May I see it very quickly?

24          Oh, no objection.  Thank you.

25          THE COURT:  It's admitted.

1          (Plaintiffs' Exhibit Number 37

2          admitted.)

3      Q.   Now, I'm just showing the front page

4  here, we're not going to go through slide by slide,

5  but can you describe what's in the Plaintiffs'

6  Exhibit 37?

7      A.   Yes.  Basically what you see in front

8  of you is the first slide of a PowerPoint

9  presentation that someone like myself as an

10 instructor would use when providing training in the

11 area of personal search.  And what that PowerPoint

12 would do would be walk the participant along

13 through the curriculum which they would have in

14 front of them to essentially hit the highlights,

15 not unlike we see in classrooms throughout the

16 world right now that that PowerPoint presentation

17 is essentially a good synopsis of that curriculum,

18 which provides another visual opportunity for the

19 cadet to see that as we go through the program.

20     Q.   When is personal searches addressed in

21 the training of a cadet?

22     A.   Essentially, personal search is covered

23 in either week two, three, or four.  Because what

24 occurs with our training is:  In week one the

25 cadets are all together in one large group.  We

1    then place them into platoons to create smaller

2    class sizes for weeks three, four, and five, to

3    allow easier instruction for areas such as

4    firearms, control tactics, but also a smaller class

5    size to allow better opportunity for questions and

6    comments and interaction in areas such as personal

7    search.  And then in weeks five and six the cadets

8    return as one large group together.

9         Q.   We've discussed two of the curricula

10   that are addressed during the training academy.  Is

11   that fair to say?

12        A.   Yes.

13        Q.   Can you discuss some of the other

14   curricula that is presented to the cadets during

15   the six-week training?

16        A.   Yes.  As I said before, in week one, we

17   discuss professional conduct.  We also discuss use

18   of force.  We provide them an overview of report

19   writing.  Because from day one we want them to be

20   able to write reports.  Because we'll require them

21   to write reports throughout their training.  They

22   also go through their classroom firearms training

23   in that first week.

24             And then, as I said, in weeks two,

25   three, and four, they are what we call platooned

where they're separated.  And in those weeks they would go through a week of control tactics; a week of firearms range instruction where they actually go out and fire our departmental weapons and qualify; and then the third platoon within that week is referred to as personal search week, in which they're instructed in the areas of personal search, specific report writing in regards to the writing of tickets, shakedown slips, incident reports, cell and area vehicle searches.

Then in week five, they would come back together.  They are taught subjects such as special populations, to include dealing with the female offender, sex offender populations.  They also receive training in blood-borne pathogens, hostage, riot, the use of Scott Air-Paks for response to smoke or fire.

Then in week six they are still together.  They continue training in areas of response to hazardous material spills, critical incident command.

And then they take their final exam and graduate.

Q.   You mentioned blood-borne pathogens. What do you mean by that?

1       A.   We teach our cadets in the universal

2   precautions that essentially that any bodily waste,

3   you know, whether it be blood, urine, feces, to

4   treat it as though it has pathogens.  And we treat

5   them -- or, excuse me -- we teach them to clean

6   those areas appropriately with a ten-to-one ratio

7   of bleach to water, to utilize gloves in those

8   cases, and to properly dispose of soiled items.

9       Q.   We've discussed some today that weeks

10  five and six also involve a training exercise.

11  Would that be fair to say?

12      A.   Yes.

13      Q.   Can you discuss that, please?

14      A.   All of our offenders at that time

15  period went through two training exercises.

16  Traditionally, they would go in week five on either

17  Wednesday or Thursday and then on week six on

18  Tuesday.  The training exercises typically were

19  different facilities.  Usually, we would go to

20  facilities that have a variety of population.  But

21  much of the decision made of where the cadets went

22  based on operational needs.

23           When I completed the training academy

24  in 1994, my class went to Menard Correctional

25  Center for both of our cadet exercises because

1    there was an operational need at Menard

2    Correctional Center in 1994.

3              But typically they do get that exposure

4    in two of those exercises.  Oftentimes, it's a

5    maximum security facility.  It may be a minimum, a

6    medium, a female facility or a male facility.

7    That's truly up to the powers to be.

8         Q.   Is it fair to say that you've been on

9    many cadet training exercises in prisons?

10        A.   Yes.  I would say on average during my

11   time at the academy -- well, with each class, two a

12   class, I would estimate I've probably been on 80 to

13   a hundred of them.

14        Q.   So, it's also fair to say you've been

15   to both female and male institutions?

16        A.   Yes.

17        Q.   In regards to March 31st, 2011, we've

18   discussed that you stayed in the housing unit.  And

19   is that what you do when you go to female

20   facilities?

21        A.   When -- as a male instructor, when I

22   would go to a female facility, I would place my

23   emphasis on the search of the cell or living area,

24   because I'm not going to be avail -- not available,

25   but I'm not going to be involved in the strip

search of a female offender.  It's against policy

and it's definitely against any practice that I've

ever demonstrated.

Q.  When you've gone to male facilities,

what have you done during these cadet training

exercises?

A.  When we go to a male facility, I

directly supervise the cadets in the conducting of

those male strip searches.

Q.  We've heard a little bit about time

constraints when the cadets are outside of the

training academy.  Do you know anything about that

in terms of these training exercises?

A.  Can you repeat that?

Q.  Sure.  Let me rephrase it maybe.

A.  Yeah.

Q.  We've heard some testimony that the

cadets shouldn't be paid overtime, that they need

to leave the training academy at a certain time and

be back at a certain time.  Do you know anything

about that?

A.  Yes, I'm very familiar with that.

We're -- our cadets, or correctional officer

trainees, they are represented by AFSCME Council

31.  Therefore, they are eligible for the overtime

rules.  And due to financial constraints, we are required that we have our cadets only work between the hours of 8 and 4 to avoid overtime costs.

Q.  Have there been instances when on training exercises the cadets have had to be paid overtime?

A.  Yes, there has been.

Q.  But that's always a concern in the minds of the people arranging these exercises?

A.  Yes.  It is not pleasant when there's overtime to be paid for someone like myself.

Q.  We heard a bit about inmate IDs, that the women were supposed to take their IDs with them along with necessary medications.  Do you know what an inmate ID is?

A.  Yes, I do.  Basically, similar in size to a driver's license, it would contain the inmate's photograph, a bar code, and their inmate ID number.  And essentially, offenders know to carry that on their persons at all times because that's how staff can readily identify them.

Q.  You mentioned an inmate number.  What's that?

A.  All inmates when they enter the Department of Corrections are given an identifying

number.  It typically -- always is prefixed with a

letter followed by five digits.  And that number

remains with that offender throughout their

incarceration or for any incarcerations that could

occur after that fact.  So, essentially, once that

number is assigned to an individual, it's never

reassigned to another offender.

Q.   What's the purpose of having an inmate

ID number?

A.   When -- when you deal with large

numbers of people, like we do, to cite an example,

the name Jeff Smith, we would have hundreds of Jeff

Smiths within the Department of Corrections.  So,

that inmate ID number gives us a way to

differentiate between the many Jeff Smiths that we

might have throughout our prisons.  And that way we

can quickly identify who specifically we're

discussing or dealing with.

Q.   We've also heard about count and

clearing count.  What does count mean?

A.   Throughout the day, once again varied

upon the facility, we're required to do a variety

of counts throughout the day.  Those can be skin

counts where essentially we just see the body, all

the way to a movement count where we're required to

1 see movement from an offender, and then what I

2 consider to be the most important count of the day

3 every facility is required to do at least once a

4 day and that is a verified ID count in which the

5 correctional officer verifies the cellhouse map or

6 printout of where offenders live, verifying that to

7 the ID of the offender, verifying that that name

8 and number matches the cellhouse map where the

9 inmate is living and that the picture on the ID

10 matches the inmate who's in that bed or cell.

11 Q. How often is the verified ID count

12 performed in a facility?

13 A. A minimum of once a day. So, we cannot

14 go over 24 hours without a verified ID count being

15 completed.

16 Q. Now, you mentioned that the verified ID

17 count can be done with a cellhouse map or a

18 printout of where they live. Do you know where

19 that information comes from?

20 A. Yes. How it's produced are throughout

21 the state each facility has a placement office and

22 that placement office is required to print off that

23 report. It would have formerly been printed off of

24 our offender tracking system. It is now printed

25 off of our computer system referred to as Offender

360.

Q.   Now, Adrian Maynor testified that she was on Housing Unit 2B on March 31st, 2011.  Does DOC maintain records regarding an inmate's housing history?

A.   Yes, we do.

Q.   Okay.  I'm going to show you what's been marked --

MS. BROWN:  Excuse me, Judge.  I'd like to call for a sidebar please.

THE COURT:  Beg pardon?

MS. BROWN:  I'd like to object and call for a sidebar.

THE COURT:  All right.  Fine.  Come on up here.  Turn on the machine.

                    (The following proceedings were
                     held at the bench, out of the
                     hearing of the jury.)

MS. BROWN:  Judge, I'd just like to make a record that the exhibit I believe the defendants are about to show Mr. Pasley was not on the exhibit list for the defendants and there's no reason for that.

          Ms. Maynor was identified as a --
disclosed as a person of knowledge in the 26(a)(1)s

1   and she was listed on our witness list many months

2   ago.  And so, I believe the document that is about

3   to be shown as an exhibit that is -- is a surprise

4   to the plaintiffs.  We did -- we were given a copy

5   of it, but only on the morning before Ms. Maynor's

6   testimony. So, we object on that basis.

7              THE COURT:  Let me see the exhibit.

8   Thank you.

9              You did see a copy of this prior to

10  today?

11             MS. BROWN:  Yes, Your Honor, on the

12  morning of her testimony.

13             THE COURT:  Which was when?

14             MS. BROWN:  Wednesday I believe.

15             THE COURT:  So, we're talking two days

16  ago.

17             MS. BAUTISTA:  I think it was Tuesday

18  that she testified.

19             MS. BROWN:  That's right, Tuesday.

20             THE COURT:  Tuesday?

21             MS. BROWN:  Yes.

22             THE COURT:  So, three days ago you did

23  see a copy of this?

24             MS. BROWN:  Yes, Your Honor.  But we

25  didn't have any opportunity to do any discovery on

1    that document, to request any records from

2    Ms. Maynor's master file, to find out about her

3    house arrest status or segregation status, and

4    where she was, and that's the reason for our

5    objection.

6              THE COURT:  Did you see a copy of this

7    prior to her testimony?

8              MS. BROWN:  Just -- just prior.  The

9    morning of her testimony.

10             THE COURT:  Did you have an opportunity

11   to go over this copy that you had with her?

12             MS. BROWN:  No, I did not, Your Honor.

13   I didn't have a copy at that time.  I was shown the

14   document, but I was not given a copy until I

15   believe Wednesday or Thursday.

16             THE COURT:  Okay.  Why the delay in

17   that?

18             MS. BAUTISTA:  Your Honor, first of

19   all, the Department of Corrections long ago

20   produced documents regarding all housing records

21   for 2B and 4B.  And on Monday night I did e-mail

22   plaintiffs' counsel and I did inform them that I

23   did not believe Ms. Maynor was on either Unit 2B or

24   4B based on these housing records because the cell

25   occupancy records for both of those units for that

1    day, March 31st, was fully produced.  Her name does

2    not appear.

3                Additionally, she was not listed in

4    Plaintiffs' 26(a) disclosure.  She was disclosed

5    just as a list of names in a letter that was sent

6    to Chris Higgerson I believe in 2014 or 2015, not

7    in any 26(a) disclosures.

8                I did run off a housing history for Ms.

9    Maynor specifically so that I could say what unit

10   she was in, rather than just that she wasn't in 2B

11   or 4B.

12               I certainly could use plaintiffs' own

13   exhibit.  They've already relied on housing records

14   for 2B and 4B today in regards to cell occupancy

15   history, and I could present those 200 records and

16   show that she's not housed in that unit on those

17   days.  But this shows where she was.  And it's

18   impeaching of Ms. Maynor's testimony.

19               MS. BROWN:  If I may, Your Honor, just

20   to clarify the record, Ms. Maynor was disclosed in

21   a supplement to our 26(a)(1) disclosures.  I

22   believe that's the letter that Counsel was

23   referring to.

24               And I think that, you know, if -- you

25   know, we object to the use of documents that

1    weren't disclosed, weren't on exhibit lists.  If

2    the defendants want to introduce our exhibit with

3    the cell occupancy records, we won't object to

4    that.  But we do object to this document, which was

5    never disclosed, never put on a witness -- on an

6    exhibit list.

7             THE COURT:  Well, what about this other

8    document she's referring to?

9             MS. BAUTISTA:  It's like 200 pages,

10   Your Honor, and this is one page that shows where

11   she was housed.

12            THE COURT:  Do the 200 pages show the

13   same information?

14            MS. BAUTISTA:  It shows that she -- no,

15   Your Honor, because it provides everyone who was on

16   -- the names of everyone who was on 2B or 4B in

17   March -- March 31st of 2011.  So, it's the process

18   of elimination.  You'd have to look at 200 pages

19   and see that her name does not appear.

20            This shows where she was housed, is

21   directly impeaching of her testimony, and I think

22   it -- it's fair for us to use it.  We presented it

23   before her testimony to plaintiffs' counsel.  And I

24   inquired Monday night, before she was even brought

25   in, saying I don't believe she was on 2B or 4B.

1  And I think it's fair to use.

2        MS. THOMPSON:  I just want to add one

3  quick thing.  I'm sorry.

4        MS. BAUTISTA:  It's also indicative,

5  Your Honor, of recent fabrication in regards to Ms.

6  Maynor's testimony.

7        MS. THOMPSON:  The only thing I'll add

8  is that I think what counsel told me -- what

9  counsel said to me that night was that they did not

10  believe that she had been disclosed as a witness

11  and that's when I sent Mr. Higgerson's letter.  It

12  was in the morning of her testimony that counsel

13  approached us that they did not believe that she

14  was in one of these housing units, and that's when

15  they showed us but didn't give us Exhibit 90.

16        THE COURT:  Let me ask this:  Do

17  plaintiffs' counsel have any reason to believe that

18  this is not authentic?

19        MS. BROWN:  Yes, we have serious

20  concerns about its accuracy.  I mean, it's not that

21  we believe -- not authenticity.  We don't believe

22  anybody fabricated it, but we do have concerns

23  about its accuracy.  Yes.

24        THE COURT:  Now, why wasn't this

25  disclosed earlier?

1          MS. BAUTISTA:  Your Honor, I -- I -- we

2   have a list of 65 witnesses that were going to be

3   brought in from either the Department of

4   Corrections or as class members.  I didn't know who

5   specifically was going to testify.  I did come into

6   this case late, which is not an excuse, but I -- I

7   ran that off to see where she was housed because

8   the records for Housing Units 2B and 4B did not

9   reveal her as an occupant of either unit and I

10  wanted to see where she was and why we didn't have

11  a record of her being in 2B and 4B, and it revealed

12  she was on Unit 5A.  I specifically asked her if

13  she was on Unit 5A.  She said no.  And I'm proving

14  up the impeachment now.

15          THE COURT:  Well --

16          MS. BROWN:  I think what -- you know,

17  what we object to is the document being admitted

18  into evidence.  This isn't impeachment.

19          MS. McNAUGHT:  How is it not

20  impeachment?

21          THE COURT:  Wait a minute.

22          MS. McNAUGHT:  I'm sorry.  Your Honor,

23  I apologize.

24          THE COURT:  That isn't the question.

25  The question -- we don't care what the effect or

1   the impact of an exhibit is.  It's the question of

2   surprise.  There's the biggest problem here.

3   Number one, accuracy, of course.  But, number two,

4   surprise.

5           Now, there is no question that there is

6   -- we all admit this is probably accurate.

7           MS. THOMPSON:  No, we don't.

8           MS. BROWN:  No.

9           THE COURT:  You don't have any reason

10  to believe it's inaccurate.

11          MS. THOMPSON:  Yeah, we do.

12          THE COURT:  Oh, you do?

13          MS. THOMPSON:  Yeah.

14          MS. McNAUGHT:  Hold on.

15          THE COURT:  Well, I think that puts a

16  whole new picture on this.  So, therefore, it seems

17  to me that what we need to do is to go ahead and

18  allow this to be admitted into evidence and give

19  you adequate opportunity to cross.  Now, if it

20  isn't accurate or if it isn't authentic, then we'll

21  strike it, and I will do so with an admonition to

22  the jury regarding this particular exhibit.  Now,

23  it's -- that may not be to you but it is rather

24  simple to me and that's the way I'm going to do it.

25          MS. BROWN:  Your Honor, we understand

1   the Court's ruling.

2           THE COURT:  Okay.  Good.  Well, I think

3   that's what we'll do.  So, you go right ahead with

4   this and -- but it is going to be open -- open

5   season on this one.

6           MS. BAUTISTA:  Yes.

7           THE COURT:  Okay.  Thank you.

8               (Which concluded the proceedings

9               at the bench.)

10          Q.  (by Ms. Bautista) I'm showing you

11  what's been marked as Defendants' Exhibit 90.  Do

12  you recognize that?

13          A.  Yes.  This would be a housing

14  assignment printout from Offender 360.

15          Q.  And how do you recognize it?

16          A.  It's a general report that's available

17  on Offender 360.

18          Q.  And is this similar to the cell

19  occupancy record that Russell Reynolds testified to

20  previously?

21          A.  Yes.  The one that Assistant Warden

22  Reynolds testified to was on the old offender --

23  excuse me -- the old offender tracking system, or

24  OTS, where this is printed off of our new computer

25  system that was implemented this year, Offender

1  360.

2        Q.   And who's responsible for maintaining

3  the information contained in Offender 360?

4        A.   A variety of staff would be, anyone

5  that would conduct data entry.  In the case of

6  housing assignments, it would be the placement

7  office.

8        Q.   You're specifically looking at a record

9  regarding housing assignments?

10        A.   Correct.

11        MS. BAUTISTA:  At this time, Your

12  Honor, I move to admit Defendants' Exhibit 90 into

13  evidence.

14        THE COURT:  And over objection, I'm

15  going to admit it.

16              (Defendants' Exhibit Number 90

17               admitted.)

18        THE COURT:  Flip that down so that the

19  top shows, to begin with.  There we go.  Now, see,

20  that tells us what each of the columns reflect.  Go

21  ahead.

22        Q.   Is this record regarding a specific

23  offender?

24        A.   Yes.  It would be in reference to

25  Maynor, K00930.

1    Q.   And is that the same Adrian Maynor that

2   testified in court this week?

3    A.   Yes, it would be.

4    Q.   How do you know that?

5    A.   I verified the name and inmate number

6   on the subpoena that was issued requiring her to

7   appear in court.

8    Q.   Are you talking about the court writ?

9    A.   Yes, the writ.

10   Q.   And can you describe the columns at the

11  top and the information that's contained within

12  this record?

13   A.   The left column would be the offender

14  name and number, followed by the institution in

15  which the offender is at, followed by the specific

16  living unit, followed by the start date that the

17  offender would have been moved to that location,

18  followed by an end date in which that offender

19  would have been moved from that location, and then

20  the reason for placement.

21   Q.   And the top line has no end date.  Do

22  you know why?

23   A.   Because that would be her current bed

24  assignment.

25   Q.   And this is only one page of her

1  housing record; is that correct?

2       A.   Yes, I would assume so.

3       Q.   Can you tell from this record where Ms.

4  Maynor, according to Offender 360, was housed on

5  March 31st, 2011?

6       A.   Based on this record, she was moved to

7  Housing Unit 5, Wing A, Room 4, on 3/4/11 and

8  remained in that room until 3/23/2012.

9       Q.   Okay.  I'm going to give you my pen so

10  that you can mark that entry on this exhibit.

11       A.   Would you like the whole line

12  highlighted?

13       Q.   Yes.  So, based on this record from

14  Offender 360, does it appear that Ms. Maynor was

15  living in Unit 2B or 4B on March 31st, 2011?

16       A.   No.  According to this record, she was

17  assigned to Housing Unit 5, A wing.

18       Q.   Isn't it possible that this is just an

19  inaccurate document?

20       A.   No.  The -- the bed assignment would be

21  verified on a daily basis during the verified ID

22  count.  The printout that I referred to earlier

23  that the housing unit officers would use when doing

24  their verified count would also be driven by the

25  same computer system that this record came from.

1   So, the officers within that 24-hour period would

2   conduct that verified ID count in which they would

3   verify that Maynor K00930 resided in Housing Unit

4   5, A wing, and they would verify that through the

5   printout sheet to her ID, with her picture on the

6   ID, and to the offender itself.

7       Q.  Talking again about March 31st, 2011,

8   you testified that you randomly checked the fit of

9   handcuffs of some of the inmates.  Is that fair to

10   say?

11       A.  Yes.

12       Q.  Was that for inmates both in Housing

13   Units 2B and 4B?

14       A.  Yes.

15       Q.  Why not check the fit for every inmate?

16       A.  For one, we were dealing with quite a

17   few offenders, and much of what I was -- driving my

18   check of fit was random, to randomly check on the

19   cadets.  But also if there were any inmate

20   complaints, I would immediately check those cuffs

21   for fit.

22       Q.  And why is that?  Why would you check

23   for fit if an inmate complains?

24       A.  For a multitude of reasons.  One, I

25   want to make sure that they are properly placed,

but I don't want an offender to have to stand there
with handcuffs on that aren't on properly.  And
I've found through my experience it resolves a lot
of issues that when an offender complains to you,
rather than let that complaint fester, address the
complaint when it occurs and deal with it.

Q.  In your history working for the
Department of Corrections, have you had inmates
complain after you yourself have placed handcuffs
on that they were too tight?

A.  Yes, I have.

Q.  And what did you do in those
situations?

A.  I did the pinkie test that I checked
myself to see if they were on too tight.

Q.  You checked for fit even though you had
just placed the handcuffs on?

A.  Yes.

Q.  Now, you mentioned at the beginning of
your testimony that you have job duties involving
programs compliance with the Prison Rape
Elimination Act; is that right?

A.  Yes, I do.

Q.  Can you explain what your role is in
regards to the Prison Rape Elimination Act?

1          A.   I am the statewide coordinator for the

2    Prison Rape Elimination Act.  Essentially, as

3    testimony was given prior, I am required to make

4    sure that all 29 facilities within the Department

5    of Corrections are fully compliant with the Prison

6    Rape Elimination Act and we do that through outside

7    auditing through contractual auditors.  I work

8    closely with the facilities, ensuring all that

9    documentation and policy and practices are

10   enforced, and I work with the auditors as they come

11   in and conduct their audits.

12         Q.   We talked a bit about the Prison Rape

13   Elimination Act regulations that came into force in

14   2012.  Do you recall that testimony from earlier

15   this week?

16         A.   Yes, I do.

17         Q.   Did Illinois have any role in those

18   PREA regulations?

19         A.   Yes, we did.  We regularly provided

20   information to the Department of Justice in regards

21   to our policies, practices, and the laws of the

22   State of Illinois.  In fact, I myself attended

23   multiple trainings provided by the Department of

24   Justice, and within those trainings also provided

25   information as regards to best practices through --

1  for the State of Illinois regards to how we

2  approach the elimination of sexual assault within

3  our prisons.

4      Q.  And how is that approached by the

5  Department of Corrections?

6      A.  We have a zero tolerance stance.  We

7  had it prior to PREA and we have it now that PREA

8  requires a zero tolerance.  And we strictly enforce

9  the standards that are provided in the Prison Rape

10  Elimination Act.  And our demonstration of that

11  compliance is that we fully participate in and

12  cooperate in the audit process.  And as required

13  under the act, we were fully compliant as a state,

14  certified by the governor, in -- just recently, in

15  September of 2016.

16      Q.  Now, these regulations weren't in place

17  at the time of this search in March of 2011; is

18  that fair to say?

19      A.  Correct.  The finalized standards were

20  not done at that point.

21      Q.  Was this strip search, as far as you

22  know, outside or in violation of the regulations of

23  the Prison Rape Elimination Act?

24      A.  No.  Our policies and our practice were

25  fully compliant prior to the introduction of the

1   Prison Rape Elimination Act.  And on the date of

2   that search, those same policies and practices were

3   put into use, and we were in full compliance with

4   the Prison Rape Elimination Act.

5        Q.   We've talked some about grievances.  In

6   March 2015, were you part of the grievance process?

7        A.   No, I was not.

8        Q.   Based on your experience and training,

9   do inmates have any method of complaining besides

10  just leaving a grievance in a box?

11       A.   Absolutely.  All offenders have the

12  ability to send request slips to anybody within the

13  facility, to include internal affairs, any of the

14  wardens, their correctional counselor.  They also

15  have the ability that under Illinois law they can

16  write their attorney, public officials, the

17  director of the Department of Corrections, and the

18  John Howard Association.  And that information is

19  handled as legal mail; so, therefore, we cannot

20  search it.  In addition, they have the ability to

21  call their family, who also can call and complain

22  to the department, and they also have the ability

23  to write mail that can be searched to any other

24  family member, friend, or advocacy group.

25       Q.   Were these methods available back in

1  2011?

2      A.  Yes, they were.

3      Q.  Why have these other methods instead of

4  just relying on the grievance process?

5      A.  It essentially establishes a system of

6  checks and balances, that if one system may fail or

7  if an offender feels as though something isn't

8  working quickly enough, it gives them another

9  opportunity to write someone or to call someone or

10  to bring a -- to air a grievance in a different

11  manner.

12      Q.  After the shakedown on 2B was complete,

13  what did you do at that time, on March 31st, 2011?

14      A.  At the completion of the shakedown on

15  2B, as best as I recollect, I waited for the number

16  of cadets to -- that were finishing paperwork.  The

17  ones who were completed, I assembled them, made

18  sure that they had had their lunch.  And then once

19  we were prepared, I went on to 4B.

20      Q.  Were you on Unit 2B when offenders came

21  back onto the unit?

22      A.  Yes, I was.

23      Q.  And why is that?

24      A.  I've always made it a point that I try

25  to be there when offenders leave the unit and also

1   when they come back to the unit so if they do have

2   concerns, they can address those concerns with me.

3                    And especially with Lincoln

4   Correctional Center, where I had done so much time

5   as a counselor at Decatur Correctional Center, I

6   knew some of the offenders.  And to be honest with

7   you, I just wanted to check to make sure that

8   everything was okay.  Because it is a disruption

9   and I do understand that a lot of times they do

10  have questions or concerns that their property is

11  torn up or property is missing, and I always try to

12  make sure that we leave that house in as much order

13  as possible before moving on to the next house.

14       Q.   And what happened when the offenders

15  returned to Unit 2B?

16       A.   The offenders that I interacted with on

17  their return to 2B, there were basic complaints of,

18  you know, they made my bed a mess, things like

19  that, but no specific complaints to any other

20  areas.

21       Q.   Were you able to observe the women as

22  they were coming back onto the unit?

23       A.   Yes, I was.

24       Q.   What did you observe?

25       A.   Normal movement.

1       Q.  Did you see any offenders that had

2 feces or blood on urine on their clothing?

3       A.  No, I did not.

4       Q.  What about after the shakedown on 4B,

5 were you still there when offenders returned to

6 that unit?

7       A.  Yes, I was.

8       Q.  And what happened at that time?

9       A.  Similar to 2B, general complaints.

10       One specific interaction I remember

11 very closely was an interaction with Offender

12 Sheila Crisp, who actually had participated in

13 groups that I had operated at Decatur Correctional

14 Center.  And Ms. Crisp approached me and apologized

15 for having pills on her person and explained to me

16 how they found pills when they conducted the

17 search.  And then she basically said she was sorry

18 to me.  Because we had worked very closely together

19 on different things and she -- she was very upset

20 by that fact.  And, you know, Inmate Crisp

21 specifically stands out, like I said, because we

22 had worked closely together, that she had attended

23 numerous groups that I had run.  In fact, to this

24 day, Sheila Crisp to me will be Catfish because

25 that's what her nickname was inside the prison.

1    Q.   And were you able to observe the women

2    as they returned to 4B?

3    A.   Yes, I was.

4    Q.   Did you see any women with blood or

5    urine or feces on their clothing when they returned

6    to 4B?

7    A.   No, I did not.

8    Q.   I wanted to talk about the shakedown

9    slips that were admitted as Exhibit 221.

10        We've talked a lot about them, but I

11   want to go through some of these so that you can

12   explain why the materials that were determined

13   contraband are contraband.

14        So, on this one it says one pair of

15   socks with cash and money on them and a pair of

16   underwear with three taps on them.  Why is that

17   contraband?

18   A.   Anytime an item's altered in any

19   manner, whether it be written on, altered in

20   regards to hemming, you know, items cut away from

21   it, we want it removed.  Because we try to keep our

22   items the same to avoid the item gaining any value

23   by being differently.

24        In the case of these, the terms cash

25   and money often pay reference to narcotics

1   dealings, gang activity.  Three taps placed on a

2   pair of underwear could be demonstrated as having a

3   sexual overtone.  And it's very common with the

4   female offenders that they sometimes will alter

5   their undergarments as gifts for offenders that

6   they're in relationships with or to demonstrate

7   some type of sexual act.

8           Q.   So, this next one, I think this is the

9   same, we've got some altered items, right?  One

10  sheet with star, one bra with cupcake drawn on it,

11  one pillowcase with My Little Pony painted on it.

12  Is that what you read there?

13          A.   Yeah, I read it one pillowcase with

14  stars and My Little Pony painted on it.

15          Q.   Okay.  So, that's the same that you

16  discussed.  These are altered bedding items; right?

17          A.   Correct.  Specifically, though, the

18  concern of stars in this case, whether -- and not

19  having the item, I don't know, but oftentimes a

20  five-point or a six-point star is obviously gang

21  activity with street gangs.  And then the writing

22  of cupcake on a bra I would assume is some type of

23  relational reference.

24          Q.   Why is gang activity a concern in a

25  correctional institution?

1       A.   Unfortunately, gangs still thrive in

2   the streets and also in our prisons, and any type

3   of organized crime element can cause a threat not

4   only to the general public but to the staff and

5   also to the other offenders within the facility.

6   And we obviously try to quell any organized

7   criminal-type activity that we see, specifically

8   with security threat groups or street gangs.

9       Q.   Why would clothing that indicates a

10  relationship within the correctional institution

11  suggest an issue?

12      A.   Many of the problems that we face with

13  all offenders, but specifically with female

14  offenders, are very relational in nature.  So, we

15  -- one, we do not condone consensual sexual

16  activity because we want to reduce a sexualized

17  environment.  But also, when offenders enter into

18  relationships, as relationships do, they break up,

19  offenders move on to other relationships, and that

20  can often cause a lot of conflict.

21           MS. BROWN:  Objection, Your Honor.

22  This is irrelevant.

23           THE COURT:  What is irrelevant?

24           MS. BROWN:  This doesn't have to do

25  with the contraband that was discovered, so we

1   would object that this is irrelevant.

2              THE COURT:  No, I think it falls within

3   the general parameters.  And besides, it's

4   instructive to the jury and to the Court as to what

5   takes place in this kind of an institution.  I take

6   it that most of us do not have any direct knowledge

7   of what goes on, and this is background, if nothing

8   more.

9              Sure, go ahead.  No.  Overruled.

10       A.   So, when you see something like the

11  term cupcake, it could be a sexual reference.  It

12  could be a label in which an offender is

13  essentially, you know, labeling themselves as

14  either a nickname of cupcake or it could be some

15  type of reference in relational ownership of one

16  offender to another offender.

17       Q.   Now, this one we've shown to the jury

18  before.  This is in regards to the Ms. Crisp that

19  you mentioned.  Is that fair to say?

20       A.   Yes, it is.

21       Q.   Do you know why here it just states a

22  green pill and two pink pills instead of naming

23  what type of pills they are?

24       A.    In this case, these pills weren't

25  located in a blister pack or any type of packaging

1   which would have the label of what the pills are.

2   And obviously, our correctional officers are not

3   pharmacists, so they just provide the description.

4   So, these pills would have been loose in nature

5   when found.

6          Q.   So, this shakedown slip is in regards

7   to a tape player that contains --

8              THE COURT:  What number is it?  How do

9   we know which ones we're talking about here?

10             MS. BAUTISTA:  Your Honor, it's

11  Plaintiffs' Exhibit 221, Bates Page 4.

12             THE COURT:  221, Page 4.  Okay.

13         Q.   This is a shakedown slip in regards to

14  a tape player with a tape inside of it.  Can you

15  explain why this is contraband?

16         A.   You can see from this shakedown slip

17  that the tape player itself is not contraband, as

18  it's assigned to the Inmate K87344, but that the

19  tape inside that tape player was contraband, the

20  fact that it belonged to another inmate, A75247.

21  And the staff could have verified that, as all of

22  our cassette tapes inside the facility we etch with

23  the inmate's number.  And it would be contraband

24  because it's not owned by that offender.  So, it

25  could be stolen, it could be traded, or it could

1   have been trafficked.

2       Q.  Okay.  This is Bates Page 5 and this

3   looks like a pill on an outdate pill card, and I

4   believe the name of the pill, which I'm not going

5   to try and pronounce, is listed on here.  Is that

6   fair to say?

7       A.  Yes, it is.  This would appear to be on

8   what we refer to as a blister pack.

9       Q.  Okay.  And that's a package that has

10   pills that you pop out behind foil?

11       A.  Correct.  It would be essentially a

12   piece of cardboard.  Each pill would be

13   individually foiled and then at the top would be

14   the prescription label similar to that that you

15   normally receive on the side of a prescription

16   bottle.

17       Q.  And why is that contraband?

18       A.  Because it was out of date.

19       Q.  Why is that a problem?

20       A.  Prescriptions have an expiration date

21   for a reason.  Sometimes there are potency changes.

22   Sometimes the use of it may no longer be necessary

23   for an offender.  And the reason why removing that

24   from a facility is very important is you don't know

25   the reaction that that offender could have or the

1  reaction that another offender could have by taking

2  it.  Along with the fact that oftentimes they will

3  crush it, accumulate it in an attempt to get a

4  high.  They will sometimes misrepresent it as

5  something else by altering it.  I've seen offenders

6  that have crushed medications that would on the

7  other -- on the surface seem harmless but would cut

8  it with more harmful medications to make it appear

9  as though they have more of that type of

10  medication.

11       Q.   This is Bates Page 6 and I believe

12  we've discussed this with the jury before regarding

13  a small copper wire found inside a Bic ink pen.

14  And can you read the rest of that?  One clear

15  liquid pill I think.

16       A.   Yeah, one clear liquid pill, one small

17  yellow pill, one something broken white pill inside

18  of tissue.

19       Q.   We've discussed the wire.  What's the

20  problem with the Bic ink pen?

21       A.   Well, as you see here, the Bic ink pen

22  was actually used to conceal the wire.  And

23  oftentimes Bic pens especially are very dangerous

24  because when the insides of them are removed, they

25  easily conceal contraband.  And in this case it's a

1    copper wire.  And the reason why they pose great

2    concern to us is the fact that if they're altered

3    from their use as a pen, an object can be placed in

4    lieu of the ink to be used as a weapon that can be

5    concealed by the lid of the ink pen.

6         Q.   We've already discussed pills, so we'll

7    move to the next one.

8              This is Bates Page 7 and this is

9    out-of-date meds and also embroidered socks.  So,

10   we've discussed both those issues.  Is that fair to

11   say?

12        A.   Yes, I would say so.

13        Q.   We're looking at Bates Page 8 and this

14   is outdated meds and we've discussed that.  Is that

15   fair to say?

16        A.   Yes, it is.

17        Q.   And on Bates Page 9, this is an

18   unidentified Sony Walkman, number scratched out,

19   graffiti socks, and T-shirts.  What is the problem

20   with having a Walkman?

21        A.   The commissary at that time would sell

22   a traditional Sony Walkman, but the problem with it

23   is the fact that the inmate number was scratched

24   out.  Because, like I stated before, all of our

25   electronic devices that are sold at a commissary

1    are etched with the inmate's number.  And

2    oftentimes, offenders, either through theft or

3    trading and trafficking or when an offender goes

4    home, they may obtain a Walkman owned by another

5    offender.  And to conceal the identity of whose it

6    is or to try to demonstrate that it's their own,

7    they'll scratch out the number that goes along with

8    the original purchasing offender.

9         Q.   This is one that's been discussed

10   before, Bates Page 10, Axe body wash, one men body

11   deodorant.  Why would this be contraband?

12        A.   I would assume that Axe body wash and

13   men deodorant was not sold on the commissary of

14   Lincoln Correctional Center, so it would be

15   contraband.

16        Q.   And why are you assuming that?

17        A.   I personally have never seen Axe body

18   wash or men's deodorant sold in a women's prison.

19        Q.   So, that's based on your experience as

20   an employee of the Department of Corrections?

21        A.   Yes, based on my experience at Decatur

22   Correctional Center and Logan Correctional Center.

23        Q.   This is Bates Page 14.  There are two

24   items listed, expired medication, which we've

25   discussed, but the second one says cross and chain,

1    silver color.  Why is that contraband?

2        A.   It could be for a multitude of reasons.

3    It could be due to the size of the cross or the

4    medallion on the chain.  It could be due to the

5    fact that the offender did not have a proper permit

6    to have that type of item.  Or it may have been

7    altered in some way.

8        Q.   This is Bates Page 17.  This lists

9    expired meds but then at the bottom there's two

10    paper clips and then stencils STG.  What -- why are

11    paper clips contraband?

12        A.   Paper clips in their traditional sense

13    -- well, paper clips are not allowed by offenders.

14    But paper clips in their traditional sense, you

15    know, don't cause that great of concern.  But very,

16    very quickly a paper clip can be spread out and

17    used for multiple reasons.  It could be used as a

18    sticking device in the use of a weapon.  It could

19    be used as a cutting instrument to essentially take

20    the end of the paper clip, put it into material to

21    alter clothing or materials.  Or it can also be

22    used in the creation of homemade or prison tattoos

23    inside the prison.

24        Q.   What about that second part, stencils

25    STG?  Do you know what STG means?

1      A.   Yes, that would be security threat

2  group or a street gang.  And I'm assuming that the

3  stencil that they're referencing is a tattoo

4  stencil.  It would be laid upon the body part, hand

5  draw what the tattoo's going to be, and then it

6  would be tattooed in later on.

7      Q.   This is Bates Page 22 and there is

8  several things listed here, but on the second line

9  it says four Sharpie markers.  Why would Sharpie

10  markers be contraband?

11      A.   Once again, Sharpie markers would not

12  be sold in the inmate commissary.  Along with that,

13  Sharpie markers are often used to tag or place

14  graffiti on items.  And also, I have seen offenders

15  that used Sharpie markers to mark out inmate

16  numbers that sometimes are written in clothing,

17  tennis shoes, stuff like that, and then they'll

18  place their identifying number inside the item to

19  make it appear as though it's theirs.

20      Q.   Why would that be a problem?

21      A.   Because, once again, that would be

22  unauthorized property.  You know, we don't want

23  offenders stealing items from other offenders,

24  marking out the number and making it appear as

25  though it's theirs.

1    Q.   Bates Page 24 says one picture alcohol.

2    Why would a picture of alcohol be contraband?

3    A.   We do not allow any photographs of

4    anything with alcohol, money, or street name

5    references to it.  Many of our offenders obviously

6    are facing substance abuse problems and the last

7    thing that we want to do is to glorify or portray

8    the use of alcohol or illegal drugs in a glorifying

9    manner, so we don't allow those items.

10    Q.   Bates Page 27, one Cross black classic.

11    Why is that contraband?

12    A.   Once again, I would assume that it was

13    something that was not readily where they were able

14    to purchase it at the facility.  It may have also

15    been altered or it may have also been homemade.

16    That I do not know.

17    Q.   And what are your assumptions based on?

18    A.   My experience working in both men's

19    prisons and women's prisons.

20    Q.   Last one.  Bates Page 33, calamine

21    lotion.  Why is that contraband?

22    A.   Once again -- and this would be an

23    assumption.  I'm not sure if they sell that on the

24    inmate commissary.  I'm assuming they do not.  I

25    would assume that this came from the health care

1    unit and would either be expired or would have been

2    perceived to been stolen from the health care unit.

3        Q.   What are your assumptions based on?

4        A.   My experience working at Jacksonville,

5    Decatur Correctional Center, and Logan Correctional

6    Center.

7              MS. BAUTISTA:  Okay.  One moment.

8              I have nothing further.

9              THE COURT:  Fine.  Thank you,

10   Ms. Bautista.

11             It is five minutes till 5 on Friday

12   night.

13             MS. BROWN:  I can be very brief, Your

14   Honor.

15             THE COURT:  Can you really?  Are you

16   sure?

17             MS. BROWN:  Yeah, five, ten minutes.

18             THE COURT:  Let's make it five.  If you

19   can make it five --

20             MS. BROWN:  Okay, yes, Your Honor.

21             THE COURT:  -- you can do it.

22   Otherwise, you'll have to wait.  But I just --

23             Is it okay, ladies and gentlemen?

24   We're going to stretch this just a little bit.  I

25   know what's going to happen and you do too.  But

1  we're going to go so we can finish up with him.

2  All right.

3                    CROSS-EXAMINATION

4  QUESTIONS BY MS. BROWN:

5        Q.   Mr. Pasley, I believe your counsel was

6  just showing you some contraband slips.

7        A.   Yes.

8        Q.   Everything on those contraband slips

9  was labeled minor contraband; correct?

10       A.   Yes, it was.

11       Q.   And a supervisor signed off on all of

12  those contraband slips; correct?

13       A.   Yes, they would have.

14       Q.   You mentioned -- I think you were

15  showed a slip that had a reference to a star and My

16  Little Pony?

17       A.   Yes.

18       Q.   Do you remember that?

19            Is My Little Pony considered a gang

20  activity?

21       A.   Not to my knowledge, no.  Although, the

22  colors of it, if there was color depicted in it, it

23  could be.  Because My Little Pony often has rainbow

24  type colors in it.  Those colors could be

25  coordinated to match a gang reference.

1          Q.   So, gangs are very serious in the

2    Illinois Department of Corrections; correct?

3          A.   Absolutely.

4          Q.   It's taken very seriously?

5          A.   Yes, it is.

6          Q.   And if there's suspicion of gang

7    activity, that would be addressed; correct?

8          A.   Yes, it would be.

9          Q.   You were also shown a contraband slip

10   for a small copper wire.  Now, are weapons

11   considered major contraband or minor contraband?

12         A.   A weapon itself would be considered

13   major.  Sometimes weapons-making material,

14   depending upon the size or seriousness of it, could

15   be considered minor.

16         Q.   You were shown a contraband slip that

17   said -- of a picture and there was a parenthetical

18   for alcohol.  Do you remember that?

19         A.   Yes, I do.

20         Q.   That could have been a picture of this

21   woman's brother holding a beer in the background;

22   right?

23         A.   Absolutely.

24         Q.   And it was considered minor contraband?

25         A.   Yes, it would be.

1        Q.  You testified that one of the checks

2  and balances that exists for rooting out misconduct

3  is that inmates can reach out to other people, like

4  to the John Howard Association; is that right?

5        A.  Yes.

6        Q.  The John Howard Association receives

7  letters from prisoners and it monitors the prisons

8  and it sometimes -- members of the John Howard

9  Association come and do investigations; is that

10  right?

11        A.  Yes, they do.

12        Q.  After the mass strip search on March

13  31st, 2011, prisoners wrote to the John Howard

14  Association about the strip search; isn't that

15  right?

16        A.  I don't have that knowledge, no.

17        Q.  Would it surprise you to learn that the

18  John Howard Association then did a monitoring visit

19  at Lincoln --

20        MS. BAUTISTA:  Your Honor.

21        Q.  -- Correctional Center in --

22        MS. BAUTISTA:  I object --

23        THE COURT:  Wait just a moment.

24        Yes, Ms. Bautista.

25        MS. BAUTISTA:  I object to this line of

1  questioning as barred by a motion in limine.

2         MS. BROWN:  I believe opposing counsel

3  asked him about the John Howard Association and so

4  they opened the door to any questioning on that

5  matter.

6         MS. BAUTISTA:  Your Honor, I asked him

7  ways that inmates could complain.  He provided a

8  response.  That does not open the door regarding

9  investigations.

10         THE COURT:  I'll sustain that.  I think

11  you're right.  I'm afraid not.

12      Q.  (by Ms. Brown) I believe you were shown

13  this exhibit by your counsel.  This is Defendants'

14  Exhibit 90.

15         You weren't at Lincoln Correctional

16  Center -- you weren't working at Lincoln

17  Correctional Center in March of 2011; is that

18  right?

19      A.  No, I was not.

20      Q.  And you don't have any personal

21  knowledge as to where any particular woman was

22  housed there; correct?

23      A.  No, I would not.

24      Q.  Okay.  Now, this document shows what

25  are called routine transfers; is that right?

1       A.   No, that would be routine housing

2  assignment placement.

3       Q.   What do you mean by that?

4       A.   You'll see -- on this sheet here you

5  will see three types of movement.  You see when an

6  offender was released from segregation, when an

7  inmate was transferred to another facility, or

8  what's referred to as a routine housing move.  So,

9  they could have been moved to a different location

10  just through a routine move, not anything involving

11  discipline or any type of issue like that.

12       Q.   I understand.  So, you testified that

13  this -- according to this record, Adrian Maynor was

14  transferred on March 4th, 2011, to housing unit --

15  or, Bed 5-A-04; is that right?

16       A.   That would be her housing unit, wing,

17  and room number.

18       Q.   And she was transferred in that

19  particular bed on March 4th, 2011?

20       A.   Yes.

21       Q.   And according to this record, where was

22  she transferred from, what housing unit bed?

23       A.   The bed numbers on this report are not

24  on it, only the housing unit -- the facility

25  location, the housing unit, the wing, and the room

1  number.

2      Q.  Okay.  So, which housing unit,

3  facility, and wing number was she transferred

4  from?

5      A.  She was transferred from Lincoln,

6  Housing Unit 5, Wing A, Room 4.

7      Q.  To Housing Unit 5, Wing A, Room 4?

8      A.  Yes.

9      THE COURT:  Is that to or from?

10      A.  She -- on 3/4, she would have been

11  moved within the room of Housing Unit 5, Wing A,

12  Room 4.

13      THE COURT:  All right.

14      Q.  Now, you testified earlier that you --

15  that the mass strip search that took place on

16  March 31st, 2011, was fully compliant with all of

17  the Illinois Department of Corrections policies and

18  practices; is that correct?

19      A.  Correct.

20      Q.  But you didn't enter the gym on March

21  31st, 2011; isn't that right?

22      A.  Correct.

23      Q.  So, you really have no idea what

24  happened in the gym; correct?

25      A.  No, I was not present in the gym.

1          Q.   You testified at length that you --

2    that the Illinois Department of Corrections trains

3    its cadets on consequences for rules violations; is

4    that right?

5          A.   Yes.

6          Q.   And the Illinois Department of

7    Corrections also trains its cadets on reporting the

8    rule violations of others; correct?

9          A.   Yes.

10          Q.   Isn't that because employees sometimes

11    break the rules?

12          A.   Absolutely.  In all professions,

13    individuals break the rules.

14          Q.   And because employees sometimes engage

15    in misconduct; right?

16          A.   Unfortunately, yes.

17          MS. BROWN:  No further questions.

18          THE COURT:  Thank you.  Well, you were

19    pretty accurate on your -- thank you very much,

20    Ms. Brown.

21          MS. BAUTISTA:  Nothing further.

22          THE COURT:  Very good.

23                    (Witness excused)

24          THE COURT:  Now, that is a relief;

25    isn't it?  All right.  We're all set to go.  It's

1   about three minutes after.

2            Now, ladies and gentlemen, please

3   recall my admonition at all times.  And we'll be

4   back here on Monday morning at 10:00.  And I

5   believe from what counsel has indicated to me that

6   we will be moving along.  So, enjoy your weekend,

7   have a great time, but please do not discuss this

8   case or talk about it with your family or in any

9   way discuss it, any way.  Okay?  Good.

10           MS. McNAUGHT:  Your Honor?

11           THE COURT:  Yes.  What?

12           MS. McNAUGHT:  Before the jury leaves,

13  the defendants rest.

14           THE COURT:  Oh, my gad.  This is fast

15  work.  Okay.  The defendants have rested.  So, I

16  think we'll move right along on Monday.  Fine.

17           Thank you very much, ladies and

18  gentlemen.  Please leave and recall my admonition.

19  Thank you so much.  Have a good weekend.  See you

20  Monday.

21               (The jury left the courtroom.)

22           THE COURT:  All right.  The jury has

23  left the courtroom.  Thank you, everyone.

24           The defense has rested, so that means

25  that I will ask, of course, on Monday morning if

1    the plaintiffs have rebuttal.

2              MS. THOMPSON:  I guess we would like

3    the weekend to think about that, but I really don't

4    anticipate any rebuttal, Your Honor.

5              THE COURT:  Okay.  Well, we'll play

6    that by ear then.

7              MS. THOMPSON:  Thank you.

8              THE COURT:  I'm not going to preclude

9    you at all.

10             MS. THOMPSON:  I appreciate that.

11             THE COURT:  But we do have the jury

12   instructions to resolve.  Now, I do not spend my

13   entire retirement worrying about jury instructions.

14   Do you understand?

15             But listen, I went through -- I went

16   through ten years on the state circuit bench, and

17   that's where they became the living beginning and

18   end.  So, you made your career out of jury

19   instruction conferences.  We don't do that here.

20   We don't do that.

21             I get three piles.  One is where

22   everybody agrees and then the other two are the

23   ones you submit that you don't agree to.  And I

24   make the cut.

25             So, we're going to be doing that on

1   Monday morning.  Okay?  Since the jury is going to

2   be in at 10, let's meet at 9:30 right here and we

3   will resolve all the jury instructions.  But make

4   sure that I get them in those three piles.  And

5   we'll talk about those.  All right?

6              Now, Ms. Thompson?

7              MS. THOMPSON:  I just have one quick

8   question.

9              THE COURT:  Sure.

10              MS. THOMPSON:  I'm not here to delay us

11   all for a long time.

12              In other closing arguments I have done

13   there has been a couple of jury instructions I have

14   wanted to show the jury during closing, including

15   some of the ones I wanted to explain.

16              THE COURT:  You won't show them because

17   I'm going to instruct them before you argue and so

18   you'll just refer to them.  You don't have to put

19   them up on the -- on here.

20              MS. THOMPSON:  Is that something the

21   Court disallows?  I don't -- obviously, don't want

22   to do something the Court doesn't allow.

23              THE COURT:  Well, I wouldn't allow you

24   anyway.

25              MS. THOMPSON:  That's what I'm asking.

1    THE COURT:  Sure.  We'll have no

2 trouble.  But you don't go to -- you're not going

3 to put them on here.

4    MS. THOMPSON:  But can I read them to

5 the jury and explain what they mean?

6    THE COURT:  Yeah, you can.

7    MS. THOMPSON:  Okay.

8    THE COURT:  You can talk to them

9 because I will have already read them to the jury.

10    MS. THOMPSON:  I appreciate the

11 clarification.  Thank you, Your Honor.

12    THE COURT:  But you just simply refer

13 to the fact that the judge has -- Judge Mills has

14 instructed you as so and so, and you can do -- say

15 whatever you want --

16    MS. THOMPSON:  I understand.

17    THE COURT:  -- as long as you keep it

18 within the proper parameters.

19    MS. THOMPSON:  Understood.  Thank you.

20    THE COURT:  Oh, sure, sure.

21    Okay.  Any other -- any other question?

22    Nothing from the defendants?

23    Anything else from here?

24    Okay.  Swell.  Everybody have a great

25 weekend and we'll see you back here at -- we'll

1   see all of you at 9:30 on Monday morning.  Thank

2   you.

3                   (Court adjourned at 5:08 p.m.)

4

5   I, DOROTHY J. HART, CSR, RPR, Freelance Court

6   Reporter, certify that the foregoing is a correct

7   transcript from the record of proceedings in the

8   above-entitled matter.

9

10                          /s/ Dorothy J. Hart

11                          CSR License No. 084-001390

12

13

14

15

16

17

18

19

20

21

22

23

24

25