1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF ILLINOIS

3              SPRINGFIELD DIVISION

4

5   BEVERLY THROGMORTON, et al., )
                                 )
6                   Plaintiffs,  )
                                 )
7          -vs-                  )   NO. 12-3087
                                 )
8   FORMER ASSISTANT WARDEN      )   JURY TRIAL
    REYNOLDS, et al.,            )
9                                )
                    Defendants.  )

10

11          TRANSCRIPT OF PROCEEDINGS

12     BEFORE THE HONORABLE RICHARD MILLS

13            U.S. DISTRICT JUDGE

14

15   NOVEMBER 21, 2016

16   A P P E A R A N C E S:

17   FOR PLAINTIFFS:        Ms. Ruth Z. Brown
                            Ms. Tara Elizabeth Thompson
18                          Mr. Vincenzo Field
                            311 N. Aberdeen St.
19                          3rd Floor
                            Chicago, IL 60607
20
     FOR DEFENDANTS:        Ms. Karen L. McNaught
21                          Ms. Deborah L. Barnes
                            Ms. Laura K. Bautista
22                          Mr. Terry Corrigan
                            500 S. Second St.
23                          Springfield, IL 62706

24

     COURT REPORTER:        Ms. Dorothy J. Hart, CSR, RPR
25                          Illinois CSR No. 084-001390

INDEX

| EXHIBITS | IDENTIFIED | ADMITTED |
|---|---|---|
| Plaintiffs' Exhibit 246 | 21-30 | 21-31 |
| Court's Exhibit 3 | 21-27 | |

| | PAGE |
|---|---|
| Jury Instruction Conference | 21-3 |
| Jury Instructed | 21-36 |
| Plaintiffs' Closing Argument | 21-51 |
| Defendants' Closing Argument | 21-110 |
| Plaintiffs' Rebuttal Argument | 21-143 |

PROCEEDINGS

1

2        (The following proceedings were

3        out of the presence of the jury.)

4      THE COURT:  Thank you, Madam Clerk.

5      Good morning, everyone.

6      Well, it was a lovely weekend.

7 Everybody is refreshed, ready to hit the ground

8 running.  And here we are at 9:30, without the jury

9 being present, to take care of our jury

10 instructions and any other matters that we need to

11 address at this time.  All right.  Everybody's in

12 place.

13      Now, let me tell you what my personal

14 attitude toward jury instructions are.

15      Back in my state court days, jury

16 instruction conferences became a living end in and

17 of themselves.  They took on a separate existence.

18 And we wrangled, sometimes for more than a day, on

19 the instructions that should be given in a classic

20 accident case.  And it just became totally absurd.

21 And there were a number of reasons for that.  We

22 don't need to go into them here.

23      But jury instructions in my view start

24 with the accepted pattern instructions.  Now, those

25 instructions have been worked on, sometimes for

1    years on end, in a continuing, constant, ongoing

2    committee, and they evolved because of the Supreme

3    Court of both the United States and of the

4    individual states.  And so, they've come up with

5    some excellent and the best that we can do to date.

6    So, if it's a pattern instruction, it is given.

7    And once we have that in mind, then we go from

8    there.

9              Now, I have gone over, this weekend,

10   these instructions.  And I compliment you on the

11   fact that you have all agreed to a certain number

12   of them.  And of course, they will be given.  And

13   then we have some that are disputed by the

14   defendants, some disputed by the plaintiffs.  And

15   this weekend, we mailed around to you by e-mail

16   Friday evening a draft which included all of the

17   agreed instructions and the resolved -- and the

18   resolves of the disputed ones.  And of course, the

19   applicable Seventh Circuit Pattern Instructions are

20   clear.

21              So, now, I simply want to have you all

22   get together and put in the order in which you want

23   them given to the jury.  And I care not.  I care

24   not.  So, I want you to do that by yourselves and

25   get that stack to me.

1           Now, I've given all of my reasons here

2    in the -- my script, and I think it's pretty clear

3    of record.

4           Now, I don't know if there's something

5    that each one of you individually might think, that

6    is the plaintiffs and the defendants, that you want

7    to make a specific record about.  And if so, I'm

8    going to give you that opportunity.  But I -- I

9    loathe making a federal case -- and no pun intended

10   -- out of jury instruction conference.  To me, that

11   is totally absurd when we have all of the patterns

12   and everything available to us.  Now, having said

13   that, I want you to feel free to make your record

14   on anything that you need to preserve.  Okay?

15          So, we'll go first, of course, to the

16   plaintiffs.

17          By the way, it was my understanding

18   that on Friday evening Ms. Gleason sent around

19   everything by e-mail to all of you and so that

20   you've had the weekend to ponder over all of this.

21   Hoping, of course, that we could shorten this to a

22   palatable amount of time, at the same time making

23   sure that we preserve all of the issues to be

24   presented to the jury.  Okay?  Very good.

25          All right.  I'll go first to the

plaintiffs.

MS. BROWN:  Thank you, Your Honor.

We have reviewed the Court's
instructions and we have no objections to any of
them.

The only thing we would add is that we
would ask the Court to give proposed instruction 5
on proof of intent to harass and proposed
instruction -- plaintiffs' proposed instruction 10
on consideration of conduct after March 31st, 2011.
But as I said, we have no objections to any of the
instructions, and we're prepared to proceed.

THE COURT:  Except for those two.

MS. BROWN:  Yes, Your Honor.

THE COURT:  That'll be swell.

MS. BROWN:  Thank you.

THE COURT:  Fine.  Thank you very much.

Ah, good morning, Counsel.

MR. CORRIGAN:  Your Honor, it's going
to take me a little longer than that because I do
have quite a bit I need to make a record on.

THE COURT:  All right.

MR. CORRIGAN:  With respect to the two
instructions that plaintiffs' counsel just
mentioned, I -- I'm assuming that you're not going

1  to give those, so I don't need to make a record on

2  my position on those.  Or if you are going to, I

3  would.

4          THE COURT:  Let me have them just to

5  make certain that we are talking about the same

6  page.

7          MR. CORRIGAN:  5 and 10 which are in

8  here.

9          THE COURT:  Okay.  Thank you.

10          Is that -- it's 5 you say?

11          MR. CORRIGAN:  5 and 10.

12          MS. GLEASON:  Your Honor, those are not

13  included in your draft.

14          THE COURT:  They're not here?

15          MS. GLEASON:  They have not been

16  included in your draft.  They have been refused by

17  you.

18          THE COURT:  All right.

19          MR. CORRIGAN:  That's what I was just

20  covering, to make sure they were being refused.

21          THE COURT:  Yes.  Okay.  Fine.  Thank

22  you, Mr. Corrigan.

23          MR. CORRIGAN:  I'm sorry, Your Honor,

24  if I can have just a second.

25          Your Honor, starting with Page 19,

which is plaintiffs' proposed instruction 7 that
the case is proceeding as a class action and that
the plaintiff has to prove this as a class or the
case has to rise and fall as a class.  We object
under the facts of this case to that instruction
because the plaintiffs were not all searched in the
same location or by the same people, and we think
there's under the facts of this case an ability for
the jury to find that potentially one class member
suffered a deprivation -- one named plaintiff
suffered a deprivation of their constitutional
rights and not another named plaintiff, and that
they should be considered separately because there
may be a need after trial to essentially break it
into subclasses based on that eventuality.  And for
that reason, we don't think that the case should
rise and fall on the named plaintiffs as a whole
under the facts of this case, and particularly
since some of the defendants may have been involved
with one plaintiff and not another.

                With respect to instruction -- at Page
22.  I don't see a specific number.  It's Pattern
Instruction 1.15, which instructs the jury that you
can only consider evidence of conviction of crimes
on the question of credibility and not for any

other reason.  Under the facts of this case, we
think the crimes evidence -- which wasn't admitted
with a -- for a limited purpose.  It was generally
admitted by the Court at the time it came in.  We
think the evidence of the serious crimes can be
considered by the jury in assessing the security
needs, and the fact that we are not dealing with
people in for shoplifting, we're dealing with some
serious crimes, that is a factor that weighs into
the security of the institution.  And under the
facts of this case, we think that the crimes
evidence is substantive evidence in addition to
impeachment evidence.

   With respect to plaintiffs' proposed
instruction number 3, which is the burden
instruction, we object, first of all, that the
instruction doesn't require the plaintiffs to prove
the claims they pleaded specifically but is general
in nature and does not specify it.

   The first claim that it lists indicates
there could be liability if there's an intent to --
to conduct the search in a harassing manner
intended to humiliate and cause psychological pain.
The law I believe on this is that if there's a
penological purpose for what they do, it doesn't

1 matter that there's also an underlying intent to

2 cause humiliation, and we think that part of it

3 needs to be without penological object -- or,

4 excuse me -- without a penological purpose.  And

5 for that reason, we think that that instruction

6 should be modified that way.

7     With regard to the second and third

8 claims claimed by plaintiff, which are variations

9 essentially on the same claim, not separate claims,

10 they're basing liability on a theory specifically

11 rejected by the U.S. Supreme Court in Iqbal and by

12 the Seventh Circuit that there is a duty to stop a

13 subordinate or another employee from committing a

14 constitutional violation.  The Courts have

15 specifically rejected that theory and stated that

16 liability can only be imposed if a supervisor or

17 another official has the requisite mental state in

18 order to violate the Constitution.

19     The mental state to violate the

20 Constitution in this case is either that they acted

21 as in Count 1 with an intent to humiliate and cause

22 psychological pain or, secondly, that the official

23 was deliberately indifferent to the substantial

24 risk of serious harm by a plaintiff.

25     In this case, the instructions talk

1 about a substantial risk of a constitutional

2 violation, and that's a theory that was

3 specifically rejected by both the U.S. Supreme

4 Court and the Seventh Circuit.

5 Those are basically the same objections

6 that I would make to the burden instructions.

7 The instruction at Page 26 and 27,

8 which is plaintiffs' proposed instruction number 4

9 as modified by the Court, doesn't require that it

10 be without penological purpose.  It allows for

11 deliberate indifference to a substantial risk that

12 the searches were being conducted in a harassing

13 manner, rather than a substantial risk of that --

14 or, substantial risk of serious injury, which is

15 the correct standard under the law.

16 The instruction -- proposed instruction

17 number 6, which states that the term -- definition

18 of the term "deliberate indifference."  It, once

19 again, allows deliberate indifference to a risk

20 that the searches were being conducted improperly,

21 does not require a substantial risk of serious

22 injury, which is the standard.

23 It also allows the jury to find that

24 the defendants are liable based on a negligence

25 theory.  It allows the jury to find that they

1    failed to take reasonable measures to obviate the

2    substantial risk of serious harm, or substantial

3    risk of a constitutional violation.

4              The Seventh Circuit has said anytime

5    that reasonableness is used as a term, that they

6    must be reasonable, we're talking about a

7    negligence standard.  That's in Duane versus Lane

8    and Gibbs versus Franklin.  While the courts have

9    repeatedly used this language, which came -- comes

10   out of Farmer originally or at least where it was

11   cited, that taking reasonable measures to alleviate

12   the harm, in Gibbs, the Court said the Supreme

13   Court was not deciding that issue.  It was deciding

14   the knowledge issue and so we shouldn't take that

15   passing reference as a standard.  The courts have

16   still talked about reasonable measures subsequent

17   to Gibbs.  But the Seventh Circuit has said that

18   when that term is used, it means something other

19   than failing to use due care and failing to act in

20   a reasonable sense in the ordinary definition of

21   the word.  If the word "reasonable" means something

22   other than reasonable, it should be defined for the

23   jury or shouldn't be used.

24              We object to the instruction at 29 and

25   30, which is the plaintiffs' proposed number 8, for

the reasons I've already stated with regard to the

elements of a search.

We also object to the instructions when

they term that they have to prove the claim as to

plaintiffs.  First, we think it should be specific

as to each named plaintiff.  And secondly, the

instruction is not specific that it has to be

proved as to a named plaintiff.

One other objection that defendants

have with the instruction:  In order to find that a

constitutional violation was committed by an

unnamed -- or, in the Counts 2 and 3, they have to

find that they failed to stop a constitutional

violation being committed by an unnamed person,

unspecified person.  The Seventh Circuit has said

in Harper versus Albert that -- as one of the

places, that the jury cannot assess the mental

state of an unknown person, and you can't find

liability for failing to stop an unknown person

from committing an act on a theory that they were

acting unconstitutionally.  That's exactly what

that instruction is asking the jury to do.

I would also note that the Court is not

giving defendants' instruction 2B, which is an

instruction that the jury is to give deference to

the opinions of prison officials regarding to what

is needed in their judgment to maintain security.

I believe the jury is entitled to know about the

deference that they must give.  And it's

particularly significant in this case that the

instruction also sets out a standard when we've had

all sorts of expert testimony about what somebody

else believes are the penological objectives.  In

this case, the deference is to -- not only that --

to their judgment, but the jury is supposed to

assess whether they have an honest belief.  They're

not supposed to make an independent assessment

about what is a penological objective.  So, the

question is whether or not the defendants believed

what they were doing was for penological purposes,

and the jury is not entitled to second-guess those

opinions if they're honestly held.

      While the Court in Bell versus Wolfish

said that that deference --

      THE COURT:  What court is that?

      MR. CORRIGAN:  U.S. Supreme Court.

I'm sorry.

      THE COURT:  Thank you.

      MR. CORRIGAN:  -- indicated that the

deference was not to exist if the jury -- or, if

1  the Court found that it was an exaggerated response

2  or some language to that, that wasn't on an Eighth

3  Amendment question.  The Eighth Amendment requires

4  a specific intent by the defendants.  That language

5  has been used many times, most often in Turner

6  versus Safley by the U.S. Supreme Court in First

7  Amendment issues.  It's also been used

8  occasionally, as it was in Bell versus Wolfish, in

9  discussions of due process.

10            However, in the context of an Eighth

11  Amendment use of force, which is the most analogous

12  issue to what we're dealing with, the U.S. Supreme

13  Court said in Whitley versus Alberts that prison

14  officials' judgment was entitled to deference as

15  long as it was not in bad faith.  In the Eighth

16  Amendment context, bad faith or a lack of honest

17  belief is in fact the standard that should be

18  applied to the deference, and the jury should be

19  assessing whether or not the defendants had an

20  honest belief in what they were doing.

21            One other instruction of the defendants

22  I wanted to mention is that defendants' instruction

23  3 is a general overview of the law in regard to

24  strip searches and the Eighth Amendment.  It's a

25  correct statement of the law and I think it's

particularly important in light of the testimony in

this case.  It emphasizes the fact that if

opposite-sex members are involved in a search, or

able to view it, it's not necessarily a

constitutional violation unless it was done with an

intent to humiliate or -- harass and humiliate and

cause psychological pain.  It emphasizes the fact

that if done for legitimate purposes, group

searches are not necessarily unconstitutional.

Those are both things that the Seventh Circuit has

said directly.

The jury needs a complete understanding

of the Eighth Amendment in order to decide this

case.  And for that reason, we think that

defendants' instruction number 3 should be given to

give the jury that understanding.  It's -- I think

it's a fair instruction, besides a correct

statement of the law.  It's not written in an

argumentative way but in order to explain the

nature of the Eighth Amendment to the jury.

And, Your Honor, could I just have a

second?

THE COURT:  Surely.  Of course.

MR. CORRIGAN:  Your Honor, I would

point out that defendants' 11 -- in addition to the

1   defendants think their issues and burden

2   instruction should be given, defendants' number 11

3   is a credibility instruction on conviction of a

4   crime that doesn't limit that consideration of that

5   evidence to credibility but allows it to be -- I

6   mean, it says that it can be considered on

7   credibility, which is a correct statement of the

8   law.  And under the facts of this case, I think it

9   should be given instead of the pattern instruction

10  which limits the issue of conviction of a crime

11  only to credibility.  That instruction is generally

12  correct as a basis that that's generally the only

13  reason that convictions come in, but under the

14  facts of this case, we think that defendants' 11

15  should be given instead of the instruction that

16  limits the issue of credibility because the

17  evidence is relevant for other purposes under the

18  facts of this case.

19          And I would also note that we believe

20  that defendants' verdict forms should be given that

21  require each individual named plaintiff to have

22  proof -- proved her own case and requires an

23  assessment of whether or not there's liability on

24  each of the two theories that -- plaintiffs have

25  three theories.

1          THE COURT:  Yes.  We've recrafted the

2   verdict forms.

3          MR. CORRIGAN:  Okay.

4          THE COURT:  Yeah, absolutely.

5          MR. CORRIGAN:  And for those reasons, I

6   think I've stated it pretty clearly.

7          THE COURT:  All right.  Fine.  Thank

8   you, Mr. Corrigan.

9          I'll give you, Ms. Bautista -- Ms.

10  Brown?

11         MS. BROWN:  Yes.

12         THE COURT:  Thank you.

13         MS. BROWN:  Your Honor, we've made our

14  record.

15         THE COURT:  Yes.

16         MS. BROWN:  If there are any of those

17  proposed instructions by the defense that the Court

18  is considering, I can speak to those.  But

19  otherwise, you know, we're satisfied that we've

20  made our record.

21         THE COURT:  I think so.  I think that

22  it's adequate.  I think that we've got -- we've got

23  a ton of this stuff and I think that everything has

24  been preserved.

25         In fact, I will make a statement for

1    the record that if there's any question at all, I

2    want to make it clear that both sides have had

3    adequate opportunity to make of record their

4    position regarding the instructions.  And with all

5    of the documents that have been submitted, I think

6    that we've pretty well cleared the waterfront.

7    It's all there.  It's all here.  And we're going to

8    make sure that it is preserved.  And if there's any

9    question at all, I want it understood that the

10   Court considers that the issues are preserved for

11   appeal or for whatever purpose.

12             MS. BROWN:  Thank you.

13             THE COURT:  You bet.  All right.  Fine.

14             MS. GLEASON:  Your Honor?

15             THE COURT:  Yes.

16             MS. GLEASON:  I don't -- when you

17   talked about the change of verdict, I -- we talked

18   about that over the weekend.

19             THE COURT:  Yes, indeed.

20             MS. GLEASON:  I don't think the parties

21   know that you have decided to go with the

22   plaintiffs' verdict, which is much shorter than

23   your own.

24             THE COURT:  Oh, absolutely.  Yes.

25             MS. GLEASON:  Okay.  I just wanted to

1   state that on the record.

2           THE COURT:  Thank you.  Thank you very

3   much, Ms. Gleason.

4           No.  Those convoluted forms of verdict

5   were just way too -- way out, just way out.  So,

6   we've got to have them individualized and

7   shortened, so it'll make ...

8           You know, folks, we've got to keep in

9   mind at all times not only the record and your

10   positions, but we've got to consider the jury.  And

11   I'm the one that considers the jury in particular.

12   I have to look out for their interests, not only

13   their abilities to perform as jurors and to be

14   educated and knowledgeable about this particular

15   case, but I've got to see also that they don't get

16   overwhelmed with a bunch of paperwork that just is

17   a confusing issue.  And I'm afraid that that's the

18   way those forms of verdict as submitted to me first

19   were just way, way out and too much.  So, we've

20   simplified them.  And I think rightly so.

21           And as to each of the named defendants,

22   even though it's a class action, we've got named

23   defendants and they have to be considered here.

24   And named plaintiffs.

25           Okay.  Now, what -- it is a couple of

minutes after 10.

Ah, Ms. Thompson, you rise to the
occasion.

MS. THOMPSON:  I have one very brief
issue I just want to make the Court aware of.

THE COURT:  Sure.

MS. THOMPSON:  We talked last week, I
believe starting on Thursday and a little on a
Friday, about these notebooks from Warden Hulett
that were found --

THE COURT:  Yes.

MS. THOMPSON:  -- in her garage.

THE COURT:  Yes.

MS. THOMPSON:  You instructed the
parties to confer about what else the plaintiffs
might want to see related to those notebooks.

THE COURT:  Uh-huh.

MS. THOMPSON:  We spoke with the state
-- or, with the defense -- excuse me.  We spoke
with the defense and we requested from them any of
the notebooks from November 1st of 2010 through I
believe April -- the end of April of 2011.  Is that
correct?

MS. McNAUGHT:  I don't know.  We gave
you what we had.

1          MS. THOMPSON:  Yeah.  We requested from

2     those that range.  And we agreed with the

3     defendants that they could redact out anything that

4     related to private healthcare information of

5     inmates or anything that was a security issue in

6     the prison that didn't relate to Units 2B or 4B.

7     And we asked for any notes that, obviously,

8     specifically related to this -- the events of March

9     31st.

10          Last night at about 4:53, the

11     defendants sent us 68 pages of redacted notes.

12     I've looked through them.  I, obviously, haven't

13     had a chance to look them as much as I might

14     otherwise, given preparation for closings.  We

15     believe that those notes further support all of the

16     arguments we've previously made.

17          I have no intention to reopen the

18     evidence to, you know, ask Warden Hulett questions

19     about them.  But I would ask that, like the Court

20     made a Court Exhibit 1 of the other information

21     that it received, that it make a Court Exhibit 2 of

22     those materials.  And I think with that, that

23     matter is concluded.

24          THE COURT:  Ms. McNaught?

25          MS. McNAUGHT:  Of course I have a

1    response.

2              THE COURT:  Of course you do.

3              MS. McNAUGHT:  When we talked last week

4    -- when Ms. Thompson and I talked last week, I told

5    her that it would be a period of time before I

6    could get back to the office, look at them, and

7    redact any healthcare information, any security

8    information, and any labor-management information.

9    And she agreed that Sunday afternoon would be fair

10   in order to get those to her.  So, I did provide

11   those to her in a redacted form.

12             And I will note for the Court the only

13   two pages that conceivably could have anything to

14   do with this case were previously given to the

15   plaintiffs' counsel last week during the testimony

16   of Warden Hulett.  So, I want to be very clear on

17   the record what it is that those notes say.

18             One --

19             THE COURT:  Which notes?

20             MS. McNAUGHT:  The notes that were

21   provided to plaintiffs' counsel last Thursday.

22             THE COURT:  Last Thursday?

23             MS. McNAUGHT:  When Warden Hulett was

24   on the stand.

25             THE COURT:  Oh, yes.

1          MS. McNAUGHT:  There were two pages.

2          THE COURT:  Okay.  That's fine.  Now,

3    what about all the other pages?

4          MS. McNAUGHT:  There is nothing in any

5    of those records which have anything to do with any

6    events that occurred on March 31st of 2011.

7          They're -- most of them are places

8    where she visited in the institution on other days.

9    They have contact information about inmates that

10   have issues other than strip searches, other than

11   being harassed, other than having to menstruate on

12   the floor.  There is absolutely nothing in any of

13   those other notes.

14         And the -- but I want to -- I want to

15   talk about those two pages that were previously

16   given to plaintiffs' counsel last week when Warden

17   Hulett was on -- on the witness stand.  There is

18   nothing in those notes which would have changed

19   plaintiffs' counsels' rendition of the facts in

20   this case.

21         One note we can't even tell whether it

22   has anything to do with the March 31st events.  It

23   says, "Needs planning team meetings," something

24   list, and then "small team for mass care."  We

25   don't know whether that has anything to do with

1  March the 31st of 2011.

2          The second one does have 31st at the

3  very bottom of the note, assuming -- I mean, it

4  appears as though it was a note taken about -- of

5  some kind of a conversation that Warden Hulett had

6  with some unknown person.  It says, "Level 1 when

7  shakedown is here.  9:00 a.m.  Lunch for COT."  I

8  don't know what the next word is.  And then it

9  says, "Feed on unit."  And then the next one is,

10 "Gym attendance, handcuff, come along with them,

11 each have one pair, 60 inmates at a time out,

12 property maintenance DIST, strip search, shakedown

13 252 ahead of time, rubber gloves, 31st."

14          Those are the only things that are in

15 those notes.  When Warden Hulett testified at

16 plaintiffs' instance, there was no elicitation of

17 anything other than what she previously testified

18 to.  So, for that reason, we don't believe that

19 there's any prejudice whatsoever to plaintiffs.

20          I have a copy for the Court if you want

21 to -- if you want to know what redacted notes I

22 tendered to the plaintiffs' counsel yesterday.

23 There's a certificate of service on the back -- or,

24 there should be a certificate of service on the

25 back -- which indicates that I sent them to her via

1    e-mail yesterday and that I've placed another copy

2    in the mail to her.

3              THE COURT:  All right.  Ms. Thompson.

4              MS. THOMPSON:  Defendants' counsel

5    provided these -- this second set of notes when

6    they said they would, so I wasn't taking issue with

7    the timing of that.  And if it seemed I was, I

8    apologize.

9              My only point is these notes, like the

10   other notes, do not contain any indication that

11   there were particular problems on Unit 2B and Unit

12   4B.  That's an issue that I think we made our

13   record about before.  I don't need to belabor that

14   issue.  I'm only asking that the notes themselves

15   be made a Court exhibit.  And I think we have said

16   everything that we need to say on that topic,

17   Judge.

18             THE COURT:  Okay.  Very good.  I think

19   that we will make a Court's Exhibit 2 of all of

20   those.

21             MS. McNAUGHT:  Your Honor, I have the

22   notes, but I don't have the certificate of service.

23   Do you want me to provide you with a copy of the

24   certificate of service?

25             THE COURT:  I think that it might be

1  wise.

2           MS. McNAUGHT:  Okay.

3           THE COURT:  And then just attach it to

4  the copies that you have there and we'll make that

5  as Court's Exhibit -- 2, did I say?

6           MS. THOMPSON:  Yes.  And I'll state on

7  the record that I received 68 pages of redacted

8  notes at 4:53 p.m. on November 20th by electronic

9  mail from defense counsel.

10          THE COURT:  All right.

11          CLERK:  Excuse me, Judge.  May I?

12          THE COURT:  Yes, sure, please, please.

13          CLERK:  We already show Court's Exhibit

14  2 as the handcuffs -- the picture of the handcuffs.

15          THE COURT:  That is 2.  You're right.

16  You're right.

17          CLERK:  That was referenced as Court's

18  2.

19          THE COURT:  So, this will be Court's

20  Exhibit 3.  Yeah.

21          CLERK:  Okay.  Thank you.

22          THE COURT:  Thank you very much.

23          I forgot that those handcuffs -- we

24  made copies of those handcuffs, remember?  And

25  that's Court's Exhibit 2.

1                All right.  Very good.  Thank you,

2      Counsel.

3                MS. THOMPSON:  I just want to make the

4      Court aware that for closing arguments we have six

5      pages of what I think would really be akin to

6      PowerPoint slides, just six, that I intend to use

7      in closing.  I've shown them to the defense and I

8      don't think they have any objection to the content.

9      But I will show the jury those in closing, Your

10     Honor.

11               THE COURT:  That'll be fine.

12               MS. THOMPSON:  All right.  Thank you.

13               THE COURT:  I have no trouble with that

14     as long as everybody is on the same page and on

15     board and agreed.

16               MS. McNAUGHT:  Tara, you said 68 pages?

17               MS. THOMPSON:  Yeah.  Do you have a

18     different number?

19               MS. McNAUGHT:  No, I have 68.

20               MS. THOMPSON:  Okay.  That's what I

21     have.

22               THE COURT:  Fine.  That's perfect.

23               MR. CORRIGAN:  Your Honor.

24               THE COURT:  Yes.

25               MR. CORRIGAN:  I'm just -- to let the

1  Court know, I'm going to absent myself.  I was here

2  just to argue -- to make the record on the

3  instructions.

4           THE COURT:  That'll be fine.  I always

5  -- we're always delighted to have you,

6  Mr. Corrigan, even for limited purposes.

7           MS. McNAUGHT:  And, Your Honor, it's my

8  understanding that plaintiffs have no rebuttal.

9  So, after that, I will stand up and make my motion

10  for judgment as a matter of law.  I won't make a

11  big deal of it.  We intend to file it.  But in the

12  presence of the jury, I'll just be saying that

13  we're renewing our motion.

14           THE COURT:  Very well.  And I am not

15  going to indicate to them that I have denied

16  anything of this nature.  In fact, I would prefer

17  that it be done in writing and not even mentioned

18  in court.

19           These are very confusing things to

20  juries.  And they're here as triers of the fact and

21  that's what I want to keep them on.  So, let's

22  don't even mess with it.

23           MS. McNAUGHT:  Okay.  So --

24           THE COURT:  I don't think that you have

25  to do it on the -- in front of the jury on the

1   record.

2           MS. McNAUGHT:  Okay.

3           THE COURT:  Just as long as you've

4   preserved it of record.  And I prefer it to be

5   written, in any event.  And I indicate that right

6   on the face of it, denied.

7           MS. McNAUGHT:  It is written.  Can we

8   just -- for purposes of housekeeping, can we just

9   all agree that as I make my renewed motion --

10          THE COURT:  Yes.

11          MS. McNAUGHT:  -- plaintiffs have

12  offered no rebuttal?

13          MS. THOMPSON:  The only thing we need

14  to do -- and we can do this in front of the jury if

15  we need to.  I think we showed in our

16  cross-examination of Troy Dawdy Exhibit 246, which

17  we did not move into evidence.  So, we're seeking

18  to move that into evidence.  But other than that,

19  we have no rebuttal and we rest.

20          THE COURT:  All right.

21          MS. McNAUGHT:  So, now, we make our

22  motion for judgment as a matter of law.

23          THE COURT:  All right.  Very good.  But

24  first, what is your rejoinder to the question of

25  the exhibit?

1          MS. McNAUGHT:  What is it?

2          MS. THOMPSON:  It's that photo of the

3    gym that looks back towards the --

4          MS. McNAUGHT:  Oh, we have no

5    objection.

6          THE COURT:  Very well.  Then it is

7    admitted.

8               (Plaintiffs' Exhibit Number 246

9               admitted.)

10         THE COURT:  And that cleans up our

11   record, Madam Clerk, on that?

12         CLERK:  Yes.

13         THE COURT:  All right.  Fine.

14         Now, we're going to have to get these

15   jury instructions all in the order in which I'm

16   going to give them.  And we've got them all taken

17   care of now?

18         MS. GLEASON:  Yes, Your Honor.

19         THE COURT:  Fine.  Thank you.

20         MS. GLEASON:  I just need to make

21   copies.

22         THE COURT:  Excellent.  We'll make

23   copies and get them to you, ladies and gentlemen,

24   and then we will be ready to go.

25              And at that time you will make of

record, Ms. Thompson, the fact that you've rested

and that you have no rebuttal.

MS. THOMPSON:  Yes, Your Honor.

THE COURT:  Okay.  And then we move

straight into my jury instructions and then we'll

go on to the closing arguments.  Okay?

Now, why don't we do this:  It'll

probably take about 30 minutes to do the

instructions, 20 to 25 maybe?

MS. GLEASON:  I just need to make

copies.  It'll take about ten minutes.

THE COURT:  Yeah, it'll take us to get

you copies about ten minutes.  But then after I

instruct, then we'll have closing arguments.  And

we still have to think about lunch.  Now, I don't

like to break up continuity, particularly on one

side, by a lunch break if we can avoid it.

Now, what would you say, Ms. Thompson,

give me a ballpark figure of the time that you will

need to argue.

MS. THOMPSON:  I have timed myself on

these at 40 to 45 minutes, and I'm going to try to

be shorter, but --

THE COURT:  Okay.

MS. THOMPSON:  -- you know, that's the

1  basic time frame, Judge.

2  THE COURT:  Well, then that might not

3  be a bad idea that we will finish or come close to

4  lunch hour when you finish your -- and then we

5  could break, take a little early lunch, get back,

6  and then go to defense and just keep right on

7  going.  Is that -- does that sound reasonable?

8  MS. THOMPSON:  We would be happy to

9  push through, but we'll -- we'll take the schedule

10  the Court chooses for us, Judge.

11  THE COURT:  Well, I just hate to go too

12  far without that lunch.

13  MS. THOMPSON:  Understood.

14  THE COURT:  What does the defense think

15  about this?

16  MS. BAUTISTA:  Your Honor, we're happy

17  to follow the Court's direction on this.

18  THE COURT:  Okay.  Well, let's play it

19  by ear, see where we are, and then we'll decide.

20  All right.  Fine.  Good.

21  Now, Ms. Gleason is going to make

22  copies of all of the instructions that are going to

23  be given and she'll have those to you in just a few

24  minutes, but it'll take about ten minutes to get

25  that accomplished.

1           MS. McNAUGHT:  Do you want us to go

2   through them in order before --

3           THE COURT:  No.

4           MS. McNAUGHT:  She goes through them

5   or --

6           THE COURT:  No, no, no.

7           MS. McNAUGHT:  Okay.

8           THE COURT:  I've already got them in

9   order.

10          MS. McNAUGHT:  Oh, okay.

11          THE COURT:  No.  They'll be in my

12  order.

13          MS. McNAUGHT:  Fair enough.

14          THE COURT:  Okay.  Very good.  Very

15  good.  Okay.  Let's stand then in recess for about

16  15 minutes, and we'll have everything in place and

17  ready to go.  And it will not be necessary for you

18  either to make any record at all --

19          MS. THOMPSON:  Understood.

20          THE COURT:  -- in front of the jury.

21  We'll go straight into my instructions and then

22  into your closing arguments.  Okay?  Good.

23          Any questions for the good of the

24  order?

25          Very well.  We'll stand in recess.

1           Thank you, Madam Clerk.

2                 (Court was then in recess.)

3                 (The jury entered the courtroom.)

4           THE COURT:  Thank you, Madam Clerk.

5           And good morning, everyone.  Nice to

6 see you all on a beautiful day like this.

7           The record may show that everyone is in

8 place.  The jury is back in the box.

9           We had some things to discuss out of

10 your presence this morning, ladies and gentlemen,

11 but we zipped through them and did not waste any

12 more time than was necessary.  So, we're ready to

13 proceed at this time.

14           Both the plaintiffs and the defendants

15 have presented their cases to you, and it is now my

16 prerogative and my privilege to instruct you as to

17 the law that is applicable to this case.

18           I'm going to read these to you and I

19 hope that you will listen carefully to all of the

20 instructions.  They are to be considered as a body,

21 taken as a whole, not singling out one individual

22 instruction to disregard another, but all as a

23 whole.  So, I want you to listen carefully.

24           And also, they will be clipped

25 together, and at the time that you go out to

1   deliberate your verdict, they will accompany you to

2   the jury room so that you will have them in front

3   of you during your deliberations.

4           Members of the jury, you have seen and

5   heard all of the evidence and will hear the closing

6   arguments of the attorneys.  Now I will instruct

7   you on the law.

8           You have two duties as a jury.  Your

9   first duty is to decide the facts from the evidence

10  in the case.  This is your job, and yours alone.

11          Your second duty is to apply the law

12  that I give you to the facts.  You must follow

13  these instructions, even if you disagree with them.

14  Each of the instructions is important, and you must

15  follow all of them.

16          Perform these duties fairly and

17  impartially.  Do not allow sympathy or public

18  opinion to influence you.  You should not be

19  influenced by any person's race, color, religion,

20  national ancestry, or sex.

21          Nothing I say now, and nothing I said

22  or did during the trial, is meant to indicate any

23  opinion on my part about what the facts are or

24  about what your verdict should be.

25          During this trial, I have asked a

witness a question myself.  Do not assume that
because I asked questions I hold any opinion on the
matters that I asked about, or on what the outcome
of the case should be.

You may consider statements given by a
party before trial as evidence of the truth of what
he or she said in the earlier statements, as well
as in deciding what weight to give his or her
testimony.

With respect to other witnesses, the
law is different.  If you decide that, before the
trial, one of these witnesses made a statement not
under oath or acted in a manner that is
inconsistent with his or her testimony here in
court, you may consider the earlier testimony --
the earlier statement or conduct only in deciding
whether his or her testimony here in court was true
and what weight to give to his or her testimony
here in court.

In considering a prior inconsistent
statement or conduct, you should consider whether
it was simply an innocent error or an intentional
falsehood and whether it concerns an important fact
or an unimportant detail.

In determining whether any fact has

1   been proved, you should consider all of the

2   evidence bearing on the question regardless of who

3   introduced it.

4            You will recall that during the course

5   of this trial I instructed you that I had admitted

6   certain evidence for a limited purpose.  You must

7   consider this evidence only for the limited purpose

8   for which it was admitted.

9            You must decide whether the testimony

10  of each of the witnesses is truthful and accurate,

11  in part, in whole, or not all.  You also must

12  decide what weight, if any, you give to the

13  testimony of each witness.

14           In evaluating the testimony of any

15  witness, including any party in the case -- to the

16  case, you may consider, among other things:

17           the ability and opportunity the witness

18  had to see, hear, or know the things that the

19  witness testified about;

20           the witness's memory;

21           any interest, bias, or prejudice the

22  witness may have;

23           the witness's intelligence;

24           the manner of the witness while

25  testifying;

1        and the reasonableness of the witness's

2    testimony in light of all the evidence in the case.

3        The evidence consists of the testimony

4    of the witnesses, the exhibits admitted in

5    evidence, and stipulations.  A stipulation is an

6    agreement between both sides that certain facts are

7    true or that a person would have given certain

8    testimony.

9        Certain things are not to be considered

10   as evidence.  I will list them for you:

11       First, if I told you to disregard any

12   testimony or exhibits or struck any testimony or

13   exhibits from the record, such testimony or

14   exhibits are not evidence and must not be

15   considered.

16       Second, anything that you may have seen

17   or heard outside the courtroom is not evidence and

18   must be entirely disregarded.  Now, this includes

19   any press, radio, or television reports that you

20   may have seen or heard.  Such reports are not

21   evidence and your verdict must not be influenced in

22   any way by such publicity.

23       Third, questions and objections or

24   comments by the lawyers are not evidence.  Lawyers

25   have a duty to object when they believe a question

is improper.  You should not be influenced by any
objection, and you should not infer from my rulings
that I have any view as to how you should decide
the case.

Fourth, the lawyers' opening statements
and closing arguments to you are not evidence.  The
purpose of these is to discuss the issues and the
evidence.  If the evidence as you remember it
differs from what the lawyers said, your memory is
what counts.

The law does not require any party to
call as a witness every person who might have
knowledge of the facts related to this case -- to
this trial.  Similarly, the law does not require
any party to present as exhibits all papers and
things mentioned during the trial.

You may find the testimony of one
witness or a few witnesses more persuasive than the
testimony of a larger number.  You need not accept
the testimony of the larger number of witnesses.

You have heard a witness give opinions
about matters requiring special knowledge or skill.
You should judge this testimony in the same way
that you judge the testimony of any other witness.
The fact that such person has given an opinion does

not mean that you are required to accept it.  Give
the testimony whatever weight you think it
deserves, considering the reasons given for the
opinion, the witness's qualifications, and all of
the other evidence in the case.

Certain diagrams have been shown to
you.  These diagrams are used for convenience and
to help explain the facts of the case.  They are
not themselves evidence or proof of any facts.

You should use common sense in weighing
the evidence and consider the evidence in light of
your own observations in life.

In our lives, we often look at one fact
and conclude from it that another fact exists.  In
law, we call this "inference."  A jury is allowed
to make reasonable inferences.  Any inference you
make must be reasonable and must be based on the
evidence in the case.

You may have heard the phrases "direct
evidence" and "circumstantial evidence."  Direct
evidence is the testimony of someone who claims to
have personal knowledge of something.
Circumstantial evidence is proof of a fact, or a
series of facts, which tend to show whether
something is true.

1    As an example, direct evidence that it

2    is raining is testimony from a witness who says, "I

3    was outside a minute ago and I saw it raining."

4    Circumstantial evidence that it is raining is the

5    observation of someone entering a room carrying a

6    wet umbrella.

7    The law makes no distinction between

8    the weight to be given to either direct or

9    circumstantial evidence.  You should decide how

10   much weight to give to any evidence.  In reaching

11   your verdict, you should consider all the evidence

12   in the case, including the circumstantial evidence.

13   When I say a particular party must

14   prove something by "a preponderance of the

15   evidence," or when I use the expression "if you

16   find," or "if you decide," this is what I mean:

17   When you have considered all the evidence in the

18   case, you must be persuaded that it is more

19   probably true than not true.

20   Now, this case is proceeding as a class

21   action.  A class action procedure allows the filing

22   of one lawsuit by a representative or a small

23   number of representatives on behalf of a whole

24   group of plaintiffs who have similar claims.  In

25   this case, the plaintiff class is comprised of all

persons who were subjected to the March 31, 2011, strip search at Lincoln Correctional Center. Your verdict here will be binding on all class members. You should not hold the physical absence of any class member against class plaintiffs.

Because this action is a class -- because this case is a class action, plaintiffs are allowed to prove their claims by evidence which applies to the class as a whole, and do not need to prove each class member's claim individually.

You must give separate consideration to each claim and each defendant in this case. Although there are six defendants, it does not follow that if one is liable, any of the others is also liable.

Defendants are being sued as individuals. Neither the State of Illinois nor the Illinois Department of Corrections is a party to this lawsuit.

You have heard evidence that plaintiffs have been convicted of crimes. You may consider this evidence only in deciding whether plaintiffs' testimony is truthful in whole, in part, or not at all. You may not consider this evidence for any other purpose.

You have heard evidence about whether defendants' conduct complied with Illinois administrative rules and generally accepted national correctional standards and practices. You may consider this evidence as it relates to one or more defendants' motive or intent. But remember that the issue is whether one or more defendants violated plaintiffs' Eighth Amendment rights, not whether administrative rules and generally accepted national correctional standards and practices have been complied with or violated.

Plaintiffs must prove by a preponderance of the evidence that each defendant was personally involved in the conduct the plaintiffs complain about. Except as otherwise stated in these instructions you may not hold a defendant liable for what other employees did or did not do.

Plaintiffs in this case make the following claims:

First, plaintiffs claim that each and every defendant violated their Eighth Amendment rights to be free from cruel and unusual punishment by directly participating in a strip search conducted in a harassing manner intended to

humiliate and cause psychological pain.

Second, plaintiffs claim that each and every defendant violated their Eighth Amendment rights to be free from cruel and unusual punishment by failing to intervene when they knew that others were conducting a strip search in a harassing manner intended to humiliate and cause psychological pain.

Finally, plaintiffs claim that each and every defendant has what is called "supervisory liability," meaning that as supervisors they knew other officers were violating or about to violate plaintiffs' Eighth Amendment rights and approved of, assisted with, condoned, or ignored what other officers were doing.

Defendants deny each and every one of these claims.

To succeed in their Eighth Amendment claim based on direct participation, plaintiffs must prove each of the following things by a preponderance of the evidence as to the particular defendant you are considering:

1. Plaintiffs were subjected to strip searches conducted in a harassing manner intended to humiliate and cause psychological pain;

1      2.  The defendant you are considering

2  was deliberately indifferent to a substantial risk

3  that the strip searches were being conducted in a

4  harassing manner intended to humiliate and cause

5  psychological pain;

6      3.  The conduct of the defendant you

7  are considering caused harm to plaintiffs.

8      If you find that plaintiffs have proved

9  each of these things by a preponderance of the

10 evidence as to a particular defendant, then you

11 should find for plaintiffs as to that defendant.

12     If, on the other hand, you find that

13 plaintiffs have failed to prove any one of these

14 things by a preponderance of the evidence as to a

15 particular defendant, then you should find for that

16 defendant.

17     When I use the term "deliberately

18 indifferent," I mean that a defendant actually knew

19 of a substantial risk that the strip search was

20 being conducted in a harassing manner intended to

21 humiliate and cause psychological pain, and that

22 the defendant consciously disregarded this risk by

23 failing to take reasonable measures to deal with

24 it.  In deciding whether the defendant failed to

25 take reasonable measures, you may consider whether

1 it was practical for the defendant to take

2 corrective action.  If you find that the defendant

3 strongly suspected that things were not as they

4 seemed, yet shut his or her eyes for fear of what

5 he or she would learn, you may conclude that the

6 defendant was deliberately indifferent.  You may

7 not conclude that a defendant was deliberately

8 indifferent if the defendant was merely careless in

9 failing to discover the truth.

10          To succeed on the supervisory liability

11 claim against a particular defendant, plaintiffs

12 must prove each of the following things by a

13 preponderance of the evidence against that

14 defendant:

15          1.  Plaintiffs were subjected to strip

16 searches conducted in a harassing manner intended

17 to humiliate and cause psychological pain;

18          2.  The defendant under consideration

19 knew that plaintiffs were about to be or were being

20 subjected to strip searches conducted in a

21 harassing manner intended to humiliate and cause

22 psychological pain;

23          3.  The defendant under consideration

24 approved of, assisted with, condoned, or purposely

25 ignored that plaintiffs were about to be or were

being subjected to strip searches conducted in a

harassing manner intended to humiliate and cause

psychological pain;

4.  As a result, plaintiffs were

injured.

If you find that plaintiffs have proved

each of these things by a preponderance of the

evidence as to a particular defendant, then you

should find for the -- find for plaintiffs as to

that defendant.

If, on the other hand, you find that

the plaintiffs have failed to prove any one of

these things by a preponderance of the evidence as

to a particular defendant, then you should find for

that defendant.

To succeed on their failure to

intervene claim against a particular defendant,

plaintiffs must prove each of the following things

by a preponderance of the evidence:

1.  Plaintiffs were subjected to strip

searches conducted in a harassing manner intended

to humiliate and cause psychological pain;

2.  The defendant that you are

considering knew that plaintiffs were about to be

or were being subjected to strip searches conducted

in a harassing manner intended to humiliate and
cause psychological pain;

       3.  The defendant that you are
considering had a realistic opportunity to do
something to prevent harm from occurring;

       4.  The defendant that you are
considering failed to take reasonable steps to
prevent harm from occurring;

       5.  The failure to act by the defendant
that you are considering caused plaintiffs to
suffer harm.

       If you find that plaintiffs have proved
each of these things by a preponderance of the
evidence as to a particular defendant, then you
should find for plaintiffs as to that defendant.

       If, on the other hand, you find that
plaintiffs have failed to prove any one of these
things by a preponderance of the evidence as to a
particular defendant, then you should find for that
defendant.

       The verdict must represent the
considered judgment of each juror.  Your verdict,
whether for or against the parties, must be
unanimous.

       You should make every reasonable effort

to reach a verdict.  In doing so, you should

consult with one another, express your own views,

and listen to the opinions of your fellow jurors.

Discuss your differences with an open mind.  Do not

hesitate to reexamine your own views and change

your opinion if you come to believe it is wrong.

But you should not surrender your honest beliefs

about the weight or effect of evidence solely

because of the opinions of other jurors or for the

purpose of returning a unanimous verdict.

All of you should give fair and equal

consideration to all the evidence and deliberate

with the goal of reaching an agreement that is

consistent with the individual judgment of each

juror.  You are impartial judges of the facts.

If you do need to communicate with me,

you should not indicate in your note what your

numerical division is, if any.

I do not anticipate that you will need

to communicate with me once you begin your

deliberations.  But if you do need to communicate

with me, the only proper way is in writing.  The

writing must be signed by the presiding juror, or,

if he or she is unwilling to do so, by any other

juror.  The writing should be given to the marshal,

1    who will then give it to me.  I will respond either

2    in writing or having you return to the courtroom so

3    that I can respond orally.

4             All right.  Now that I have instructed

5    you as to the law that you should apply to the

6    facts as you find them in this case, ladies and

7    gentlemen, it is now my pleasure to call upon first

8    for closing arguments to the plaintiff.

9             Ms. Thompson.

10             MS. THOMPSON:  Thank you, Your Honor.

11             May it please the Court.

12             THE COURT:  It does.

13             MS. THOMPSON:  Counsel, ladies and

14    gentlemen.

15             Ladies and gentlemen of the jury:

16             Accountability, controllability,

17    repercussions.  You heard Assistant Warden Reynolds

18    tell you in open court in no uncertain terms that

19    the reason that he conducted these strip searches

20    is because he felt that Units 2B and 4B had been

21    acting up and he decided that there needed to be

22    repercussions for their conduct.

23             Now, I told you in opening statements

24    that the plaintiffs, that the class of women that

25    they represent, would not be here if they just

1     wanted to tell you about a routine strip search and

2     a routine shakedown that they experienced on March

3     31st of 2011.  They're here about something else.

4     They're here because what happened on that day was

5     not routine.  The purpose of these strip searches

6     was to punish them and it was to punish them by

7     humiliating them.

8             You've now heard all the evidence in

9     this case and so you know what happened.  And you

10    know that these strip searches were designed to

11    humiliate these women by forcing them to be naked

12    in front of men; by forcing them to expose intimate

13    areas of their bodies for visual inspection in

14    front of each other and in front of people that

15    were not involved in the search; by forcing these

16    women to stand for long periods of time handcuffed

17    behind their backs, both in the dayrooms of the

18    units where they lived and in the gym; by

19    subjecting these women to demeaning and profane

20    language about their bodies and about their

21    circumstances; by denying these women access to the

22    bathroom; and finally, by not giving women who

23    needed them replacement sanitary pads, forcing

24    those women to remove their sanitary materials in

25    front of each other, and forcing them to undergo

these strip searches in dirty conditions.

You learned here that the Illinois policies and procedures that govern these kinds of strip searches, as well as national correctional standards, prohibit the kind of conduct that you know happened on March 31st. Everyone agrees that a strip search that happened as these plaintiffs described to you would violate Illinois Department of Corrections policy.

And it's true that every single defendant who testified told you that they understood those policies. They understood that they were not supposed to make strip searches demeaning. And despite knowing how those strip searches could be conducted, these defendants participated in and allowed to occur strip searches that were humiliating. And those people, every single one of these defendants, is responsible for making these strip searches unconstitutional.

I know that this trial has now taken, you know, more than a week of your lives. We're close to the holiday. As I told you, the subject matter of this case has been unpleasant. It's been uncomfortable. The women who are here, the women who are part of this class that are not here are

1   grateful for your jury service.  They're grateful

2   for you approaching this case with an open mind and

3   grateful for your consideration.  They're grateful

4   for your attention.  They're asking one more thing

5   from you now which is to consider the evidence that

6   you've heard and to find these defendants liable.

7          I know you don't need me to spend a

8   bunch of time explaining to you the evidence that

9   you've heard because you've spent the last week

10  hearing it.  But I do want to take a little bit of

11  time to explain to you how the evidence that you've

12  heard shows that these defendants are liable for

13  what happened to the plaintiffs.

14         Now, you heard -- we told you in

15  opening statements what happened with these strip

16  searches and you heard from a number of women about

17  what happened to them.  You heard from Ieshia

18  Brown; you heard from Patricia Phillips; you heard

19  from Jacqueline Hegwood; you heard from Delores

20  Henry; and you heard from other women.  And you

21  heard, as Ms. Henry, as Ms. Brown, as Ms. Phillips,

22  as Ms. Hegwood described, that this mass strip

23  search was punitive from the start with Orange

24  Crush coming into those housing units, yelling at

25  the women, telling them to line up two by two, a

reference to Noah's ark, like the animals that they were.  And this was by plan.

As Ms. Brown told you, as Ms. Hegwood told you, Warden Reynolds had come to their unit a little bit before the strip search and told them that he was tired of Unit 2B acting up, and if they didn't stop acting up, he was going to bring in Orange Crush.  He wanted to teach them a lesson.

The women that you heard testify told you that Warden Reynolds himself was telling women to shut up.  They told you that Troy Dawdy was calling them bitches that day.  They told you that Troy Dawdy was threatening to put them in seg if they didn't shut up.

And all of the defendants and all of the testimony you've heard is that all of the women involved in this strip search were fully compliant with everything that was being asked of them.

You heard that women were forced to stand in handcuffs for hours -- and we'll talk about that timing a little bit -- first in their dayrooms and then in the gym.  The women told you that some of them asked for their handcuffs to be loosened.  They described how painful these cuffs were.  And they told you that they were denied.

And Ms. Hegwood explained to you that even when she
had a shoulder injury from the way that she was
cuffed, the solution to that was just to cuff her
in the front, which continued to cause her pain.

And then came the strip searches
themselves.  Ms. Brown described to you having to
submit to a strip search in the bathroom in a group
of five to seven women with blood on the floor of
the bathroom and with no covering of any kind on
that door that you saw all trial, that entrance to
the inmate bathroom in the gym.

Ms. Henry too described to you having
to be strip-searched on a dirty floor in bare feet
and that she was standing so close to the other
women in the room that another woman, while they
were doing the squat-and-cough portion of the strip
searches, fell.

Ms. Henry and Ms. Brown told you that
there were male officers all over the gym while
they were being searched and that there was no
covering on the door at that time.  They told you
that Defendant Reynolds was in there, that Troy
Dawdy was in there, that Russell Craig was in
there, and that Officers Leonetti and Anderson were
in there.

1          Ms. Lee told you that, you know, she

2     was strip-searched in the bathroom after that sheet

3     that everyone's been talking about was put up, but

4     that because there was someone standing in the

5     door, you know, opening that sheet that the sheet

6     was ineffective.  And she told you that a male

7     officer told the person in that door that he could

8     see in and the woman in the door responded that she

9     didn't give an F if they saw us.

10          Ms. Phillips and Ms. Maynor told you

11     about how they were searched in the beauty shop,

12     also in view of other people that weren't part of

13     the search.  And they described to you that there

14     was -- I think Ms. Phillips described this -- that

15     there was a window in the door of the beauty shop

16     that was open.

17          And these women all described to you

18     what it was like to stand in close proximity to one

19     another, exposing their most private areas in front

20     of each other, in front of cadets, in front of

21     officers.  They told you they saw women being

22     denied sanitary supplies and they told you there

23     were women who were embarrassed and humiliated from

24     having to sit in the gym without access to sanitary

25     supplies.

1          And they told you that during this all

2  -- and I think it was Ms. Henry, Ms. Brown,

3  Ms. Phillips who talked about this -- they saw

4  Officer Crudup, who you heard testify on Friday,

5  walking around with some kind of cloth on her face,

6  talking about how the women stink, talking about

7  how they were disgusting.  And Ms. Brown remembered

8  Ms. Hatfield laughing when she heard those

9  comments.

10          Ms. Henry, Ms. Brown, Ms. Phillips --

11  or, excuse me -- Ms. Hegwood, they all told you

12  that Warden Hulett came in at some point during

13  these searches.  And Ms. Phillips told you that

14  what she heard Warden Hulett say was, "Who

15  authorized this?  Who authorized this?"  And at

16  that point there was finally a request for some

17  kind of covering to be put on that bathroom door

18  and later that covering was finally put up.

19          These women also told you -- and there

20  was a lot of discussion during the trial about this

21  -- about these grievances, that many women in their

22  units filed grievances.  And as you heard, despite

23  all those grievances being filed, none of them were

24  ever returned, none of them ever received a

25  response.

1          And Warden Hulett and Warden Reynolds
2     also told you that they did have conversations with
3     women about these strip searches after the strip
4     searches, that women were asking about these
5     grievances.  Warden Reynolds told you there were
6     women who were complaining to him.  And despite
7     that -- and I think these women told you about
8     these conversations that they themselves had with
9     Warden Hulett and Warden Reynolds and that they
10    were given the runaround, that there was no
11    concern, that as far as they know there was never
12    any follow-up or investigation by IDOC into what
13    happened to them.
14          Now, the judge told you that argument
15    from counsel is not evidence, and so what I'm
16    telling you right now isn't evidence.  You should
17    consider your own memories of what you heard in
18    this case.  But I want you to think carefully about
19    what these women said.
20          And I don't know what defense counsel
21    is going to say back -- when they get up to talk
22    after I'm done, but think about the kinds of
23    questions that they asked in this case.  They asked
24    some ridiculous questions of some of the officers.
25    You know, they asked them, "Well, were they

tracking blood into the gym?  You know, was there

fecal material everywhere?  Was there, you know,

blood all over the floor in the gym?"

That's not what these women said

happened.  They described seeing blood on the

floor.  Some of them described having blood get on

them.  But they didn't oversell that to you.  They

told you honestly what happened.

You get to decide the credibility of

the witnesses.  And the judge instructed you on

that.  Think carefully about what these women said.

You got to observe their demeanor on the stand.

They were credible.  They told you honestly what

they remembered and what they didn't remember.

They gave consistent stories, but each of them

experienced something slightly different and so

they had different testimony for you.

If the defense gets up here and tells

you these women are liars, that they're

exaggerators, that, hey, they have criminal

convictions, so, you know, you can't trust what

they have to say, you have to think about what you

heard.

You did hear some incredible testimony

in this trial.  You heard some very pat answers.

1   But it was not from these women.  They were honest

2   with you.  And you have to ask yourself why they

3   would be generally consistent about what happened

4   if it wasn't true.  These are women from all

5   different parts of the state.  They're from

6   different walks of life.  They were all in prison

7   for different amounts of time.  Many of them are

8   out now.  Why would they come together to concoct a

9   story about this?

10          And think too, why would they tell you

11  positive information about Warden Hulett if they

12  were here to lie about what the defendants had

13  done?  Some of them told you about positive

14  interactions they had with Warden Hulett that day.

15  Why would they say that if what they were saying

16  wasn't true?

17          You heard one of the people testify

18  about what happened.  It was a woman named Adrian

19  Maynor.  And at the end of this trial, on Friday at

20  the end with Alan Pasley, you heard some testimony

21  about housing records that relate to Adrian Maynor.

22  You heard, too, that housing records aren't always

23  accurate.  You heard that there were women moving

24  in and out of Unit 2B on a regular basis.  You

25  heard that the housing record that you were shown

comes from the system Offender 360 and the data was

migrated into this system later. You also heard

that that data is dependent on these visual checks

that Alan Pasley told you are supposed to be

conducted, but that it's dependent on people, you

know, checking the system and updating it as

they're supposed to do.

You also didn't hear any testimony --

and you heard on Friday I think from six of the

line officers, the officers that aren't defendants,

in a row, and you didn't hear anybody say, you

know, Adrian Maynor wasn't there. You heard from

Officer Anderson who I think said he was assigned

to 2B. He didn't tell you Adrian Maynor wasn't

there. Nobody told you she wasn't there. There's

no records that specifically say what exactly she

was doing that day.

So, you get to decide what to believe.

You can evaluate her testimony just like everybody

else. But think about this: The defendants want

you to believe that those housing records were kept

with a hundred percent accuracy. But they also

told you that the shakedown slips might not be

accurate. You know, they want you to trust the

Illinois Department of Corrections to have been

keeping those records incorrectly, but they want to tell you that some of the other ambiguities in the case are just the result of, hey, it gets done how it's done -- how it gets done.

So, you get to decide what you believe. But nobody is going to tell you that this strip search didn't happen. Nobody is going to tell you that 200 women weren't searched as a part of it. And nobody is going to tell you that these plaintiffs and that the testimony you heard from them wasn't true, that these plaintiffs weren't searched.

And ask yourself this too -- and then I'll move on to another topic. But, Delores Henry is out of prison. She has cancer and you heard the testimony about her medical situation. Is this what she would be doing with her time if she wasn't truly upset about what happened on March 31st? Jackie Hegwood has a job in Chicago that she's missing to be here, just like you all are missing your jobs. Why would she come here so many years later after being released from prison if she wasn't telling you the truth? Why would Patricia Phillips be here? Why would Ieshia Brown be here now that she's in another institution? She's got a

different warden.  Why would they all come here if what they were saying happened didn't happen?

And think about this too:  Why would they be complaining to Warden Reynolds and Warden Hulett after this happened if it didn't -- if they weren't truly upset about something, when, as we told you, strip searches happened to them on a regular basis?  Why would they be doing that if this wasn't different?

I think some of the testimony that Warden Reynolds gave you was that when he was talking to women in the gym, you know, they were concerned about missing lunch.  Are these women here five years later because they're upset that lunch was late on March 31st or are they here about something different?

You heard from the defendants and from the Illinois Department of Corrections officers about what happened.  And a lot of that testimony was on Friday, so it's recent for you.  But you heard a lot of, "I would have done."  You heard, "I don't remember."  You heard, "Well, I probably did this."  You heard, "I usually did this."  You heard people say, "Well, I would have provided sanitary pads," even though nobody said they actually were

1  passing out those pads.  You heard, "I would have

2  told the women they could sit down."  You didn't

3  hear very much of people saying, "This is what I

4  did."  And they're telling you what they would have

5  done, they're telling you what they usually did,

6  because they either cannot or will not tell you

7  what they actually did that day.

8         And as you heard -- you know, you heard

9  the testimony from the defendants.  As you think

10  about that, as you deliberate in this case, I want

11  you to think about a few things that the testimony

12  from the defendants and the testimony from those

13  line officers didn't really answer in this case.

14         First of all, why is it that although

15  the plaintiffs all remember seeing the defendants

16  in the gym, why is it that no one wants to admit

17  that they spent a significant amount of time there

18  among the defendants?  Why are Reynolds, Dawdy,

19  Craig, Hulett very anxious to say that they spent

20  little time in the gym?  And why is Renee Hatfield

21  saying that, you know, she was in the bathroom some

22  but really she was focusing on, you know, helping

23  those cadets do the escorts into the bathroom?  Why

24  is that their testimony?  Why is Alan Pasley so

25  anxious to tell you he didn't have any idea what

1   was going on in there?

2            And related to that, why is no one in

3   charge of the gym?  You heard a lot of different

4   testimony.  Who was responsible for what was

5   happening in the gym?  Reynolds says Hatfield.

6   Dawdy says Hatfield.  Hatfield says those female

7   tactical officers that were doing those strip

8   searches.  Warden Hulett says she was delegating

9   her authority to Reynolds that day.  Alan Pasley

10  says, well, Reynolds was in charge.  Why does no

11  one want to take responsibility for that?

12           Why is everyone so certain from the

13  beginning this curtain was up in the bathroom but

14  not a single person told you, "I watched that

15  curtain get up.  I put that curtain up.  I told,

16  you know, these officers to put it up."  Even

17  Warden Reynolds on his second try said, "Well, I

18  checked the gym.  I made sure everything was

19  there."  But nobody came here to say, "I saw the

20  curtain getting put up at the beginning."  Why is

21  that?  And why is it that the only people who tell

22  you exactly when the curtain was put up was the

23  plaintiffs?

24           Even though everyone is sure -- and

25  we'll talk about the handcuffs more in a minute --

1  that when the women got to the gym those handcuffs

2  came right off, why is it that nobody knows who it

3  is that actually gave the order for that to happen?

4  No one saw that order be given.  No one heard that

5  order be given.  You heard that that had to come

6  from Warden Hulett, from Warden Reynolds, from Troy

7  Dawdy, from somebody high up, but nobody can tell

8  you, "Okay, well, this is when they said take the

9  handcuffs off and then we did."  That is not

10  testimony that you heard.

11            Who was it that decided that they

12  needed to start doing strip searches in the beauty

13  shop and in the inmate bathroom?  No one -- no one

14  can explain to you how that began, other than the

15  plaintiffs.  And we'll talk about that in a minute.

16            Why is everybody so sure that these

17  sanitary pads and sanitary materials were

18  available, but nobody had the key, nobody opened

19  that closet, nobody can specifically remember

20  handing out sanitary materials to women?

21            Warden Reynolds told you in his initial

22  testimony that, you know, when he made those

23  announcements in the housing units that he told

24  women, you know, "Bring what you need with you."

25  And he told you that, you know, he thought if any

1    women needed to bring sanitary materials, they

2    would have come up to him, that that was definitely

3    addressed in the units.  But then when you heard

4    the testimony from Troy Dawdy, when you heard the

5    testimony from Leonetti, it was very clear from

6    their testimony that that didn't happen.  So, why

7    is there a difference in the testimony between

8    those men?  Why is Warden Reynolds going to such

9    lengths to try to convince you in the first

10   testimony he gave that women could bring that with

11   them?

12          Why is everybody so sure that the

13   bathrooms were clean, that they weren't dirty the

14   way the women describe?  But you also didn't hear

15   any testimony about how they were being kept clean,

16   about who was keeping things sanitary.  The only

17   thing you heard is that there's inmate porters that

18   come in once a day.  You didn't hear any testimony

19   about how 200 women could have come through these

20   spaces and nobody making any effort to clean up.

21          What happened to the grievances?  You

22   heard a lot of testimony about this, so I don't

23   want to spend too much time on it.  But why is it

24   that even though there's a policy that when these

25   grievances get filed, they get addressed and

1    returned, why are there no grievances?

2             And Warden Hulett told you that there

3    should have been an incident report or some kind of

4    written report created at the conclusion of this

5    search.  Where is that incident report?

6             And along those same lines, this trial

7    really changed on Friday.  Because all along, you

8    had heard the defendants testify, you'd heard the

9    defendants insist, insist certain things to you

10   about this case.  They insisted that men were not

11   in the gym during the strip searches.  They

12   insisted that Unit 2B went to the gym, got

13   strip-searched, finished up, and it was only after

14   that that Unit 4B came in.  They insisted that

15   women were definitely not standing in the gym.

16   They insisted that, you know, women were given

17   feminine hygiene materials.  They insisted that

18   those cuffs came right off when those women came

19   into the gym.  And they told you, hey, women were

20   given the chance in the housing units to grab what

21   they needed to come with.  And they also insisted

22   that, you know, the women in the housing units were

23   not being yelled at.  And then on Friday, those

24   line officers, those people who are not defendants

25   in this case, started testifying.  And suddenly,

1    the story was very different.  And you heard things

2    from those line officers that these defendants had

3    really been telling you, you know, wasn't true all

4    during this trial.

5            Officer Anderson, retired, he comes in

6    here and the first thing he tells you is that, "You

7    know, I was assigned to the gym.  I was in the gym

8    during the strip searches."  And you heard other

9    things from other line officers that challenge

10   everything that the defendants had been telling you

11   was true about this case.  The line officers and

12   the defendants are just not on the same page with

13   what happened in this case, and you saw that on

14   Friday.

15           And so, after all of this, after all

16   this testimony, hearing from the plaintiffs,

17   hearing from the defendants, hearing from those

18   line officers, you know what happened.  You know

19   what happened in this case.

20           No one can deny that there was a strip

21   search that took place of 200 women.  And nobody

22   can deny that this took a long time.  The times

23   that everyone in this case agrees on was that these

24   started sometime after the cadets got to the

25   facility at 8:00, so maybe 8:30 or 9, and they took

1    until 3:00 to finish.  Everybody knows that's true.

2    So, at minimum, that's 9:00 a.m. to 3:00 p.m.  That

3    is six hours.  Six hours is a long time.  Six hours

4    is a long time of standing, of being handcuffed, of

5    standing more, of finally getting strip-searched

6    whenever these women were in line to have that

7    happen over the course of that time.  And the

8    defendants know it's a long time.  They know it's a

9    long time and they know that's a question in this

10   case because it's a question of what the women were

11   having to do during that long period of time before

12   this ended.  And so what they have done in this

13   trial is to spend a lot of time with you trying to

14   convince you that six hours is less bad than it

15   seems.  They tried to minimize that six hours in

16   various ways and minimize to you what was happening

17   to the women during that time.  But they didn't

18   quite get their stories straight and so that six

19   hours just doesn't really work out.

20            You know the ways that that's true.

21   Let me give you a couple of examples of it.

22            We talked a minute ago about the

23   handcuffing, so let's start there.  The defendants

24   want to tell you, "We got to the housing units.  We

25   very quickly got these women in handcuffs.  You

1    know, we marched them right over to the gym, the

2    handcuffs came off, and then the women were just in

3    the gym."  And they want to tell you that the women

4    were not handcuffed for very long.  But that

5    doesn't work.

6              This was a training exercise.  They

7    were using cadets to do this handcuffing and to

8    both take them on and to take them off.  And you

9    got a long demonstration from Renee Hatfield about

10   how it is that these handcuffs go on, how you have

11   to set them so that they double-lock so that they

12   don't tighten up, and then what it takes to remove

13   these cuffs.  And you actually saw from Renee

14   Hatfield, who is -- you know, she's a teacher in

15   this subject.  She is very good at handcuffing

16   people.  This was difficult for her.  This wasn't

17   an easy thing to do.  And imagine how much more

18   difficult that it would be for a cadet and how much

19   more time it would take a cadet to get these

20   handcuffs on and off.  No cadet is going to be

21   anywhere near as professional as Renee Hatfield was

22   in doing this.

23             And remember too that part of what was

24   happening on those units was that women were being

25   patted down.  And there was some description of

1   this, that the pat-downs themselves are relatively

2   extensive, that people have to take their shoes

3   off.  They have to have the outside of their

4   clothes thoroughly searched.  They have to empty

5   their pockets.  So, that's all taking time in the

6   housing units too.  Cadets are doing it.  They're

7   slow.  It's their first time doing it.  They're

8   trying to be thorough.  That took a long time.

9           Again to this -- there is this

10  consistent claim by the defendants that when they

11  got the women to the gym, those cuffs came right

12  off, they were not standing in the gym handcuffed.

13  That's what they told you.  And that's also untrue

14  and you know that from the evidence that you heard

15  in this case, both -- I mean, everyone told you

16  that the women were marched into the gym in

17  handcuffs.  That's something that Reynolds said;

18  that's something that Dawdy said.  And when you

19  started hearing from these line officers, I think

20  it was Officer Johnson who testified that, you

21  know, when -- when the people got to the gym, the

22  officers were standing around, they were standing

23  around waiting to take the cuffs off, was her

24  testimony on Friday.  And you'll remember it as it

25  was said to you.

1     Officer Anderson, that's the older,

2 retired man with the beard who came in and talked

3 to you on Friday, he told you he -- he's retired.

4 He told you that when he got into the gym, the

5 women came in and it took a long time to get the

6 cuffs off.  That was his testimony.

7     We also know from the demonstration

8 with Renee Hatfield that this took a long time.

9     So, does that sound like a process to

10 you that was quick?  Does it sound to you from the

11 evidence you've heard that these women weren't

12 standing handcuffed in the gym?

13     And this relates to the question of,

14 well, were these women sitting in the gym?  Because

15 you heard from the defendants, well, you know, they

16 weren't -- they didn't have to stand.  If they

17 wanted to sit down, they could.  People could sit.

18 People could have come up and asked to sit.  That

19 would have been fine.  But no one told you that

20 they actually saw women sitting.  They just told

21 you if they'd asked, that's something they would

22 have been allowed to do.

23     And again, Officer Anderson gets here

24 on Friday, and what does he tell you?  He tells you

25 these women were standing, they were standing in

1   the gym handcuffed.

2           The defendants also want to tell you

3   that these strip searches were quick.  And you saw

4   Ms. McNaught, when many of these women testified,

5   you know, she was asking them a series of questions

6   about five seconds for this, five seconds for this,

7   that's ten seconds, trying to show you, and I --

8   when -- when defense closes, maybe they're going to

9   give you a number for that.  Maybe they're going to

10  say, "Well, you know, these searches took between

11  one and two minutes apiece.  It was very quick.

12  The women were not in the gym that long."

13          But again you know from the evidence

14  that that's not true.  The plaintiffs told you that

15  they were in those areas, that they were getting

16  strip-searched for between 10 and 15 minutes.  You

17  remember the testimony.  But that was I think

18  roughly the answer that the plaintiffs and the

19  women who testified basically gave you.  And the

20  testimony that you heard from the officers on

21  Friday is really consistent with that timing.

22          They described to you what actually has

23  to happen in a strip search.  And you want to think

24  about that process when you're considering the

25  evidence in this case.  The women had to take their

clothes off.  And you heard that these are women of

all ages.  There's -- you know, this is not all

18-year-olds that are throwing everything quickly

in a pile in the corner.  Some of these are older

women that take some time to bend down, takes time

to get shoes off, takes time to get clothing off.

That clothing then has to be checked.  And

defendants told you that there were cadets who had

to, you know, look through that clothing or feel

through that clothing to make sure there wasn't

something there that wasn't supposed to be there.

The women had to have their mouths inspected, the

back of their ears inspected.  They had to shake

out their hair, as was described to you.  They had

to show their wrists and their arms.  They had to

show their body.  And there was some testimony

about having to lift, you know, areas of your skin

that aren't showing for those to be inspected.

They had to, you know, open -- open their buttocks

and show those areas of their body for visual

inspection.  And they had to do the squat-and-cough

process that was described to you by the

defendants.  And again, that's all being done by

cadets, who are slow, and it's also being done as

officers are instructing the cadets how to do it.

So, you're getting instructions as you go.  And
everyone told you from the defendants that this was
a detailed process, this was a thorough process.
It takes longer when you have to have it explained
to you as well.  So, all the testimony tells you
that these searches were taking a long time.

And one of the best pieces of evidence
that these searches were taking a long time is what
Officer Slater told you on Friday.  She told you,
"I had to come from the housing units because those
searches were taking a long time."  She was brought
over to start those beauty shop searches because
they weren't able to get everybody done in the
bathroom.  And that's how you know that these
searches were taking a long time.  And during that
time the women are standing in the gym in
handcuffs.

So, to deal with that long period of
time, as sort of a last-ditch effort to tell you,
well, it wasn't that bad, what the defendants tried
to tell you -- and this really goes in particular
to the testimony that you heard from Warden
Reynolds on Friday.  He tried to tell you, "Look,
we definitely did 2B first, then the cadets took a
lunch break, and then we came back and did 4B."

1  And what they're trying to do is tell you you can

2  just go ahead and cut that time in half and then

3  take some time off on both sides for a lunch break.

4  You know, it's less than -- less than even three

5  hours per side because, you know, we got 2B done,

6  those ladies are out, we get 4B done.  It's not as

7  long as you think.  That may be one thing that

8  defense counsel tries to get up here and tell you.

9  If there's one thing in this case that you know to

10 be a lie, you know that's a lie.

11              And you know that Warden Reynolds

12 explained to you on Friday that his deposition

13 testimony originally said that the tactical team

14 went from Unit 2B to Unit 4B as simultaneously as

15 possible.  And that makes sense given all the

16 evidence in this case.  Because you heard all about

17 -- you know, I think it was Warden Reynolds who

18 said that word travels faster in a prison than on

19 the Internet.  You heard that, you know, if Orange

20 Crush is on the grounds, people see that, that's

21 going to defeat the purpose of doing a shakedown.

22 And so, you heard that they don't have much time

23 once Orange Crush gets there to do what they want

24 to do.  And you also heard a lot of testimony --

25 and I think most of this came from Alan Pasley --

that 3:00 was that cutoff.  There is no overtime

here.  You've got to get these people off the

grounds, and so, you know, you can't risk not

having this done.  Because those people have to be

-- have to be out.  And so you know from all that

evidence that there's no way they would have tried

to finish 2B and then started 4B later.  You know

that what happened was what Warden Reynolds

originally said, that they did -- they went and got

the women from 2B, got them to the gym, and then

they went and got the women from 4B and brought

them to the gym at the same time.

Now, on Friday, Warden Reynolds got up

and told you, "Well, I looked at those shakedown

slips and, you know, that really refreshed my

memory, that really put this all into place."  And

I'm paraphrasing his testimony.  You heard it.  You

know what he said.  But he said, "You know, I've

looked at the times on those shakedown slips and I

know from the times on the shakedown slips that we

did 2B, there was a break, and then we did 4B."

And you heard my questions of him.  You know that

there is actually a problem with the shakedown

slips in that way and you know that the shakedown

slips actually support what it is that the women

1  that testified told you.

2  And you know this because -- you know

3  this because we looked at that shakedown slip from

4  Ms. Crisp and you heard the evidence that Ms. Crisp

5  was in Unit 4B.  And you know from the shakedown

6  slip that Ms. Crisp was getting shook down and

7  having those pills discovered at 11:55.  And you

8  know that she was in the gym before that because

9  the testimony wasn't that, you know, she and

10  Ms. Lee were the first group searched.  And you

11  also know that this slip was written after, so you

12  can assume that she was in the gym even before

13  that.  This slip shows that what the defendants are

14  trying to tell you about that just isn't true.

15  It's not true.

16  And you saw Warden Reynolds's demeanor

17  on the stand when this was pointed out to him.  He

18  didn't have an answer for this.  You know what

19  happened.

20  So, there's a lot of testimony in this

21  case, too, about the language that was being used

22  at these women, about the general way that this

23  strip search was being conducted and the conduct of

24  the defendants and the officers under their command

25  towards these women.  You heard a lot of testimony

1   from defendants saying, "Well, you know, that
2   definitely didn't happen.  If it would have
3   happened, I would have -- people would have been
4   disciplined."  I think Renee Hatfield said, well,
5   she would have definitely at least talked to any
6   cadet who was doing that.  You heard a lot of
7   testimony saying, "This is what the rules in IDOC
8   are.  People would have been reported.  And
9   moreover, we're not trained to do that.  You know,
10  we're trained to do other things."  So, the defense
11  counsel might tell you, well, that's how you know
12  that didn't happen in this case because there's
13  rules that say that things are supposed to happen
14  in another way.

15          Alan Pasley testified and he gave you
16  some, you know, explanation of the training that
17  IDOC gets on this issue, and he explained to you
18  actually what they train the cadets about how
19  misconduct happens.  And what Alan Pasley told you
20  is, you know from your experience and from thinking
21  about all this evidence, exactly what happened in
22  this case.

23          He told you that anger plus pressure
24  equals misconduct, even for -- and I think his
25  words were -- experienced staff.  Anger plus

1    pressure.  He told you there's other reasons people

2    commit misconduct too.  I think greed, lust, other

3    things on the list.  But in this case, anger plus

4    pressure equal misconduct.  And that was true in

5    two ways.

6              You heard from various line officers

7    that the gym people said there was a lot going on.

8    People said -- from everything that everyone

9    testified, you know there was a lot of people in

10   there.  You know there was a large group of women

11   standing in there in handcuffs, which is incredibly

12   unusual for Lincoln Correctional Center.  That

13   didn't happen all the time.  This was the first

14   strip search of this kind in Lincoln Correctional

15   Center.  So, something unusual was happening that

16   day.  A lot of staff was brought in to deal with

17   that.

18             You know it was hot in the gym.  And

19   you know that because Officer Johnson, I think it

20   was, told you that the tac women took off all that

21   gear.  They left it on the -- you know, on the

22   side.  And they were in the bathroom doing their

23   searches.

24             You know staff was wearing rubber

25   gloves.  They testified about that.  Those rubber

gloves are really uncomfortable.  They make your
hands hot.

          And you heard from the defendants that,
hey, the people in the gym doing these searches,
they were on their feet all day.  So, you have
staff in the gym.  It's hot.  They've been there a
long time.  This -- these strip searches are going
on.  You have line officers, not defendants, who
are frustrated about their situation.  And they're
in there having to do something they don't want to
do.  And you heard that from Officer Crudup, who
many of these plaintiffs told you was making
statements.  And you know what happened.  This
wasn't what she expected was going to happen at
work that day, and suddenly she's in the gym, she's
doing these searches, it's unpleasant, it's
uncomfortable.  They're having to look at women's
bodies when that's not something they want to do.
And people get upset and people commit misconduct.
That's what happened for those line officers in the
gym.

          Anger plus pressure also equaled
misconduct for Warden Reynolds, for Troy Dawdy, for
Russell Craig, for the comments that they made to
the women but in a different way.  They're there,

1   you know -- especially for Troy Dawdy and for

2   Russell Craig, they're there to be Orange Crush,

3   and their job is to go in and, you know, I think

4   the testimony was shock people.  Their job is to

5   get those women up.  Their job is to get those

6   women in cuffs.  And they're yelling at people and

7   they're making statements because that's what

8   they're there to do.  And so -- and so, for them,

9   anger and pressure also led to misconduct.

10              And finally, for Warden Reynolds, you

11  know, he started out by telling you about

12  repercussions.  He felt that 2B and 4B were acting

13  up.  Rather than looking at alternative ways and

14  things that he could do to address those housing

15  units, he decided, "I'm going to teach those women

16  a lesson."  And for him, anger, pressure,

17  misconduct.  That happened at every level of the

18  way that people conducted this strip search.

19              We know from what Warden Reynolds said

20  what this search was about.  Again, you heard all

21  of his testimony.  Repercussions.  Defense counsel

22  is probably going to get up here and tell you,

23  "Well, hey, you know, the strip search was really

24  about other kinds of things.  It was really for

25  other reasons.  There were other things that were

motivating what the defendants were doing."  And
so, let's talk about those other reasons for a
minute.

Now, you heard -- you might hear from
defense counsel, well, this was really to search
for contraband.  And when you conduct your
deliberations, think about that very carefully.
First of all, you know Warden Reynolds's testimony.
For him, it was not for contraband.  Moreover, the
testimony that you heard was that the shakedown
component of what happened was to search for
contraband.

And these plaintiffs are not
complaining to you that there is not a legitimate
way to search for contraband by doing shakedowns in
their living units.  They're not complaining to you
about that.  There was contraband that was found
during the shakedowns.  And you have the shakedown
slips.  You can look at that.  There was very
little contraband found during their strip
searches.  It's 200 women and you saw two shakedown
slips that relate to what was found in the gym, the
pills from Ms. Crisp and then I think some clothing
items from somebody else.  Shakedowns are very
effective at finding the kind of nuisance

1   contraband that we're talk -- that was talked to

2   you about in this case, blankets, cassette tapes,

3   you know, personal grooming items that the women

4   aren't supposed to have like calamine lotion or

5   other things, and even think of all the expired

6   medication that was found in the units.  That's all

7   from the shakedowns.

8          The strip searches, after you've

9   already had a pat-down, after you have had your

10  unit shook down, didn't really yield contraband at

11  all.  Warden Reynolds told you what the strip

12  search was really about and you should take his

13  word for it.

14         And you also know that if there was

15  some urgent need to find contraband by doing strip

16  searches, this is something that Warden Reynolds

17  could have done before.  He waited for the cadet

18  class, he says, but he also told you he knew that

19  it was possible that he might never get a cadet

20  class or it might be a long time.  And so you know

21  that he wasn't waiting for the cadet class to do

22  the strip search portion of this just to find

23  contraband.  That's not what was going on.

24         This also wasn't for training.  And

25  Warden Reynolds again told you, for him, he didn't

1    care about training at all.  That's not why he was

2    doing what he was doing.  And you know for Troy

3    Dawdy, who talked with Warden Reynolds, for Russell

4    Craig, this wasn't about training either.  Well,

5    you heard from Warden Hulett that, you know, maybe

6    for her this had some training component.  And you

7    get to evaluate the credibility of her testimony.

8    And we'll talk about her specific liability in a

9    minute.

10           Officer Slater told you on Friday that

11   Orange Crush does not need to be the unit that does

12   shakedowns.  And you also heard that Orange Crush

13   doesn't have to be the unit to do strip searches.

14   There were strip searches done in Lincoln

15   Correctional Center during this time period all the

16   time that have nothing to with the Orange Crush.

17   They're not the only people at Lincoln Correctional

18   Center who do strip searches.  The strip searches

19   these women were having done every day weren't

20   being done necessarily by tactical officers.

21           So, if the strip searches were being

22   done for training, then why was it that it was

23   Orange Crush who was involved in that?  What was

24   the point of having Orange Crush involved?  Orange

25   Crush was there to make a point.  Orange Crush was

there to help Warden Reynolds do what he wanted to

do, which was repercussions. You don't need Orange

Crush to handcuff these women. You don't need

Orange Crush to supervise cadets in the gym. You

don't need Orange Crush to do the actual strip

searches. The shakedowns were being done by cadets

in T-shirts. That's what the institution told you.

So, what is Orange Crush involved for?

And the other thing that you should

consider too -- and the judge instructed you on the

law. You should look at the law that the Court

gave you and consider it. But in considering

whether these strip searches violated these women's

Eighth Amendment rights, it's not just the

underlying reason that a strip search was done that

day or an underlying reason that a shakedown was

done that way, but you have to consider what the

reasons were for the actual conduct that these

women experienced. Why was it that people were

swearing at them? Why were they being denied

sanitary materials? Why were they being forced to

stand handcuffed for so long? Why is it that men

were allowed to see these strip searches? Are the

reasons for any of those things that happened, are

they because there was some need for training,

1  because there was some need to look for contraband?

2  You know from the testimony that that's simply not

3  true.

4          You know from the testimony -- and

5  everybody told you this -- that swearing at women,

6  demeaning women has no penological purpose.

7  There's no reason for it.  People are trained to do

8  the opposite.  There's no penological purpose to

9  have women standing in handcuffs in the gym for so

10  long.  The defendants told you -- and I think it

11  was Warden Reynolds who said this and you heard

12  this from Wendy Still -- that having people sitting

13  quietly in the gym facing the wall serves the exact

14  same purpose as having people standing.  These

15  women were all compliant.  There's no reason to

16  have them remain handcuffed, and there's no reason

17  to have the women standing handcuffed for so long

18  as some kind of training issue for these cadets.

19  Because if the point is to even have them practice

20  taking handcuffs on and off, if you believe that

21  that is a reason that something was done, that

22  doesn't explain why the women were kept in

23  handcuffs for so long.

24          And you also heard Renee Hulett -- or,

25  Renee Hatfield tell you -- excuse me -- that

1   handcuffing is practiced in the academy, that many

2   cadets, especially female cadets, don't participate

3   in these kind of strip searches while they're

4   there.

5           So, you know that you can't excuse what

6   actually happened to these women by saying, well,

7   that was for training; well, that was to find

8   contraband.  Because there is no excuse, there is

9   no explanation for why the women were treated the

10  way they were.  And no one can stand up here and

11  tell you, "Well, we yelled at these women, we had

12  men in the gym, we demeaned them, we humiliated

13  them, and we did that because we had a reason to do

14  it."  No one is going to be able to give you an

15  explanation that you will accept about why that was

16  something that was serving the interests of the

17  prison or was done to serve the interests of the

18  prison.

19          And you know that too for one other

20  reason which I want to cover with you briefly.  You

21  heard that in response to a grievance a short time

22  before this strip search was conducted that Warden

23  Hulett responded to a grievance by saying, "Strip

24  searches are not to be done in a collective group."

25          Now, Warden Hulett had an explanation

for that.  You heard her testimony.  You can
evaluate if you think that what she was saying made
sense.  She told you that, well, she was responding
in that way because she was really saying that the
ratio for those strip searches was off, that you
should not have, you know, only one staff member
searching, you know, more inmates than there are
staff.  And she talked about concerns about what
that meant for the security of the facility.

What she told you about that doesn't
make any sense.  Why would you respond to an inmate
grievance by correcting some issue of internal
policy?  That is not reasonable.  You get to decide
the credibility of what she said.  What she told
that inmate was strip searches are not to be done
in a collective group.  And that's exactly what
happened here.  This wasn't the policy of the
institution to do it that way.  There was no
penological reason for doing the strip searches in
the way that they were done in the gym.

And along those lines, there was no
emergency here.  And you all know that.  That's
been covered at this trial in depth.  Everybody
told you this wasn't an emergency.  There weren't
exigent circumstances.  This wasn't a situation

1    where all hands on deck and we have to do anything

2    we need -- you know, anything we have to do to get

3    this done.  That's not what was told to you.  This

4    wasn't an emergency.  There was time to do it the

5    right way and that's not how it was done.

6              So, that's the evidence in this case.

7    You heard it.  You'll have an opportunity to

8    deliberate about it, to think about it.  The

9    question then becomes:  Okay, well, given all the

10   evidence you've heard, given what you know about

11   this case, is there liability?  And the judge told

12   you that you can -- you should consider the

13   liability of the six defendants separately.

14   They're not a group, like the plaintiffs are.  So,

15   you have to decide for each of those people, are

16   they liable?

17             The judge just read the law to you, so

18   I don't want to retell you -- you know, it's the

19   judge's job to instruct you, not mine.  The judge

20   told you the law that you should apply.  But I want

21   to explain to you why each of these defendants are

22   liable.

23             You heard that there are three theories

24   of liability in this case that you should think

25   about for each of these defendants.  I want to talk

about those, but let me tell you one thing first,
which is:  We have the burden of proof in this
case.  That's why we as the plaintiffs go first.
Because it's our job to show you that there was a
constitutional violation.  And we accept that
burden and we believe we've met it.

The burden in this case -- it's not a
criminal case.  It's not -- you know, you might
have heard beyond a reasonable doubt.  You might
think about that from, you know, legal shows you've
watched.  This case is not that.  The judge
instructed you that the burden here is a
preponderance of the evidence.  And a preponderance
of the evidence is different.  A preponderance of
the evidence means that it's more probably true
than not true.

And think about that as the scales.  If
the plaintiff is a little bit over the top, then
we've shown that it's more probably true than not
true.  So, when you go back to deliberate, that's
what you should be thinking.  Is it more probably
true than not true that plaintiffs have shown you
that the defendants violated their constitutional
rights and have met all of the -- all of the parts
of the Eighth Amendment claims that the judge told

1    you that you need to consider?

2            For all of those theories -- and the

3    judge just read -- read these three theories to

4    you.  There's direct liability; there's supervisory

5    liability; and then there's the failure to

6    intervene.  For all of those theories, we have to

7    show you that the plaintiffs were harmed.  And I'm

8    not going to spend a lot of time talking to you

9    about that because it's obvious given the evidence

10   in this case, it's obvious given what these women

11   experienced that they were harmed.  They were

12   psychologically harmed.  They were humiliated.

13   They were degraded.  That's harm.  And we've met

14   that as to any of the ways that you want to think

15   about liability in this case.

16           The judge told you that you also have

17   to think about something called deliberately

18   indifference -- or, excuse me -- called deliberate

19   indifference.  And you want to think about that

20   too.  The judge gave you the instruction.  But one

21   of the things that he tells you in the instruction

22   is that it's not enough if the defendants were

23   merely careless.  And we don't want you to

24   misunderstood that either.  Because the defendants

25   may get up here and tell you that we haven't shown

1  that these defendants were deliberately

2  indifferent.  We have to show you more than that

3  the defendants, you know, acted out of mere

4  carelessness.  We have to show you that they at

5  least knew that were was a substantial risk that

6  these strip searches were being conducted in a

7  harassing manner that was intended to humiliate and

8  intended to cause psychological pain.  And when you

9  think about that for each defendant, you know that

10  we've met that burden too.  You know that these

11  defendants weren't acting because they were

12  careless.  They were acting because they understood

13  what was happening and they were causing it or they

14  were deliberately -- they were causing it or they

15  were failing to prevent it in that they were

16  deliberately indifferent.  Again, the judge gave

17  you the law.  You should consider the law that

18  applies for each of those claims, but we have shown

19  that each of these defendants was deliberately

20  indifferent.

21          We presented to you as defendants in

22  this case the six people who were supervisors.  And

23  they all had different roles.  You heard about what

24  everybody was doing that day.  We gave you the six

25  supervisors who were involved in what happened and

1   you get to decide their liability.  You get to

2   decide if you think that nobody is liable.  You get

3   to decide if you believe everybody is responsible

4   and has met the legal standards that the Court gave

5   you.  You get to decide if you think some but not

6   all of these people are responsible.  And we leave

7   that to you.  We've shown you what everybody did,

8   and it's for you to make a judgment call about

9   where everybody falls and what you'll do with the

10  verdict form as to each of these defendants.

11          There are different defendants that are

12  in different positions with respect to what

13  happened in this case.  And we want to explain to

14  you how we believe that's true.

15          I want to say too, just as an aside,

16  that everybody, even people who want to be true to

17  themselves, are sometimes different people in

18  different situations.  You know, people get up here

19  and testify and they're talking to you and they're

20  presenting to you in one way.  It doesn't mean that

21  that's the same person that someone is in every

22  situation.  You got to hear the testimony of these

23  defendants.  You got to evaluate their testimony,

24  just like you did the plaintiffs.  And as you think

25  about the defendants' testimony and you think about

1    the testimony that you heard from them, think about

2    the fact that who they were on the stand -- and you

3    know that from what plaintiffs told you about what

4    was happening that day -- wasn't who they were on

5    March 31st.  It wasn't who they were on March 31st

6    in a locked correctional center with the plaintiffs

7    as inmates.

8         The defendants in this case really fall

9    into two categories.  There are people in this case

10   who were the punishers, the people in this case who

11   they themselves by their direct conduct contributed

12   to or caused these strip searches to be

13   humiliating, to be punitive.

14        You heard from Warden Reynolds.  You

15   know that Warden Reynolds -- again, we've talked

16   about it -- decided that he was going to punish

17   Units 2B and 4B, as he told you, decided there were

18   going to be repercussions.  He planned this search.

19   He oversaw it.  Most people told you that they

20   thought he was the person that had responsibility

21   that day.  He won't admit to you that he was in and

22   out of the gym, but that's what other people told

23   you.  And you know that he -- you can infer from

24   everything that was going on that he knew what was

25   going on in the gym.  He himself was directly

1  making degrading statements to these women.  It was

2  officers under his control who were doing these

3  strip searches in the way they were done.  He was

4  directly responsible.  He also has supervisory

5  liability and he also failed to intervene.  So,

6  when you consider this evidence, he's liable under

7  any of those theories.

8  The same is true with Troy Dawdy and

9  with Russell Craig.  They're responsible for Orange

10  Crush.  You heard about the specific kinds of

11  comments that Troy Dawdy and Russell Craig made to

12  these women.  You also know that even though they

13  don't want to tell you they were in the gym that

14  they were.  That's the evidence in this case.  They

15  were in the gym.  They were directly contributing

16  to what was happening in these strip searches.

17  They caused these strip searches and the overall

18  experience for these women to be unconstitutional.

19  They're directly liable.  They're liable as

20  supervisors.  They're liable for failing to

21  intervene.  They have liability under all three

22  theories.

23  Candidly, you know, it may be a little

24  more complicated for the other three defendants

25  that you heard from in this case.  And again, you

get to decide who, if anyone, is liable.  But
there's three defendants you heard from that didn't
seem to be people who were making comments.  You
didn't hear testimony from any of these -- the
women who testified that any of these people said
something derogatory to them.  You heard testimony
from Alan Pasley that, hey, he wasn't even in the
gym.  You heard Renee Hatfield give you her
testimony.  And you heard from Warden Hulett.  And
we'll take Warden Hulett last.

But let's talk about Renee Hatfield
first.  You know, she admits to you that she was in
the gym.  She's a person who wants to tell you, you
know, "I was in the bathroom but really supervising
those escorts.  That was -- that's what was
important to me and that's what I was doing."  You
know that if she was in the gym all day, as she
said, that she also saw what was going on.  She
understood what was happening.  She understood that
these women were standing in handcuffs.  She
understood the statements that were being made by
them to other officers.  She knew that this strip
search was punitive in nature, that what was
happening was wrong, that the overall circumstances
were unconstitutional.  And she came here and told

1　you that she didn't.

2　　　　　You get to judge her credibility.  If

3　you really believe that Renee Hatfield was doing

4　this for training, that she really didn't see

5　anything that was going on, that she really didn't

6　understand what was happening, that's your

7　decision, and you shouldn't find her liable.  But

8　if you believe that she knew exactly what was going

9　on in that gym and she failed to prevent it, she

10　failed to report it, she condoned it, she assisted

11　with it, she turned a blind eye, then you should

12　find her liable for failing to intervene and you

13　should find her liable for failing to prevent what

14　was happening by having supervisory liability.

15　　　　　Similarly, you can decide what to

16　believe about Alan Pasley.  You heard from Mr.

17　Pasley.  You heard his testimony.  If you believe

18　he was never in the gym, if you believe he had no

19　reason to know what was going on in the gym, if you

20　believe he wasn't involved in supervising those

21　cadets, and really just to him March 31st was all

22　about being in the units, then you shouldn't find

23　him liable.

24　　　　　But if you believe, like Renee

25　Hatfield, that he knew what was going on, he failed

to prevent it, he understood what was happening in
that gym, then you should find him liable for
failing to intervene, you should find him liable
under the supervisory liability theory.  And again,
you can look at the elements of those claims and
make a decision for yourself.

Warden Hulett is maybe the most
difficult decision for all of you.  And again, I'll
be candid about that.  She came here to court and
you can tell from what she said that she was
basically a good warden.  You can tell from her
testimony that there are many things that she did
right as warden.  And you heard from our clients,
you heard them tell you that Warden Hulett was, you
know, one person who was at times looking out for
the women that day.  You know that.  You know
that's true because the plaintiffs told that to you
and you know that because you had an opportunity to
observe Warden Hulett.  And she gave you some
honest information.  You know, she's the person who
told you that this -- you know, she had no
information that there was this special problem
with 2B and 4B, that if there was something major
going on, she would remember it.  She did not stick
with Reynolds on that point.  So you know that

there was some truthful information that you heard
from her.

You also know that she planned this
search with Warden Reynolds.  You know that,
despite all of the evidence -- you know, she
insists to you, "I was in that gym in the morning
and I never came back."  And you know from all the
other testimony and you know from IDOC officers
themselves that people saw her come back into the
gym before those strip searches were over.  You
heard the testimony from Patricia Phillips and you
know what Patricia Phillips said.  She said that
when Warden Hulett came back into the gym she said,
"Who authorized this?  Who authorized this?"

Everyone can understand the experience
where you've -- you know, you've planned something,
you're relying on your subordinates, you're
delegating your authority, which is appropriate.
You might believe that everything is fine and then
you walk into that gym and you see what's going on
and you realize that there's a huge problem.  You
know what you're seeing.  You know what you're
seeing is wrong.  You know that it's your own view
that strip searches should not be conducted in a
collective group.  You know that there should be a

1  curtain on that bathroom door.  You know that you

2  shouldn't be seeing these women standing in

3  handcuffs.

4          And you know from the evidence and from

5  what you can infer about the evidence exactly what

6  happened.  You know that Warden Hulett came into

7  that gym at some point while those strip searches

8  were going on.  She saw all those women standing

9  handcuffed.  She saw the general tenor of the room.

10 Maybe she heard demeaning statements being made.

11 But she saw that that -- she saw there were men in

12 the gym.  She saw the women in the bathroom were

13 being strip-searched the way they were.  And she

14 had a decision to make at that moment.

15         You know from our clients what she did.

16 You know that one thing she did was say, "Hey, we

17 got to get a curtain up there for that bathroom."

18 And she asked for that to be done.  Now, the

19 testimony you heard was that it took a while for

20 that to be done.  But that's something that our own

21 plaintiffs told you she tried to do.  And you know

22 that -- you can infer from the evidence that she's

23 the person that tried to speed this up.  You know,

24 somebody made the order, let's get the -- you know,

25 more women over here to get these done faster.  And

1 the plaintiffs told you that after she came in,

2 that's when the beauty shop searches started. So,

3 you know something changed when she came into the

4 gym.

5 But she didn't do enough. She knew

6 there was a serious problem there and, you know,

7 the testimony from everybody is that she came in,

8 she did a couple things, and then she left. She

9 knew there was a problem in that gym. She knew

10 there was a serious issue. And rather than get

11 additional supervisors in there, rather than just

12 stopping this whole thing, rather than taking other

13 steps, her solution was to leave, to walk away.

14 And she came here in court and she was not truthful

15 with you about that. You get to evaluate her

16 intent. You get to evaluate her conduct. You get

17 to decide if she was responsible.

18 But you look at those jury

19 instructions. You look at the law. And if you

20 believe that she could have intervened at that

21 moment and that she didn't do what she needed to

22 do, and if you believe that as a supervisor her

23 actions condoned, assisted with, that she failed to

24 -- you know, she turned a blind eye to what she was

25 seeing, when you look at the law and the

1  instructions, then you should find her liable too.

2  We have proven liability.

3        You're going to get verdict forms.  The

4  judge is going to explain to you how to complete

5  that form.  For anybody that you believe is liable

6  under any of these theories, you should find for

7  the plaintiffs as to that person on that particular

8  claim.  And the judge will explain to you how to

9  complete those verdict forms.

10        I'm going to come back in rebuttal.

11  I've said a lot to you morning.  You've been

12  patient with me.  I'm going to address in rebuttal

13  anything else that the defendants get up and tell

14  you that I think I need to address.  But I've

15  talked to you a lot.  It's not my intention to talk

16  to you very much more, but I do want to leave you

17  with one other thing.

18        You know from the evidence in this case

19  that the defendants punished these women.  And

20  think about the people who specifically planned

21  this search, think about Warden Reynolds, think

22  about Troy Dawdy, think about Russell Craig.  They

23  punished these women.  They let them be humiliated.

24  They humiliated them because they didn't think that

25  they were people whose Eighth Amendment

constitutional right was worth protecting.  You

know that from the language, go two by two like the

animals you are, telling people to shut up, calling

people bitches.  That's degrading and demeaning

language.

There was some more subtle argument

that you heard about this too.  On Friday, when

Alan Pasley was testifying, he spent a long time --

and you have a memory of this.  You remember he

spent a long time going through these contraband

slips.  Now, we had talked to you about these

contraband strips because we wanted to -- we wanted

to show you that, you know, what was going on in

the shakedowns didn't justify what was happening in

those strip searches, and we explained to you

specifically what was being found in the

shakedowns.  What Alan Pasley was doing was a

little different.  He was going through in detail

and talking to you about his opinions about, you

know, My Little Pony gang and about women possibly

having relationships with other women in prison.

And he was trying to subtly suggest to you that

these women are not as worthy of your consideration

as other people, that you shouldn't be -- you

shouldn't take their constitutional rights as

1    seriously, that maybe you should think of them as

2    people that, you know, are in prison and should get

3    what they deserve.

4             We told you, and I'll tell you again,

5    these women are not complaining to you that they

6    were in prison.  You know, you know about their

7    pasts.  You know about their criminal records.

8    It's not a secret.  They're not hiding that from

9    you.  They're not complaining to you that they were

10   subjected to shakedowns.  They're not complaining

11   to you that they were subjected to strip searches

12   in various contexts.  And you know that.  You heard

13   all about that.  The judge told you how to think

14   about their prior convictions and you can take that

15   into account into what you're considering.

16            If the defendants get up here after

17   I've talked to you and they suggest to you in some

18   kind of direct way, in some kind of veiled way that

19   this contraband, that these women's circumstances

20   mean somehow to you that you should take their

21   constitutional rights less seriously, you should be

22   very upset about that.  You shouldn't let them

23   diminish these women's character, diminish these

24   women's right to constitutional protection by

25   smearing them in your eyes, and you should reject

1  any arguments that advise you or suggest to you

2  that that's something you should do.  Because if

3  you allow these defendants and you allow what

4  happened on March 31st to have taken away the

5  constitutional rights of these women, then where

6  does disrespect for the Constitution stop?  Where

7  does it end?  These women are not entitled to less

8  Eighth Amendment protection because of who they

9  were or where they were.  The Eighth Amendment

10  applies to them just like the Constitution applies

11  to everybody else.

12  You know -- you know that what the

13  defendants did violated their Eighth Amendment

14  rights.  You know that these defendants are liable

15  to these plaintiffs.  And we ask you that your

16  verdict in this case reflect that knowledge.

17  Thank you.

18  THE COURT:  Thank you, Ms. Thompson.

19  Ladies and gentlemen, I think that at

20  this time -- it is just about six minutes until 12

21  -- I think that what we will do is take a

22  ten-minute recess.  And I've asked Madam Clerk to

23  have luncheon orders for you on the table in the

24  jury room.  So, during this ten-minute break, let

25  us -- you fill out your order forms and they will

1   be -- it will be brought into you lunch.  So, we'll

2   be eating an hour later than usual.  But this I

3   think will accommodate every interest we have here

4   so that we don't waste time.  So, if that's

5   agreeable with you, rather than break, take an hour

6   and a half, and then go to the rest of the closing

7   argument, I think that this might speed things

8   along.  If that's agreeable?

9                   Okay.  Let's do that.

10                  Now, please recall my admonition.

11  Don't talk about the case until time.  And fill out

12  your forms and we'll take a ten-minute recess for

13  that purpose.  And then be back in here and I will

14  then ask the defense to then address you.  All

15  right?  So, let's take a recess of ten minutes.

16  Fill out your forms.

17                      (The jury left the courtroom.)

18              THE COURT:  All right.  The jury has

19  left the courtroom.

20                  Any problems with that agenda, ladies

21  and gentlemen?

22                  We're all going to be having lunch

23  later.  But at least this will get the matter

24  completed.  And I don't want a lot of break in

25  between your argument and the defense.  So, ten

1  minutes I think is a reasonable period here and

2  we'll get everything accomplished.  Thank you very

3  much.

4          Let's stand in recess ten minutes.

5              (Court was then in recess.)

6              (The jury entered the courtroom.)

7          THE COURT:  Thank you, everyone.

8          All right.  We are all in place and

9  ready to proceed now with the closing for the

10  defense.

11          MS. BAUTISTA:  Thank you.  May it

12  please the Court.

13          THE COURT:  It does, Ms. Bautista.

14          MS. BAUTISTA:  Counsel.

15          Good afternoon, ladies and gentlemen of

16  the jury.  I very much appreciate the time and

17  attention you've paid to this case.

18          You've seen the evidence.  The judge

19  has instructed you as to the law.  Plaintiffs'

20  counsel will have one more opportunity to talk to

21  you, but after that, you will asked to decide the

22  issues in this case.

23          Ultimately, this case is about who you

24  believe.  It's not about whether the plaintiffs

25  could be handcuffed on March 31st, 2011.  It's not

1    about whether or not they could be strip-searched

2    on March 31st, 2011.

3              As you've heard and as the plaintiffs

4    have admitted, the correctional institution is

5    permitted to use handcuffs.  Strip searches are

6    done on a regular basis for various reasons, before

7    and after visitors come, before and after court

8    appearances.  When -- when an inmate comes back

9    from a job assignment that's on the outer perimeter

10   or from sewing industries, they do strip searches.

11   Before Mom and Me visits, strip searches are done

12   in large groups, just like they were done on March

13   31st, 2011.  When Sister Pat comes in and brings

14   inmates' families to come in and visit for a whole

15   day, they strip-search the large number of women

16   that want to visit with their family.  These strip

17   searches are also done on a random basis in smaller

18   groups every single day in the prison to ensure the

19   safety and security of the inmates, the staff, and

20   the facility.

21             We are here because the plaintiffs

22   claim that our clients, Alan Pasley, Renee

23   Hatfield, Russell Craig, Troy Dawdy, Melody Hulett,

24   and Russell Reynolds, purposefully conducted the

25   strip searches on March 31st, 2011, in a harassing

1   manner intending to cause psychological harm,

2   rather than for the purpose of ensuring the safety

3   and security of the facility.  But that's not what

4   happened.

5         Let's take a minute to review the

6   evidence that was presented to you.  And as we do,

7   keep in mind what the plaintiffs were required to

8   prove.

9         They have to prove that each individual

10   actually knew that these inmates were being

11   harassed and humiliated during these strip searches

12   but that they purposefully ignored that conduct.

13   That absolutely did not happen in this case.  As

14   you've seen, the plaintiffs were not harassed

15   during these strip searches.  They were not

16   conducted solely for the purpose of humiliating the

17   plaintiffs.  It is -- is it embarrassing to take

18   off your clothes in front of a correctional officer

19   and have to go through a strip search?  Yes.  As we

20   told you in the beginning of the case, that is

21   embarrassing.  It's embarrassing for both the

22   officer and for the inmate being strip-searched.

23   But that was not the purpose of the searches on

24   March 31st, 2011.

25         As you saw during the course of the

1    trial, the shakedown and strip searches on March

2    31st, 2011, were intended to improve the safety and

3    security of the facility.  Nearly two months before

4    the strip searches, Russell Reynolds contacted the

5    statewide tactical commander and the manager of the

6    training academy and said, "I've been having

7    problems at my facility.  Do you have cadets that

8    can come and assist me in searching my facility?

9    We've been having issues with contraband.  There

10   have been fights amongst inmates and the inmates

11   have been disobeying the staff."  "No cadets were

12   available at that time but we'll keep you on the

13   list," was the response that Mr. Reynolds received.

14   So, he continued to do what he could do within his

15   facility with the manpower that he had to try and

16   restore order in the facility.  Ultimately, the

17   statewide tactical commander contacted the

18   facility, "We have cadets coming.  They're

19   available on March 31st, 2011."

20           You heard the tactical team members

21   explain to you, including the tactical commanders

22   that have been sued in this case, how they entered

23   the unit.  "Ladies, time to go back to your dorms."

24   Was it loud?  Yes.  They needed to quickly gain

25   compliance from approximately 100 women that were

1   in the dorm.  There were some women that were in

2   the dayroom.  They were playing cards and watching

3   TV.  You've got five dorms that go back beyond the

4   dayroom into the hallway, and they needed everyone

5   to hear them and everyone to respond.  By speaking

6   loudly, the tactical team was able to announce to

7   the dayroom and all five dorms at the same time

8   that it was time to get up, time to get what you

9   need, that you're going to be gone from the dorm.

10          So, let's talk about language for a

11  minute.  You were able to hear directly from the

12  correctional officers that were there that day.

13  You don't have to rely on people saying what other

14  people said.  You heard directly from these people

15  that were there.  Carlita Edmonson, Kim Johnson,

16  Abe Anderson, Courtney Krull were all there at the

17  beginning in the dayroom.  They all testified they

18  used the word "ladies" when they were referring to

19  inmates or offenders.  They didn't use that

20  language.  They said, "Ladies."  "Ladies, we need

21  to clear the dayroom.  Ladies, grab your necessary

22  medication and ID cards.  Ladies, there's going to

23  be a shakedown.  Ladies, there's no talking.

24  Ladies, face the wall."  They may have used a loud

25  voice to be firm with the inmates, but that's in

line with their training, firm, fair, and
consistent.  They didn't use profanity.  They
didn't holler and scream.

And you heard why profanity wasn't used
that day and isn't used at the Department of
Corrections.  That kind of language isn't going to
get them anywhere.  They come into contact with
these women every single day.  This isn't just one
instance, March 31st, 2011.  They have to work with
these women every single day.

Renee Hatfield explained to you
approach determines response.  If you want respect
from an offender, first you have to give respect to
that offender.

There were only eight to ten tactical
team members there that day, and they had to gain
control and maintain control over a hundred
inmates.  If they walked into that housing unit
referring to the women as bitches or calling them
animals and line up two by two, things would have
gotten out of control.  It would have escalated
quickly.  There's no reason for them to comply if
they're being talked to in a derogatory manner.
You think that an inmate is just going to respond
and say, "Okay, I'm being yelled at, so I'm going

to do what I'm going to do."  That's not what was going to happen.  And you heard, both from the defendants and from the correctional officers that testified, that's not how we get things done.

As the women were handcuffed and brought into the dayroom, you heard from Alan Pasley he was randomly checking the fit of the handcuffs.  Now, as Renee Hatfield stood up and explained to you, handcuffing had been taught to these cadets well before this March 31st exercise at Lincoln Correctional Center.  They had practiced it on each other.  They had gone over it several times.  So, Alan Pasley was randomly checking the fit for all of these handcuffs.  And then if anybody complained, he would check the fit of their handcuffs.  There's no reason not to.  They're getting everyone gathered up in the training -- in the dayroom.

Even one of the plaintiffs admitted this.  Jacqueline Hegwood explained to you that when she said, "Hey, I have a front-cuffing permit, I have an injury, I have a medical issue, I need to be cuffed in the front," that complaint was not ignored.  She testified Troy Dawdy called down to the medical unit, confirmed the front-cuffing

permit, and she was cuffed in the front.  The
complaint wasn't ignored.  It wasn't disregarded.

If the design of the plan, as
plaintiffs' counsel has told you, was to humiliate
and harass these women, then why listen to any
complaints?  Why take any action or any
consideration for the plaintiffs?

From there, the women were taken to the
gym.  And while some staff did stay on Unit 2B,
like Alan Pasley, to conduct the shakedown, there
were people that went over to the gym.  Troy Dawdy
and Russell Craig explained to you they went with
the lines of women over to the gym.  They got them
lined up in the gym.  But not only them, they
weren't the only ones who went over there.

You also heard from Abe Anderson, a
retired Department of Corrections employee.  He was
assigned to Housing Unit 2B that day.  That was his
regular assignment.  They get assignments for 90
days and that was -- that was his job.  So, when
they came into Housing Unit 2B, the tactical team,
and said there was going to be a shakedown, they're
taking the women to the gym, he's going with the
women to the gym.  This is no different than what
his job would have been if they had stayed on the

1   unit.  But the plaintiffs want you to believe that

2   once they got to the gym, they stood in the gym for

3   hours in handcuffs.  But you know that that's not

4   true because Abe Anderson testified once all the

5   inmates were brought over to the gym and they had

6   them lined up, he and the other officers in the gym

7   started unhandcuffing everyone.  Did it take time

8   to do this?  Yes.  But they did not remain

9   handcuffed for the entire time that they were in

10  the gym.  They started taking off the cuffs

11  immediately.

12          And it makes sense that they would do

13  that.  They're now in a controlled area with

14  security staff able to watch the women in the gym.

15  They're not able to drop contraband on the walkway

16  to the gym anymore.  They're not able to hand off

17  contraband to another inmate in an attempt to hide

18  it.  They're going to be strip-searched soon, so

19  even if they conceal any contraband that they've

20  brought with them on their bodies, they're going to

21  find it during the strip search.  And that makes

22  sense.

23          They also kept the women who had been

24  searched separate from the women who were waiting

25  to be strip-searched.  And that also makes sense.

1   Why would you have them together so that one woman

2   can hand off contraband to someone who's already

3   been searched?  That defeats the entire purpose.

4           Inmate Sheila Crisp's situation is

5   instructive here specifically.  She was on Unit 4B,

6   the second unit that was shaken down.  If she

7   hadn't been handcuffed from the dorm to the point

8   where they got to the gym, wouldn't she have done

9   her best to dispose of the contraband that she had

10  hidden in her vagina while they were walking over

11  to the gym?  That way, you find pills on the

12  walkway between 4B and the gym, you can't attach it

13  to her, she can't suffer the consequences for that

14  -- for that action.

15          By surprising the women with a

16  shakedown and using handcuffs between the dorm and

17  the gym, the staff made it possible to hold the

18  inmates accountable for the contraband that they

19  had in their property or had hidden on their

20  persons.

21          Now, after uncuffing all of the

22  prisoners, the officers were ready to start

23  strip-searching.  And they started in the inmate

24  bathroom.  Plaintiffs want you to believe that the

25  bathroom was so small that once you got some of the

1   inmates in there and the staff and the cadets that

2   they were nearly standing on top of each other.

3   But you were able to see in this courtroom the size

4   of that bathroom.  You were able to see the size of

5   the beauty shop that started to be used later.

6           Kim Johnson, one of the tactical team

7   members, testified in court and explained to you

8   that they did this strip search the same way they

9   had done it hundreds of times before.  They had

10  four staff and what was new about this strip search

11  is they had cadets with them in the bathroom and

12  they had inmates in the bathroom to be

13  strip-searched.  There was a sheet covering the

14  entrance to the bathroom door so that nobody in the

15  gym could see the inmates as they were being

16  strip-searched.  This was the same sheet that they

17  always used when they were doing Mommy and Me strip

18  searches or Sister Pat strip searches.  It was the

19  same routine.

20          Plaintiffs' counsel told you in her

21  opening that the men in the gym were able to see

22  all of the women as they were being strip-searched.

23  But that's not even what the plaintiffs have

24  testified to.  Delores Henry, Jacqueline Hegwood,

25  Patricia Phillips, they all admitted that a curtain

1   was put up to block the view between the gym

2   bathroom and the gym.  Now, they do claim that

3   there was a delay in putting up the curtain, that

4   Delores Henry estimated that maybe 20 women -- 20

5   percent of the women were searched before it was

6   put up.  Ieshia Brown testified differently.  She

7   said, "No, there was nothing blocking the gym

8   bathroom from the gym."  She never saw a curtain

9   that day.  But then later she testified, "Well, I

10  did see a curtain but they taped it up at the top."

11          And then you can take the plaintiffs'

12  testimony and compare it to the other inmate

13  witnesses that they called to testify.  Adrian

14  Maynor claimed that there wasn't a curtain put up

15  until -- that, you know, it wasn't on poles like

16  the other plaintiffs said.  It wasn't taped at the

17  top like Ieshia Brown said.  That, you know, right

18  before the very end of the strip searches they

19  brought out a curtain but it was only knee high and

20  it exposed everything from the waist and above.

21  But that doesn't make sense.  Why would you even

22  bother bringing out a curtain if you're not going

23  to cover anything up?

24          We know that Adrian Maynor wasn't

25  telling the truth because she wasn't even housed on

1    Unit 2B that day.  We know that because of Adrian

2    Maynor's housing records.

3                Alan Pasley and Russell Reynolds

4    explained to you the importance of keeping track of

5    where an inmate is housed.  They do multiple counts

6    in a prison every day.  They have different types

7    of counts.  They have a count where you just have

8    to count, you know, people that are there.  Then

9    you have a movement count where you have to see the

10   person move.  And that's to make sure that nobody's

11   stuffed pillows under their blankets to try and

12   escape from the prison.  But then you have what

13   Alan described as the most important count of the

14   day and that's the count where -- the positive ID

15   count.  And that's where the housing unit records

16   come into play.  That positive ID count is done

17   every single day.  They take the housing records,

18   they make a chart of the dorm, and a correctional

19   officer is expected to walk the dorm, compare an

20   inmate's ID to the face of that inmate to the

21   housing unit record.

22               And you heard that the housing record

23   on that day showed that Adrian Maynor was in Unit

24   5A and she had been in that unit for three weeks

25   before this search and for a year after this

search.  She simply was not on Unit 2B.

Millie Lee was another inmate who testified regarding her experience that day.  She was the only inmate housed on Unit 4B.  And she testified to you, yes, when Unit 4B was taken there, there was no one there from Unit 2B.

No one has testified that the two units were in the gym together.  They finished the one; they started the other.

According to Millie Lee, she said there was a curtain up -- there wasn't a knee-high curtain.  It wasn't taped to the wall.  It was the curtain that we've seen in the pictures -- that there was a curtain up, but for whatever reason they opened the curtain.  So, they put the curtain up but they opened it, and she said she could see people in the gym while she was being strip-searched.

You have all this contradictory testimony amongst the plaintiffs and the inmate witnesses that they have brought in, but the correctional officers who were present in the gym and Renee Hatfield who was present in the gym have all testified consistently.  Abe Anderson, Dominique Crudup, Carlita Edmonson, Kim Johnson,

1  Courtney Krull, they were all there from the very

2  beginning, and they said, "The curtain was up.  We

3  had that curtain for this very purpose, for

4  blocking the view from the gym when we're

5  conducting strip searches in the gym."  And they

6  all said it was there from the very beginning.

7           Melody Hulett testified she went in

8  with Deputy Director Deb Denning at the very

9  beginning of the search for the very purpose of

10 making sure that curtain was up and it was.

11          So, let's talk about how the searches

12 themselves were conducted.  There were four staff

13 members in the bathroom with the inmates and the

14 cadets.  As the inmates removed their closing, the

15 correctional officers checked the clothing for

16 contraband and then handed it to a cadet to hold

17 while the inmate was being strip-searched.  There

18 was no throwing the inmate's clothing on the floor,

19 ordering the inmate to set the clothing on the

20 floor.  That simply did not happen.

21          Carlita Edmonson, Kim Johnson, and

22 Courtney Krull explained how they dealt with

23 menstruating women, not just on this day but on any

24 day in which a menstruating woman is being

25 strip-searched.  That woman would squat and cough

1  over the toilet.  And they did that to maintain a

2  hygienic area in which to strip-search people.

3  Ms. Johnson told you, "This is the routine.  This

4  is how we always do it."

5          Troy Dawdy can't testify to you as to

6  how female inmates are strip-searched.  He has not

7  strip-searched female inmates.  Russell Craig

8  cannot testify to you how female inmates were

9  strip-searched because that is not his job.  That's

10 not his role.  And that's because care is taken to

11 make sure that only female officers strip-search

12 female inmates.  And this is a female institution.

13         Now, Ms. Johnson explained to you why

14 they're careful to maintain a hygienic area when

15 strip-searching menstruating women.  Correctional

16 officers don't want to be exposed to that blood any

17 more than inmates do.  And Wendy Still, who

18 testified regarding nationally accepted

19 correctional practices said, "Yes, having a woman

20 squat and cough over the toilet when she's being

21 strip-searched when she's on her menstrual cycle is

22 an acceptable way to deal with hygiene in this

23 situation."

24         Plaintiffs would have you believe that

25 not only were menstruating women squatting and

1  coughing with no precautions to maintain the

2  hygiene of the bathroom but that those women were

3  also directly ordered to throw their bloody tampons

4  and pads on the floor of the inmate bathroom even

5  though there was a garbage can available in the

6  bathroom.  Just from a commonsense perspective,

7  that claim makes absolutely no sense at all.  Why

8  would correctional officers who are having to stand

9  in the same conditions as the inmates order people

10  to throw used tampons and pads on the floor?

11          And this supposedly happened and

12  continued to happen even after the warden and the

13  deputy director of the Department of Corrections

14  walked through the gym and nobody noticed it.  The

15  statewide tactical commander was there.  People

16  from Springfield were there making sure that the

17  search was being conducted appropriately.  But yet,

18  correctional officers have taken it upon themselves

19  to tell women to discard of their items on the

20  floor.

21          Besides just not making sense, you know

22  this testimony isn't true because the plaintiffs

23  themselves swore under oath that when women removed

24  their tampons and pads they threw it in the garbage

25  can.  They were confronted with statements that

1  they made much closer in time to the search than

2  this.  And you know that if it really had happened,

3  if a correctional officer really had told them to

4  throw tampons and pads on the floor, they would

5  have remembered that and they would have written

6  that in that statement rather than saying that they

7  told them to throw them away in the garbage can.

8          Kim Johnson said it well.  Blood can

9  carry contagions.  They're not going to stand

10  around in a situation like that.

11          You also know that sanitary napkins

12  were provided to women who were menstruating after

13  the search.  One of the plaintiffs herself admitted

14  that.  Delores Henry told you that when Melody

15  Hulett came into the gym, she personally went

16  around and supplied sanitary napkins to women who

17  needed them in the gym.

18          But you also heard from the female

19  correctional officers, the women who were

20  responsible for doing these strip searches not just

21  on this day but on any day, that this is what they

22  do.  They have sanitary pads available everywhere

23  in the prison.  They always have them available in

24  the gym bathroom because they use that gym bathroom

25  to conduct strip searches on a regular basis.

1           Monica Slater, the correctional officer

2    who testified that she came over from the housing

3    unit to start conducting strip searches in the

4    beauty shop, told you that the first thing that she

5    did was grab a box of sanitary pads and grab some

6    toilet paper so she could be prepared.  Proactive

7    rather than reactive.  When you deal with an inmate

8    population -- a female inmate population on a

9    regular basis, you know there will be menstruating

10   women and you're going to be prepared for that.

11           In addition to being prepared with the

12   sanitary napkins, let's talk about Monica Slater

13   going to the beauty shop to conduct the strip

14   searches.  The plaintiffs want you to believe that

15   the whole design of the plan for the strip searches

16   was to humiliate and to harass the female inmates.

17   If that's the whole design of the plan, then why

18   would they care that the strip searches are taking

19   too long?  Why would you open up the beauty shop to

20   conduct strip searches in there?  Why speed it up

21   if your whole point is to harass the women there,

22   to force them to stand in handcuffs as long as

23   possible?  Why would you show this care to go ahead

24   and like, okay, we need to get this done, we need

25   to speed this up?  It just doesn't make sense.  It

1   doesn't match with the facts that you know are

2   true.

3           You've heard the evidence that there

4   were male correctional officers in the gym.  And it

5   makes sense that Troy Dawdy and Russell Craig and

6   Alan Pasley wouldn't know if there were male

7   correctional officers in the gym.  Troy and Russell

8   Craig were just there at the very beginning.  That

9   wasn't their job to -- to supervise the gym.  They

10  were in the units doing the shakedowns.  But the

11  correctional officers who were there that day know

12  that they were there that day, that they were in

13  the gym.

14          You heard from Abe Anderson.  He was

15  responsible for the hundred female inmates from 2B

16  that were there and he told you they went over to

17  the gym at 9 a.m., they finished the strip searches

18  at 11 a.m., and because he was responsible for Unit

19  2B, he went with them to the chow hall, and then

20  they went back to the housing unit once they were

21  done with the shakedown there.  He didn't stay in

22  the gym for the search for 4B because that's not

23  his job.

24          Mr. Anderson also explained to you that

25  precautions were taken to make sure that male staff

1 couldn't see female inmates being strip-searched,

2 and he told you he could not see anybody being

3 strip-searched, and the same precautions were taken

4 in the gym as were taken regularly on the housing

5 unit to protect the women that were showering from

6 being seen by the male officer that has to walk

7 through the housing unit.  There's a curtain there

8 to block the view.

9             Additionally, the beauty shop was used.

10 And you saw that solid door between the beauty shop

11 and the gym.  You heard the testimony that a female

12 correctional officer stood at the door to make sure

13 that it wasn't opened while females were being

14 strip-searched in the beauty shop.

15             The plaintiffs expect you to believe

16 that correctional officers like Dominique Crudup

17 and Abe Anderson made derogatory statements about

18 the women's bodies while they were being

19 strip-searched, that they made statements about the

20 odors of these women.  They claim that Dominique

21 Crudup had a bandanna covering her face during the

22 strip search, an item that is associated with gangs

23 and was contraband in the facility.  Yet, a

24 correctional officer had a bandanna and was seen by

25 people covering her face.

1          Even if this did happen, which it

2    didn't, they want you to believe that Renee

3    Hatfield heard statements and laughed.  She's there

4    to train correctional officers how to do their

5    jobs, to teach them to be firm, fair, and

6    consistent.  She doesn't know these officers in the

7    gym.  She doesn't know these tactical team members.

8    She doesn't owe them anything.  They're not in her

9    chain of command.  They don't have any authority

10   over her.  And yet, she's teaching cadets how to do

11   their job and is expected to -- you're expected to

12   believe that she would laugh.  There's no reason

13   for her to have done this.  And you heard her

14   testify that didn't happen.

15          Ms. Hatfield explained if something

16   like that had happened, she would have reported it.

17   If one of her cadets had made statements like that,

18   they would have been subject to immediate

19   termination.  They're just trainees.  They were

20   going to be trainees for about four and a half

21   months after this exercise.  Cadets are taught well

22   before they come to a facility you don't risk your

23   job to hide someone else's bad acts.  There would

24   have been no reason to do that.

25          Now, we've only heard from one inmate

who testified about what happened when Unit 4B came

over to the gym and was strip-searched, and that

was Millie Lee.  She explained that the tactical

team and the cadets came to her unit sometime after

she had lunch while on the job and that they were

handcuffed and taken to the gym.  She specifically

recalls while being handcuffed that there was a

female trainer explaining to the cadet how to apply

the handcuffs.  She didn't testify that anybody was

running around using profanity, that they were told

to line up two by two like animals.  She didn't say

that the handcuffs were applied too tightly.  She

said that they were taking care, instructing on how

to apply the handcuffs.

   So, you've got two units, and the

testimony is that at one, in Unit 2B, the design of

the plan is to harass and humiliate, but by the

time they get to 4B, there's no profanity, there's

no yelling and screaming, there's no calling them

animals.  It doesn't make sense that they would act

one way by design and then by the time they get to

Unit 4B they're following the steps that even Wendy

Still said is nationally accepted correctional

practices.

   Now, Millie Lee said that once they got

to the gym, she was strip-searched in the inmate

bathroom, but she doesn't mention any pads or

tampons being on the floor, or blood, urine, and

feces being everywhere.  Now, if that testimony was

true, if Unit 2B had really experienced the

circumstance, it would have still been like that by

the time 4B got there.  And you know that because

movement was frozen in the prison.  Inmates weren't

doing their jobs.  The inmate porter wasn't going

to come to the gym.  And it wouldn't make any sense

for correctional officers to purposefully have

inmates destroy a bathroom and then clean it up

real quick before Unit 4B was brought over there.

That doesn't make any sense.

Now, Millie Lee did testify that she

was strip-searched at the same time as Sheila

Crisp, one of the inmates that we've talked a lot

about throughout this trial, and that when Sheila

Crisp squatted and coughed, that's when the pills

wrapped in plastic fell out of her vagina and were

recovered by the correctional officers.  Millie Lee

didn't testify that the officers said anything

derogatory to Sheila Crisp when this happened.  She

was asked, "What happened?  What was the reaction

when this happened?"  Well, they got her out of

there.  "We finished our strip search.  We got
dressed.  We sat on the bleachers, waited for
everyone else to be searched."

The officers acted in a professional
manner in this case.

You heard from Alan Pasley.  He stayed
on Units 2B and 4B after the shakedown was complete
to wait for the women to come back on the wing.  He
wanted to be proactive.  He wanted to hear any
complaints that there were.  He said, you know,
regularly women will complain about broken property
or missing property or the state of their living
area after they come back from the strip search,
and he wanted to hear if there were any complaints
about the strip search and how it was conducted.
He didn't hide from this.  He didn't go on to the
next unit.  He was there to listen to the women.
And he explained to you he was able to observe the
women.  There wasn't blood or feces or urine on the
women's clothes that they had to set on the floor
in this bathroom, as the plaintiffs have claimed.
They came back on the units.  They complained about
the state of their property.  And he remembered
Sheila Crisp apologizing.  This was an inmate he
specifically remembered working with at Decatur.

1    They had tried to work together.  He had tried to

2    help her.  And she apologized for having hidden

3    contraband.

4                  As you saw and heard during the trial,

5    besides recovering contraband during the strip

6    search from Sheila Crisp and altered clothing from

7    another inmate during the strip searches, there was

8    contraband that was found on the unit.  And Alan

9    Pasley was able to explain to you why this material

10   is considered contraband in a prison.  It is true

11   that only minor contraband was recovered that day.

12   But, as Wendy Still testified to you, contraband

13   builds up.  It builds up quickly.  Control of

14   contraband is a basic tenet of a correctional

15   institution.  It's important to take contraband.

16   And even Wendy Still testified that you don't know

17   what contraband exists until you find it.

18                  This search was done in accordance with

19   the nationally accepted correctional standards that

20   Wendy Still testified about.  There were provisions

21   for menstruating women.  There was a partition so

22   men and other staff who weren't involved in the

23   searches couldn't see the women while they were

24   being searched.  Handcuffs were taken off as soon

25   as all of the women were in the gym.  Although

1   Chief Still said that the gold standard is to

2   search one-on-one with an inmate with no other

3   inmates in the room, she said that it was an

4   accepted practice to search four to six inmates at

5   the same time in a room when time constraints are

6   an issue.

7           Now, Chief Still also testified that a

8   written plan is necessary, even though that's not

9   actually a requirement of any law or regulation she

10   could point to.  She testified regarding the Prison

11   Rape Elimination Act, an act that Illinois is in

12   full compliance with.  And she said, "No, it's not

13   a written requirement, but you have to have a

14   written plan just in case something goes wrong."

15   Well, a written plan isn't going to stop something

16   from happening.  You can't plan for every

17   contingency.

18           And although Lincoln Correctional

19   Center didn't regularly have cadets in its facility

20   to conduct shakedowns, the female correctional

21   officers were not unfamiliar with strip-searching a

22   group of women at a time.  This was something that

23   they had done.  The plaintiffs said that, yes,

24   these -- these occurred, these strip searches

25   occurred.

1          The cadet training staff testified that

2   they go on two training exercises every cadet

3   class.  They are used to coming into a facility,

4   getting briefed on where they're going to do

5   searches, and conducting the strip searches.  Once

6   you know what location you're going to and where

7   the searches are going to be conducted, everything

8   else is already put in place.  The facility already

9   had the curtain available.  You don't need a

10  written plan when your training and practice has

11  already informed you how the search is to be

12  conducted.  You're just adding in more people to

13  help you get done with these searches more quickly.

14          As you saw during the trial, the

15  training of cadets is taken very seriously, and it

16  starts with professionalism.  They don't just leave

17  it to cadets to try and decide how they're going to

18  behave in a correctional institution.  The academy

19  specifically teaches how to behave in a

20  correctional setting, what kind of a demeanor to

21  have in order to get the response that you want and

22  to be able to accomplish the tasks that you need to

23  accomplish.  In addition, they teach them to

24  empathize with an offender without not -- without

25  socializing with them or sympathizing too much with

an offender.  There still has to be some distance
between a correctional officer and an inmate.

But professionalism doesn't just stop
with that one curriculum regarding professionalism.
It's woven into every single other thing that the
cadets are taught.  They're taught that a strip
searches are a fact of life at a correctional
setting and here's how you can follow the steps of
a strip search while respecting the dignity of the
person you're strip-searching and recover
contraband.

In addition to being trained regarding
strip searches, we've talked about how cadets were
trained to apply handcuffs, that when you apply the
handcuffs, it can injure a person being handcuffed
if those cuffs are either too loose or too tight.
Or if they're too loose, the person being
handcuffed can slip the cuffs and now it's a
weapon.  They're taught how to do the pinkie test.
And Renee Hatfield stood in front of you and did
demonstrate how the cuffs are applied, how you
check for fit, how you double-lock, and how the
cuffs are removed.

As we said -- as I said at the
beginning of this and as we said in the opening

1   statements, this comes down to who's telling the

2   truth.  As the instructions read by the Court

3   recognize, a person convicted of a felony may not

4   feel the same constraints to testify truthfully.

5   The Court has instructed you you can consider the

6   fact that a person has been convicted of a crime in

7   deciding whether or not that person's testimony was

8   truthful.

9            To prevail, the plaintiffs needed to

10  prove that these individuals intended for them to

11  be harassed and humiliated, for them to suffer

12  psychological pain during these strip searches,

13  that they didn't truly intend to find contraband to

14  conduct the strip search.  But if the intent was

15  truly to harass or to humiliate these women, then

16  why even bother taking them to the gym bathroom to

17  strip-search them?  If that's what you're going to

18  do, then just strip-search them in the middle of

19  the gym.  If the design of the plan was to

20  humiliate, why take them off to the side?

21           Patricia Phillips testified that when

22  she was strip-searched in the beauty shop, the door

23  was closed, nobody could see inside the window,

24  that nobody said any demeaning comments while she

25  was in the beauty shop.

1          Why are you willing to be careful to

2    follow the Illinois Department of Corrections rules

3    regarding strip searches in the beauty shop, but

4    just a basketball court away in the gym bathroom

5    you're going to violate every rule?  It doesn't

6    make any sense.  There's been no explanation

7    provided for that.

8          In addition, the plaintiffs had to

9    prove that the defendants had actual knowledge of

10   this alleged harassing and humiliating behavior

11   that was going on in the gym.

12          MS. THOMPSON:  Objection, Your Honor.

13   This misstates the law.

14          THE COURT:  Beg your pardon?

15          MS. THOMPSON:  This misstates the law.

16   There is a deliberate indifference standard, Your

17   Honor.

18          THE COURT:  All right.  You respond.

19          MS. BAUTISTA:  Your Honor, the

20   instructions say that there has to be actual

21   knowledge and, you know, the jury can read the

22   instructions, and the Court has instructed them.

23   This is argument.

24          THE COURT:  I think that's correct.

25   Overruled.  You may proceed.

1          MS. BAUTISTA:  The plaintiffs have to

2    prove that there was actual knowledge of the

3    defendants of what was happening in the gym, and

4    they haven't shown that in this case.  Plaintiffs'

5    counsel said herself, "If it's true that Alan

6    Pasley wasn't in the gym, then you shouldn't find

7    him liable."  And no one said that Alan Pasley was

8    in the gym, not the plaintiffs, not their

9    witnesses, not any of the defendants.

10          In opening statements, plaintiffs'

11    counsel told you that you were going to hear the

12    plaintiffs' story, and that's exactly what you've

13    heard.  It's a story.  It's not the truth of what

14    happened that day.

15          The inmates on Units 2B and 4B were

16    upset that their normal routine was changed.  They

17    were upset that their property was shaken down.

18    And, yes, they were upset that they were handcuffed

19    when taken from the dayroom to the gym.  But these

20    were all steps that were taken to ensure the safety

21    and security of the facility, not intending to

22    harass.

23          Where is the evidence that Russell

24    Reynolds designed this whole plan for the purpose

25    of humiliating these women?  There's no evidence of

that.

Where is the evidence that Melody
Hulett intended for the plaintiffs to be harassed
and humiliated to cause them psychological pain on
March 31st of 2011?

Where's the knowledge that these events
took place but they simply ignored what was
happening in front of their own eyes?  There's no
evidence of that.

The defendants didn't conduct the strip
search on March 31st, 2011, for the purpose of
harassing or humiliating the plaintiffs or any of
the other women from Units 2B or 4B.  As you heard,
the evidence has shown that the strip searches were
done in order to find contraband, in order to try
and maintain safety and security over the facility.
Russell Reynolds testified he had made previous
attempts in order to restore order in the facility
and those attempts were not successful.

I'm confident that once you consider
the facts before you that you will return a verdict
stating that the plaintiffs have failed to prove
their case, that these searches were not done with
the design or the intent to harass or humiliate,
that it was done for the purpose of safety and

1  security of the facility.

2          The judge is going to discuss the

3  verdict forms with you after plaintiffs' counsel is

4  able to speak to you again.  But I ask that you

5  mark the boxes X, the lines X, and find in favor of

6  the defendants, to find in favor of Melody Hulett

7  on all three claims against her, a failure to

8  intervene, a supervisory liability, and a claim

9  that she directly violated these plaintiffs' rights

10  and purposefully conducted these strip searches

11  intending to harass and humiliate.  I ask that you

12  find in favor of Russell Reynolds, Russell Craig,

13  Troy Dawdy, Alan Pasley, and Renee Hatfield on all

14  three of the claims against them as well.

15          Thank you.

16          THE COURT:  Thank you, Ms. Bautista.

17          And now, Ms. Thompson, you may close.

18          MS. THOMPSON:  Thank you, Your Honor.

19          And members of the jury, I've talked to

20  you a lot today.  I -- you know what I've said and

21  I don't want to just repeat things that I already

22  told you a minute ago before the defendants spoke,

23  but there's a couple of additional things I want to

24  talk to you about before the case is yours to

25  consider.

1          You need to read the jury instructions

2    very carefully because what the defendants just

3    told you about the law on deliberate indifference

4    isn't right.  Read the instruction on deliberate

5    indifference.  What the instruction on deliberate

6    indifference says is that a defendant actually knew

7    of a substantial risk that the strip search was

8    being conducted in a harassing manner intended to

9    humiliate and cause psychological pain.  So, all

10   the things I told you before are true.  Think about

11   who it is that knew of a substantial risk that that

12   is what was happening and decide that issue as you

13   conduct your deliberations.

14          I think, if I understand the

15   defendants' argument, that the defendants want to

16   tell you that, you know, evidence that this wasn't

17   punishment is that it could have been done even

18   worse, that they could have harassed the plaintiffs

19   even more.  If we wanted to humiliate them in the

20   open gym, we could have done that.  And you, of

21   course, know that's not the standard.  Is that even

22   an acceptable argument to be making in this court?

23   That's something for you to consider.

24          Safety and security are not magic words

25   that the defendants can throw around that replace

1    the Constitution.  Safety and security does not

2    explain the manner in which this was done.  And I

3    told you why that was the case.  Warden Hulett also

4    told you this wasn't true, that there were no

5    particular problems on Units 2B and 4B that she

6    knew about.  So, when you go back and consider this

7    case, you consider what actually happened.

8    Defendants can't just tell you, "We get to do

9    anything we want as long as it's for safety."  That

10   is not the constitutional standard.  You look at

11   the law and you decide what this evidence shows.

12            In closing, defendants are now saying,

13   "Well, these strip searches were done on a regular

14   basis."  The evidence shows that's not true.  The

15   evidence shows that there were more individualized

16   searches done, specifically for inmates that had

17   outside jobs, that had contact with outside people.

18   That's like the Sister Pat Program, people going

19   for visits.  That's totally different than what

20   happened here.  This is not that kind of a strip

21   search.  Those strip searches were done

22   voluntarily, and they were done in groups

23   voluntarily, as the plaintiffs told you about when

24   they testified.

25            It's not the case that whatever

1    defendants want to do they can do.  The question is

2    how specifically the searches are done.  And these

3    particular searches were done in a humiliating and

4    degrading way.

5              The idea from defendants that Orange

6    Crush came into these housing units saying, you

7    know, "Ladies, ladies, gather your items," you know

8    from all the testimony that that just isn't right.

9    And you know from the way that Orange Crush was

10   dressed, what Lieutenant Dawdy told you about

11   shocking people, what Leonetti told you about, you

12   know, we all raise our voices at the same time, and

13   he couldn't explain to you how that's any different

14   from yelling, you know what happened when Orange

15   Crush came in.  That's not why the plaintiffs would

16   be here in front of you.

17             And you know what Ms. Hegwood said

18   about the handcuffing.  It was only because Warden

19   Hulett saw what was going on that something changed

20   with her situation.  What Dawdy told her was, "Hey,

21   if you're lying, you're going to seg."  You know,

22   he only checked that because that's something that

23   Warden Hulett asked him to do.  So, that doesn't

24   indicate any particular care or compassion on the

25   part of Troy Dawdy or any of the other people that

1   were involved, other than Warden Hulett.

2           What the defendants are saying about

3   Sheila Crisp doesn't make any sense.  Consider that

4   evidence very carefully.  Because what did Troy

5   Dawdy tell you?  Troy Dawdy and others told you

6   that Ms. Crisp is pulled out of that room and she

7   goes to seg.  So, Alan Pasley got up and he's a

8   nice person and he gave you a story about Ms. Crisp

9   coming back.  She was pulled out of that room.  How

10  is she returning to her housing unit?  People told

11  you she went to seg.  That is not a story that is

12  worthy of belief, ladies and gentlemen.

13          You got some information about the

14  measurements and you can consider that evidence.

15  Think about how many people are in this bathroom

16  and how many people are in this beauty shop.

17  People are packed in there.  You've got all the

18  cadets; you've got all of the staff; you've got all

19  of these women.  You can do the math yourselves and

20  think about it.  These are very crowded areas.  And

21  defendants kind of want to have it both ways, but

22  think about the facts as you know them.

23          And about the covering, you know, I'm

24  not -- it wasn't my intention to suggest that all

25  of these women, you know, saw men searching them as

1    they looked out.  But what you know is there were

2    men in the gym and you know there was no covering,

3    and, you know, as Ms. Lee explained, that the

4    covering when it was eventually put on was very

5    ineffective.

6            If there's no problem with views in the

7    gym, then why are the women facing the other wall?

8    Why are things in the gym being done the way they

9    are?  It's because there is no covering on that gym

10   for most of the time and it's because as those

11   coverings, as the doors -- as those doors are being

12   opened and closed, people can see in.  That's what

13   these women told you and you know that what they're

14   telling you is true.  You know that this curtain

15   wasn't up until later when Warden Hulett came in.

16           These women did their best to describe

17   to you what happened to them in a traumatic

18   situation.  Their testimony about that was credible

19   and you can evaluate that.

20           And as one point of correction, what

21   Delores Henry said was that at the time that Warden

22   Hulett came in there was 20 percent of the women

23   left to be searched.  You heard her testimony.  You

24   can evaluate it.  But that's what she said.

25           Defense's argument again is trying to

pull into you things that you know that the line

officers told you they usually did, they would have

done, they typically did.  They were not telling

you what they actually did that day.  You heard the

testimony.

Think about Officer Krull.  She told

you how she typically handled the situation with

women having their periods.  Hatfield didn't tell

you how people were dealt with that day.  Courtney

Krull didn't tell you how people did it that day.

They told you that they know how it should have

been done, but they're not telling you what was

done on this day because what was done on this day

was different.  Nobody knows -- nobody was able to

tell you what actually happened, as I said, because

they don't want to or they can't tell you.

And even Officer Slater, you know,

there was some testimony -- or, there was some

discussion from the defense about that.  She was

telling you what she would have done.  You heard

her words.  And she told you there were a lot of

men in the gym.  Slater told you this was taking

too long.

And again ask yourself, if everything

the defense says is true, then why is nobody

willing to tell you who was supervising in the gym?
That is a simple question.  If this was really an
organized event, if it was really going on the way
the defense says, who was in charge?  Nobody wants
to tell you because nobody wants to be responsible.

Anderson, when you think about his
testimony, he didn't know what time 2B was done.
He didn't give the testimony that the defense told
you you heard and you know what he had to say about
that.

There was some discussion about what
Wendy Still said.  Wendy Still testified that a
mass strip search is not an accepted way to look
for nuisance contraband or to look for medication
or for training.  So, when you conduct your
deliberations, Wendy Still did not bless this type
of a search.  She told you something very, very
different.  And the reason why is because these
strip searches are traumatic.  They're very
traumatic for women in the situation that women in
prison find themselves.  And you know that from
what Wendy Still told you.

Alan Pasley told you in no uncertain
terms that misconduct happens and that's why they
train cadets about it.  So, again, the defendants'

1  test -- the defendants' argument to you that, you

2  know, everybody knows not to do that, the reason

3  why there's training is because it occurs.  And

4  this is one of the rare times, ladies and

5  gentlemen, where misconduct occurred.

6          You heard Millie Lee's testimony.  She

7  didn't tell you that there was no yelling when

8  Orange Crush came in.  She didn't say that this was

9  some different situation for her in 4B than in 2B.

10  You know from the evidence you heard that the women

11  in the two units were treated the same.

12          And you also know, as I told you, that

13  the shakedowns might have had something to do with

14  contraband.  The strip searches were something

15  entirely different.  And the way the strip searches

16  were conducted was something entirely different

17  too.

18          The two key pieces of testimony you

19  need to think about:  Warden Reynolds,

20  repercussions.  Patricia Phillips heard Warden

21  Hulett say, "Who authorized this?"  When you think

22  about those statements, you know exactly what

23  happened in this case, you know exactly what

24  happened in the gym.

25          The defendants just told you, "Well,

nobody would risk their jobs, you know, to not

report other people's misconduct."  Think about

Alan Pasley's testimony.  We know why people do the

things that they do.  We know why sometimes people

don't really reach expectations.  And the culture

of this facility, the culture of the people

involved in this case was evident when Warden

Reynolds told you -- and it's not what the

defendants said.  The defendants said that Warden

Reynolds told these higher-ups that he was having

problems with the inmates.  He admitted on

cross-examination that's not what he said.  What he

actually told you was -- I want to be right about

what he said.  And you heard it.  He said, "I would

not have aired the facility's laundry."  Those are

his words.  That's what he told you.  He didn't

tell them what his reason was because he didn't

want to air the facility's laundry.  He just said,

"I want cadets."  What is any different from

anybody here today?  These are people that don't

want to air the facility's laundry.  That's why

their story is so different from the plaintiffs'.

          The plaintiffs have told you as

honestly as they could what happened.  The

defendants' suggestion to you is, "Well, they have

criminal convictions, so, you know, that's the

reason, that's the reason people would lie.  People

with criminal convictions lie."  There's a jury

instruction on this issue -- the judge just read it

to you -- that you can consider that in deciding

whether they're truthful.

And it is a case that in part is about

credibility.  You heard one thing from these

plaintiffs.  You heard one thing from these

defendants.  You heard another thing from the line

officers.  You do get to decide who to believe.

That's your job.  That's a job that the plaintiffs

trust you to make.

But think about this in thinking about

who has a reason to lie.  Who is it that has a

reason to lie about what happened?  Do plaintiffs

have a reason to come before you and spend time on

this case just to make something up or do

defendants have a reason to lie because they don't

want to say what they really did that day to you?

That is something for you to consider.

It was Warden Reynolds who talked early

on in this case about repercussions and he talked

about the idea that he believed it was appropriate

for him to let these women know that he was

dissatisfied with some of the people in these
housing units by sending a message and by making
there be repercussions for their actions.  What he
did in doing that was wrong.  What the defendants
did in participating in that was wrong.  Wendy
Still told you that the purpose of prison is not
supposed to be to punish.

We're not in a prison here.  We're in
court.  You're the jury.  You have a different
charge in this case because you can find liability.
That can be repercussions.  You can send a message
by recognizing that liability and by finding that
liability and by showing these defendants that
there is a consequence for violating women's
constitutional rights.

We thank you for all of your time in
this case.  We thank you for your time spent
considering this evidence.  And on behalf of the
plaintiffs, we ask you once again to find these
defendants liable.  Thank you.

THE COURT:  Thank you, Ms. Thompson.

Now, ladies and gentlemen, upon
retiring to the jury room, you must select a
presiding juror.  The presiding juror will preside
over your deliberations and will be your

1    representative here in court.  A verdict form has

2    been prepared for you.

3                Now, you take this form to the jury

4    room, and when you have reached unanimous agreement

5    on the verdict, your presiding juror will fill in

6    and date the form, and all of you will sign it.

7                The verdict form reads as follows:

8                We, the jury, find with respect to the

9    claims of plaintiffs as follows:

10                And there appears Plaintiffs' Eighth

11   Amendment Direct Liability Claim and a column with

12   all of the plaintiffs' named, Melody Hulett,

13   Russell Reynolds, Alan Pasley, Renee Hatfield, Troy

14   Dawdy, Russell Craig.

15                MS. McNAUGHT:  Your Honor?

16                THE COURT:  Beg your pardon?

17                MS. McNAUGHT:  Those are the

18   defendants' names --

19                THE COURT:  Yes.

20                MS. McNAUGHT:  -- not the plaintiffs'

21   names.

22                THE COURT:  But they are appearing on

23   this verdict form to the left.  And then there's

24   two columns, one for the plaintiffs and one for the

25   defendants as to the claims against each of these.

1  Understood?  Okay.

2           Then you have the same responsibility

3  for the Eighth Amendment Supervisory Liability

4  Claim as to the same defendants, for plaintiffs,

5  for defendant.

6           And the third, on the second page, is

7  the Eighth Amendment Failure to Intervene Claim as

8  to the same named defendants and a line for

9  plaintiffs or for defendant.

10          On the date below, we, the jury

11  completed this entire verdict form and signed

12  below.

13          And there's a date -- a place for the

14  date and there is the signature of the presiding

15  juror number 1 and the rest of the eight jurors

16  following thereafter.  So, when you have reached

17  your verdicts as to all claims, the presiding juror

18  will date and sign, and then each individual juror

19  will also sign the verdict.

20          Now, where's the marshal?

21          Marshal, if you will stand, please, and

22  be sworn by Madam Clerk to attend this jury.

23                    (The marshal was duly

24                    sworn.)

25          THE COURT:  Fine.  Thank you.

1          Now, Marshal, if you will come forward,

2     please.

3          I'm handing the marshal the set of jury

4     instructions that have been all clamped together as

5     a body.  Don't separate them out individually but

6     they are to be considered as a whole, ladies and

7     gentlemen.  And also, the two-page form of verdict

8     that has been stapled together, and I will hand

9     that to the marshal.

10         Very well.  Now, your lunches should

11    either be delivered right at this time and be on

12    the desk -- on the table in the jury room, or they

13    will be very shortly delivered to you.

14         Now you've been instructed.  You've

15    heard the entire case.  Now it is your time to do

16    your duty, ladies and gentlemen.  We thank very

17    much.  And please follow the marshal.

18              (The jury retired to deliberate.)

19         THE COURT:  The record may show that

20    the jury has left the courtroom and have begun

21    their deliberation, and the time is 7 minutes after

22    1:00 p.m.

23         We'll stand in recess until we have

24    been advised that a verdict has been returned by

25    the jury.

1          Ladies and gentlemen, please let Madam

2    Clerk know where you can be contacted and give

3    cellphones and so forth in case we have any

4    questions or inquiries from the jury during their

5    deliberation.  All right?

6          MS. McNAUGHT:  Judge, do you want to

7    send the exhibits back to the jury?

8          THE COURT:  Yes, I do.  And those will

9    be all gathered together, and I want counsel to

10   cooperate in getting those together and making sure

11   that Madam Clerk has all of the exhibits to be sent

12   in as a body.  Okay?

13         Now, any other issues or questions or

14   problems that you can think of?

15         MS. THOMPSON:  No, Your Honor.

16         MS. McNAUGHT:  No, Your Honor.

17         THE COURT:  Very good.  Enjoy your

18   lunch, and we will await fate, as it were, and that

19   the jury is ready to return.  We'll stand in

20   recess.  Thank you, everyone.

21              (Court was then in recess.)

22

23

24

25

1  I, DOROTHY J. HART, CSR, RPR, Freelance Court

2  Reporter, certify that the foregoing is a correct

3  transcript from the record of proceedings in the

4  above-entitled matter.

5

6                          /s/ Dorothy J. Hart
                        _____
7                        CSR License No. 084-001390

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25